# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN COHEN, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:20-cv-01293-LJL-JLC |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | |
| LUCKIN COFFEE INC., JENNY ZHIYA QIAN, and REINOUT HENDRIK SCHAKEL, | |
| Defendants. | |

*Caption continued on next page.*

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF SJUNDE AP-FONDEN AND LOUISIANA SHERIFFS' PENSION & RELIEF FUND FOR APPOINTMENT AS LEAD PLAINTIFF, APPROVAL OF SELECTION OF LEAD COUNSEL, AND CONSOLIDATION OF <u>RELATED ACTIONS, AND IN OPPOSITION TO COMPETING MOVANTS</u>**

| | |
|---|---|
| WAI CHUN SHEK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LUCKIN COFFEE INC., JENNY ZHIYA QIAN, CHARLES ZHENGYAO LU, REINOUT HENDRIK SCHAKEL, JINYI GUO, JIAN LIU, HUI LI, ERHAI LIU, CREDIT SUISSE SECURITIES (USA) LLC, MORGAN STANLEY & CO. LLC, CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, KEYBANC CAPITAL MARKETS INC., AND NEEDHAM & COMPANY, LLC,<br><br>Defendants. | Case No. 1:20-cv-02977-LJL-SDA<br><br>CLASS ACTION |
| CHRISTOPHE STERCKX, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LUCKIN COFFEE INC., JENNY ZHIYA QIAN, REINOUT HENDRIK SCHAKEL, CHARLES ZHENGYAO LU, JIAN LIU, JINYI GUO, HUI LI, ERHAI LIU, CREDIT SUISSE SECURITIES (USA) LLC, MORGAN STANLEY & CO. LLC, CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, KEYBANC CAPITAL MARKETS INC., and NEEDHAM & COMPANY, LLC,<br><br>Defendants. | Case No. 1:20-cv-03304-LJL-JLC<br><br>CLASS ACTION |

## **TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................ 1

II.    ARGUMENT ...................................................................................................... 6

    A.     THE CHESI GROUP AND THE LUCKIN INVESTOR GROUP ARE
        NOT THE "MOST ADEQUATE PLAINTIFF" UNDER THE PSLRA ............... 6

        1.     The Chesi Group Is Inadequate ................................................................ 7

            a.     Mr. Tiah's Criminal Conduct and Lack of Candor
               Precludes the Chesi Group's Appointment ..................................... 7

            b.     Chesi Assets Is a Shell that Has Ceded Control to a Third
               Party .............................................................................................. 11

            c.     The Chesi Group's False and Untimely Filings Evidence
               Its Inadequacy ............................................................................... 13

        2.     The Luckin Investor Group Is an Improper Group that Includes
            Investors Connected to Financial Crimes ................................................ 15

            a.     The Luckin Investor Group Is Controlled By Its Lawyers ........... 16

            b.     Luckin Investor Group's Connection to Financial Crimes
               Renders It an Inadequate Lead Plaintiff. ...................................... 20

    B.     AP7 AND LOUISIANA SHERIFFS SATISFY THE PSLRA'S
        REQUIREMENTS FOR APPOINTMENT AS LEAD PLAINTIFF .................. 22

    C.     THE REMAINING MOTIONS SHOULD BE DENIED .................................... 25

III.   CONCLUSION .................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Bank of Am. Corp. Sec., Derivative & Emp't Ret. Sec. Act (ERISA) Litig.*,
258 F.R.D. 260 (S.D.N.Y. 2009) ........................................................................ 24-25

*Batter v. Hecla Mining Co.*,
2020 WL 1444934 (S.D.N.Y. Mar. 25, 2020) ............................................... *passim*

*Bhojwani v. Pistiolis*,
2007 WL 9228588 (S.D.N.Y. July 30, 2007) ......................................................15

*In re The Boeing Co. Aircraft Sec. Litig.*,
2019 WL 6052399 (N.D. Ill. Nov. 15, 2019) ......................................... 2-3, 10, 21

*In re The Boeing Co. Aircraft Sec. Litig.*,
2020 WL 476658 (N.D. Ill. Jan. 28, 2020) ..........................................................10

*Camp v. Qualcomm Inc.*,
2019 WL 277360 (S.D. Cal. Jan. 22, 2019).............................................15, 18, 25

*Carson v. Clarent Corp.*,
2001 WL 1782712 (N.D. Cal. Dec. 14, 2001) ......................................................13

*In re Cavanaugh*,
306 F.3d 726 (9th Cir. 2002) ...............................................................................25

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001)........................................................................5, 7, 17

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
2020 WL 248729 (S.D.N.Y. Jan. 15, 2020) ........................................................10

*Faris v. Longtop Fin. Techs. Ltd.*,
2011 WL 4597553 (S.D.N.Y. Oct. 4, 2011) .................................................. *passim*

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)................................................................................9, 21

*Garbowski v. Tokai Pharm., Inc.*
302 F. Supp. 3d 441 (D. Mass. 2018) ......................................................... 18, 18-19

*Glauser v. EVCI Career Colls. Holding Corp.*,
236 F.R.D. 184 (S.D.N.Y. 2006) .........................................................................19

*Gross v. AT&T Inc.*,
   2019 WL 7759222 (S.D.N.Y. June 24, 2019) ....................................................12

*Hartsell v. Source Media*,
   2003 WL 21245989 (N.D. Tex. Mar. 31, 2003) ..................................................8

*Hedick v. Kraft Heinz Co.*,
   2019 WL 4958238 (N.D. Ill. Oct. 8, 2019).........................................................19

*Mustafin v. GreenSky, Inc.*,
   2019 WL 1428594 (S.D.N.Y. Mar. 29, 2019) ................................................24-25

*In re NYSE Specialists Sec. Litig.*,
   240 F.R.D. 128 (S.D.N.Y. 2007) .........................................................................4

*Plaut v. Goldman Sachs Grp., Inc.*,
   2019 WL 4512774 (S.D.N.Y. Sept. 19, 2019)................................3, 14-15, 15, 19

*Porzio v. Overseas Shipholding Grp.*,
   2013 WL 407678 (S.D.N.Y. Feb. 1, 2013)..................................................... 19-20

*In re Regions Morgan Keegan Open-End Mut. Fund Litig.*,
   2009 WL 10665043 (W.D. Tenn. Sept. 30, 2009).............................................13

*Savino v. Comput. Credit, Inc.*,
   164 F.3d 81 (2d Cir. 1998)...................................................................................8

*Schaffer v. Horizon Pharma Plc*,
   2016 WL 3566238 (S.D.N.Y. June 27, 2016) .................................................6-7

*Skwortz v. Crayfish Co.*,
   2001 WL 1160745 (S.D.N.Y. Sept. 28, 2001)............................................3, 13-14

*Smajlaj v. Brocade Commc'ns Sys. Inc.*,
   2006 WL 7348107 (N.D. Cal. Jan. 12, 2006) ...................................................12

*In re Tarragon Corp. Sec. Litig.*,
   2007 WL 4302732 (S.D.N.Y. Dec. 6, 2007) .....................................................15

*In re Telxon Corp. Sec. Litig.*,
   67 F. Supp. 2d 803 (N.D. Ohio 1999)...............................................................13

*Tomaszewski v. Trevena, Inc.*,
   383 F. Supp. 3d 409 (E.D. Pa. 2019) ...............................................................15

*Tsirekidze v. Syntax-Brillian Corp.*,
   2008 WL 942273 (D. Ariz. Apr. 7, 2008) ................................................17, 19, 20

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
    589 F. Supp. 2d 388 (S.D.N.Y. 2008) ................................................................. 5, 15, 15-16

*Xianglin Shi v. SINA Corp.*,
    2005 WL 1561438 (S.D.N.Y. July 1, 2005) ......................................................... 2, 8

*Zemel Family Tr. v. Philips Int'l Realty Corp.*,
    205 F.R.D. 434 (S.D.N.Y. 2002) ......................................................................... 11

**Statutes**

15 U.S.C. § 78u-4(a) ............................................................................................. *passim*

15 U.S.C. § 78u-4(e) ............................................................................................. 22

**Other Authorities**

Local Civil Rule 7.1 .............................................................................................. 3, 14

U.S. Dist. Court for the S. Dist. of N.Y. Elec. Case Filing Rules & Instructions 23.6 ................ 14

Sjunde AP-Fonden ("AP7") and Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") respectfully submit this response in further support of their motion for appointment as Lead Plaintiff [ECF No. 61] and in opposition to the five remaining, competing motions.[1]

## I.    INTRODUCTION

In order to be appointed as Lead Plaintiff, the Private Securities Litigation Reform Act of 1995 (the "PSLRA") requires a movant to: (1) timely file a motion; (2) assert the largest financial interest among the movants before the court; and (3) make a preliminary showing of adequacy and typicality under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23").  15 U.S.C. § 78u-4(a)(3)(B)(iii).  Only AP7 and Louisiana Sheriffs satisfy all of these elements.

AP7 and Louisiana Sheriffs's collective losses of $6.9 million in connection with their Class Period transactions in Luckin Coffee Inc. ("Luckin") American Depositary Shares are the largest of any qualified movant.  AP7's losses of $5.4 million are, on their own, larger than those of any eligible movant.  Moreover, AP7 and Louisiana Sheriffs's adequacy and typicality cannot be disputed.  Both are sophisticated, public institutions that collectively manage approximately $64 billion in assets, have long histories of successfully serving as lead plaintiff in complex securities class actions, and have recovered billions of dollars for investors.  *See* ECF No. 67-7.

Two groups of investors—the "Chesi Group"[2] and the "Luckin Investor Group"[3]—claim larger losses but are beset by numerous fatal deficiencies, including connections to serious criminal

---

[1] Unless otherwise indicated, all references to "ECF No. __" are to docket entries in *Cohen v. Luckin Coffee Inc., et al.*, No. 1:20-cv-01293-LJL-JLC (S.D.N.Y.), and all internal citations and quotation marks are omitted.  In addition to AP7 and Louisiana Sheriffs, seventeen other movants filed motions seeking appointment as lead plaintiff and approval of counsel.  To date, twelve have withdrawn their motions or have conceded that they cannot meet the criteria for appointment.  *See* ECF Nos. 74, 77-78, 84, 86-92, 94.  Thus, five competing motions remain.  *See* ECF Nos. 10, 51, 58, 64, & 69.

[2] The Chesi Group is comprised of Chesi Assets Limited ("Chesi Assets") and Interactive Digital Finance Limited ("Interactive Digital").

[3] The Luckin Investor Group is comprised of John Hickey, Regent Mercantile Holdings Limited ("Regent"), James Sproul, Li Tutang, and Khaled Abdullah Almdamegh.  Two additional investors, Alessandro Sproul and Elvio DelZatto, purportedly assigned their claims to James Sproul.  *See* ECF No. 66 at 1 n.1.

conduct and the inability to satisfy Rule 23's most basic requirements.  Appointing either the Chesi Group or the Luckin Investor Group guarantees this litigation will be, at best, sidetracked by unique issues plaguing these movants or, at worst, denied class certification for inadequate leadership.  Investors should not be subject to these serious risks.

The Chesi Group is inadequate for a host of reasons.  Tiah Thee Kian, who signed Interactive Digital's PSLRA certification, ***admitted*** to making fraudulent reports to the Kuala Lumpur Stock Exchange in connection with one of the most notable cases of financial fraud in Malaysian history.  Mr. Tiah pled guilty to violating Malaysian securities laws and was fined nearly $800,000, forced to resign as Chief Executive Officer ("CEO") of TA Enterprise Berhad ("TA Enterprise," one of Malaysia's largest brokerage firms), and received a five-year ban from serving as a director of any Malaysian public company (from 2002 to 2007).  *See infra* Section II.A.1.a.  Mr. Tiah's criminal conduct, regardless of when it occurred, and particularly because it involves misrepresentations in connection with securities transactions, completely bars him and the entities he controls from serving as lead plaintiff.  *See, e.g.*, *Xianglin Shi v. SINA Corp.*, 2005 WL 1561438, at *4 (S.D.N.Y. July 1, 2005) (Buchwald, J.) (rejecting movant who, ten years prior to filing lead plaintiff motion, "pled guilty . . . to providing false information").  Because honesty and trustworthiness are paramount in assessing adequacy, "numerous courts have rejected the appointment of convicted felons as class representatives."  *Id.*  Mr. Tiah warrants no exception.

The Chesi Group concealed Mr. Tiah's criminal background from the Court, asserting only in conclusory fashion that it "meets the . . . adequacy requirements of Rule 23."  ECF No. 70 at 2. Remarkably, a week after the Chesi Group's initial filing, Mr. Tiah submitted a sworn declaration touting his professional background but omitting any mention of his involvement in the securities fraud scandal or his guilty plea.  *See* ECF No. 76-4 ¶¶ 2, 3.  The Chesi Group's lack of candor and

selective disclosures provide an independent basis for its disqualification. *See In re The Boeing Co. Aircraft Sec. Litig.*, 2019 WL 6052399, at *6 (N.D. Ill. Nov. 15, 2019) (explaining that doubts about movant's "fealty to the duty of candor" cut against the movant's adequacy).

Apart from the Chesi Group's connection to an admitted criminal, its conduct in this litigation further undermines its motion. ***First***, the Chesi Group failed the basic requirement of filing its required PSLRA certifications and supporting memorandum of law by the April 13, 2020 statutory deadline. *See* ECF Nos. 70 & 71-1 (filed April 14, 2020). This is fatal. The PSLRA's sixty-day deadline "is mandatory" and "an untimely motion has the effect of preventing the proposed Group from satisfying the [PSLRA's] first requirement." *Skwortz v. Crayfish Co.*, 2001 WL 1160745, at *5 (S.D.N.Y. Sept. 28, 2001) (Batts, J.). Moreover, filing a motion, without supporting materials, on the deadline does not salvage its application. Local Civil Rule 7.1 requires motions to be supported by a memorandum of law and exhibits "necessary for the decision of the motion." The Court cannot assess the Chesi Group based solely on its motion.

***Second***, the Chesi Group has demonstrated extreme carelessness and has admitted that its sworn (and untimely) certifications were false. Eight days after the statutory deadline, the Chesi Group filed "corrected" certifications, revealing that its original filings overstated Chesi Assets's losses by nearly ***300%*** (or $18 million). *See* ECF No. 76-2. Errors of this magnitude, alone, are sufficient to deny appointment. *See Plaut v. Goldman Sachs Grp., Inc.*, 2019 WL 4512774, at *5 (S.D.N.Y. Sept. 19, 2019) (Broderick, J.) (rejecting movant correcting financial interest).[4]

***Third***, there are serious questions about who is actually directing the Chesi Group. While we know that Interactive Digital is controlled by Mr. Tiah, the Chesi Group initially provided no

---

[4] Mistakes in the Chesi Group's original submissions are blatant. While the Chesi Group's brief claimed the group lost $24 million, the "loss charts" submitted in support reflect a loss of $37.3 million. *Compare* ECF No. 70 at 2 *with* ECF No. 71-2. Both of these numbers were incorrect and predicated on inaccurate transactions. *See* ECF No. 76-3.

information about Chesi Assets, and only belatedly identified it as an "investment vehicle" based in the British Virgin Islands.  ECF No. 76-1 ¶ 2.  Its owners, investors, and beneficiaries remain undisclosed.  Chesi Assets's certifications and its declaration were executed by four employees of another entity, Intertrust Group ("Intertrust"), on behalf of a third enterprise, INB Holdings Ltd. ("INB").  *See* ECF Nos. 71-1, 76-1, & 76-2.  INB signed Chesi Assets's PSLRA certification as its "sole director."  ECF No. 71-1.  Intertrust—which first appears when the Chesi Group filed its "corrected" certifications—is described as an "administrator" that "operate[s] the day-to-day activities of Chesi Assets" and will be directing this litigation, but has not moved for appointment as lead plaintiff.  ECF No. 76-1 ¶ 2; *see also* ECF No. 76-4 ¶ 6 (Mr. Tiah representing that he will be directing this litigation with Intertrust's employees).  Intertrust's involvement raises a number of issues.  As described in several reports, one of Intertrust's key roles is to create "phoney compan[ies] with phoney directors" to help its clients avoid taxes.  Ex. A.[5]  It is possible that INB is one of Intertrust's "phoney directors."  Moreover, Intertrust—which is the largest so-called "trust manager" listed on the Euronext Amsterdam stock exchange—has caught the eye of Dutch regulators, which in recent years have enacted regulations to "limit the use of shell companies as a way to transfer money to tax havens."  Ex. B.[6]  If the Chesi Group's motion is granted, this case will be led by Mr. Tiah, who concealed his criminal history, and employees of Intertrust, which has no financial interest in this litigation, answers to unknown masters, and is known to create "phoney" companies run by "phoney" directors.  This is not the type of leadership contemplated under the PSLRA.  *See In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 134 (S.D.N.Y. 2007) (Sweet, J.) ("purpose of the PSLRA [is] to ensure . . . active participation").

---

[5] References to "Ex. __" refer to exhibits to the Declaration of Gerald H. Silk filed herewith.

[6] INB, the signatory for Chesi Assets, has appeared in leaked documents published by The International Consortium of Investigative Journalists, which published the Panama Papers, the documents leaked from an offshore law firm that exposed how wealthy politicians and others exploit secretive offshore tax regimes.  *See* Ex. C.

The only other movant claiming a greater financial interest than AP7 and Louisiana Sheriffs is the Luckin Investor Group—an ungainly grouping of seven investors, cobbled together from Georgia, Canada, Bermuda, Saudi Arabia, and China, by four law firms without any demonstrated ability to actually direct this litigation. The group's very structure reflects the strong hand its four law firms had in its creation. The Luckin Investor Group, which was subject to change up until the PSLRA deadline, bases its purported financial interest on the investments of six individuals and one investment fund (managed by a seventh individual). However, because there is clear case law restricting a lead plaintiff group to no more than five members, two of these seven individuals "assigned" their claims to one group member.[7] The assignment converted a group of seven into a group of five, and allowed the lawyers to claim compliance. This is exactly the type of absentee group rejected by the PSLRA. *See Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 392 (S.D.N.Y. 2008) (Marrero, J.) (requiring "evidence" of group's ability to function apart from counsel).

Even if it were appropriate for these seven unrelated investors to aggregate their losses, the Luckin Investor Group suffers from other disqualifying issues. For example, Ian Burns, who signed the PSLRA certification for Regent, is closely tied to a major corruption scandal that involved arms dealing and money laundering through a U.K. division of Investec, a South African merchant bank. *See infra* Section II.A.2.b. Mr. Burns, formerly the Group Managing Director and Director of the Guernsey, U.K. subsidiary of Investec, introduced his "long-standing client" Lightweight Body Armor ("LBA") to Investec, and appears to have supervised LBA's accounts. Critically, LBA reportedly entered into contracts for over $700 million of illicit arms deals,

---

[7] *See In re Cendant Corp. Litig.*, 264 F.3d 201, 267 (3d Cir. 2001) ("agree[ing] with the Securities and Exchange Commission that courts should generally presume that groups with more than five members are too large to work effectively").

including mortar rounds and grenades, triggering investigations by the U.K.'s Serious Fraud Office and Kenya's Anti-Corruption Commission.  Mr. Burns was terminated by Investec for his role in the scandal.

Like Mr. Tiah's criminal conduct, Mr. Burns's role in the corruption scandal precludes Regent's appointment as lead plaintiff.  And, as with the Chesi Group, the Luckin Investor Group told the Court nothing about Mr. Burns's questionable background.  *See* ECF No. 66-5.  That the other members of the Luckin Investor Group believe Regent to be an adequate lead plaintiff further undermines the appointment of the entire group.  *See Faris v. Longtop Fin. Techs. Ltd.*, 2011 WL 4597553, at *8 (S.D.N.Y. Oct. 4, 2011) (Scheindlin, J.) ("the willingness of the other members of the [group] to seek lead plaintiff appointment with [a group member alleged to be involved in a Ponzi scheme] raises questions about the adequacy of the entire group").  In any event, eliminating Regent from the Luckin Investor Group gives AP7 and Louisiana Sheriffs a larger financial interest than the remaining members of the Luckin Investor Group.

With the Chesi Group and the Luckin Investor Group disqualified, AP7 and Louisiana Sheriffs assert the largest financial interest, and no movant has provided "proof" that AP7 and Louisiana Sheriffs are inadequate to represent the class.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Accordingly, AP7 and Louisiana Sheriffs respectfully request that the Court grant their motion.

## II.    ARGUMENT

### A.    THE CHESI GROUP AND THE LUCKIN INVESTOR GROUP ARE NOT THE "MOST ADEQUATE PLAINTIFF" UNDER THE PSLRA

Irrespective of their claimed losses, the Chesi Group and the Luckin Investor Group have failed to comply with the PSLRA's requirements and cannot make a *prima facie* showing of their typicality and adequacy.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  Moreover, courts throughout the country, including in this District, have held that the "potential" risk that a movant's unique issues

are likely to become a major focus of the litigation is enough to deny their appointment. *See Batter v. Hecla Mining Co.*, 2020 WL 1444934, at *7 (S.D.N.Y. Mar. 25, 2020) (Carter, J.) ("Where there is at least a ***potential*** that the presumptively most adequate lead plaintiff will be subject to unique defenses . . . disqualification is appropriate.") (emphasis added); *Schaffer v. Horizon Pharma Plc*, 2016 WL 3566238, at *3 (S.D.N.Y. June 27, 2016) (Furman, J.) ("[M]any courts have rejected appointments of lead plaintiffs based on ***potential risks***.") (emphasis added).

1.    **The Chesi Group Is Inadequate**

      a.    **Mr. Tiah's Criminal Conduct and Lack of Candor Precludes the Chesi Group's Appointment**

The Chesi Group cannot make the required "*prima facie* showing of typicality and adequacy." *Cendant*, 264 F.3d at 263; *see also* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc). Malaysia's Securities Commission previously charged Mr. Tiah with violating the country's securities laws by issuing false statements to the Kuala Lumpur Stock Exchange in connection with a scheme by notorious fugitive businessman Soh Chee Wen to defraud Omega Holdings Berhad ("Omega") (a midsize stockbrokerage firm in Malaysia). *See* Exs. D-H. As detailed by Malaysia's Securities Commission, Mr. Tiah "furnished false statements to the [Kuala Lumpur Stock Exchange] in respect of his off-market dealings in shares of Omega Holdings Bhd."—falsely claiming "[t]hat TA Securities transacted 28,036,000 Omega shares at RM11.50 per share when in fact it was done at RM6.45 per share" and "[t]hat TA Securities transacted 7,010,000 Omega-A shares at RM9.80 per share when in fact it was done at RM6.45 per share." Exs. D-E. Mr. Tiah's violations of securities laws and participation in the multimillion-dollar scheme—which led to the collapse of Omega in one of the highest profile cases of securities fraud in Malaysian history—are not debatable. Mr. Tiah pled guilty to the charges, was fined approximately $783,000, forced to step down as CEO of TA Enterprise, and was prohibited from serving as a director for Malaysian public

7

companies for five years.  *See* Exs. E, G-H.[8]  In addition to his admitted violation of Malaysian securities laws, Mr. Tiah is an advocate for less than "clinically clean" securities markets and has warned Malaysia's Securities Commission to "be very careful not to kill the goose that lays the golden egg" by engaging in robust market enforcement of wrongdoing.  Ex. J.  Mr. Tiah's checkered background renders him completely unfit to act as a lead plaintiff.[9]

The Second Circuit has long held that "honesty and trustworthiness" are relevant factors in assessing the adequacy of class representatives.  *See Savino v. Comput. Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998).  As such, courts in the Second Circuit—and across the country—have consistently held that investors should not be saddled with lead plaintiffs and class representatives whose history of misconduct—like that of Mr. Tiah—demonstrates that they would be unsuited to serve as fiduciaries for the class.  Mr. Tiah's misconduct goes to the core of this litigation—he is an admitted violator of securities laws who, despite his own past misconduct and statements advocating for limited market enforcement, now seeks to lead a securities fraud class action.  *See, e.g.*, *SINA*, 2005 WL 1561438, at *4 (rejecting movant "who pled guilty [ten years prior] to providing false information to a financial institution"); *Longtop*, 2011 WL 4597553, at *8 ("Whether or not the [complaint's] claims [involving participation in a Ponzi scheme] are eventually proven to be true is irrelevant"); *Hartsell v. Source Media*, 2003 WL 21245989, at *6 (N.D. Tex. Mar. 31, 2003) ("recognition of that fiduciary duty to the class as a whole should compel recognition of a serious potential problem for the class, when a class representative, whose

---

[8] For his part, Mr. Soh pled guilty to charges of abetting Mr. Tiah in submitting the false reports and was fined approximately $1.6 million.  *See* Ex. I.

[9] In addition to his admission that he violated securities laws, Mr. Tiah is also implicated in a more recent FBI investigation reportedly focused on whether lucrative licensing deals financed by Mr. Tiah's companies were designed to improperly influence the U.S. government.  *See* Ex. K.

duties obviously require acting on behalf of absent persons, is convicted of a felony involving fraud").

The Honorable Andrew L. Carter, Jr.'s recent opinion in *Hecla* is directly on point.  There, Judge Carter rejected a movant accused of violating securities rules and regulations in connection with a discretionary brokerage account nearly ***forty years*** ago.  *See Hecla*, 2020 WL 1444934, at *5 (discussing conduct "in the early 1980s").  The fact that the accused movant—unlike Mr. Tiah—never fully admitted to the wrongdoing was irrelevant.  As explained by the court:

> [T]he proof needed to rebut the presumption need not establish a plaintiff's inadequacy with absolute certainty; instead it is enough that it presents a colorable risk of inadequacy. . . .  Where there is at least a potential that the presumptively most adequate lead plaintiff will be subject to unique defenses and will not fairly and adequately protect the interests of the class disqualification is appropriate.

*Id.* at *7; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) (noting adequacy is not met if the class representative is "subject to any 'unique defenses which threaten to become the focus of the litigation'").  Here, Mr. Tiah's "past misconduct creates the potential for him to be subject to unique defenses that could jeopardize the certification of a class in this matter."  *Hecla*, 2020 WL 1444934, at *7.  Mr. Tiah's ***admitted*** violations of the securities laws, also suggest that he "lacks the honesty, conscientiousness, and other affirmative personal qualities required of a class representative who, [a]s a fiduciary for the class must adhere to the highest standards of honesty and integrity."  *Id.* (alteration in original).  Any argument that Mr. Tiah's current position as the chairman of TA Enterprise or the passage of time immunizes his motion would miss the mark.  *Hecla* clearly rejects attempts to minimize prior dishonest conduct and correctly notes that decades old transgressions, ***even if not admitted***, are disqualifying.  *See id.* at *7 ("Although [movant] is correct that he did not admit to the illegal conduct through this Stipulation, his consent still renders him susceptible to defenses that are not applicable to other

class members."). Mr. Tiah's illicit conduct is much more recent and, given his guilty plea, is significantly more incriminating than the movant rejected by *Hecla*. Case law precludes gambling with the class's claims based on whatever narrative Mr. Tiah will offer on reply. *See id.*

The "honesty and integrity" of the entire Chesi Group is further impugned by its concealment of Mr. Tiah's criminal conduct from the Court while touting his "vast business experience" over his "entire career" as evidence of his adequacy. ECF No. 76-4 ¶¶ 2-3; *cf. Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 2020 WL 248729, at *10 (S.D.N.Y. Jan. 15, 2020) (Caproni, J.) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth"). The Chesi Group asserted in its brief that it satisfied Rule 23's adequacy requirement, and Mr. Tiah (belatedly) submitted a declaration that purports to outline his background and experience for purposes of establishing his adequacy. *See* ECF No. 76-4. That neither document informs the Court of Mr. Tiah's guilty plea for violating securities laws can only be seen as an intentional effort to mislead this Court. *See Boeing*, 2019 WL 6052399, at *6 (rejecting movant where court had doubts about movant's "fealty to the duty of candor"); *In re The Boeing Co. Aircraft Sec. Litig.*, 2020 WL 476658, at *5 (N.D. Ill. Jan. 28, 2020) (denying motion for reconsideration and explaining that "in trying to provide as little information to the Court and other class members as possible, the [movant] ha[s] made a *prima facie* showing that they will ***not*** be adequate representatives of the class). Even if Mr. Tiah's misconduct did not directly impugn the adequacy of Chesi Assets, Chesi Assets's willingness to knowingly seek appointment with a notorious violator of the securities laws undermines its own adequacy. *See Longtop*, 2011 WL 4597553, at *8 ("the willingness of the other members of the [group] to seek lead plaintiff appointment with [a group member alleged to be involved in a Ponzi scheme] raises questions about the adequacy of the entire group").

10

The misconduct surrounding the Chesi Group would have serious consequences for the class, including forcing the class to expend resources litigating unique ancillary issues and the high likelihood of class certification being denied. *See Zemel Family Tr. v. Philips Int'l Realty Corp.*, 205 F.R.D. 434, 437 (S.D.N.Y. 2002) (Cedarbaum, J.) (denying class certification because the proposed class representative's "status in entities engaged in mini-tender offers that have been the subject of SEC sanctions shows that he does not meet the standards of a fiduciary"). There is "no reason to subject the class to th[e] potential defense" stemming from the Chesi Group's appointment. *Longtop*, 2011 WL 4597553, at *8; *see also Hecla*, 2020 WL 1444934, at *7.

**b.      Chesi Assets Is a Shell that Has Ceded Control to a Third Party**

Chesi Assets has little public presence other than being listed as one of TA Enterprise's largest shareholders in its annual reports. *See* Ex. L. The supplemental declaration filed on behalf of Chesi Assets (eight days after the PSLRA's deadline), *see* ECF No. 76-1, raises more questions than answers. That declaration is signed by two employees of Intertrust, who are different from the two signing Chesi Assets's initial (false) and corrected certifications. *See* ECF Nos. 71-1, 76-1, & 76-2. The declaration describes Intertrust as the "corporate administrator" of Chesi Assets, and states that Intertrust employees "operate the day-to-day activities" of Chesi Assets. ECF No. 76-1 ¶ 2. The only information disclosed about Chesi Assets's structure is that it is a "private investment vehicle" incorporated in the British Virgin Islands. *Id.* There is no indication of who owns Chesi Assets, whose money it invests, or who makes its investment decisions. Indeed, Chesi Assets's sole director, INB (which signed Chesi Assets's certifications), is simply an Intertrust affiliate that serves as the director for various Intertrust clients, including Chesi Assets. *Id.* These omissions are critical because, as the declaration makes clear, Intertrust employees will carry out the duties of the lead plaintiff if the Chesi Group is appointed, yet Intertrust has no financial interest

in the litigation.  *See id*. ¶ 7 ("[Intertrust employees] . . . will carry out Chesi Assets' obligations and duties if it is appointed"); ECF No. 76-4 ¶ 6 (Mr. Tiah reiterating that Interactive Digital "will be working with" Intertrust employees to oversee the litigation).  Here, the record is devoid of any legal documentation supporting Intertrust's authority, let alone any explanation for how Chesi Assets can adequately represent the class when it has abdicated oversight of the litigation to Intertrust (via INB).  Concerns about Intertrust's involvement are not trivial given Intertrust's history of creating shell companies to evade taxes and populating them with "phoney" directors. *See* Ex. A.  The Chesi Group is a convoluted movant with several unknown interests:



The class should not be led by a movant with such an opaque background.  *See Gross v. AT&T Inc.*, 2019 WL 7759222, at *1-2 (S.D.N.Y. June 24, 2019) (Caproni, J.) (rejecting movant "alleged to be an opaque . . . shell company" because it "failed to provide any information, beyond the name of a director, as to its business, management, structure, or its experience with securities litigation"); *Smajlaj v. Brocade Commc'ns Sys. Inc.*, 2006 WL 7348107, at *3 (N.D. Cal. Jan. 12, 2006) (rejecting movant where there were "too many questions surrounding [its] standing, authority, transparency, and structure that may give rise to unique defenses and are atypical of the class").

**c.      The Chesi Group's False and Untimely Filings Evidence Its Inadequacy**

The Chesi Group filed untimely certifications after the statutory lead plaintiff deadline and subsequently admitted that those certifications were materially false.  The failure to comply with the PSLRA's filing requirements leaves the Chesi Group with no recognizable financial interest.

The PSLRA expressly provides that "not later than 60 days after the date on which the notice [announcing the litigation] is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class."  15 U.S.C. § 78u-4(a)(3)(A)(i)(II).  Here, all movants—including the Chesi Group—agree "that applications for Lead Plaintiff must be made no later than . . . April 13, 2020."  ECF No. 70 at 6.  Nevertheless, the Chesi Group did not file its supporting brief [ECF No. 70] and certifications [ECF No. 71-1] until April 14, 2020.  *See id.* at 2 n.1 (the Chesi Group describing certifications as "PSLRA-required").  The Chesi Group's filing failures are disqualifying.  *See, e.g.*, *In re Regions Morgan Keegan Open-End Mut. Fund Litig.*, 2009 WL 10665043, at *4 (W.D. Tenn. Sept. 30, 2009) (rejecting class member that did not timely file a certification substantiating its losses because "[c]ourts may only examine the losses certified by the parties as of the close of the sixty-day period" and "the language of the statue is plain: the sixty-day deadline is mandatory"); *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999) (explaining that "[t]he PSLRA is unequivocal and allows for no exceptions" and that "[t]he plain language of the statute precludes consideration of a financial loss asserted for the first time in a complaint, or any other pleading, for that matter, filed *after* the sixty (60) day window has closed"); *Carson v. Clarent Corp.*, 2001 WL 1782712, at *2 (N.D. Cal. Dec. 14, 2001) (rejecting movant with largest loss and noting that "[t]he PSLRA does not have different filing deadlines based on the financial interest of the movant").  The Honorable Deborah A. Batts's opinion in *Crayfish* is instructive.  As explained by Judge Batts, "[t]he 60 day period the statute

provides for the submission of lead counsel motions is mandatory," and the filing of a tardy motion "precludes this Court from appointing the [Chesi] Group as Lead Plaintiff in this case."  2001 WL 1160745, at *5.  Moreover, Local Civil Rule 7.1 mandates that, other than permitted letter motions, every motion "***shall include*** . . . [a] memorandum of law [and] [s]upporting affidavits and exhibits thereto containing any factual information and portions of the record necessary for the decision of the motion."  Thus, the Court cannot assess the Chesi Group based solely on its boilerplate motion (even though it was filed shortly before midnight on April 13, 2020).[10]

Even if the Chesi Group's sworn certifications had been timely, the fact that they were materially false is yet another reason to reject the Chesi Group's motion.  On April 21, 2020, eight days after the deadline, the Chesi Group filed a "corrected" certification, acknowledging that the sworn certification it filed on April 14, 2020, containing only ***six*** transactions, was false.  *See* ECF No. 76-1 ¶ 8.  The belatedly corrected certification revealed that the Chesi Group had overstated its loss by nearly ***300%***.  *See* ECF Nos. 76-2 & 76-3.  While the subsequent declaration blames both the Easter holiday and the current pandemic (issues faced by every movant), *see* ECF No. 76-1, Chesi Assets (like every other movant) had sixty days after this action was filed to accurately identify its Luckin transactions but instead waited until the 11th hour to prepare the necessary information.[11]

As explained by the Honorable Vernon S. Broderick, such errors, whether "clerical" or otherwise, "speak[s] to a level of carelessness, and causes me to doubt whether [the movant]

---

[10] The Chesi Group does not suggest it faced any technical issues that prevented a timely filing.  *See* U.S. Dist. Court for the S. Dist. of N.Y. Elec. Case Filing Rules & Instructions 23.6 (requiring statement explaining how technical errors led to delayed filing).  Its supplemental filing on April 21, 2020 [ECF No. 76] is completely silent on the matter.

[11]  The Chesi Group's assertion that this error was "promptly" corrected, ECF No. 76-1 ¶ 9, is belied by the record. The corrected certification was signed and filed on April 21, 2020—a full week after the initial submission. Additionally, despite suggesting having "over a dozen conversations" with "counsel" and Interactive Digital, the Chesi Group never explains why its proposed lead counsel did not verify the trading and/or make necessary arrangements to file a timely motion.  *Id.* ¶ 7.

possesses the necessary adequacy and sophistication to be lead plaintiff." *Goldman*, 2019 WL 4512774, at *5 (rejecting movant claiming the largest financial interest due to, *inter alia*, incorrect certification that overstated loss by about $17,000) (alteration in original). *Goldman* accords with a number of courts weighing inaccuracies in PSLRA certifications when assessing movants' adequacy. *See, e.g.*, *Bhojwani v. Pistiolis*, 2007 WL 9228588, at *3 (S.D.N.Y. July 30, 2007) (McMahon, J.) (explaining that minor loss calculation error reflected "a certain carelessness about detail that undermines the adequacy of" the proposed lead plaintiff); *Tomaszewski v. Trevena, Inc.*, 383 F. Supp. 3d 409, 414-15 (E.D. Pa. 2019) ("minor or inadvertent mistakes . . . nonetheless speak to a level of carelessness . . . . [G]iven that these errors were made at the outset of the case, this causes the Court to doubt whether [movant] possesses the necessary adequacy"); *Camp v. Qualcomm Inc.*, 2019 WL 277360, at *3-4 (S.D. Cal. Jan. 22, 2019) (highlighting "doubts about [movant's] ability to serve as the class representative because of . . . errors in the transaction records and loss calculations accompanying [his] motion"). The Chesi Group's carelessness provides an independent basis for disqualification. *See Goldman*, 2019 WL 4512774, at *5.

> **2.    The Luckin Investor Group Is an Improper Group that Includes Investors Connected to Financial Crimes**

The Luckin Investor Group, the only other movant to claim a larger financial interest than AP7 and Louisiana Sheriffs, can do so only if the losses of seven different investors are aggregated. While the PSLRA allows for the appointment of groups, such groups must "proffer an evidentiary showing" that the "group will be able to function cohesively and to effectively manage the litigation apart from their lawyers before its members will be designated as presumptive lead plaintiffs." *Varghese*, 589 F. Supp. 2d at 392; *see also In re Tarragon Corp. Sec. Litig.*, 2007 WL 4302732, at *2 (S.D.N.Y. Dec. 6, 2007) (Castel, J.). As such, courts frequently require evidence explaining, among other things, the "involvement of the group members in the litigation thus far,"

"plans for cooperation," "the sophistication of its members," and "whether the members chose outside counsel, and not vice versa." *Varghese*, 589 F. Supp. 2d at 392.

a.      **The Luckin Investor Group Is Controlled By Its Lawyers**

The Luckin Investor Group—which aggregates the investments of seven unrelated investors plucked from around the world by four different law firms[12]—has provided the Court with no evidence explaining how the group was formed, how the group will oversee counsel, why two investors assigned claims to a third investor, or whether any of the group members have experience directing securities class actions or other complex litigation in the United States.[13]  The declaration provided by the Luckin Investor Group does not clearly state that all the members of the group have even spoken together.  *See* ECF No. 66-5 ¶ 8.[14]  The difficulties inherent with the multiple decision makers and stakeholders within the Luckin Investor Group, and no concrete plan for directing this litigation, perfectly illustrates why courts reject such sprawling groups:



---

[12] While the Luckin Investor Group seeks only the appointment of two law firms as co-lead counsel, Pomerantz LLP and The Rosen Law Firm, P.A., the group's motion lists two other firms as proposed "additional counsel" for the class—The Schall Law Firm and Kaskela Law LLC.  *See* ECF No. 64.

[13] James Sproul purports to assert claims on behalf of two additional investors: Alessandro Sproul (James Sproul's brother) and Elvio DelZatto (James Sproul's grandfather), *see* ECF No. 66 at 1 n.1.  Of the $535,000 in investment losses that James Sproul claims to represent, only $33,000 result from his own, personal investments, giving him a de minimis financial interest in this case.  The Luckin Investor Group does not explain the reason for these assignments, or whether the members of the group were aware that James Sproul has little personal interest in this case.

[14] The Luckin Investor Group's joint declaration vaguely states only that the group "discussed" certain matters "both with our counsel and with one another."  ECF No. 66-5 ¶ 8.  Such an ambiguous statement calls into question both the nature and breadth of these "discuss[ions]."

Several factors strongly suggest that this "group" was cobbled together by counsel without any meaningful participation by the movants.  First, there is no explanation for how these seven investors came together, other than the obvious inference that they were grouped by the four law firms filing their motion.  Mr. Sproul's assignments also raise significant questions, particularly when considering case law restricting lead plaintiff groups to five members.  *See Cendant*, 264 F.3d at 267 ("agree[ing] with the Securities and Exchange Commission that courts should generally presume that groups with more than five members are too large to work effectively").  Mr. Sproul's assignments serve no apparent purpose beyond increasing Mr. Sproul's purported financial interest and manipulating the group's configuration.  Clever lawyering should not be permitted to circumvent this case law by miraculously converting a group of seven into a group of five by having two investors assign their claims.

Second, the Luckin Investor Group provides no explanation for when the decision to form a group was made and when each member decided to join the group.  Indeed, the various members of the Luckin Investor Group executed their respective certifications between April 3, 2020, and April 13, 2020, *see* ECF No. 66-3, and firms representing the group were issuing press releases seeking to replace group members as late as April 13, 2020—the statutory deadline.  *See, e.g.*, Ex. M.  The fluid nature of the Luckin Investor Group undermines any arguments of cohesion.  *See Tsirekidze v. Syntax-Brillian Corp.*, 2008 WL 942273, at *4 (D. Ariz. Apr. 7, 2008) ("willingness to abandon the group only suggests how loosely it was put together").

What little information that has been submitted establishes the group's inadequacy.  For example, Luckin Investor Group member John Hickey's certification does not authorize the filing of a lead plaintiff motion on his behalf and, instead, incorrectly represents that he "has reviewed the complaint and authorized its filing."  ECF No. 66-3.  Hickey has not filed a complaint in this

case.  An identical false representation, among other things, led the court in *Qualcomm* to reject

the appointment of a movant, claiming the largest financial interest, represented by Rosen (one of

the Luckin Investor Group's proposed co-lead counsel).  *See* 2019 WL 277360, at \*3 (explaining

the court's "reservations" in appointing a movant who "sign[ed] under penalty of perjury that he

'reviewed the complaint and authorized its filing'" when "there was indeed no filing made on

behalf of [the movant]").  A similar conclusion was reached by the court in *Garbowski v. Tokai*

*Pharmaceuticals, Inc.*, which explained:

> [the movant's] willingness to make false statements under oath
> contributes to the court's conclusion that he would not have been an
> adequate lead plaintiff [and] [t]he willingness of Pomerantz [one of
> the Luckin Investor Group's proposed co-lead counsel here] to
> submit to the court a statement that was obviously incorrect at least
> to the extent that it represented that [the movant] had authorized the
> filing of a complaint heightens the court's concerns.

302 F. Supp. 3d 441, 455 (D. Mass. 2018).[15]  Mr. Hickey's willingness to sign a false certification

illustrates that he has no intention or ability to properly oversee his selected counsel.

Moreover, while the Luckin Investor Group states that its proposed co-lead counsel "have

been directed to prosecute this action in an efficient, cost-effective manner while obtaining the

best possible result for the class," ECF No. 66-5 ¶ 10, the group provides no details about how it

proposes to ensure the efficient prosecution of litigation by four law firms (*e.g.*, through a detailed

joint prosecution agreement among counsel) or whether the group has negotiated reasonable

limitations on attorneys' fees.  *See Tokai*, 302 F. Supp. 3d at 447 (explaining that "[w]hether the

proposed lead plaintiff diligently negotiated a fee agreement is especially important because the

court, when approving any request for attorney's fees, will presume that the lead plaintiff's fee

---

[15] Rosen's clients inexplicably continue to submit false PSLRA certifications despite this clear authority.  *Compare* ECF No. 66-3 at 2 ¶ 1 *with Qualcomm*, 2019 WL 277360, at \*3; *Tokai*, 302 F. Supp. 3d at 447.  Rosen is aware that Mr. Hickey's certification is false given that the separate certification filed by Mr. Almdamegh states that Rosen is authorized to "file a lead plaintiff motion on [his] behalf."  ECF 66-3 at 16 ¶ 1.

agreement is one that 'a fully informed client would negotiate' and is, therefore, reasonable"). Indeed, there is no explanation for why these investors believe four law firms are necessary, whether they believe the two proposed "Co-Lead Counsel" are incapable of handling the case alone, or what role the two "additional" firms will play, beyond collecting a fee. The absence of this information undermines the Luckin Investor Group's motion and strongly suggests that the group was "brought together for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff" and is "unlikely to fairly and adequately represent the class because it is unlikely to engage in the litigation in a meaningful way at all." *Tsirekidze*, 2008 WL 942273, at *3. "[T]he clear implication is that [the Luckin Investor Group's four law firms], rather than the [group's members], are steering the litigation" and that the Luckin Investor Group is precisely the type of "lawyer-driven litigation" the PSLRA sought to prevent. *Id*. at *3-4.

The concerns about the formation and operation of the Luckin Investor Group are increased when considered in light of the PSLRA's objective of increasing participation of institutional investors as lead plaintiffs in securities class actions. *See, e.g.*, *Glauser v. EVCI Career Colls. Holding Corp.*, 236 F.R.D. 184, 188 (S.D.N.Y. 2006) (McMahon, J.) ("the PSLRA was passed, at least in part, to increase the likelihood that institutional investors would serve as lead plaintiffs in [securities class] actions"). Here, AP7, which has been repeatedly appointed as a lead plaintiff under the PSLRA,[16] on its own asserts a larger financial interest than any individual member of the Luckin Investor Group. By improperly aggregating their losses, these seven investors would supplant AP7, a sophisticated institution that is the paradigmatic Lead Plaintiff under the PSLRA. Courts have refused to appoint groups of unrelated individual investors where the aggregation of their losses would displace institutional investors. *See, e.g.*, *Porzio v. Overseas Shipholding Grp.*,

---

[16] *See, e.g.*, *Goldman*, 2019 WL 4512774, at *7 (appointing AP7); *Hedick v. Kraft Heinz Co.*, 2019 WL 4958238, at *14 (N.D. Ill. Oct. 8, 2019) (appointing AP7 with another institutional investor).

2013 WL 407678, at *3 (S.D.N.Y. Feb. 1, 2013) (Scheindlin, J.) (rejecting group of individual investors that asserted the largest losses, and appointing a group including two institutional investors, because "a group of unrelated investors should not be considered as lead plaintiff when that group would displace the institutional investor preferred by the PSLRA").  Appointing a group of unrelated, inexperienced individuals (who also have not established their ability to cohesively oversee this litigation) in lieu of AP7 and Louisiana Sheriffs—which have unquestionably demonstrated their ability to oversee counsel and have collectively recovered more than $2 billion on behalf of investors in securities class actions—would not advance the interests of the class.  *See* *Tsirekidze*, 2008 WL 942273, at *5 (concluding that institutional investors are "more likely to control counsel").

        **b.**       **Luckin Investor Group's Connection to Financial Crimes Renders It an Inadequate Lead Plaintiff**

Ian Burns, who signed the certification for Regent, *see* ECF No. 66-3, has connections to financial crimes and international arms dealing that the Luckin Investor Group concealed from the Court.  In his prior role as Group Managing Director and Director at Investec Trust (Guernsey) Ltd., Mr. Burns was the lead banker for a client that engaged in illicit arms deals and money laundering, triggering one of the greatest corruption scandals in Kenya's history, the "Anglo Leasing" scandal.  *See* Exs. N-O.  Mr. Burns introduced his "long-standing client" LBA—an entity run by Scottish arms dealer Andrew Macgill—to Investec.  The scandal involved purported transactions for hundreds of millions of dollars of weapons, including anti-tank grenades, mortar rounds, and machine guns supposedly for the Kenyan police and prison system (but also a Bentley car and property in Minsk, Belarus).  The Anglo Leasing scandal was, at heart, a financial fraud rather than a massive arms deal: while millions of dollars flowed through LBA's accounts, little to no weapons were delivered to Kenya.  The scandal resulted in investigations by the UK's

Serious Fraud Office and Kenya's Anti-Corruption Commission, as well as an internal investigation by the law firm Allen & Overy.  Mr. Burns appears to have been terminated by Investec for his role: "We got rid of the account, and we got rid of the individual (Burns)."  Ex. N; *see also* Ex. O (reporting that Mr. Burns was notified by a subordinate of "documents that clearly represent a request for payments by LBA for the purchase of arms from Iran").  Mr. Burns's role in this transaction will undoubtedly provide defendants an opportunity to scuttle the class's claims by raising questions about Regent's (and Mr. Burns's) adequacy.  *See Hecla*, 2020 WL 1444934, at *7; *Flag Telecom*, 574 F.3d 29 at 40.  As with Interactive Digital (and Mr. Tiah), the class should not be exposed to the unique issues accompanying the appointment of Regent (and Mr. Burns).

Moreover, like Mr. Tiah and the Chesi Group, the failure of Mr. Burns and the Luckin Investor Group to disclose this matter to the Court (while blandly touting their adequacy) raises serious concerns about their "fealty to the duty of candor" to the Court.  *Boeing*, 2019 WL 6052399, at *6.  Indeed, Mr. Burns submitted a sworn declaration that discussed his professional background as a means to support his adequacy to serve as lead plaintiff, but omitted any discussion of his employment by Investec—an intentional omission clearly intended to mislead this Court.  *See* ECF No. 66-5 ¶ 3.  Moreover, the willingness of the other members of the Luckin Investor Group to seek appointment with Regent (and Mr. Burns) undercuts their own adequacy. *See Longtop*, 2011 WL 4597553, at *8 ("the willingness of the other members of the [group] to seek lead plaintiff appointment with [a group member alleged to be involved in a Ponzi scheme] raises questions about the adequacy of the entire group").

Even if the Court simply eliminates Regent from the Luckin Investor Group on the basis of Mr. Burns's prior misconduct and lack of candor with the Court, the motion of the Luckin Investor Group fails: without the $2.1 million in losses incurred by Regent, the Luckin Investor

Group has a smaller financial interest than AP7 and Louisiana Sheriffs (even if the Court does not disqualify Mr. Hickey for executing a false certification).

### B.   AP7 AND LOUISIANA SHERIFFS SATISFY THE PSLRA'S REQUIREMENTS FOR APPOINTMENT AS LEAD PLAINTIFF

Given the disqualification of the Chesi Group and the Luckin Investor Group, AP7 and Louisiana Sheriffs are the only movant capable of satisfying the PSLRA's largest financial interest, adequacy, and typicality requirements.

With losses of approximately $6.9 million in connection with their Class Period transactions in Luckin securities under a last-in, first-out ("LIFO") analysis, *see* ECF No. 63 at 7, AP7 and Louisiana Sheriffs assert the largest financial interest of the remaining movants (even if the Court considered the financial interests of the members of the Luckin Investor Group):

| Movant [Motion Docket Number] | Losses |
|---|---|
| **AP7 and Louisiana Sheriffs [ECF No. 61]** | **$6,880,497** |
| Khaled Abdullah Almdamegh (Luckin Investor Group) [ECF No. 64][17] | $3,044,090 |
| Regent Mercantile Holdings Limited (Luckin Investor Group) [ECF No. 64] | $2,106,423 |
| Teamsters Local 710 Pension Fund [ECF No. 51] | $2,096,004 |
| Li Tutang (Luckin Investor Group) [ECF No. 64] | $1,584,349 |
| John Hickey (Luckin Investor Group) [ECF No. 64] | $1,530,655 |
| Wai Chun Shek [ECF No. 10] | $668,103 |
| James Sproul (Luckin Investor Group) [ECF No. 64] | $525,425 |
| Chaile Steinberg [ECF No. 58] | $5,044 |

In fact, with losses of approximately $5.4 million, AP7 incurred a greater individual loss than any of the remaining movants.

---

[17] The Luckin Investor Group calculated Mr. Almdamegh's losses at $3,658,692 using a retained share price of $0. *See* ECF No. 66-4.  In order to provide an apples-to-apples comparison of losses with the other movants, the table above uses a retained share price of $4.39, consistent with the PSLRA, to calculate Mr. Almdamegh's losses.  *See* Ex. P; 15 U.S.C. § 78u-4(e)(1) (limiting damages to the difference between purchase price and "the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market").

In addition to asserting the largest financial interest of any movant properly before the Court, AP7 and Louisiana Sheriffs are the paradigmatic Lead Plaintiff and readily satisfy the typicality and adequacy requirements of Rule 23.  To overcome the strong presumption entitling AP7 and Louisiana Sheriffs to appointment as Lead Plaintiff, the PSLRA requires a showing that the presumptive Lead Plaintiff is inadequate.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  No such evidence exists in this case and any arguments to the contrary should be flatly rejected.

As demonstrated in their opening brief and Joint Declaration, AP7 and Louisiana Sheriffs are adequate and typical class representatives.  *See* ECF Nos. 63 at 8 & 67-7.  AP7 and Louisiana Sheriffs—unlike the Chesi Group and the Luckin Investor Group—have affirmatively demonstrated their commitment and ability to cohesively and zealously prosecute this litigation for the benefit of the class.  AP7 and Louisiana Sheriffs are sophisticated institutional investors that have combined assets under management of approximately $64 billion, have extensive experience and a track record of successfully serving as members of lead plaintiff groups under the PSLRA, and have collectively recovered more than $2 billion on behalf of investors in securities class action.  *See* ECF No. 67-7.  AP7 and Louisiana Sheriffs's ability to oversee their proposed co-lead counsel, Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") and Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), in this case is clear based on their significant experience prosecuting several of the most significant securities class actions in the Second Circuit, including: *In re Citigroup Inc. Bond Litigation*, No. 08-cv-9522 (S.D.N.Y.) ($730 million recovery with Louisiana Sheriffs serving as a co-lead plaintiff with other institutional investors, Bernstein Litowitz serving as lead counsel, and Kessler Topaz serving as additional counsel); *In re JPMorgan Chase & Co. Securities Litigation*, No. 12-cv-3852 (S.D.N.Y.) ($150 million recovery with AP7 serving as a co-lead plaintiff with other institutional investors, and

Kessler Topaz and Bernstein Litowitz serving as co-lead counsel); and *Sjunde AP-Fonden v. The Goldman Sachs Group, Inc.*, *et al.*, No. 18-cv-12084 (S.D.N.Y.) (with AP7 currently serving as lead plaintiff, and Kessler Topaz serving as lead counsel and Bernstein Litowitz serving as liaison counsel).  While the Luckin Investor Group makes vague representations about its plans to lead this case, the foregoing examples provide actual evidence of AP7's and Louisiana Sheriffs's achievements in leading class actions and returning billions of dollars to injured investors.

Moreover, AP7 and Louisiana Sheriffs have explained that their decision to join together to prosecute this litigation was based upon their prior experiences working with other institutional investors to successfully litigate class actions proceeding under the PSLRA.  *See* ECF No. 67-7 ¶¶ 8-10, 12-14.  To this end, AP7 and Louisiana Sheriffs have demonstrated their ability to confer telephonically with each other in furtherance of their motion for appointment, and have taken steps to ensure that the litigation will be prosecuted effectively and efficiently, including instructing their proposed co-lead counsel to enter into a Joint Prosecution Agreement that governs their activities in the litigation, requiring counsel to keep contemporaneous time records during the litigation, and setting reasonable limits on fees in their retainer agreements with counsel that are consistent with fees approved in this District.  *See id.* ¶¶ 11, 17.  The appointment of two sophisticated institutional investors—the preferred lead plaintiffs under the PSLRA—upon such a record is plainly appropriate.  *See, e.g.*, *Mustafin v. GreenSky, Inc.*, 2019 WL 1428594, at *5 (S.D.N.Y. Mar. 29, 2019) (Engelmayer, J.) (appointing group of three institutions that "pledge[d] to work closely together to vigorously prosecute the claims on behalf of the class"); *In re Bank of Am. Corp. Sec., Derivative & Emp't Ret. Sec. Act (ERISA) Litig.*, 258 F.R.D. 260, 270 (S.D.N.Y. 2009) (Chin, J.) (appointing group of institutions submitting declaration detailing discussions regarding "plans for joint oversight over the litigation and joint supervision of counsel").

## C.     THE REMAINING MOTIONS SHOULD BE DENIED

Given that AP7 and Louisiana Sheriffs have satisfied all the requirements for appointment as Lead Plaintiff, and each of the remaining movants asserts a smaller financial interest, *see supra* Section II.B., the Court need not consider the competing motions. *See Longtop*, 2011 WL 4597553, at *8 ("the inquiry can stop here"); *In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir. 2002) (stating that the movant with the largest losses satisfying the typicality and adequacy requirements "is entitled to lead plaintiff status").

## III.   CONCLUSION

AP7 and Louisiana Sheriffs respectfully request the Court grant their motion in its entirety.

Dated: May 13, 2020                          Respectfully submitted,

                          **BERNSTEIN LITOWITZ BERGER
                             & GROSSMANN LLP**

                          */s/ Gerald H. Silk*
                          Gerald H. Silk
                          Avi Josefson
                          Michael D. Blatchley
                          1251 Avenue of the Americas
                          New York, New York 10020
                          Telephone: (212) 554-1400
                          Facsimile: (212) 554-1444
                          jerry@blbglaw.com
                          avi@blbglaw.com
                          michaelb@blbglaw.com

                          *Counsel for Proposed Lead Plaintiff
                          Louisiana Sheriffs' Pension & Relief Fund
                          and Proposed Lead Counsel for the Class*

                          **KESSLER TOPAZ MELTZER
                             & CHECK, LLP**
                          Naumon A. Amjed
                          Darren J. Check
                          Ryan T. Degnan
                          280 King of Prussia Road
                          Radnor, PA 19087
                          Telephone: (610) 667-7706

Facsimile: (610) 667-7056
namjed@ktmc.com
dcheck@ktmc.com
rdegnan@ktmc.com

*Counsel for Proposed Lead Plaintiff Sjunde AP-Fonden and Proposed Lead Counsel for the Class*