**Exhibit C**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                                    :
                                                    :
MARTIN COHEN, Individually and on Behalf of All     :
Others Similarly Situated,                          :
                        Plaintiff,                  :
                                                    :
                                                    :
            v.                                      :     Case No. 1:20-cv-01293-LJL
                                                    :
                                                    :
LUCKIN COFFEE INC., JENNY ZHIYA QIAN, and           :
REINOUT HENDRIK SCHAKEL,                             :
                                                    :
                                                    :
                    Defendants.                     :
                                                    :
-----------------------------------------------------------------------X

## EXPERT REPORT OF JONATHAN R. MACEY

## I.      **Introduction**

1.      I am an expert in corporate governance and I offer this report (the "Report") at the request of Labaton Sucharow LLP ("Labaton Sucharow"), proposed Lead Counsel for the Class in this securities class action lawsuit against Luckin Coffee Inc. ("Luckin" or the "Company"), as well as its control persons, and entities that participated Luckin's securities offerings.  Chesi Assets Limited and Interactive Digital Finance Limited (together, the "Chesi Assets Limited Group"), have moved for consolidation, appointment as lead plaintiff, and approval of their selection of Labaton Sucharow as Lead Counsel.[1]

2.      Among various other movants, a branch of the Swedish government called Sjunde AP-Fonden ("AP7") has also filed a motion for appointment as lead plaintiff as part of a group with the Louisiana Sheriffs' Pension & Relief Fund.[2]  AP7 acts as an investment advisor for certain investment funds as part of the Swedish retirement system.  It is my understanding that AP7 does not allege that it has direct standing to assert claims in this litigation.

3.      The Report analyzes the economic and public policy implications of allowing an investment advisor to serve as lead plaintiff in this class action litigation, notwithstanding the advisor's lack of standing,[3] and notwithstanding the availability and willingness of other lead plaintiff movants who have actual standing to serve as lead plaintiff.

---

[1] *Cohen v. Luckin Coffee Inc.*, No. 1:20-cv-01293-LJL (S.D.N.Y. filed Feb. 13, 2020) ("*Cohen Action*"), ECF Nos. 69–71.

[2] *Cohen Action*, ECF Nos. 61–63.

[3] This Report does not offer legal opinions, but it does incorporate assumptions about the state of the law into the analysis.  Should those assumptions change, my analysis and possibly my conclusion would change.  For example, I am assuming that: (1) the "named plaintiffs in a class action must allege and show that they personally have been injured"; and (2) there is a "prudential exception" to the standing rules that may apply where a third party has a "close relationship to the injured party" and there is some sort of a "barrier to the injured party's ability to assert its own interests."  *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP,* 549 F.3d 100, 106 n.5, 109–10 (2d Cir. 2008) (internal citations and quotations omitted) (hereinafter, "*Huff*").

4.      An important question at this particular juncture in the litigation is whether the Court should grant a "prudential" exception to the several generally accepted principles that ordinarily would block an investment advisor who lacks any direct financial interest in the outcome of the litigation on the grounds that the advisor lacks standing.  I assume for the purpose of this Report that the ostensible grounds for granting this exception is that the owner of the Luckin securities at issue may lack standing to sue.

5.      This report provides two opinions arising from my analysis.  Those opinions are summarized below:

- **Opinion 1:**  The economic underpinnings of both the Constitutional standing requirements and the PSLRA's largest financial interest inquiry are served by the traditional Constitutional standing requirements and, therefore, weigh heavily against providing investment managers with a "prudential exception" to the standing rules.

- **Opinion 2:**  Assuming that a "prudential exception" may be granted in some (but not all) situations where the "injured party" is unable to assert its own rights, fundamental principles of corporate governance dictate that the relevant "injured party" to consider in a class action is the class, and not any particular purported class member.

## II.      My Expertise and Qualifications

6.      I am an expert in corporate governance.[4]  I also am an expert on the economic (efficiency) implications of corporate governance in the litigation context, and on economic incentives and agency costs in principal agency relationships including the lawyer-client relationship.[5]  A scholarly focus of mine is the economic incentives of lead plaintiffs in securities class actions, and the problems that exist when such plaintiffs lack appropriate incentives.[6]

---

[4] Corporate governance is a broad term that encompasses not only the governance of corporations, but also the management of any organization, including partnerships and other associations of individuals with common interests, such as the members of the plaintiff class in a securities class action lawsuit.
[5] Agency-costs are the costs that principals incur as a result of the fact that the interests of principals diverge from the interests of their agents.  Specifically, principals have private incentives to pursue their

2

7.      Additional information on my background and qualifications is provided in Exhibit 1 of this Report.  Briefly, I am the Sam Harris Professor of Corporate Law, Corporate Finance, and Securities Law at Yale Law School, and a Professor in the Yale School of Management.  I also am a member of the Provost's Standing Advisory & Appointments Committee for the Yale School of Management, and Chair of the Yale University Advisory Committee on Investor Responsibility (ACIR).

8.      I have more than 30 years of experience in the fields of law and economics, corporate governance, the economic underpinnings of fiduciary duties, and agency costs in securities class action litigation.

9.      My compensation for this engagement is set at my long-standing standard hourly rate of $1,250.00 per hour, and, in addition, I expect to be reimbursed for my reasonable and ordinary out-of-pocket expenses in connection with my review of the record, preparation of this Report, and provision of testimony.  My compensation is not dependent on the analysis, conclusions, or any of the content of my Report or testimony, or on the outcome of litigation.

10.      I provide a list of my prior testimony over the past four years in Exhibit 2. Exhibit 3 is a list of the documents I have reviewed in connection with preparing this Report.

### III.    Factual Background

11.      Defendant Luckin is a corporation that operates a significant retail coffee chain throughout China.  Several class action lawsuits have been brought against Luckin and other defendants alleging violations of the Securities Act of 1933 and the Securities Exchange Act of

---

own interests at the expense of their agents.  Agency costs include the cost to the principal of monitoring the agent as well as the residual losses that occur because it is costly and difficult to monitor perfectly.

[6] *See* Jonathan R. Macey and Geoffrey P. Miller, *Judicial Review of Class Action Settlements,* 1 HARV. J. LEGAL ANALYSIS 1 (2009); Jonathan R. Macey and Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. CHI. L. REV. 1 (1991).

1934.[7]  These actions allege that Luckin and other defendants made misrepresentations and omitted information in public statements and in connection with offerings of Luckin securities.

12.    It is my understanding that this action is governed by the PSLRA and that the Court has previously ordered parties to file motions to serve as lead plaintiff.  *See Cohen Action,* ECF No. 9.  It is my understanding that there were several motions to serve as lead plaintiff, including a motion by the Chesi Assets Limited Group and motion by a group including AP7.

13.    AP7 is a government agency that serves as the asset manager for Swedish pensioners.  AP7 describes itself as the state alternative to the private investment funds offered within the Swedish Premium pension system.[8]  It operates a high-risk global equity fund[9] whose "core strategy is to take advantage of returns in the stock market as a whole by tracking market indices rather than individual shares."[10]  Its goal is to generate a rate of return that is "at least as good as the average of the (Swedish) private investment funds in the system."[11]  AP7 operates and administers the Equity Fund.  The "unitholder" of the Equity Fund is the Pensions Agency,

---

[7] *See Cohen Action*; *Shek v. Luckin Coffee Inc.*, No. 1:20-cv-02977-LJL (S.D.N.Y filed Apr. 10, 2020) ("*Shek Action*"); *Sterckx v. Luckin Coffee Inc.*, No. 1:20-cv-01677-KAM-VMS (E.D.N.Y filed Apr. 2, 2020); *Gopu v. Luckin Coffee Inc.*, No. 1:20-cv-01747- KAM-VMS (E.D.N.Y. filed Apr. 8, 2020).  The actions filed in E.D.N.Y, *Sterckx* and *Gopu*, have been consolidated and transferred to S.D.N.Y.  *See* 20-cv-1677, ECF No. 64.

[8] *About US,* AP7.SE, https://www.ap7.se/english/about-us/ (last visited May 6, 2020).  Premium pension is the part of the Swedish public pension system that invests funds received from the general payroll tax paid by employers.  The scheme is described by a Swedish lawyer for AP7 in the following way: "2.5 % percentage points of each individual's pensionable income is paid to a premium pension account held by the individual with the PA (the "Premium Pension Account").  The individual pension saver may instruct the PA to invest these contributions in as many as five of the 800 investment funds, authorized by the PA and managed by independent fund managers.  In addition to these private investment funds there is also a governmental default option, managed by AP7.  If the individual does not make an active investment selection for his premium pension contributions, his contribution will be invested in the default option managed by AP7.  In addition to being the default option for the pension savers who do not make a choice in the premium pension programme, AP7's funds can also be chosen by the savers."  Anders Mänsson Letter to Kessler, Topaz, Meltzer & Check, Oct. 24, 2014, at 3, available at *Hachem v. Gen. Elec. Co.*, No. 1:17-cv-08457-JMF, ECF No. 123-1 (filed on May 17, 2018) (hereinafter "Mänsson Letter").

[9] *AP7 Equity Fund,* AP7.SE, https://www.ap7.se/english/ap7-equity-fund/ (last visited May 6, 2020).

[10] *Our Approach,* AP7.SE, https://www.ap7.se/english/about-us/our-approach/ (last visited May 6, 2020).

[11] *In English,* AP7.SE, https://www.ap7.se/english/ (last visited May 6, 2020).

4

another agency of the Swedish government.  In terms of the way that AP7 is structured, it is my understanding that AP7 is not the beneficial owner of securities.[12]  I further understand that under Swedish law, the AP7 funds are "pools of assets but are not independent legal entities capable of taking" actions such as litigating a securities fraud case.[13]  Similarly, a Swedish lawyer AP7 retained in prior U.S. litigation asserted that "Swedish law empowers AP7 to pursue litigation in its own name (without an assignment of any claims) in any court for investments held by the Funds."[14]

14.    In other litigation, AP7 has disclosed information about its structure, the actual ownership of the securities in its portfolio, and its standing under U.S. law.  I understand that AP7 has not made similar disclosures in this case.  To the extent that it submits disclosures in this case in the future, I request the right to supplement my opinion.

### IV.    Opinions: Background, Analysis and Conclusions

a. **Opinion 1.** The economic underpinnings of both the Constitutional standing requirements and the PSLRA's largest financial interest inquiry are served by the traditional Constitutional standing requirements and, therefore, weigh heavily against providing investment managers with a "prudential exception" to the standing rules.

15.    There is strong economic support for the principle that standing is a "bedrock" requirement of the federal legal system and for the status of standing as a key component of the Constitution's Article III "case-or-controversy" requirement.[15]  "To satisfy Article III standing, a plaintiff 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged

---

[12] *See Pipefitters Local No. 636 Defined Benefit Plan v. Bank of Am. Corp.*, 275 F.R.D. 187, 189 (S.D.N.Y. 2011) ("AP7 is a Swedish pension fund manager and does not directly own any [of the relevant company defendant's] shares" at issue in the securities fraud class action case).

[13] *See* Mänsson Letter, at 1 n.1.

[14] *Id.* at 1.

[15] *Sonterra Capital Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 533–34 (2d Cir. 2020) (citing *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 92 (2d Cir. 2018)).

conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"[16] For sound economic reasons, the particular requirement that a plaintiff suffer injury in fact has been described as an "irreducible constitutional minimum."[17]

16.     The economic basis for the injury-in-fact requirement is "to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'"[18] The central goal of the standing rules, from an economic perspective, is to achieve what economists call the alignment of incentives, or "incentive compatibility."[19] The purpose of the litigation in this case is to allow investors an opportunity to recover losses due to fraud. From a corporate governance perspective, there is what economists describe as a "positive externality"[20] associated with this litigation: securities fraud lawsuits, such as this one, police the accuracy and completeness of disclosures and incentivize corporations and related actors to avoid misleading disclosures,[21]

---

[16] *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

[17] *Spokeo,* 136 S. Ct. at 1547 (citation omitted).

[18] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "[S]tanding requires that the plaintiff 'personally has suffered some actual or threatened injury.'" *Spokeo*, 136 S. Ct. at 1548 (citation omitted). "[T]he injury must affect the plaintiff in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992). Standing is granted by Article III "only to redress or otherwise to protect against injury *to the complaining party*." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771–72 (2000) (quoting *Warth*, 422 U.S. at 499). In a fraud action under § 10(b) of the Exchange Act, the injury-in fact requirement is satisfied when the plaintiff was a beneficial owner of the securities at issue, and engaged in a purchase or sale, during the relevant period during which misconduct allegedly occurred. *In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, No. 09-MD-2058, 2011 WL 3211472, at *12 (S.D.N.Y. July 29, 2011).

[19] Leonid Hurwicz, *On Informationally Decentralized Systems*, in C. B. McGuire and R. Radner, eds., DECISION AND ORGANIZATION: A VOLUME IN HONOR OF JACOB MARSHAK, 297–336, at 320 (1972).

[20] A "positive externality" is the occurrence of a general benefit to society or to a larger group from the private self-interested action of an economic actor. In this context, the general benefit is better corporate governance and improved corporate disclosure, and the private action is the securities litigation itself.

[21] Brian McTeir and John Wald, *The Causes and Consequences of Securities Class Action Litigation*, 17 J. CORP. FIN. 649-665 (2011) (Examining the impact of securities class action lawsuits on firms' investment and financing choices and finding that firms that overinvest are more likely to be sued. Other findings are that after securities class action litigation, firms on average decrease overinvestment activity, and they decrease payouts while increasing leverage, cash holdings, and firm- specific risk. The Article reports that after such litigation there is a "decrease in agency problems which lead to significant changes in real investment policies," and finds that the evidence is consistent with the notion that security class action lawsuits draw attention to agency problems which are then at least partly resolved.").

reducing the agency costs associated with the corporate form.[22]  Permitting an investment manager to pursue litigation without an actual stake in the outcome of the controversy, leads to a greater likelihood that those goals will not be achieved.[23]

17.    These economic goals of the standing rules are buttressed and supported by the PSLRA, indicating the particular relevance and significance of the standing requirement in the context of PSLRA cases.  In other words, the economic underpinnings of both the PSLRA and the Article III standing rules applicable here have an important common feature.  Both of these sets of rules are designed to ensure, to the fullest extent possible, that lead plaintiffs have themselves suffered real economic injury and therefore have the strongest incentives to vigorously pursue the relevant underlying substantive lawsuit.[24]

18.    In particular, the PSLRA "reflects the expectation that the lead plaintiff, who will presumptively be [the movant] with the largest financial interest in the litigation, will [best] oversee the conduct of the case and monitor the decisions of class counsel."[25]  This monitoring

---

[22] An agency problem refers to the problems associated with the fact that agents (corporate officers and directors) do not always act in the best interests of their principals (shareholders).  The seminal work in this field of law and economics is Michael C. Jensen and William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure,* 3 J. FIN. ECON.  305-360 (1976).

[23]  Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions,* 104 YALE L. J. 2053, 2112 (1995) (in enacting the PSLRA and, in particular, its lead plaintiff provision, Congress sought to replace figurehead named plaintiffs with institutional investors. Investors with large holdings and, consequently, large financial interests in the outcome of class litigation would select good lawyers, bargain hard over fees, and actively monitor the conduct of litigation, producing spillover benefits for all defrauded investors); *see* Charles Silver & Sam Dinkin, *Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions,* 57 DEPAUL L. REV. 471 (2008) (Congress expected that the incentives of plaintiffs with financial stakes in the litigation would more actively monitor the conduct of a securities fraud class action in order to reduce the litigation agency costs that may arise when class counsel's interests diverge from those of the shareholder class).

[24] *See Baker v. Carr*, 369 U.S. 186, 204 (1962); S. Rep. No.104-98, at 4 (1995), available at https://www.congress.gov/congressional-report/104th-congress/senate-report/98/1.

[25] Jill E. Fisch, *Complex Litigation at the Millenium: Aggregation, Auctions, and Other Developments in the Selection of Lead Counsel Under the PSLRA,* 64 LAW & CONTEMP. PROBLEMS 53, 53-96 (2001); S. Rep. No.104-98, at 4 (1995), available at https://www.congress.gov/congressional-report/104th-

of lead class counsel by lead plaintiffs "has the potential to reduce agency costs and improve litigation decisions."[26] Central to the PSLRA's scheme is that authority to oversee litigation is to be vested in the movant with the greatest losses to ensure that the lead plaintiff has a sufficiently large stake in the litigation to be motivated to oversee the action rigorously and effectively.[27]

19.    To express the point from a slightly different direction, agency problems *increase* when a "court appoints a lead plaintiff group consisting of group members with relatively small stakes."[28]  *A fortiori*, these problems increase when a party like AP7, which has zero stake in the outcome of the litigation, is appointed as lead plaintiff.  Notwithstanding AP7's inherent desires to achieve a recovery, there is no substitute for a direct economic injury.  The injury in fact requirement and the PSLRA's presumption in favor of the plaintiffs with the largest financial interest in the litigation both recognize this fact, and caution against loosening of the standing requirements to accommodate procedural privileges.

20.    Article III standing is to be construed narrowly and the Supreme Court "ha[s] not looked favorably upon third-party standing."[29]  To the extent that the Supreme Court's few exceptions to classic standing doctrine rest on a unifying principle, the analytical distinction seems to be "between claims asserting ***private interests*** and those asserting ***public interests***."[30]  This is because "[w]hen private rights are involved, it is easy to understand that one person

---

congress/senate-report/98/1 ("Institutions with large stakes in class actions have much the same interests as the plaintiff class generally").

[26] Fisch, *supra* at 53.

[27] S. Rep. No. 104-98, at 11; *In re Cendant Corp. Litig.*, 264 F.3d 201, 243-244 (3d Cir. 2001) (Congress "anticipated and intended" that the plaintiffs with the largest stake in a given securities class action would be institutional investors who would serve as lead plaintiffs).

[28] Fisch, *supra* note 26, at 71.

[29] *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citing *Conn v. Gabbert,* 526 U.S. 286, 292-93 (1999) (rejecting an attorney's attempt to adjudicate the rights of a client)).

[30] *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 67 (2d Cir. 2012) (Hall, J., concurring) (emphasis added).

cannot seek to recover on a claim that belongs to someone else,"[31] except for in certain very narrow types of relations, such as that of a trustee, guardian ad litem, or receiver.[32]  Aside from those narrow relationships, the Supreme Court's concern appears to be situations where standing rules make it "likely" that the "relevant law will not be enforced" at all.  It is in those situations the Court has recognized "third-party standing."[33]  "In practice, *almost without exception, the Supreme Court allows third-party standing only to preserve the constitutional rights of third parties* who are unable to challenge the infringement of those rights."[34]

21.    But even assuming that third-party standing (sometimes referred to as a "prudential exception") could be appropriate in a securities suit for damages, a class action governed by the PSLRA is a poor candidate for a standing exception when considered from the perspective of law and economics.[35]

22.    I previously mentioned that within the framework of law and economics, there are what economists describe as "positive externalities" associated with this litigation, which take the form of incentivizing the policing of corporate disclosures and good corporate governance generally.  Advancing these positive externalities further the "public interest," because they

---

[31] *Id.* (quoting Charles Alan Wright et al., FED. PRACTICE & PROC. § 3531.9 (3d ed. 2011)); *see Barrows v. Jackson*, 346 U.S. 249, 257 (1953) (permitting third-party standing to challenge racially restrictive covenant because "the reasons which underlie [the] rule denying standing to raise another's rights" were "outweighed by the need to protect the fundamental rights" that otherwise would have been denied).

[32] *Huff,* 549 F.3d  at 109–10 (listing close relationships, and holding "the investment advisor-client relationship is not the type of close relationship courts have recognized for a 'prudential exception'").

[33] *Miller v. Albright*, 523 U.S. 420, 450 (1998).

[34] *See Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 57 (E.D.N.Y. 2017) (emphasis added).

[35] It is my understanding that class representatives pursuing class actions must have individual standing to bring claims on behalf of the absent class members. *See Sierra Club v. Morton*, 405 U.S. 727, 734 (1972); *Warth v. Seldin*, 422 U.S. 490, 502 (1975) (stating that named plaintiffs who seek to represent a class must "show that *they personally have been injured*, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent") (emphasis added).  And that generally, Rule 23 "must be interpreted in keeping with Article III constraints." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612-13 (1997); *see Vallario v. Vandehey*, 554 F.3d 1259, 1268 n.7 (10th Cir. 2009) (stating that class certification analysis must begin with Article III standing).

benefit society broadly.  However, permitting an exception to the standing requirement based on that sort of public interest would erode the distinction observed by the Supreme Court between third-party standing in cases seeking public interests and those seeking private interests.[36]

23.     Significantly, the existence of a competitive PSLRA appointment process strongly undermines the policy case for granting a prudential exception.  That there are competing motions for lead plaintiff implies that among the multiple aspirants to serve in this role, *someone* will be prosecuting claims on behalf of the class.[37]  As such, granting a prudential exception for a plaintiff with no direct economic stake in the outcome of the litigation will not serve any valid economic interest.  In fact, as previously stated, it would be reasonable to expect the opposite, due to the lack of effective alignment of incentives between lead plaintiff and the class, and due to the fact that the putative plaintiff has no stake in the outcome of the litigation.

   b.  **Opinion 2.**  Assuming that a "prudential exception" may be granted in some (but not all) situations where the "injured party" is unable to assert its own rights, principles of corporate governance dictate that the relevant "injured party" to consider in a class action is the class, and not any particular purported class member.

24.     The Supreme Court has recognized narrow prudential exceptions to the standing rules and has denied granting exceptions where "claims could have been litigated through other 'open avenues.'"[38]  Consistent with this instruction, the Second Circuit has stated the following rule (while denying a requested exception) as to when these "prudential exceptions" may be appropriate:

---

[36] Economic theory would suggest there are *some* positive externalities from all non-frivolous litigation.

[37] Here, the Chesi Assets Limited Group, appears to be the presumptive lead plaintiff, given their largest financial interest in the litigation.  *See Cohen Action* ECF No. 76-3.  The Chesi Assets Limited Group includes two entities managed by individuals with experience as fiduciaries—Interactive Digital Finance Limited is managed by Tiah Thee Kian, who is the chairman of a publicly traded corporation (*see Cohen Action,* ECF No. 76-4) and Chesi Assets Limited is managed by employees of Intertrust Group (*see Cohen Action,* ECF No. 76-1).

[38] *See Kowalski*, 543 U.S. at 131–32.

Huff argues that it qualifies for a prudential exception to the injury-in-fact requirement because of its authority to make investment decisions on behalf of its clients. There are, indeed, a few well-recognized prudential exceptions to the "injury-in-fact" requirement. These exceptions permit third-party standing where the plaintiff can demonstrate (1) a close relationship to the injured party **_and_** (2) a barrier to **the injured party's** ability to assert its own interests.[39]

25.     *Huff* addressed this issue in the context of a direct action (not a class action) where the investment advisor sought a prudential exception to bring claims on behalf of its clients. Therefore, *Huff* provided no guidance as to who the relevant "injured party" is, in the context of class actions. From a corporate governance perspective,[40] the relevant "injured party," in applying *Huff* in a class action context, is the class itself and not particular individuals who populate a portion of that class. This conclusion means that, under *Huff*, there must be "a barrier to the [class'] ability to assert its own interests," for a prudential exception to be granted.[41]

26.     The Supreme Court has held that even corporations (along with other forms of business association such as partnerships) are at their core most appropriately conceptualized as "associations of persons."[42] Both that holding and basic principles of corporate governance dictate that members of a class of plaintiffs clearly constitute a ***party***, which is not unlike a form

---

[39] *Huff*, 549 F.3d at 109 (emphasis added; internal citations omitted).

[40] Policy considerations are relevant to interpreting the Second Circuit's decision, based on the fact that it is articulating a "prudential" rule. *Id.* This conclusion is further supported by the general rule that prudential exceptions to the standing rules should be interpreted narrowly and are denied where "claims could have been litigated through other 'open avenues.'" *See Kowalski*, 543 U.S. at 131–32.

[41] *Huff*, 549 F.3d at 109.

[42] *Citizens United v. Federal Election Commission*, 558 U.S. 310, 349, 354, 356 (2010), found that regardless of whether a business enterprise takes the form of a corporation, partnership or something else, it is merely a "association[] of citizens." From a similar point of view, it does not matter if the class is an entity, partnership, association or something else; it is a business enterprise with a specific purpose.

of business organization.[43]

27.    For example, a general partnership is nothing more than a "voluntary association of two or more persons who jointly own and carry on a business for profit."[44]  And while a partnership is not a legal entity distinct from its members, general partnerships routinely sue in their own name as parties in Federal Court.[45]  In the same vein, while the Class is not a legal entity, it proceeds through litigation and is treated as the party that the lead plaintiff represents.

28.    Corporate governance concerns further confirm that it is essential to think of the class as the relevant party.  The members of a class are eligible to be members if and only if, like shareholders, they share common characteristics and goals with one another.  The possession of such common characteristics and goals are essential prerequisites for eligibility for membership in a class.  The particular corporate governance concerns at play here are further reflected in the fact that all of the plaintiffs in a particular class must be similarly situated and have similar goals and issues.  These corporate governance concerns are reflected in the standing rules as well as in the well-known commonality and typicality requirements of Rule 23.

29.    It is widely recognized that class representatives have fiduciary duties to the class. *See Deposit Guar. Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 331 (1980) ("A separate consideration, distinct from their private interests, is the responsibility of named plaintiffs to

---

[43] Whether a particular assemblage of class action plaintiffs is viewed as more closely analogous to any particular form of business organization (*e.g.*, limited partnership, corporation, or general partner) is not relevant to this analysis.  *See* Adam Winkler, WE THE CORPORATIONS: HOW AMERICAN BUSINESSES WON THEIR CIVIL RIGHTS (2018); Jonathan Macey & Leo E. Strine, Jr., *Citizens United as Bad Corporate Law*, 2019 WIS. L. REV. 451 (2019).

[44] Partnership, BLACK'S LAW DICTIONARY (11th ed. 2019).

[45] Alan Wright et al., FED. PRACTICE & PROC. § 1564 (3d ed. 2011) (noting that a partnership's standing to sue depends on whether that capacity was granted by state law, but confirming that unincorporated general partnerships may sue in their own name where state law permits).

represent the collective interests of the putative class").[46]  From this perspective, the class

representative qua class representative exists to advance the interests of the class and not

whatever individual interests the class members would have.

30.    Permitting a prudential exception to advance the ***individual interests*** of any one

class member makes no sense from the perspective of the existent fiduciary duties.  The class

representative duties as agent flow to the class.  Viewed from that perspective, the "injured

party" whose rights AP7 seeks to vindicate in moving to serve as lead plaintiff, must be the class,

not its individual members (*e.g.*, AP7's clients).  But, that injured party (*i.e.*, the class) has no

impediment whatsoever to pursuing its rights that would warrant the prudential standing

exception, since there are other movants seeking to serve as lead plaintiff on behalf of the class.

31.    This opinion is consistent with the general way that Courts view class actions.

Courts are typically far less concerned with the rights of any particular class member, than with

the class as whole.[47]  As a result, when applying the prudential exception to class actions, the

focus should remain on the class.[48]

* * *

The opinions expressed in this Report represent my views as of the date that the Report is

submitted.  I reserve the right to amend, reinforce, or revise my opinions as new information

becomes available.

---

[46] *See also Sondel v. Nw. Airlines, Inc.*, 56 F.3d 934, 938–39 (8th Cir. 1995) (stating that "certified representatives and the class counsel assume[ ] certain fiduciary responsibilities to the Class").

[47] For example, the Class itself can proceed even if the representative's individual claims become moot after class certification. *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 (1980).  This further shows that the relevant party in the litigation is the Class itself not the individual class members.

[48] In reaching the conclusion that the class is the relevant "injured party" in assessing the "prudential exception" in the context of the appointment of lead plaintiff, I reach no conclusion about whether AP7 should be granted a "prudential exception" for other purposes.  For example, I take no position as to whether AP7 should be granted a prudential exception if it seeks to pursue claims based on securities held by its funds through an opt-out action.

13

Respectfully submitted,

Jonathan R. Macey

May 13, 2020

14

# Exhibit 1

**JONATHAN R. MACEY**
**CURRICULUM VITAE**

Name:        Jonathan R. Macey

Address:     Yale Law School
             127 Wall Street              P.O. Box 208215
             New Haven, CT 06511          New Haven, CT 06520-8215
             (courier)                    (post)

Telephone:    (203) 432-7913             Fax:  (203) 432-4871

e-mail:      jonathan.macey@yale.edu

Education:   J.D. Yale Law School; Article and Book Review Editor, Yale Law Journal, 1982;
             A.B., cum laude (economics), Harvard College, 1977.

Current Positions:

- Sam Harris Professor of Corporate Law, Finance, and Securities Regulation, Yale University
- Professor, Yale School of Management
- Chair, Yale University Advisory Committee on Investor Responsibility (ACIR)
- Chair, Yale Faculty Committee on Athletics
- Executive Committee, Yale Law School Center for the Study of Corporate Law
- Provost's Standing Advisory and Appointment Committee (SAAC) for the Yale School of Management
- Economics Advisory Board, Financial Industry Regulatory Authority, (FINRA)
- Member, European Corporate Governance Institute (ECGI)

Subjects:    Business Organizations (Corporations and Other Business Associations);
             Corporate Finance; Corporate Governance; Banking and Financial Institutions
             Regulation; the Economics of Regulation

Other:       Ph.D. (Law) honoris causa Stockholm School of Economics, 1996

D.P. Jacobs prize for the most significant paper in volume 6 of the <u>Journal of Financial Intermediation</u> for "The Law & Economics of Best Execution" (co-authored with Maureen O'Hara) (1997)

Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service awarded by the University of Chicago Law School Chapter of the Federalist Society, 1995

Bipartisan Policy Center (BPC) Financial Regulatory Reform Initiative's Working Group on Capital Markets

Fellow, Columbia Law School and Columbia Business School, Program in the Law & Economics of Capital Markets

Founding Member, CCH/Aspen Wolters Kluwer Law & Business, Banking and Securities Editorial Board

<u>Books</u>:

"Cases and Materials on Corporations Including Partnerships and Limited Liability Companies," (Thomson*West, Thirteenth Edition 2017) (with Robert Hamilton and Douglas Moll).

"The Law of Banking and Financial Institutions," (Aspen Law &Business, sixth edition, 2017) (with Richard Cornell and Geoffrey P. Miller)

"Macey on Corporation Laws" (2 volume treatise), originally published in 1998, updated annually, Wolters Kluwer Law & Business, 2017 (updated annually)

"The Death of Corporate Reputation: How Integrity Has Been Destroyed on Wall Street," The Financial Times Press, (2013)

"Corporate Governance: Promises Kept, Promises Broken" (Princeton University Press 2008)

"Classics in Corporate Law and Economics," Jonathan Macey, editor, (Edward Elgar Publishing, 2008)

"Iconic Cases in Corporate Law," Jonathan Macey, editor, (Thomson*West, 2008)

"Costly Policies:  State Regulation and Antitrust Exemption in Insurance Markets" (with Geoffrey P. Miller, The AEI Press 1993)

1

"Svensk Aktiebolags Rätt I Omvandling: En Rättsekonomisk Analys" (Swedish Corporate Law in Transition:  A Law and Economics Analysis (published in Swedish and English by SNS Förlag 1993)

"Third Party Legal Opinions:  Evaluations and Analysis" (Prentice Hall Law and Business, 1992)

"Insider Trading:  Economics, Politics, and Policy" (The AEI Press, 1991)

"An Introduction to Modern Financial Theory" (The American College of Trust and Estate Council Foundation (1991)


Articles, Chapters in Books, Book Reviews:

"Extended Shareholder Liability for Systemically Important Financial Institutions, 69 American University Law Review 967 (2020)

"Comment on 'A Stream That Rises Above Its Source: Judicial Review from a Public Choice Perspective," 26 Supreme Court Economic Review 61 (2019)

"Citizens United as Bad Corporate Law,"  2019 Wisconsin Law Review 451 (2019) (with Leo Strine)

"Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets," 74 Business Lawyer 1015 (2019) (with Joshua Mitts)

"Error and Regulatory Risk in Financial Institution Regulation,"  25 Supreme Court Economic Review 155 (2018)

"*Martoma* and *Newman*: Valid Corporate Purpose and the Personal Benefit Test," 71 Southern Methodist University L. Rev. 869 (2018)

"Vertical and Horizontal Problems in Financial Regulation and Corporate Governance," *in* The Oxford Handbook of Corporate Law and Governance," Jeffrey Gordon and Wolf-Georg Ringe,editors, (Oxford University Press 2018)

"Recovering the Promise of the Orderly and Fair Stock Exchange" 42 The Journal of Corporation Law 778 (2017) (with David Swensen)

"Beyond the Personal Benefit Test: The Economics of Tipping by Insiders," 2 University of Pennsylvania Journal of Law & Public Affairs 24 (2017)

"Their Bark is Bigger than Their Bite: An Essay on W*ho Bleeds When the Wolves Bite*," The Yale Law Journal Forum, April 26, 2017

http://heinonline.org/HOL/Page?handle=hein.journals/yljfor126&div=44&g_sent=1&casa_token=&collection=journals

"A Public Choice Approach to the Unequal Treatment of Securities Market Participants and Home Borrowers," 3 Russell Sage Foundation Journal of the Social Sciences 94-101 (2017)

"The Genius of the Personal Benefit Test," 69 Stanford Law Review Online 17 (2016)

"Bank Corporate Governance: A Proposal for the Post-Crisis World," 22 Economic Policy Review 85-105 (2016) (Publication of the Federal Reserve Bank of New York) (with Maureen O'Hara);

"Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil," 100 Cornell L. Rev. 99 (2014)

"Are Any Creditors 'Particularly Deserving"?: On the Enduring Attraction of the Ring-Fence Approach to Cross-Border Insolvencies of Financial Institutions, 31 Yale J. on Reg. 695 (2014)

"Theories of Regulatory Risk: The Surprise Theory, The Arbitrage Theory and the Regulatory Mistake Theory, *in* Risk Management in Financial Institutions, Shahin Shojai and George Feiger, editors, (Euromoney Books, 2013)

"Sublime Myths: An Essay in Honor of the Shareholder Value Myth and the Tooth Fairy," 91 Texas Law Review 911 (2013) (book review)

"The Regulator Effect in Financial Regulation," 98 Cornell Law Review, 591 (2013)

"Enforcing Self-Regulatory Organizations' Penalties and the Nature of Self-Regulation," 40 Hofstra Law Review 963 (2012) (with Caroline Novogrod), *reprinted in* 55 Corporate Practice Commentator 279-313 (2013)

"It's All Shadow Banking, Actually" 31 Rev. Banking & Fin. L. 593 (2011-2012)

"Reducing Systemic Risk: The Role Money Market Mutual Funds as Substitutes for Federally Insured Bank Deposits" 17 Stanford Journal of Law, Business & Finance 131 (2011)

"Failure is an Option: An Ersatz-Antitrust Approach to Financial Regulation" 120 Yale Law Journal 1368 (2011) (with James Holdcroft)

"How Big Banks Fail and What to Do about It," 49 Journal of Economic Literature 750 (2011) (review essay)

3

"The Value of Reputation in Corporate Finance and Investment Banking (and the Related Roles of Regulation and Market Efficiency) 22 Journal of Applied Corporate Finance 18- 29 (2010).

"Process as Currency With the Courts: Judicial Scrutiny of Directors' Decisions," 4 International Journal of  Corporate Governance 337 (2009 (published June, 2010) (with Geoffrey Miller)

"The Demise of the Reputational Model in Capital Markets: The Problem of the 'Last Period Parasites'" 60 Syracuse Law Review 427 (2010)

"The Distorting Incentives Facing the U.S. Securities and Exchange Commission," 33 Harvard Journal of Law and Public Policy 641 (2010)

"Helping Law Catch Up to Markets: Applying Broker-Dealer Law to Subprime Mortgages," 34 The Journal of Corporation Law 790 (2009) (with Geoffrey Miller, Maureen O'Hara, and Gabriel Rosenberg).

"Regulation and Scholarship: Constant Companions or Occasional Bedfellows?" 26 Yale Journal on Regulation 89 (2009) with Maureen O'Hara

"Judicial Review of Class Action Settlements" Harvard Journal of Legal Analysis Winter 2009: Volume 1, Number 1 peer-edited Harvard Law Review publication, pp. 1-40 (available at https://ojs.hup.harvard.edu/index.php/jla/article/view/6/21 2009) (2009) with Geoffrey Miller

"Down and Out in the Stock Market: The Law and Economics of the Delisting Process," 51 Journal of Law and Economics 683 – 713 (2008) with Maureen O'Hara

"A Close Read of an Excellent Commentary on *Dodge v. Ford*," 3 Virginia Law & Business Review, 177 (2008)

"Introduction to Iconic Cases in Corporate Law," *in* "Iconic Cases in Corporate Law," pp. i – x (Thomson*West, 2008)

"Judicial Review of Corporate Decisions: Kamin v. American Express Company," *in* "Iconic Cases in Corporate Law," pp. 120-138 (Thomson*West, 2008)

"Out With the Bathwater: Erosion of Shareholders' Takeover Review," *in* "Iconic Cases in Corporate Law,"  pp. 209-239  (Thomson*West, 2008)

4

"Getting the Word Out About Fraud" A Theoretical Analysis of Whistleblowing and Insider Trading" 105 Michigan Law Review 1899 (2007), *reprinted in* "Retaliation and Whistleblowers," Wolters Kluwer, 2009, p 439.

Too Many Notes and Not Enough Votes: Lucian Bebchuk and Emperor Joseph II Kvetch about Contested Director Elections and Mozart's *Seraglio*," 93 Virginia Law Review 759 (2007)

"Executive Branch Usurpation of Power: Corporations and Capital Markets," 115 Yale Law Journal 2416 (vol. 9, 2006)

"The Nature of Conflicts of Interest Within the Firm," 31 The Journal of Corporation Law 613 (2006)

"The Politicization of American Corporate Governance," 1 Virginia Law & Business Review 10 (2006) (revised  in volume 2, #2, Virginia Law & Business Review).

"Government as Investor: Tax Policy and the State," 23 Social Philosophy & Policy, (2006);

"Commercial Banking and Democracy: The Illusive Quest for Deregulation," 23 Yale Journal on Regulation 1 (2006);

"Occupation Code 541110: Lawyers, Self-Regulation, and the Idea of a Profession," 74 Fordham Law Review 1079 (2005);

"From Markets to Venues: Securities Regulation in an Evolving World," 58 Stanford Law Review 563 (2005) ) (with Maureen O'Hara);

"Comment – The Limits of Legal Analysis: Using Externalities to Explain Legal Opinions in Structured Finance,"  84 Texas L. Rev.  75 (2005);

"Delaware: Home of the World's Most Expensive Raincoat," 33 Hofstra L. Rev. 1131 (2005);

"Stock Transfer Restrictions and Issuer Choice in Trading Venues," 55 Case Western Reserve L. Rev.  587 (2005) (with Maureen O'Hara);

"Institutional and Evolutionary Failure and Economic Development in the Middle East," 30 The Yale Journal of International Law 397 (2005) (with Ian Ayres);

"Positive Political Theory and Federal Usurpation of the Regulation of Corporate Governance: The Coming Preemption of the Martin Act," 80 Notre Dame Law Review 951 (2005);

"Best Execution Regulation: From Orders to Markets," 13 <u>Journal of Financial Transformation</u> 1 (2005);

"Legal Scholarship: A Corporate Scholar's Perspective," 41 <u>San Diego Law Review</u>, 1759 (2004);

"Wall Street in Turmoil: Federal State Relations Post Eliot Spitzer," 70 <u>Brooklyn Law Review</u> 117 (2004);

"Was Arthur Andersen Different? An Empirical Examination of Major Accounting Firm Audits of Large Clients," <u>Journal of Empirical Legal Studies</u>, July 2004, vol. 1, issue. 2, pp. 263-300(38) (with Ted Eisenberg);

"Monitoring, Corporate Performance: The Role of Objectivity, Proximity and Adaptability in Corporate Governance," <u>Cornell Law Review</u>, 2004, vol. 89, issue 2, p. 356-393 (with Arnoud Boot) (reprinted (in English and Portuguese) in Direito Empresarial: Aspectos atuais de Direito Empresarial brasileiro e comparado, pp. 416-441 (English); 442-470 (Portuguese) (2005);

"Efficient Capital Markets, Corporate Disclosure and Enron," <u>Cornell Law Review</u>, 2004, vol. 89, issue 2, p. 394-422;

"Regulatory Globalization as a Response to Regulatory Competition," 52 <u>Emory L. J</u>. 1353 (2003);

"A Pox on Both Your Houses: Enron, Sarbanes-Oxley and the Debate Concerning the Relative Efficiency of Mandatory Versus Enabling Rules, 81 <u>Washington University Law Quarterly</u>, 329 (2003);

"Observations on the Role of Commodification, Independence, Governance, and the Demise of the Accounting Profession," 48 <u>Villanova Law Review</u> 1167 (2003) (with Hillary Sale);

"The Corporate Governance of Banks," 9 <u>Economic Policy Review</u> 91 (2003) (Publication of the Federal Reserve Bank of New York) (with Maureen O'Hara);

"Solving the Corporate Governance Problems of Banks: A Proposal" 120 <u>The Banking Law Journal</u> 309 (2003) (with Maureen O'Hara);

"The Economics of Stock Exchange Listing Fees and Listing Requirements" 11 <u>Journal of Financial Intermediation</u> 297 (2002) (with Maureen O'Hara);

"Displacing Delaware: Can the Feds Do a Better Job Than the States in Regulating Takeovers?" 57 <u>The Business Lawyer</u> 1025 (2002);

6

"Smith  v. Van Gorkom: Insights About C.E.O.s, Corporate Law Rules, and the Jurisdictional Competition for Corporate Charters" 96 Northwestern Law Review 607 (2002);

"Cynicism and Trust in Politics and Constitutional Theory" 87 Cornell Law Review 280 (2002);

"Creditors Versus Capital Formation: The Case Against the European Legal Capital Rules" 86 Cornell Law Review 1165 (2001), rewritten in Italian as "Raccolta di Capitale di Rischio e Tutela dei Creditori: Una Critica Radicale alle Regole Europee sul Capitale Sociale" (Capital Formation and Creditor Protection: A Radical Critique of the European Legal Capital Rules), 57 Rivista delle Società 78 (2002) (with Luca Enriques);

"Regulatory Competition in the US Federal System: Banking and Financial Services" in Regulatory Competition and Economic Regulation: Comparative Perspectives, edited by Daniel C. Esty and Damien Geradin (Oxford University Press 2001) at pages 95-110;

"The 'Demand' for International Regulatory Cooperation: A Public Choice Perspective" in Transatlantic Regulatory Co-operation: Legal Problems and Political Perspectives" edited by George A. Bermann, Matthias Herdegen, & Peter L. Lindseth (Oxford University Press  2000) at pages 147-166;

"US and EU Structures of Governance as Barriers to Transatlantic Regulatory Cooperation" in  Transatlantic Regulatory Co-operation: Legal Problems and Political Perspectives,  edited by George A. Bermann, Matthias Herdegen, & Peter L. Lindseth (Oxford University Press  2000) at pages 357-372;

"The Business of Banking: Before and After Gramm-Leach-Bliley" 25 The Journal of Corporation Law 691 (2000);

"Securities Trading: A Contractual Perspective" 50 Case Western L. Rev. 269 (1999);

"Information and Transaction Costs as the Determinants of Tolerable Growth Levels" 155 Journal of Institutional and Theoretical Economics 617 (1999) (with Enrico Colombatto);

"Fiduciary Duties as Residual Claims: Obligations to Non-shareholder Constituencies from a Theory of the Firm Perspective," 84 Cornell L. Rev. 1266 (1999);

"Globalization, Exchange Governance, and the Future of Exchanges" Brookings Wharton Papers on Financial Services 1999, the Brookings Institution (with Maureen O'Hara);

"Regulating Exchanges and Alternative Trading Systems: A Law and Economics Perspective" 28 Journal of Legal Studies 17 (1999 with Maureen O'Hara);

"Lawyers in Agencies: Economics, Social Psychology, and Process," 61 Law & Contemporary Problems 109 (1998 (published in January, 1999));

"The Legality and Utility of the Shareholder Rights Bylaw," 26 Hofstra Law Review 835 (1998);

"Wall Street Versus Main Street: How Ignorance, Hyperbole, and Fear Lead to Regulation," 65 The University of Chicago Law Review 1487 (1998);

"Professor Simon on the Kaye Scholer Affair: Shock at the Gambling at Rick's Place in Casablanca" 23 Law and Social Inquiry 323 (1998);

"Winstar, Bureaucracy and Public Choice," 6 Supreme Court Economic Review 173 (1998);

"On the Failure of Libertarianism to Capture the Popular Imagination," 15 Journal of Social Philosophy 372 (1998);

"Regulation and Disaster: Some Observations in the Context of Systemic Risk," 1998 Brookings-Wharton Papers on Financial Services 405;

"Public Choice and the Legal Academy" (reviewing Mashaw, Greed, Chaos and Governance), 86 Georgetown Law Journal 1075 (1998);

"Italian Corporate Governance: One American's Perspective" 1998 Columbia Business Law Review 121 (1998);

"Measuring the Effectiveness of Different Corporate Governance Systems: Toward a More Scientific Approach" 10 Journal of Applied Corporate Finance 16 (1998);

"The Legality of the Shareholder Rights By-Law in Delaware: Preserving the Market for Corporate Control" 10 Journal of Applied Corporate Finance 63 (1998);

"The Law and Economics of Best Execution," 6 Journal of Financial Intermediation 188 (1977, published in 1998, with Maureen O'Hara);

"An Economic Analysis of Conflict of Interest Regulation," 82 Iowa Law Review 965 (1997, published in 1998, with Geoffrey P. Miller);

"Law and the Social Sciences" 21 Harvard Journal of Law & Public Pol'y 171 (1997);

"Flexibility in Determining the Role of the Board of Directors in the Age of Information" 19 Cardozo Law Review 291 (1997 with Enrico Colombatto);

"Public and Private Ordering and the Production of Legitimate and Illegitimate Legal Rules"
82 Cornell Law Review 1123 (1997);

"Lessons from Transition in Eastern Europe: A Property-Right Interpretation," 1 International Bulletin of the Institute of Macroeconomic Analysis and Development 10 (1997 with Enrico Colombatto);

"Manipulation on Trial: Economic Analysis and the Hunt Silver Case" 35 Journal of Economic Literature 162 (1997) (book review);

"A Public Choice Model of International Economic Cooperation and the Decline of the Nation State," 18 Cardozo Law Review 925 (1996 with Enrico Colombatto);

"Externalities and the Matching Principle: The Case for Reallocating Environmental Regulatory Authority," 23 Yale Law & Policy Review/ Yale Journal on Regulation Symposium: Constructing a New Federalism 25 (1996);

"Exchange-Rate Management in Eastern Europe: A Public-Choice Perspective," 16 International Review of Law and Economics 195 (1996 with Enrico Colombatto);

"Derivative Instruments: Lessons For the Regulatory State," 21 The Journal of Corporation Law 69 ((1995) published in 1996);

"Public Choice, Public Opinion, and the Fuller Court," 49 Vanderbilt Law Review 373 (1996) (book review);

"Originalism As An `Ism'," 19 Harvard Journal of Law & Public Policy, 301 (1996);

"Exchange-Rate Management in Eastern Europe:  A Public Choice Perspective," 6 Journal des Economistes et des Etudes Humanines 259-275 (1995 with Enrico Colombatto);

"Reflections on Professional Responsibility in a Regulatory State," 63 George Washington Law Review 1105 (1995 with Geoffrey P. Miller);

9

"Corporate Governance and Commercial Banking:  A Comparative Examination of Germany, Japan, and the United States" 48 Stanford Law Review 73 (1995) (with Geoffrey P. Miller) reprinted in 9 Journal of Applied Corporate Finance 57 (1997);

"Public Choice Theory and the Transition Market Economy in Eastern Europe: Currency Convertibility and Exchange Rates" 28 Cornell Journal of International Law 387 (1995) (with Enrico Colombatto);

"The Regulation of Corporate Acquisitions:  A Law and Economics Analysis of European Proposals for Reform" 1995 Columbia Business Law Review 495 (1995) (with Clas Bergström, Peter Högfeldt and Per Samuelsson);

"A Market Approach to Tort Reform via Rule 78" 80 Cornell Law Review 909 (1995) (with Geoffrey P. Miller);

"Language and Self-Interest:  Preliminary Notes Towards a Public Choice Approach to Legal Language" in Northwestern University/Washington University Law and Linguistics Conference, 73 Washington University Law Quarterly 1001 (1995);

"The Limited Liability Company:  Lessons for Corporate Law" in F. Hodge O'Neal Corporate and Securities Law Symposium:  Limited Liability Companies, 73 Washington University Law Quarterly 433 (1995);

"Path Dependence, Public Choice, and Transition in Russia:  A Bargaining Approach" 4 Cornell Journal of Law and Public Policy 379 (1995) (with Enrico Colombatto);

"A Rejoinder" 16 Cardozo Law Review 1781 (1995);

"Deposit Insurance, the Implicit Regulatory Contract, and the Mismatch in the Term Structure of Banks' Assets and Liabilities" 12 Yale Journal on Regulation 1 (1995) (with Geoffrey P. Miller);

"Towards a Regulatory Analysis of Deposit Insurance" in Prudential Regulation of Banks and Securities Firms" (Guido Ferrarini, editor, 1995) (with Geoffrey P. Miller);

"Packaged Preferences and the Institutional Transformation of Interests" 61 University of Chicago Law Review 1443 (1994);

"Health Care Reform:  Perspectives from the Economic Theory of Regulation and the Economic Theory of Statutory Interpretation: 79 Cornell Law Review 1434 (1994);

10

"Judicial Preferences, Public Choice, and the Rules of Procedure" 23 <u>Journal of Legal Studies</u> 627 (1994);

"Property Rights, Innovation and Constitutional Structure" 11 <u>Social Philosophy and Policy</u> 181 (1994);

"A Public Choice View of Transition in Eastern Europe" 2-3 <u>Economia delle Scelte pubbliche</u> 113 (1994) (with Enrico Colombatto);

"Chief Justice Rehnquist, Interest Group Theory, and the Founders' Design" 25 <u>Rutgers Law Review</u> 577 (1994);

"Comment:  Confrontation or Cooperation for Mutual Gain?" 57 <u>Law and Contemporary Problems</u> 45 (comment on Moe & Wilson, Presidents and the Politics of Structure 1994);

"Administrative Agency Obsolescence and Interest Group Formation:  A Case Study of the SEC at Sixty" 15 <u>Cardozo Law Review</u> 909 (1994);

"The Pervasive Influence of Economic Analysis on Legal Decisionmaking" 17 <u>Harvard Journal of Law and Public Policy</u> 107 (1994);

"Civic Education and Interest Group Formation in the American Law School" 45 <u>Stanford Law Review</u> 1937 (1993);

"Corporate Law and Corporate Governance:  A Contractual Perspective" 18 <u>The Journal of Corporation Law</u> 185 (1993);

"Thayer, Nagel and the Founders' Design:  A Comment" 88 <u>Northwestern Law Review</u> 226 1993);

"The McCarran-Ferguson Act of 1945:  Reconceiving the Federal Role in Insurance Regulation" 68 <u>New York University Law Review</u> 13 (with Geoffrey P. Miller 1993);

"The Transformation of the American Law Institute" 61 <u>George Washington Law Review</u> 1412 (1993);

"Corporate Stakeholders:  A Contractual Perspective" 43 <u>University of Toronto Law Journal</u> 401 (with Geoffrey P. Miller 1993);

"Double Liability of Bank Shareholders:  A Look at the New Data" 28 <u>Wake Forest Law Review</u> 933 (1993);

"The Inevitability of Universal Banking" 19 <u>Brooklyn Journal of International Law</u> 203 (1993);

11

"Congress, the Court, and the Bill of Rights" 23 Cumberland Law Review 93 (Comment at Sixth Annual Federalist Society Symposium 1993);

"Kaye, Scholer, Firrea, and the Desirability of Early Closure:  A View of the Kaye, Scholer Case From the Perspective of Bank Regulatory Policy" 66 Southern California Law Review 1115 (with Geoffrey P. Miller 1993);

"Representative Democracy" 16 Harvard Journal of Law & Public Policy 49 (1993);

"The Community Reinvestment Act:  An Economic Analysis" 79 Virginia Law Review 291 (with Geoffrey P. Miller 1993);

"Auctioning Class Action and Derivative Litigation:  A Rejoinder" 87 Northwestern Law Review 458 (with Geoffrey P. Miller 1993);

"Bank Failure:  The Politicization of a Social Problem" 45 Stanford Law Review 289 (with Geoffrey P. Miller 1992);

"Implementing the FDIC Improvement Act of 1991" in Rebuilding Public Confidence Through Financial Reform, Conference Proceedings Volume, Ohio State University Business School, June 25, 1992;

"Nondeposit Deposits and the Future of Bank Regulation" 91 Michigan Law Review 237 (with Geoffrey P. Miller 1992);

"Judicial Discretion and the Internal Organization of Congress" 12 International Review of Law and Economics  280 (1992);

"Mandatory Pro Bono:  Comfort for the Poor or Welfare for the Rich?"  77 Cornell Law Review 1115 (1992);

"The End of History and the New World Order:  The Triumph of Capitalism and the Competition Between Liberalism and Democracy" 25 Cornell International Law Journal 277 (with Geoffrey P. Miller 1992);

"Separated Powers and Positive Political Theory:  The Tug of War Over Administrative Agencies" 80 Georgetown Law Journal 671 (1992);

"Organizational Design and the Political Control of Administrative Agencies" 8 Journal of Law, Economics & Organization 93 (1992);

"The Canons of Statutory Construction and Judicial Preferences" 45 Vanderbilt Law Review 647 (with Geoffrey P. Miller 1992);

12

"Some Causes and Consequences of the Bifurcated Treatment of Economic Rights and `Other' Rights Under the U.S. Constitution" 9 Social Philosophy and Policy 141 (1992);

"Double Liability of Bank Shareholders:  History and Implications" 27 Wake Forest Law Review 31 (with Geoffrey P. Miller 1992 Symposium);

"Origin of the Blue Sky Laws" 70 Texas Law Review 347 (with Geoffrey P. Miller 1991);

"Toward Enhanced Consumer Choice in Banking:  Uninsured Deposit Facilities as Financial Intermediaries for the 1990's" 1991 New York University Annual Survey of American Law 865 (with Geoffrey P. Miller 1991);

"The Fraud-on-the-Market Theory Revisited" 77 Virginia Law Review 1001 (with Geoffrey P. Miller 1991);

"Lessons From Financial Economics:  Materiality, Reliance, and Extending the Reach of Basic v. Levinson" 77 Virginia Law Review 1017 (with Geoffrey P. Miller, Mark L. Mitchell and Jeffry M. Netter 1991);

"The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation:  Economic Analysis and Recommendations for Reform" 58 University of Chicago Law Review 1 (with Geoffrey P. Miller 1991);

"The Glass-Steagall Act and the Riskiness of Financial Intermediaries" 14 Research in Law and Economics 19 (with M. Wayne Marr and S. David Young 1991);

"Agency Theory and the Criminal Liability of Corporations" 71 Boston University Law Review 315 (1991 Symposium);

"State and Federal Regulation of Corporate Takeovers:  A View From the Demand Side" 69 Washington University Law Quarterly 383 (1991);

"America's Banking System:  The Origins and Future of the Current Crisis" 69 Washington University Law Quarterly 769 (1991 Symposium);

"An Economic Analysis of the Various Rationales for Making Shareholders the Exclusive Beneficiaries of Corporate Fiduciary Duties" 21 Stetson Law Review 23 (1991 Symposium);

"Politics, Bureaucracies, and Financial Markets:  Bank Entry into Commercial Paper Underwriting in the United States and Japan" 139 University of Pennsylvania Law Review 369 (with David G. Litt, Geoffrey P. Miller and Edward L. Rubin 1990);

13

"The Role of the Democratic and Republican Parties as Organizers of Shadow Interest Groups" 89 Michigan Law Review 1 (1990);

"Federal Deference to Local Regulators and the Economic Theory of Regulation" 75 Virginia Law Review 265 (1991);

"Good Finance, Bad Economics:  An Analysis of the Fraud on the Market Theory" 42 Stanford Law Review 1059 (with Geoffrey P. Miller 1990);

"The Stock Exchange as a Firm:  The Emergence of Close Substitutes for the New York and Tokyo Stock Exchanges" 76 Cornell Law Review 1007 (with Hideki Kanda 1990);

"Auction Theory, MBO's and Property Rights in Corporate Assets" 25 Wake Forest Law Review 85 (1990 Symposium);

"Firm-Specific Human Capital Investments and Hegelian Ethics:  A Comment on Cornell and Posner" 11 Cardozo Law Review 505 (1990);

"Courts and Corporations:  A Comment on Coffee" 89 Columbia Law Review 1692 (1990);

"Macey Responds to Lubet" 75 Cornell Law Review 959 (1990);

"The Fraud on the Market Theory:  Some Preliminary Issues" 74 Cornell Law Review 923 (1989);

"Restrictions on Short Sales:  An Analysis of the Uptick Rule and its Role in View of the October 1987 Stock Market Crash" 74 Cornell Law Review 799 (with Mark Mitchell and Jeffry Netter 1989);

"Externalities, Firm-Specific Capital Investments, and the Legal Treatment of Fundamental Corporate Changes" 1989 Duke Law Journal 173 (1989);

"The Political Science of Regulating Bank Risk" 49 Ohio State Law Journal 1277 (1989);

"The Myth of `Re-Regulation':  The Interest Group Dynamics of Regulatory Change in the Financial Services Industry" 45 Washington & Lee Law Review 1275 (1989);

"Public Choice:  The Theory of the Firm and the Theory of Market Exchange" 74 Cornell Law Review 43 (1989);

14

"How Separation of Powers Protects Individual Liberties" 41 <u>Rutgers Law Review</u> 813 (1989);

"The Chicken Wars as a Prisoners' Dilemma:  What is in a Game?" 64 <u>Notre Dame Law Review</u> 447 (1989) (review of John A.C. Conybeare, <u>Trade Wars: The Theory and Practice of International Commercial Rivalry</u>);

"The Dangers of Pop Thinking About Japan" 22 <u>Cornell Journal of International Law</u> 623 (1989) (review of Daniel Burstein, <u>Yen! Japan's New Financial Empire and its Threat to America</u>);

"The Internal and External Costs and Benefits of <u>Stare Decisis</u>" 65 <u>Chicago-Kent Law Review</u> 93 (Special Symposium Issue on Post-Chicago Law and Economics, 1989);

"Trans Union Reconsidered" 98 <u>Yale Law Journal</u> 127 (with Geoffrey P. Miller 1988);

"The Missing Element in the Republican Revival" 97 <u>Yale Law Journal</u> 1673 (1988);

"Bank Failures, Risk Monitoring and the Market for Bank Control" 88 <u>Columbia Law Review</u> 1153 (with Geoffrey P. Miller 1988);

"The Myth of Competition in the Dual Banking System" 73 <u>Cornell Law Review</u> 677 (with Henry N. Butler 1988);

"State Anti-Takeover Statutes:  Good Politics, Bad Economics" 1988 <u>Wisconsin Law Review</u> 467 (1988);

"Ethics, Economics and Insider Trading: Ayn Rand Meets the Theory of the Firm" 11 <u>Harvard Journal of Law and Public Policy</u> 785 (1988);

"Alan Bloom and the American Law School" 73 <u>Cornell Law Review</u> 1038 (1988) (review of Alan Bloom, <u>The Closing of the American Mind</u>);

"The Private Creation of Private Trusts" 37 <u>Emory Law Journal</u> 295 (1988);

"From Judicial Solutions to Political Solutions:  The New, New Direction of the Rules Against Insider Trading" 39 <u>Alabama Law Review</u> 355 (1988 <u>Symposium</u>); reprinted 30 <u>Corporate Practice Commentator</u> 459 (1989);

"Transaction Costs and the Normative Elements of the Public Choice Model:  An application to Constitutional Theory" 74 <u>Virginia Law Review</u> 471 (1988 <u>Symposium</u>);

15

"Market Discipline by Depositors:  A Summary of the Theoretical and Empirical Arguments" 5 Yale Journal on Regulation 215 (with Elizabeth H. Garrett 1988);

"Regulation on Demand:  Special Interest Groups and Insider Trading Law" 30 Journal of Law and Economics 311 (with David D. Haddock 1987);

"Competing Economic Views of the Constitution" 56 George Washington Law Review 50 (1987 Symposium);

"Regulation 13D and the Regulatory Process" 65 Washington University Law Quarterly 131 (with Jeffry M. Netter 1987 Symposium);

"Takeover Defensive Tactics and Legal Scholarship:  Market Forces vs. the Policymaker's Dilemma" 96 Yale Law Journal 342 (1987);

"A Coasian Model of Insider Trading" 88 Northwestern Law Review 1449 (with David D. Haddock 1987);

"Toward An Interest Group Theory of Delaware Corporate Law" 65 Texas Law Review 469 (with Geoffrey P. Miller 1987);

"Property Rights in Assets and Resistance to Tender Offers" 73 Virginia Law Review 701 (with David D. Haddock and Fred S. McChesney 1987);

"Promoting Public-Regarding Legislation Through Statutory Interpretation:  An Interest Group Model" 86 Columbia Law Review 223 (1986);

"ESOP's and Market Distortions" 23 Harvard Journal on Legislation 103 (with Richard L. Doernberg 1986);

"From Fairness to Contract:  The New Direction of the Rules Against Insider Trading" 14 Hofstra Law Review 6 (1985 Symposium); reprinted in 18 Securities Law Review (1986);

"A Theoretical Analysis of Corporate Greenmail" 95 Yale Law Journal 13 (with Fred S. McChesney 1985);

"Controlling Insider Trading in Europe and America:  The Economics of the Politics" (with David D. Haddock) (1986); in Law and Economics and the Economics of Regulation 149 (International Studies in Economics and Econometrics, Volume 13, Kluwer Academic Publishers);

"Shirking at the SEC:  The Failure of the National Market System" University of Illinois Law Review, 315 (with David Haddock 1985);

16

"Special Interest Groups Legislation and the Judicial Function:  The Dilemma of Glass-Steagall" 33 Emory Law Journal 1 (1984); Reprinted in 17 Securities Law Review 401 (1985);

"Toward a New Pedagogy" (Review of Loss, Fundamentals of Securities Regulation) 93 Yale Law Journal 1173 (1984);

Miscellaneous
Publications:

"Behind the SEC's War on Freedom of Speech," BNN Bloomberg Newswire/Opinion, March 2, 2020, https://www.bnnbloomberg.ca/behind-the-sec-s-war-on-freedom-of-speech-1.1398605

"Investigation Into Rebates for Brokers Much Needed,"  The Financial Times, https://www.ft.com/content/0619f7ca-32c3-11ea-a329-0bcf87a328f2, January 12, 2020

"Wall Street Profits by Putting Investors in the Slow Lane," The New York Times, https://www.nytimes.com/2017/07/18/opinion/wall-street-brokers-rebates kickbacks.html?mcubz=2 July 18, 2017 (with David Swensen)

"As IPOs Decline, The Market is Becoming More Elitist," The Los Angeles Times, http://www.latimes.com/opinion/op-ed/la-oe-macey-ipo-democracy-20170110-story.html  January 10, 2017

"Corporations: The Short-Termism Debate," Panel Transcript from 2014 National Lawyers Convention: Millennials, Equity and the Rule of Law, 85 Mississippi Law Journal 697, 711-714 *inter alia* (2016)

"In Defense of Athletics," The Yale Daily News, http://yaledailynews.com/blog/2016/11/18/macey-in-defense-of-athletics/, November 18, 2016

"Obama's Pitch to Ban Non-Compete Agreements Would Make the Rich Richer," Fortune Magazine, http://fortune.com/2016/11/03/obama-non-compete-agreements/, November 3, 2016

"Insider Trading and the Supreme Court," Defining Ideas, A Hoover Institution Journal, http://www.hoover.org/research/insider-trading-and-supreme-court, September 29, 2016

"The Rise of Crony Capitalism," Defining Ideas, A Hoover Institution Journal, http://www.hoover.org/research/rise-crony-capitalism, February 11, 2016

17

"Beware of Banking Animus," Defining Ideas, A Hoover Institution Journal, http://www.hoover.org/research/beware-banking-animus, January 5, 2016 (reprinted in Hebrew in the Tel Aviv newspaper Haaretz)

"One Way to Unrig Stock Trading," The New York Times, December 24, 2015 (with David Swensen)

"Fannie and Freddie Are Making Lots of Money – But Not for Their Shareholders," The National Review, September 3, 2015 (with Logan Beirne)

"The Cure for Stock-Market Fragmentation: More Exchanges," The Wall Street Journal, June 1, 2015 (with David Swensen)

"Commissioner Gallagher's and Professor Grundfest's Wrongful Attack on the Shareholder Rights Project," Harvard Law School Forum on Corporate Governance and Regulation, May 18, 2015

"Injustice at the SEC," Defining Ideas, A Hoover Institution Journal, http://www.hoover.org/research/injustice-sec, May 14, 2015

"Professor Grundfest's Latest Reply Flip-Flops Allegations and Further Demonstrates that He and Commissioner Gallagher Wrongfully Accused the SRP," The Harvard law School Forum on Corporate Governance and Financial Regulation, January 6, 2015

"Professor Grundfest's Reply Demonstrates that He and Commissioner Gallagher Wrongfully Accused the SRP," The Harvard law School Forum on Corporate Governance and Financial Regulation, December 21, 2014

"SEC Commissioner, Law Professor Wrongfully Accuse SRP of Securities Fraud," The Harvard law School Forum on Corporate Governance and Financial Regulation, December 15, 2014

"An Insider-Trading Watershed," The Wall Street Journal, December 12, 2014

"Argentina's Disturbing New Low," National Review OnLine, October 31, 2014

"Did Fannie and Freddie Recover After the Collapse? Read the Report," The National Law Journal, (with Logan Beirne), September 8, 2014

"Congress Is Stealing Fannie and Freddie, Real Clear Markets," (with Logan Beirne), May 14, 2014

"It's Perfectly Fine For Herbalife Short-Sellers To Lobby The Government," Forbes.com, April 24, 2014

"How Argentina's Default Could Be New York's Loss: The Commercial Capital Depends On U.S. Courts to Hold Governments to Their Promises," The Wall Street Journal, April 20, 2014

"3 Justifications for Piercing the Corporate Veil," LexisNexis Law 360, April 1, 2014

"On Divestment," The Yale Daily News, November 15, 2013

"Using Disclosure to Silence Corporate America: The Soros-funded CPA-Zicklin Index' is Merely A Weapon Against Business," The Wall Street Journal, October 22, 2013

Jonathan Macey, Opinion analysis: "That which does not kill the SEC may make the agency stronger," SCOTUSblog (Feb. 28, 2013, 12:04 PM), http://www.scotusblog.com/2013/02/opinion-analysis-that-which-does-not-kill-the-sec-may-make-the-agency-stronger/

Jonathan Macey, Argument recap: "We're from the government and we're here to win," SCOTUSblog (Jan. 15, 2013, 10:50 AM), http://www.scotusblog.com/2013/01/argument-recap-were-from-the-government-and-were-here-to-win/

Jonathan Macey, Argument Preview: "Too bad both sides can't lose this one," SCOTUSblog (Jan. 7, 2013), http://www.scotusblog.com/2013/01/argument-preview-too-bad-both-sides-cant-lose-this-one/

"Is Mitt Romney at Risk from the Department of Justice?" Politico, August 16, 2012

"Libor: Three Scandals in One" Foreign Affairs, (foreignaffairs.com), July 20, 2012

"The Feds' New Mortgage Disclosures Are a Bust" The Wall Street Journal, July 18, 2012

"J.P. Morgan Lost $2 billion. They'll Learn From Experience. Regulators Rarely Do," The Wall Street Journal, May 14, 2012

"The Right Lessons of JPMorgan Fiasco," Politico, May 14, 2012

"An End to the Regulatory State," Politico, March 22, 2012

"How Private Equity Works," The Wall Street Journal, January 13, 2012

"Congress's Phony Insider-Trading Reform," The Wall Street Journal, December 13, 2011

19

"Tackling the Power of the 1%," Politico.com, November 29, 2011

"Buffett BofA Buy No Seal of Approval," Politico.com, August 28, 2011

"Will Court Short-Circuit Dodd-Frank"," Politico.com, (with Elaine Buckberg and James Overdahl) August 16, 2011

"Reform Still Lets Banks Play Roulette," Politico.com, May 5, 2011

"Deconstructing the Galleon Insider Trading Trial," The Wall Street Journal, April 19, 2011

"Uncle Sam and the Hostile Takeover" The Wall Street Journal, March 21, 2011

"The Governor's Power Grab: New York Law Journal March 7, 2011

"Did Egypt's Rising Economy Lead to Hosni Mubarak's Fall?" Politico.com, February 18, 2011.

"The SEC's Facebook Fiasco" The Wall Street Journal, January 20, 2011

"Who wants to watch 'Bank Bailout 2'? Politico.com, October 28, 2010

"Slouching Toward Financial Reform" Politico.com, June 17, 2010

"Break Up the Wall Street Banks. Now" RealClearPolitics.com, April 20, 2010

"Dodd Bill Too Opaque" Politico.com, April 19, 2010

"Financial Reform: It's the Politics" Politico, February 3, 2010

"Obama's Financial Reform Falls Short," Politico, January 22, 2010

"Obama and 'Fat Cat Bankers'" The Wall Street Journal, January 12, 2010

"Washington's Plans May Result In Even Higher Executive Pay," The Wall Street Journal, October 25, 2009

"Advice and Consent: The Biggest Danger Is That The Governance Model Transforms Too Radically and Directors Become a Threat To, Rather Than a Resource For, Management," (with Steven Seiden) Directors and Boards Magazine, 2009.

"Say on Pay and Other Bad Ideas: A Ban on Golden Parachutes Will Entrench Management," The Wall Street Journal, April 14, 2009

20

"Holding CEOs Accountable: Corporate Boards Are Often Last to See What's Wrong," The Wall Street Journal, December 9, 2008

"The Government Is Contributing to the Panic," The Wall Street Journal, October 11, 2008

"Wall Street-Main Street Power Game," The Washington Independent, October 17, 2008 (with James Holdcroft)

"Regulation and Scholarship: Constant Companions or Occasional Bedfellows?" 25 Yale Journal on Regulation 305-313 (2008) (speech delivered on the occasion of the 25th Anniversary of the Yale Journal on Regulation).

Yale Invests Responsibly," Yale Daily News, Friday, November 21, 2008

"Bear Stearns Too Big to Fail?" The Washington Independent, May 21, 2008 (http://washingtonindependent.com/view/bear-stearns-too-big)

"Brave New Fed" The Wall Street Journal, Monday, March 31, 2008, at A19.

"Regulatory McCarthyism" The Wall Street Journal, Tuesday, October 24, 2006 at A17

"From Orders to Markets: Who Should Decide What is 'Best Execution'" Regulation, Vol. 28, No. 2, Summer 2005.

"A Misguided Proposal to Regulate Risk-Taking" (letter) The Wall Street Journal, Tuesday, April 5, 2005.

"A Risky Proposition" (book review) The Wall Street Journal, Tuesday, March 15, 2005;

"How Does the SEC Arrive at its Fines Against Corporate Wrongdoers" June 21, 2004, Forbes;

"Securities and Exchange Nanny" The Wall Street Journal, Tuesday, December 29, 2003, A10;

"Public Choice and the Law." In *The New Palgrave Dictionary of Economics and the Law, Vol. 3*. P. Newman, ed. New York: Stockton. (1998).

"A Poison Pill That Shareholders Can Swallow" The Wall Street Journal, Monday, May 4, 1998;

"A Critical Test of Corporate Governance" The Los Angeles Times, Sunday, February 22, 1998, M2;

21

"Shareholder Rights Will Be Next Battleground" The National Law Journal, Monday, February 16, 1998;

"Will Euro's Heat Make U.S. Firms Wilt?" The National Law Journal, Monday, September 1, 1997

"Banking; A Reform Plan that Leaves Consumers Out" The Los Angeles Times, Sunday, May18, 1997;

"Fed Does End Run on Glass-Steagall" The National Law Journal, Monday, April 28, 1997;

"Blame Managers, Not Derivatives" The National Law Journal, Monday, August 26, 1996;

"Wealth Creation as a `Sin'," XVII The Journal of Corporate Governance 12 (1996), reprinted in Independent Policy Report, Independent Institute (1996);

"Appeals Court Decision Validates Shady Deals" The National Law Journal, Monday, September 25, 1995;

"The Court Gets It Half Right on Firrea" The Wall Street Journal Wednesday, September 13, 1995;

"The Lowdown on Lending Discrimination"  The Wall Street Journal, Wednesday, August 9, 1995;

"The '80s Villain, Vindicated" The Wall Street Journal, July 18, 1995;

"A Poison Pill to Destroy Banking Reform" The Wall Street Journal, Wednesday, June 7, 1995;

"Banking by Quota" The Wall Street Journal, Wednesday, September 7, 1994;

"Mutual Banks Take Your Money and Run" The Wall Street Journal, Wednesday, December 29, 1993;

"Porkbarrel Banking" The Wall Street Journal, Monday, July 19, 1993;

"Not All Pro Bono Work Helps the Poor" The Wall Street Journal, Wednesday, December 30, 1992;

"Naderite Mossbacks Lose Control Over Corporate Law" The Wall Street Journal, Wednesday, June 24, 1992;

22

"Needless Nationalization at the FDIC" The Wall Street Journal, Friday, February 14, 1992;

"The SEC Dinosaur Expands its Turf: The Wall Street Journal, Wednesday, January 29, 1992;

"Don't Blame Salomon, Blame the Regulators" The Wall Street Journal, Monday, August 19, 1991;

"In Wake of Bailout, Why are we Rewarding Banks?" The Los Angeles Times, Sunday, July 14, 1991;

"While Politicians Fiddle Banking Crises Explode" The Los Angeles Times, Sunday, September 23, 1990;

"S&L Bailout Plan Victim of Hysteria" The Wall Street Journal, Monday, June 25, 1990;

"A Good Idea Gone Sour:  Can Bank Insurance Fail?" The Los Angeles Times, Sunday, June 24, 1990;

"It's Time for Bush to Pay the Piper on the S&L Bailout" The Los Angeles Times, Sunday, April 22, 1990;

"The Politics of Denying an S&L Crisis" The Los Angeles Times, Sunday, December 10, 1990;

"Savings and Loan Regulations Create `Win-Win' Situation for Risk Takers" The Los Angeles Times, Sunday, February 5, 1989;

"The SEC's Insider Trading Proposal:  Good Politics, Bad Policy" Cato Institute Policy Analysis No. 101, March 31, 1988;

"Market for Corporate Control" The Wall Street Journal, Friday, March 4, 1988;

"Senators Would Shoot SEC Messengers" The Wall Street Journal, Thursday, September 10, 1987;

"SEC Vigilant Against Insider Trading - But is it Within Law?  Too Strict a Crackdown Will Harm Markets" The Wall Street Journal, Wednesday, May 28, 1986;

"Financial Planners - A New Professional Cartel?" The Wall Street Journal, Tuesday, October 31, 1985;

"Conservative Judgment Time" The Wall Street Journal, Friday, August 23, 1985;

"Introduction" to Volume V (1989) of the Banking Law Anthology;

Remarks at Symposium on the First Amendment and Federal Securities Regulation, 20 Connecticut Law Review (assorted pages) 1988;

Remarks at Colloquium on the ALI Corporate Governance Project, 71 Cornell Law Review. (assorted pages) (1986);

"A Conduct Oriented Approach to the Glass-Steagall Act" 91 Yale Law Journal 102 (1981) (published as a student).

Recent Testimony

"Measuring the Systemic Importance of U.S. Bank Holding Companies," Senate Banking Committee Hearing, July 23, 2015

Current Activities:

Member, American Law Institute;

Editorial Board, Journal of Accounting, Finance and Law

Academic Advisory Board Committee, the Banking Law Anthology;

Academic Advisory Board, The Social Philosophy and Policy Center;

Board of Editors, Journal of Banking and Finance;

Board of Editors, Journal of Banking Law;

Board of Editors, Journal of Financial Crime;

Board of Editors, Corporate Practice Commentator;

Guest Contributor, Harvard Corporate Governance Blog

Employment History:

Sam Harris Professor of Corporate Law, Securities Law and Corporate Finance, Yale University, 2004 – present;

Visiting Professor, Bocconi University, Milan, Italy, fall 2012;

Visiting Professor of Law, Yale University, 2003-2004;

24

 J. DuPratt White Professor of Law, Cornell Law School, 1991-2004;

Visiting Professor of Law, Harvard Law School, 1998-1999

Visiting Professor, Faculty of Law, Stockholm School of Economics, fall, 1993;

Research Fellow, International Centre for Economic Research, Turin Italy, winter, 1993, spring, 1994;

Professor of Law (with tenure), University of Chicago, 1990-1991;

Professor of Law, (with tenure), Cornell University, 1987-1990;

Visiting Professor of Law, The University of Chicago, fall quarter, 1989-1990;

Visiting Professor, University of Tokyo Faculty of Law, summer, 1989;

Visiting Associate Professor of Law, University of Virginia, 1986-1987;

Assistant to Associate Professor of Law, Emory University, 1983-1986;

Law Clerk to the Honorable Henry J. Friendly, United States Court of Appeals, Second Circuit, 1982-1983 term of court;

Consultant, Municipal Finance Department, Lloyd Bush & Associates, New York, NY (consultant representing municipalities and investment banks before credit rating agencies (1978-1979));

Municipal Bond Trader, Bankers Trust Company, New York, NY (1977-1978);

Member, Board of Directors, Telxon Corporation, 1998-1999 (appointed as dissident director in settlement of proxy contest dispute); Member, Board of Directors, WCI Communities, Inc., 2007 – 2009; Member, Board of Directors, Shred-It Connecticut, 2007-2010; Alternative Director nominee for Illumina, Inc., 2012, Hess Corporation; 2015; Director nominee Rexene Corporation, 1999, Circon Corporation, 1998, Arvin Meritor, Inc. 2004, Wynn Resorts, Ltd. 2012, Family Dollar Stores, 2014 (among others).

Current consulting rate: $1250.00 per hour.

# Exhibit 2

**Jonathan Macey -- Prior Expert Testimony as of May 13, 2020**

| Year | Case Name | Court | Testimony Given |
|------|-----------|-------|-----------------|
| 2016 | *CaremarkPCS Health, L.L.C. v. Walgreen Co.* | American Arbitration Association, Phoenix, AZ | AAA Arbitration Hearing Testimony |
| 2017 | *Robinson Mechanical Contractors, Inc. v. PTC Group Holdings Corp.* | United States District Court for the Eastern District of Missouri, Southeastern Division | Deposition Testimony |
| 2018 | *United States of America v. AT&T Inc., DirecTV Group Holdings, LLC, and Time Warner, Inc.* | United States District Court for the District of Columbia | Deposition Testimony |
| 2018 | *Blueblade Capital Opportunities LLC, v. SciQuest, Inc.* | Court of Chancery of the State of Delaware | Deposition Testimony |
| 2019 | *Maurice Greenberg v. Eliot L. Spitzer* | Supreme Court of the State of New York, County of Putnam | Deposition Testimony |
| 2019 | *In Re: National Prescription Opiate Litigation* | U.S. District Court for the Northern District of Ohio | Deposition Testimony |
| 2019/ 2020 | *Party City Corporation v. Cayan LLC* | American Arbitration Association | Deposition Testimony/ AAA Arbitration Hearing Testimony |
| 2020 | *In re; ASHINC Corporation, et. al, debtors, Catherine Youngman Litigation Trustee v. Black Diamond Opportunity Fund II, LP* | United States Bankruptcy Court for the District of Delaware | Deposition Testimony |
| 2020 | *A.O.A. et al. v. Doe Run Resources Corporation, et. al.* | United States District Court for the Eastern District of Missouri, Eastern Division | Deposition Testimony |

# Exhibit 3

**I.    Case Materials**

    **A.    Memorandum Opinions and Orders**

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997)

*Baker v. Carr,* 369 U.S. 186 (1962)

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.,* No. 09-MD-2058, 2011 WL 3211472 (S.D.N.Y. July 29, 2011)

*Barrows v. Jackson,* 346 U.S. 249, 257 (1953)

*Boynton Beach Firefighters' Pension Fund v. HCP, Inc., et al.,* No. 3:16-cv-1106, Memorandum Opinion (N.D. Ohio Nov. 28, 2017)

*In re Cendant Corp. Litig.,* 264 F.3d 201 (3d Cir. 2001)

*Citizens United v. Federal Election Commission,* 558 U.S. 310 (2010)

*City of Taylor Police & Fire Ret. Sys. v. W. Union Co.,* No. 13–cv–03325–MSK–MJW, 2014 WL 4799659 (D. Colo. Sept. 26, 2014)

*Greene v. Gerber Prods. Co.,* 262 F. Supp. 3d 38 (E.D.N.Y. 2017)

*Kowalski v. Tesmer,* 543 U.S. 125 (2004)

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)

*Mahon v. Ticor Title Ins. Co.,* 683 F.3d 59 (2d Cir. 2012)

*Miller v. Albright,* 523 U.S. 420 (1998)

*Pipefitters Local N. 636 Defined Benefit Plan v. Bank of Am. Corp.,* 275 F.R.D. 187 (S.D.N.Y. 2011)

*Sierra Club v. Morton,* 405 U.S. 727 (1972)

*Sondel v. Nw. Airlines, Inc.,* 56 F.3d 934 (8th Cir. 1995)

*Sonterra Capital Master Fund Ltd. v. UBS AG,* 954 F.3d 529 (2d Cir. 2020)

*Spokeo, Inc. v. Robins,* 136 S. Ct. 1540 (2016)

*Sterckx v. Luckin Coffee Inc., et al.,* No. 1:20-cv-01677, Order (E.D.N.Y. Apr. 22, 2020)

*Susan B. Anthony List v. Driehaus,* 573 U.S. 149 (2014)

*United States Parole Comm'n v. Geraghty,* 445 U.S. 388 (1980)

1

*United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 v. Ocwen Fin. Corp.,* Nos. 14–CIV–81507–WPD, 14–81064–CIV–WPD, 81076–CIV–WPD, 2014 WL 7236985 (S.D. Fla. Nov. 7, 2014)

*Vallario v. Vandehey,* 554 F.3d 1259 (10th Cir. 2009)

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens,* 529 U.S. 765 (2000)

*In re Vivendi Universal Sec. Litig.,* 605 F. Supp. 2d 570 (S.D.N.Y. 2009)

*Warth v. Seldin,* 422 U.S. 490 (1975)

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP,* 549 F.3d 100 (2d Cir. 2008)

## B.    Complaints

*Cohen v. Luckin Coffee Inc., et al.,* No. 1:20-cv-01293, Class Action Complaint (S.D.N.Y. Feb. 13, 2020)

*Gopu v. Luckin Coffee Inc., et al.,* No. 1:20-cv-01747, Class Action Complaint for Violations of the Federal Securities Laws (E.D.N.Y. Apr. 8, 2020)

*Shek v. Luckin Coffee Inc., et al.,* No. 1:20-cv-02977-NRB, Class Action Complaint for Violations of the Federal Securities Laws (S.D.N.Y. Apr. 10. 2020)

*Sterckx v. Luckin Coffee Inc., et al.,* No. 1:20-cv-01677, Class Action Complaint for Violations of the Federal Securities Laws (E.D.N.Y. Apr. 2, 2020)

## C.    Briefs

*Cohen v. Luckin Coffee Inc., et al.,* No. 1:20-cv-01293-LJL, Memorandum of Law in Support of the Motion of Sjunde AP-Fonden and Louisiana Sheriffs' Pension & Relief Fund for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel and Consolidation of Related Actions (S.D.N.Y. Apr. 13, 2020)

*Cohen v. Luckin Coffee Inc., et al.,* No. 1:20-cv-01293-LJL, Memorandum of Law in Support of the Motion of Chesi Assets Limited Group for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (S.D.N.Y. Apr. 14, 2020)

*Hachem v. Gen. Elec. Co., et al.,* No. 1:17-cv-08457-JMF, Reply in Further Support of the Motion of Sjunde AP-Fonden for Appointment as Lead Plaintiff and Approval of Its Selection of Counsel (S.D.N.Y. May 17, 2018)

## D.    Declarations and Exhibits in Support

*Cohen v. Luckin Coffee Inc.,* No. 1:20-cv-01293-LJL, Declaration of Gerald H. Silk in Support of the Motion of Sjunde AP-Fonden and Louisiana Sheriffs' Pension & Relief Fund for Appointment as Lead Plaintiff and Approval of Selection of Counsel (S.D.N.Y. Apr. 13, 2020)

*Cohen v. Luckin Coffee Inc.,* No. 1:20-cv-01293-LJL, Joint Declaration of Richard Gröttheim and Osey McGee Jr. in Support of the Motion of Sjunde AP-Fonden and Louisiana Sheriffs' Pension & Relief Fund for Appointment as Lead Plaintiff and Approval of Selection of Counsel (S.D.N.Y. Apr. 13, 2020)

*Cohen v. Luckin Coffee Inc.,* No. 1:20-cv-01293-LJL, Certification of Sjunde AP-Fonden (S.D.N.Y. Apr. 13, 2020)

*Hachem v. Gen. Elec. Co., et al.,* No. 1:17-cv-08457-JMF, Declaration of Anders Mansson, executed on Oct. 24, 2014 (S.D.N.Y. May 17, 2018)

*In re Luckin Coffee Inc. Sec. Litig.*, No. 1:20-cv-01677-KAM-VMS, Supplemental Declaration of Christopher J. Keller in Support of Motion of Chesi Assets Limited Group for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (E.D.N.Y. Apr. 21, 2020)

*In re Luckin Coffee Inc. Sec. Litig.*, No. 1:20-cv-01677-KAM-VMS, Declaration of Lau Lai Sze and Lau Lui Yeuk in Support of the Motion of Chesi Assets Limited and Interactive Digital Finance Limited for Consolidation, Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (E.D.N.Y. Apr. 21, 2020)

*In re Luckin Coffee Inc. Sec. Litig.*, No. 1:20-cv-01677-KAM-VMS, Amended Certification of Chesi Assets Limited (E.D.N.Y. Apr. 21, 2020)

*In re Luckin Coffee Inc. Sec. Litig.*, No. 1:20-cv-01677-KAM-VMS, Amended Loss Analysis of Chesi Assets Limited (E.D.N.Y. Apr. 21, 2020)

*In re Luckin Coffee Inc. Sec. Litig.*, No. 1:20-cv-01677-KAM-VMS, Declaration of Tiah Thee Kian in Support of the Motion of Chesi Assets Limited and Interactive Digital Finance Limited for Consolidation, Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (E.D.N.Y. Apr. 21, 2020)

*Pipefitters Local N. 636 Defined Benefit Plan v. Bank of Am. Corp.,* No. 1:11-cv-00733-WHP, Declaration of Richard Grottheim in Further Support of the Funds Group's Motion for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Co-Lead Counsel (S.D.N.Y. May 2, 2011)

*Plaut v. Goldman Sachs Group, Inc.,* No. 1:18-cv-12084-VSB, Declaration of Prof. J. Andrew Kent in Connection with Motions for Appointment of Lead Plaintiff (S.D.N.Y. Mar. 5, 2019)

3

**E.      Periodicals and Academic Articles**

BLACK'S LAW DICTIONARY (11th ed. 2019)

Jill E. Fisch, *Complex Litigation at the Millenium: Aggregation, Auctions, and Other Developments in the Selection of Lead Counsel Under the PSLRA,* 64 LAW & CONTEMP. PROBLEMS 53 (2001)

Leonid Hurwicz, *On Informationally Decentralized Systems*, in C. B. McGuire and R. Radner, eds., DECISION AND ORGANIZATION: A VOLUME IN HONOR OF JACOB MARSHAK, (1972)

Michael C. Jensen and William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure,* 3 J. FIN. ECON.  (1976)

Jonathan Macey & Leo E. Strine, Jr., *Citizens United as Bad Corporate Law*, 2019 WIS. L. REV. 451 (2019)

Jonathan R. Macey and Geoffrey P. Miller, *Judicial Review of Class Action Settlements,* 1 HARV. J. LEGAL ANALYSIS 1 (2009)

Jonathan R. Macey and Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. CHI. L. REV. 1 (1991)

Brian McTeir and John Wald, *The Causes and Consequences of Securities Class Action Litigation*, 17 J. CORP. FIN. 649-665 (2011)

Charles Silver & Sam Dinkin, *Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions,* 57 DEPAUL L. REV. 471 (2008)

Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions,* 104 YALE L. J. 2053, 2112 (1995)

*Adam Winkler,* WE THE CORPORATIONS: HOW AMERICAN BUSINESSES WON THEIR CIVIL RIGHTS (2018)

Alan Wright et al., FED. PRACTICE & PROC. § 1564 (3d ed. 2011)

**F.      Congressional Reports**

S. Rep. No.104-98 (1995)

4