## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE LUCKIN COFFEE INC. SECURITIES LITIGATION | Case No. 1:20-cv-01293-LJL-JLC<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

# <u>TABLE OF CONTENTS</u>

**Page**

I.    NATURE OF THE ACTION ........................................................2

II.   JURISDICTION AND VENUE ................................................12

III.  PARTIES ...................................................................................12

    A.    Plaintiffs ........................................................................12

    B.    Defendants .....................................................................13

          1.    Luckin Coffee Inc. ..........................................13

          2.    Executive Defendants .....................................14

          3.    Director Defendants ........................................17

          4.    Underwriter Defendants ..................................19

    C.    Relevant Non-Parties ....................................................21

          1.    Ernst & Young Hua Ming LLP........................21

          2.    Former Luckin Employees ..............................22

IV.  SUMMARY OF THE EXCHANGE ACT DEFENDANTS' FRAUD..........................23

    A.    Luckin's Early Growth and Business Model Based on Aggressive Marketing, Cheap Coffee, and Its Mobile App System.................23

    B.    Luckin Announces Its Plan to Overtake Starbucks in China in 2019....................27

    C.    Luckin's Early Fundraising and the IPO ........................29

    D.    Through Their Buy-Side Analyst Coverage, the Underwriter Defendants Continue to Promote Luckin.................34

    E.    Following the IPO, Luckin's Reported Earnings and Growth Dramatically Increase and its Stock Price Soars ..................36

          1.    2Q2019 Reported Financial Results and Analyst Coverage.....................36

          2.    3Q2019 Reported Financial Results and Analyst Coverage.....................39

    F.    January 2020 SPO and Concurrent Note Offering and Analyst Coverage...........43

    G.    Unbeknownst to Investors, Luckin's Reported Sales, Profits, and Other Key Operating Metrics Were Vastly Inflated by Fraud Throughout the Class Period ..................46

          1.    Defendants' Use of Related Parties to Carry Out the Fraudulent Scheme.................48

          2.    The Exchange Act Defendants' Fraudulent Use of Coupons and Vouchers .................53

|  |  | 3. | The Exchange Act Defendants Fraudulently Skipped Receipt Numbering | 53 |
|  |  | 4. | The Exchange Act Defendants' Fraudulent Inflation of Costs | 56 |
|  |  | 5. | The Exchange Act Defendants' Fraudulent Inflation of Other Key Metrics | 57 |
|  | H. | Before the SPO, Lu and Qian Pledge Their Inflated Luckin Shares as Collateral for a $533 Margin Loan from the Underwriter Defendants | | 59 |
| V. | THE RELEVANT TRUTH IS GRADUALLY REVEALED | | | 61 |
|  | A. | Muddy Waters Claims "Smoking Gun" Evidence of Fraud | | 61 |
|  | B. | Luckin Publicly Denies All the Allegations in the Anonymous Report, and Analysts Affiliated with the Underwriter Defendants Staunchly Defend the Company | | 64 |
|  | C. | Luckin Belatedly Admits that Its Financial Results were Fraudulently Overstated | | 69 |
|  | D. | After the Class Period, as New Details Concerning the Exchange Act Defendants' Fraud Emerge, Luckin's Stock Is Delisted, and the Company Enters Provisional Liquidation Proceedings | | 74 |
|  |  | 1. | Luckin's Shares Are Delisted | 74 |
|  |  | 2. | In the Wake of Luckin's Disclosures, Multiple Regulators Launch Investigations into the Exchange Act Defendants' Misconduct | 76 |
|  |  | 3. | Luckin's Auditor Publicly Distances Itself from the Exchange Act Defendants' Financial Misconduct | 78 |
|  |  | 4. | Defendants Lu and Qian Default on the Margin Loan Facility | 80 |
|  |  | 5. | Defendant Lu Attempts to Retain Control of Luckin's Board and Subvert the Internal Investigation | 81 |
|  |  | 6. | Luckin Enters Provisional Liquidation Proceedings in the Cayman Islands | 84 |
| VI. | THE IPO AND SPO REGISTRATION STATEMENTS VIOLATED GAAP AND RELEVANT SEC DISCLOSURE OBLIGATIONS | | | 85 |
|  | A. | The IPO and SPO Registration Statements Violated GAAP | | 85 |
|  | B. | The SPO Registration Statement Violated SEC Regulation G | | 92 |
|  | C. | The IPO and SPO Registration Statements Violated SEC Regulation S-K | | 93 |
| VII. | EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT | | | 97 |
|  | A. | IPO Registration Statement | | 98 |

1.      The IPO Registration Statement Failed to Disclose Subsequent Events that Rendered Luckin's Reported Financial Results Materially Misleading ..................................................................98

2.      Misstatements and Omissions Regarding Luckin's Compliance with Laws and Regulations, GAAP, and Internal Controls over Financial Reporting ..................................................................100

3.      Misstatements and Omissions Regarding Luckin's Business Model and Increased Earnings and Growth .......................................104

4.      Misstatements and Omissions Regarding Luckin's Use of Coupons and Vouchers ..................................................................106

5.      Misstatements and Omissions Regarding Related-Party Transactions ..................................................................107

6.      The Exchange Act Defendants Misattributed the Reduced Growth in 1Q2019 to Seasonal Factors ..............................................110

7.      The IPO Registration Statement Omitted Material Facts in Violation of Regulation S-K and Section 10(b).......................................111

B.      Misstatements and Omissions in the 2Q2019 Press Release and 2Q2019 Conference Call ..................................................................113

        1.      2Q2019 Press Release ..................................................................113

        2.      2Q2019 Conference Call ..................................................................117

C.      Misstatements and Omissions in the 3Q2019 Press Release and 3Q2019 Conference Call ..................................................................121

        1.      3Q2019 Press Release ..................................................................121

        2.      3Q2019 Conference Call ..................................................................126

D.      SPO Registration Statement..................................................................130

        1.      The SPO Registration Statement Misstated Luckin's Revenues and Expenses ..................................................................130

        2.      The SPO Registration Statement Failed to Disclose Subsequent Events that Rendered Luckin's Reported Financial Results Materially Misleading ..................................................................134

        3.      The SPO Registration Statement Contained False or Misleading Non-GAAP Financial Measures in Violation of Regulation G ..............136

        4.      Misstatements and Omissions Regarding the Reasons for Luckin's Increased Earnings and Growth ..............................................137

        5.      Misstatements and Omissions Regarding Luckin's Compliance with Laws and Regulations, GAAP, and Internal Controls over Financial Reporting ..................................................................140

|  |  | 6. | Misstatements and Omissions Regarding Related-Party Transactions | 144 |
|  |  | 7. | Misstatements and Omissions Regarding the Margin Loan Facility | 145 |
|  |  | 8. | The SPO Registration Statement Omitted Material Facts in Violation of Regulation S-K and Section 10(b) | 146 |
|  | E. |  | The Exchange Act Defendants' False Denials of the Anonymous Report's Allegations and Their False Affirmations of Luckin's Reported Financial Results and Internal Controls | 149 |

VIII. SUMMARY OF ADDITIONAL ALLEGATIONS REGARDING THE EXCHANGE ACT DEFENDANTS' SCIENTER .......................................... 152

    A. Luckin's Admissions Establish the Exchange Act Defendants' Scienter ........... 153

    B. The Ongoing Investigations by Numerous Regulators Support an Inference of the Exchange Act Defendants' Scienter ........................................ 155

    C. The Exchange Act Defendants' Public Statements Regarding the Fraud Demonstrate Their Scienter ................................................................. 156

    D. The Exchange Act Defendants' Efforts to Conceal Their Fraud Further Support an Inference of Scienter ........................................................... 157

    E. Defendant Lu's Attempts to Subvert the Internal Investigation Demonstrate His Scienter ..................................................................... 159

    F. The Termination or Ouster of Numerous Luckin Officers, Directors, and Employees Supports an Inference of the Exchange Act Defendants' Scienter ................................................................................................ 159

    G. The Exchange Act Defendants were Financially Motivated to Perpetrate Their Fraud on Investors .................................................................... 161

    H. The Knowledge of Luckin's Senior Executives and Other Managerial Agents Is Imputed to Luckin ............................................................... 162

    I. The Magnitude of the Exchange Act Defendants' Fraud Supports an Inference of Scienter ....................................................................... 163

    J. The Exchange Act Defendants' Fraud Concerned Luckin's Key Operating Metrics ............................................................................................. 163

IX. LOSS CAUSATION/ECONOMIC LOSS ....................................................... 165

X. PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ................... 170

XI. THE STATUTORY SAFE HARBOR AND BESPEAKS-CAUTION DOCTRINE ARE INAPPLICABLE ...................................................... 172

XII. CAUSES OF ACTION UNDER THE EXCHANGE ACT ............................. 173

XIII. DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT ..................... 175

    A. Luckin's IPO and SPO ........................................................................ 176

1.      Luckin's Rapid Early Growth ................................................176

2.      Luckin's Growth Stalls Immediately Before the IPO ............................178

3.      Luckin Conducts Its IPO, Raising $651 million from Public Investors ................................................179

4.      Luckin's Growth Purportedly Accelerates in 2Q2019 and 3Q2019 ........183

5.      Luckin Conducts its SPO, Raising an Additional $643 Million from Investors ................................................186

B.      Unbeknownst to Investors, Luckin's Revenues and Expenses Were Materially Inflated Throughout 2019 ................................................188

C.      Before the SPO, Lu and Qian Pledge Their Luckin Shares as Collateral in a $533 Million Margin Loan Facility with the Underwriter Defendants .............194

D.      The Underwriter Defendants Disregarded Numerous Red Flags at the Time of Luckin's IPO and SPO ................................................196

E.      As Information that Was Incorrectly Stated in, and Omitted from the Registration Statements Is Gradually Disclosed, the True Value of Luckin's ADSs Is Revealed ................................................213

F.      The Registration Statements Contained Untrue Statements of Material Fact and Material Omissions in Violation of Section 11 of the Securities Act ................................................217

1.      IPO Registration Statement ................................................217

a.      The IPO Registration Statement Failed to Disclose Subsequent Events that Rendered Luckin's Reported Financial Results Materially Misleading ................................................217

b.      Misstatements and Omissions Regarding Luckin's Compliance with Laws and Regulations, GAAP, and Internal Controls over Financial Reporting ................................................219

c.      Misstatements and Omissions Regarding Luckin's Business Model and Increased Earnings and Growth ................................................224

d.      Misstatements and Omissions Regarding Luckin's Use of Coupons and Vouchers ................................................226

e.      Misstatements and Omissions Regarding Related-Party Transactions ................................................227

f.      The IPO Registration Statement Misattributed the Reduced Growth in 1Q2019 to Seasonal Factors ................................................229

2.      SPO Registration Statement ................................................230

a.      The SPO Registration Statement Misstated Luckin's Revenues and Expenses ................................................230

b.     The SPO Registration Statement Failed to Disclose Subsequent Events that Rendered Luckin's Reported Financial Results Materially Misleading ....................................233

c.     The SPO Registration Statement Contained False or Misleading Non-GAAP Financial Measures in Violation of Regulation G .................................................................235

d.     Misstatements and Omissions Regarding the Reasons for Luckin's Increased Earnings and Growth...................................236

e.     Misstatements and Omissions Regarding Luckin's Compliance with Laws and Regulations, GAAP, and Internal Controls over Financial Reporting ................................239

f.     Misstatements and Omissions Regarding Related-Party Transactions .................................................................244

g.     Misstatements and Omissions Regarding the Margin Loan Facility .......................................................................245

G.     The Registration Statements Failed to Disclose Information Required to Be Disclosed Under SEC Regulations .................................................246

XIV.    CAUSES OF ACTION UNDER THE SECURITIES ACT............................................248

XV.    CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS......................252

XVI.    PRAYER FOR RELIEF ..............................................................255

XVII.   JURY TRIAL DEMANDED.........................................................256

Court-appointed Lead Plaintiffs Sjunde AP-Fonden and Louisiana Sheriffs' Pension & Relief Fund (together, "Plaintiffs"), by and through their undersigned counsel, bring this federal securities class action on behalf of themselves and a class ("Class") consisting of all persons and entities that purchased or otherwise acquired the American Depository Shares ("ADSs") of Luckin Coffee Inc. ("Luckin" or the "Company") from May 17, 2019 through April 1, 2020, inclusive (the "Class Period"), including those who purchased ADSs in or traceable to the Company's initial public offering on or about May 17, 2019 (the "IPO"), or Luckin's secondary public offering on or about January 10, 2020 (the "SPO"), and were damaged thereby. Plaintiffs assert their claims under the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act"). As alleged in this Complaint, Defendants (defined in ¶¶ 33-53) issued materially false or misleading registration statements and prospectuses for the May 2019 IPO and January 2020 SPO and, throughout the Class Period, also made a series of statements that the Exchange Act Defendants (defined in ¶ 40) knew or recklessly disregarded were materially false or misleading at the time the statements were made, and omitted material information necessary to make the statements, in light of those material omissions, not materially false or misleading.

Except as to allegations specifically pertaining to Plaintiffs, all allegations in this Complaint are based upon the investigation undertaken by Plaintiffs' counsel, which included, but was not limited to, the review and analysis of: (i) public filings made by Luckin with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and other public statements issued by Defendants; (iii) press releases and other public statements by Chinese regulatory authorities; (iv) research reports issued by securities and financial analysts; (v) media and news reports and other publicly available information concerning Luckin and Defendants; (vi) transcripts of Luckin's earnings and other investor conference calls; (vii) publicly available

presentations, press releases, and interviews by Luckin and its employees; (viii) documents filed in proceedings involving Luckin and Defendants in the Grand Court of the Cayman Islands and the British Virgin Islands; (ix) economic analyses of the movement and pricing of Luckin's publicly traded ADSs; (x) consultations with relevant consultants and experts; and (xi) interviews of former employees ("FEs") of Luckin.  Plaintiffs believe that substantial additional evidentiary support will exist for the Complaint's allegations after a reasonable opportunity for discovery.

## I.       NATURE OF THE ACTION

1.       This case is about the confessed fraudulent scheme that has transformed Luckin and its founders—former chairman Charles Zhengyao Lu ("Lu") and former Chief Executive Officer ("CEO") Jenny Zhiya Qian ("Qian")—from stock market darlings overseeing People's Republic of China ("China")'s purportedly fastest growing retail coffee network into the targets of criminal and civil investigations by regulators on two continents, including the SEC, the China Securities Regulatory Commission ("CSRC"), China's Ministry of Finance, and China's State Administration for Market Regulation ("SAMR").

2.       Before its May 2019 IPO and throughout the Class Period, Luckin billed itself as one of China's fastest-growing companies, consistently touting its plans to overtake Starbucks Corporation ("Starbucks") as China's largest coffee chain.  The Company saw its share price soar over ***200%*** between May 2019 and January 2020, during which it also raised over $1.5 billion from unsuspecting investors in a series of public and private offerings.  But less than one year after going public, the Company admitted that its purported growth was a sham, confessing that it deliberately fabricated ***hundreds of millions of dollars in sales*** as part of a fraudulent scheme that pre-dated its IPO.[1]  Following these shocking admissions, Luckin's ADSs were delisted from the

---

[1] Unless otherwise indicated, all emphasis is added.

NASDAQ exchange, its senior officers and directors—including Lu and Qian—were unceremoniously ousted from the Company, and its investors were saddled with ***billions of dollars*** in losses.

3.      Luckin was founded in June 2017 by Lu, Qian, and Jinyi Guo (the Company's current CEO), and specialized in the retail sale of freshly brewed coffee and non-coffee drinks. Luckin billed itself as a disruptor within the Chinese retail coffee industry due to its technology-based business model. Luckin claimed to have "pioneered a technology-driven new retail model to provide coffee and other products of high quality, high affordability, and high convenience to its customers." Central to Luckin's technology-based model was its mobile app, which customers used to purchase products from Luckin, and which Luckin used to send vouchers and coupons for free or discounted coffee to customers. Luckin relied heavily on these mobile vouchers and coupons—which reduced the price of Luckin's coffee to one-third of the cost of a similar drink at Starbucks—to grow its customer base. While these discounts caused the Company to operate at a loss, Luckin told investors that this was part of a deliberate strategy to win market share from Starbucks and other competitors by increasing brand awareness and expanding the Company's customer base.

4.      In addition to its purportedly disruptive, technology-based model, Luckin also pursued a vastly different "bricks-and-mortar" strategy than its competitors. Unlike Starbucks, Luckin's coffee shops placed a premium on convenience over comfort. During the Class Period, over 90% of Luckin's stores were described as "pick-up" stores, which had limited seating and were 100% cashier-less. Unlike Starbucks's cafes, Luckin's pick-up stores were not designed to allow customers to relax, work, or socialize. Instead, they were designed so customers could quickly pick up orders that were placed through the Company's mobile app.

5.      Luckin claimed that its mobile app and vast network of pick-up stores allowed the Company to "improve operational efficiency and quickly expand and scale up [its] business"— i.e., to "operate efficiently [and] grow rapidly."  And grow rapidly it did.  Luckin opened its first store in Beijing in June 2017, and over the next eighteen months, it opened *2,370* additional stores in twenty-eight cities in China.  The Company claimed that its revenues skyrocketed *over 350,000%* during this time, from $35,302 in 2017 to $125.2 million in 2018.  Over the same time period, Luckin claimed that its customer base grew by *over 150,000%* from 11,100 customers to over 16.8 million.

6.      Luckin's rapid ascent attracted significant attention from investors in both Asia and the United States.  The Company's early growth had been funded primarily by approximately $550 million in private investments from institutional investors like BlackRock, Inc. ("BlackRock"), China International Capital Corporation Hong Kong Securities Limited ("CICC")—which later served as an underwriter in Luckin's IPO and SPO—and one of Singapore's sovereign wealth funds.  By the time Luckin conducted its last round of private fundraising in April 2019, these institutional investors were valuing the Company—which was less than two years old at the time— at *nearly $3 billion*.

7.      Seeking to capitalize on this massive valuation, Luckin conducted its IPO less than a month later.  On May 17, 2019, after touting the Company's tremendous growth prospects, Luckin sold 33 million ADSs to investors at a price of $17.00 per ADS in the IPO, going from founding to public listing in less than two years.  The IPO generated over $650 million in gross proceeds for the Company.  The investment banks that underwrote Luckin's IPO—including Credit Suisse Securities (USA) LLC ("Credit Suisse"), Morgan Stanley & Co. LLC ("Morgan Stanley"), CICC, Haitong International Securities Company Limited ("Haitong"), KeyBanc

Capital Markets Inc. ("KeyBanc"), and Needham & Company, LLC ("Needham")  (collectively, the "Underwriter Defendants")—collected over $30 million in fees, plus an additional $4.6 million through their subsequent exercise of a greenshoe option[2] for 4.95 million additional ADSs.  As alleged below, these Underwriter Defendants (and certain Director Defendants, defined in ¶¶ 41-46) are not sued for fraud, but for failing to conduct a reasonable investigation while underwriting the IPO and SPO, and Plaintiffs specifically disclaim any claims of fraud against the Underwriter Defendants (and those Director Defendants).

8.     In the quarters following the IPO, Luckin continued to tout its skyrocketing revenues.  For example, Luckin boasted on August 14, 2019 that its revenues for the second quarter of 2019 had increased by *698%* year-over-year, and that "[d]uring the second quarter of 2019, we sold nearly as many items as in *full year 2018*."  The Exchange Act Defendants told investors that Luckin's remarkable reported growth was "driven by a significant increase in transacting customers, an increase in the average number of items purchased by our transacting customers as well as higher effective selling prices."

9.     The following quarter, on November 13, 2019, Luckin reported a *557.6%* year-over-year increase in revenues, a *470.1%* year-over-year increase in average monthly items sold, and an operating *profit* of RMB186.3 million compared to a net *loss* of RMB126.0 million in the third quarter of 2018.  Once again, Luckin attributed its dramatic reported revenue growth to "a significant increase in the number of transacting customers, an increase in effective selling price, and an increase in the number of products sold per transacting customer."  During a conference call with investors on this date, Lu dismissed concerns about Luckin's rapid growth:

> I have been often asked whether we are doing too much and too fast.  I would say, *no*. In fact, *this is a natural evolution of our business model*.  Since our inception,

---

[2] A "greenshoe option" is a provision in an underwriting agreement granting the underwriters the right to sell more shares if the demand proves higher than expected.

Luckin's growth has always been beyond everyone's expectations. ***This is because our business model is entirely built on a technology, completely different from a traditional retailer***.

10.     Luckin's spectacular reported performance drove its ADS price upward by over ***200%*** between the IPO and mid-January 2020.

11.     Analysts—many of whom worked for the same banks that underwrote Luckin's IPO—cheered the Company's rapid ascent.  For example, Haitong stated in November 2019 that Luckin's "profitability outlook" was "increasingly upbeat," while KeyBanc raised its price target to $32.00—almost double the IPO price—based on its belief that "Luckin's execution continues to prove out its business model."

12.     On January 10, 2020, Luckin again capitalized on its purported success by conducting a secondary public offering of 13.8 million ADSs.  Investors scooped up these ADSs at a price of $42.00 per ADS—nearly two and a half times the IPO price.  Luckin received over $448.6 million in gross proceeds from the SPO, while the Underwriter Defendants took home another $23 million in fees.

13.     Luckin's founders also personally capitalized off the Company's success.  Luckin's dramatic rise turned Lu into a billionaire, and both he and Qian used their rapidly appreciating Luckin securities as collateral to secure ***more than $500 million*** in personal loans from certain of the Underwriter Defendants.

14.     As the market would begin to learn shortly after the SPO, however, the meteoric growth that had defined Luckin's existence as a public company and that had made its securities a favorite of both institutional and retail investors alike was illusory.  Luckin's growth was not the result of its "disruptive," "technology-driven new retail model," as investors had been led to believe.  Instead, the Company's finances were a sham and the product of an outrageous fraud.

15.     Specifically, investors learned at the end of the Class Period that beginning in April 2019—before Luckin's IPO—the Company's senior executives and certain directors, including Lu, Qian, and Jian Liu ("J. Liu"), Luckin's former Chief Operating Officer ("COO"), together with dozens of other employees working at their behest, embarked upon a brazen scheme to intentionally inflate Luckin's financial results through the reporting of ***hundreds of millions of dollars in fake sales***.

16.     The Company generated these false sales in several ways.  First, Luckin had its own employees create individual accounts with their cell phone numbers and then use those accounts to purchase vouchers for cups of coffee.  Second, the Company created fake corporate accounts and then used those accounts to execute fictitious bulk purchases of coffee.  In May 2019, "orders began flooding in under a fledgling line of business that involved selling coffee vouchers in bulk to corporate customers."  These corporate customers, however, were actually sham companies connected to Lu.  For example, one of these companies, which purportedly made over one hundred bulk purchases of coffee vouchers between May 2019 and November 2019, was linked to a relative of Lu and an executive in one of Lu's other business ventures, the ride-hailing firm UCAR Inc. ("UCAR").

17.     Unbeknownst to investors, nearly ***$300 million*** in revenues, or ***nearly half*** of all of the revenues that Luckin reported in the second, third, and fourth quarters of 2019, were fabricated as part of this fraudulent scheme.  Luckin has now admitted that Defendants Lu, Qian, and J. Liu and employees reporting to them "participated in the fabricated transactions," and that "documentary and other evidence" directly implicates Lu in the Exchange Act Defendants' fraudulent scheme.  Indeed, confidential sources at Luckin have revealed that the Company's own internal investigation determined that Lu "knew—or should have known—about the fabricated

transactions," and "found evidence that Mr. Lu had knowledge of certain related-party transactions that weren't properly disclosed."

18.     So elaborate was Luckin's fraud that it concocted fake expenses to support the appearance of revenue growth.  Luckin's financial statements included nearly ***$190 million*** in these payments all made to companies linked to Lu and his other business ventures, including UCAR.  As one example, a documented supplier of raw materials to Luckin was owned by a childhood friend of Lu, who also owned a company that was a regular bulk buyer of coffee vouchers from the Company.  This web of related entities created a "loop of transactions that allowed the company to inflate sales and expenses with a relatively small amount of capital that circulated in and out of the company's accounts."

19.     Neither Luckin's fake sales nor the related-party transactions in its concocted supply chain were disclosed to investors before the offerings.   In fact, the Exchange Act Defendants actively prevented the market from learning the truth about their fraud.  For instance, immediately after short-seller Muddy Waters Research ("Muddy Waters") published an anonymous report ("Anonymous Report") on January 31, 2020 suggesting that Luckin "had evolved into a fraud," Luckin issued a press release on a Form 6-K signed by Reinout Hendrik Schakel, Luckin's Chief Financial Officer ("CFO"), that "***categorically denie[d]***" the Anonymous Report's allegations and criticized the report as "***flawed***," "***unsubstantiated***," "***unsupported***," "***false***," and "***malicious***."  The Company further stated that it operated "***in strict compliance with***" its internal controls over financial reporting and reaffirmed "***the integrity of its financial reporting***."

20.     Piggy-backing on the Company's denials, analysts for the Underwriter Defendants swiftly came to Luckin's defense.  For example, Haitong downplayed the Anonymous Report,

calling it "written anonymously" and noting that "its biggest flaw . . . is the **selective data set** used to make the claims."  (emphasis in original).  Credit Suisse also stridently defended the Company, stating that it "found no hard evidence in the short-seller report to claim Luckin's business as fraudulent, and *some of the allegations are baseless or have major flaws*."  Other analysts similarly credited Luckin's denial, and investors ultimately disregarded the Anonymous Report's allegations.  Indeed, in the days following Luckin's press release, its ADS price traded *higher* than it did before the publication of the Anonymous Report and Needham actually *raised* its price target to *$40.00*.

21.     Two months later, however, investors would finally come to learn that Luckin's denials, like its Class Period financial statements and representations regarding the strength of its financial condition, were flat-out lies.  On April 2, 2020, the Company stunned investors by admitting, based on the results of an independent investigation conducted by a Special Committee of the Board of Directors ("Special Committee"), that "beginning in the second quarter of 2019, Mr. Jian Liu, the chief operating officer and a director of the Company, and several employees reporting to him, *had engaged in certain misconduct, including fabricating certain transactions*."  The Company admitted to nearly *$300 million* in fabricated sales between the second and fourth quarters of 2019, and advised investors to "no longer rely upon the Company's previous financial statements and earnings releases" and all "other communications relating to these consolidated financial statements."

22.     Investors lost billions of dollars following this disclosure, as Luckin's ADS price collapsed by over *75%* in response to this news, declining from a closing price of $26.20 on April 1, 2020 to a closing price of $6.40 on April 2, 2020.  Three days later, Lu issued a public statement *apologizing and accepting responsibility for* the fraud, stating that he was "ashamed" and

"blame[d] [him]self" for what had happened at the Company.   The next day, the NASDAQ temporarily halted trading of Luckin's ADSs.

23.      The fallout from Luckin's misconduct continued over the next several months.  On May 12, 2020, Luckin publicly implicated more of its senior executives in the fraud, announcing that Qian and J. Liu were terminated following the Board's receipt of "evidence that sheds more light on the fabricated transactions."   A week later, NASDAQ notified the Company that its securities would be delisted from the exchange and, on June 29, 2020, Luckin's ADSs were officially removed from the NASDAQ.   Thereafter, on July 1, 2020, Luckin acknowledged Lu's involvement in the scheme when it announced that, based on its review of "documentary and other evidence" concerning Lu's involvement in the scheme and "Lu's degree of cooperation in the Internal Investigation," the Board recommended that Lu be removed as director and chairman.

24.      The unraveling of Luckin's scheme spawned multiple regulatory investigations in China.  The CSRC "strongly condemn[ed]" Luckin's misconduct, vowing to investigate Luckin and "severely punish [such] securities fraud."  Likewise, in April 2020, as part of its investigation into Luckin's fraud, China's SAMR raided the Company's offices and obtained "full access to the company's accounts, transaction records and internal systems."  As reported on June 6 and 10, 2020 by Caixin Global Limited ("Caixin Global"), these Chinese authorities had discovered e-mails in in which Lu gave *direct orders to commit accounting fraud*.

25.      On July 31, 2020, the SAMR published its conclusion that Luckin and its executives violated laws against unfair competition and that it would be punished for its illegal conduct.  That same day, China's Ministry of Finance announced that it had completed its months-long investigation into Luckin, and had independently confirmed that the Company falsified over $300 million in sales through forged merchandise vouchers and fraudulent transactions with twenty-

three companies linked to Lu.  The Ministry of Finance said that it would punish two of Luckin's Chinese-registered subsidiaries, and that the specifics regarding these penalties would be disclosed at a later date.  Parallel investigations have also been launched in the United States by the SEC, and Luckin has disclosed that it "has been cooperating with and responding to inquiries from regulatory agencies in both the United States and China."  On September 22, 2020, the SAMR announced that it had determined that "*43 third-party related business entities . . . aided and abetted Luckin in carrying out [its] misleading acts*" and that it would impose RMB61 million (US$8.61 million) in administrative sanctions on Luckin and each of these related entities.[3]

26.     The Exchange Act Defendants' brazen fraud also crippled the Company's financial condition.  On July 15, 2020, after a winding up petition was filed by one of Luckin's creditors in the Company's home jurisdiction of the Cayman Islands, the court presiding over that matter appointed joint provisional liquidators to oversee the day-to-day operations of the Company, and to enter into negotiations with its creditors in a last-ditch effort to avoid insolvency.

27.     All told, once the Company's fraud unraveled, investors suffered billions of dollars in losses on their investments.  The price of Luckin's ADSs cratered from a Class Period high of $51.38 on January 17, 2020 to close at just $1.38 on June 26, 2020, the last day its ADSs traded publicly on the NASDAQ.  Given the Company's allegedly-fragile financial condition and the absence of a robust, liquid market for investors to dispose of their remaining Luckin securities, this Action likely represents investors' only opportunity to seek recompense for the Exchange Act Defendants' audacious fraud.

---

[3] Except where historical conversion rates are provided, the conversion rate between Chinese renminbi ("RMB") and United States dollars ("US$") used in this Complaint is 0.14121, the rate on April 2, 2020.

## II.    JURISDICTION AND VENUE

28.    The claims asserted in this Complaint arise under §§ 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated under those sections, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

29.    Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute the violations of law complained of in this Complaint, including the dissemination to the public of materially false or misleading statements, occurred in this District.  In addition, at all relevant times Luckin's ADSs were offered, sold, and traded on the NASDAQ.

30.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiffs

31.    Lead Plaintiff Sjunde AP-Fonden ("AP7") is a Swedish public pension fund, established under law as a Swedish governmental agency, with approximately $60 billion in assets under management as of April 11, 2020.  As stated in the certification attached to this Complaint as Exhibit A, AP7 purchased or otherwise acquired Luckin ADSs through U.S. domestic transactions during the Class Period and was damaged thereby.

32.     Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") is a public pension fund that provides pension and other benefits for sheriffs, deputy sheriffs, and tax collectors in the State of Louisiana.  Louisiana Sheriffs manages approximately $4 billion in assets for the benefit of its approximately 20,000 active and retired participants as of April 11, 2020.  As stated in the certification attached to this Complaint as Exhibit B, Louisiana Sheriffs purchased or otherwise acquired Luckin securities through U.S. domestic transactions during the Class Period, including 22,400 ADSs that it purchased from Credit Suisse directly in the SPO for $42.00 per ADS, and was damaged thereby.

**B.      Defendants**

**1.      Luckin Coffee Inc.**

33.     Defendant Luckin Coffee Inc. ("Luckin") is a Cayman Islands corporation with principal executive offices located at 17F Block A, Tefang Portman Tower, No. 81 Zhanhong Road, Siming District, Xiamen, Fujian, China.  During the Class Period, Luckin's ADSs traded in an efficient market on the NASDAQ under the ticker symbol "LK."

34.     Luckin incorporated its holding company in June 2017 and commenced operations in October 2017.  The Company also controlled a complex web of subsidiaries and variable interest entities:



35. Defendant Luckin is liable for the acts of its executives, directors, officers, and agents under the doctrine of respondeat superior and common law because all the wrongful acts complained of in this Complaint were carried out within the scope of their employment. The scienter of Luckin's executives, directors, officers, and agents is similarly imputed to Luckin under agency principles.

### 2. Executive Defendants

36. Defendant Charles Zhengyao Lu ("Lu") is a co-founder of the Company and was the Chairman of its Board of Directors during the Class Period. Defendant Lu signed the Company's SEC filings, including the materially false or misleading registration statements and prospectuses (as defined below in ¶¶ 81, 121) issued for the IPO and SPO of ADSs by the Company. At the time of the IPO, Defendant Lu held approximately 39% of Luckin's Class B ordinary shares— which have ten times the voting rights of the Company's Class A ordinary shares—giving Lu control of over 36% of aggregate voting power in the Company. Luckin's internal investigation conducted by a Special Committee, the results of which Luckin publicly

disclosed on July 1, 2020 ("Special Committee Investigation"), directly implicated Lu in the scheme to fraudulently inflate Luckin's reported sales, operating expenses, and other key metrics. Lu was removed as Chairman and as a director following an extraordinary general meeting of Luckin's shareholders on July 5, 2020 ("July 5 Extraordinary Shareholder Meeting") and subsequent meeting of Luckin's Board of Directors on July 12, 2020.  Before founding Luckin, Lu founded an auto-rental firm called CAR Inc. ("CAR") and a ride-hailing firm, UCAR.  Lu served as Executive Director, Chairman of the Board, and CEO of CAR from 2014 to 2016, and is currently a non-Executive Director and the Chairman of the Board of CAR.  Lu is also the Chairman of the Board and CEO for UCAR.

37.     Defendant Jenny Zhiya Qian ("Qian") is a co-founder of the Company and was the CEO and a member of the Board of Directors of the Company from November 2017 until she was terminated on May 12, 2020 following the Special Committee Investigation.  In announcing her termination, Luckin stated that the Special Committee "has brought to the attention of the Board evidence that sheds more light on the fabricated transactions described in the press release issued by the Company on April 2, 2020" and that "[a]fter considering such information, the Board has terminated Ms. Jenny Zhiya Qian."   Luckin later confirmed that the Special Committee Investigation "demonstrates that the Company's former Chief Executive Officer, Ms. Jenny Zhiya Qian, former Chief Operating Officer, Mr. Jian Liu and certain employees reporting to them participated in the fabricated transactions and that the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties."   Qian signed the Company's SEC filings, including the materially false or misleading registration statements and prospectuses issued for the IPO and SPO of ADSs by the Company.  At the time of the IPO, Qian held approximately 25% of Luckin's Class

B ordinary shares, giving Qian control of over 23% of aggregate voting power in the Company.

Moreover, as of the time of the IPO, Qian controlled approximately 19% of Luckin's voting rights

through her holdings of Luckin Class B shares.  Qian served as Lu's "right-hand" for over thirteen

years.  She previously served as COO and Executive Vice President of CAR from 2014 to 2016,

and then served as a director and the COO of UCAR from 2016 to 2017.

38.    Defendant Jian Liu ("J. Liu") was the COO of the Company from May 2018, and a

member of the Board of Directors of the Company from February 2019, until he was terminated

on May 12, 2020 as part of the Special Committee Investigation.  In announcing his termination,

Luckin stated that the Special Committee "has brought to the attention of the Board evidence that

sheds more light on the fabricated transactions described in the press release issued by the

Company on April 2, 2020" and that "[a]fter considering such information, the Board has

terminated . . . Mr. Jian Liu."  Luckin later confirmed that its internal investigation "demonstrates

that the Company's former Chief Executive Officer, Ms. Jenny Zhiya Qian, former Chief

Operating Officer, Mr. Jian Liu and certain employees reporting to them participated in the

fabricated transactions and that the funds supporting the fabricated transactions were funneled to

the Company through a number of third parties associated with the Company employees and/or

related parties."   J. Liu signed the Company's SEC filings, including the materially false or

misleading registration statements and prospectuses issued for the IPO and SPO of ADSs by the

Company.  From 2008 to 2015, J. Liu served successively as the Deputy Head of Vehicle

Management Center and the Head of Yield Management for CAR.  From 2015 to 2018, J. Liu also

served as the Head of Yield Management for UCAR.

39.    Defendant Reinout Hendrik Schakel ("Schakel") has been the CFO and Chief

Strategy Officer of the Company since January 2019.  From 2008 to 2016, Defendant Schakel

served successively as an analyst, associate, and vice president for the investment banking division of Credit Suisse.  Schakel signed the Company's SEC filings, press releases, and earnings announcements, including the materially false or misleading registration statements and prospectuses issued for the IPO and SPO of ADSs by the Company.

40.     Defendants Lu, Qian, J. Liu, and Schakel are collectively referred to in this Complaint as the "Executive Defendants."  Luckin and the Executive Defendants are collectively referred to in this Complaint as the "Exchange Act Defendants."

### 3.     Director Defendants

41.     Defendant Hui Li ("Li") was a member of the Board of Directors of the Company from June 2018 until he was removed by shareholder vote following the July 5 Extraordinary Shareholder Meeting.  Defendant Li signed the Company's SEC filings, including the materially false or misleading registration statements and prospectuses issued for the IPO and SPO of ADSs by the Company.  At the time of the IPO, Li held approximately 12% of Luckin's Class B ordinary shares, giving Li control of over 11% of aggregate voting power in the Company.  In the SPO, Li, in coordination with Centurium Capital (of which he is founder and CEO), sold 38.4 million shares of the Company, equal to 4.8 million ADSs, priced at $42.00 per ADS on January 10, 2020, for gross proceeds of US$201.6 million.  Li previously worked in the investment banking division of Morgan Stanley from 1994 to 2001.  Li also served as a director of CAR from 2012 to 2016, and as a Vice President, director, and later Chairman of the Board of UCAR beginning in 2017.

42.     Defendant Erhai Liu ("E. Liu") was a member of the Board of Directors of the Company from November 2018 until he was removed following the July 5 Extraordinary Shareholder Meeting.  E. Liu signed the Company's SEC filings, including the materially false or misleading registration statements and prospectuses issued for the IPO and SPO of ADSs by the Company.  Prior to his removal, E. Liu was a member of the Audit Committee of the Board.  At

the time of the IPO, E. Liu held approximately 13.8% of Luckin's Class A ordinary shares.  E. Liu previously served as a director of CAR from 2009 to 2015.

43.    Defendant Jinyi Guo ("Guo") is a co-founder of the Company and has been a member of the Board of Directors of the Company since June 2018.  Guo previously served as Luckin's Senior Vice President in charge of Product & Supply Chain beginning in October 2017. On May 12, 2020, Guo was appointed as acting CEO following the termination of Qian.  On July 14, 2020, Guo was appointed as CEO and Chairman.  Defendant Guo signed the Company's SEC filings, including the materially false or misleading registration statements and prospectuses issued for the IPO and SPO of ADSs by the Company.  Guo previously served as the Assistant to the Chairman for UCAR, Lu, from 2016 to 2017.

44.    Defendant Sean Shao ("Shao") was a member of the Board of Directors of the Company from May 2019 until he was removed by shareholder vote following the July 5 Extraordinary Shareholder Meeting.  Prior to his removal as a Director, Shao was chairman of the Audit Committee of the Board.  Shao was later reinstated as a Director on September 2, 2020. Shao was purportedly one of two independent directors.  On April 18, 2019, Shao signed a Letter of Consent, filed as exhibit 99.4 of the Registration Statement, which stated that, "[p]ursuant to Rule 438 under the Securities Act of 1933, as amended, I hereby consent to the references to my name in the Registration Statement on Form F-1 . . . of the Company and any amendments thereto, which indicate that I have accepted the nomination to become a director of the Company.  I further agree that immediately upon the Securities and Exchange Commission's declaration of effectiveness of the Registration Statement, I will serve as a member of the board of directors of the Company."  Shao also served as Chair of the Audit Committee from his appointment to the Board until his removal.  Shao currently serves or previously served as a director at numerous

companies that have been the subject of securities fraud actions during his tenure, including Jumei International Holdings Ltd., LightInTheBox Holdings, Ltd., Agria Corporation, and UTStarcom Holdings Corporation.

45.     Defendant Thomas P. Meier ("Meier") was a member of the Board of Directors of the Company from May 2019 until his resignation on April 23, 2020 following the revelation of the Exchange Act Defendants' fraud.  Prior to his resignation, Meier was a member of the Audit Committee of the Board.  Meier was purportedly one of two independent directors.  On April 18, 2019, Defendant Meier signed a Letter of Consent, filed as exhibit 99.5 of the Registration Statement, which stated that, "[p]ursuant to Rule 438 under the Securities Act of 1933, as amended, I hereby consent to the references to my name in the Registration Statement on Form F-1 . . . of the Company and any amendments thereto, which indicate that I have accepted the nomination to become a director of the Company.  I further agree that immediately upon the Securities and Exchange Commission's declaration of effectiveness of the Registration Statement, I will serve as a member of the board of directors of the Company."  Defendant Meier has been a member of the Audit Committee since becoming a member of the Board.

46.     Defendants Li, E. Liu, Guo, Shao, and Meier are collectively referred to in this Complaint as the "Director Defendants."

### 4.     Underwriter Defendants

47.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a financial-services company located in New York, New York.  Credit Suisse served as an underwriter for both the May 2019 IPO and the January 2020 SPO.  As underwriter, Credit Suisse assisted in the preparation and drafting of the registration statements and prospectuses filed with the SEC for the offerings and first created a public market and then facilitated in making additional public sales of Luckin ADSs during the Class Period.  As alleged below in ¶ 154, Credit Suisse also acted as

trustee in holding the shares pledged by Defendants Lu and Qian to several banks, including affiliates of several of the Underwriter Defendants, as security for a $518 million margin loan facility.

48.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a financial services company located in New York, New York.  Morgan Stanley served as an underwriter for both the May 2019 IPO and the January 2020 SPO.  As underwriter, Morgan Stanley assisted in the preparation and drafting of the registration statements and prospectuses filed with the SEC in connection with the Offerings and first created a public market and then facilitated in making additional public sales of Luckin ADSs during the Class Period.

49.     Defendant China International Capital Corporation Hong Kong Securities Limited ("CICC") is a financial-services company located in Hong Kong, SAR.  CICC served as an underwriter for both the May 2019 IPO and the January 2020 SPO.  As Underwriter, CICC assisted in the preparation and drafting of the registration statements and prospectuses filed with the SEC for the offerings and first created a public market and then facilitated in making additional public sales of Luckin ADSs during the Class Period.

50.     Defendant Haitong International Securities Company Limited ("Haitong") is a financial-services company based in Hong Kong, SAR.  Haitong served as an underwriter for both the May 2019 IPO and the January 2020 SPO.  As Underwriter, Haitong assisted in the preparation and drafting of the registration statements and prospectuses filed with the SEC for the offerings and first created a public market and then facilitated in making additional public sales of Luckin ADSs during the Class Period.

51.     Defendant KeyBanc Capital Markets Inc. ("KeyBanc") is a financial-services company based in Cleveland, Ohio.  KeyBanc served as an underwriter for both the May 2019

IPO and the January 2020 SPO.  As underwriter, KeyBanc assisted in the preparation and drafting of the registration statements and prospectuses filed with the SEC for the offerings and first created a public market and then facilitated in making additional public sales of Luckin ADSs during the Class Period.

52.     Defendant Needham & Company, LLC ("Needham") is a financial-services company based in New York, New York.  Needham served as an underwriter for both the May 2019 IPO and the January 2020 SPO.  As underwriter, Needham assisted in the preparation and drafting of the registration statements and prospectuses filed with the SEC for the offerings and first created a public market and then facilitated in making additional public sales of Luckin ADSs during the Class Period.

53.     Defendants Credit Suisse, Morgan Stanley, CICC, Haitong, KeyBanc, and Needham are collectively referred to in this Complaint as the "Underwriter Defendants."  Together with Luckin, the Executive Defendants, the Director Defendants, and the Underwriter Defendants are collectively referred to in this Complaint as "Defendants."

C.     **Relevant Non-Parties**

1.     **Ernst & Young Hua Ming LLP**

54.     Ernst & Young Hua Ming LLP ("E&Y Hua Ming") is based in Beijing, China, and is a member firm of Ernst & Young Global Limited ("Ernst & Young"), a United Kingdom private company, and is registered with the U.S. Public Company Accounting Oversight Board ("PCAOB").  E&Y Hua Ming served as the Company's outside auditor from February 2019 until September 17, 2020, when Luckin announced that E&Y Hua Ming had been replaced by Marcum Bernstein & Pinchuk LLP ("MarcumBP").  During its time as Luckin's auditor, E&Y Hua Ming audited the Company's consolidated financial statements, including Luckin's consolidated balance sheets as of December 31, 2017 and 2018, the related consolidated statements of comprehensive

loss, shareholders' deficits and cash flows for the period from June 16, 2017 (date of inception) through December 31, 2017, and the year ended December 31, 2018, which were included in Luckin's IPO and SPO registration statements.

## 2. Former Luckin Employees[4]

55.     Former Employee ("FE") 1 was a store operations manager for Luckin from the second quarter of 2018 to the third quarter of 2019 in the jurisdiction of Wuhan, China.  During FE 1's employment, FE 1 traveled among numerous shops in Wuhan, managed various aspects of the stores' operations, interacted with Luckin employees in the stores, and witnessed customer transactions.  FE 1 reported directly to an operations manager and an area manager in Wuhan, China, who oversaw seven to eight operational zones.

56.     FE 2 was a business analyst in Luckin's Beijing, China corporate offices from the fourth quarter of 2018 to the fourth quarter of 2019.  FE 2 ultimately reported to Defendant J. Liu.  During FE 2's employment, FE 2 had direct access to Luckin sales and coupon data, including historical usage rates.

57.     FE 3 was a store manager for Luckin in Shanghai, China from the fourth quarter of 2019 to the second quarter of 2020.  FE 3 directly oversaw the day-to-day operations of his store, including customer service, preparation of product, and human resource related duties.  Before Luckin, FE 3 worked as a shift manager at a Starbucks store, Luckin's main competitor, in Shanghai, China.

58.     FE 4 was a senior data analyst in Luckin's Xiamen, China corporate offices from the first quarter of 2019 to the second quarter of 2020.  FE 4 was responsible for the analysis of

---

[4] All former employees are defined using masculine pronouns to protect their anonymity.

data pertaining to materials and units sold by Luckin.  FE 4 was tasked with collecting and analyzing beverage and food order data, as well as logistical data.

59.     FE 5 was an operations manager in Luckin's Xian, China corporate offices from the third quarter of 2018 to the third quarter of 2019.  FE 5 was responsible for opening new stores within the Xi'an province, and the training of new store managers.

60.     FE 6 was an accountant in the tax department of Luckin's Tianjin, China corporate offices from the third quarter of 2017 to the fourth quarter 2019.  FE 6 was responsible for the filing of municipal taxes, along with related duties, for Luckin in the Municipality of Tianjin, China.

## IV.     SUMMARY OF THE EXCHANGE ACT DEFENDANTS' FRAUD

### A.     Luckin's Early Growth and Business Model Based on Aggressive Marketing, Cheap Coffee, and Its Mobile App System

61.     Founded in June 2017 by Lu and Qian, Luckin engages in the retail sale of freshly brewed drinks, including freshly brewed coffee and non-coffee drinks, and pre-made food and beverage items.

62.     Luckin was the latest blockbuster business venture of Lu, a Chinese entrepreneur with close ties to major investment banks throughout Asia, including the Underwriter Defendants. Before founding Luckin, Lu was the CEO of Chinese car rental company, CAR, and its largest customer, UCAR, a ride-sharing company.   At CAR and UCAR, Lu employed the same overarching business strategy: burn through cash to grow the company at a breakneck pace, use that purported growth to raise even more cash in the capital markets, and then allow the companies' early investors—many of whom were Lu's friends and family members—to capitalize off that growth by selling their stakes at massive profits.

63.     At CAR, for example, Lu implemented dramatic pricing cuts to quickly gain market share, and then rushed to take the company public on the Hong Kong Stock Exchange in a $400 million offering that was underwritten by certain of the Underwriter Defendants—namely, Morgan Stanley, Credit Suisse, and CICC.  And when CAR's stock price soared following the offering, CAR's investors, which included private equity funds run by Li and E. Liu, cashed out to the tune of *$1.6 billion*.

64.     In June 2017, shortly after UCAR went public on China's National Equities Exchange (in an IPO underwritten by CICC), Qian, who had served as the COO of both CAR and UCAR, launched Luckin and pitched the Company to Lu.  By October of that year, Lu had assembled a team of investors that contributed over $150 million to the burgeoning coffee start-up.

65.     Luckin's value proposition was relatively straightforward.  It claimed that, unlike Starbucks and other coffee retailers, it was pursuing a "disruptive [business] model" based on app-based, cashier-less purchases, and steep discounts and promotions, which it claimed had "fulfilled the large unmet demand for coffee and driven its mass market consumption in China."  The Company stated that "China's freshly brewed coffee market is highly underpenetrated due to inconsistent qualities, high prices and inconvenience," and claimed that Luckin's "model has successfully driven the mass market coffee consumption in China by addressing these three pain points."  The Exchange Act Defendants touted that they had "pioneered a technology-driven new retail model to provide coffee and other products with high quality, high affordability and high convenience to our customers," which they claimed "allow[ed] [Luckin] to achieve significant scale and growth since [its] inception."

66.     Luckin's "technology-driven new retail model" centered on its mobile app, which it used to send vouchers and coupons for free or discount coffee to tens of millions of people. These steep discounts and other promotions brought the price of a latte down to 12 yuan, or $1.67, about a third the cost of a similar drink at Starbucks, which then dominated the Chinese coffee market.

67.     Luckin operated three types of stores during the Class Period: (i) ***pick-up stores***, which have limited seating, are 100% cashier-less, and are designed primarily for customers to pick up orders placed on the Company's app; (ii) ***relax stores***, which are larger and designed for "branding purpose[s]"; and (iii) ***delivery kitchens***, which only serve delivery orders and are intended for new markets where Luckin has not yet achieved sufficient demand to support a pick-up store.  Luckin claimed that its stores were "located in areas with high demand for coffee, such as office buildings, commercial areas and university campuses," which enabled the Company to "expand rapidly with low rental and decoration costs and stay close to [its] target customers."  The Company also purported to operate unmanned coffee vending machines under its "Luckin coffee EXPRESS" and "Luckin pop MINI" brands.

68.     Luckin claimed that its mobile app and network of pick-up stores allowed it to "simplify and standardize [its] operations . . . improve operational efficiency and quickly expand and scale up [its] business."  Luckin also claimed that its app-based business model enabled it to "leverage big data analytics and AI to analyze [its] customer behavior and transaction data, which enables [it] to continuously enhance [its] products and services, implement dynamic pricing and improve customer retention."  Luckin touted that its "focus on technologies has enabled [it] to operate efficiently, grow rapidly while maintaining quality control."

69.     Luckin opened its first trial store in Beijing in June 2017, and over the next eighteen months it reported explosive growth.  According to the Company, by the end of 2018, it had opened 2,370 additional stores in twenty-eight cities in China, and it had over 16.8 million cumulative transacting customers.  According to Luckin, as of March 31, 2019, over 90% of its stores were pick-up stores, and in 2018, over 90% of its transacting customers made their first purchase via the Company's Luckin mobile app.

70.     Luckin reports revenue in three groups: Freshly brewed drinks, Other Products, and Others.  Freshly brewed drinks, which constituted the majority of the Company's purported net revenues, include products such as freshly brewed coffee, non-coffee drinks, and Luckin Tea. Other Products consists of food and beverage items, such as light meals, "Luckin Pop" products, and other Luckin merchandise.  Others revenue includes delivery fees paid by Luckin customers.

71.     According to the Company, Luckin's number of stores, number of transacting customers and net revenues all purportedly grew at an exponential pace between 2017 and 2018. Luckin claimed that the number of its stores skyrocketed from only ***nine*** stores in the fourth quarter of 2017 to ***2,073*** stores in the fourth quarter of 2018.  The Company also claimed that the cumulative number of transacting customers grew from a mere ***11,000*** customers in the fourth quarter of 2017 to ***over 12.5 million*** customers in the fourth quarter of 2018.

72.     During this same time period, the Company claimed that Luckin's total net revenues grew by ***336,000%*** in 2018, from only RMB250,000 (US$35,302) in 2017 to RMB840.7 million (US$118.7 million) in 2018.  Significantly, the Company claimed that Luckin generated over half of its 2018 total net revenues, or RMB465.4 million (US$65.7 million) in the fourth quarter of 2018 alone.  Luckin's reported growth rate was markedly higher than the growth rate

for Starbucks,[5] Luckin's main competitor in China.  By comparison, Starbucks' China sales grew only 1% in the fourth quarter of 2018, down from 8% in the fourth quarter of 2017.  In fact, Luckin's sales growth over 2018 was over twenty-four times that of Starbucks over the same period.  At its peak, Luckin's rate of growth was thirty-eight times that of Starbucks.  Likewise, Starbucks increased the number of stores it had in its China/Asia Pacific region by only approximately three percent per quarter during 2018.

73.    Despite Luckin's rapid growth, the Company operated at a net loss throughout 2017 and 2018.  However, the Company assured the market that this was part of a deliberate strategy to win market share from competitors like Starbucks.  The Exchange Act Defendants told the market that the Company's rapid expansion and its decision "to invest heavily in offering discounts and deals and other aspects of [its] business, especially sales and marketing expenses," were part of a concerted effort to "increase [Luckin's] brand awareness, expand [its] customer base and store network," and ultimately increase the Company's share of China's freshly brewed coffee market. As Luckin stated at the time of its $200 million Series B funding round in December 2018, the Company's "strategy [was] to quickly grab market share through subsidies, so losses are expected."

**B.    Luckin Announces Its Plan to Overtake Starbucks in China in 2019**

74.    Luckin showed no signs of slowing its growth plans in early 2019.  During a January 3, 2019 presentation in Beijing, the Company announced plans to open 2,500 new stores in 2019, which would give it "over 4,500 stores by the end of 2019."  Luckin's aggressive growth target was part of an effort to overtake Starbucks as the biggest coffee chain in China by the end of 2019.  During the January 3, 2019 presentation, Qian touted that Luckin had purportedly sold

---

[5] Starbucks does not report data only from China, but instead groups China in the China-Asia Pacific segments of its financial reports.

89.6 million cups of coffee by the end of 2018, and that its total customers exceeded 12.5 million. Rebuffing concerns about Luckin's heavy operating losses, Qian reiterated that these losses were part of a larger strategy to gain market share: "A large amount of money spent in marketing is extremely beneficial for rapid acquisition of customers, this is our strategy of winning recognition and market share, and we believe it is more than worthwhile to do so."

75.     During the first quarter of 2019, however, Luckin failed to live up to its lofty growth plans.  Luckin opened just 297 stores during the quarter—less than half of the 625 openings it needed to be on pace to hit its 2,500-store target.  Luckin's net revenue growth rate also slowed dramatically in the first quarter of 2019.  While the Company had experienced a 93.3% sequential increase in total net revenues during the fourth quarter of 2018, its revenues grew by just *2.8%* during the first quarter of 2019.  Moreover, Luckin's sequential growth in cumulative transacting customers declined from 6.5 million in 4Q2018 to 4.3 million in 1Q2019, while its average monthly customers increased at a rate of only *1.8%*, a far cry from the *130%* increase in the prior quarter and the *4,387.5%* increase in 1Q2018.

76.     Notwithstanding this slowdown in Luckin's growth, the Company continued to publicly tout itself as "China's second largest and fastest growing coffee network, in terms of number of stores and cups of coffee sold."  Luckin explained in the IPO Registration Statement (as defined below in ¶ 81) that the Company's reduced growth during the first quarter of 2019 was due to seasonal factors, stating that "[w]e experience seasonality in our business, primarily as a result of orders fluctuations in holiday seasons.  For example, we generally experience fewer purchase orders during Chinese New Year holidays which fall between late January and late February."  However, since Luckin had yet to report year-over-year financial results, investors and analysts had no way to verify the Company's explanation for its slowing growth.

77.     Notably, a comparison of Luckin's and Starbucks' average number of items sold per store per day reveals that unlike Luckin, Starbucks' average number of items sold *increased* from 4Q2018 to 1Q2019.  Similarly, Starbucks' China revenues *increased 9%* year-over-year in the first quarter of 2019.  Unlike Luckin, Starbucks made no mention of the Chinese New Year in its quarterly or annual financial statements, despite operating the largest coffee chain in China during this period.

### C.     Luckin's Early Fundraising and the IPO

78.     The Company's rapid early growth was funded primarily by private investment. Between June 2017 and April 2019, Luckin raised over $563 million from private investors, including CICC, BlackRock, and Carob Investment Pte. Ltd., an affiliate of GIC Private Limited ("GIC"), one of Singapore's sovereign wealth funds, among others.

79.     For example, despite operating at a consistent loss, one year after its founding, in June 2018, Luckin raised $389 million in a maiden fundraising round that valued the Company at a *billion dollars*.  Investors in the fundraising round included GIC.  According to Qian, the funds would "be used for product research, technology innovation and business development."  Then, in November 2018, Luckin raised an additional $200 million in a second fundraising round that valued the Company at *$2.2 billion*.  Investors included GIC, Centurium Capital, Joy Capital, and CICC.  Five months later, in April 2019, Luckin raised an additional $150 million (including a $125 million investment from BlackRock) in a pre-IPO fundraising round—this time based on a valuation of *$2.9 billion*.  In addition to these major funding rounds, Luckin raised an additional $13.9 million through smaller fundraising efforts in January and April 2019.

80.     Then, on April 22, 2019, in an effort to capitalize on this skyrocketing valuation, Luckin announced its intention to conduct an initial public offering of ADSs by filing a Registration Statement on Form F-1 with the SEC (the "F-1").  Luckin subsequently amended that

Registration Statement on May 6, 2019 by filing a Form F-1/A (the "F-1/A").  Defendants Lu, Qian, J. Liu, and Schakel each signed the F-1.

81.     On May 17, 2019, Luckin filed a Form 424(B)(4) Prospectus (the "IPO Prospectus" and together with the F1 and F-1/A, the "IPO Registration Statement"), which offered 33 million ADSs to investors at a price of $17.00 per ADS.  Each ADS represented eight of Luckin's Class A ordinary shares.

82.     The IPO was underwritten by the Underwriter Defendants, including CICC, which had invested in the Company just six months earlier.  Credit Suisse, Morgan Stanley, CICC, and Haitong acted as the joint book-running managers, while KeyBanc and Needham acted as co-managers.  Credit Suisse underwrote 61% of the ADSs offered in the IPO.  Morgan Stanley, which underwrote the second-largest number of ADSs, underwrote 15%.

83.     As part of the IPO, Luckin granted the Underwriter Defendants a thirty-day option to purchase an additional 4.95 million ADSs from the Company at the IPO price, less the underwriting discounts and commissions.

84.     Notably, as a quid pro quo for selecting the Underwriter Defendants for the IPO, Lu demanded $200 million in personal financing to be secured by his Luckin shares, a requirement that was woven into the banks' IPO mandate agreement.  Credit Suisse and Morgan Stanley—who had previously served as underwriters in CAR's public offering—agreed to these unusual terms, while at least one prospective underwriter refused and walked away from the deal.

85.     Luckin completed its IPO on May 17, 2019.  On June 19, 2019, Luckin announced that the Underwriters had exercised in full their option to purchase an additional 4.95 million ADSs from the Company at the IPO price of $17.00 per ADS (less underwriting discounts and commissions).  In total, Luckin reaped over $650 million in gross proceeds.  The Underwriters

earned fees of approximately $35.84 million and further profits from the exercise of their greenshoe option.

86.     In connection with the IPO, the Company also sold $50 million worth of Class A ordinary shares to Louis Dreyfus Company, B.V., in a private placement under Regulation S under the Securities Act.

87.     In anticipation of the Company's IPO, analysts commented how Luckin's progression from start-up to IPO was rapid even by tech-company standards.  For example, Renaissance Capital remarked that "[n]ot since the dotcom bubble of 1999-00 has a company achieved a $3 billion public valuation less than two years after its launch."  In a report dated May 17, 2019, Red Pulse noted that "[w]ithin only 17 months since its establishment, Luckin becomes the fastest listing firm in the history of the US stock market."

88.     In an interview with CNBC on May 17, 2019, Defendant Schakel touted Luckin's "new retail" business model and discount-driven growth strategy, stating that "[w]hat we're trying to do is bring down the per-cup cost . . . and with that price point, we think we're going to drive mass-market consumption."  Schakel claimed that Luckin had "fundamentally changed the cost structure in China," adding that in its short history, Luckin had "done what most people do in 15 or 20 years."

89.     The IPO Registration Statement touted Luckin's purportedly disruptive business model, attested to the financial strength and well-being of the Company, and also addressed Luckin's internal controls and procedures, management systems, and accounting and auditing procedures and policies.

90.     For example, Luckin claimed that it had "pioneered a technology-driven new retail model to provide coffee and other products with high quality, high affordability and high

convenience to our customers," and that this "disruptive model has fulfilled the large unmet demand for coffee and driven its mass market consumption in China, while allowing [the Company] to achieve significant scale and growth since our inception."

91.     The IPO Registration Statement touted Luckin's purported exponential growth in stores, transacting customers, and items sold in the year preceding the IPO:

| | For the three months ended, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | December 31, 2017 | March 31, 2018 | June 30, 2018 | September 30, 2018 | December 31, 2018 | March 31, 2019 |
| Number of stores at the beginning of the period | 0 | 9 | 290 | 624 | 1,189 | 2,073 |
| Number of stores at the end of the period | 9 | 290 | 624 | 1,189 | 2,073 | 2,370 |
| Net increase in the number of stores | 9 | 281 | 334 | 565 | 884 | 297 |

| | For the three months ended or as of | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | December 31, 2017 | March 31, 2018 | June 30, 2018 | September 30, 2018 | December 31, 2018 | March 31, 2019 |
| Total stores | 9 | 290 | 624 | 1,189 | 2,073 | 2,370 |
| Pick-up stores | 4 | 83 | 356 | 903 | 1,811 | 2,163 |
| Relax stores | 5 | 15 | 22 | 45 | 86 | 109 |
| Delivery kitchens | 0 | 192 | 246 | 241 | 176 | 98 |
| Cumulative number of transacting customers (in thousands)[1] | 11.1 | 485.0 | 2,917.8 | 5,984.3 | 12,529.5 | 16,872.3 |
| Average monthly transacting customers (in thousands)[2] | 4.0 | 179.5 | 1,207.6 | 1,877.4 | 4,325.9 | 4,402.0 |
| Average monthly total items sold (in thousands)[3] | 8.6 | 487.5 | 4,001.0 | 7,760.3 | 17,645.1 | 16,275.8 |
| Freshly brewed drinks | 8.0 | 451.7 | 3,743.7 | 6,220.4 | 13,418.8 | 13,077.2 |
| Other products | 0.5 | 35.8 | 257.3 | 1,539.9 | 4,226.4 | 3,198.6 |

92.     The IPO Registration Statement also touted Luckin's purported exponential growth in net revenues:

| | Period from the inception date to December 31, 2017 | | For the year ended December 31, 2018 | | | For the three months ended March 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | 2018 | | 2019 | | |
| | RMB | % | RMB | US$ | % | RMB | % | RMB | US$ | % |
| | (in thousands, except for percentages) | | | | | | | | | |
| Net revenues: | | | | | | | | | | |
| Freshly brewed drinks | 215 | 86.0% | 649,609 | 96,795 | 77.3% | 9,575 | 73.9% | 361,095 | 53,805 | 75.4% |
| Other products | 25 | 10.0% | 135,642 | 20,211 | 16.1% | 1,403 | 10.8% | 83,980 | 12,513 | 17.6% |
| Others | 10 | 4.0% | 55,444 | 8,261 | 6.6% | 1,976 | 15.3% | 33,435 | 4,982 | 7.0% |
| Total net revenues | 250 | 100.0% | 840,695 | 125,267 | 100.0% | 12,954 | 100.0% | 478,510 | 71,300 | 100.0% |

93.     The Company claimed that its "revenue growth is mainly driven by [its] ability to attract new customers and actively engage existing customers," and attributed its ability to attract and retain customers to Luckin's "new retail model . . . built upon [its] mobile apps and store

network."   The Company also touted that its store-level operating loss was purportedly rapidly declining due to its "technology-driven new retail business."

94.      Luckin touted that it had "invested significantly in branding, sales and marketing to acquire and retain customers since [its] inception."   Included among these purported investments, Luckin stated that the Company offered "various discount offers and deals in the form of vouchers and coupons" and "regularly offer coupons and vouchers to increase [Luckin's] customer base, retain [its] existing customers or promote new products."   Luckin highlighted its introduction of bulk corporate promotions, stating that Luckin had "opened [its] application programming interface to corporations with membership programs, where the corporations pay for [Luckin's] products in bulk in advance, and their members can then redeem these products."

95.      The IPO Registration Statement represented to investors that the Company's financial statements and disclosures were made in accordance with U.S. Generally Accepted Accounting Principles ("GAAP") and that the Company's consolidated financial statements contained all necessary adjustments.   Although the Company disclosed material weaknesses identified during its audit of its 2018 financial statements, including the "lack of sufficient accounting and financial reporting personnel with requisite knowledge and experience in application [of U.S. GAAP and SEC] rules" and the "lack of financial reporting policies and procedures that are commensurate with [U.S. GAAP and SEC] reporting requirements," Luckin represented that it was "in the process of implementing a number of measures to address the material weaknesses and deficiencies that have been identified."

96.      In particular, Luckin claimed that it was in the process of: "(i) hiring additional accounting and financial reporting personnel with U.S. GAAP and SEC reporting experience, (ii) expanding the capabilities of existing accounting and financial reporting personnel through

continuous training and education in the accounting and reporting requirements under U.S. GAAP, and SEC rules and regulations, (iii) developing, communicating and implementing an accounting policy manual for our accounting and financial reporting personnel for recurring transactions and period-end closing processes, and (iv) establishing effective monitoring and oversight controls for non-recurring and complex transactions to ensure the accuracy and completeness of our company's consolidated financial statements and related disclosures."

> **D.    Through Their Buy-Side Analyst Coverage, the Underwriter Defendants Continue to Promote Luckin**

97.     Immediately following the IPO (and continuing through to the SPO), analysts employed by the Underwriter Defendants began issuing aggressively bullish reports touting Luckin's ADSs and repeating the statements in the IPO Registration Statement about Luckin's growth and business model.  For example, on June 11, 2019, Credit Suisse—one of the lead underwriters in Luckin's IPO—issued a report initiating coverage and setting a price target of $24.00, *32%* above Luckin's then-current trading price.  In the report, Credit Suisse echoed Luckin's claims about its business in the IPO Registration Statement, stating that "Luckin is uniquely positioned to fulfil the huge unmet demand for freshly brewed coffee in China, and further expand its addressable market, supported by its tech-driven new retail model, distinguished value propositions and early-mover advantage."  Credit Suisse touted "Luckin's disruptive new retail model," stating that "Luckin's technology-driven new retail model has provided the company significant advantages in cost and customer engagement to drive the mass market coffee consumption in China."

98.     The glowing coverage by these affiliates of the Underwriter Defendants continued. For instance, in a follow-up report on July 15, 2019, Credit Suisse raised its price target to $25, stating that it expected a "strong comeback in 2Q19" and that "[w]e expect Luckin's 2Q results

(due mid-Aug) to notably improve from 1Q."  Credit Suisse added that "[w]hile some investors are still skeptical of Luckin's business model, we believe sentiment could turn bullish in the near term, with strong 2Q19 results and promising trends ahead."

99.     Haitong issued a report on June 14, 2019 setting a price target of $22.80 and touting that "Luckin Coffee has applied what we see as a revolutionary business model to an under-penetrated market in China."  The report repeated the Company's claims in the IPO Registration Statement regarding Luckin's purported business model and "argue[d] these should, in the long term, lead to stronger profitability than its peers."  Haitong also stated that "we believe that [Luckin's] revenue growth and profitability improvement during FY18 and Q1 FY19 validate the success and potential of its business model."  Haitong further stated that "[w]e believe that the company has complied with all corporate-governance requirements as guided by the New York stock exchange."

100.    Needham initiated coverage on Luckin on June 11, 2019, with a "buy" rating, and then, on July 17, 2019, repeated its and other analysts' bullish stance and "buy" recommendations, noting that growth was expected to come from new store openings, products, and patrons.

101.    However, some analysts not affiliated with the Underwriter Defendants expressed doubt over Luckin's potential long-term viability.  While it had experienced explosive growth since its inception, some market commentators questioned whether that growth was sustainable in a country with a strong historical and cultural preference for tea.  For example, in a research report, Sanford Bernstein noted that China's per capita coffee consumption was a fraction of Japan's, "[b]ut at a similar stage of market development, Japan's per capita rate was already 10x higher, suggesting China may never achieve coffee consumption rates that exist in present-day Japan."

102.     Concerns like these in the market were repeatedly discounted and dismissed by the analysts affiliated with the Underwriter Defendants, who repeatedly touted Luckin's ability to sustain its previous level of exponential growth.  For example, on August 1, 2019, Haitong asserted that "Luckin's operations are on track to meet our full-year forecasts" and "[w]e maintain our BUY rating and see upward revisions to consensus estimates as catalysts for the share price."  On the eve of Luckin's 2Q2019 filing, Needham issued an August 12, 2019 report reiterating its "buy" recommendation and noting that "mobile app usage indicates strong user growth in 2Q and into the first month of 3Q."

**E.     Following the IPO, Luckin's Reported Earnings and Growth Dramatically Increase and its Stock Price Soars**

**1.     2Q2019 Reported Financial Results and Analyst Coverage**

103.     On August 14, 2019, the Company published a press release that purported to announce results for 2Q2019, the quarter ended June 30, 2019 (the "2Q2019 Press Release").  The Company announced that its net revenues had skyrocketed by over ***698%*** year-over-year, and that Luckin had added 5.9 million new customers during 2Q2019 alone.  The 2Q2019 Press Release was replete with similar claims regarding Luckin's seemingly spectacular growth during the quarter.  For example, Luckin claimed that "[a]verage monthly transacting customers in the quarter were 6.2 million, representing an increase of ***410.6%*** from 1.2 million in the second quarter of 2018," and that "[a]verage monthly total items sold in the quarter were 27.6 million, representing an increase of ***589.7%*** from 4.0 million in the second quarter of 2018."  The 2Q2019 Press Release also stated that Luckin's "[s]tore level operating loss in the quarter was RMB55.8 million (US$8.1 million) decreasing from a loss of RMB81.7 million in the second quarter of 2018."

104.     The Company attributed its meteoric reported revenue growth to increased demand and operational efficiency driven by Luckin's technology-centered business model.  For example,

the press release quoted Qian as stating that "we have substantially reduced our store operating loss as a percentage of net revenues *as a result of benefits of scale and increased bargaining power, operating efficiency from technology, and higher store throughput*, and we are on track to reach our store level break-even point during the third quarter of 2019."  Qian also claimed that "[t]otal net revenues from products sold increased 698.4% year-over-year, *driven by a significant increase in transacting customers, an increase in the average number of items purchased by our transacting customers and higher effective selling prices*," and that "*this is the result of our distinguished value proposition of delivering our customers high quality, high convenience and high affordability*."

105.    On August 14, 2019, Defendants Lu, Qian, and Schakel each participated in the Company's quarterly conference call with analysts and investors.  Analysts employed by each of the Underwriters participated in the conference call, including Tony Wang (Credit Suisse), Lillian Lou (Morgan Stanley), Eric Gonzalez (KeyBanc), Ro Chen (CICC), Billy Leung (Haitong), and Vincent Yu (Needham).

106.    During the conference call, the Exchange Act Defendants repeatedly lauded Luckin's purported revenue growth and the success of its business model.  For example, Lu touted the Company's "*strong performance during the second quarter*" and "*progress . . . across all of [Luckin's] key metrics*."  Qian claimed that the Company had "been able to rapidly expand our operations and are on-track to be the largest coffee network by number of stores by the end of this year."  With respect to the Company's net revenues, Qian claimed that "*[r]evenue growth was driven by a significant increase in transacting customers, an increase in the average number of items purchased by our transacting customers as well as higher effective selling prices*."  Qian added that "this is the result of our distinguished value proposition by delivering our customers

37

high quality, high convenience and high affordability."  Similarly, Schakel stated that "*[n]et revenue from products grew just under 700% year-over-year and 95% sequentially, driven by more transacting customers, an increase in the number of items purchased per transacting customers, and higher effective selling prices*."  Touting the Company's purported average monthly-items-sold metric, Schakel also stated that "*[d]uring the second quarter of 2019, we sold nearly as many items as in full year 2018, which illustrates our rapid expansion*."

107.    Consistent with the post-IPO coverage, following the 2Q2019 conference call, the analysts affiliated with the Underwriter Defendants were bullish with their coverage of Luckin's 2Q2019 financial results.  For example, an August 14, 2019 report from Morgan Stanley recounted Luckin's strong performance since its IPO: "Average customers per store in 2Q19 reached 7,500, vs. 6,600 in 1Q19 and 6,000 in full-year 2018" and "[m]anagement . . . confirmed a strong number of new customers at the beginning of 3Q19."  The report "maintain[ed] our price target price at US$21, based on our 2020 sales estimate of Rmb15bn and a target 2020 P/S multiple of 2.4x (benchmarking to the average of peers including coffee chains, leisure food stores, and ecommerce/new retail players in China). We remain EW [equal-weight] on the stock."  Credit Suisse similarly stated in a report on August 15, 2019 that Luckin's 2Q2019 results were "in line," highlighting the Company's purported sequential revenue growth and stating that "store-level profit margin improved notably."  In a report on August 15, 2019, Haitong also stated that Luckin's 2Q2019 results were "in line with our expectations," and that Haitong was "upbeat to see sequential improvement in all major operating metrics," including items sold per store per day, cost per product and quarter-end store count.  On August 21, 2019, KeyBanc reiterated an "[o]verweight rating and $22.00 price target on Luckin," noting that Luckin was expected to "turn an overall profit by early 2021."

108.     In a September 4, 2019 report, Haitong declared that "[w]e maintain our FY20-21 EPS forecasts"; "we continue to be impressed with Luckin's ability to leverage new opportunities"; and "[w]e maintain our BUY rating."  Likewise, Needham issued a report on September 26, 2019, reiterating its "buy" rating and underscoring Luckin's ability to attract younger customers than Starbucks because of Luckin's "relatively low pricing strategy" and infrastructure that "can generate more sales per store."

109.     In a report on October 22, 2019 Credit Suisse stated that it "expect[ed] Luckin to report product revenue of Rmb1.38 bn in 3Q (due 13-Nov), up 59% QoQ [quarter-over-quarter] and close to the guidance midpoint (Rmb1.40 bn), underpinned by strong growth in new customers, improvement in customer retention and sequential ASP [average selling price] increase," concluding that "LK is on track to deliver its full-year guidance."  Similarly, on October 24, 2019, Haitong stated that "[o]ur channel checks suggest that most major metrics for Luckin improved in Q3 FY19, with monthly customer adds of more than 2mn coupled with a rising average selling price (ASP) and falling cost per item."  Haitong noted that the "customer adds" were purportedly "from both new and existing stores while the increase in ASP was driven by a decrease in subsidies and an improving product mix."

**2.     3Q2019 Reported Financial Results and Analyst Coverage**

110.     On November 13, 2019, the Company published a press release that purported to announce Luckin's financial results for 3Q2019, the period ended September 30, 2019 (the "3Q2019 Press Release").  Once again, the Company reported exponential growth.  The Company announced that net revenues ***exceeded*** the high end of Luckin's guidance, stating that "[t]otal net revenues from products in the quarter were RMB1,493.2 million (US$208.9 million), representing an increase of ***557.6%*** from RMB227.1 million in the same quarter of 2018."  Luckin further represented that "[a]verage monthly total items sold in the quarter were 44.2 million, representing

an increase of *470.1%* from 7.8 million in the third quarter of 2018"; "[a]verage total net revenues from products per store in the quarter were RMB449.6 thousand (US$62.9 thousand), representing an increase of *79.5%* from RMB250.5 thousand in the same quarter of 2018"; and "[s]tore level operating profit in the quarter was ***RMB186.3 million (US$26.1 million)***, or 12.5% of net revenues from products, ***compared to a loss of RMB126.0 million in the third quarter of 2018***."

111.    Additionally, the 3Q2019 Press Release stated that "[n]et revenues from other products were RMB347.8 million (US$48.7 million), representing *22.6%* of total net revenues in the third quarter of 2019, compared to RMB34.4 million, or *14.3%* of total net revenues, in the third quarter of 2018."  The Company also reported that "[s]ales and marketing expenses were RMB557.7 million (US$78.0 million)," which represented a year-over-year increase of 147.6%, but it stated that these increased costs were "mainly due to increases in advertising expenses as the Company launched new marketing initiatives, entered into new cities and launched Luckin Tea as an independent brand."

112.    On November 13, 2019, Defendants Lu, Qian, and Schakel participated in the Company's quarterly conference call with analysts and investors.  Just like the prior quarter, the only analysts who participated in the 3Q2019 conference call were representatives of the Underwriter Defendants.  During the call, Lu attributed Luckin's growth to its technology-centric business model: "I have been often asked whether we are doing too much and too fast.  I would say, *no*. In fact, ***this is a natural evolution of our business model***.  Since our inception, Luckin's growth has always been beyond everyone's expectations. ***This is because our business model is entirely built on a technology, completely different from a traditional retailer***."

113.    During the conference call, Qian and Schakel reviewed the Company's purported financial results.  Qian claimed that "the growth of product revenue is greater than the growth of

40

the number of items sold. The growth of items sold is greater than the growth of transacting customers, and the growth of transacting customers is greater than the growth of stores. ***That shows that we are not just grow[ing] quickly, but also [are] able to improve efficiency and profitability at the same time. It also shows that the growth of the revenue is not only due to the growth of stores***."

114. Schakel described Luckin's 3Q2019 results as "***very, very strong***." With respect to revenue growth, Schakel stated that "product revenue was above the high end of our range and grew more than 70% sequentially. Illustrative of the improved store efficiency, you can see that the average product revenue grew even faster during the quarter." Schakel further claimed that the "***key underlying drivers***" of Luckin's steady revenue growth were "***a very strong increase in the number of monthly transacting customers***," an increase in "***the average monthly items per transacting customer***," and increases in "***the net selling price per item***."

115. Following the release of Luckin's 3Q2019 financial results, analysts for the Underwriter Defendants again issued positive reports touting the Company's results. For example, a November 14, 2019 report from Morgan Stanley stated: "Luckin achieved strong store-level profitability (12.5% margin) with store productivity growth and efficiency improvement"; "[a]verage customers per store in 3Q19 reached 8,100, vs. 7,400 in 2Q19, 6,600 in 1Q19 and 6,000 in full-year 2018"; and "[m]anagement has become increasingly confident in its 3Q20 earnings break-even target." Credit Suisse issued a report on November 14, 2019 describing the results as a "strong beat," highlighting that the Company's purported product revenues were ahead of analyst estimates and that the Company "beat[] the high-end of its guidance." Credit Suisse also highlighted the Company's purported 29% quarter-over-quarter growth in items sold per store per day, which it stated was "driven by new product launch and solid growth in coffee" sales. Credit

Suisse also raised its price target to $28.00, describing the Company's 3Q2019 results as "a high-quality beat with all the key operating metrics ahead of consensus," adding that the results made Credit Suisse "more confident on Luckin's delivery of its mid-term target (breakeven at company-level by 3Q20), and more importantly, to prove itself a sustainable business model."

116.    In a November 15, 2019 report titled "Full Steam Ahead," Haitong stated that Luckin's "profitability outlook" was "increasingly upbeat"; "[w]e maintain our EPS forecasts and BUY rating"; and "[w]e see multiple favorable share-price catalysts ahead."  Similarly, on November 14, 2019, Needham stated that Luckin's purported store-level profitability justified Needham's "buy" rating.  Likewise, on November 22, 2019, KeyBanc raised its price target on Luckin from $24.00 to $32.00, stating that it "believe[s] Luckin's execution continues to prove out its business model, targeting high affordability, convenience, and quality."

117.    Other analysts and media outlets were similarly upbeat regarding Luckin's 3Q2019 results.  A Zephirin Group Inc. ("Zephirin") report on November 15, 2019 stated that "[t]he Q319 results were as strong as we and investors expected" and that "[w]e believe that management deserves full credit in continuing to quickly build out the LK brand with the new retail model partnerships."  A follow-up Zephirin report, issued on November 25, 2019, stated that the Company had an "attractive valuation," noting "hyper-growth that is expected by year-end" spurred by Luckin's "promotion[al] [. . .] offering [of] a 55% year-end gift voucher."  On November 27, 2019, a report from China Tonghai Securities stated that Luckin "has disrupted China's freshly brewed coffee market by leveraging its innovative New Retail business model to optimize operating efficiencies and fuel its rapid expansion," and declared that the Company purportedly "has accumulated a loyal corporate customer base of 30.7 million cumulative transacting users (3Q19) through offering highly convenient user experience at competitive

prices." The positive recommendations kept coming.  Immediately before Luckin's SPO, TH Data Capital stated in a January 6, 2020 report that "[w]e are positive on LK's 4Q19E operations," noting in its headline that, "Continuing Expansion In Stores and Customer Spending Drive Better Financials."

### F.     January 2020 SPO and Concurrent Note Offering and Analyst Coverage

118.     Between the May 2019 IPO and mid-January 2020, Luckin's ADS price increased over *200%*, driven by the Exchange Act Defendants' repeated statements touting Luckin's seemingly unstoppable growth.  In early January 2020, multiple news outlets reported that Luckin had finally surpassed its rival Starbucks in number of locations in China.  Having raised over $600 million from its May 2019 IPO, Luckin went back to the public markets for further fundraising in early 2020.

119.     Accordingly, on January 10, 2020, Luckin conducted the SPO of 13.8 million ADSs priced at $42.00 each.  Lucky Cup Holdings Limited, a Cayman Islands company wholly owned by Centurium Capital Partners 2018, L.P. and ultimately controlled by Defendant Li, also offered and sold 4.8 million ADSs in the SPO.

120.     The SPO was made through an underwriting syndicate led by Defendants Credit Suisse, Morgan Stanley, CICC, and Haitong, who acted as the joint book-running managers, while KeyBanc and Needham acted as co-managers.  As in the case of the IPO, Credit Suisse underwrote 60% of the ADSs offered in the SPO.  Morgan Stanley and CICC, which underwrote the second largest number of ADSs, each underwrote 12.5%.

121.     In connection with the SPO, on January 7, 2020, Luckin filed a Form F-1 Registration Statement with the SEC.  Defendants Lu, Qian, J. Liu, and Schakel each signed the January 7, 2020 Form F-1 Registration Statement.  On January 9, 2020, the Company filed an Amendment to its Form F-1 on Form F-1MEF.  On January 10, 2020, Luckin filed a Form

424(B)(4) Prospectus (together with the January 7, 2020 F1 and January 9, 2020 F-1MEF, the "SPO Registration Statement") with the SEC.  The statements contained in the January 9, 2020 Form F-1 and January 10, 2020 424(B)(4) Prospectus were the same or substantially similar.

122.    As with the May 2019 IPO, the Underwriter Defendants received a thirty-day option to purchase up to an additional 2.07 million ADSs from the Company and Li to cover over-allotments (1.35 million from the Company and 720,000 from Li).  On January 17, 2020, Luckin announced the full exercise of the underwriters' option.  Gross proceeds from the sale of these ADSs, including the oversubscription allotments, totaled over US$643 million.  The Underwriter Defendants received fees of at least $23.329 million for underwriting the SPO.

123.    Concurrent with the SPO, the Company also offered US$400,000,000 aggregate principal amount 0.75% Convertible Senior Notes due 2025 to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A under the Securities Act and to non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act ("Concurrent Note Offering"), or a total of US$460,000,000 aggregate principal amount if the initial purchasers in the Concurrent Note Offering exercised in full their option to purchase additional notes.

124.    The SPO Registration Statement contained statements that attested to the financial strength and well-being of the Company, as well as statements concerning Luckin's internal controls and procedures, management systems, and accounting and auditing procedures and policies.  As in the IPO Registration Statement, the SPO Registration Statement included representations concerning the Company's purported internal controls over financial reporting, compliance with U.S. GAAP, and other critical accounting policies, and purported risk disclosures.

125.   The SPO Registration Statement made numerous positive claims about Luckin's business.   For example, the Company claimed that it "had pioneered a technology-driven new retail model" and touted that Luckin's "disruptive model has fulfilled the large unmet demand for coffee and driven its mass market consumption in China, while allowing [it] to achieve significant scale and growth since [its] inception."   Luckin attributed its rapid growth to its "centralized technology system," which it claimed enabled it "to simplify and standardize [its] operations, which allows [it] to improve operational efficiency and quickly expand and scale up [its] business."

126.   The SPO Registration Statement included the Company's unaudited interim condensed consolidated statements of comprehensive loss and unaudited interim condensed consolidated statements of cash flow for the nine months ended September 30, 2018 and 2019 and the unaudited interim condensed consolidated balance sheet as of September 30, 2019.   The Company attested that these consolidated financial statements were prepared and presented in accordance with U.S. GAAP.

127.   According to the Company, Luckin's "net revenues were RMB2,929.2 million (US$409.8 million) in the nine months ended September 30, 2019, increased by 680.6% from RMB375.3 million in the nine months ended September 30, 2018."   The Company stated that "[t]he growth of [Luckin's] net revenues was primarily driven by the significant increase in the number of [its] transacting customers, effective selling prices and purchasing frequency per customer."   The Company also touted its purported decrease in net loss, stating that it "recorded a net loss of RMB1,764.9 million (US$246.9 million) in the nine months ended September 30, 2019, compared to a net loss of RMB950.2 million in the nine months ended September 30, 2018."

128.   Luckin also represented that it was continuing to remediate Luckin's previously identified internal controls weaknesses, including by "(i) hiring additional accounting and financial

reporting personnel with U.S. GAAP and SEC reporting experience, (ii) expanding the capabilities of existing accounting and financial reporting personnel through regular training and education in the accounting and reporting requirements under U.S. GAAP, and SEC rules and regulations, (iii) developing, communicating and implementing an accounting policy manual for our accounting and financial reporting personnel for recurring transactions and period-end closing processes, and (iv) establishing effective monitoring and oversight controls for non-recurring and complex transactions to ensure the accuracy and completeness of our company's consolidated financial statements and related disclosures."

129.    Following Luckin's SPO, Credit Suisse issued a report on January 15, 2020 increasing its price target by *92%* from $28.00 to $54.00.   Credit Suisse stated that "[o]ur grassroots check suggests the progress with this business has been running well, and we believe it's time to factor it into our valuation, as LK's self-operated stores are on the right path to reach break-even point in 3Q20E."  Haitong's January 16, 2020 report was equally glowing. Haitong raised its target price *86%* to $53.20, and stated that "[w]e see strong potential for Luckin's unmanned initiatives," or vending machines, and Luckin's expansion into tea initiatives, including tea franchises. Similarly, a report from KeyBanc, issued on January 16, 2020, raised its price target by *75%* to $56.00 "based on strong core business momentum and the addition of new revenue streams."

**G.    Unbeknownst to Investors, Luckin's Reported Sales, Profits, and Other Key Operating Metrics Were Vastly Inflated by Fraud Throughout the Class Period**

130.    In truth, the growth story that Luckin sold to investors was a complete sham. The Company has now admitted that *before* the IPO and throughout the Class Period, Luckin's most senior executives—including Lu, Qian, J. Liu, and dozens of unnamed employees working for or with the Exchange Act Defendants—schemed to fraudulently inflate the Company's reported

financial metrics through massive, fabricated transactions.  The Company has admitted that "the fabrication of transactions began in April 2019," before the IPO, and that, as a result of this fraud, Luckin overstated its net revenues by *80-90%*, accounting for *nearly half* of Luckin's revenues during the second, third, and fourth quarters of 2019:

| Quarter | Reported Net Revenue from Products[6] | Actual Net Revenue from Products | % Overstatement |
|---------|---------------------------------------|----------------------------------|-----------------|
| **2Q2019** | RMB870 million (US$122.8 million) | RMB620 million (US$87.5 million) | **40.3%** |
| **3Q2019** | RMB1,493.2 million (US$210.85 million) | RMB793.2 million (US$112 million) | **88%** |
| **4Q2019 [Projected]** | RMB2,100-2,400 million (US$296.5-338.9 million) | RMB930-1,230 million (US$131.3-173.6 million) | **95-125.8%** |
| **Total** | **RMB4,463.2-4,763.2 million (US$630.2-672.6 million)** | **RMB2,343.2-2,643.2 million (US$330.8-373.2million)** | **80-90%** |

131.    In the Company's own words, "*[e]vidence discovered to date demonstrates that the Company's former Chief Executive Officer, Ms. Jenny Zhiya Qian, former Chief Operating Officer, Mr. Jian Liu and certain employees reporting to them participated in the fabricated transactions and that the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties.*"  In addition to Qian and J. Liu, the Company has also directly implicated Lu in the Exchange Act Defendants' fraud based on "documentary and other evidence" identified in the investigation, as well as "Lu's degree of cooperation."  According to reporting by *The Wall Street Journal* ("*Journal*"), the Company's investigation determined that Lu "knew—or should have known—about the fabricated transactions."

---

[6] Luckin calculated net revenues from products "as the sum of net revenues from freshly brewed drinks and net revenues from other products."  Net revenues from products excluded revenue generated from delivery fees paid by customers.  Unless otherwise indicated, calculations of Luckin's overstatements of net revenue is based on net revenue from products.

132.    Shockingly, before the IPO and throughout the Class Period, Luckin lacked **any** internal audit function or other internal controls sufficient to prevent or detect the massive fraud at the center of the Company.  Contrary to the Exchange Act Defendants' repeated claims that Luckin had remediated the material weaknesses in its internal controls over financial reporting, Luckin did not "***charter[] an internal audit function to test and evaluate its control functions***" until ***after*** the Exchange Act Defendants' fraud was revealed to the market.

**1.    Defendants' Use of Related Parties to Carry Out the Fraudulent Scheme**

133.    The loop of fabricated transactions that allowed the Exchange Act Defendants to report Luckin's exponential growth was only made possible by the Exchange Act Defendants' use of third parties affiliated with or controlled by Lu, many of which were created for the purpose of carrying out this fraud.  As the Company has admitted, "***the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties***."  Moreover, the SAMR determined that "***43 third-party related business entities, including Beijing Automotive Travel Business Consulting Services Co. Ltd., UCar, Zhengzhe International (Xiamen) Co. Ltd. aided and abetted Luckin in carrying out the misleading acts***."

134.    Following the Company's admissions, the *Journal* conducted an investigation that determined that "[i]n late May 2019 [around the time of the IPO], orders began flooding in under a fledgling line of business that involved selling coffee vouchers in bulk to corporate customers, according to internal records reviewed by the Journal."  Those records "show numerous purchases by dozens of little-known companies in cities across China.  These companies repeatedly bought bundles of vouchers, often in large amounts.  Rafts of orders sometimes came in during overnight hours."  Internal company records obtained the *Journal* show that "***Luckin booked more than 1.5***

*billion yuan ($210 million) of corporate sales in this manner in 2019, dwarfing genuine purchases during the period.*"  However, as the Company has admitted, the Company's scheme to fabricate revenues far exceeded these figures, totaling **at least $300 million** between 2Q2019 and 4Q2019.

135.    Many of the entities that Luckin used to facilitate the fraud in this manner had ties to Lu.  As reported by the *Journal*, "registration records of companies that bought vouchers and others that received repeated supplier payments shows that many had links to Luckin, Mr. Lu or Mr. Lu's two previous ventures."  Some of these entities "listed the same office addresses and contact numbers as branches of CAR Inc. or Ucar"; "[s]everal were registered with email addresses of employees of those companies"; and "[o]ne was registered with a Luckin email address."  Moreover, "[a] few of the companies had links to a relative or a friend of Mr. Lu."  For example, Date Yingfei (Beijing) Data Technology Development Co. Ltd. ("Date Yingfei"), which was "[o]ne regular bulk buyer of coffee vouchers" based on records obtained by the *Journal*, "has the same phone number as a branch of CAR Inc. and a predecessor of Ucar."

136.    In addition, "Qingdao Zhixuan Business Consulting Co. Ltd., situated in China's northern Shandong province, bought 960,000 yuan ($134,000) worth of Luckin vouchers in a single order, according to the documents.  They show it made more than a hundred similar purchases from May to November of 2019."  Corporate-registry records "link this company to a relative of Mr. Lu, to an executive of Mr. Lu's previously founded Ucar Inc. and to a Luckin executive, via a complex web of other companies and their directors and shareholders."  The *Journal* also found that "Qingdao Zhixuan also has the same telephone number as a branch of CAR Inc. and is registered with a Ucar email address."

137.    In another example, Zhengzhe International Trade (Xiamen) Co. ("Zhengzhe") was documented as a supplier of raw materials to Luckin.  The *Journal* reported that both "Date Yingfei and Zhengzhe have the same legal representative, Wang Baiyin, a former classmate of Mr. Lu." According to corporate registration records obtained by the *Journal* "Mr. Wang owns 60% of Date and 95% of Zhengzhe."  The below corporate registration records confirm Mr. Wang's ownership of both Date Yingfei, which purportedly purchased bulk coffee vouchers, and Zhengzhe, a purported supplier of raw materials:

<table>
<tr><td align="center"><b><u>Corporate Registry Records</u></b></td><td align="center"><b><u>Translation</u></b></td></tr>
</table>



138. The SAMR's investigation confirmed that Zengzhe as well as UCAR were among the forty-three related parties used to facilitate Luckin's fraud, imposing RMB61 million (US$8.6 million) in administrative sanctions on Luckin and each of these related entities.

139. These transactions through third parties affiliated with or controlled by Lu increased throughout the Class Period.  Consistent with the media reports described above, FE 2, a business analyst in Luckin's Beijing corporate offices from November 2018 to November 2019, recalled reviewing Luckin sales and coupon data in 3Q2019 and noticing significant and unexplainable increases in sales data and other key metrics regarding Luckin's overall operations. FE 2 described the increases as noticeably larger, unusual, and very different than the data FE 2 was accustomed to seeing just before 3Q2019.

140. As reported by the *Journal*, individuals who are familiar with these transactions stated that "the rafts of purchases and payments formed a loop of transactions that allowed the company to inflate sales and expenses with a relatively small amount of capital that circulated in and out of the company's accounts."  The below chart depicts the web of Lu-related entities and individuals that facilitated the Company's immense fraud on investors:



Source: *The Wall Street Journal*

141.    Confirming the Company's admissions, according to a person interviewed by the *Journal*, the Company's own internal investigation "found evidence that Mr. Lu had knowledge of certain related-party transactions that weren't properly disclosed."  Moreover, according to a June 15, 2020 report by Caijing.com ("Caijing"), Luckin's auditor, E&Y Hua Ming "***uncovered a large number of email exchanges indicating that at least people at the level of CEO Zhiya Qian approved various fraudulent transactions.***"  The report revealed that "***[t]hese emails included application for payments of fraudulent related transactions, setting up and coordinating related entities, and summaries of financial impacts of fraudulent transactions***."

### 2.    The Exchange Act Defendants' Fraudulent Use of Coupons and Vouchers

142.    The Exchange Act Defendants' scheme to engineer fake transactions took several forms.  According to Luckin employees interviewed by the *Journal*, "employees used individual accounts registered with cellphone numbers to purchase vouchers for numerous cups of coffee. Between 200 million and 300 million yuan of sales ($28 million to $42 million) were fabricated in this manner, according to a person familiar with the matter."  Consistent with these reports, FE 1 observed that customers rarely paid in cash and that Luckin relied heavily on coupons, vouchers, and other promotional activities, practices that allowed the Exchange Act Defendants to fabricate sale numbers.  FE 3 likewise stated that Luckin's broad and generous issuance of coupons and vouchers helped to "inflate sales," and that, "I'm sure, was also helpful to manipulating revenue data."

143.    According to FE 1, the Luckin stores that he oversaw were never set up to accept any cash payments. When a customer insisted on paying with cash, store employees were instructed to pocket the cash and use their own cell phones to pay for the customer's purchase. This was one point of sale mechanism to facilitate over-reporting of sales.  As FE 1 stated, "if a cash transaction happened, it wouldn't go in the system, so workers could input *whatever they wanted*."

### 3.    The Exchange Act Defendants Fraudulently Skipped Receipt Numbering

144.    During the Class Period, Luckin also engineered fake transactions by miscounting the number of drinks sold.  When an order is placed online or through Luckin's app, a three-digit pickup-up number and a QR code is generated to allow the customer to pick up the order.  In theory, this system would allow Luckin's order volume to be tracked in real time.  However, according to FE 1, "sometime in the second quarter of 2019," he observed that the issuance of

receipts often "skipped" ahead, such that the sequential number imprinted on the receipt of one purchased product did not sync consecutively with the receipt of the next product sold; the receipts for the products would be several numbers apart, and non-consecutive, indicating that several numbers between the receipts had been "skipped." This was also observed by FE 3 and FE 4. FE 4, who worked in Luckin's corporate offices, stated that Luckin's point of sale system was notorious for its automatic issuance of receipts that would "skip order numbers," which FE 4 described as "suspicious."

145.   FE 1 stated that this practice allowed Luckin to "increase the number of cups [of coffee] recorded as sold" and ***allowed for inflated sales***. As FE 1 explained, through this practice, certain stores "known for relatively low foot traffic were able to report sales of more cups of coffee than they had actually sold." Specifically, FE 1 recounted that "I knew of some store[s] that were only actually selling maybe 200 cups of coffee a day, but reported much higher numbers of cups sold daily. The amount that was getting reported out as sold, ***I thought wasn't real***." FE 1 added that "***my sense was that the altering of sales metrics was something being directed at the corporate level***."

146.   Luckin's practice of skipping receipt numbers was an obvious internal red flag. According to FE 3, a former employee of Luckin's main competitor, Starbucks, Luckin's practice was against industry norms and never happened at his prior employer. FE 3 stated that the practice of skipping receipt numbers "***was related to efforts to try to inflate sales figures***." According to FE 3, "our first cup sold of the day would generate a receipt numbered one, fine, but then the second cup sold would generate a receipt numbered, say, three or four, and I didn't know how corporate was actually tallying the sales, but ***I thought maybe they were counting the skipped numbers as items sold as well***." FE 3 stated that he inquired about this phenomenon with Luckin's

corporate offices, but was told that the practice was "***normal***."  FE 3 stated that "we didn't know at the store level why the system was skipping numbers, but ***corporate kept telling us it's normal, everything is normal***."  However, "the corporate personnel did not provide an explanation about why the receipt numbers were being skipped."  Rather, in an e-mail, Luckin instructed the store personnel to "***treat the skipped receipts as a normal operation, whatever number came up in the system***."  Furthermore, the e-mail from Luckin's corporate office provided instructions to employees about what to tell the customers if challenged with questions about the receipts that skipped numbers.  FE 3 stated that it was well known amongst the store managers that Luckin was "***doing this [skipping numbers on receipts] to pump sales up***."

147.    Internal communications among Luckin's store managers confirm these accounts. For example, in a WeChat group chat published online, store managers discussed the fact that an "upgrade" in Luckin's application would result in skipping receipt numbers.  The message instructed the managers to inform their staff that the practice was "normal":



Source: WeChat Group

### 4. The Exchange Act Defendants' Fraudulent Inflation of Costs

148.    Luckin's fraud was not limited to the overstatement of revenues.  In order to avoid detection and create the appearance of actual sales, the Exchange Act Defendants also inflated Luckin's costs during the Class Period by recording fake payments to sham entities.  Internal company records accessed by the *Journal* show that "[a]s money flowed in from the [fabricated] bulk sales, Luckin also made payments to more than a dozen companies listed in its records as providers of raw materials, delivery or human-resources services."

149.    The *Journal* revealed that "Chinese regulators who recently went through Luckin's systems found more than 1 billion yuan (about $140 million) in questionable supplier payments, according to the company's internal documents and people familiar with the matter."  These internal documents show that payments to the entities were processed by a purported employee named Lynn Liang, who was described as fictitious by sources interviewed by the *Journal*.  As

documented in internal records and recounted by an individual familiar with the matter, Luckin's

CEO, Qian, "approved the payments and, in some instances, ***actively saw to the progress of the***

***payment processes***." Like the Company's fabricated revenues, the Exchange Act Defendants'

inflation of Luckin's operating costs steadily increased throughout 2019 in order to support the

purported revenue growth driven by the fabricated sales:

| Quarter | Actual Operating Expenses | Fabricated Expenses | % Overstatement |
|---------|---------------------------|---------------------|------------------|
| **2Q2019** | RMB1,448 million (US$204.4 million) | RMB150 million (US$21.1 million) | **10.4%** |
| **3Q2019** | RMB1,612.5 million (US 227.7 million) | RMB520 million (US$73.4 million) | **32.25%** |
| **4Q2019** | [Unreported] | RMB670 million (US$94.6 million) | |
| **Total: RMB1,340 million (US$189.2 million)** | | | |

### 5.     The Exchange Act Defendants' Fraudulent Inflation of Other Key Metrics

150.     In addition to the admitted, massive inflation in Luckin's revenues and expenses

due to a loop of fabricated transactions, the Exchange Act Defendants also inflated many of the

key performance metrics that Luckin repeatedly touted to investors as evidence for the success of

Luckin's purportedly disruptive "new retail" model.  These include the number of items sold per

store per day, net selling price per item, revenue from other products, and advertising expenses.

151.     For example, the Anonymous Report documented how 11,260 hours of store traffic

video—recorded by 92 full-time and 1,418 part-time staff over the course of 981 store-days and

covering 100% of the operating hours at the selected locations—revealed that the Exchange Act

Defendants inflated the number of items sold per store per day by ***at least 69%*** in 3Q2019 and

***88%*** in 4Q2019.  Similarly, the Anonymous Report reviewed 25,843 customer receipts and found

that the Exchange Act Defendants inflated Luckin's net selling price per item by at least 12.3%.

These same receipts documented that the Exchange Act Defendants inflated Luckin's revenue from other products by as much as ***400%*** in 3Q2019.  Furthermore, consistent with the Company's admissions, the Anonymous Report alleged on the basis of third-party media tracking data that Luckin overstated its 3Q2019 advertising expenses by over 150%, suggesting that "Luckin recycled its overstated advertising expense back to inflate revenue and store-level profit."

152.    Despite the enormity of their fraud, the Exchange Act Defendants were able to carry out their brazen scheme by restricting access to Luckin's key operating metrics to only the Executive Defendants and those in their inner circle.  According to FE 3, individual Luckin stores did not have any visibility into their sales figures.  In fact, FE 3, despite being a store manager, was denied access to critical information such as total sales or revenue for his own store.  This is corroborated by FE 5, who stated that the stores "never had visibility on even their own sales revenue."  Luckin's practice of extreme secrecy extended to those working in its corporate headquarters.  According to FE 4, a senior data analyst, he was strictly firewalled from all financial data.  FE 4 stated that these figures were "held very tightly at higher levels."  Furthermore, FE 4 stated that there was a separate, siloed unit that deals specifically with revenue and income called the "Proceed Department" that was only accessible to a few select high-level executives.  Similarly, FE 6, despite his role as a tax accountant, was denied any access to Luckin's "financial statements."

153.    As an additional measure to conceal Luckin's true financial performance, Luckin instructed its store managers to underreport their inventory in order to make Luckin's sales numbers appear higher than they were.  FE 1 stated that store managers were "encouraged" to underestimate their inventory to make it appear as if more products were sold.

### H.    Before the SPO, Lu and Qian Pledge Their Inflated Luckin Shares as Collateral for a $533 Margin Loan from the Underwriter Defendants

154.    On September 10, 2019, while Luckin's ADS price was inflated, Lu and Qian entered into a $533 margin loan facility ("Margin Loan Facility") with several of the Underwriter Defendants, including Credit Suisse, Morgan Stanley, CICC, and Haitong, along with Goldman Sachs & Co. LLC ("Goldman Sachs") and Barclays Bank, LLC.  Under the Margin Loan Facility agreement ("Facility Agreement"), which was overseen by Credit Suisse, the Underwriter Defendants, and other banks served as lenders, while Haode Investment Inc. ("Haode"), a British Virgin Islands company ultimately controlled by Lu's family trust, was the borrower.  The loan was guaranteed by Lu and his spouse, Lichun Guo.  Lu and Qian, along with Lu's sister, Sunying Wong ("Wong"), pledged a total of *488.4 million* Luckin Class B shares—which carry ten times the voting power of ordinary shares— as collateral to secure the Margin Loan Facility.

155.    As of the time of the SPO, the shares pledged under the Margin Loan Facility represented over *42%* of the total aggregate voting power in the Company.  Luckin stated in the SPO Registration Statement that Lu, through Haode and Primus Investments Fund, L.P. ("Primus"), entities controlled by Lu's family trust, pledged 145,455,450 Class B ordinary shares "to an affiliate of an underwriter to secure a borrowing";  Qian, through Summer Fame Limited ("Summer Fame"), an entity controlled by Qian's family trust, pledged 146,100,254 Class B ordinary shares "to an affiliate of an underwriter to secure a borrowing"; and Wong, through Mayer Investments Fund, L.P. ("Mayer"), pledged an additional 196,875,000 Class B ordinary shares "to an affiliate of an underwriter to secure a borrowing."  These share pledges represented 30%, 46%, and 100%, respectively, of Lu, Qian and Wong's ownership stakes in the Company.

156.    While the number of shares pledged under the Margin Loan Facility was disclosed in the SPO Registration Statement, the Exchange Act Defendants concealed the fact that under the

terms of the Facility Agreement, Lu and Qian could lose control of the Company in the event of a mandatory prepayment event and ensuing default.  At the time of the SPO, through their ownership of Class B shares, Lu and Qian together controlled approximately 60% of the voting power in Luckin.  In the event the shares pledged under the Margin Loan Facility were liquidated, Lu's and Qian's voting power would fall below 50%.  However, Luckin expressly disclaimed any risk of this kind in the SPO Registration Statement, claiming that it was "***not aware of any arrangement that may, at a subsequent date, result in a change of control of our company***."  Moreover, while the Company disclosed that Lu and Qian's Class B shares had been "pledged to an affiliate of an underwriter to secure a borrowing," Luckin failed to disclose the amount by which Lu and Qian had drawn down the Margin Loan Facility, or the fact that a decline in Luckin's ADS price could trigger an event of default under the Margin Loan Facility.

157.    As investors would learn only following the revelation of the Exchange Act Defendants' fraud, Lu and Qian ultimately borrowed ***$518 million*** from the Underwriter Defendants during the Class Period, effectively cashing out of a significant percentage of their inflated holdings in Luckin.  When, as discussed below, Luckin's ADS price collapsed, this triggered a mandatory repayment provision under the Facility Agreement.  Specifically, clause 7.3 of the Facility Agreement provides that a "'Hard Trigger Event' occurs when the ADS Price on any Trading Day is less than 50 per cent of the Initial ADS Price," which was set at $29.10, the price of Luckin's ADSs on December 11, 2019, when the Facility Agreement was last amended and restated.  The Facility Agreement further provides that following the occurrence of a Hard Trigger Event, the lenders may declare that all amounts accrued under the agreement are immediately due.  If the borrowers then fail to make the accelerated payments, the lenders may seek to liquidate the pledged shares.

158.     As discussed below, once the Exchange Act Defendants' fraud was revealed and the Underwriter Defendants demanded prepayment of the Margin Loan Facility in full, Lu and Qian defaulted on their obligations, prompting the Underwriter Defendants to seek to liquidate the ADSs pledged as collateral.   The Underwriter Defendants ultimately obtained judgments against Lu and Qian granting the Underwriter Defendants control of the pledged shares.   As discussed below, this directly contributed to Lu losing control of the Company—the very risk the Exchange Act Defendants had concealed in the SPO Registration Statement.

## V.     THE RELEVANT TRUTH IS GRADUALLY REVEALED

### A.     Muddy Waters Claims "Smoking Gun" Evidence of Fraud

159.     On January 31, 2020, in the midst of the scheme and just after the Company raised over a billion dollars in the SPO and Concurrent Note Offering, noted market critic and short-seller, Muddy Waters, published the Anonymous Report that it had acquired.   The Anonymous Report was titled "Luckin Coffee: Fraud + Fundamentally Broken Business" and contained the following Executive Summary:

> When Luckin Coffee (NASDAQ: LK) ("Luckin" or the "Company") went public in May 2019, it was a fundamentally broken business that was attempting to instill the culture of drinking coffee into Chinese consumers through cut-throat discounts and free giveaway coffee. Right after its USD 645 million IPO, the Company had evolved into a fraud by fabricating financial and operating numbers starting in 3rd quarter 2019. It delivered a set of results that showcased a dramatic business inflection point and sent its stock price up over 160% in a little over 2 months. Not surprisingly, it wasted no time to successfully raise another USD 1.1 billion (including secondary placement) in January 2020. Luckin knows exactly what investors are looking for, how to position itself as a growth stock with a fantastic story, and what key metrics to manipulate to maximize investor confidence. This report consists of two parts: **the fraud** and **the fundamentally broken business**, where we separately demonstrate how Luckin faked its numbers and why its business model is inherently flawed.

(emphasis in original).

160.    The Anonymous Report consisted of a Part One analysis that analyzed what it called "Smoking Gun" evidence of fraud and a "Red Flags" section that identified what it claimed were further indicia of fraud.  Included among the "Smoking Gun" evidence were the following alleged facts:

> **Smoking Gun Evidence #1**: Number of items per store per day was inflated by at least 69% in 2019 3Q and 88% in 2019 4Q, supported by 11,260 hours of store traffic video. We mobilized 92 full-time and 1,418 part-time staff on the ground to run surveillance and record store traffic for 981 store-days covering 100% of the operating hours. Store selection was based on distribution by city and location type, the same as Luckin's total directly-operated store portfolio.

> **Smoking Gun Evidence #2**: Luckin's "Items per order" has declined from 1.38 in 2019 2Q to 1.14 in 2019 4Q.

> **Smoking Gun Evidence #3**: We gathered 25,843 customer receipts and found that Luckin inflated its net selling price per item by at least RMB 1.23 or 12.3% to artificially sustain the business model. In the real case, the store level loss is high at 24.7%-28%. Excluding free products, actual selling price was 46% of listed price, instead of 55% claimed by management.

> **Smoking Gun Evidence #4**: Third party media tracking showed that Luckin overstated its 2019 3Q advertising expenses by over 150%, especially its spending on Focus Media. It's possible that Luckin recycled its overstated advertising expense back to inflate revenue and store-level profit.

> **Smoking Gun Evidence #5**: Luckin's revenue contribution from "other products" was only about 6% in 2019 3Q, representing nearly 400% inflation, as shown by 25,843 customer receipts and its reported VAT numbers.

(emphasis in original).

161.    The Red Flags section includes the following allegations:

**Red Flag #1**: Luckin's management has cashed out on 49% of their stock holdings (or 24% of total shares outstanding) through stock pledges, exposing investors to the risk of margin call induced price plunges.

**Red Flag #2**: CAR Inc (HKEX: 699 HK) ("CAR") déjà vu: Luckin's Chairman Charles Zhengyao Lu and the same group of closely-connected private equity investors walked away with USD 1.6 billion from CAR while minority shareholders took heavy losses.

**Red Flag #3**: Through acquisition of Borgward, Luckin's Chairman Charles Zhengyao Lu transferred RMB 137 million from UCAR (838006 CH) to his related

party, Baiyin Wang. UCAR, Borgward, and Baiyin Wang are on the hook to pay BAIC-Foton Motors RMB 5.95 billion over the next 12 months. Now Baiyin Wang owns a recently founded coffee machine vendor located next door to Luckin's Headquarter.

**Red Flag #4**: Luckin recently raised USD 865 million through a follow-on offering and a convertible bond offering to develop its "unmanned retail" strategy, which is more likely a convenient way for management to siphon large amount of cash from the company.

**Red Flag #5**: Luckin's independent board member, Sean Shao, is/was on the board of some very questionable Chinese companies listed in the US that have incurred significant losses on their public investors.

**Red Flag #6**: Luckin's co-founder & Chief Marketing Officer, Fei Yang, was once sentenced to 18 months' imprisonment for crime of illegal business operations when he was the co-founder and general manager of Beijing Koubei Interactive Marketing & Planning Co., Ltd. ("iWOM"). Afterwards, iWOM became a related party with Beijing QWOM Technology Co., Ltd. ("QWOM"), which is now an affiliate of CAR and is doing related party transactions with Luckin.

(emphasis in original).

162.    Part Two of the Anonymous Report focused on what it called Luckin's "Fundamentally Broken Business," and identified the following "Flaws" in the Company's business model:

**Business Model Flaw #1**: Luckin's proposition to target core functional coffee demand is wrong: China's caffeine intake level of 86mg/day per capita is comparable to other Asian countries already, with 95% of the intake from tea. The market of core functional coffee product in China is small and moderately growing in China.

**Business Model Flaw #2**: Luckin's customers are highly price sensitive and retention is driven by generous price promotion; Luckin's attempt to decrease discount level (i.e. raise effective price) and increase same store sales at the same time is mission impossible.

**Business Model Flaw #3**: Flawed unit economics that has no chance to see profit: Luckin's broken business model is bound to collapse.

**Business Model Flaw #4**: Luckin's dream "to be part of everyone's everyday life, starting with coffee" is unlikely to come true, as it lacks core competence in non-coffee products as well. Its "platform" is full of opportunist customers without brand loyalty. Its labor-light store model is only suitable for making "Generation

1.0" tea drinks that have been in the market for more than a decade, while leading fresh tea players have pioneered "Generation 3.0" products five years ago.

**Business Model Flaw #5**: The franchise business of Luckin Tea is subject to high compliance risk as it's not registered with relevant authority as required by law, because Luckin Tea launched its franchise business in September 2019 without having at least two directly-operated stores fully operational for at least 1 year.

(emphasis in original).

163. Despite these shocking allegations, Luckin quickly issued a denial refuting the allegations in the Anonymous Report. These denials were echoed by at least one of the Underwriter Defendants, which helped to restore investor confidence.

**B.      Luckin Publicly Denies All the Allegations in the Anonymous Report, and Analysts Affiliated with the Underwriter Defendants Staunchly Defend the Company**

164. Muddy Waters published the Anonymous Report on Friday January 31, 2020. On Monday, February 3, 2020, Luckin issued a statement "***categorically den[ying] all allegations in the Report***." In a press release issued on this date, Luckin stated the following:

**Luckin Coffee Responds to Anonymous Report Containing Misleading and False Allegations**

BEIJING, Feb. 03, 2020 (GLOBE NEWSWIRE) -- Luckin Coffee Inc. ("Luckin Coffee" or the "Company") (NASDAQ: LK), a pioneer of a technology-driven new retail model to provide coffee and other products of high quality, high affordability, and high convenience to customers, today issued the following responses to misleading and false allegations contained in an anonymous report (the "Report"), which was made public on January 31, 2020 by a short seller who may benefit from this meritless Report.

***Luckin Coffee categorically denies all allegations in the Report***. The methodology of the Report is flawed, the evidence is unsubstantiated, and the allegations are unsupported speculations and malicious interpretations of events. The Report also attacks members of Luckin Coffee's management team, shareholders, and business partners and its claims are either false, misleading or entirely irrelevant. Furthermore, Luckin Coffee believes that the Report demonstrates a fundamental misunderstanding of the Company's business model and operating environment. Luckin Coffee intends to take appropriate actions to defend itself against these malicious allegations and to protect the interests of its shareholders.

In particular, Luckin Coffee responded to the following misleading and false allegations raised in the Report in the following:

- ***The Report alleged the number of items per store per day was inflated in 2019 3Q and 4Q***. [emphasis in original.] ***There are material inconsistencies between the unsubstantiated data presented in the Report and the actual data from the Company's own system***. Every single order that customers placed with Luckin Coffee is online and automatically recorded in its system, and payments for orders went through third-party payment service providers. Therefore, ***all the Company's key operating data, including the number of items per store per day, items per order and effective selling price, are tracked in real time and can be verified. Luckin Coffee has a robust internal control system over data management to ensure the data integrity and consistency within its system as well as that of its third party partners***.

- ***The Report alleged items per order had declined from 2019 2Q to 2019 4Q and the effective selling price was inflated in 2019 3Q***. [emphasis in original.] The sources and authenticity of the alleged customer order receipts in the Report are unsubstantiated and the underlying methodology in the Report is ungrounded. ***Luckin Coffee's items per order during the period is substantially higher than the data alleged in the Report. In addition, Luckin Coffee stands by its reported effective selling price, which is true, accurate, and can be verified by Luckin Coffee's internal system***.

- ***The Report alleged Luckin Coffee overstated advertising expenses and may recycle overstated advertising expenses to inflate revenue in 2019 3Q***. [emphasis in original.] The allegation is based on flawed assumptions, and inaccurate and misleading analysis of the Company's advertising expenses. ***Luckin Coffee performs a detailed review and cross check of its sales and marketing expenses with underlying evidence and confirms the Company's reported advertising expenses are true and accurate***.

- ***The Report alleged net revenues from other products were inflated in 2019 3Q***. [emphasis in original.] The Report's reference to value-added-tax ("VAT") in calculating net revenues from other products represents a clear misunderstanding of the applicable VAT rates for the Company's non-freshly brewed products and the Report reached an ungrounded allegation based on such flawed and unsupported assumption. ***All the Company's orders are tracked in real time and the Company has rigorous internal controls over revenue recognition and reconciliation. Luckin Coffee is in strict compliance with these rigorous controls and is committed to ensure the integrity of its financial reporting***.

As a data-driven company, ***Luckin Coffee is committed to providing full and accurate disclosure to investors and to rebutting any false claims that attempt to***

> *undermine confidence in Luckin Coffee's business, management and results of operations.*
>
> *Luckin Coffee firmly stands by its business model* and is confident in benefiting from the strong growth of China's coffee market in the future. *Luckin Coffee's pioneering business model has enabled the Company to become the leading and fastest growing player driving coffee consumption in China.* Supported by its disruptive new retail model, diversified product portfolio and strong financial position, Luckin Coffee will continue to grow its business, provide a superior customer proposition and deliver sustainable value for its shareholders over the long-term.

165.    Following the Company's denial of the allegations in the Anonymous Report, Haitong downplayed the report in a February 2, 2020 analyst report, calling the Anonymous Report "written anonymously" and stating that "its biggest flaw . . . is the **selective data set** used to make the claims." (emphasis in original). Haitong concluded that "[w]e believe that if the short report claims were true and that transactions and ASP were inflated, Luckin would have reported considerably lower cash flows and cash positions, which we believe are difficult to fabricate and undergo audits."

166.    Similarly, Credit Suisse issued a report on February 4, 2020, strongly defending the Company. While Credit Suisse acknowledged that the Company "didn't provide any detail or supporting documents to rebut the allegations," Credit Suisse nonetheless attempted to discredit the Anonymous Report. For example, Credit Suisse criticized the representativeness of the video evidence obtained by Muddy Waters, stating that it "only accounted for <0.3% of total operation hours in 4Q19." Credit Suisse added that "[f]or LK, every single order that customers placed is online and automatically recorded in its system, and payments for orders went through third-party payment service providers. So it's not that hard for LK to provide such evidence to rebut this allegation." With respect to the Anonymous Report's allegations of overstated advertising expenses to inflate revenue and store-level profit, Credit Suisse suggested that "we believe this could be easily verified by auditors or a third party." Credit Suisse concluded by assuring investors

that it "found no hard evidence in the short-seller report to prove Luckin's business as fraudulent, and some of the allegations are baseless or have major flaws."  In similar fashion, a Needham report issued on February 4, 2020 cited the Company's denial of all of the Anonymous Report's allegations and **raised** its price target to **$40.00**.

167.    Notably, Credit Suisse issued a follow-up report on February 14, 2020 that made no mention of the Anonymous Report.  Instead, Credit Suisse focused on the effect of Covid-19: "**we view the challenges faced by LK as transitory and its long-term story**—evolving digital ecosystem, new retail initiatives and product category expansion to drive user growth and enhance brand equity—**remains intact**."

168.    Several prominent investors joined in Luckin's defense.  For example, investor Andrew Left of Citron Research ("Citron") disclosed that he had taken a long position in Luckin, and, citing data from Business Connect China ("BCC"), stated in a social media post that the Anonymous Report would "fall short on accuracy."

169.    In truth, the Exchange Act Defendants' categorical denials of the Anonymous Reports' claims were each materially false or misleading when made because, as the Company would later admit, it had been engaged in an undisclosed scheme to materially inflate its reported revenues and key operating metrics since at least the time of IPO, and suffered from severely deficient internal controls that had failed to detect or prevent its fraudulent conduct.  Despite their undisclosed falsity, the Exchange Act Defendants' denials were almost completely effective, as the price of Luckin's ADSs rebounded following the publication of the Company's press release refuting the allegations, as supported by the Underwriter Defendants' reports.  As *Barron's* reported on February 3, 2020, "Luckin Stock Is Surging Because the Company Hit Back Against Fraud Allegations," noting that its ADS price "climbed 2.9% in early trades, after Luckin Coffee

(ticker: LK) said it 'categorically denies' allegations made in an anonymous report published Friday by short-selling shop Muddy Waters Research."  Indeed, Luckin's ADS price reached a high of $36.99 on February 4, 2020, **higher** than its trading price before the publication of the Anonymous Report days earlier.

170.    However, not all investors were so easily convinced.  On February 12, 2020, J Capital Research ("J Capital"), a China-focused investment research firm, published a more detailed report supporting the findings in the Anonymous Report and specifically rebutting Citron's statements in support of Luckin (the "J Capital Report"):

> Citron cited data from "Biz Con China," referring to Business Connect China (BCC), a Shanghai-based expert-network company that also sells data on listed, Chinese-domiciled companies. We managed to see a copy of BCC's report, and right there in the first paragraph is written: "***Based on BCC's tracking, we are skeptical about some of Luckin's reported figures***." The next paragraph begins: "***Luckin's reported figure of 444 items sold per day in 3Q19 is likely to be higher than their actual sales***." Citron seems to have missed this.
>
> We know BCC to operate with a high degree of integrity but think the methodology used to collect the data was flawed. BCC itself warns clients that "we believe BCC's tracking results portray the optimal situation that Luckin can reach." Notably, ***BCC's tracking results show lower numbers than LK management reports***.
>
> \* \* \*
>
> ***Luckin has so far issued a blanket denial without providing confirmatory evidence***. We are short Luckin and believe that ***the work of the anonymous short sellers was credible and complementary to our own analysis of the company's reports***.

171.    Despite a few analysts raising concerns, Luckin's ADS price rose in the weeks following the Company's denials, reaching a high of $43.18 on February 20, 2020.  Accordingly, the market was understandably shocked when the Company came clean, admitting to a massive scheme to fraudulently inflate revenue and expenses.

### C.   Luckin Belatedly Admits that Its Financial Results were Fraudulently Overstated

172.     As detailed in a series of press releases issued between April 2, 2020 and July 1, 2020, Luckin's Board of Directors formed a Special Committee on March 19, 2020 to investigate issues purportedly uncovered during the audit of Luckin's consolidated financial statements for fiscal year 2019.  The Special Committee consisted of three independent directors, Shao, Tianruo Pu, and Wai Yuen Chong, and Shao served as its chairman.[7]  Luckin also enlisted Kirkland & Ellis as independent outside counsel and FTI Consulting as an independent forensic accounting expert. According to the Company, the Special Committee was empowered "to access documents, records and information of the Company, and to conduct interviews with any employee, officer and director, as the Special Committee deemed appropriate."  During the course of its approximately 15-week investigation, "the Special Committee and its advisors reviewed over 550,000 documents collected from over 60 custodians, interviewed over 60 witnesses, and performed extensive forensic accounting and data analytics testing."

173.     Based on the results of its internal investigation, Luckin admitted that its fabrication of sales overstated its revenues by ***nearly 100%*** and its costs by as much as ***32%*** during the second, third, and fourth quarters of 2019.  The Company further admitted that "***[e]vidence discovered to date demonstrates that the Company's former Chief Executive Officer, Ms. Jenny Zhiya Qian, former Chief Operating Officer, Mr. Jian Liu and certain employees reporting to them participated in the fabricated transactions and that the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties***."

---

[7] On March 27, 2020, Luckin announced the appointment of two purported independent directors, including Tianruo Pu and Wai Yuen Chong, as members of the Audit Committee and the board, effective March 27, 2020, and Defendant E. Liu's resignation from the Audit Committee

174.    Beginning on April 2, 2020, Luckin shocked the market when it published a press release announcing the termination of the Company's COO, J. Liu, the formation of an Independent Special Committee, and an ongoing internal investigation:

**BEIJING, China, April 02, 2020 (GLOBE NEWSWIRE)** – Luckin Coffee Inc. ("Luckin Coffee" or the "Company") (NASDAQ: LK) today announced that the Company's Board of Directors (the "Board") has formed a special committee (the "Special Committee") to oversee an internal investigation into certain issues raised to the Board's attention during the audit of the consolidated financial statements for the fiscal year ended December 31, 2019 (the "Internal Investigation").

The Special Committee is comprised of three independent directors of the Board, Mr. Sean Shao, Mr. Tianruo Pu and Mr. Wai Yuen Chong, with Mr. Shao serving as its chairman. The Special Committee has retained independent advisors, including independent legal advisors and forensic accountants, in connection with the Internal Investigation. The Special Committee has retained Kirkland & Ellis as its independent outside counsel. Kirkland & Ellis is assisted by FTI Consulting as an independent forensic accounting expert. The Internal Investigation is at a preliminary stage.

The Special Committee today brought to the attention of the Board information indicating that, ***beginning in the second quarter of 2019, Mr. Jian Liu, the chief operating officer and a director of the Company, and several employees reporting to him, had engaged in certain misconduct, including fabricating certain transactions***. The Special Committee recommended certain interim remedial measures, including the suspension of Mr. Jian Liu and such employees implicated in the misconduct and the suspension and termination of contracts and dealings with the parties involved in the identified fabricated transactions. The Board accepted the Special Committee's recommendations and implemented them with respect to the currently identified individuals and parties involved in the fabricated transactions. The Company will take all appropriate actions, including legal actions, against the individuals responsible for the misconduct.

***The information identified at this preliminary stage of the Internal Investigation indicates that the aggregate sales amount associated with the fabricated transactions from the second quarter of 2019 to the fourth quarter of 2019 amount to around RMB2.2 billion [US$310 million]. Certain costs and expenses were also substantially inflated by fabricated transactions during this period***. The above figure has not been independently verified by the Special Committee, its advisors or the Company's independent auditor, and is subject to change as the Internal Investigation proceeds. The Company is assessing the overall financial impact of the misconduct on its financial statements. As a result, ***investors should no longer rely upon the Company's previous financial statements and earning releases for the nine months ended September 30, 2019 and the two quarters starting April 1, 2019 and ended September 30, 2019, including the prior***

*guidance on net revenues from products for the fourth quarter of 2019, and other communications relating to these consolidated financial statements.* The investigation is ongoing and the Company will continue to assess its previously published financials and other potential adjustments.

175.   As the Company's April 2, 2020 admissions made clear, the Anonymous Report, which alleged that Luckin was "fabricating financial and operating numbers" since 3Q2019, had vastly underestimated the actual magnitude of the Exchange Act Defendants' fraud. Indeed, Luckin's internal investigation revealed that the fabrication stretched back much further, to at least 2Q2019 (and possibly further) and was much more substantial than previously disclosed.

176.   Following the shocking belated disclosure by the Company, Luckin's ADSs collapsed—falling over **75%** on April 2, 2020, declining from a closing price of $26.20 on April 1, 2020 to a closing price of $6.40 on April 2, 2020, and wiping out billions of dollars of market capitalization.

177.   On April 5, 2020, Lu issued a public statement apologizing and accepting responsibility for the financial misconduct.  In a statement on Chinese social media, Lu accepted responsibility for the massive fraud at Luckin, stating that he was he was "ashamed" and that "I personally blame myself."  Lu acknowledged that "the accounting fraud has disappointed and hurt too many people, including our trusting investors," and that "as the Chairman of the Board, I own my share of blame."  Lu further stated that "[d]espite the ultimate outcome of the independent committee's investigation, I will bear my share of responsibilities."

178.   On May 12, 2020, Luckin issued a press announcing that its internal investigation had uncovered evidence directly implicating its CEO, Qian, and COO, J. Liu, and that the Board had decided to terminate them on the basis of this evidence:

**BEIJING, China, May 12, 2020 (GLOBE NEWSWIRE)** — Luckin Coffee Inc. (the "Company") (NASDAQ: LK), today announced changes to its Board of Directors ("Board") and senior management, effective May 11, 2020.

During its ongoing internal investigation (the "Internal Investigation"), *the Special Committee of the Board (the "Special Committee") has brought to the attention of the Board evidence that sheds more light on the fabricated transactions described in the press release issued by the Company on April 2, 2020. After considering such information, the Board has terminated Ms. Jenny Zhiya Qian and Mr. Jian Liu from the positions of the Chief Executive Officer and the Chief Operating Officer, respectively*. The Board also demanded and received from Ms. Qian and Mr. Liu their resignations from the Board. In addition to Ms. Qian and Mr. Liu, since the beginning of the Internal Investigation, the Company has placed six other employees, who were involved in or had the knowledge of the fabricated transactions, on suspension or leave.

179.    On May 28, 2020, the *Journal* published an article entitled "Behind the Fall of China's Luckin Coffee: a Network of Fake Buyers and a Fictitious Employee," which provided new details concerning the methods the Exchange Act Defendants used to orchestrate their massive overstatement of Luckin's earnings and growth.   As the article explained, Luckin's fraud had begun much earlier, *before* the May 2019 IPO:

It turns out that *Luckin sold vouchers redeemable for tens of millions of cups of coffee to companies that had ties to Luckin's chairman and controlling shareholder, Charles Lu, according to internal documents and public records reviewed by The Wall Street Journal*. Their purchases helped the company book sharply higher revenue than its coffee shops produced.

Meanwhile, *other internal documents showed a procurement employee called Lynn Liang processing more than $140 million of payments for raw materials such as juice, delivery and human-resources services. Ms. Liang was fictitious, according to people familiar with Luckin's business*.

*The scale and audacity of deception, which the Journal found traced back to before Luckin's initial public offering on the Nasdaq Stock Market just a year ago*, have stunned international investors and confounded regulators. This was a company that went from founding to public listing in less than two years. Its sudden fall saddled pension, mutual and hedge funds, not to mention individual investors, with heavy losses both in Asia and the West.

180.    Analysts took note of these shocking new revelations.   For example, a May 29, 2020 report from Red Pulse titled "Luckin Coffee Exposed Sales by Selling Vouchers" outlined how Luckin's employees "forged RMB200m to RMB300m (USD28m to USD42m) worth of transactions through buying vouchers by individual accounts" and that the "fabrications started

72

before the company's US IPO in May 2019."  Red Pulse noted that the Company "also concocted an unreal procurement employee to process material and service payments, worth over USD140m."

181.    On July 1, 2020, Luckin issued a press release announcing that its Special Committee had "substantially completed its independent internal investigation" into "the issues disclosed in the press release issued by the Company on April 2, 2020."  Luckin admitted that the Exchange Act Defendants' fraud began before the IPO and inflated the Company's sales by approximately *US$300 million* and costs and expenses by approximately *US$190 million* in 2019:

> The Special Committee was formed on March 19, 2020 and authorized by the Board of Directors (the "Board") to access documents, records and information of the Company, and to conduct interviews with any employee, officer and director, as the Special Committee deemed appropriate.  In the course of the Internal Investigation, the Special Committee and its advisors reviewed over 550,000 documents collected from over 60 custodians, interviewed over 60 witnesses, and performed extensive forensic accounting and data analytics testing.
>
> ***Based on its work, the Special Committee has found that the fabrication of transactions began in April 2019 and that, as a result, the Company's net revenue in 2019 was inflated by approximately RMB 2.12 billion (consisting of RMB 0.25 billion in the second quarter, RMB 0.70 billion in the third quarter, and RMB 1.17 billion in the fourth quarter.)  The Company's costs and expenses were inflated by RMB 1.34 billion in 2019 (consisting of RMB 0.15 billion in the second quarter, RMB 0.52 billion in the third quarter, and RMB 0.67 billion in the fourth quarter).***
>
> ***Evidence discovered to date demonstrates that the Company's former Chief Executive Officer, Ms. Jenny Zhiya Qian, former Chief Operating Officer, Mr. Jian Liu and certain employees reporting to them participated in the fabricated transactions and that the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties***.

182.    The July 1, 2020 press release confirmed that the fraud was orchestrated by Luckin's senior-most executives, including its CEO, Qian, its COO, J. Liu, and its Chairman, Lu:

> Following the Special Committee's recommendations, ***the Board terminated its former Chief Executive Officer and former Chief Operating Officer based on evidence demonstrating their participation in the fabricated transactions***.  In

addition, the Board resolved to require Mr. Charles Zhengyao Lu to resign as a director and the chairman of the Board and a meeting of the Board will be held on July 2, 2020 to consider the proposal to remove Mr. Charles Zhengyao Lu, as a director and the chairman of the Board. ***The proposed resignation and removal regarding Mr. Charles Zhengyao Lu was requested by the majority of directors of the Board, and based on findings presented by and the recommendations of the Special Committee. The Special Committee based its recommendations regarding Mr. Charles Zhengyao Lu on documentary and other evidence identified in the Internal Investigation and its assessment of Mr. Charles Zhengyao Lu's degree of cooperation in the Internal Investigation***.

183.   Luckin further admitted that Defendants Qian and J. Liu were aided by at least a dozen other Luckin employees who acted at their direction, and that it had identified an additional fifteen employees who engaged in misconduct:

> The Board has further resolved to terminate ***12 other employees who, at the direction of the former Chief Executive Officer and former Chief Operating Officer, participated in, and/or had knowledge of, the fabricated transactions***, including previously suspended employees.  ***An additional 15 employees are subject to other disciplinary actions***.  In addition, the Company is in the process of terminating relationships with all third parties involved in the fabricated transactions.

184.   The July 1, 2020 press release also announced that the Company had implemented "several immediate enhancements to its finance functions and engaged an internal controls consultant to evaluate the existing controls environment and recommend enhancements to detect and prevent misconducts in the future."  Among these "immediate enhancements," the Company disclosed that it was only now "***chartering an internal audit function to test and evaluate its control functions***."

**D.     After the Class Period, as New Details Concerning the Exchange Act Defendants' Fraud Emerge, Luckin's Stock Is Delisted, and the Company Enters Provisional Liquidation Proceedings**

   **1.     Luckin's Shares Are Delisted**

185.   On April 7, 2020, NASDAQ temporarily halted trading of Luckin's ADSs in light of the Company's disclosures.  On May 19, 2020, Luckin announced that it had received a notice

that Luckin's ADSs would be officially delisted from NASDAQ because of the Company's previously announced fraud:

> Luckin Coffee Inc. (the "Company") (NASDAQ: LK) today announced that on May 15, 2020, it received a written notice (the "Notice") from the Listing Qualifications Staff (the "Listing Qualifications Staff") of The Nasdaq Stock Market LLC ("Nasdaq") indicating that the Listing Qualifications Staff has determined to delist the Company's securities from Nasdaq. The Listing Qualifications Staff cited two bases for the delisting determination: (i) *public interest concerns as raised by the fabricated transactions disclosed by the Company in a Form 6-K on April 2, 2020*, pursuant to Nasdaq Listing Rule 5101; and (ii) *the Company's past failure to publicly disclose material information, citing a business model through which the previously disclosed fabricated transactions were executed*, pursuant to Nasdaq Listing Rule 5250.

186.    While the Company indicated that it would appeal the decision, Luckin's ADSs remained frozen until it satisfied NASDAQ's request for additional information.  Following a six-week hiatus, during which new details continued to emerge concerning the Exchange Act Defendants' fraud, NASDAQ allowed trading in Luckin ADSs to resume on May 20, 2020.

187.    On June 23, 2020, Luckin announced that it had received a second notice from NASDAQ that its ADSs would be delisted due to its failure to file its Form 20-F Annual Report for 2019.  In a press release, Luckin stated that its failure to file the Annual Report "serves as an additional basis for delisting the Company's securities from the Nasdaq pursuant to Nasdaq Listing Rule 5250(c)(1). This Notice is in addition to the two bases cited in the written notice issued by the Listing Qualifications Staff as disclosed by the Company on May 19, 2020."  The Company cited its previously disclosed internal investigation as one of the reasons for its delay.

188.    On June 26, 2020, in a pre-market announcement, Luckin announced that it would no longer seek to reverse or stay the Company's delisting from NASDAQ.  As a result, trading in the Company's ADSs on NASDAQ was suspended on June 29, 2020.  Luckin ADSs continue to trade over-the-counter.

### 2. In the Wake of Luckin's Disclosures, Multiple Regulators Launch Investigations into the Exchange Act Defendants' Misconduct

189.     Following Luckin's admissions that it had fraudulently inflated its revenues and expenses through fabricated transactions, numerous regulatory agencies in the United States and China launched investigations.  As the Company disclosed on May 12, 2020, "[f]ollowing issuing the press release by the Company on April 2, 2020, the Company has been cooperating with and responding to inquiries from regulatory agencies in both the United States and China."

190.     The CSRC swiftly issued a press release on April 3, 2020, stating that it "strongly condemns the company for committing accounting fraud" and "will coordinate with the International Organization of Securities Commissions (IOSCO) to investigate and severely punish securities fraud, and effectively protect investors' rights and interests."

191.     On April 29, 2020, multiple news outlets reported that the SEC had launched an investigation into Luckin for "fabricating millions of dollars worth of sales."  The CSRC also said that it had been in contact with the SEC regarding its investigation.

192.     In late April 2020, numerous news outlets also reported that the Company's headquarters in Xiamen were raided by the SAMR, which demanded "full access to the company's accounts, transaction records and internal systems."  Beginning on June 6, 2020, it was reported that the SAMR and China's Ministry of Finance had obtained evidence of Lu's personal involvement with the Luckin fraud.  For example, on June 6 and 10, 2020, Caixin reported that Chinese authorities had discovered e-mails in which Lu gave direct orders to commit accounting fraud.  According to these sources, Lu and other responsible executives will be directly prosecuted and will likely face criminal charges.

193.     On July 31, 2020, the SAMR issued a press release stating that it had begun an investigation of Luckin in April, and that it had determined that the Company's fabricated

transactions involving related entities violated laws against unfair competition.  On July 31, 2020,

China's Ministry of Finance announced that, following a months-long investigation into Luckin's

financial misconduct, its Supervision and Evaluation Bureau would impose fines on two of

Luckin's Chinese-registered subsidiaries.  In a press release, the Ministry of Finance stated that

"since May 6, 2020, the Ministry of Finance has organized and conducted investigation into

accounting information of two Luckin entities that primarily operate in China, namely, Luckin

Coffee (China) Co. Ltd. and Luckin Coffee (Beijing) Co. Ltd.  The scope of the investigation

includes data from the inception of both entities and expands to include 23 related entities and

financial institutions."  The Ministry of Finance confirmed that between April 2019 and December

2019, Luckin Coffee inflated its sales revenue, income, operating expenses, and profit by engaging

in fraudulent transactions.  The Ministry of Finance also announced that it would impose

administrative sanctions on Luckin as a result of its findings.

194.    On September 22, 2020, the SAMR announced the results of its investigation in a

press release:

> **State Administration for Market Regulation (SAMR) Imposes Administrative
> Sanctions upon Luckin (China) Co. Ltd. and Luckin (Beijing) Co. Ltd. for
> Engaging in Unfair Competition**
>
> In April this year, the State Administration of Market Regulation launched an
> investigation of Luckin Coffee (China) Co. and Luckin Coffee (Beijing) Co., Ltd.
> (hereinafter collective referred to as Luckin Company) for alleged fraudulent
> transactions and other unfair competition.
>
> It was revealed during the investigation that ***between April 2019 and December
> 2019, in order to gain advantage over its competitors and to win more business
> opportunities, with assistance from multiple third-party business entities, Luckin
> Company inflated its sales revenue, costs, profit and other key indicators of its
> business operations***.  In addition, ***from August 2019 to April 2020, it widely
> publicized fraudulent data concerning its sales to defraud and mislead the
> general public*** in violation of Clause 8 of Article 1 of the Anti-Unfair Competition
> Law of the People's Republic of China, which states that "business operators shall
> not make false or misleading statements regarding the quality, performance, or
> functionality of its products, sales, customer reviews, awards conferred upon their

products, or engage in misleading marketing to deceive or mislead consumers." Thus, Luckin Coffee's actions were misleading.

According to the investigation, ***43 third-party related business entities, including Beijing Automotive Travel Business Consulting Services Co. Ltd., UCar, Zhengzhe International (Xiamen) Co. Ltd. aided and abetted Luckin in carrying out the misleading acts*** in violation of Clause 3 of Article 8 of the Anti-Unfair Competition Law of the People's Republic of China, which prohibits "business operators from engaging in fraudulent transactions to assist other business operations to carry out fraudulent or misleading commercial business marketing or actions." These actions constitute aiding and abetting misrepresentations.

On September 18, 2020, the State Administration of Market Regulation and the Shanghai and Beijing market supervision authorities made the decision to impose administrative sanctions upon all 45 business entities, including Luckin Coffee (China), Luckin Coffee (Beijing), Beijing Automotive Travel Business Consulting Co. Ltd., UCar Technology Development Co. Ltd., Zhengzhe International (Xiamen) Co. Ltd., totaling 61 million RMB.

195.    On September 23, 2020, Luckin issued a press release confirming the sanctions imposed by the SAMR. The press release stated:

The SAMR imposed an aggregate fine of RMB61.0 million on two Luckin Coffee entities and certain implicated third-party companies ("Implicated Companies") due to their involvement in the fabricated transactions, which the Company disclosed in its press release on April 2, 2020 (the "Fabricated Transactions"). Pursuant to the Penalty Decisions, the conduct related to the Fabricated Transactions violated the PRC Anti-Unfair Competition Laws.

### 3.    Luckin's Auditor Publicly Distances Itself from the Exchange Act Defendants' Financial Misconduct

196.    Luckin's former auditor, E&Y Hua Ming, has sought to publicly distance itself from Luckin since the Company admitted to its massive fabrication of revenue and expenses throughout 2019. On April 3, 2020, E&Y Hua Ming issued a statement explaining that during its audit of Luckin's 2019 financial statements, it discovered that "management personnel engaged in fabricated transactions which led to the inflation of the Company's income, costs and expenses." According to E&Y Hua Ming, "[b]ased on such findings, EY made a report to the Company's Audit Committee," which prompted the Company's internal investigation.

197.    Confirming E&Y Hua Ming's statement, according to a June 15, 2020 report by Caijing, E&Y Hua Ming was first alerted to Luckin's fraud during its on-site audit of Luckin's 2019 financial results "before the Chinese New Year," which occurred on January 25, 2020. Specifically, Caijing reported that E&Y Hua Ming discovered an increasing number of business to business transactions beginning in the second quarter of 2019, which was a "drastic change" in Luckin's business model and "aroused the attention of the Ernst & Young audit team."

198.    Upon closer inspection, E&Y Hua Ming discovered that many of Luckin's new customers and suppliers involved related entities.  According to the Caijing report "[i]n mid-March, Luckin's auditing firm, Ernst & Young Hua Ming, took away computers from Luckin's executives and uncovered evidence of accounting fraud."  The report stated that E&Y Hua Ming "***uncovered a large number of email exchanges indicating that at least people at the level of CEO Zhiya Qian approved various fraudulent transactions.***"  The report revealed that "***[t]hese emails included application for payments of fraudulent related transactions, setting up and coordinating related entities, and summaries of financial impacts of fraudulent transactions***." Shockingly, "***[t]he review and approval of these email applications involved the highest level of management and CEO, Zhiya Qian***."

199.    Similarly, in an April 3, 2020 report by Yicai Global, which cited a person with close ties to Ernst & Young China's management, Yicai Global stated that following the publication of the Anonymous Report, E&Y Hua Ming sent an anti-fraud team to Luckin, and that team confirmed the fraud and "pushed Luckin to launch an internal investigation in accordance with US regulations and urged it to publish the findings as soon as possible."

200.    A subsequent statement by E&Y Hua Ming on July 16, 2020 confirmed the reports that E&Y Hua Ming alerted Luckin to the fraud as early as January 2020.  In a statement posted

to its WeChat account, E&Y Hua Ming disclosed that it first uncovered evidence of Luckin's fraud in January 2020, *before* Luckin's denials of the allegations in the Anonymous Report.  In the statement, E&Y Hua Ming disclaimed any responsibility for Luckin's financial misconduct, stating that its audit records were inspected by a team from the Bureau of Supervision and Evaluation of China's Ministry of Finance as part of the agency's investigation into Luckin's fraud. E&Y Hua Ming stated that it was cooperating with the investigation and that it "should not be held responsible for the disclosure of Luckin Coffee's 2019 financial information."

201.    On September 18, 2020, Luckin announced that it had replaced E&Y Hua Ming with MarcumBP as the Company's auditor, effective September 17, 2020.  According to Luckin, its decision to replace E&Y Hua Ming was "due to timetable considerations regarding its Form 20-F for the period ended December 31, 2019."

### 4.    Defendants Lu and Qian Default on the Margin Loan Facility

202.    As noted above, Defendants Lu and Qian, as well as Lu's sister, Wong, had pledged a significant portion of their Luckin holdings as collateral to secure loans from affiliates of the Underwriter Defendants.  On April 6, 2020, Goldman Sachs revealed that Defendants Lu and Qian had defaulted on *$518 million* in margin loans secured by these shares.  In other words, while the Company's shares were artificially inflated by and through the Exchange Act Defendants' misrepresentations, Defendants Lu and Qian cashed out by pledging their inflated holdings as collateral for *personal loans* and then defaulted on these loans.  The lender banks then sought to liquidate the entities that had pledged the shares in order to recover whatever was left of the diminished collateral.

203.    On June 16, 2020, a court in the Cayman Islands granted a petition by Credit Suisse Singapore Branch AG, an affiliate of Credit Suisse, to wind up Primus and Mayer, finding that the entities were jointly and severally liable for the debts under the Margin Loan Facility.  On July 9,

2020, a court in the British Virgin Islands granted a similar application by the lender banks to wind up Haode, the entity controlled by Defendant Lu that had pledged Luckin shares as collateral.  The British Virgin Islands court appointed KPMG (BVI) Limited and KPMG Advisory (Hong Kong) (together, "KPMG") as the liquidator of the assets.

### 5.    Defendant Lu Attempts to Retain Control of Luckin's Board and Subvert the Internal Investigation

204.    On June 19, 2020, Luckin announced that it would hold an extraordinary general meeting on July 5, 2020 for shareholders to vote on resolutions to oust several other members of Luckin's Board, including Defendants Lu, Shao, Li, and E. Liu.  On June 20, 2020, the *Journal* reported that "[p]eople familiar with the company said even though the meeting would oust Mr. Lu, it ***appeared to be an attempt by the chairman to hang on to control and frustrate an internal investigation into the fake sales***."  According to the report, "[t]he request to hold the meeting came in a letter to the board Friday from Haode Investment, one of the shareholding entities controlled by Mr. Lu."  Significantly, Lu sought to replace Shao, who was overseeing the Company's internal investigation, with two new directors nominated by Lu's Haode, Ying Zeng ("Zeng") and Jie Yang ("Yang").  Moreover, the *Journal* reported that "Lu has repeatedly not complied with requests by the special committee to interview him and gain access to his phone and laptop," which "has delayed the company's efforts to complete and publish the results of its internal probe and release audited financial results for 2019."  The report noted that the impending liquidation of shares Lu had pledged as collateral under the Margin Loan Facility threatened to reduce Lu's voting rights by approximately 25%, which likely prompted Lu's attempts to subvert the internal investigation and pack the Company's Board with his hand-picked nominees.

205.    On June 26, 2020, Luckin disclosed that its Board had "resolved to require [Lu] to resign as a director and the chairman of the Board."  In a press release, Luckin stated that the

decision was "based on findings presented by and the recommendations of the Special Committee" and that "[t]he Special Committee based its recommendations *on documentary and other evidence identified in its ongoing internal investigation and its assessment of Mr. Charles Zhengyao Lu's degree of cooperation in the internal investigation*."

206.    Notwithstanding the fact that the Company's internal investigation had directly implicated Defendant Lu, on July 2, 2020, Luckin issued a press release announcing that Lu's efforts to subvert the Company's internal investigation and retain control of the Company had so far been successful.  The Company announced that a meeting of the Board was held on July 2, 2020 to consider the resolution to remove Lu as a director and Chairman.  However, Luckin disclosed that the resolution failed to garner the two-thirds majority required under the Company's Articles of Association, and that as a result, Lu remained a director and Chairman of the Board.

207.    As reported by media outlets in China, Lu presided over the July 5 Extraordinary Shareholder Meeting even though his removal was one of the resolutions to be voted on.  Lu's conduct at the meeting revealed his desperate attempts to retain control of the Company.  At the meeting, Lu denied shareholders' requests to hear the opinions of Luckin's lawyers concerning the voting rights owned by Primus, the entity controlled by Lu before its liquidation due to Lu's default on the Margin Loan Facility.  Through its liquidators, Primus held approximately 131 million Class B shares, each with ten times the voting right of Class A shares.  At the meeting, Summer Fame, controlled by Qian, proposed to treat Primus's shares as Class A shares, which triggered an objection from the Primus liquidator.  Defendant Lu overruled the liquidator's objection and proceeded to rule Primus's shares as Class A shares, thereby increasing the combined voting rights of Haode and Summer Fame.  Further, Defendant Lu reportedly overruled requests that the ballots

for the appointment of his handpicked replacement Board members be reviewed by the Company's lawyers.

208.    Following the July 5 Extraordinary Shareholder Meeting, several shareholders challenged the results of the vote.  These entities included Centurium Capital and Joy Capital, private-equity investors in Luckin controlled by Li and E. Liu, respectively, as well as KPMG, the court-appointed liquidator for Haode.  Representatives of these entities submitted objections concerning how the meeting was conducted and how the votes were tallied and questioned the legality of proceedings, according to the *Journal*.

209.    On July 13, 2020, the Company reported on the results of the July 5 Extraordinary Shareholder Meeting.  Luckin announced in a press release on this date that Lu, Li, E. Liu, and Shao had been removed as directors, and that Yang and Zeng, the two directors hand-picked by Lu, had been appointed as directors.  The Company also announced that Guo, who had been serving as acting CEO, had been appointed as Chairman and CEO.

210.    On July 30, 2020, Lucky Cup Holdings Limited and Fortunate Cup Holdings Limited—entities controlled by Centurium Capital, which is ultimately controlled by Li, and which held approximately 10% of the voting rights in Luckin—served a demand on Luckin requesting that the Board convene a second extraordinary meeting.  The demand by Centurium Capital proposed three resolutions, including the removal of Zeng and Yang, the two directors hand-picked by Lu as part of his efforts to retain control of the Company, and the reinstatement of Shao.  The demand by Centurium Capital further stated that the "[t]he circumstances around the extraordinary general meeting held on 5 July 2020," including the fact that it was requested by Haode, "caused concerns over the independence of the directors nominated by Haode and elected in the [July 5 Extraordinary Shareholder Meeting]."  The demand further stated that since Shao

had previously headed the Special Committee, "[h]is reinstatement will allow for the Board to fully implement the remedial measures as recommended by the Special Committee, and to further facilitate any process related thereto."

211.    Immediately following the demand by Centurium Capital, Luckin announced on August 3, 2020 that both Yang and Zeng had notified the Board of their resignations, effective immediately.  On this date, Luckin issued a press release announcing that the Board would convene a second extraordinary general meeting on September 2, 2020 to vote on the resolution to reinstate Shao as a Director.

212.    On September 2, 2020, Luckin announced the re-appointment of Shao as an independent director following the results of the September 2, 2020 extraordinary general meeting. Luckin further stated that the Board had once again elected Shao to the Audit Committee, which is overseeing the internal investigation.

### 6.    Luckin Enters Provisional Liquidation Proceedings in the Cayman Islands

213.    On July 15, 2020, Luckin announced that it had entered provisional liquidation proceedings in the Cayman Islands in response to a winding-up petition filed by a creditor of the Company.  Under Cayman Islands Companies Law, a company can be wound up at the request of its creditors.  Provisional liquidation occurs where a company is or is likely to become unable to pay its debts and intends to present a compromise or arrangement to its creditors.  In a "light touch" provisional liquidation, the provisional liquidators work alongside the existing directors to develop and propose a restructuring without completely displacing the directors' powers.  In a press release on July 15, 2020, Luckin stated that it had petitioned the Grand Court of the Cayman Islands for the appointment of provisional liquidators, and that the court had appointed Alvarez & Marsal Cayman Islands Limited and Alvarez & Marsal Asia Limited to act as "light-touch" Joint

Provisional Liquidators of the Company (the "JPLs").   Luckin stated that it "believes the appointment of the JPLs will provide a stable platform to allow the Company and its advisors . . . to facilitate the negotiation and restructuring of the Company's financial obligations."   Luckin stated that while the provisional liquidation proceedings are pending, the Company would "continue to operate its business under the day-to-day control" of the Board.

## VI.   THE IPO AND SPO REGISTRATION STATEMENTS VIOLATED GAAP AND RELEVANT SEC DISCLOSURE OBLIGATIONS

### A.   The IPO and SPO Registration Statements Violated GAAP

214.   SEC Regulation S-X, 17 C.F.R. § 210, *et seq.* ("Regulation S-X"), governs the content of financial statements filed with the SEC in registration statements under the Securities Act and under the Exchange Act.   Regulation S-X, 17 C.F.R. § 210.4–01(a)(1), states that "[f]inancial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."   GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.   GAAP principles have been codified in the Accounting Standards Codification ("ASC"), the authoritative source of U.S. GAAP promulgated by the Financial Accounting Standards Board ("FASB").

215.   According to the IPO and SPO Registration Statements, Luckin's "consolidated financial statements *are prepared and presented in accordance with U.S. GAAP*."   Moreover, Luckin claimed in the IPO and SPO Registration Statements that the responsibilities of the Audit Committee of Luckin's Board of Directors included, among other things: (i) "reviewing with the independent registered public accounting firm any audit problems or difficulties and management's response"; (ii) "discussing with [Luckin's] independent auditor, among other things, the audits of the financial statements, including whether any material information should

be disclosed, issues regarding accounting and auditing principles and practices"; (iii) "reviewing and approving all proposed related party transactions, as defined in Item 404 of Regulation S-K under the Securities Act"; (iv) "discussing the annual audited financial statements with management and the independent registered public accounting firm"; (v) "reviewing the adequacy and effectiveness of [Luckin's] accounting and internal control policies and procedures and any special steps taken to monitor and control major financial risk exposures"; (vi) "approving annual audit plans, and undertaking an annual performance evaluation of the internal audit function"; and (vii) "meeting separately and periodically with management and the independent registered public accounting firm."

216.    As alleged above, Luckin has admitted that its CEO, Qian, its COO, J. Liu, and numerous other Luckin employees fabricated sales transactions, inflated revenues, overstated expenses, and failed to disclose numerous transactions with related parties.  Luckin has also admitted that as a result of these undisclosed fabricated transactions "the Company's net revenue in 2019 was inflated by approximately RMB 2.12 billion (consisting of RMB 0.25 billion in the second quarter, RMB 0.70 billion in the third quarter, and RMB 1.17 billion in the fourth quarter)" and its "costs and expenses were inflated by RMB 1.34 billion in 2019 (consisting of RMB 0.15 billion in the second quarter, RMB 0.52 billion in the third quarter, and RMB 0.67 billion in the fourth quarter)."  By definition, these fabricated transactions were materially misrepresented and lacked any economic substance.  Moreover, Luckin has admitted "*that the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties*"—none of which were disclosed in the IPO or SPO Registration Statements.  By failing to disclose these fabricated transactions

and by including these transactions in Luckin's financial reports, the Exchange Act Defendants violated numerous GAAP standards.

217.  *First*, Luckin's financial statements violated the requirements of ASC 855 (*Subsequent Events*), which provides that any entity which files financial statements with the SEC is responsible for evaluating the impact of subsequent events through the date the financial statements are issued.  ASC 855-10-25-1A.  Even if the events or circumstances arose after the time covered by the financial statements, ASC 855 recognizes that "[s]ome nonrecognized subsequent events"—i.e., "events that provide evidence about conditions that did not exist at the date of the balance sheet but arose after the balance sheet date but **before financial statements are issued**"—"may be of such a nature that they must be disclosed to keep the financial statements from being misleading."  ASC 855-10-50-2; ASC 855 10-25-3 (emphasis in original).  For such events, an entity which files financial statements with the SEC must disclose "[t]he nature of the event" and "[a]n estimate of its financial effect, or a statement that such an estimate cannot be made."  ASC 855-10-50-2.

218.  The SEC has likewise stated that "[a] registrant . . .  ha[s] responsibilities with regard to post-balance-sheet-date subsequent events, as well as the application of authoritative literature applicable to such events."  SEC Staff Announcement: Issuance of Financial Statements, ASC 855 at S99-2.  A registrant must "***at a minimum, disclose subsequent events***."  *Id.*  "If a registrant does not amend [its] financial statements so that they are free of material misstatement or omissions when they are filed with the Commission, ***the registrant will be knowingly filing a false and misleading document***."  *Id.*

219.  Both the IPO and SPO Registration Statements included Luckin's consolidated balance sheets as of December 31, 2017 and December 31, 2018, and consolidated statements of

cash flow and comprehensive loss for the period from June 16, 2017 (date of inception) through December 31, 2017 and for the year ended December 31, 2018.  In addition, the IPO Registration Statement included Luckin's consolidated balance sheet data and statements of cash flow and comprehensive loss for the three months ended March 31, 2019, while the SPO Registration Statements included consolidated balance sheet data and statements of cash flow and comprehensive loss for the nine months ended September 30, 2019.  As Luckin has admitted, "***the fabrication of transactions began in April 2019***," prior to the date that Luckin's financial statements for 2017, 2018, and first quarter of 2019 were filed as part of the IPO Registration Statement.  Moreover, Luckin has admitted that its fabrication of revenue continued throughout the second, third, and fourth quarters of 2019, prior to the date that Luckin's financial statements for 2017, 2018, and the nine months ended September 30, 2019 were filed as part of the SPO Registration Statement.

220.    Given the magnitude and material nature of the fabricated transactions, under ASC 855, these transactions should have been disclosed as non-recognized subsequent events in the notes to Luckin's consolidated financial statements in both the IPO and SPO Registration Statement.  By failing to disclose its fabrication of transactions, Luckin violated GAAP and "***knowingly fil[ed] a false and misleading document***."

221.    *Second*, Luckin's financial statements violated ASC 605 (*Revenue Recognition*), which requires that to be recognized, revenue must have been "realized or realizable" and have been "earned."  ASC 605-10-25-1.  Revenue is realized when "products (goods or services), merchandise, or other assets are exchanged or cash or claims to cash"; revenue is realizable when "related assets received or held are **readily convertible** to known amounts of cash or claims to cash."  *Id*.  (emphasis in original).  Revenues are considered earned when an entity has

"substantially accomplished what it must do to be entitled to the benefits represented by the revenues."  ASC 605-10-S99.  In other words, to record revenue under ASC 605, Luckin must have delivered coffee or another product to the consumer.  Any revenues Luckin recognized as a result of fabricated transactions would, by definition, not have been realized or realizable or earned.

222.     Moreover, with respect to prepaid vouchers—which Luckin utilized as one method of inflating its revenues—Luckin stated in the IPO and SPO Registration Statements that "[c]ash received from the sales of prepaid vouchers are recognized as deferred revenues," which "are recognized as revenues upon the redemption of the vouchers for purchases."  However, the financial statements included in the IPO or SPO Registration Statements did not report *any* deferred revenue attributable to the purported sale of coffee vouchers.  As reported by the *Journal* based on its review of Company records, "Luckin booked more than 1.5 billion yuan ($210 million) of corporate sales [through the sale of purported coffee vouchers] in 2019, dwarfing genuine purchases during the period."

223.     Luckin's recognition of revenue from fabricated transactions, including the fraudulent sales of coffee vouchers, violated ASC 605 and rendered its financial statements misleading and inaccurate.

224.     *Third*, Luckin's admitted reliance on round-trip transactions, in which "***the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties***" violated ASC 605-50 (*Customer Payments and Incentives*) and ASC 845 (*Non-monetary Transactions*).  As reported by the *Journal* based on its interview of Luckin employees, "the rafts of purchases and payments

formed a loop of transactions that allowed the company to inflate sales and expenses with a relatively small amount of capital that circulated in and out of the company's accounts."

225.     Under ASC 605-50, "**[c]ash consideration** . . . given by a vendor to a customer is presumed to be a reduction of the selling price of the vendor's products or services and, therefore, should be characterized as a reduction of revenue when recognized in the vendor's income statement."  ASC 605-50-45-2 (emphasis in original).  In other words, when the "third parties associated with the Company employees and/or related parties"—which Luckin has admitted were instrumental in its fraud—initially funded the loop of fraudulent transactions, the consideration provided to the purported vendors and customers should have been recorded as a reduction of the revenue generated by means of the fabricated sales.

226.     Similarly, under ASC 845, reciprocal transactions which do not involve actual "exchanges of cash or other **monetary assets or liabilities** for goods" or which "lack[] commercial substance" constitute nonmonetary transactions and must be offset against one another.  ASC 845-10-05-2; ASC 845-10-30-3 (emphasis in original).

227.     The SEC has characterized the type of non-monetary transactions Luckin engaged in as "sham transactions."  For example, in a speech on Revenue Recognition on May 31, 2001, Lynn Turner, the SEC's chief accountant stated:

> The staff is concerned when it appears Company A has taken $1 million out of its left pocket only to receive that $1 million back in its right pocket, and wants to record the $1 million received in revenue.  For example, assume that Company A pays Company X $1 million to enter into the purchase and supply arrangement under which Company A agrees to supply a product to Company X and Company X agrees to purchase a specified minimum volume of product from Company A. Company A gets the $1 million that it gave Company X back through Company X's guaranteed product purchases.  ***The staff questions how these types of 'round-trip' arrangements result in revenue, and whether, in substance, they are sham transactions engineered solely to inflate the revenue line in the income statement***.

228.   Luckin's round-trip transactions were the exact circumstance identified by the SEC as "sham transactions" since they were engineered to portray a false picture of revenue growth. Under GAAP, the linked transactions should have been offset against one another, which would have resulted in a dramatic reduction in the revenue reported in Luckin's financial statements.

229.   *Fourth*, Luckin's undisclosed reliance on "***a number of third parties associated with the Company employees and/or related parties***" to facilitate its fabricated transactions violated ASC 850 (*Related Party Disclosures*).   Under ASC 850, when a company engages in transactions with a related party or entity with common control relationships, such transactions must be disclosed where information about the transactions "would make a difference in decision making."   ASC 850-10-10-1.   These disclosures enable "users of the financial statements [to] evaluate their significance."   *Id.*   ASC 850 identifies examples of related-party transactions, including those between an entity, its principal owners, management, or members of their immediate families or affiliates.   ASC 850-10-05-03.   An affiliate is "a party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an entity."   ASC 850-10-20.   Control includes "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity through ownership, by contract, or otherwise."   *Id.*

230.   As alleged above, the *Journal* uncovered evidence showing that "registration records of companies that bought vouchers and others that received repeated supplier payments shows that many had links to Luckin, Mr. Lu or Mr. Lu's two previous ventures."   Moreover, the Company's internal investigation "found evidence that Mr. Lu had knowledge of certain related-party transactions that weren't properly disclosed."   Under ASC 850, Luckin was required to disclose the following information concerning each of these related-party transactions in the IPO

and SPO Registration Statements: (i) the nature of the relationship; (ii) a description of the transactions (even if the transaction involved nominal amounts) including "information deemed necessary to an understanding of the effects of the transactions on the financial statements"; (iii) the dollar amount of the transactions for all periods that income statements were presented; and (iv) "amounts due from or to **related parties**." ASC 850-10-50-1 (emphasis in original). Luckin's failure to do so violated GAAP.

231.    In light of the numerous GAAP violations alleged above, Luckin's financial statements as reported in the IPO and SPO Registration Statements violated Regulation S-X, 17 C.F.R. § 210.4–01(a)(1), and are therefore presumed to be misleading or inaccurate.

**B.    The SPO Registration Statement Violated SEC Regulation G**

232.    In addition to failing to comply with GAAP, the SPO Registration Statement violated SEC Regulation G, 17 C.F.R. § 244.100 ("Regulation G"), through its presentation of numerous misleading non-GAAP financial measures.  Non-GAAP measures either exclude or include adjustments to a comparable measure presented on a GAAP basis—or, in the case of Luckin, that is supposed to be presented on a GAAP basis—in a company's financial statements. Regulation G, which applies to the disclosure of adjusted measures, prohibits a company from making public an adjusted financial measure that is misleading or omits to state a material fact. 17 C.F.R. § 244.100(b) provides:

> A registrant, or a person acting on its behalf, shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure and any other accompanying discussion of that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.

233.    The SPO Registration Statement presented numerous non-GAAP financial measures, including adjusted operating loss, adjusted net loss and non-GAAP net loss attributable

to ordinary shareholders.  Luckin claimed in the SPO Registration Statement that these "non-GAAP financial measures help identify underlying trends in [Luckin's] business, provide further information about [its] results of operations, and enhance the overall understanding of [its] past performance and future prospects."  However, each of the non-GAAP financial measures reported in the SPO Registration Statement was materially misleading by virtue of Luckin's materially inflated revenue and expenses in the second and third quarters of 2019, and Luckin's failure to disclose that it was actively inflating its revenue and expenses by means of massive fabricated transactions.  As such, Luckin's presentation of these measures violated Regulation G.

### C.     The IPO and SPO Registration Statements Violated SEC Regulation S-K

234.    SEC Regulation S-K, 17 C.F.R. § 229, *et seq.* ("Regulation S-K"), requires disclosure concerning substantive matters such as the business and property of the issuer, the management of the issuer, and the market in the issuer's securities.  Regulation S-K, 17 C.F.R. § 229.101 ("Item 101"), requires management to accurately describe the "general development of the business" during the past five years, "any material changes in the mode of conducting the business," and "the business done and intended to be done."  As described above, by the time of the IPO, the Exchange Act Defendants began fraudulently inflating Luckin's revenue and expenses through fabricated transactions.  These fabricated transactions unquestionably reflected material changes in Luckin's mode of conducting its business.  By failing to disclose these fabricated transactions in the IPO and SPO Registration Statements, the Exchange Act Defendants violated Item 101.

235.    Regulation S-K, 17 C.F.R. § 229.303(a)(3) ("Item 303"), requires public companies to "describe *any unusual or infrequent events or transactions* or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected."  Item 303 also requires public

companies to disclose "trends or uncertainties . . . that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  These disclosures must be made in the management's discussion and analysis of financial condition and results of operations ("MD&A") section of a registration statement.  A company's failure to disclose information required by Item 303 in its annual and quarterly reports filed with the SEC is actionable under the federal securities laws, including under Section 10(b) of the Exchange Act.

236.    The purpose of MD&A disclosures, according to the SEC, is to provide investors with information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations."  In particular, there are three principal objectives of the MD&A: (i) to provide an explanation of a company's financial statements that enables investors to see the company through management's eyes; (ii) to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and (iii) to provide information about the quality and potential variability of a company's earnings and cash flow, so that investors can judge the extent to which past performance predicts future performance.

237.    For the past thirty years, the SEC has emphasized that public companies have a duty to disclose significant trends, risks, and uncertainties that could affect their performance in the future.  First, on May 18, 1989, the SEC issued an interpretive release concerning registrants' MD&A disclosure obligations, including those arising under Item 303 ("1989 Release").  The 1989 Release affirms that the MD&A sections of public company SEC filings "are intended to provide, in one section of a filing, material historical ***and prospective*** textual disclosure enabling

investors and other users to assess the financial condition and results of operations of the registrant, *with particular emphasis on the registrant's prospects for the future*."

238.    Citing Securities Act Release Nos. 6711 and 6349, the 1989 Release also states:

MD&A is intended to give the investor an opportunity to look at the company *through the eyes of management* by providing both a short and long-term analysis of the business of the company. . . .  It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors *which are peculiar to and necessary for an understanding and evaluation of the individual company*.

239.    Moreover, quoting the Instructions to Item 303, the 1989 Release states that the MD&A "shall focus specifically on *material events and uncertainties known to management* that would cause reported financial information *not to be necessarily indicative of future operating results or of future financial condition*."

240.    On April 7, 2003, the SEC issued a final rule addressing registrants' disclosure obligations under Item 303 ("2003 Rule").  It emphasizes that MD&A disclosures are "of paramount importance in increasing the transparency of a company's financial performance and providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions."  The 2003 Rule further states that the MD&A provides "a unique opportunity for management to provide investors with an understanding of its view of the financial performance and condition of the company, an appreciation of what the financial statements show *and do not show*, as well as *important trends and risks* that have shaped the past *or are reasonably likely to shape the future*."

241.    As described above, the Company has admitted that beginning in April 2019, *before the effective date of Luckin's IPO Registration Statement*, Luckin's most senior executives, including its CEO, Qian, and COO, J. Liu, engaged in a fraudulent scheme involving millions of dollars of fake transactions, fabricated sales, and wildly overstated revenues, which,

had they been disclosed to the public, would have had a material unfavorable impact on sales and revenues.  The Company's admissions also establish "***that the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties***," none of which were disclosed in the IPO Registration Statement.  Furthermore, the Company has admitted that "documentary and other evidence" directly implicates Defendant Lu in the Exchange Act Defendants' fraudulent scheme, a fact which is corroborated by extensive reporting indicating that the Company's internal investigation proved that Lu "knew—or should have known—about the fabricated transactions," and "found evidence that Mr. Lu had knowledge of certain related-party transactions that weren't properly disclosed."

242.   The Exchange Act Defendants' failure to disclose the fraudulent scheme which existed at the core of the Company in the IPO and SPO Registration Statements violated Item 303 and Section 10(b) of the Exchange Act.  Without this information, investors had no ability to view Luckin "***through the eyes of management***" or know what Luckin's financial statements did "***not show***," including the "***material events and uncertainties known to management*** that would cause reported financial information ***not to be necessarily indicative of future operating results or of future financial condition***" and "***important trends and risks*** that have shaped the past ***or are reasonably likely to shape the future***."   In particular, the Exchange Act Defendants failed to disclose "***any unusual or infrequent events or transactions***," such as the massive influx of fraudulent purchases beginning in April 2019, and the fact that "***the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties***," as the Company has admitted.

243.    SEC Regulation S-K, 17 C.F.R. § 229.503(c) ("Item 503"), requires public companies to disclose in a registration statement, among other things, a "discussion of the ***most significant factors that make the offering speculative or risky***."   Item 503 also requires public companies to "[e]xplain how the risk affects the issuer or the securities being offered."   A company's failure to disclose information required by Item 503 in its registration statement is actionable under the federal securities laws, including under Section 10(b) of the Exchange Act. Luckin's IPO and SPO Registration Statements failed to disclose information regarding material risks as required by Item 503, including risks related to Luckin's massive inflation of revenue and expenses through fabricated transactions, its deficient internal controls over financial reporting, and undisclosed related-party transactions that were used to facilitate its fabrication of revenues and expenses.   The disclosures in the IPO and SPO Registration Statements therefore failed to adequately alert investors to the actual risks associated with an investment in Luckin.

## VII.   EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

244.    As alleged below, the Exchange Act Defendants issued numerous false or misleading statements and omissions of material fact during the Class Period concerning, among other things, Luckin's: (i) compliance with laws and regulations, GAAP, and internal controls over financial reporting; (ii) increased earnings and growth leading up to the IPO and between the IPO and the SPO; (iii) fabrication of revenue and expenses; (iv) reliance on undisclosed related-party transactions to facilitate its fabrication of revenue and expenses; (v) the terms of the Margin Loan Facility; and (vi) the Anonymous Report's allegations.   The Exchange Act Defendants' misstatements and omissions were made in the Company's IPO and SPO Registration Statements, SEC filings, press releases, and conference calls with analysts and investors.

A. **IPO Registration Statement**

1. **The IPO Registration Statement Failed to Disclose Subsequent Events that Rendered Luckin's Reported Financial Results Materially Misleading**

245.     The IPO Registration Statement included Luckin's consolidated balance sheets as of December 31, 2017 and December 31, 2018; consolidated statements of cash flow and comprehensive loss for the period from June 16, 2017 (date of inception) through December 31, 2017 and for the year ended December 31, 2018; unaudited interim consolidated balance sheet data and statements of cash flow and comprehensive loss for the three months ended March 31, 2018 and March 31, 2019; and unaudited quarterly financial and operating data for the four quarters of 2018 and three months ended March 31, 2019 (together, the "IPO Financial Statements").

246.     The IPO Registration Statement purported to disclose all "SUBSEQUENT EVENTS" in the notes to the IPO Financial Statements.  Note 20 to Luckin's consolidated financial statements for the period from June 16, 2017 (date of inception) through December 31, 2017 and year ended December 31, 2018 identified two subsequent events, including the issuance of additional Series B Preferred Shares on January 9, 2019 and the adoption of a share option plan for employees and directors on January 18, 2019.

247.     Note 15 to Luckin's unaudited interim financial statements, including for the first quarter of 2019, disclosed the following subsequent events: (i) in April 2019, Luckin "issued 173,182 Series B-1 convertible redeemable preferred shares to third-party investors at US$865.91 per share for an aggregate purchase consideration of US$149,960"; (ii) "[o]n April 16, 2019, the board of directors approved the dual-class share structure" under which "each Class A ordinary share is entitled to one vote and each Class B ordinary share is entitled to ten votes"; (iii) on April 16, 2019, "the board of directors also approved that the authorized share capital of "US$50,000

divided into 25,000,000,000 ordinary shares of a par value of US$0.000002 each"; (iv) in April 2019, Luckin entered into a joint venture with Louis Dreyfus Company Asia Pte. Ltd. "to incorporate a joint venture for constructing and operating a coffee roasting plant in China"; and (v) on April 26, 2019 Luckin issued 15,211 Series B-1 convertible redeemable preferred shares to TTCO Trust Corporation Limited for an aggregate purchase consideration of US$8,936.  The IPO Registration Statement did not include any other subsequent events.

248.     The IPO Financial Statements were materially false or misleading when issued. As Luckin has admitted, by the time of the IPO, Luckin's senior management was actively engaged in a scheme to inflate the Company's revenue and expenses through massive fabricated transactions, resulting in an overstatement of Luckin's revenues by 40.3% and expenses by 10.4% in the second quarter of 2019—the quarter in which the IPO occurred.  The Company's admissions establish that the Exchange Act Defendants' scheme arose *before* the IPO Financial Statements were filed with the SEC as part of the IPO.  Under ASC 855, Luckin was required to disclose all events "of such a nature that they must be disclosed to keep the financial statements from being misleading."  Likewise, the SEC has stated that "[i]f a registrant does not amend [its] financial statements so that they are free of material misstatement or omissions *when they are filed with the Commission*, *the registrant will be knowingly filing a false and misleading document*."  Given the magnitude and material nature of the fabricated transactions, under ASC 855, these transactions should have been disclosed as non-recognized subsequent events in the notes to the IPO Financial Statements.  By failing to disclose the Exchange Act Defendants' overstatement of revenue and expenses as subsequent events in the notes to the IPO Financial Statements, the Exchange Act Defendants violated GAAP and "*knowingly fil[ed] a false and misleading document*."  Moreover, because the IPO Financial Statements were "not prepared in accordance with generally accepted

accounting principles," they are "***presumed to be misleading or inaccurate***."  Regulation S-X, 17 C.F.R. § 210.4–01(a)(1).

> **2.      Misstatements and Omissions Regarding Luckin's Compliance with Laws and Regulations, GAAP, and Internal Controls over Financial Reporting**

249.     The Exchange Act Defendants represented in the IPO Registration Statement that Luckin's "consolidated financial statements ***are prepared and presented in accordance with U.S. GAAP***."  The Exchange Act Defendants also represented that the Company's reported quarterly financial data, including its unaudited quarterly financial and operating data for the four quarters of 2018 and three months ended March 31, 2019, "***includes all adjustments, consisting only of normal and recurring adjustments, that we consider necessary for a fair representation of our operating results for the quarters presented***."

250.      The Exchange Act Defendants' statements regarding Luckin's compliance with GAAP were materially false or misleading when made.  As Luckin has admitted, by the time of the IPO, the Exchange Act Defendants had begun inflating Luckin's revenue and expenses through fabricated transactions.  Luckin's fabrication of revenue and expenses in the second quarter of 2019—when the IPO occurred—resulted in material misstatements in net revenue, all metrics derived from net revenue, and operating costs and expenses.  As alleged above, the Exchange Act Defendants' material misstatements of Luckin's revenue and expenses, and reliance on undisclosed related-parties to facilitate their fabrication transactions, violated numerous GAAP principles, including ASC 605 (*Revenue Recognition*), ASC 605-50 (*Customer Payments and Incentives*), ASC 845 (*Nonmonetary Transactions*), and ASC 850 (*Related Party Disclosures*). Moreover, even if the Exchange Act Defendants' fraud had yet to be reflected in Luckin's reported financial results, under ASC 855 (*Subsequent Events*), the Exchange Act Defendants' ongoing fabrication of revenue and expenses should have been disclosed as subsequent events in the notes

to the IPO Financial Statements.  The Exchange Act Defendants' ongoing violations of GAAP at the time of the IPO rendered the IPO Registration Statement's claims regarding Luckin's compliance with GAAP materially incomplete and therefore misleading.

251.    Luckin disclosed in the IPO Registration Statement that during the audit of Luckin's consolidated financial statements for the year ended December 31, 2018, the Company and its outside auditor, E&Y Hua Ming, identified two material weaknesses in the Company's internal control over financial reporting: (i) the "lack of sufficient accounting and financial reporting personnel with requisite knowledge and experience in application of U.S. GAAP and the Securities and Exchange Commission, or the SEC, rules"; and (ii) "lack of financial reporting policies and procedures that are commensurate with U.S. GAAP and the SEC reporting requirements."  Luckin represented:

> *We are in the process of implementing a number of measures to address these material weaknesses identified*, including: (i) hiring additional accounting and financial reporting personnel with U.S. GAAP and SEC reporting experience, (ii) expanding the capabilities of existing accounting and financial reporting personnel through continuous training and education in the accounting and reporting requirements under U.S. GAAP, and SEC rules and regulations, (iii) developing, communicating and implementing an accounting policy manual for our accounting and financial reporting personnel for recurring transactions and period-end closing processes, and (iv) *establishing effective monitoring and oversight controls for non-recurring and complex transactions to ensure the accuracy and completeness of our company's consolidated financial statements and related disclosures*.

252.    The Exchange Act Defendants' statements about their efforts to remediate Luckin's material weaknesses and deficiencies, including by "establishing effective monitoring and oversight controls," were also false or misleading because, as Luckin has admitted, at the time of the IPO, Luckin lacked adequate internal controls over financial reporting sufficient to prevent or detect the massive fabrication of revenue and expenses being perpetrated by its senior management beginning in April 2019.  Indeed, Luckin did not "*charter[] an internal audit function to test and*

*evaluate its control functions*" until *after* the Exchange Act Defendants' fraud was revealed to the market.  Furthermore, Luckin's Finance and Treasury functions, basic transaction-level controls, were not overseen by its CFO.  As a result of these undisclosed material weaknesses in Luckin's internal controls over financial reporting, by the time of the IPO, the Exchange Act Defendants had begun inflating Luckin's revenue and expenses through fabricated transactions.  Therefore, any purported remedial measures implemented by the Company had failed to prevent the Exchange Act Defendants' ongoing, widespread financial misconduct at the time of the IPO, and were therefore plainly insufficient.

253.    Luckin also represented in the IPO Registration Statement that Luckin's success depended on its ability to "*ensur[e] full compliance with relevant laws and regulations*."  Luckin likewise warned that the Company "*may* be unsuccessful in operating our stores" and that "[t]he operating results of our stores have been and will continue to be subject to a number of factors," including Luckin's "*ability to ensure full compliance with relevant laws and regulations, and maintain adequate and effective control, supervision and risk management over our stores*."  The IPO Registration Statement further stated that Luckin's ability to successfully grow its business and brand recognition depended on its ability to "*stay compliant* with relevant laws and regulations."  Furthermore, the IPO Registration Statement claimed that Luckin's ability "to successfully manage [its] rapid growth" depended on "*effectively managing our supply chain and ensuring our third-party suppliers continue to meet our quality and other standards and satisfy our future operations' needs*."

254.    The Exchange Act Defendants' statements regarding Luckin's compliance with relevant laws and regulations were materially false or misleading because, as Luckin has admitted, at the time of the IPO, Luckin's senior management was actively engaged in a scheme to inflate

revenue and expenses through massive fabricated transactions.  Luckin's purported risk disclosures warning of ***potential*** risks due to non-compliance with relevant law or regulations were materially false or misleading because, by the time of the IPO, the risk of non-compliance with these laws and regulations had already materialized due to the ongoing fraud by senior management.

255.    The IPO Registration Statement included a risk disclosure related to short sellers that acknowledged the possibility that Luckin could be accused of financial or accounting misconduct.  However, the Exchange Act Defendants disclaimed awareness of any basis for short sellers to attack the Company with this kind of accusation:

> Public companies that have substantially all of their operations in China have been the subject of short selling.  Much of the scrutiny and negative publicity has centered on ***allegations of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and, in many cases, allegations of fraud***. As a result, many of these companies are now conducting internal and external investigations into the allegations and, in the interim, are subject to shareholder lawsuits and/or SEC enforcement actions.
>
> ***It is not clear what effect such negative publicity could have on us***. If we were to become the subject of any unfavorable allegations, ***whether such allegations are proven to be true or untrue***, we could have to expend a significant amount of resources to investigate such allegations and/or defend ourselves. ***While we would strongly defend against any such short seller attacks***, we may be constrained in the manner in which we can proceed against the relevant short seller by principles of freedom of speech, applicable state law or issues of commercial confidentiality. Such a situation could be costly and time-consuming, and could distract our management from growing our business. ***Even if such allegations are ultimately proven to be groundless***, allegations against us could severely impact our business operations, and any investment in the ADSs could be greatly reduced or even rendered worthless.

256.    The Exchange Act Defendants' statements regarding the purported absence of any financial or accounting misconduct at the Company were materially false or misleading because, as Luckin has admitted, at the time of the IPO, Luckin's senior management was actively engaged in a scheme to inflate revenue and expenses through massive fabricated transactions.  Luckin's

purported risk disclosures warning of ***potential*** risks due to "allegations of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and, in many cases, allegations of fraud" were materially false or misleading because, by the time of the IPO, the risk of these allegations being made had already materialized due to the ongoing fraud by senior management.

### 3. Misstatements and Omissions Regarding Luckin's Business Model and Increased Earnings and Growth

257.   The Exchange Act Defendants claimed in the IPO Registration Statement that Luckin had "***pioneered a technology-driven new retail model to provide coffee and other products with high quality, high affordability and high convenience to our customers***," and that this "***disruptive model has fulfilled the large unmet demand for coffee and driven its mass market consumption in China, while allowing [the Company] to achieve significant scale and growth since our inception***."   The Exchange Act Defendants claimed that Luckin's "***focus on technologies has enabled [it] to operate efficiently, [and] grow rapidly while maintaining quality control***."

258.   The Exchange Act Defendants stated that the Company's "***revenue growth is mainly driven by [its] ability to attract new customers and actively engage existing customers***" and that the growth of the Company's net revenues was "***primarily driven by the significant increase in the number of [its] transacting customers, [its] stores, and [its] products sold***."   The Exchange Act Defendants attributed their ability to attract and retain customers to Luckin's "***new retail model . . . built upon [its] mobile apps and store network***," claiming that they "***leverage[d] big data analytics and AI to analyze [Luckin's] customer behavior and transaction data, which***

*enables [it] to attract new customers and retain and engage existing customers to increase repurchases*."

259.    The Exchange Act Defendants' statements attributing Luckin's growth, including its growth in revenues, to its purportedly "***disruptive***" "***technology-driven new retail model***" were materially false or misleading when made.  By the time of the IPO, Luckin's growth rate had declined dramatically, from a 93.3% sequential increase in total net revenues during the fourth quarter of 2018 to just 2.8% during the first quarter of 2019, demonstrating the failure of Luckin's business model.  Contrary to the Exchange Act Defendants' representations, by the start of the Class Period, the Exchange Act Defendants had resorted to massively inflating Luckin's revenues through fabricated transactions.  Indeed, in the second quarter of 2019 alone, which began on April 1, 2019, Luckin overstated its revenues by over ***40%***.  The Exchange Act Defendants' undisclosed reliance on fabricated transactions rendered materially false or misleading their claims regarding Luckin's business model and the reasons for Luckin's growth.  Having chosen to speak affirmatively about the reasons for Luckin's revenue growth and business expansion, it was materially misleading for the Exchange Act Defendants not to disclose the fact that Luckin's revenues were being materially inflated through fabricated transactions.

260.    The IPO Registration Statement also touted Luckin's purported "***store operational efficiency by leveraging technology***."  The Exchange Act Defendants stated that they "measure [Luckin's] store performance with store level operating profit (loss), which is calculated by deducting cost of materials, store rental and other operating costs and depreciation expenses from net revenues from sales of freshly brewed drinks and other products."  The Exchange Act Defendants claimed that Luckin's "***technology-driven new retail business model significantly improves [its] operational efficiency***" and touted the fact that store-level operating loss as a

percentage of net revenues had rapidly declined from 1,260.4% in 2017 to 44.3% in the first quarter of 2019.  The Exchange Act Defendants further represented that "***store level operating costs, including cost of materials, store rental and other operating costs and depreciation expenses, will continue to decrease as percentage of our net revenues from sales of freshly brewed drinks and other products***."

261.    The Exchange Act Defendants' statements touting Luckin's store-level operational efficiency and claims that store-level operating costs would continue to decrease as a percentage of net revenues were materially false or misleading when made.  By the time of the IPO, Luckin's growth rate had declined dramatically, from a 93.3% sequential increase in total net revenues during the fourth quarter of 2018 to just 2.8% during the first quarter of 2019, demonstrating the failure of Luckin's business model.  Contrary to the Exchange Act Defendants' representations, by the start of the Class Period, the Exchange Act Defendants had resorted to massively inflating Luckin's revenues through fabricated transactions.  Indeed, in the second quarter of 2019 alone, which began on April 1, 2019, Luckin overstated its revenues by over ***40%***.  Given the Exchange Act Defendants' knowledge of their ongoing fraud, their statements that store-level operating losses were decreasing and "store level operating costs . . . will continue to decrease as percentage of our net revenues" were materially false or misleading when made.

### 4.    Misstatements and Omissions Regarding Luckin's Use of Coupons and Vouchers

262.    The Exchange Act Defendants represented in the IPO Registration Statement that Luckin's "ability to cost-effectively attract new customers and retain existing customers is crucial to driving net revenues growth and achieving profitability," and claimed that they had "***invested significantly in branding, sales and marketing to acquire and retain customers since [the Company's] inception***."  The Exchange Act Defendants stated that the Company offered "***various***

*discount offers and deals in the form of vouchers and coupons*" and "*regularly offer[ed] coupons and vouchers to increase [Luckin's] customer base, retain [its] existing customers or promote new products*."   The Exchange Act Defendants specifically touted the Company's introduction of bulk corporate promotions, stating that Luckin had "*opened [its] application programming interface to corporations with membership programs, where the corporations pay for [Luckin's] products in bulk in advance, and their members can then redeem these products*."

263.    The Exchange Act Defendants' statements regarding Luckin's purported sales and marketing expenses, including its reliance on coupons and vouchers to increase revenues, were materially false or misleading when made.  As Luckin has admitted, by the time of the IPO, the Exchange Act Defendants had begun inflating Luckin's revenue and expenses through fabricated transactions, and the Exchange Act Defendants relied on the very vouchers and coupons they touted in the IPO Registration Statement to facilitate these fabricated transactions.  Specifically, Luckin employees interviewed by the *Journal* reported using individual accounts registered with cellphone numbers to purchase vouchers for numerous cups of coffee.  Consistent with these accounts, FE 1 and FE 3 both stated that Luckin's use of coupons and vouchers helped to facilitate its fabrication of revenue.  Moreover, as reported by the *Journal*, around the time of the IPO, Luckin began selling massive amounts of fraudulent bulk coffee vouchers to corporate customers, many of which had direct ties to Defendant Lu.  The Exchange Act Defendants' undisclosed reliance on coupons and vouchers to facilitate their fraud rendered their statements regarding Luckin's purported sales and marketing expenses materially false or misleading.

### 5.    Misstatements and Omissions Regarding Related-Party Transactions

264.    The IPO Registration Statement identified several related-party transactions involving Luckin's officers and directors, including loans from and to Defendants Qian and Lu. The IPO Registration Statement also disclosed that Luckin rented office space from UCAR and

received advertising services from a company affiliated with CAR. Specifically, the IPO Registration Statement identified the following related-party transactions:

### Transactions with Ms. Jenny Zhiya Qian and Mr. Min Chen

In 2017, we received a loan from Ms. Jenny Zhiya Qian of RMB50 million and a loan from Mr. Min Chen, our then director, of RMB10 million to support our working capital management. The loan is interest-free with a term of one year and permits prepayment. We settled all the outstanding balance of the related party loans due to Ms. Jenny Zhiya Qian and Mr. Min Chen in 2018.

### Transactions with Haode Investment, Haode Group, UCAR and QWOM

In 2017, we received a loan of RMB1.8 million from Haode Investment Inc., a shareholder of our company and an affiliate of Mr. Charles Zhengyao Lu, to support our working capital management. The loan is interest-free with a term of one year and permits prepayment. We settled all the outstanding balance of the related party loan due to Haode Investment Inc. in 2018.

In 2018, we provided a loan of RMB147.6 million (US$22.0 million) to Haode Group Inc., an affiliate of by [sic] Mr. Charles Zhengyao Lu. The loan is interest-free with a term of six months and permits prepayment. We settled all the outstanding balance of the related-party loan due from Haode Group Inc. in February 2019.

We rent certain office space from UCAR Inc. In 2018 and in the three months ended March 31, 2019, the amount for the rent for UCAR Inc. was RMB3.2 million (US$0.5 million) and RMB 1.0 million (US$0.1 million), respectively, and as of December 31, 2018 and March 31, 2019, the amount due to UCAR Inc. was RMB1.0 million (US$0.1 million) and RMB 1.0 million (US$0.1 million), respectively.

We received advertising service from Beijing QWOM Digital Technology Co., Ltd., or QWOM, an affiliate of CAR Inc., which is an affiliate of Mr. Charles Zhengyao Lu. In 2018 and in the three months ended March 31, 2019, the amount for advertising service fee for QWOM was RMB 42.9 million (US$ 6.4 million) and RMB 7.6 million (US$1.1 million), respectively, and as of December 31, 2018 and March 31, 2019, the amount due to QWOM was RMB 23.2 million (US$3.5 million) and RMB 7.0 million (US$1.0 million), respectively.

### Transaction with Primus

In 2017, we received a loan of RMB92.9 million from Primus Investments Fund, L.P., a shareholder of our company and an affiliate of Mr. Charles Zhengyao Lu, to support our working capital management. The loan is interest-free with a term of one year and permits prepayment. We settled all the outstanding balance of the related party loan due to Primus Investments Fund, L.P. in 2018.

*Transaction with Star Grove*

In 2017, we received a loan of RMB227.5 million from Star Grove Global Limited, a shareholder of our company, to support our working capital management. The loan is interest-free with a term of one year and permits prepayment. We settled all the outstanding balance of the related party loan due to Star Grove Global Limited in 2018.

265.    The IPO Registration Statement's disclosures regarding Luckin's related-party transactions were materially incomplete and therefore materially false or misleading when made. Under ASC 850 (*Related Party Disclosures*), transactions with a related party or entity with common control relationships must be disclosed where information about the transactions "would make a difference in decision making."   ASC 850-10-10-01.   As the Company has admitted, ***"[e]vidence discovered to date demonstrates that the Company's former Chief Executive Officer, Ms. Jenny Zhiya Qian, former Chief Operating Officer, Mr. Jian Liu and certain employees reporting to them participated in the fabricated transactions and that the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties*."   Moreover, Luckin sold purported vouchers and made supplier payments to dozens of entities linked directly to Defendant Lu.   The SAMR determined that "*43 third-party related business entities, including Beijing Automotive Travel Business Consulting Services Co. Ltd., UCar, Zhengzhe International (Xiamen) Co. Ltd. aided and abetted Luckin in carrying out the misleading acts*."   As sources with knowledge of Luckin's internal investigation stated, Luckin "found evidence that Mr. Lu had knowledge of certain related-party transactions that weren't properly disclosed."

266.    With respect to each of these transactions, ASC 850 required Luckin to disclose: (i) the nature of the relationship; (ii) a description of the transactions (even if the transaction involved nominal amounts) including "information deemed necessary to an understanding of the effects of the transactions on the financial statements"; (iii) the dollar amount of the transactions

for all periods that income statements were presented; and (iv) "amounts due from or to related parties." ASC 850-10-50-1. By failing to do so, the IPO Registration Statement's related-party disclosures were rendered materially false or misleading.

<strong>6. The Exchange Act Defendants Misattributed the Reduced Growth in 1Q2019 to Seasonal Factors</strong>

267. During the first quarter of 2019, just before to the IPO, Luckin's net revenue growth rate slowed dramatically. While the Company had experienced a 93.3% sequential increase in total net revenues during the fourth quarter of 2018, its revenues grew by just 2.8% during the first quarter of 2019. Moreover, its sequential growth in cumulative transacting customers declined from 6.5 million in 4Q2018 to 4.3 million in 1Q2019, and the Company opened just 297 stores—less than half of the 625 openings it needed to be on pace to hit its 2,500-store target for 2019.

268. The Exchange Act Defendants represented at various points in the IPO Registration Statement that the Company's reduced growth during the first quarter of 2019 was due to seasonal factors. The IPO Registration Statement stated:

> We experience seasonality in our business, primarily as a result of orders fluctuations in holiday seasons. For example, we generally experience fewer purchase orders during Chinese New Year holidays which fall between late January and late February. The decrease of sales during the holiday seasons is a typical pattern in the coffee market.

269. The IPO Registration Statement similarly provided: "As in the case of customer retention rate, we generally experience a seasonal decrease in transaction value per customer (based on listed price) during the Chinese New Year holidays when most office workers go on holiday."

270. Those disclosures were false or misleading. The downturn in Luckin's operating results in the first quarter of 2019 was not due in whole or significant part to short-term seasonal factors, as the Exchange Act Defendants represented. Rather, as the Company has now admitted,

110

it embarked upon a scheme to fraudulently and artificially inflate its sales immediately after the end of the first quarter of 2019 in order to conceal its lack of growth—a scheme that would have been entirely unnecessary if the Company's first quarter results were due to transient seasonal factors.

### 7. The IPO Registration Statement Omitted Material Facts in Violation of Regulation S-K and Section 10(b)

271.    As alleged above in ¶¶ 130-53, the IPO Registration Statement omitted material information regarding: (i) Luckin's fabrication of revenue and expenses, which Luckin has admitted began in April 2019; and (ii) that "*the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties*."

272.    Luckin's undisclosed, pervasive reliance on fabricated transactions to inflate Luckin's revenue and expenses, and extensive reliance on undisclosed related-party transactions to facilitate these fraudulent transactions, constituted "*material changes in [Luckin's] mode of conducting the business*" that the Exchange Act Defendants were required to disclose under Item 101. 17 C.F.R. § 229.101(a)(1).  Contrary to the Exchange Act Defendants' description of Luckin's business as a "*technology-driven new retail model*" that was "*disrupting the status quo of the traditional coffee shop model*," in actuality, by the time of the IPO, Luckin's growth was being driven in large part by fictitious transactions.  By failing to disclose this material change in Luckin's business in the IPO Registration Statement, the Exchange Act Defendants violated Item 101 and Section 10(b).

273.    The Exchange Act Defendants' omissions concerning their fabrication of revenue and expenses and undisclosed related-party transactions also constituted "*unusual*" transactions and "*known trends or uncertainties*" that the Exchange Act Defendants were required to disclose

under Item 303. 17 C.F.R. § 229.303(a)(3)(i) & (ii).  The Exchange Act Defendants stated in the IPO Registration Statement that Luckin had "achieved rapid growth since [its] inception," but that "[i]f our growth rates decline, investors' perceptions of our business and prospects may be adversely affected and the trading price of the ADSs could decline."  Thus, Luckin's ability to sustain its previous growth rates was of critical importance to understanding Luckin's prospects for the future, which is one of the principal purposes of the disclosures required by Item 303.  However, the Exchange Act Defendants failed to disclose that Luckin's growth rate had declined significantly, and that the Exchange Act Defendants had resorted to extensive fraudulent transactions in order to create the appearance of sustained rapid growth.  These facts were "*material events and uncertainties known to management* that would cause reported financial information *not to be necessarily indicative of future operating results or of future financial condition*" and "*important trends and risks* . . . *reasonably likely to shape the future*."  Because the IPO Registration Statement failed to make the requisite disclosures, the Exchange Act Defendants violated Item 303 and Section 10(b).

274.    Luckin's reliance on fabricated transactions to inflate its revenue and expenses, and its reliance on undisclosed related-party transactions to facilitate these fraudulent transactions, also constituted "significant factors" that made the IPO "speculative or risky."  As the Exchange Act Defendants stated in the IPO Registration Statement, material risks that posed serious threats to the Company included Luckin's "*ability to ensure full compliance with relevant laws and regulations*" and the risk that Luckin would be the subject to "*allegations of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and, in many cases, allegations of fraud*"—the precise risk that materialized during the Class Period.  As

a result, the Exchange Act Defendants had a duty to disclose Luckin's currently-known non-compliance with relevant laws and regulations, lack of effective internal control over financial reporting resulting in accounting irregularities, and ongoing fraud, as these undisclosed factors made an investment in Luckin extremely risky.  The Exchange Act Defendants' omission of these material risks from the IPO Registration Statement violated Item 503 and Section 10(b) and gave investors a materially false or misleading impression of the Company's vulnerability to allegations of financial misconduct and fraud.

### B.    Misstatements and Omissions in the 2Q2019 Press Release and 2Q2019 Conference Call

#### 1.    2Q2019 Press Release

275.    On August 14, 2019, Luckin issued a press release purporting to report its 2Q2019 financial results.  The 2Q2019 Press Release was attached to a Form 6-K signed by Defendant Schakel.  The Company touted the following "HIGHLIGHTS" with respect to Luckin's 2Q2019 performance:

**SECOND QUARTER 2019 HIGHLIGHTS[]**

- **Total net revenues from products** in the quarter were RMB870.0 million (US$126.7 million), representing an increase of 698.4% from RMB109.0 million in the same quarter of 2018.

- **Cumulative number of transacting customers** increased to 22.8 million from 2.9 million as of the end of the second quarter of 2018. During the second quarter of 2019, the Company acquired 5.9 million new transacting customers.

- **Average monthly transacting customers** in the quarter were 6.2 million, representing an increase of 410.6% from 1.2 million in the second quarter of 2018.

- **Average monthly total items sold** in the quarter were 27.6 million, representing an increase of 589.7% from 4.0 million in the second quarter of 2018.

- **Total number of stores** at the end of the quarter were 2,963 stores, representing an increase of 374.8% from 624 stores at the end of the second quarter of 2018.

- **Store level operating loss** in the quarter was RMB55.8 million (US$8.1 million), decreasing from a loss of RMB81.7 million in the second quarter of 2018.

(emphasis in original)

276.    With respect to revenues, Luckin stated the following in the 2Q2019 Press Release:

**SECOND QUARTER 2019 UNAUDITED FINANCIAL RESULTS**

**Total net revenues** were RMB909.1 million (US$132.4 million) in the second quarter, representing an increase of 648.2% from RMB121.5 million in the second quarter of 2018. Net revenues growth was primarily driven by a significant increase in the number of transacting customers, an increase in effective selling prices, and the number of products sold.

- **Net revenues from freshly brewed drinks** were RMB659.2 million (US$96.0 million), representing 72.5% of total net revenues in the second quarter of 2019, compared to RMB100.5 million, or 82.7% of total net revenues, in the second quarter of 2018.

- **Net revenues from other products** were RMB210.8 million (US$30.7 million), representing 23.2% of total net revenues in the second quarter of 2019, compared to RMB8.4 million, or 7.0% of total net revenues, in the second quarter of 2018.

- **Other revenues**, which mainly include delivery fees, were RMB39.1 million (US$5.7 million), representing 4.3% of total net revenues in the second quarter of 2019, compared to RMB12.5 million, or 10.3% of total net revenues, in the second quarter of 2018.

(emphasis in original)

277.    The Exchange Act Defendants' statements in 2Q2019 Press Release purporting to report Luckin's financial results were materially false or misleading when made.  Luckin has admitted that all of the financial results for 2Q2019 reported to the market were materially inflated, including net revenue and all metrics derived from net revenue.  Specifically, Luckin has admitted that it overstated net revenue by RMB250 million (US$35.3 million), or ***40.3%***.  As a result of these material misstatements, Luckin retracted its reported financial results for 2Q2019, including the August 14, 2019 press release and "***other communications relating to***" these financial results,

stating that "***investors should no longer rely upon the Company's previous financial statements and earning releases***."

278.     In the 2Q2019 Press Release, the Exchange Act Defendants also represented that the growth in Luckin's total net revenues was "***primarily driven by a significant increase in the number of transacting customers, an increase in effective selling prices, and the number of products sold***."   The 2Q2019 Press Release quoted Qian as stating: "We are pleased with the performance of our business as we continue to execute against our long-term growth plan."   Qian touted Luckin's 2Q2019 net revenue growth, stating:

> ***Total net revenues from products sold increased 698.4% year-over-year, driven by a significant increase in transacting customers, an increase in the average number of items purchased by our transacting customers and higher effective selling prices. We believe this is the result of our distinguished value proposition of delivering our customers high quality, high convenience and high affordability***.

279.     Qian also touted Luckin's purported reduction in store operating loss, stating:

> ***At the same time we have substantially reduced our store operating loss as a percentage of net revenues as a result of benefits of scale and increased bargaining power, operating efficiency from technology, and higher store throughput, and we are on track to reach our store level break-even point during the third quarter of 2019***.

280.     The Exchange Act Defendants' statements in the 2Q2019 Press Release attributing Luckin's growth to factors other than the Exchange Act Defendants' fraudulent scheme were materially false or misleading.   Rather than being "***primarily driven by a significant increase in the number of transacting customers, an increase in effective selling prices, and the number of products sold***," the growth in Luckin's net revenues was driven in large part by the Exchange Act Defendants' fraudulent scheme to inflate revenues through fabricated transactions.   Having chosen to speak affirmatively about the reasons for Luckin's revenue growth and business expansion, it

was materially misleading for the Exchange Act Defendants not to disclose that Luckin's revenues were being materially inflated through fabricated transactions.

281.    The Exchange Act Defendants' inflation of net revenue also rendered materially false or misleading their claims about Luckin's reduced store-level operating loss, by making Luckin appear far more profitable than it actually was.  Contrary to the Exchange Act Defendants' claims that they had "***substantially reduced our store operating loss as a percentage of net revenues***," the reported reduction in store-level operating loss as a percentage of net revenues was driven in large part by the inflated net revenues the Exchange Act Defendants fraudulently reported to investors.

282.    The 2Q2019 Press Release represented that Luckin's ***"[t]otal operating expenses were RMB1,598.8 million (US$232.9 million), representing an increase of 243.9% from RMB465.0 million in the second quarter of 2018***."  The Exchange Act Defendants further claimed that the increase in operating expenses was "***in line with business expansion***."

283.    The Exchange Act Defendants' representations regarding Luckin's purported operating expenses during 2Q2019 were materially false or misleading.  Luckin has admitted that all of the financial results for 2Q2019 reported to the market were materially inflated, including operating costs and expenses.  Specifically, Luckin has admitted that it overstated its costs and expenses by RMB150 million (US$21.18 million), or ***10.4%***, in the second quarter.  At the end of the Class Period, Luckin retracted its reported financial results for 2Q2019, including the 2Q2019 Press Release and "***other communications relating to***" these financial results due to these material misstatements, stating that "***investors should no longer rely upon the Company's previous financial statements and earning releases***."

284.   The Exchange Act Defendants' claim that Luckin's reported increase in operating expenses was "*in line with business expansion*" was also materially false or misleading.   In addition to being materially misstated, Luckin's admitted inflation of expenses served to conceal the Exchange Act Defendants' inflation of Luckin's revenues, giving investors a materially false impression of the growth in Luckin's business.

### 2.   2Q2019 Conference Call

285.   Luckin hosted a conference call with investors on August 14, 2019 before the market opened.   Defendants Lu, Qian, and Schakel participated in the conference call for Luckin. In addition, analysts from each of the Underwriter Defendants participated.

286.   During the conference call, Defendant Lu touted the Company's purportedly "*strong performance during the second quarter*" and "*progress . . . across all of [Luckin's] key metrics*."

287.   Defendant Qian presented the following slide, highlighting Luckin's purported 700% year-over-year growth in revenue from products:



288.     Defendant Schakel likewise touted Luckin's purported 2Q2019 financial results, presenting the following slide which highlighted Luckin's supposed "*[r]apid improvement in profitability*":



289.     Defendant Schakel added that "*[i]t is worth noting that net revenues from other products as a percentage of total net revenues increased significantly to 23.2%, our highest quarterly contribution to date as we expanded our product offering*."

290.     The Exchange Act Defendants' statements during the August 14, 2019 conference call touting Luckin's purported financial results were materially false or misleading when made. Luckin has admitted that all of its financial results for 2Q2019 reported to the market were materially inflated, including net revenue, all metrics derived from net revenue, and costs and expenses.  Specifically, Luckin has admitted that it overstated its net revenue by RMB250 million (US\$35.3 million), or *40.3%*, and its costs and expenses by RMB150 million (US\$21.18 million), or *10.4%*, in the second quarter.  As a result of these material misstatements, at the end of the Class

Period, Luckin retracted its reported financial results for 2Q2019, including the 2Q2019 Press Release and "***other communications relating to***" these financial results due to these material misstatements, stating that "***investors should no longer rely upon the Company's previous financial statements and earning releases***."

291.    During the conference call, the Exchange Act Defendants attributed Luckin's purported revenue growth solely to non-fraudulent factors.  For example, Defendant Qian represented that Luckin's 2Q2019 "***[r]evenue growth was driven by a significant increase in transacting customers, an increase in the average number of items purchased by our transacting customers as well as higher effective selling prices***."  Defendant Qian added that "***this is the result of our distinguished value proposition by delivering our customers high quality, high convenience and high affordability***."

292.    Defendant Schakel claimed that "[n]et revenue from products grew just under 700% year-over-year and 95% sequentially, ***driven by more transacting customers, an increase in the number of items purchased per transacting customers, and higher effective selling prices***."  In response to a question from Tony Wang, a Credit Suisse analyst, regarding "the recent progress and outlook for some of [Luckin's] key operating metrics," Defendant Schakel stated that "***what we've seen in Q2 is really sort of an enhancement of the business across all the key metrics that we saw more new customers coming in, we saw an increased number of items per customer and also, we saw an increase in the effective selling price***."  Defendant Schakel added that "the impact of that and sort of the -- sort of ***the drivers that has [sic] really been driving sort of net revenue growth, we continue to see those increases going into the third quarter***."

293.    Defendant Qian also highlighted Luckin's reduced store operating loss, stating that "***we substantially reduced our store operating loss as [a] percentage of net revenues as a result***

*of, first, benefits of scale and increased bargaining power; second, operating efficiency from technology; and third, higher store throughput*."  Defendant Qian claimed that Luckin's "*rapid growth and technology-enabled business model has created barriers to entry, providing us with a sustainable competitive advantage*."

294.    Defendant Schakel similarly attributed Luckin's reported revenue growth to its store throughput i.e., "the average number of items sold per store per day," representing that store throughput "increased to 345 items during the quarter from 292 items during the same period last year *as we expanded our product offering and our transacting customers are buying our products more frequently*."

295.    The Exchange Act Defendants' statements during the 2Q2019 conference call attributing Luckin's growth to factors other than their fraudulent scheme were materially false or misleading.  Rather than being "*driven by a significant increase in transacting customers, an increase in the average number of items purchased by our transacting customers as well as higher effective selling prices*," the growth in Luckin's reported net revenues was driven in large part by the Exchange Act Defendants' fraudulent scheme to inflate revenues through fabricated transactions.  Having chosen to speak affirmatively about the reasons for Luckin's revenue growth and business expansion, it was materially misleading for the Exchange Act Defendants not to disclose that Luckin's revenues were being materially inflated through fabricated transactions.

296.    The Exchange Act Defendants' inflation of net revenue also rendered materially false or misleading their claims about Luckin's reduced store-level operating loss, by making Luckin appear far more profitable than it actually was.  Contrary to the Exchange Act Defendants' claims that they had "*substantially reduced our store operating loss as [a] percentage of net revenues*" as a result of "*benefits of scale and increased bargaining power*," "*operating*

*efficiency from technology*," and "***higher store throughput***," the reported reduction in store-level operating loss as a percentage of net revenues was driven in large part by the inflated net revenues the Exchange Act Defendants fraudulently reported to investors.

297.   During the conference call, Defendant Schakel also stated that Luckin's "***operating growth in the second quarter regained momentum from a seasonally slower first quarter that was impacted by Chinese New Year holiday season***."   Defendant Schakel highlighted the Company's purported average-monthly-items-sold metric, stating that "*[d]uring the second quarter of 2019, we sold nearly as many items as in full year 2018, which illustrates our rapid expansion*."

298.   In light of the Exchange Act Defendants' inflation of Luckin's revenues and expenses, their claims that Luckin's growth had reaccelerated in 2Q2019 were materially false or misleading.   Excluding fabricated revenue, Luckin's true sequential growth rate in net revenue from products was only ***39%***, significantly less than the 95% figure the Exchange Act Defendants touted to investors.

### C.   Misstatements and Omissions in the 3Q2019 Press Release and 3Q2019 Conference Call

#### 1.   3Q2019 Press Release

299.   On November 13, 2019, Luckin issued a press release purporting to report Luckin's 3Q2019 financial results.   The 3Q2019 Press Release was attached to a Form 6-K signed by Defendant Schakel.   The Company touted the following "HIGHLIGHTS" with respect to Luckin's 2Q2019 performance:

**THIRD QUARTER 2019 HIGHLIGHTS[]**

- **Total net revenues from products** in the quarter were RMB1,493.2 million (US$208.9 million), representing an increase of 557.6% from RMB227.1 million in the same quarter of 2018.

* * *

- **Average total net revenues from products per store** in the quarter were RMB449.6 thousand (US$62.9 thousand), representing an increase of 79.5% from RMB250.5 thousand in the same quarter of 2018.

- **Store level operating profit** in the quarter was RMB186.3 million (US$26.1 million), or 12.5% of net revenues from products, compared to a loss of RMB126.0 million in the third quarter of 2018.

(emphasis in original)

300.    In the 3Q2019 Press Release, the Exchange Act Defendants reported Luckin's purported 3Q2019 revenue as follows:

**THIRD QUARTER 2019 UNAUDITED FINANCIAL RESULTS**

**Total net revenues** were RMB1,541.6 million (US$215.7 million) in the third quarter, representing an increase of 540.2% from RMB240.8 million in the third quarter of 2018. **Total net revenues from products** were RMB1,493.2 million (US$208.9 million) in the third quarter, representing an increase of 557.6% from RMB227.1 million in the third quarter of 2018. Net revenues from products growth was primarily driven by a significant increase in the number of transacting customers, an increase in effective selling price, and an increase in the number of products sold per transacting customer.

- **Net revenues from freshly brewed drinks** were RMB1,145.4 million (US$160.2 million), representing 74.3% of total net revenues in the third quarter of 2019, compared to RMB192.7 million, or 80.0% of total net revenues, in the third quarter of 2018.

- **Net revenues from other products** were RMB347.8 million (US$48.7 million), representing 22.6% of total net revenues in the third quarter of 2019, compared to RMB34.4 million, or 14.3% of total net revenues, in the third quarter of 2018.

- **Other revenues**, which mainly include delivery fees, were RMB48.4 million (US$6.8 million), representing 3.1% of total net revenues in the third quarter of 2019, compared to RMB13.7 million, or 5.7% of total net revenues, in the third quarter of 2018.

(emphasis in original)

301.    The Exchange Act Defendants' statements in the 3Q2019 Press Release purporting to report Luckin's financial results were materially false or misleading when made.  Luckin has admitted that all the financial results for 3Q2019 reported to the market, including net revenue and all metrics derived from net revenue, were materially inflated.  Specifically, Luckin has admitted that it overstated net revenue by RMB700 million (US$98.84 million), or *88%*.  As a result of

these material misstatements, at the end of the Class Period, Luckin retracted its reported financial results for 3Q2019, including the 3Q2019 Press Release and "*other communications relating to*" these financial results, stating that "*investors should no longer rely upon the Company's previous financial statements and earning releases*."

302.    The Exchange Act Defendants' financial misconduct also grossly exaggerated the growth and success of Luckin's business in the third quarter of 2019.  Contrary to the Exchange Act Defendants' misrepresentation that, for the first time in its history, Luckin had achieved a store-level operating *profit* of $26.1 million, or "12.5% of net revenues from products," in 3Q2019, in reality, Luckin had maintained a store-level operating *loss* after excluding fabricated revenue.

303.    In the 3Q2019 Press Release, the Exchange Act Defendants also touted Luckin's purported net revenue growth from products, stating that "*[t]otal net revenues from products* were RMB1,493.2 million (US$208.9 million) in the third quarter, representing an increase of *557.6%* from RMB227.1 million in the third quarter of 2018."  (first emphasis in original).  The Exchange Act Defendants attributed the increase in net revenue from products as being "*primarily driven by a significant increase in the number of transacting customers, an increase in effective selling price, and an increase in the number of products sold per transacting customer*."  With respect to freshly-brewed coffee sales, the press release quoted Defendant Qian as stating that "*sales from freshly-brewed coffee drinks continued to maintain very strong growth*."

304.    The 3Q2019 Press Release also quoted Defendant Qian as stating that "[w]e exceeded the high-end of our guidance range, *achieved a store level profit margin of 12.5% and experienced continuous growth across all key operating metrics*. These achievements follow a clear trend: *an increase in volumes, efficiency and, as a result, profitability*."  Qian added that "*we continued to enrich our product offerings during the quarter*.  We launched Luckin Tea

products nationwide in July 2019 and experienced strong incremental demand during the quarter, ***contributing to an increase in per store revenue and higher customer retention rate***."

305.    The Exchange Act Defendants' statements in the 3Q2019 Press Release attributing Luckin's growth to factors other than their fraudulent scheme were materially false or misleading. Rather than being "***primarily driven by a significant increase in the number of transacting customers, an increase in effective selling price, and an increase in the number of products sold per transacting customer***," as the Exchange Act Defendants claimed, the growth in Luckin's net revenues was driven in large part by the Exchange Act Defendants' fraudulent scheme to inflate revenues through fabricated transactions. Having chosen to speak affirmatively about the reasons for Luckin's revenue growth and business expansion, it was materially misleading for the Exchange Act Defendants not to disclose that Luckin's revenues were being materially inflated through fabricated transactions.

306.    The 3Q2019 Press Release also reported Luckin's purported operating expenses, stating that "**[t]otal operating expenses** were RMB2,132.5 million (US$298.3 million), representing an increase of 193.6% from RMB726.4 million in the third quarter of 2018." (emphasis in original). The Exchange Act Defendants represented that "***[t]he increase in operating expenses was the result of business expansion***."

307.    The Exchange Act Defendants' representations in the 3Q2019 Press Release regarding Luckin's purported operating expenses during 3Q2019 were materially false or misleading. Luckin has admitted that all the financial results for 3Q2019 reported to the market were materially inflated, including operating costs and expenses. Specifically, Luckin has admitted that it overstated its costs and expenses by RMB520 million (US$73.4 million), or ***32.25%***, in the third quarter of 2019. As a result of these material misstatements, at the end of the

Class Period, Luckin retracted its reported financial results for 3Q2019, including the 3Q2019 Press Release and "***other communications relating to***" these financial results, stating that "***investors should no longer rely upon the Company's previous financial statements and earning releases***."

308.     The Exchange Act Defendants' claim that "***[t]he increase in operating expenses was the result of business expansion***" was also materially false or misleading.  In addition to being materially misstated, Luckin's admitted inflation of expenses served to conceal the Exchange Act Defendants' inflation of Luckin's revenues, giving investors a materially false impression of the growth in Luckin's business.

309.     With respect to sales and marketing expenses, the 3Q2019 Press Release stated that "**[s]ales and marketing expenses** were RMB557.7 million (US\$78.0 million), representing an increase of 147.6% from RMB225.3 million in the third quarter of 2018, ***mainly due to increases in advertising expenses as the Company launched new marketing initiatives, entered into new cities and launched Luckin Tea as an independent brand***."  (first emphasis in original).  The Exchange Act Defendants touted that "***[t]he increase in sales and marketing expenses reflect strategic investments in branding which, management believes, will bring long-term benefits to the Company***."

310.     The Exchange Act Defendants' claims regarding Luckin's sales and marketing expenses were materially false or misleading.  As Luckin has admitted, its total costs and expenses were overstated by RMB520 million (US\$73.4 million), or ***32.25%***.  Furthermore, as documented by the Anonymous Report, third party media tracking showed that Luckin overstated its 3Q2019 advertising expenses by ***over 150%***.

### 2.    3Q2019 Conference Call

311.    Luckin hosted a conference call with investors and analysts on November 13, 2019 before the market opened.  Defendants Lu, Qian, and Schakel participated in the conference call for Luckin.  In addition, analysts from each of the Underwriter Defendants participated.  During the conference call, Defendant Lu touted the Company's purported financial results for 3Q2019, stating that "*[w]e exceed[ed] the high end of our guidance range, achieved a strong store level profit margin of 12.5% and outperformed across all other key metrics.  These results are not surprising to us.  It just follows a clear trend*."  Defendant Lu also touted that "*[d]uring the quarter, sales from the coffee [sic] continued to maintain very strong growth*."

312.    Defendant Qian similarly touted the Company's purported results.  Defendant Qian presented the following slide, stating that "[d]uring this quarter, we outperformed all operational and financial metrics":



Q3 earnings highlights: strong performance across all key metrics

| | | |
|---|---|---|
| **Financial Metrics** | **Total net revenues from products** [1]<br>**RMB1,493.2mn**<br>*+557.6% YoY increase* | **Store level operating profit** [2]<br>**+12.5% store level profit margin** [3]<br>*RMB186.3mn* |
| **Operational Metrics** | **Store footprint**<br>**3,680 stores** [4]<br>*+717 net new stores QoQ* | **Cumulative transacting customers** [5]<br>**~30.7mn**<br>*+7.9mn new customers QoQ* |
| | **Average monthly total items sold** [6]<br>**~44.2mn items**<br>*+470.1% YoY increase* | **Average monthly transacting customers** [7]<br>**~9.3mn**<br>*+397.5% YoY increase* |

Notes:
(1)   Calculated as the sum of net revenues from freshly brewed drinks and net revenues from other products
(2)   Calculated by deducting cost of materials, store rental & other operating costs and depreciation expenses from net revenues from freshly brewed drinks and from other products
(3)   Calculated by dividing store level operating profit by total net revenues from products
(4)   Number of stores as of September 30th, 2019
(5)   Number of cumulative transacting customers refers to the total number of transacting customers since our inception
(6)   Calculated by dividing the total number of items sold during the quarter by three
(7)   The number of average monthly transacting customers in the three months during the quarter

luckin coffee | 瑞幸咖啡       3

313.    The Exchange Act Defendants' statements during the November 13, 2019 conference call touting Luckin's purported financial results were materially false or misleading when made.  Luckin has admitted that all the financial results for 3Q2019 reported to the market, including net revenue, all metrics derived from net revenue, and operating costs and expenses were materially inflated.  Specifically, Luckin has admitted that it overstated net revenue by RMB700 million (US$98.84 million), or *88%*, and costs and expenses by RMB520 million (US$73.4 million), or *32.25%*, in the third quarter of 2019.  As a result of these material misstatements, Luckin retracted its reported financial results for 3Q2019 and "*other communications relating to*" these financial results, stating that "*investors should no longer rely upon the Company's previous financial statements and earning releases*."

314.    The Exchange Act Defendants' financial misconduct grossly exaggerated the growth and success of Luckin's business in the third quarter of 2019.  Contrary to the Exchange Act Defendants' misrepresentation that, for the first time in its history, Luckin had achieved a store-level operating profit of $26.1 million in 3Q2019, in reality, Luckin had maintained a store-level operating *loss* after excluding fabricated revenue.  Moreover, Luckin's true sequential growth rate in net revenue from products was only *27%*, compared to the *71%* figure the Exchange Act Defendants reported to investors.

315.    During the conference call, the Exchange Act Defendants made numerous misstatements falsely attributing Luckin's purported revenue growth to non-fraudulent factors.  For example, Defendant Lu dismissed concerns about Luckin's rapid growth and claimed that the Company's growth was attributable to its purportedly disruptive "new retail" model:

> I have been often asked whether we are doing too much and too fast. I would say, *no*. In fact, *this is a natural evolution of our business model*. Since our inception, Luckin's growth has always been beyond everyone's expectations. *This is because our business model is entirely built on a technology, completely different from a*

***traditional retailer. With our fully technology-driven new retail partnership model, we believe we can rapidly expand with limited capital expenditures, while maintaining high quality and high efficiency, at the same time, enhance our profitability***.

316.   Defendant Qian highlighted the Company's purported revenue growth and increased profitability.  Defendant Qian presented the following slide, which purported to explain the Company's increased revenues in terms of an increased number of stores, customers, items sold, and effective selling price of products:



317.   In presenting the slide, Defendant Qian stated:

[T]he growth of product revenue is greater than the growth of the number of items sold. The growth of items sold is greater than the growth of transacting customers, and the growth of transacting customers is greater than the growth of stores. ***That shows that we are not just grow[ing] quickly, but also [are] able to improve efficiency and profitability at the same time. It also shows that the growth of the revenue is not only due to the growth of stores***.

318.   In similar fashion, Defendant Schakel described the Company's 3Q2019 results as "***very, very strong***."   Addressing the Company's net revenue, Defendant Schakel presented the

following slide, which represented that Luckin's revenue growth was due to "***strong business fundamentals***":



319.    Defendant Schakel claimed that "***product revenue was above the high end of our range and grew more than 70% sequentially. Illustrative of the improved store efficiency, you can see that the average product revenue grew even faster during the quarter***."  Defendant Schakel represented that the "key underlying drivers" of Luckin's purported revenue growth were: (i) "***a very strong increase in the number of monthly transacting*** customers to 9.3 million, a 51% quarter-over-quarter increase," which purportedly occurred as "***the result of successfully acquiring close to 8 million new customers during the quarter***, a notable increase compared to last quarter, and a further increase in the retention rate of our existing customers, partly driven by the success of Luckin Tea products"; (ii) "***the average monthly items per transacting customer during the quarter increased to 4.7, an increase of 6% quarter-over-quarter, partly driven by introduction of new products***"; and (iii) "***the net selling price per item***, which is calculated by

dividing net product revenue by all items transacted, and as such, adjusted for free products as well as promotions and coupons, was [RMB] 11.2 for the quarter, ***an increase of 7% quarter-over-quarter*.**"

320.  The Exchange Act Defendants' statements during the November 13, 2019 conference call attributing Luckin's revenue growth to factors other than their fraudulent scheme were materially false or misleading.  Rather than being the result of Luckin's "***technology-driven new retail partnership***," "***improved store efficiency***," or "***strong business fundamentals***," as the Exchange Act Defendants claimed, the growth in Luckin's net revenues was driven in large part by the Exchange Act Defendants' fraudulent scheme to inflate revenues through fabricated transactions.  Luckin has admitted that it overstated net revenue by RMB700 million (US$98.8 million), or ***88%*** in the third quarter of 2019.  After accounting for this fabricated revenue, Luckin's true sequential growth rate in net revenue from products was only ***27%*** compared to the ***71%*** figure the Exchange Act Defendants reported to investors.

### D.   SPO Registration Statement

#### 1.   The SPO Registration Statement Misstated Luckin's Revenues and Expenses

321.  The SPO Registration Statement included unaudited interim condensed consolidated statements of comprehensive loss data for the nine months ended September 30, 2019.  The Exchange Act Defendants represented that Luckin had generated total net revenues for the nine months ended September 30, 2019 of RMB2,929,216 thousand (US$413,634 thousand).  The SPO Registration Statement included the following chart purporting to reflect Luckin's net revenue growth in 2019:

| | Period from the inception date to December 31, 2017 | | For the year ended December 31, 2018 | | | For the nine months ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | 2018 | | 2019 | |
| | RMB | % | RMB | US$ | % | RMB | % | RMB | US$ | % |
| | | | | | (in thousands, except for percentages) | | | | | |
| **Net revenues :** | | | | | | | | | | |
| Freshly brewed drinks | 215 | 86.0% | 649,609 | 90,884 | 77.3% | 302,759 | 80.7% | 2,165,614 | 302,981 | 74.0% |
| Other products | 25 | 10.0% | 135,642 | 18,977 | 16.1% | 44,249 | 11.8% | 642,662 | 89,912 | 21.9% |
| Others | 10 | 4.0% | 55,444 | 7,757 | 6.6% | 28,254 | 7.5% | 120,940 | 16,920 | 4.1% |
| **Total net revenues** | **250** | **100.0%** | **840,695** | **117,618** | **100.0%** | **375,262** | **100.0%** | **2,929,216** | **409,813** | **100.0%** |

322.  The Exchange Act Defendants touted that during the nine months ended September 30, 2019, Luckin's "net revenues . . . increased by 680.6% from RMB375.3 million in the nine months ended September 30, 2018."

323.  The Exchange Act Defendants broke down Luckin's net revenue growth by category and touted the significant year-over-year growth in each category.  The Exchange Act Defendants claimed that "[Luckin's] net revenues from freshly brewed drinks were RMB2,165.6 million (US$303.0 million) in the nine months ended September 30, 2019, *increased by 615.3%* from RMB302.8 million in the nine months ended September 30, 2018," and represented that "*[t]he growth of [Luckin's] freshly brewed drinks revenue was primarily driven by the significant increase in the number of . . . freshly brewed drinks sold*."

324.  The Exchange Act Defendants claimed that "net revenues from other products were RMB642.7 million (US$89.9 million) in the nine months ended September 30, 2019, *increased by 1,352.4%* from RMB44.2 million in the nine months ended September 30, 2018," and represented that "*[t]he increase in other product revenue was primarily driven by the significant increase in the number of other products sold and newly launched product offering*."

325.  The Exchange Act Defendants claimed that "other revenue was RMB120.9 million (US$16.9 million) in the nine months ended September 30, 2019, *increased by 328.0%* from RMB28.3 million in the nine months ended September 30, 2018," and represented that "*[t]he growth of . . . other revenue was in line with the increase of delivery orders*."

326.    The Exchange Act Defendants also touted Luckin's purported decrease in net loss, stating that the Company "recorded a net loss of RMB1,764.9 million (US$246.9 million) in the nine months ended September 30, 2019, compared to a net loss of RMB950.2 million in the nine months ended September 30, 2018."

327.    The Exchange Act Defendants' statements in the SPO Registration Statement regarding Luckin's revenue growth, including its consolidated statements of comprehensive loss data for the nine months ended September 30, 2019, were materially false or misleading when made.  Luckin has admitted that all of the financial results for 2Q2019 and 3Q2019 reported to the market, including net revenue and all metrics derived from net revenue, were materially inflated. Luckin has admitted that it overstated its net revenue by *40.3%* and *88%* and in 2Q2019 and 3Q2019, respectively.  As a result of these material misstatements, Luckin retracted its reported financial results for 2Q2019 and 3Q2019 and "*other communications relating to*" these financial results, stating that "*investors should no longer rely upon the Company's previous financial statements and earning releases*."

328.    The Exchange Act Defendants' financial misconduct grossly exaggerated the growth and success of Luckin's business during the nine months ended September 30, 2019.  The Exchange Act Defendants' fraud overstated the growth in Luckin's total net revenue for the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018 by *59%*.  Likewise, the Exchange Act Defendants' fraud resulted in a vast understatement of Luckin's net loss during this period.

329.    With respect to operating expenses, the Exchange Act Defendants represented in the SPO Registration Statement that Luckin's "operating expenses were RMB4,736.9 million (US$662.7 million) in the nine months ended September 30, 2019, compared to RMB1,329.5

million in the nine months ended September 30, 2018," and stated that **"[t]he growth of our operating expenses was in line with [the Company's] business expansion**."  The Exchange Act Defendants represented that "operating expenses as a percentage of our net revenues decreased from 354.3% in the nine months ended September 30, 2018 to 161.7% in the nine months ended September 30, 2019, **mainly driven by the increased economies of scale and our technology-driven operations**."

330.    The Exchange Act Defendants' statements in the SPO Registration Statement regarding Luckin's purported operating expenses in the nine months ended September 30, 2019 were materially false or misleading.  Luckin has admitted that it inflated its costs and expenses in 2Q2019 and 3Q2019 by **10.4%** and **32.25%**, respectively.   As a result of these material misstatements, Luckin retracted its reported financial results for 2Q2019 and 3Q2019, including the reported costs and expenses and "**other communications relating to**" these financial results, stating that "**investors should no longer rely upon the Company's previous financial statements and earning releases**."

331.    Given the Exchange Act Defendants' admitted inflation of Luckin's operating expenses, the Exchange Act Defendants' representations regarding Luckin's purported operating expenses in the SPO Registration Statement, including that "**[t]he growth of our operating expenses was in line with [the Company's] business expansion**," were also materially false or misleading.  Luckin's overstatement of its operating expenses helped to conceal the Exchange Act Defendants' inflation of Luckin's revenues and gave investors a materially false impression of the growth in Luckin's business.

> **2.     The SPO Registration Statement Failed to Disclose Subsequent Events that Rendered Luckin's Reported Financial Results Materially Misleading**

332.   The SPO Registration Statement included Luckin's consolidated balance sheets as of December 31, 2017 and December 31, 2018, consolidated statements of cash flows and comprehensive loss for the period from June 16, 2017 (date of inception) through December 31, 2017 and for the year ended December 31, 2018, and unaudited interim consolidated balance sheet data and statements of cash flow and comprehensive loss for the nine months ended September 30, 2019 (together, the "SPO Financial Statements").

333.   The SPO Registration Statement purported to disclose all "SUBSEQUENT EVENTS" in the notes to the SPO Financial Statements.  Note 20 to Luckin's 2017 and 2018 financial statements stated that "[o]n January 9, 2019, the Company issued additional 6,809 Series B Preferred Shares to Galaxy Shine Limited at US$734.37 per share for an aggregate purchase consideration of US$5,000" and that "[o]n January 18, 2019, [Luckin] adopted the 2019 share option plan providing for the grants of share options to its employees and directors."  Note 16 to Luckin's unaudited interim condensed consolidated financial statements, including for the nine months ended September 30, 2019 stated that on "July 23, 2019, the Company signed an Equity Joint Venture Agreement with Louis Dreyfus Company North Asia Pte Ltd. to transfer to it 40% of the Company's equity ownership in Luckin Roastery Technology (Xiamen) Co., Ltd." and that on "September 25, 2019, the Company signed an Equity Joint Venture Agreement with Louis Dreyfus Company Juices Holding B.V. to establish a joint venture to develop a co-branded not-from-concentrate juice business in China."  The SPO Registration did not include any other subsequent events.

334.   The SPO Financial Statements were materially false or misleading when issued. As Luckin has admitted, beginning before the IPO and continuing through the date of the SPO,

Luckin's senior management was actively engaged in a scheme to inflate the Company's revenue and expenses through massive fabricated transactions.  The Exchange Act Defendants' scheme resulting in an overstatement of Luckin's revenues by 40.3% and expenses by 10.4% in the second quarter of 2019, an overstatement of Luckin's revenues by 88% and expenses by 32.25% in the third quarter of 2019, and an overstatement of Luckin's revenues by at least 95% in the fourth quarter of 2019.  The Company's admissions establish that the Exchange Act Defendants' scheme had been ongoing for three full quarters before the SPO Financial Statements were filed with the SEC as part of the SPO.  Under ASC 855, Luckin was required to disclose all events "of such a nature that they must be disclosed to keep the financial statements from being misleading."  Likewise, the SEC has stated that "[i]f a registrant does not amend [its] financial statements so that they are free of material misstatement or omissions *when they are filed with the Commission*, *the registrant will be knowingly filing a false and misleading document*."  Given the magnitude and material nature of the fabricated transactions, under ASC 855, these transactions should have been disclosed as non-recognized subsequent events in the notes to the SPO Financial Statements.

335.    By failing to disclose the Exchange Act Defendants' overstatement of revenue and expenses as subsequent events in the notes to the SPO Financial Statements, the Exchange Act Defendants violated GAAP and "*knowingly fil[ed] a false and misleading document*."  Moreover, because the SPO Financial Statements were "not prepared in accordance with generally accepted accounting principles," they are "presumed to be misleading or inaccurate."  Regulation S-X, 17 C.F.R.  § 210.4–01(a)(1).

3.   **The SPO Registration Statement Contained False or Misleading Non-GAAP Financial Measures in Violation of Regulation G**

336.   The SPO Registration Statements contained the following non-GAAP financial measures, including adjusted operating loss, adjusted net loss, and non-GAAP net loss attributable to ordinary shareholders:

| | Period from the inception date to December 31, 2017 | For the year ended December 31, 2018 | | For the nine months ended September 30, | | |
| --- | --- | --- | --- | --- | --- | --- |
| | RMB | RMB | US$ | 2018 RMB | 2019 RMB | US$ |
| | | | (in thousands) | | | |
| Operating loss | (56,207) | (1,598,006) | (223,568) | (954,235) | (1,807,688) | (252,904) |
| Adjusted for: Share-based compensation expenses | — | — | — | — | 111,210 | 15,559 |
| **Non-GAAP operating loss** | **(56,207)** | **(1,598,006)** | **(223,568)** | **(954,235)** | **(1,696,478)** | **(237,345)** |
| Net loss | (56,371) | (1,619,152) | (226,526) | (950,153) | (1,764,921) | (246,920) |
| Adjusted for: Share-based compensation expenses | — | — | — | — | 111,210 | 15,559 |
| Adjusted for: Change in the fair value of warrant liability | — | 19,276 | 2,697 | 991 | 8,322 | 1,164 |
| **Non-GAAP net loss** | **(56,371)** | **(1,599,876)** | **(223,829)** | **(949,162)** | **(1,645,389)** | **(230,197)** |
| Net loss attributable to our company's Ordinary Shareholders | (56,371) | (3,190,334) | (446,342) | (1,744,145) | (2,319,084) | (324,451) |
| Add: Accretion to redemption value of convertible redeemable preferred shares | — | 1,571,182 | 219,816 | 793,992 | 552,036 | 77,233 |
| Add: Share-based compensation expenses | — | — | — | — | 111,210 | 15,559 |
| Add: Change in the fair value of warrant liability | — | 19,276 | 2,697 | 991 | 8,322 | 1,164 |
| **Non-GAAP net loss attributable to our company's Ordinary Shareholders** | **(56,371)** | **(1,599,876)** | **(223,829)** | **(949,162)** | **(1,647,516)** | **(230,495)** |

337.   The SPO Registration Statement stated that Luckin defined "non-GAAP operating loss as operating loss excluding share-based compensation expenses, and non-GAAP net loss as net loss excluding share-based compensation expenses and change in fair value of warrant liability." The SPO Registration Statement claimed that these non-GAAP financial measures "*help identify underlying trends in [Luckin's] business, provide further information about [its] results of operations, and enhance the overall understanding of [its] past performance and future prospects*."

338.   The statements in the SPO Registration Statements regarding Luckin's non-GAAP financial measures were materially false or misleading when made. Luckin has admitted that all of the financial results for 2Q2019 and 3Q2019 reported in the SPO Registration Statement, including its non-GAAP financial measures, which were derived from Luckin's reported net revenues and expenses, were materially inflated. Luckin has admitted that it overstated its net revenue by *40.3%* and *88%* and in 2Q2019 and 3Q2019, respectively, resulting in massive inflation

in Luckin's reported non-GAAP operating loss and net loss. As a result of these material misstatements, Luckin retracted its reported financial results for 2Q2019 and 3Q2019, and all "*other communications relating to these consolidated financial statements*," stating that "*investors should no longer rely upon the Company's previous financial statements and earning releases*." By issuing these false or misleading non-GAAP financial measures, the SPO Registration Statement violated Regulation G, 17 C.F.R. § 244.100.

### 4. Misstatements and Omissions Regarding the Reasons for Luckin's Increased Earnings and Growth

339. In the SPO Registration Statement, the Exchange Act Defendants made numerous misstatements falsely attributing Luckin's purported revenue growth to non-fraudulent factors. The Exchange Act Defendants claimed that they had "*pioneered a technology-driven new retail model to provide coffee, tea and other products with high quality, high affordability and high convenience to [Luckin's] customers*," and that the Company's "*disruptive model has fulfilled the large unmet demand for coffee and driven its mass market consumption in China, while allowing [it] to achieve significant scale and growth since [its] inception.*"

340. The Exchange Act Defendants claimed that "*[t]he growth of [Luckin's] net revenues was primarily driven by the significant increase in the number of [its] transacting customers, effective selling prices and purchasing frequency per customer*."

341. The Exchange Act Defendants attributed Luckin's rapid growth to its "*centralized technology system*," which they claimed enabled it "*to simplify and standardize [its] operations, which allows [it] to improve operational efficiency and quickly expand and scale up [its] business*." The Exchange Act Defendants stated that the Company's "*revenue growth is mainly driven by [its] ability to attract new customers and actively engage existing customers*."

342.     The Exchange Act Defendants claimed to "leverage big data analytics and AI to analyze [Luckin's] customer behavior and transaction data, which enables [it] to continually enhance [its] products and services, implement dynamic pricing and improve customer retention." The Exchange Act Defendants also claimed that by "*leverag[ing] big data analytics and AI*," they were able "*to attract new customers and retain and engage existing customers to increase repurchases*." The Exchange Act Defendants stated that their "*focus on technologies has enabled [Luckin] to operate efficiently, [and] grow rapidly while maintaining quality control*." The Exchange Act Defendants further claimed that by "*leveraging our new retail model, [Luckin] experienced robust growth in net revenues* in 2018 *and in the nine months ended September 30, 2019*."

343.     The Exchange Act Defendants' statements in the SPO Registration Statement attributing Luckin's revenue growth to factors other than their fraudulent scheme—like its "*technology-driven new retail model*," its "*centralized technology system*," an "*increase in the number of . . . transacting customers*," its "*leverag[ing] big data analytics and AI*," and "*economies of scale*"—were materially false or misleading. Contrary to the Exchange Act Defendants' claims, the growth in Luckin's net revenues during 2Q2019 and 3Q2019 was driven in large part by their fraudulent scheme to inflate revenues through fabricated transactions. As a result, the Exchange Act Defendants' statements attributing Luckin's "*robust growth*" in revenues to non-fraudulent factors, such as Luckin's purportedly disruptive "*new retail model*," were materially false or misleading when made.

344.     With respect to operating expenses, the Exchange Act Defendants represented in the SPO Registration Statement that "*[a]s a result of increased economies of scale and technology-driven operations, [Luckin's] operating expenses as a percentage of [its] net*

*revenues decreased significantly from 1,066.2% in the first quarter of 2018 to 138.3% in the third quarter of 2019, and similarly, [its] operating loss as a percentage of [its] net revenues decreased rapidly from 966.2% in the first quarter of 2018 to 38.3% in the third quarter of 2019*."

345.    The Exchange Act Defendants' statements attributing the decrease in Luckin's operating expenses as a percentage of net revenues to "*increased economies of scale and technology-driven operations*" were false or misleading, since the admitted overstatement in Luckin's revenues made Luckin appear far more profitable that it actually was.  Moreover, having chosen to speak affirmatively about the reasons for Luckin's revenue growth and business expansion, it was materially misleading for the Exchange Act Defendants not to disclose that Luckin's revenues were being materially inflated through fabricated transactions.

346.    With respect to sales and marketing expenses, the Exchange Act Defendants claimed in the SPO Registration Statement that they had "*invested significantly in sales and marketing activities to promote our brand and our products and to deepen our relationships with customers*," and that they "*regularly offer coupons and vouchers to increase our customer base, retain our existing customers or promote new products*."

347.    The Exchange Act Defendants' claims regarding Luckin's purported investments in sales and marketing activities were materially false or misleading because Luckin's total costs and expenses (including sales and marketing expenses) were materially inflated.  Moreover, as documented by the Anonymous Report, third-party media tracking showed that Luckin overstated its 3Q2019 advertising expenses by *over 150%*.  The Exchange Act Defendants also relied on the purported vouchers and coupons that these Defendants touted in the SPO Registration Statement to facilitate the Company's fabricated transactions.  Specifically, Luckin employees interviewed by the *Journal* reported using individual accounts registered with cellphone numbers to purchase

vouchers for numerous cups of coffee.  Consistent with these accounts, FE 1 and FE 3 both stated that Luckin's use of coupons and vouchers helped to facilitate its fabrication of revenue. Moreover, as reported by the *Journal*, since the time of the IPO, Luckin had been selling massive amounts of fraudulent bulk coffee vouchers to corporate customers, many of which had direct ties to Defendant Lu.  The Exchange Act Defendants' undisclosed reliance on coupons and vouchers to facilitate their fraud rendered their statements materially false or misleading.

5.  **Misstatements and Omissions Regarding Luckin's Compliance with Laws and Regulations, GAAP, and Internal Controls over Financial Reporting**

348.    The Exchange Act Defendants represented in the SPO Registration Statement that Luckin's "consolidated financial statements ***are prepared and presented in accordance with U.S. GAAP***."

349.    The Exchange Act Defendants' statements regarding Luckin's compliance with GAAP were materially false or misleading when made.  As Luckin has admitted, beginning before the IPO and continuing through the date of the SPO, Luckin's senior management was actively engaged in a scheme to inflate the Company's revenue and expenses through massive fabricated transactions.  The Exchange Act Defendants' scheme resulting in an overstatement of Luckin's revenues by 40.3% and expenses by 10.4% in the second quarter of 2019; an overstatement of Luckin's revenues by 88% and expenses by 32% in the third quarter of 2019; and an overstatement of Luckin's revenues by at least 95% in the fourth quarter of 2019.  The Company's admissions establish that the Exchange Act Defendants' scheme had been ongoing for three full quarters before the SPO Financial Statements were filed with the SEC as part of the SPO.

350.    As alleged above, the Exchange Act Defendants' material misstatements of Luckin's revenue and expenses, and reliance on undisclosed related-parties to facilitate their fabrication transactions, violated numerous GAAP principles, including ASC 605 (*Revenue*

*Recognition*), ASC 605-50 (*Customer Payments and Incentives*), ASC 845 (*Nonmonetary Transactions*), and ASC 850 (*Related Party Disclosures*). Moreover, under ASC 855 (*Subsequent Events*), the Exchange Act Defendants' ongoing fabrication of revenue and expenses should have been disclosed as subsequent events in the notes to the SPO Financial Statements. The Exchange Act Defendants' longstanding and ongoing violations of GAAP at the time of the SPO rendered the SPO Registration Statement's claims regarding Luckin's compliance with GAAP materially incomplete and therefore misleading.

351. The Exchange Act Defendants disclosed in the SPO Registration Statement that during the audit of Luckin's consolidated financial statements for the year ended December 31, 2018, the Company and its outside auditor, E&Y Hua Ming, identified two material weaknesses in the Company's internal control over financial reporting: (i) the "lack of sufficient accounting and financial reporting personnel with requisite knowledge and experience in application of U.S. GAAP and the Securities and Exchange Commission, or the SEC, rules"; and (ii) "lack of financial reporting policies and procedures that are commensurate with U.S. GAAP and the SEC reporting requirements." The Exchange Act Defendants claimed that:

> To remediate our identified material weakness and improve our internal control over financial reporting, ***we are implementing a number of measures to address these material weaknesses identified***, including: (i) hiring additional accounting and financial reporting personnel with U.S. GAAP and SEC reporting experience, (ii) expanding the capabilities of existing accounting and financial reporting personnel through regular training and education in the accounting and reporting requirements under U.S. GAAP, and SEC rules and regulations, (iii) developing, communicating and implementing an accounting policy manual for our accounting and financial reporting personnel for recurring transactions and period-end closing processes, and (iv) ***establishing effective monitoring and oversight controls for non-recurring and complex transactions to ensure the accuracy and completeness of our company's consolidated financial statements and related disclosures***.

352. The Exchange Act Defendants claimed further that "[t]he process of designing and implementing an effective financial reporting system is a ***continuous effort*** that requires us to

anticipate and react to changes in our business and the economic and regulatory environments and to expend significant resources to maintain a financial reporting system that is adequate to satisfy our reporting obligation."

353.   The Exchange Act Defendants' statements about their efforts to remediate Luckin's material weaknesses and deficiencies, including by "***establishing effective monitoring and oversight controls***," were false or misleading.  As Luckin has admitted, it lacked adequate internal controls over financial reporting sufficient to prevent or detect the massive fabrication of revenue and expenses being perpetrated by its senior management beginning in April 2019.  Indeed, Luckin did not "***charter[] an internal audit function to test and evaluate its control functions***" until ***after*** the Exchange Act Defendants' fraud was revealed to the market.  Furthermore, Luckin's Finance and Treasury functions, basic transaction-level controls, were not overseen by its CFO.  As a result of these undisclosed material weaknesses in Luckin's internal controls over financial reporting, the Exchange Act Defendants inflated Luckin's revenue and expenses through fabricated transactions throughout the second, third, and fourth quarters of 2019.  Any purported remedial measures implemented by the Company had failed to prevent the Exchange Act Defendants' ongoing, widespread financial misconduct, and were therefore plainly insufficient.

354.   The Exchange Act Defendants also represented in the SPO Registration Statement that Luckin's success depended on its ability to "***ensur[e] full compliance with relevant laws and regulations***."  The Exchange Act Defendants likewise warned that the Company "***may*** be unsuccessful in operating our stores" and that "[t]he operating results of our stores have been and will continue to be subject to a number of factors," including Luckin's "***ability to ensure full compliance with relevant laws and regulations, and maintain adequate and effective control, supervision and risk management over our stores***."  The Exchange Act Defendants further stated

that Luckin's ability to successfully grow its business and brand recognition depended on its ability to "***stay compliant*** with relevant laws and regulations."   Furthermore, the Exchange Act Defendants claimed that Luckin's ability "to successfully manage [its] rapid growth" depended on "***effectively managing our supply chain and ensuring our third-party suppliers continue to meet our quality and other standards and satisfy our future operations' needs***."

355.   The Exchange Act Defendants' statements regarding Luckin's "***compliance***" with relevant laws and regulations were materially false or misleading because, as Luckin has admitted, since April 2019, Luckin's senior management had been actively engaged in a scheme to inflate revenue and expenses through massive fabricated transactions.   Luckin's purported risk disclosures warning of ***potential*** risks due to non-compliance with relevant laws or regulations were materially false or misleading because, at the time of the SPO, this risk of non-compliance had already materialized due to the ongoing fraud by senior management.

356.   The SPO Registration Statement included a risk disclosure related to short sellers that acknowledged the possibility that Luckin could be accused of financial or accounting misconduct.   However, the Exchange Act Defendants disclaimed awareness of any basis for short sellers to attack the Company with this kind of accusation:

> Public companies that have substantially all of their operations in China have been the subject of short selling.   Much of the scrutiny and negative publicity has centered on allegations of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and, in many cases, allegations of fraud. As a result, many of these companies are now conducting internal and external investigations into the allegations and, in the interim, are subject to shareholder lawsuits and/or SEC enforcement actions.
>
> ***It is not clear what effect such negative publicity could have on us***. If we were to become the subject of any unfavorable allegations, ***whether such allegations are proven to be true or untrue***, we could have to expend a significant amount of resources to investigate such allegations and/or defend ourselves. ***While we would strongly defend against any such short seller attacks***, we may be constrained in the manner in which we can proceed against the relevant short seller by principles

of freedom of speech, applicable state law or issues of commercial confidentiality. Such a situation could be costly and time-consuming, and could distract our management from growing our business. ***Even if such allegations are ultimately proven to be groundless***, allegations against us could severely impact our business operations, and any investment in the ADSs could be greatly reduced or even rendered worthless.

357.   The Exchange Act Defendants' statements regarding the purported absence of any financial or accounting misconduct at the Company were materially false or misleading because, as Luckin has admitted, since April 2019, Luckin's senior management had been actively engaged in a scheme to inflate revenue and expenses through massive fabricated transactions.  Luckin's purported risk disclosures warning of ***potential*** risks due to "***allegations of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and, in many cases, allegations of fraud***" were materially false or misleading because, by the time of the SPO, the risk of allegations of this kind being made had already materialized due to the ongoing fraud by senior management.

**6.**    **Misstatements and Omissions Regarding Related-Party Transactions**

358.   The SPO Registration Statement identified the same related-party transactions involving its directors as were disclosed in the IPO Registration Statement, as discussed in ¶ 264 above.  The Exchange Act Defendants did not disclose any other related-party transactions involving Defendants Lu or Qian or their affiliates.

359.   The SPO Registration Statement's disclosures regarding Luckin's related-party transactions were materially incomplete and therefore materially false or misleading when made. Under ASC 850 (*Related Party Disclosures*), transactions with a related party or entity with common control relationships must be disclosed where information about the transactions "would make a difference in decision making."  ASC 850-10-10-01.  As the Company has admitted,

"*[e]vidence discovered to date demonstrates that the Company's former Chief Executive Officer, Ms. Jenny Zhiya Qian, former Chief Operating Officer, Mr. Jian Liu and certain employees reporting to them participated in the fabricated transactions and that the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties*." Moreover, Luckin sold purported vouchers and made supplier payments to dozens of entities linked directly to Defendant Lu. The SAMR determined that "*43 third-party related business entities, including Beijing Automotive Travel Business Consulting Services Co. Ltd., UCar, Zhengzhe International (Xiamen) Co. Ltd. aided and abetted Luckin in carrying out the misleading acts*." As sources with knowledge of Luckin's internal investigation stated, Luckin "*found evidence that Mr. Lu had knowledge of certain related-party transactions that weren't properly disclosed*."

360.    With respect to each of these transactions, ASC 850 required Luckin to disclose: (i) the nature of the relationship; (ii) a description of the transactions (even if the transaction involved nominal amounts) including "information deemed necessary to an understanding of the effects of the transactions on the financial statements"; (iii) the dollar amount of the transactions for all periods that income statements were presented; and (iv) "amounts due from or to related parties." ASC 850-10-50-1. By failing to do so, the SPO Registration Statement's related-party disclosures were rendered materially false or misleading.

### 7.    Misstatements and Omissions Regarding the Margin Loan Facility

361.    The SPO Registration Statement disclosed that Defendants Lu and Qian and Lu's sister, Wong, had pledged a total of 488.4 million Luckin Class B shares, representing over *42%* of the total aggregate voting power in the Company, "to an affiliate of an underwriter to secure a borrowing." However, the Exchange Act Defendants did not provide any other disclosure to investors concerning the terms of the Facility Agreement under which these shares were pledged,

nor any disclosure concerning the amounts borrowed or the risk of default.  Indeed, the Exchange Act Defendants expressly disclaimed this risk, stating that they were "***not aware of any arrangement that may, at a subsequent date, result in a change of control of our company***."

362.    The Exchange Act Defendants' disclosures regarding the Margin Loan Facility were materially false or misleading.  Unbeknownst to investors, Defendants Lu and Qian borrowed ***$518 million*** from the Underwriter Defendants, effectively cashing out of a significant percentage of their inflated holdings in Luckin in exchange for personal loans.  Moreover, the Facility Agreement provided that if Luckin's ADS price declined by at least 50% from $29.10—the price on December 11, 2019, when the Facility Agreement was last amended—the total amounts owed under the Margin Loan Facility would be immediately due in full, and that failure to immediately pay would result in potential liquidation of the pledged shares.  The Exchange Act Defendants misled investors by failing to disclose the risk that Defendants Lu's and Qian's control of the Company could be significantly reduced in the event of a decline in Luckin's ADS price— precisely the risk that materialized when the Exchange Act Defendants' fraud was revealed.

**8.    The SPO Registration Statement Omitted Material Facts in Violation of Regulation S-K and Section 10(b)**

363.    As alleged above in ¶¶ 130-53, and in violation of Regulation S-K and Section 10(b), the SPO Registration Statement omitted material information regarding: (i) Luckin's fabricated revenue and expenses, which Luckin has admitted began in April 2019 and continued through at least the end of 2019; and (ii) that "***the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties***."

364.    The Exchange Act Defendants' undisclosed, pervasive reliance on fabricated transactions to inflate Luckin's revenue and expenses, and extensive reliance on undisclosed

related-party transactions to facilitate these fraudulent transactions, constituted "*material changes in [Luckin's] mode of conducting its business*" that the Exchange Act Defendants were required to disclose under Item 101 of Regulation S-K, 17 C.F.R. § 229.101(a)(1). Contrary to the Exchange Act Defendants' description of Luckin's business as a "*technology-driven new retail model*" that was "*disrupting the status quo of the traditional coffee shop model,*" in actuality, by the time of the SPO, Luckin's growth was being driven in large part by fictitious transactions. By failing to disclose this material change in Luckin's business in the SPO Registration Statement, the Exchange Act Defendants violated Item 101, and this violation is actionable under Section 10(b).

365. The Exchange Act Defendants' omissions concerning their fabrication of revenue and expenses and undisclosed related-party transactions also constituted "*unusual*" transactions and "*known trends or uncertainties*" that the Exchange Act Defendants were required to disclose under Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(i) & (ii). In particular, given the admittedly material impact that the Exchange Act Defendants' fabricated transactions had on Luckin's reported income during the second and third quarters of 2019, the Exchange Act Defendant were required under 17 C.F.R. § 229.303(a)(3)(i) to "*describe any unusual or infrequent events or transactions . . . that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.*" In addition, the Exchange Act Defendants were required to disclose that Luckin's true growth rate had declined significantly, and that the Exchange Act Defendants had resorted to extensive fraudulent transactions to create the appearance of sustained rapid growth because these facts were "*material events and uncertainties known to management* that would cause reported financial information *not to be necessarily indicative of future operating results or of future*

*financial condition*" and "*important trends and risks* . . . *reasonably likely to shape the future*." Because the SPO Registration Statement failed to make the requisite disclosures, the Exchange Act Defendants failed to comply with Item 303 in violation of Section 10(b).

366.    The Exchange Act Defendants' omissions concerning Luckin's reliance on fabricated transactions to inflate Luckin's revenue and expenses, and reliance on undisclosed related-party transactions to facilitate these fraudulent transactions, also constituted "significant factors" that made the SPO "speculative or risky."  As the Exchange Act Defendants stated in the SPO Registration Statement, material risks that posed serious threats to the Company included Luckin's "*ability to ensure full compliance with relevant laws and regulations*" and the risk that Luckin would be the subject to "*allegations of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and, in many cases, allegations of fraud*"—the precise risk that materialized during the Class Period.  As a result, the Exchange Act Defendants had a duty to disclose Luckin's currently known non-compliance with relevant laws and regulations, lack of effective internal control over financial reporting resulting in accounting irregularities, and ongoing fraud, as these undisclosed factors made an investment in Luckin extremely risky.  By failing to disclose these risks, the Exchange Act Defendants gave investors a materially false or misleading impression of the Company's real vulnerability to allegations of financial misconduct and fraud.  Because the SPO Registration Statement failed to make the requisite disclosures, the Exchange Act Defendants violated Item 503 and Section 10(b).

E.     **The Exchange Act Defendants' False Denials of the Anonymous Report's Allegations and Their False Affirmations of Luckin's Reported Financial Results and Internal Controls**

367.     The Exchange Act Defendants issued a press release on February 3, 2020, which was attached to a Form 6-K signed by Defendant Schakel.  In the press release, the Exchange Act Defendants categorically denied the allegations contained in the Anonymous Report:

**Luckin Coffee Responds to Anonymous Report Containing Misleading and False Allegations**

**BEIJING, Feb. 03, 2020 (GLOBE NEWSWIRE)** – Luckin Coffee Inc. ("Luckin Coffee" or the "Company") (NASDAQ: LK), a pioneer of a technology-driven new retail model to provide coffee and other products of high quality, high affordability, and high convenience to customers, today issued the following responses to misleading and false allegations contained in an anonymous report (the "Report"), which was made public on January 31, 2020 by a short seller who may benefit from this meritless Report.

***Luckin Coffee categorically denies all allegations in the Report***. ***The methodology of the Report is flawed, the evidence is unsubstantiated, and the allegations are unsupported speculations and malicious interpretations of events***. The Report also attacks members of Luckin Coffee's management team, shareholders, and business partners and its claims are either false, misleading or entirely irrelevant. Furthermore, ***Luckin Coffee believes that the Report demonstrates a fundamental misunderstanding of the Company's business model and operating environment***. Luckin Coffee intends to take appropriate actions to defend itself against these malicious allegations and to protect the interests of its shareholders.

368.     Luckin's press release specifically denied many detailed allegations raised in the Anonymous Report, describing them as "***misleading and false***":

- ***The Report alleged the number of items per store per day was inflated in 2019 3Q and 4Q***. [emphasis in original.] ***There are material inconsistencies between the unsubstantiated data presented in the Report and the actual data from the Company's own system***. Every single order that customers placed with Luckin Coffee is online and automatically recorded in its system, and payments for orders went through third-party payment service providers. Therefore, ***all the Company's key operating data, including the number of items per store per day, items per order and effective selling price, are tracked in real time and can be verified. Luckin Coffee has a robust internal control system over data management to***

*ensure the data integrity and consistency within its system as well as that of its third party partners*.

- ***The Report alleged items per order had declined from 2019 2Q to 2019 4Q and the effective selling price was inflated in 2019 3Q***. [emphasis in original]. The sources and authenticity of the alleged customer order receipts in the Report are ***unsubstantiated*** and the underlying methodology in the Report is ***ungrounded***. *Luckin Coffee's items per order during the period is substantially higher than the data alleged in the Report. In addition, Luckin Coffee stands by its reported effective selling price, which is true, accurate, and can be verified by Luckin Coffee's internal system*.

- ***The Report alleged Luckin Coffee overstated advertising expenses and may recycle overstated advertising expenses to inflate revenue in 2019 3Q***. [emphasis in original]. The allegation is based on flawed assumptions, and inaccurate and misleading analysis of the Company's advertising expenses. *Luckin Coffee performs a detailed review and cross check of its sales and marketing expenses with underlying evidence and confirms the Company's reported advertising expenses are true and accurate*.

- ***The Report alleged net revenues from other products were inflated in 2019 3Q***. [emphasis in original]. The Report's reference to value-added-tax ("VAT") in calculating net revenues from other products represents a clear misunderstanding of the applicable VAT rates for the Company's non-freshly brewed products and the Report reached an ungrounded allegation based on such flawed and unsupported assumption. *All the Company's orders are tracked in real time and the Company has rigorous internal controls over revenue recognition and reconciliation. Luckin Coffee is in strict compliance with these rigorous controls and is committed to ensure the integrity of its financial reporting*.

As a data-driven company, *Luckin Coffee is committed to providing full and accurate disclosure to investors and to rebutting any false claims that attempt to undermine confidence in Luckin Coffee's business, management and results of operations*.

*Luckin Coffee firmly stands by its business model* and is confident in benefiting from the strong growth of China's coffee market in the future. *Luckin Coffee's pioneering business model has enabled the Company to become the leading and fastest growing player driving coffee consumption in China*. Supported by its disruptive new retail model, diversified product portfolio and strong financial position, Luckin Coffee will continue to grow its business, provide a superior customer proposition and deliver sustainable value for its shareholders over the long-term.

369.    The Exchange Act Defendants' statements "***categorically den[ying] all allegations***" in the Anonymous Report were materially false or misleading when made.  As Luckin has admitted, the central allegation in the Anonymous Report, i.e., that "[r]ight after its USD 645 million IPO, the Company had evolved into a fraud by fabricating financial and operating numbers starting in 3rd  quarter 2019," was ***true***, except that the Exchange Act Defendants' fabrication of revenue and operating expenses actually began ***before the IPO***.  Moreover, while the Anonymous Report alleged that the Company inflated its number of items sold per store per day, its net selling price per item, and its advertising expenses in the third and fourth quarters of 2019, Luckin has admitted that ***total net revenues and total operating expenses*** were materially inflated in the second, third, and fourth quarters of 2019.  Far from being "***unsubstantiated***," "***unsupported speculations and malicious interpretations of events***," and "***demonstrat[ing] a fundamental misunderstanding of the Company's business model and operating environment***," as the Exchange Act Defendants claimed, the Anonymous Report  actually ***underestimated*** the magnitude of the Exchange Act Defendants' fraud.

370.    The Exchange Act Defendants also made materially false or misleading statements regarding Luckin's purported "***robust internal control system***," including that: (i) "***the Company's key operating data . . . are tracked in real time and can be verified***"; (ii) "***[a]ll the Company's orders are tracked in real time and the Company has rigorous internal controls over revenue recognition and reconciliation***"; (iii) it "***performs a detailed review and cross check of its sales and marketing expenses with underlying evidence***"; (iv) "***[a]ll the Company's orders are tracked in real time and the Company has rigorous internal controls over revenue recognition and reconciliation***"; and (v) "***Luckin Coffee is in strict compliance with these rigorous controls and is committed to ensure the integrity of its financial reporting***."   As Luckin has admitted,

throughout the Class Period, it lacked adequate internal controls over financial reporting sufficient to prevent or detect the massive fabrication of revenue and expenses being perpetrated by its senior management.  Indeed, Luckin did not "***charter[] an internal audit function to test and evaluate its control functions***" until ***after*** the Exchange Act Defendants' fraud was revealed to the market.  Furthermore, Luckin's Finance and Treasury functions, basic transaction-level controls, were not overseen by its CFO.

371.    The Exchange Act Defendants' adamant denials of the Anonymous Report's allegations and claims about the Company's "***robust internal control system***" were particularly egregious because following the publication of the Anonymous Report, Luckin's auditor dispatched an anti-fraud team to Luckin to investigate the claims in the Anonymous Report, and that team confirmed the fraud and prompted the Company's internal investigation.  Thus, the Exchange Act Defendants' denials lacked any basis in fact.

## VIII.   SUMMARY OF ADDITIONAL ALLEGATIONS REGARDING THE EXCHANGE ACT DEFENDANTS' SCIENTER

372.    As alleged in this Complaint, the Exchange Act Defendants acted with scienter throughout the Class Period in that each knew or recklessly disregarded that Luckin's publicly reported financial results, as well as other statements made in the Company's IPO and SPO Registration Statements, SEC filings, press releases, and conference calls, were false or misleading.  Defendants Lu, Qian, J. Liu, and Schakel, as directors or the most senior officers of the Company, are liable as direct participants in all of the wrongs complained of in this Complaint.  Because of their positions in the Company, as well as their stock ownership, they possessed the power and authority to control the contents of Luckin's public statements to the market.   In particular, the Exchange Act Defendants knew or recklessly disregarded that: (i) the adverse facts ultimately disclosed to the market regarding Luckin's deficient internal controls over financial

reporting, fabrication of revenue and expenses in violation of GAAP and SEC regulations, and undisclosed related-party transactions, had not been disclosed to, and were being actively concealed from, the investing public; and (ii) the public documents and statements issued and disseminated in the name of the Company were false or misleading.   By participating or acquiescing in the issuance or dissemination of these statements, the Exchange Act Defendants participated in the fraudulent scheme as primary violators of the federal securities laws.   In addition, numerous facts give rise to a strong inference that, throughout the Class Period, each of the Exchange Act Defendants acted with scienter.

### A.   Luckin's Admissions Establish the Exchange Act Defendants' Scienter

373.   Luckin has admitted several critical aspects of the Exchange Act Defendants' fraudulent scheme, including the direct knowledge or involvement of Defendants Lu, Qian, and J. Liu.  Luckin has admitted that it failed to disclose, *inter alia*: (i) the Company's massive fabricated transactions beginning in April 2019, which accounted *for nearly half its reported revenues during the second, third, and fourth quarters of 2019*; and (ii) overstatements of the Company's costs and expenses by as much as *32%* during this same period.

374.   Following its internal investigation, during which "the Special Committee and its advisors reviewed over 550,000 documents collected from over 60 custodians, interviewed over 60 witnesses, and performed extensive forensic accounting and data analytics testing," Luckin admitted that "*[e]vidence discovered to date demonstrates that the Company's former Chief Executive Officer, Ms. Jenny Zhiya Qian, former Chief Operating Officer, Mr. Jian Liu and certain employees reporting to them participated in the fabricated transactions and that the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties*."  The Company has directly implicated Defendant Lu in the Exchange Act Defendants' fraud based on

"documentary and other evidence" identified in the internal investigation, as well as "Lu's degree of cooperation."  In addition, according to reporting by the *Journal*, the Company's investigation determined that Defendant Lu "***knew—or should have known—about the fabricated transactions***" and "***found evidence that Mr. Lu had knowledge of certain related-party transactions that weren't properly disclosed***."

375.    Confirming the Company's admissions, reports from sources within the Company have also directly implicated Defendants Qian and Lu in the fraudulent scheme.  As the *Journal* reported, based on the accounts of persons with knowledge of the internal investigation and a review of internal Luckin documents, Defendant Qian approved supplier payments, and in some instances actively aided the progress of payments to more than a dozen companies with direct ties to Defendant Lu.  According to reporting by Caijing, as part of its investigation E&Y Hua Ming obtained emails involving Qian that included "***application for payments of fraudulent related transactions, setting up and coordinating related entities, and summaries of financial impacts of fraudulent transactions***."  As Caijing reported, "***[t]he review and approval of these email applications involved the highest level of management and CEO, Zhiya Qian***."

376.    Significantly, these payments bypassed Luckin's CFO, Schakel, since he did not oversee the Company's Finance and Treasury functions.  According to sources interviewed by the *Journal*, many of the companies that purportedly bought coffee vouchers also had direct ties to Defendant Lu.

377.    Luckin's admissions also establish Defendant Schakel's knowledge or, at the very least, recklessness.  As Luckin's CFO, Defendant Schakel was directly responsible for ensuring the effectiveness of Luckin's internal controls over financial reporting.  Despite the Exchange Act Defendants' repeated statements touting the Company's purported implementation of "a number

of measures to address the material weaknesses and deficiencies that have been identified," Luckin's admissions regarding the brazen fraud by Defendants Lu, Qian, and J. Liu establish that the Company's internal controls over financial reporting were so deficient as to be virtually nonexistent.  Indeed, Luckin has admitted that throughout the Class Period, it lacked any internal audit function to test and evaluate its control functions.

**B.     The Ongoing Investigations by Numerous Regulators Support an Inference of the Exchange Act Defendants' Scienter**

378.    The Exchange Act Defendants' fraudulent conduct has prompted investigations by regulatory agencies in the United States and China, including the SEC and China's CSRC, SAMR, and Ministry of Finance, and calls for tighter regulation of Chinese companies listed on U.S. exchanges.  The Company has admitted that it "has been cooperating with and responding to inquiries from regulatory agencies in both the United States and China."  Several of these regulators have publicly denounced the Exchange Act Defendants' conduct, while others have announced the imposition of fines and penalties and the possibility of additional civil and criminal investigations, including prosecution of Luckin's executives.  For example, the CSRC stated on April 3, 2020 that it "strongly condemns the company for committing accounting fraud."

379.    As reported by multiple media outlets, more than a dozen officers from the SAMR raided Luckin's headquarters in April.  The investigations by the SAMR and the Ministry of Finance reportedly obtained e-mails confirming that ***Defendant Lu gave direct orders to Luckin employees to commit accounting fraud***.

380.    On July 31, 2020, China's Ministry of Finance disclosed that its investigation had expanded to include ***twenty-three related entities*** and financial institutions, and announced that it would impose fines on two of Luckin's Chinese-registered subsidiaries.  Significantly, the Ministry of Finance independently confirmed the magnitude and fraudulent nature of the Exchange

Act Defendants' scheme, stating that "between April 2019 and December 2019, Luckin Coffee inflated its sales revenue," operating expenses and profit by "***engaging in fraudulent transactions of vouchers***."

381.    On September 22, 2020, the SAMR announced that its investigation had shown that "between April 2019 and December 2019, in order to gain advantage over its competitors and to win more business opportunities, ***with assistance from multiple third-party business entities, Luckin Company inflated its sales revenue, costs, profit and other key indicators of its business operations***."  Moreover, the SAMR determined that "from August 2019 to April 2020, [Luckin] ***widely publicized fraudulent data concerning its sales to defraud and mislead the general public***."  The SAMR concluded that "***43 third-party related business entities*** . . . ***aided and abetted Luckin in carrying out the misleading acts***" and imposed RMB61 million (US$8.6 million) in administrative sanctions on Luckin and each of these related entities.

**C.    The Exchange Act Defendants' Public Statements Regarding the Fraud Demonstrate Their Scienter**

382.    The Exchange Act Defendants' public statements following the revelation of their fraud are also strongly indicative of their scienter.  On April 5, 2020, Luckin issued a public statement on the Chinese micro-blogging platform Sina Weibo ("Weibo") apologizing for its fraud.  Specifically, Luckin stated that "[t]he company will also deeply reflect and repent, and strengthen our internal controls," and that it "will take all necessary remedial measures and we will not skirt any problems brought on by this matter."

383.    Similarly, on April 5, 2020, Defendant Lu publicly accepted responsibility for the massive fraud at Luckin, stating on Weibo that he was "***ashamed***" and "***accepted all questions and criticisms***."  Defendant Lu further stated that "***I personally blame myself***.  Regardless of the final findings of the independent committee, ***I will bear the responsibility that I ought to***."

Defendant Lu has gone on to make similar incriminating admissions.  For example, on May 20, 2020, Defendant Lu issued a statement on Weibo that he has "***been in deep pain and remorse***" concerning the fraud and that he "***can't sleep at night***." Defendant Lu acknowledged that his management "***style***" was responsible for the massive fraud at the center of the Company: "***My style may have been too aggressive*** and the company may have been growing too fast, ***which led to many problems***."

> **D.**     **The Exchange Act Defendants' Efforts to Conceal Their Fraud Further Support an Inference of Scienter**

384.    Throughout the Class Period, the Exchange Act Defendants sought to dispel any concerns about the accuracy of the Company's reported financial results or the sufficiency of its internal controls over financial reporting.  In both the IPO and SPO Registration Statements, the Exchange Act Defendants claimed that it was "***not clear what effect***" allegations "***of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and*** . . . ***allegations of fraud***" would have on the Company, and assured investors that they would "***strongly defend against***" allegations of this kind.  During Luckin's conference calls with investors, the Exchange Act Defendants also dismissed any questions about the Company's seemingly unstoppable growth.  For example, on November 13, 2019, Defendant Lu stated:

> I have been often asked whether we are doing too much and too fast.  I would say, ***no***.  In fact, ***this is a natural evolution of our business model***.  Since our inception, Luckin's growth has always been beyond everyone's expectations.  This is because our business model is entirely built on a technology, completely different from a traditional retailer.

385.    Following the release of the Anonymous Report, the Exchange Act Defendants doubled down on this false narrative.  In a press release signed by Defendant Schakel, the Exchange Act Defendants labeled the Anonymous Report "***flawed***," "***unsubstantiated***,"

"*unsupported*," "*false*," and "*malicious*," and re-affirmed the accuracy of Luckin's financial reporting and the effectiveness of its internal controls, claiming that "*the Company's key operating data . . . are tracked in real time and can be verified*," that Luckin had a "*robust internal control system*" and that it operated "*in strict compliance with these rigorous controls and is committed to ensure the integrity of its financial reporting*." These brazen denials, which were unquestionably false when made, demonstrate the Exchange Act Defendants' scienter.

386.    Former Luckin employees' accounts further support an inference of the Exchange Act Defendants' scienter. As multiple FEs stated, Luckin utilized an order system that allowed receipts to skip numbers, so that the receipt of one sold product did not sync consecutively with the receipt of the next sold product. As FE 1 explained, this system allowed Luckin to "increase the number of cups [of coffee] recorded as sold" and *allowed for inflated sales*. Similarly, FE 3 stated that the practice of skipping receipt numbers "*was related to efforts to try to inflate sales figures*" and that it was well known among store managers that Luckin was "*doing this [skipping numbers on receipts] to pump sales up*." In response to inquiries from store managers such as FE 3, Luckin assured its employees that these practices were "*normal*" and instructed them to tell the same to any customers that inquired about the practice.

387.    Moreover, multiple former employees described how Luckin closely guarded its key operating metrics. As a result, according to FE 5, individual stores "never had visibility on even their own sales revenue." Even among those working in Luckin's corporate offices, such as FE 4, all financial data was strictly firewalled and there was a separate, siloed unit that deals specifically with revenue and income that was only accessible to a few select high-level executives.

### E.   Defendant Lu's Attempts to Subvert the Internal Investigation Demonstrate His Scienter

388.   Defendant Lu's repeated attempts to subvert the internal investigation are also indicative of his scienter.   The Company cited Defendant Lu's "degree of cooperation in the Internal Investigation" as one of the grounds for his removal as Chairman.   Sources interviewed by the *Journal* revealed that Defendant Lu had "repeatedly not complied with requests by the special committee to interview him and gain access to his phone and laptop," which "delayed the company's efforts to complete and publish the results of its internal probe and release audited financial results for 2019."   Defendant Lu also successfully ousted two members of Luckin's Board, including Shao, who was overseeing the internal investigation, and replaced them with two directors nominated by Defendant Lu's own Haode.   As Luckin stated in a press release on June 26, 2020, Luckin's Board "resolved to recommend to shareholders to vote against the proposal to remove Mr. Sean Shao as an independent director of the Board, due to concerns of potential disruption to the ongoing internal investigation considering Mr. Shao currently serves as the chairman of the Special Committee of the Board."   Moreover, at the Company's July 5 Extraordinary Shareholder Meeting Defendant Lu overruled numerous shareholder objections concerning his conduct of the meeting, including his tallying of votes and classification of shares. This behavior strongly supports an inference of Defendant Lu's scienter.

### F.   The Termination or Ouster of Numerous Luckin Officers, Directors, and Employees Supports an Inference of the Exchange Act Defendants' Scienter

389.   The terminations and resignations of numerous Luckin executives and directors as the fraud unraveled strengthens the inference of the Exchange Act Defendants' scienter.   In light of the Special Committee's findings, the Board terminated Defendants Qian and J. Liu "based on evidence demonstrating their participation in the fabricated transactions."   The Company also terminated twelve other unnamed employees "who, at the direction of the former Chief Executive

Officer and former Chief Operating Officer, participated in, and/or had knowledge of, the fabricated transactions" and subjected fifteen other employees to disciplinary actions, including "employees implicated in the misconduct." Additionally, on April 30, 2020, He Gang, Luckin's Chief Technology Officer, who reported to Defendant Qian, resigned, roughly seven months after joining the Company.

390.   With respect to Defendant Lu, the Board sought his removal as a director and Chairman based on "documentary and other evidence" identified in the internal investigation. Although that attempt initially failed when the proposed removal did not garner the vote of at least two-thirds of the Board, Lu was ultimately ousted by a general shareholder vote at the July 5 Extraordinary Shareholder Meeting.

391.   In addition, no fewer than seven other members of Luckin's Board have resigned or been voted out since the details of the Exchange Act Defendants' fraud began to emerge. On April 21, 2020, Meier, who was a member of the Audit Committee, resigned as a Board member. On June 16, 2020, Tianruo Pu, who had just become a Board member on March 27, 2020, abruptly resigned due to "personal reasons." At the July 5, 2020 general meeting, in addition to Defendant Lu, Defendants Shao, Li, and E. Liu were removed as directors and were replaced by Zeng and Yang—directors nominated by Defendant Lu. Immediately following their appointment, however, on August 3, 2020, both Zeng and Yang notified the Board of their resignation, effective immediately, which Luckin announced in a press release on this date. In a separate press release issued on this date, Luckin announced an attempt to reinstate Shao by Lucky Cup Holdings Limited and Fortune Cup Holdings Limited—entities controlled by Defendant Li. Shao was ultimately reinstated on September 2, 2020. The musical chairs among Luckin's Board, including among

those overseeing the internal investigation, further supports an inference of the Exchange Act Defendants' scienter.

#### G.    The Exchange Act Defendants were Financially Motivated to Perpetrate Their Fraud on Investors

392.    The Exchange Act Defendants were also highly motivated to inflate the Company's ADS price and maintain the illusion of an exponentially growing company in order to enrich themselves.  At the time of IPO, Defendants Lu and Qian held 30.39% and 19.59% of Luckin's ordinary shares, respectively, while Lu's sister, Wong, held 12.34%.  Immediately after the IPO, the shares held by Lu, Qian, and Wong were redesignated as Class B shares, carrying ten times the voting rights of Class A shares, and subject to a 1:500 share split.  Lu and Qian held 25.75% and 16.6% of Luckin's ordinary shares, respectively, on an as-converted basis, while Wong held 10.46%.  Following the SPO, Defendant Lu held 39.12% of Class B shares, Defendant Qian held 25.22% of Class B shares, and Wong held 15.89% of Class B shares.  Together, through their ownership of Class B shares, Lu and Qian controlled 49.3% of aggregate voting power following the IPO, and over 60% of aggregate voting power following the SPO.

393.    Defendants Lu and Qian directly benefitted from the artificially inflated ADS price as a result of the $518 million Margin Loan Facility, in which Defendants Lu and Qian pledged 515,355,752 Luckin Class B ordinary shares and 95,445,000 Luckin Class A ordinary shares (convertible into ADSs) as collateral.  On April 6, 2020, Goldman Sachs, disposal agent for the lenders, disclosed that an entity controlled by Defendant Lu had defaulted on the Margin Loan Facility and that the lenders would be putting up for sale approximately 76.3 million of Luckin's ADSs, representing the collateral for the loan.  In other words, while the Company's ADSs were artificially inflated by the Exchange Act Defendants' fraud, Lu and Qian had cashed out by

pledging their inflated holdings as collateral for personal loans and then defaulted on their obligations.

394.    Similarly, during the Class Period, the Exchange Act Defendants used the false or misleading information about the Company's financial stability that was being disseminated to the market to raise over $1.5 billion in capital through the sale of ADSs in the IPO and SPO, as well as its sales of convertible notes.  In fact, because the Company's ADS price had grown over ***200%*** between the IPO in May 2019 and the SPO in January 2020 due to the continuing and escalating fraud, the Company priced the SPO at $42.00 per ADS, an increase of nearly 250% from the IPO price of $17.00 per ADS, just eight months earlier.  The Company was thus able to garner the significant proceeds from each of these offerings, including over $800 million in the SPO and Convertible Note offering alone (purportedly to develop its "unmanned retail" strategy), as a result of the Company's rising ADS price buoyed significantly by the fraudulent scheme and inflated quarterly results.

### H.    The Knowledge of Luckin's Senior Executives and Other Managerial Agents Is Imputed to Luckin

395.    By virtue of their high-level positions as the most senior officers of the Company, participation in and awareness of Luckin's day-to-day operations, and control over the issuance of the false or misleading statements alleged above in Section VII, the knowledge or recklessness of Defendants Lu, Qian, J. Liu, and Schakel concerning the Exchange Act Defendants' false or misleading statements is imputed to Luckin.  In addition, the knowledge or recklessness of other senior employees and managers concerning the Company's fabrication of revenue and expenses, deficient internal controls over financial reporting, and undisclosed related-party transactions is also imputed to Luckin.  Accordingly, by no later than April 2019, prior to the start of the Class

Period, Luckin knew about or recklessly disregarded its fabrication of revenue and expenses, deficient internal controls over financial reporting and undisclosed related-party transactions.

### I.      The Magnitude of the Exchange Act Defendants' Fraud Supports an Inference of Scienter

396.     As the Company has admitted, the Exchange Act Defendants' fabrication of revenue resulted in the overstatement of Luckin's reported net revenue by ***80-90%***, accounting for ***nearly half*** of Luckin's revenues during the second, third, and fourth quarters of 2019.   The Exchange Act Defendants' scheme also led to the overstatement of Luckin's reported operating expense by as much as ***32%***.   The magnitude and duration of the fraud is strongly indicative of scienter.   While the Company has directly implicated Defendants Lu, Qian, and J. Liu in the fabricated transactions, along with dozens of other employees, it is simply implausible that other high-ranking executives, including Defendant Schakel, did not know of or recklessly disregard the massive overstatement of Luckin's key financial metrics during the Class Period.

### J.      The Exchange Act Defendants' Fraud Concerned Luckin's Key Operating Metrics

397.     The Exchange Act Defendants' fraud involved inflating the Company's revenue and expenses by means of fabricated coffee transactions and fictitious supplier payments.   The metrics that the Exchange Act Defendants falsely portrayed to the market, including revenue and operating expenses, were so important to Luckin's business that knowledge regarding the true amount of these metrics can readily be attributed to the Exchange Act Defendants.   Indeed, in the IPO Registration Statement, the Exchange Act Defendants identified Luckin's ability "***to maintain [its] historical growth rates***" and the risk that Luckin "***may continue to experience significant net losses***" as the most significant risks facing the Company.

398.     The Exchange Act Defendants' own statements leave no doubt concerning their knowledge of the true amount of Luckin's revenue and operating expenses during the Class Period.

In the IPO Registration Statement, the Exchange Act Defendants represented that they "***measure [Luckin's] store performance with store level operating profit (loss)***," and identified net revenues and operating expenses as "***Key Components of Results of Operations***."  Throughout the Class Period, the Exchange Act Defendants specifically addressed Luckin's purported growth in revenue and expenses in their public statements to investors.  For example, the 2Q2019 Press Release touted Luckin's purported ***698%*** year-over-year growth in net revenues from products, and claimed that this growth was "***driven by a significant increase in transacting customers, an increase in the average number of items purchased by our transacting customers and higher effective selling prices***."  The 2Q2019 Press Release also claimed that the 243.9% year-over-year increase in Luckin's operating expenses was "***in line with business expansion***."

399.   The Exchange Act Defendants, including Qian and Schakel, repeated these claims during the August 14, 2019 conference call.  Similarly, the Exchange Act Defendants claimed in the 3Q2019 Press Release that Luckin's purported ***557.6%*** increase in net revenue from products was "***primarily driven by a significant increase in the number of transacting customers, an increase in effective selling price, and an increase in the number of products sold per transacting customer***."  The 3Q2019 Press Release also claimed that Luckin's 193.6% "***increase in operating expenses was the result of business expansion***."

400.   Confirming the Exchange Act Defendants' knowledge or reckless disregard of Luckin's true revenue and expenses, the Exchange Act Defendants represented in the February 3, 2020 press release that "***all the Company's key operating data, including the number of items per store per day, items per order and effective selling price, are tracked in real time and can be verified***."  The Exchange Act Defendants also represented that "***[a]ll the Company's orders are***

*tracked in real time*" and that "***Luckin Coffee performs a detailed review and cross check of its sales and marketing expenses with underlying evidence***."

## IX.    LOSS CAUSATION/ECONOMIC LOSS

401.    Class members were damaged as a result of the Exchange Act Defendants' fraudulent conduct as alleged in this Complaint.  During the Class Period, the Exchange Act Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations and omissions of material facts, trends, events, and uncertainties required to be disclosed, relating to, among other things, the Exchange Act Defendants': (i) fabrication of hundreds of millions of dollars in revenue and expenses beginning before the IPO; (ii) fraudulent transactions with numerous undisclosed related parties to facilitate its fabrication of revenue and expenses; (iii) deficient internal controls over financial reporting, including Luckin's lack of an internal audit function; and (iv) failure to disclose the terms of the Margin Loan Facility, including the risk that Defendants Lu and Qian would lose control of the Company in the event of a decline in Luckin's ADS price.

402.    As a direct result of the Exchange Act Defendants' scheme, misrepresentations of material fact, and omissions of material fact, Luckin's ADSs traded at artificially inflated prices throughout the Class Period.

403.    Unknowingly and in reliance upon the Exchange Act Defendants' materially false or misleading statements and omissions, Class Members purchased Luckin's ADSs at artificially inflated prices on the NASDAQ exchange.   But for the Exchange Act Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiffs and other Class members would not have purchased or otherwise acquired Luckin's ADSs at the artificially inflated prices at which the ADSs traded during the Class Period.

404.    The truth regarding the Exchange Act Defendants' fraud was revealed beginning on April 2, 2020.  Specifically, on Thursday, April 2, 2020, before the market's opening, Luckin shocked the market when it announced that, contrary to its recent denial of the allegations in the Anonymous Report, it had formed a Special Committee to investigate the Company's fabrication of revenues and expenses throughout 2019. The press release stated, among other things, that the Special Committee had determined that "***beginning in the second quarter of 2019, Mr. Jian Liu, the chief operating officer and a director of the Company, and several employees reporting to him, had engaged in certain misconduct, including fabricating certain transactions***."  The press release disclosed that "***the aggregate sales amount associated with the fabricated transactions from the second quarter of 2019 to the fourth quarter of 2019 amount to around RMB2.2 billion [US$310.6 million]***" and also that "***[c]ertain costs and expenses were also substantially inflated by fabricated transactions during this period***."   In light of the Company's admitted financial misconduct, Luckin told investors that they "***should no longer rely upon the Company's previous financial statements and earning releases***" for 2019 "***and other communications relating to these consolidated financial statements***."

405.    As the Company's April 2, 2020 admissions made clear, the Anonymous Report—which alleged that Luckin was "fabricating financial and operating numbers" since 3Q2019, and which the market had largely disregarded due to, among other things, Luckin's false statements denying the Anonymous Report's allegations—had ***vastly underestimated*** the magnitude of the Exchange Act Defendants' fraud. Indeed, Luckin's internal investigation revealed that the fabrication stretched back much further, to at least 2Q2019 (and possibly further) and was much more substantial than previously alleged by the Anonymous Report.

406.   Following the shocking April 2, 2020 disclosure by the Company, Luckin's ADSs collapsed, falling over **75%** from a closing price of $26.20 on April 1, 2020 to a closing price of $6.40 on April 2, 2020, wiping out billions of dollars of market capitalization.

407.   Analysts and market commentators were surprised by the revelation of Luckin's fraud, particularly in light of the Company's adamant denials of the allegations in the Anonymous Report only a month earlier.   For example, *Bloomberg* reported that "[t]he company's announcement that Chief Operating Officer Jian Liu and employees reporting to him engaged in misconduct ***casts doubt on the foundations of the Chinese coffee chain's meteoric rise and its emergence as a key competitor to Starbucks Corp***."   KeyBanc analyst Eric Gonzalez said that "***it will take several years for management to repair its credibility***."

408.   The Company's disclosure on April 2, 2020 partially corrected or reflected the materialization of risks concealed by their material misstatements and omissions of material facts, as alleged in this Complaint.   Over the following weeks, Luckin's ADS price continued its downward spiral, ultimately reaching a closing price of $1.38 on June 26, 2020, when Luckin announced that its ADSs would be permanently delisted from the NASDAQ exchange.

409.   On April 6, 2020, Goldman Sachs revealed that Defendants Lu and Qian had defaulted on $518 million in margin loans secured by Luckin shares, and that the lender banks were seeking to liquidate the entities which had pledged the shares in order to collect on Defendants Lu's and Qian's debts.  On this date, the price of Luckin's ADSs declined an additional **18%**, from a closing price of $5.38 on April 3, 2020 to their then lowest-ever price of $4.39 per ADS at close on April 6, 2020.  Moreover, on the morning of April 7, 2020, at 9:15 a.m. E.T., before markets opened, the NASDAQ halted trading in Luckin's ADSs.  NASDAQ's suspension of trading was accompanied by a "news pending" alert, which NASDAQ uses to denote that it was

expecting material news concerning the issuer to be released.  On April 9, 2020, NASDAQ revised its trade halt code to indicate that the trading halt was now pending a request for additional information from Luckin.

410.    On May 19, 2020, while trading in Luckin's ADSs was still suspended, Luckin announced that NASDAQ had served a notice on Luckin that its ADSs would be officially delisted from NASDAQ.  Luckin's press release directly attributed NASDAQ's decision to "***public interest concerns as raised by the fabricated transactions disclosed by the Company in a Form 6-K on April 2, 2020,***" *and* "***the Company's past failure to publicly disclose material information, citing a business model through which the previously disclosed fabricated transactions were executed***."  Luckin's press release asserted that it would appeal NASDAQ's decision and request a hearing.

411.    On May 20, 2020, following a six-week hiatus, NASDAQ allowed trading in Luckin ADSs to resume pending the hearing requested by Luckin.

412.    Luckin's ADS price immediately declined an additional ***35.7%*** from the closing price of $4.39 on April 6, 2020, before trading was initially halted on April 7, 2020, reaching an all-time low of $2.82 per ADS at close on May 20, 2020.  Also on May 20, 2020, Defendant Lu issued a statement on WeChat in which he claimed that Luckin had "dealt with the relevant responsible persons, reorganized the board of directors, updated the management and actively carried out the rectification and reform as soon as possible according to the latest periodic investigation results."  He expressed surprise at NASDAQ's decision to delist the Company "without waiting for the final investigation results, which was unexpected, and I am deeply disappointed and regretful."

413.    On June 19, 2020, Luckin announced that it would hold an extraordinary general meeting on July 5, 2020 in order for shareholders to vote on resolutions to oust several members of Luckin's Board, including Defendants Lu, Shao, Li, and E. Liu.  On June 20, 2020, the *Journal* reported that "[p]eople familiar with the company said even though the meeting would oust Mr. Lu, it ***appeared to be an attempt by the chairman to hang on to control and frustrate an internal investigation into the fake sales***."  Significantly, Lu sought to replace Shao, who was overseeing the Company's internal investigation, with two new directors nominated by Lu's Haode, Zeng and Yang.  Moreover, the *Journal* reported that "***Lu has repeatedly not complied with requests by the special committee to interview him and gain access to his phone and laptop***," which "***has delayed the company's efforts to complete and publish the results of its internal probe and release audited financial results for 2019***."  On June 22, 2020, Luckin's ADS price declined an additional ***19.6%*** from a closing price of $3.96 on June 18, 2020, to a closing price of $3.18 on June 22, 2020.

414.    As a further consequence of its inability to complete and publish the results of its internal probe and release its audited financial results, on June 23, 2020, Luckin announced that it had received a second notice from NASDAQ and that its ADSs would be delisted due to its failure to file its Form 20-F Annual Report for 2019 and complete its investigation, rendering any appeal of NASDAQ's earlier determination to delist Luckin doomed. Luckin's ADS price declined an additional ***12.26%*** from a closing price of $3.18 on June 22, 2020 to a closing price of $2.79 on June 23, 2020.

415.    Finally, on June 26, 2020, Luckin announced that it had notified NASDAQ's listing qualifications Staff on June 24, 2020 that it would no longer be seeking an appeal of the NASDAQ decision to delist the Company's ADSs and that trading in its ADSs would be suspended at market open on June 29, 2020.  On this date, Luckin's ADS price declined an additional ***54%*** from a

closing price of $3.00 on June 25, 2020 to a closing price of $1.38 on June 26.  Trading in Luckin's ADSs was suspended on June 29, 2020.

416.    The declines in Luckin's ADS price between April 2, 2020 and June 26, 2020 are directly attributable to the market absorbing information that corrected, or reflected the materialization of risks concealed by, the Exchange Act Defendants' material misrepresentations or omissions.

417.    Plaintiffs and other Class members suffered economic losses as the price of Luckin's ADSs fell in response to the disclosure of new information concealed by the Exchange Act Defendants' misstatements and omissions on these dates.  These price declines were a direct result of the materially false or misleading statements and omissions alleged in this Complaint.  It was foreseeable that these disclosures would cause Luckin's ADS price to decline.  Thus, the Exchange Act Defendants' wrongful conduct, as alleged in this Complaint, directly and proximately caused the damages suffered by Plaintiffs and other Class members.

## X.    PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

418.    At all relevant times, the market for Luckin's ADSs was an efficient market for the following reasons, among others:

a.    Luckin's ADSs met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market, under the ticker symbol "LK";

b.    As a regulated issuer, Luckin filed periodic public reports with the SEC;

c.    Luckin regularly and publicly communicated with investors via established market communication mechanisms, including through quarterly investor and analyst conference calls, regular dissemination of press releases on the national circuits of

major newswire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.   Luckin was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

419.   As a result of the foregoing, the market for Luckin's ADSs promptly digested current information regarding Luckin from all publicly available sources and reflected that information in the price of Luckin ADSs.  Under these circumstances, all purchasers of Luckin's ADSs during the Class Period suffered similar injury through their purchase of Luckin's ADSs at artificially inflated prices, and the presumption of reliance applies.

420.   Further, at all relevant times, Plaintiffs and all other members of the Class reasonably relied upon the Exchange Act Defendants to disclose material information as required by law and in the Company's SEC filings.  Plaintiffs and the other members of the Class would not have purchased or otherwise acquired Luckin's ADSs at artificially inflated prices if these Defendants had disclosed all material information as required.  Thus, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972).

## XI.   THE STATUTORY SAFE HARBOR AND BESPEAKS-CAUTION DOCTRINE ARE INAPPLICABLE

421.    The PSLRA's statutory safe harbor or the bespeaks-caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged in this Complaint.

422.    None of the statements complained of in this Complaint was a forward-looking statement.

423.    Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

424.    To the extent that any materially false or misleading statement or portion of a statement alleged in this Complaint can be construed as forward-looking, the statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.  As alleged above in detail, given the then-existing facts contradicting the Exchange Act Defendants' statements, the generalized risk disclosures made by these Exchange Act Defendants were not sufficient to insulate them from liability for their materially false or misleading statements.

425.    To the extent that the statutory safe harbor may apply to any materially false or misleading statement or portion of a statement alleged in this Complaint, the Exchange Act Defendants are liable for the false or misleading forward-looking statement because at the time the statement was made, the speaker actually knew that the statement was false or misleading, or the statement was authorized or approved by an executive officer of Luckin who actually knew that the statement was false or misleading.

426.    Moreover, to the extent that Luckin or the other Exchange Act Defendants issued any disclosures purporting to warn or caution investors of certain "risks," those disclosures were

also materially false or misleading because they did not disclose that the risks that were the subject of the warnings had materialized, or Luckin and the other Exchange Act Defendants had actual knowledge of undisclosed material adverse facts that rendered the purportedly cautionary disclosures materially false or misleading.

## XII.    CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT I
**Violation of Section 10(b) of the Exchange Act And SEC Rule 10b-5
Promulgated Thereunder Against the Exchange Act Defendants**

427.    Plaintiffs incorporate ¶¶ 61-426 by reference.   During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that the statements contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, thereby violating Section 10(b) of the Exchange Act and SEC Rule 10b-5.

428.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Luckin ADSs.  Plaintiffs and the Class would not have purchased Luckin ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.  Plaintiffs and other Class members suffered actual economic loss and were damaged when the trading price of Luckin ADSs declined upon the public disclosure of new information correcting the Exchange Act Defendants' misrepresentations and omissions regarding Luckin's: (i) fabrication of revenue and expenses; (ii) reliance on undisclosed related-party transactions to facilitate its fabrication of revenue and expenses; (iii) internal controls over financial reporting; (iv) compliance with GAAP; and (iv) purported risk disclosures.

429.    This claim is brought within the applicable statute of limitations.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against the Executive Defendants**

430.     Plaintiffs incorporate ¶¶ 61-426 by reference.  During their tenures as officers of Luckin, the Executive Defendants were controlling persons of Luckin within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and directors of Luckin, the Executive Defendants had the power and authority to cause Luckin to engage in the conduct complained of in this Complaint.  The Executive Defendants were able to, and did, control, directly and indirectly, the decision-making of Luckin, including the content and dissemination of Luckin's public statements and filings described in this Complaint, and they caused the dissemination of the materially false or misleading statements and omissions as alleged in this Complaint.

431.     In their capacities as senior corporate officers and directors of Luckin, and as more fully described above, the Executive Defendants participated in the misstatements and omissions alleged above.  Indeed, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and had access to non-public information regarding Luckin's revenue, expenses, related-party transactions, internal controls over financial reporting, and compliance with GAAP.  The Executive Defendants had the ability to influence and direct and did influence and direct the activities of the Company and its employees in their violations of § 10(b) of the Exchange Act and SEC Rule 10b-5.

432.     As a result, the Executive Defendants, individually and as a group, were control persons within the meaning of § 20(a) of the Exchange Act.

433.     As alleged above, Luckin violated §10(b) of the Exchange Act.  By virtue of their positions as controlling persons, the Executive Defendants are liable under § 20(a) of the Exchange

Act, jointly and severally with, and to the same extent as Luckin is liable to Plaintiffs and the other members of the Class.

434.    This claim is brought within the applicable statute of limitations.

## XIII.   DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT

435.    In this part of the Complaint, Plaintiffs assert a series of strict-liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act on behalf of all persons or entities who purchased or otherwise acquired Luckin ADSs in or traceable to the offerings and pursuant to the registration statements.

436.    The Securities Act claims are asserted against the Company, the Executive Defendants who signed the registration statements, the Director Defendants, and the Underwriter Defendants.  Each of these Defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements contained in the registration statements and accompanying prospectuses.   Additionally, Section 12(a)(2) claims are asserted against the Underwriter Defendants who sold shares in the Offerings on behalf of Class members who purchased ADSs in the Offerings.  Plaintiffs also assert control person liability under Section 15 of the Securities Act against various principals of Luckin, including certain of its executives and directors at the times of the offerings.

437.    The Securities Act claims are based on the fact that the IPO and SPO Registration Statements contained untrue statements of material fact and omitted material facts about the Company's business and operations, including misrepresentations and omissions regarding, among other things: (i) Luckin's compliance with laws and regulations, GAAP, and internal controls over financial reporting; (ii) the reasons for Luckin's increased earnings and growth leading up to the IPO and between the IPO and the SPO; (iii) Luckin's reported revenues and expenses; (iv) Luckin's related-party transactions; and (v) the terms of the Margin Loan Facility.

438.    As described below, the Securities Act claims against Luckin and the Executive Defendants are premised upon their direct participation in the Company's GAAP violations, including its overstatement of the Company's revenues, costs, and key operating metrics before the IPO and through the date of the SPO and undisclosed related-party transactions, which, among other undisclosed facts, rendered materially untrue and incomplete the statements contained in the IPO and SPO Registration Statements.

439.    The Securities Act claims against the Underwriter Defendants and the Director Defendants are premised upon their negligent failure to conduct a reasonable due-diligence investigation into the accuracy and completeness of the representations contained in the IPO and SPO Registration Statements.  Had the Underwriter Defendants and the Director Defendants not acted negligently, and had they conducted reasonable due-diligence investigations before the offerings, they would have uncovered that the IPO and SPO Registration Statements contained untrue statements of fact and omitted material facts.

440.    With respect to the Underwriter Defendants and the Director Defendants, Plaintiffs' Securities Act claims are not based on any knowing or reckless misconduct on the part of these Defendants.  Thus, for purposes of the liability of these Defendants, named in Counts III-V, Plaintiffs' claims do not sound in fraud, and Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims.

A.    **Luckin's IPO and SPO**

1.    **Luckin's Rapid Early Growth**

441.    Luckin, which was founded in June 2017, engages in the retail sale of freshly brewed beverages and non-coffee drinks, and pre-made food and beverage items.  The Company

employs a "technology-driven new retail model" centered on its mobile app, which it uses to send vouchers and coupons for free or discount coffee to tens of millions of people.

442.     Luckin opened its first trial store in Beijing in June 2017, and over the next eighteen months, it reported explosive growth.  According to the Company, by the end of 2018, it had opened 2,370 additional stores in twenty-eight cities in China, and had over 16.8 million cumulative transacting customers.  Luckin's number of stores, number of transacting customers, and net revenues all purportedly grew at an exponential pace between 2017 and 2018.  As reported at the time of the IPO, Luckin claimed that the number of its stores grew from nine stores in the fourth quarter of 2017 to 2,073 stores in the fourth quarter of 2018.  Luckin claimed that the cumulative number of transacting customers grew from a mere 11,000 customers in the fourth quarter of 2017 to over 12.5 million customers in the fourth quarter of 2018.  Luckin also claimed that its total net revenues grew ***336,000%*** in 2018, from only RMB250,000 (US$35,302) in 2017 to RMB840.7 million (US$118.7 million) in 2018.  Indeed, Luckin reported that it generated over ***half*** of its 2018 total net revenues, or RMB465.4 million (US$65.7 million), in the fourth quarter of 2018 alone.

443.     Despite Luckin's rapid growth, the Company operated at a net loss throughout 2017 and 2018.  To fund its operations, the Company relied primarily on private investment.  Between June 2017 and April 2019, Luckin raised over $563 million from private investors, including CICC, BlackRock, and one of Singapore's sovereign wealth funds, among others.  Despite operating at a consistent loss, one year after its founding, in June 2018, Luckin raised $200 million from these private investors based on a ***billion-dollar*** valuation.  By November 2018, when Luckin raised an additional $200 million, its valuation had soared to ***$2.2 billion***.  Five months later, in

April 2019, Luckin raised an additional $150 million (including a $125 million investment from BlackRock)—this time based on a valuation of ***$2.9 billion***.

444.    The Company assured the market that its consistent losses were part of a deliberate strategy to win market share from competitors like Starbucks.   Luckin and the Executive Defendants told the market that the Company's rapid expansion and its decision "to invest heavily in offering discounts and deals and other aspects of [its] business, especially sales and marketing expenses," were part of a concerted effort to "increase [Luckin's] brand awareness, expand [its] customer base and store network," and ultimately increase the Company's share of China's freshly brewed coffee market.  As Luckin stated at the time of its $200 million Series B funding round in December 2018, Luckin's "chief strategy is to quickly grab market share through subsidies, so losses are expected."

445.    During a January 3, 2019 presentation in Beijing, the Company announced plans to open 2,500 new stores in 2019, which would give it "over 4,500 stores by the end of 2019." Luckin's aggressive growth target was part of an effort to overtake Starbucks as the biggest coffee chain in China by the end of 2019.  Defendant Qian touted that Luckin had purportedly sold 89.6 million cups of coffee by the end of 2018, and that its total customers exceeded 12.5 million. Rebuffing concerns about Luckin's heavy operating losses, Defendant Qian reiterated that such losses were part of a larger strategy to gain market share: "A large amount of money spent in marketing is extremely beneficial for rapid acquisition of customers, this is our strategy of winning recognition and market share, and we believe it is more than worthwhile to do so."

## 2.    Luckin's Growth Stalls Immediately Before the IPO

446.    During the first quarter of 2019, Luckin opened just 297 stores—less than half of the 625 openings it needed to be on pace to hit its 2,500-store target for 2019.  Luckin's total net revenue growth rate also slowed dramatically in the first quarter of 2019.  While the Company had

experienced a 93.3% sequential increase in total net revenues during the fourth quarter of 2018, its revenues grew by just 2.8% during the first quarter of 2019. Moreover, its sequential growth in cumulative transacting customers declined from 6.5 million in 4Q2018 to 4.3 million in 1Q2019.

447. Notwithstanding this slowdown in Luckin's growth, the Company continued to publicly tout itself as "China's second largest and fastest growing coffee network, in terms of number of stores and cups of coffee sold." Luckin explained that the Company's reduced growth during the first quarter of 2019 was due to seasonal factors: "We experience seasonality in our business, primarily as a result of orders fluctuations in holiday seasons. For example, we generally experience fewer purchase orders during Chinese New Year holidays which fall between late January and late February." Since Luckin had yet to report year-over-year financial results, investors had no way to verify the Company's explanation for its slowing growth.

### 3. Luckin Conducts Its IPO, Raising $651 million from Public Investors

448. On April 22, 2019, Luckin filed with the SEC a preliminary version of the registration statement on Form F-1 for its IPO, which was subsequently amended on May 6, 2019 on Form F-1/A. On May 17, 2019, Luckin filed a Form 424(B)(4) Prospectus, which offered 33 million ADSs to investors at a price of $17.00 per ADS. Each ADS represented eight of Luckin's Class A ordinary shares.

449. As part of the IPO, Luckin granted the Underwriters a thirty-day option to purchase an additional 4.95 million ADSs from the Company at the IPO price. Subsequently, the Underwriter Defendants exercised their option to purchase an additional 4.95 million ADSs issued for over-allotments, which they sold in full. In total, the IPO generated approximately $651 million in gross proceeds for the Company.

450. The IPO was made through an underwriting syndicate led by Credit Suisse, Morgan Stanley, CICC, and Haitong as the joint book-running managers, while KeyBanc and Needham

acted as co-managers.  Credit Suisse underwrote 61% of the ADSs offered in the IPO.  Morgan Stanley, which underwrote the second-largest number of ADSs, underwrote 15%.  In total, the Underwriter Defendants received fees of approximately $35.84 million from Luckin's IPO.

451.    The IPO Registration Statement was signed by Defendants Lu, Qian, J. Liu, Schakel, Guo, Li, and E. Liu.  Defendants Shao and Meier each filed a letter of consent that was attached as an exhibit to the IPO Registration Statement that consented to the references to their names in the Form F-1 and any amendments to the Form F-1, and also indicated that Shao and Meier had accepted the nomination to become directors of the Company immediately upon the SEC's declaration of effectiveness of the IPO Registration Statement.

452.    The IPO Registration Statement touted Luckin's purportedly disruptive business model, internal controls and procedures, management systems, and accounting and auditing procedures and policies.  For example, the IPO Registration Statement claimed that Luckin had "pioneered a technology-driven new retail model to provide coffee and other products with high quality, high affordability and high convenience to our customers," and that this "disruptive model has fulfilled the large unmet demand for coffee and driven its mass market consumption in China, while allowing [the Company] to achieve significant scale and growth since our inception."

453.    The IPO Registration Statement touted Luckin's purported exponential growth in the year preceding the IPO:

| | For the three months ended, | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2017 | March 31, 2018 | June 30, 2018 | September 30, 2018 | December 31, 2018 | March 31, 2019 |
| Number of stores at the beginning of the period | 0 | 9 | 290 | 624 | 1,189 | 2,073 |
| Number of stores at the end of the period | 9 | 290 | 624 | 1,189 | 2,073 | 2,370 |
| **Net increase in the number of stores** | **9** | **281** | **334** | **565** | **884** | **297** |

| | For the three months ended or as of | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | December 31, 2017 | March 31, 2018 | June 30, 2018 | September 30, 2018 | December 31, 2018 | March 31, 2019 |
| **Total stores** | **9** | **290** | **624** | **1,189** | **2,073** | **2,370** |
| Pick-up stores | 4 | 83 | 356 | 903 | 1,811 | 2,163 |
| Relax stores | 5 | 15 | 22 | 45 | 86 | 109 |
| Delivery kitchens | 0 | 192 | 246 | 241 | 176 | 98 |
| **Cumulative number of transacting customers (in thousands)[1]** | **11.1** | **485.0** | **2,917.8** | **5,984.3** | **12,529.5** | **16,872.3** |
| **Average monthly transacting customers (in thousands)[2]** | **4.0** | **179.5** | **1,207.6** | **1,877.4** | **4,325.9** | **4,402.0** |
| **Average monthly total items sold (in thousands)[3]** | **8.6** | **487.5** | **4,001.0** | **7,760.3** | **17,645.1** | **16,275.8** |
| Freshly brewed drinks | 8.0 | 451.7 | 3,743.7 | 6,220.4 | 13,418.8 | 13,077.2 |
| Other products | 0.5 | 35.8 | 257.3 | 1,539.9 | 4,226.4 | 3,198.6 |

454.    The IPO Registration Statement also touted Luckin's purported exponential growth in net revenues:

| | Period from the inception date to December 31, | | For the year ended December 31, | | | For the three months ended March 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2017 | | 2018 | | | 2018 | | 2019 | | |
| | RMB | % | RMB | US$ | % | RMB | % | RMB | US$ | % |
| | | | | (in thousands, except for percentages) | | | | | | |
| **Net revenues:** | | | | | | | | | | |
| Freshly brewed drinks | 215 | 86.0% | 649,609 | 96,795 | 77.3% | 9,575 | 73.9% | 361,095 | 53,805 | 75.4% |
| Other products | 25 | 10.0% | 135,642 | 20,211 | 16.1% | 1,403 | 10.8% | 83,980 | 12,513 | 17.6% |
| Others | 10 | 4.0% | 55,444 | 8,261 | 6.6% | 1,976 | 15.3% | 33,435 | 4,982 | 7.0% |
| **Total net revenues** | **250** | **100.0%** | **840,695** | **125,267** | **100.0%** | **12,954** | **100.0%** | **478,510** | **71,300** | **100.0%** |

455.    The IPO Registration Statement claimed that Luckin's "*revenue growth is mainly driven by [its] ability to attract new customers and actively engage existing customers*," and attributed the Company's ability to attract and retain customers to its "*new retail model . . . built upon [its] mobile apps and store network*."  Luckin also touted that its store-level operating loss was purportedly rapidly declining due to its *technology-driven new retail business*."

456.    Luckin also touted that it had "*invested significantly in branding, sales and marketing to acquire and retain customers since [the Company's] inception*."  Among these purported investments, the IPO Registration Statement stated that the Company offered "*various discount offers and deals in the form of vouchers and coupons*" and "*regularly offer[ed] coupons and vouchers to increase [Luckin's] customer base, retain [its] existing customers or promote new products*."  The IPO Registration Statement specifically highlighted the Company's

introduction of bulk corporate promotions, stating that Luckin had "***opened [its] application programming interface to corporations with membership programs, where the corporations pay for [Luckin's] products in bulk in advance, and their members can then redeem these products***."

457.    The IPO Registration Statement included representations concerning the Company's purported internal controls over financial reporting, compliance with GAAP and other purported risk disclosures.  For example, the IPO Registration Statement represented to investors that the Company's financial statements and disclosures were "***prepared and presented in accordance with U.S. GAAP***" and that the Company's consolidated financial statements "***include[d] all adjustments*** . . . ***that we consider necessary for a fair representation of our operating results for the quarters presented***."    Although the Company disclosed material weaknesses identified during its audit of its 2018 financial statements, including the "lack of sufficient accounting and financial reporting personnel with requisite knowledge and experience in application [of U.S. GAAP and SEC] rules" and the "lack of financial reporting policies and procedures that are commensurate with [U.S. GAAP and SEC] reporting requirements," the IPO Registration Statement represented that the Company was "***in the process of implementing a number of measures to address the material weaknesses and deficiencies that have been identified***."

458.    In particular, Defendants claimed that Luckin was in the process of:

(i) hiring additional accounting and financial reporting personnel with U.S. GAAP and SEC reporting experience, (ii) expanding the capabilities of existing accounting and financial reporting personnel through continuous training and education in the accounting and reporting requirements under U.S. GAAP, and SEC rules and regulations, (iii) developing, communicating and implementing an accounting policy manual for our accounting and financial reporting personnel for recurring transactions and period-end closing processes, and (iv) ***establishing effective monitoring and oversight controls for non-recurring and complex transactions to ensure the accuracy and completeness of our company's consolidated financial statements and related disclosures***.

459.    The IPO Registration Statement included operating data and audited consolidated financial data for the periods of June 16, 2017 through December 31, 2017, and the year ended December 31, 2018, and operating data and unaudited quarterly financial data for the four quarters of 2018 and three months ended March 31, 2019.  Significantly, Luckin's auditor, E&Y Hua Ming expressly disclaimed any "opinion on the effectiveness of the Company's internal control over financial reporting" in its audit opinion letter to Luckin's Board of Directors filed in connection with the IPO Registration Statement.

### 4.    Luckin's Growth Purportedly Accelerates in 2Q2019 and 3Q2019

460.    Following the IPO, Luckin's claims about its "disruptive" business model and rapid growth appeared to prove accurate.  On August 14, 2019, Luckin published a press release that purported to announce results for 2Q2019, the period ended June 30, 2019, during which the IPO had occurred.  Luckin claimed that its net revenues from products had skyrocketed by over *698%* year-over-year, and that it had added 5.9 million new customers during 2Q2019 alone.  The 2Q2019 Press Release was replete with claims regarding Luckin's seemingly spectacular growth during the quarter.  For example, Luckin claimed that "[a]verage monthly transacting customers in the quarter were 6.2 million, representing an increase of *410.6%* from 1.2 million in the second quarter of 2018," and that "[a]verage monthly total items sold in the quarter were 27.6 million, representing an increase of *589.7%* from 4.0 million in the second quarter of 2018."  The 2Q2019 Press Release also stated that despite Luckin's rapid growth, its store-level operating loss in the quarter decreased by *31%*.

461.    Luckin attributed its meteoric revenue growth to increased demand and operational efficiency driven by Luckin's technology-centered business model.  For example, the 2Q2019 Press Release quoted Qian as stating that "we have substantially reduced our store operating loss as a percentage of net revenues *as a result of benefits of scale and increased bargaining power,*

*operating efficiency from technology, and higher store throughput*, and we are on track to reach our store level break-even point during the third quarter of 2019." Qian also claimed that "[t]otal net revenues from products sold increased 698.4% year-over-year, *driven by a significant increase in transacting customers, an increase in the average number of items purchased by our transacting customers and higher effective selling prices*," and that "*this is the result of our distinguished value proposition of delivering our customers high quality, high convenience and high affordability*." The 2Q2019 Press Release further represented that Luckin's "[t]otal operating expenses were RMB1,598.8 million (US$232.9 million), representing an increase of 243.9% from RMB465.0 million in the second quarter of 2018." Luckin claimed that the increase in operating expenses was "*in line with business expansion*."

462.   Following the Company's announcement of its purported 2Q2019 financial results, numerous analysts issued glowing reports about Luckin's prospects. For example, a report from Red Pulse dated August 15, 2019 highlighted the Company's purported 698% revenue increase and described Luckin's reported 2Q2019 results as "a step closer to store-level break even." Similarly, an October 8, 2019 report from Zephirin adjusted its 3Q2019 model upward, stating "we are forecasting total revenues of $219.9 million up from previous estimates of $198.8," and noting the Company's "**growth prospects and large upside opportunities**." (emphasis in original).

463.   Luckin's growth seemed unstoppable. On November 13, 2019, Luckin issued a press release that purported to announce Luckin's financial results for 3Q2019, the period ended September 30, 2019. Luckin claimed that net revenues *exceeded* the high end of Luckin's guidance, stating that "[t]otal net revenues from products in the quarter were RMB1,493.2 million (US$208.9 million), representing an increase of *557.6%* from RMB227.1 million in the same

quarter of 2018." Luckin further represented that "[a]verage monthly total items sold in the quarter were 44.2 million, representing an increase of *470.1%* from 7.8 million in the third quarter of 2018," "[a]verage total net revenues from products per store in the quarter were RMB449.6 thousand (US$62.9 thousand), representing an increase of *79.5%* from RMB250.5 thousand in the same quarter of 2018," and "[s]tore level operating profit in the quarter was *RMB186.3 million (US$26.1 million)*, or 12.5% of net revenues from products, *compared to a loss of RMB126.0 million in the third quarter of 2018*." Once again, Luckin explained its revenue growth as being "*primarily driven by a significant increase in the number of transacting customers, an increase in effective selling price, and an increase in the number of products sold per transacting customer*."

464. With respect to operating expenses, Luckin claimed in the 3Q2019 Press Release that "[t]otal operating expenses were RMB2,132.5 million (US$298.3 million), representing an increase of 193.6% from RMB726.4 million in the third quarter of 2018." Luckin again represented that "*[t]he increase in operating expenses was the result of business expansion*."

465. Analysts and media outlets were universally upbeat regarding Luckin's 3Q2019 results. A Zephirin report on November 15, 2019 stated that "[t]he Q319 results were as strong as we and investors expected" and that "[w]e believe that management deserves full credit in continuing to quickly build out the LK brand with the new retail model partnerships." A follow-up Zephirin report, issued on November 25, 2019, stated that the Company had an "Attractive Valuation," noting "'hyper growth' that is expected by year-end." On November 21, 2019, a report from China Tonghai Securities stated that Luckin "has disrupted China's freshly brewed coffee market by leveraging its innovative New Retail business model to optimize operating efficiencies and fuel its rapid expansion," and declared that the Company purportedly "has accumulated a loyal

corporate customer base of 30.7 million cumulative transacting users (3Q19) through offering highly convenient user experience at competitive prices." The positive recommendations kept coming.  Immediately before Luckin's SPO, TH Data Capital stated in a January 6, 2020 report that "[w]e are positive on LK's 4Q19E operations," noting in its headline that, "Continuing Expansion In Stores and Customer Spending Drive Better Financials."

### 5.    Luckin Conducts its SPO, Raising an Additional $643 Million from Investors

466.    Between the May 2019 IPO and mid-January 2020, the price of Luckin's ADSs increased over ***200%***, driven by Luckin's reported increasing growth and financial performance. In early January 2020, multiple news outlets reported that Luckin had finally surpassed its rival Starbucks in number of locations in China.

467.    On January 10, 2020, Luckin conducted the SPO pursuant to a registration statement on Form F-1 and accompanying prospectus, pursuant to which an aggregate of 13.8 million ADSs, each representing eight Class A ordinary shares of the Company, were offered and sold to the public at $42.00 per ADS.  As part of the SPO, "Lucky Cup Holdings Limited, a Cayman Islands company wholly owned by Centurium Capital Partners 2018, L.P. and ultimately controlled by" Defendant Li, offered and sold 4.8 million ADSs.  The Company and Li also granted the Underwriter Defendants a thirty-day option to purchase up to 2.07 million additional ADSs. The SPO generated approximately $643 million in gross proceeds for the Company and Li.

468.    The January 7, 2020 Form F-1 Registration Statement was signed by Defendants Lu, Qian, J. Liu, Schakel, Guo, Li, E. Liu, Shao, and Meier.

469.    As in the case of the IPO, the SPO was made through an underwriting syndicate led by Credit Suisse, Morgan Stanley, CICC, and Haitong as the joint book-running managers, while KeyBanc and Needham acted as co-managers.  Credit Suisse underwrote 60% of the ADSs offered

in the SPO.  Morgan Stanley and CICC, which underwrote the second largest number of ADSs, both underwrote 12.5%.  The Underwriter Defendants received fees of at least $23.329 million for the SPO.

470.    Lead Plaintiff Louisiana Sheriffs purchased 22,400 ADSs from Credit Suisse in the SPO at $42.00 per ADS, which were issued pursuant to the SPO Registration Statement.  As usual for a purchase directly in a public offering, no commission was charged for this purchase.

471.    The SPO Registration Statement included representations concerning the Company's purported internal controls over financial reporting, compliance with GAAP, and other purported risk disclosures.  As with the IPO Registration Statement, Luckin made numerous claims about its business in the SPO Registration Statement.  For example, Luckin claimed that it "ha[d] pioneered a technology-driven new retail model" and touted that Luckin's "disruptive model has fulfilled the large unmet demand for coffee and driven its mass market consumption in China, while allowing [it] to achieve significant scale and growth since [its] inception."  The SPO Registration Statement attributed Luckin's rapid growth to its "centralized technology system," which the SPO Registration Statement claimed enabled Luckin "to simplify and standardize [its] operations, which allows [it] to improve operational efficiency and quickly expand and scale up [its] business."

472.    The SPO Registration Statement included Luckin's consolidated financial statements for the years ended December 31, 2017 and 2018, as well as the Company's unaudited interim condensed consolidated statements of comprehensive loss and cash flow for the nine months ended September 30, 2018 and 2019, and unaudited interim condensed consolidated balance sheet as of September 30, 2019.  The Company attested that these consolidated financial statements were "***prepared and presented in accordance with U.S. GAAP***."

473.     According to the SPO Registration Statement, Luckin's "net revenues were RMB2,929.2 million (US$409.8 million) in the nine months ended September 30, 2019, increased by ***680.6%*** from RMB375.3 million in the nine months ended September 30, 2018." Luckin stated that ***"[t]he growth of [Luckin's] net revenues was primarily driven by the significant increase in the number of [its] transacting customers, effective selling prices and purchasing frequency per customer***." Luckin also emphasized its purported decrease in net loss, stating that it "recorded a net loss of RMB1,764.9 million (US$246.9 million) in the nine months ended September 30, 2019, compared to a net loss of RMB950.2 million in the nine months ended September 30, 2018."

### B.     Unbeknownst to Investors, Luckin's Revenues and Expenses Were Materially Inflated Throughout 2019

474.     According to the Company's own admissions, the findings of numerous regulators, and various media reports, by the time of the IPO, Luckin and its most senior executives, including Defendants Lu, Qian, and J. Liu, had begun inflating Luckin's sales, costs, and expenses through extensive fabricated transactions. As the Company has admitted, "***the fabrication of transactions began in April 2019***" and, as a result of the fabricated transactions, Luckin's net revenues were overstated by ***80-90%***, accounting for ***nearly half*** of Luckin's revenues during the second, third, and fourth quarters of 2019:

| Quarter | Reported Net Revenue from Products | Actual Net Revenue from Products | % Overstatement |
|---|---|---|---|
| **2Q2019** | RMB870 million (US$122.8 million) | RMB620 million (US$87.5 million) | **40.3%** |
| **3Q2019** | RMB1,493.2 million (US$210.85 million) | RMB793.2 million (US$112 million) | **88%** |
| **4Q2019 [Projected]** | RMB2,100-2,400 million (US$296.5-338.9 million) | RMB930-1,230 million (US$ 131.3-173.6 million) | **95-125.8%** |
| **Total** | **RMB4,463.2-4,763.2 million (US$630.2-672.6 million)** | **RMB2,343.2-2,643.2 million (US$330.8-373.2million)** | **80-90%** |

475.     In the Company's own words, "*[e]vidence discovered to date demonstrates that the Company's former Chief Executive Officer, Ms. Jenny Zhiya Qian, former Chief Operating Officer, Mr. Jian Liu and certain employees reporting to them participated in the fabricated transactions and that the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties*."   In addition to Defendants Qian and J. Liu, the Company has also directly implicated Defendant Lu in the fabricated transactions based on "*documentary and other evidence*" identified in the investigation, as well as Defendant "*Lu's degree of cooperation*." Moreover, Luckin's regulators, including the SAMR and the Ministry of Finance, reportedly obtained e-mails confirming that Defendant *Lu that gave direct orders to Luckin employees to commit accounting fraud*.

476.     According to Luckin employees interviewed by the *Journal*, "employees used individual accounts registered with cellphone numbers to purchase vouchers for numerous cups of coffee.  Between 200 million and 300 million yuan of sales ($28 million to $42 million) were fabricated in this manner, according to a person familiar with the matter."  In addition, around the time of the IPO in May 2019, "orders began flooding in under a fledgling line of business that involved selling coffee vouchers in bulk to corporate customers."   Internal Luckin records reviewed by the *Journal* "show numerous purchases by dozens of little-known companies in cities across China.  These companies repeatedly bought bundles of vouchers, often in large amounts. Rafts of orders sometimes came in during overnight hours."

477.     As the Company has admitted, Luckin's costs were also misstated, and the misstated amounts steadily increased throughout 2019:

| Quarter | Actual Operating Expenses | Fabricated Expenses | % Overstatement |
|---------|---------------------------|---------------------|-----------------|
| **2Q2019** | RMB1,448 million (US$204.4 million) | RMB150 million (US$21.1 million) | **10.4%** |
| **3Q2019** | RMB1,612.5 million (US 227.7 million) | RMB520 million (US$73.4 million) | **32.25%** |
| **4Q2019** | [Unreported] | RMB670 million (US$94.6 million) | |
| **Total: RMB1,340 million (US$189.2 million)** | | | |

478.    Internal company records accessed by the *Journal* show that "[a]s money flowed in from the bulk sales, Luckin also made payments to more than a dozen companies listed in its records as providers of raw materials, delivery or human-resources services." These records show that "Chinese regulators who recently went through Luckin's systems found more than 1 billion yuan (about $140 million) in questionable supplier payments, according to the company's internal documents and people familiar with the matter." Payments to the entities were processed by a purported employee named Lynn Liang, who was described as fictitious by sources interviewed by the *Journal*. As documented in internal Luckin records and recounted by an individual familiar with the matter, Luckin's CEO, Qian, "approved the payments and, in some instances, ***actively saw to the progress of the payment processes***."

479.    Many of the entities that facilitated the misstatements of Luckin's revenues and expenses had direct ties to Lu. Indeed, according to reporting by the *Journal*, the Company's investigation determined that Lu "knew—or should have known—about the fabricated transactions," and "***found evidence that Mr. Lu had knowledge of certain related-party transactions that weren't properly disclosed***." Moreover, the SAMR determined that "***43 third-party related business entities, including Beijing Automotive Travel Business Consulting Services Co. Ltd., UCar, Zhengzhe International (Xiamen) Co. Ltd. aided and abetted Luckin in carrying out [its] misleading acts***."

480.    As reported by the *Journal*, "registration records of companies that bought vouchers and others that received repeated supplier payments shows that many had links to Luckin, Mr. Lu or Mr. Lu's two previous ventures."  Specifically, "[s]ome listed the same office addresses and contact numbers as branches of CAR Inc. or Ucar," "[s]everal were registered with email addresses of employees of those companies," and "[o]ne was registered with a Luckin email address."  Moreover, "[a] few of the companies had links to a relative or a friend of Mr. Lu."

481.    For example, "Qingdao Zhixuan Business Consulting Co. Ltd., situated in China's northern Shandong province, bought 960,000 yuan ($134,000) worth of Luckin vouchers in a single order, according to the documents.  They show it made more than a hundred similar purchases from May to November of 2019."  Corporate-registry records "link this company to a relative of Mr. Lu, to an executive of Mr. Lu's previously founded Ucar Inc. and to a Luckin executive, via a complex web of other companies and their directors and shareholders."  The *Journal* also found that "Qingdao Zhixuan also has the same telephone number as a branch of CAR Inc. and is registered with a Ucar email address."  Internal Company records show that "***Luckin booked more than 1.5 billion yuan ($210 million) of corporate sales in this manner in 2019, dwarfing genuine purchases during the period***."  However, by the Company's own admissions, the misstatements in Luckin's net revenues exceeded even this figure, totaling nearly ***$300 million***.

482.    In another example, "[o]ne regular bulk buyer of coffee vouchers, Date Yingfei (Beijing) Data Technology Development Co. Ltd., has the same phone number as a branch of CAR Inc. and a predecessor of Ucar."  Similarly, Zhengzhe International Trade (Xiamen) Co.—one of the entities administratively sanctioned by the SAMR for aiding and abetting Luckin's misstatements of its revenue and expenses—was documented "as a supplier of raw materials to

Luckin." The report notes that both "Date Yingfei and Zhengzhe have the same legal representative, Wang Baiyin, who is a former classmate of Mr. Lu." According to corporate registration records obtained by the *Journal* "Mr. Wang owns 60% of Date and 95% of Zhengzhe."

483. According to individuals interviewed by the *Journal*, "the rafts of purchases and payments formed a loop of transactions that allowed the company to inflate sales and expenses with a relatively small amount of capital that circulated in and out of the company's accounts." The below chart depicts the web of Lu-related entities and individuals that facilitated the Company's immense overstatement of its revenues and expenses:



Source: *The Wall Street Journal*

484. Significantly, none of the related parties that facilitated the overstatement of Luckin's revenue and expenses were disclosed in either the IPO or SPO Registration Statements.

485.   In addition, many of the Company's key performance metrics touted to investors as evidence for the success of Luckin's purportedly disruptive "new retail" model were false. These include metrics such as the number of items sold per store per day, net selling price per item, revenue from other products, and advertising expenses.

486.   For example, the Anonymous Report, which was published by short seller Muddy Waters on January 31, 2020, alleged that Luckin overstated these metrics on the basis of its independent investigation.  The Anonymous Report's investigation included 11,260 hours of store traffic video—recorded by 92 full-time and 1,418 part-time staff over the course of 981 store-days, and covered 100% of the operating hours at the selected locations.  On the basis of this data, the Anonymous Report alleged that Luckin's number of items sold per store per day was misstated by *at least 69%* in 3Q2019 and *88%* in 4Q2019.  Similarly, the Anonymous Report reviewed 25,843 customer receipts and alleged that Luckin's net selling price per item was misstated by at least 12.3%.  Using these same receipts, the Anonymous Report alleged that Luckin's revenue from other products was misstated by as much as *400%* in 3Q2019 alone.  Furthermore, consistent with the Company's admissions, the Anonymous Report alleged on the basis of third-party media tracking data that Luckin's 3Q2019 advertising expenses were misstated by *over 150%*.

487.   As confirmed by the Company's admissions concerning the material misstatement of its revenues and expenses, Luckin's internal controls over financial reporting were virtually non-existent throughout the Class Period.  While the IPO and SPO Registration Statements stated that the Company was "in the process of implementing a number of measures to address the material weaknesses and deficiencies that have been identified," in truth, before the IPO and throughout the Class Period, Luckin lacked *any* internal audit function or other internal controls sufficient to prevent or detect the Company's misstatement of revenue and expenses.  Luckin

admitted in July 2020 that it did not "***charter[] an internal audit function to test and evaluate its control functions***" until ***after*** it retracted its reported financial results for 2019.

### C. Before the SPO, Lu and Qian Pledge Their Luckin Shares as Collateral in a $533 Million Margin Loan Facility with the Underwriter Defendants

488.    On September 10, 2019, Lu and Qian entered into the $533 Margin Loan Facility with several of the Underwriter Defendants, including Credit Suisse, Morgan Stanley, CICC, and Haitong, along with Goldman Sachs and Barclays Bank, LLC.   Under the Facility Agreement, which was overseen by Credit Suisse, the Underwriter Defendants and other banks served as lenders, Haode, a British Virgin Islands company ultimately controlled by Lu's family trust, was the borrower.   The loan was guaranteed by Lu and his spouse, Lichun Guo.   Lu and Qian, along with Lu's sister, Wong, pledged a total of ***488.4 million*** Luckin Class B shares—which carry ten times the voting power of ordinary shares—as collateral to secure the Margin Loan Facility.

489.    As of the time of the SPO, the shares pledged under the Margin Loan Facility represented over ***42%*** of the total aggregate voting power in the Company.   Luckin stated in the SPO Registration Statement that Lu, through Haode and Primus, entities controlled by Lu's family trust, pledged 145,455,450 Class B ordinary shares "to an affiliate of an underwriter to secure a borrowing";   Qian, through Summer Fame Limited, an entity controlled by Qian's family trust, pledged 146,100,254 Class B ordinary shares "to an affiliate of an underwriter to secure a borrowing"; and Wong, through Mayer, pledged an additional 196,875,000 Class B ordinary shares "to an affiliate of an underwriter to secure a borrowing."   These share pledges represented 30%, 46%, and 100%, respectively, of Lu's, Qian's, and Wong's ownership stakes in the Company.

490.    While the number of shares pledged under the Margin Loan Facility was disclosed in the SPO Registration Statement, Luckin failed to disclose the fact that under the terms of the

Facility Agreement, Defendants Lu and Qian could lose control of the Company in the event of a mandatory prepayment event and ensuing default.  At the time of the SPO, through their ownership of Class B shares, Lu and Qian together controlled approximately 60% of the voting power in Luckin.  If the shares pledged under the Margin Loan Facility were liquidated, Defendants Lu's and Qian's voting power would fall below 50%.  However, the SPO Registration Statement expressly disclaimed this risk, stating that Luckin was "***not aware of any arrangement that may, at a subsequent date, result in a change of control of our company***."  Moreover, while the SPO Registration Statement disclosed that Defendants Lu's and Qian's Class B shares had been "pledged to an affiliate of an underwriter to secure a borrowing," the SPO Registration Statement failed to disclose the amount by which Lu and Qian had drawn down the Margin Loan Facility, or the fact that a decline in Luckin's ADS price could trigger an event of default under the Margin Loan Facility.

491.   As investors would learn only after the Class Period, Lu and Qian ultimately borrowed ***$518 million*** from the Underwriter Defendants during the Class Period, effectively cashing out of a significant percentage of their inflated holdings in Luckin.  When Luckin's ADS price collapsed, this triggered a mandatory-repayment provision under the Facility Agreement.  Specifically, clause 7.3 of the Facility Agreement provides that a "'Hard Trigger Event' occurs when the ADS Price on any Trading Day is less than 50 per cent of the Initial ADS Price," which was set at $29.10, the price of Luckin's ADSs on December 11, 2019, when the Facility Agreement was last amended and restated.  The Facility Agreement further provides that following the occurrence of a "Hard Trigger Event," the lenders may declare that all amounts accrued under the agreement are immediately due.  If the borrowers then fail to make the accelerated payments, the lenders may seek to liquidate the pledged shares.

492.     As alleged below, once the truth concealed by the misstatements and omissions in the IPO and SPO Registration Statements was revealed and the Underwriter Defendants demanded prepayment in full, Defendants Lu and Qian defaulted on their obligations, prompting the Underwriter Defendants to seek to liquidate the shares pledged as collateral.  The Underwriter Defendants ultimately obtained judgments against Defendants Lu and Qian granting them control of the pledged shares.  This directly contributed to Lu losing control of the Company—the very risk the SPO Registration Statement had failed to disclose.

**D.     The Underwriter Defendants Disregarded Numerous Red Flags at the Time of Luckin's IPO and SPO**

493.     As underwriters of Luckin's IPO, each of the Underwriter Defendants had a duty to conduct a reasonable due-diligence investigation to ensure that the offering documents did not contain any false or misleading statements or fail to disclose any material information needed to make the information provided in the offering documents not misleading.  However, in their rush to bring Luckin to market and collect their hefty fees, the Underwriter Defendants failed to conduct a reasonable due-diligence investigation into the accuracy of the IPO and SPO Registration Statements.  Had they done so, the Underwriter Defendants would have uncovered numerous red flags that called into question the accuracy of the IPO and SPO Registration Statements' representations about Luckin's reported financial results, including its net revenues, costs and expenses, compliance with GAAP, internal controls over financial reporting, and related-party transactions.  The Underwriter Defendants were negligent in failing to conduct a reasonable due-diligence investigation into the accuracy of the IPO and SPO Registration Statements, and in failing to discover and disclose that Luckin and the Executive Defendants began inflating the Company's sales, costs, and expenses in April 2019, and that Luckin lacked sufficient internal

controls over financial reporting to prevent or detect the Company's GAAP violations and other financial misconduct.

494.    The Underwriter Defendants participated directly in drafting the IPO and SPO Registration Statements, as demonstrated by the fact that the IPO and SPO Registration Statements prominently displayed the names of each of the Underwriter Defendants on the first page of the prospectuses.  Moreover, the Underwriter Defendants were responsible for setting the offering price of ADSs sold in the offerings.  The Underwriter Defendants were also required to deliver a copy of the IPO or SPO prospectus to buyers who purchased in each offering, and a copy of the IPO and SPO prospectuses were made available on websites maintained by one or more of the Underwriter Defendants.  Accordingly, the Underwriter Defendants were required to exercise due diligence before offering Luckin's ADSs to investors.  However, as alleged in this Complaint, the Underwriter Defendants failed to conduct a reasonable investigation into the accuracy and completeness of the representations contained in the IPO and SPO Registration Statements, as they negligently overlooked numerous red flags concerning Luckin and its officers and directors.  Had they not negligently overlooked these red flags, and had they conducted a reasonable investigation, the Underwriter Defendants would have discovered that material information had been misstated or omitted from the IPO and SPO Registration Statements.

495.    *First*, at the times of both the IPO and the SPO, Luckin had an extremely limited financial history, having been founded in June 2017.  The IPO and SPO Registration Statements included audited financial statements only for full-year 2018 and that portion of 2017 when Luckin was operational.  Moreover, Luckin's auditor, E&Y Hua Ming, had identified several material weaknesses in Luckin's internal controls over financial reporting in the context of auditing its 2018 financial results.  This was a glaring red flag.  As Luckin disclosed in the IPO and SPO Registration

Statements, it suffered from two material weaknesses in its internal controls over financial reporting, including the "lack of sufficient accounting and financial reporting personnel with requisite knowledge and experience in application of [U.S. GAAP and SEC] rules" and the "lack of financial reporting policies and procedures that are commensurate with [U.S. GAAP and SEC] reporting requirements."  Underscoring this red flag, Luckin's outside auditor, E&Y Hua Ming, expressly disclaimed any "opinion on the effectiveness of the Company's internal control over financial reporting" in its audit opinion letter to Luckin's Board of Directors and shareholders included in the IPO and SPO Registration Statements.

496.    It is well established that weaknesses in internal controls over financial reporting increase the risk of fraud by providing an opportunity for fraud to occur.  For example, AS 2401, (*Consideration of Fraud in a Financial Statement Audit*) states that "the absence of controls, ineffective controls, or the ability of management to override controls . . . provide an *opportunity* for a fraud to be perpetrated."  AS 2401.07.  (emphasis in original).  The PCAOB specifically highlights the "employment of ineffective accounting, internal audit, or information technology staff" and "[i]neffective accounting and information systems" as risk factors relating to misstatements arising from fraudulent financial reporting—the very internal control deficiencies Luckin acknowledged existed at the time of the IPO and SPO.  AS 2401.A2, Opportunities at d. The existence of these material weaknesses and the lack of any external audit of Luckin's internal controls should have prompted the Underwriter Defendants to scrutinize Luckin's internal controls over financial reporting to ensure that Luckin's claims about its business were accurate.  Had the Underwriter Defendants done so, they would have known that at the time of the IPO, Luckin lacked any internal audit function and that Luckin's Finance and Treasury functions, basic transaction-

level controls, were not overseen by its CFO.  They also would have discovered that, at the time of the IPO, Luckin was engaging in fabricated sales.

497.   *Second*, there is a well-recognized increased risk of financial misstatements among companies in emerging markets such as China.  For example, in PCAOB Staff Audit Practice Alert No. 8, Audit Risks in Certain Emerging Markets (October 3, 2011), the PCAOB warned that "conditions in audits of certain companies in emerging markets . . . indicate heightened fraud risk." The PCAOB noted that "[i]n just two months in 2011, more than 24 companies with their principal place of business in the People's Republic of China ('PRC') filed Forms 8-K with the SEC reporting auditor resignations, accounting irregularities, or both."  The SEC has also warned of the increased fraud risk among companies based in China.  For example, a December 7, 2018 joint statement by SEC Chairman Jay Clayton, SEC Chief Accountant Wes Bricker, and PCAOB Chairman William D. Duhnke III regarding "Current Information Access Challenges with Respect to U.S.-listed Companies with Significant Operations in China," explained that "[o]ne of the most significant current issues relates to the ability of the PCAOB to inspect the audit work and practices of PCAOB-registered auditing firms in China . . . with respect to their audit work of U.S.-listed companies with operations in China."

498.   Following the revelation of Luckin's materially misstated financial results, the SEC reminded investors in an April 21, 2020 Joint Statement that "in many emerging markets, including China, there is substantially greater risk that disclosures will be incomplete or misleading and, in the event of investor harm, substantially less access to recourse, in comparison to U.S. domestic companies."  Compounding this red flag, according to the U.S. Department of State, corruption is "rampant" in China.

499.    The Underwriter Defendants were no strangers to fraud involving Chinese entities

seeking to conduct public offerings.  In fact, one of the Underwriter Defendants had previously

been sanctioned for *participating* in a fraud involving a Chinese company's public offering of

securities.  On June 13, 2014, the CSRC issued a warning letter to CICC, one of the underwriters

in Luckin's IPO and SPO, following the CSRC's investigation into CICC's role as lead underwriter

for Jiangsu Aosaikang Pharmaceutical Co. Ltd. ("Aosaikang").  As detailed in a press release

issued by the CSRC,

> [D]uring the underwriting process, the CICC instructed a financial public relation
> firm to prepare and publish advertising articles that cited research report from the
> distributor of the proposed offering, Sinolink Securities.  CICC then instructed the
> PR firm to spread the view that Aosaikang 'is undervalued and will see the price of
> its shares rise after the IPO', in an attempt to induce investors to subscribe for the
> shares at a high offering price.

500.    These actions by CICC, which sought to inflate Aosaikang's stock price following

its offering, violated Chinese securities regulations, which prohibit inducing investors to submit

higher bids or interfering "with investors in the normal course of submitting bids and subscribing

for shares."  As the CSRC stated in issuing its warning to CICC, "underwriters and issuers should

market the offering of new shares strictly in accordance with the provisions of applicable laws and

regulations.  The CSRC will continue to strengthen the regulations of processes and conducts [sic],

and impose stronger ex post accountability with respect to the offering of new shares."

501.    Relatedly, the fact that Luckin's CFO, Schakel, is not a Chinese native—and is

reported not to even speak any Chinese language—also presented a red flag concerning Luckin's

internal controls.  As the PCAOB warned in Staff Audit Practice Alert No. 8, Audit Risks in

Certain Emerging Markets (October 3, 2011):

> Some emerging market companies employ as their chief financial officer ('CFO')
> an individual based in, or from, another region or country.  Such a CFO might lack
> knowledge of the local language and the company's business practices and,
> therefore, might not be able to effectively perform certain important entity-level

controls, thereby creating opportunities for company personnel to commit or conceal fraudulent misstatement of the financial statements.

502.    Defendant Schakel's status as an outsider should have prompted the Underwriter Defendants to conduct additional due diligence into Luckin's internal controls over financial reporting and claims about its business and financial results.

503.    *Third*, Credit Suisse and Morgan Stanley, the lead underwriters in Luckin's IPO and SPO, as well as CICC, were both closely associated with Luckin and its officers and directors, including Lu, and therefore should have exercised heightened caution to ensure that their investigation of Luckin was both objective and independent.  Credit Suisse and Morgan Stanley previously served as underwriters for the IPO of CAR, one of Lu's other companies, in 2014. Tidjane Thiam, who served as Credit Suisse's CEO from March 2015 until February 2020, described Lu as a "dream client."[8]  At a conference in 2019, Thiam stated that: "I've had I don't know how many dinners with [Lu] in Beijing and he's absolutely the poster child for what we want to do."

504.    Schakel, Luckin's CFO, previously worked as an analyst, associate, and later vice president for the investment banking division of Credit Suisse from 2008 until 2016.  Li, one of Luckin's directors, and who sold 4.8 million ADSs in Luckin's SPO, also previously worked in the investment banking division of Morgan Stanley from 1994 to 2001.  In addition, at the time of the IPO and SPO, Lu's daughter worked for Credit Suisse in its Hong Kong office.

505.    Moreover, for nearly a decade, CICC shepherded several of Lu's prior business entities, including CAR and UCAR, from start-up to private funding to IPO.  Liangyun Chen, the former executive general manager of CICC's International Investment Banking, was in charge of

---

[8] Thiam resigned from Credit Suisse in response to findings that Credit Suisse conducted unlawful surveillance of a former employee, Iqbal Khan, following Khan's decision to join Credit Suisse's rival, UBS Group AG.

both the overseas private equity funding of CAR and the listing of CAR in the United States and Hong Kong.  Mr. Chen also participated in UCAR's listing on the National Equities Exchange and Quotations ("NEEQ"), a Chinese stock exchange.  Another CICC executive, Wei Ding, was also a director of CAR.  CICC was also an *investor* in Luckin through its participation in the Company's November 2018 Series B preferred share funding round.

506.     *Fourth*, Luckin's business model, which prioritized growth at the expense of operating profit, was inherently risky.  As Mark Williams, a professor at Boston University and a former U.S. Federal Reserve bank examiner, stated: "Luckin is a microcosm of what can happen when weak underwriting standards are allowed to persist in the pursuit of rapid growth," adding that "Luckin exhibited many signs of a high-growth, high-risk business."  Indeed, as Luckin disclosed at the time of the IPO, the Company had operated at a significant loss since its inception and its "principal source of liquidity ha[d] been cash generated from historical equity financing activities."  Furthermore, the IPO Registration Statement stated that there was "substantial uncertainty with respect to [Luckin's] results of operations" and that Luckin could not "assure [investors] when [the Company] will achieve profitability."  Given Luckin's historical reliance on private fundraising to finance its operations and the significant uncertainty that existed with respect to its future profitability, the Underwriter Defendants should have conducted thorough due diligence into Luckin's operations and the viability of its business model before allowing their names to appear as Underwriters in the IPO Registration Statement.  Had they done so, the Underwriter Defendants would have uncovered the fact that by the time of the IPO, Luckin had already begun fraudulently inflating its reported net sales to create the appearance of continued growth.

507.   *Fifth*, at the time of the IPO, Luckin's supposedly exponential growth had declined dramatically, raising an additional red flag concerning Luckin's purportedly "disruptive new retail model."   This presented a risk of material misstatement because, as stated in AS 2401.A2,  a company with "[r]apid growth or unusual profitability, especially compared to that of other companies in the same industry" may be incentivized to commit fraud in order to avoid an interruption in its growth trends.  AS 2401.A2, Incentives/Pressures at a.  In the first quarter of 2019,  Luckin opened just 297 new stores, less than half of the 625 openings it needed to be on pace to hit its 2,500-store target in 2019 announced in January 2019.  Luckin's net revenue growth rate also slowed dramatically in the first quarter of 2019, from a 93.3% sequential increase in total net revenues during the fourth quarter of 2018 to only 2.8% during the first quarter of 2019.  Moreover, its growth in cumulative transacting customers declined 33% sequentially from 6.5 million in 4Q2018 to 4.3 million in 1Q2019.

508.   According to the IPO Registration Statement, this precipitous decline in Luckin's growth in 1Q2019 was attributable to the Chinese New Year.  However, Luckin's failure to sustain its previously rapid growth in 1Q2019 should have prompted the Underwriter Defendants to scrutinize Luckin's financial results and its transactions occurring at the time of the IPO, including for the period from March 31, 2019, the end of 1Q2019, through May 17, 2019, the date of the IPO.  Indeed, the PCAOB identifies "[s]ignificant declines in customer demand" as an additional risk factor giving rise to the risk of fraudulent financial reporting.   AS 2401.A2, Incentives/Pressures at a.  Had the Underwriter Defendants done so, they would have discovered that Luckin's sales were being inflated through fabricated transactions.  They also should have discovered that Luckin's principal competitor, Starbucks, reported no seasonal impact on sales in China from the Chinese New Year, a further red flag that Luckin's explanation was false.

509.   *Sixth*, it has also been reported that employees of the Underwriter Defendants uncovered, but negligently overlooked, evidence that could have led to their discovery that Luckin's revenues were overstated.  As reported by *Nikkei Asian Review* on July 8, 2020:

> One investment banking associate who worked for one of the lead managers on Luckin's IPO said their due diligence threw up some other red flags.  For example, ***there were discrepancies between the number of coffees that the company claimed to be selling and the number of coffee cups that were being taken out of inventory.  These concerns were flagged to senior management but were not seen as significant***.

510.   *Seventh*, the Underwriter Defendants negligently overlooked the fact that Luckin's extensive reliance on promotional coupons and payment vouchers presented a well-recognized fraud risk.  As Luckin disclosed in the IPO Registration Statement, it offered "various discount offers and deals in the form of vouchers and coupons" and "regularly offer[ed] coupons and vouchers to increase [Luckin's] customer base, retain [its] existing customers or promote new products."  Auditor publications, including those from Ernst &Young, recognize an increased risk of revenue fraud, including the risk of fraud perpetrated by insiders, associated with consumer e-retail business models that rely on extensive promotions.[9]

511.   Moreover, AS 2401 recognizes that "[s]ignificant transactions that are outside the normal course of business for the company or that otherwise appear to be unusual due to their timing, size, or nature . . . may be used to engage in fraudulent financial reporting or conceal misappropriation of assets."  AS 2401.66.  As such, the exercise of professional skepticism should involve "*[e]valuating whether the business purpose for significant unusual transactions*

---

[9] *See, e.g.*, Anurag Kashyap, *How digital transformation increases consumer and retail fraud risks*, Ernst & Young (July 25, 2019), https://www.ey.com/en_gl/assurance/how-digital-transformation-increases-consumer-and-retail-fraud-risks. *See also Sample listing of fraud schemes*, Deloitte Touche Tohmatsu India Private Limited, 2009, https://www2.deloitte.com/content/dam /Deloitte/in/Documents/risk/Corporate%20Governance/Audit%20Committee/in-gc-fraud-schem es-questions-to-consider-noexp.pdf (addressing fraud risk associated with promotional allowances such as vouchers).

**indicates that the transactions may have been entered into to engage in fraud**." *Id.* (emphasis in original).  As reported by the *Journal*, "[i]n late May 2019, [around the time of the IPO] orders began flooding in under a fledgling line of business that involved selling coffee vouchers in bulk to corporate customers, according to internal records reviewed by the Journal."  Those records "show numerous purchases by dozens of little-known companies in cities across China.  These companies repeatedly bought bundles of vouchers, often in large amounts.  Rafts of orders sometimes came in during overnight hours."  The existence of these significant unusual transactions should have alerted the Underwriter Defendants to the possibility that Luckin was utilizing these transactions to engage in fraudulent financial reporting.  Had the Underwriter Defendants investigated this possibility, they would have discovered that Luckin's sales were being inflated through fabricated transactions.

512.    *Eighth*, beginning in the second quarter of 2019, Luckin introduced a purported "update" to its ordering system that allowed for non-sequential receipts.  As reported by numerous former employees, including FE 1, Luckin's non-sequential receipt system allowed Luckin to "increase the number of cups [of coffee] recorded as sold" and **allowed for inflated sales**.  This was an obvious red flag.  According to FE 3, who was also a former employee of Luckin's main competitor, Starbucks, Luckin's practice was against industry norms and never happened at his prior employer.  FE 3 stated that the practice of skipping receipt numbers "was related to efforts to try to inflate sales figures" and that it was well known amongst the store managers that Luckin was "doing this [skipping numbers on receipts] to pump sales up."  Had the Underwriter Defendants conducted reasonable due diligence into Luckin's business practices at the time of the IPO, they would have discovered this red flag, which should have prompted them to verify that Luckin's sales accurately reflected the amount of products sold.

513.     *Ninth*, Luckin's complicated business structure, comprising no fewer than **sixty-one** subsidiaries and affiliates, including entities registered in the Cayman Islands, British Virgin Islands, Hong Kong, and mainland China, presented an additional red flag that should have prompted the Underwriter Defendants to scrutinize Luckin's business operations in order to ensure the accuracy of Defendants' statements in the IPO and SPO Registration Statements.  Indeed, AS 2401 identifies an "[o]verly complex organizational structure involving unusual legal entities" as a risk factor relating to misstatements arising from fraudulent financial reporting.  AS 2401.A2, Opportunities at c.

514.     *Tenth*, Luckin's extensive related-party transactions should have caused the Underwriter Defendants to more closely scrutinize Luckin's relationships with third parties affiliated with or controlled by Defendant Lu—the very entities that were used to facilitate the Executive Defendants' scheme to fraudulently inflate Luckin's reported sales and expenses.  For example, the IPO and SPO Registration Statements disclosed that Luckin engaged in the following related-party transactions with entities controlled by or affiliated with Lu: (i) Luckin rented office space from UCAR, which was then controlled by Lu; (ii) Luckin received advertising service from Beijing QWOM Digital Technology Co., Ltd. ("QWOM"), an affiliate of CAR, which was then controlled by Lu; (iii) Luckin received a loan of RMB92.9 million (US$13.1 million) in 2017 from Primus, an affiliate of Lu; (iv) Luckin received a loan of RMB1.8 million (US$254,000) in 2017 from Haode, an affiliate of Lu; and (v) Luckin provided a loan of RMB147.6 million (US$20.8 million) to Haode Group Inc., an affiliate of Lu in 2018.

515.     AS 2401 identifies related-party transactions, and in particular, "[r]elated party transactions that are also significant unusual transactions," "transactions with related parties whose financial statements are not audited or are audited by another firm," and management's "ability to

dominate [another entity] that allows the entity to dictate terms or conditions to suppliers or customers that may result in inappropriate or non-arm's-length transactions," as risk factors relating to misstatements arising from fraudulent financial reporting.  AS 2401.A2, Opportunities at a.  Each of these risk factors existed with respect to the related-party transactions Luckin disclosed in the IPO and SPO Registration Statements, which should have prompted the Underwriter Defendants to scrutinize Luckin's transactions with Lu-affiliated entities.  Had they done so, the Underwriter Defendants would have known that entities controlled by or affiliated with Lu were being used to facilitate Luckin's fabrication of its revenues and expenses.

516.    *Eleventh*, the fact that certain Underwriter Defendants, including Credit Suisse, Morgan Stanley, CICC, and Haitong, entered into the $518 million margin loan facility with Defendants Lu and Qian in connection with Luckin's IPO and SPO should have prompted the Underwriter Defendants to conduct more thorough due diligence into Luckin's current financial status, including by examining Luckin's financial performance and purported revenue and expenses during the second, third, and fourth quarters of 2019, and to more closely scrutinize the terms of the Facility Agreement to ensure that material information concerning the Margin Loan Facility was disclosed to investors. AS 2401 recognizes that where "management or the board of directors' personal financial situation is threatened by the entity's financial performance," whether due to significant financial interests in the entity or personal guarantees of debts, this presents a significant risk factor relating to misstatements arising from fraudulent financial reporting.  AS 2401.A2, Incentives/Pressures at c.

517.    As alleged above, Defendant Lu, through Haode and Primus, entities controlled by Defendant Lu's family trust, pledged 145,455,450 Class B ordinary shares; Defendant Qian, through Summer Fame, an entity controlled by Defendant Qian's family trust, pledged

146,100,254 Class B ordinary shares; and Wong, Defendant Lu's sister, through Mayer, pledged an additional 196,875,000 Class B ordinary shares. The Margin Loan Facility effectively allowed Defendants Lu and Qian to cash out a significant percentage of their Luckin holdings at the time of the IPO and SPO, while also subjecting them to the risk that their personal financial situation would suffer in the event of a precipitous decline in the price of Luckin's ADS. The Margin Loan Facility also presented an undisclosed risk that Lu and Qian's approximately 60% control of the voting rights in the Company could be reduced in the event of a default. Demonstrating the highly unusual nature of the Margin Loan Facility, Lu demanded this financing arrangement with the Underwriters as a condition for their participation in Luckin's sought-after IPO, a demand that caused at least one prospective underwriter to decline the engagement.

518.    *Twelfth*, the Underwriter Defendants negligently overlooked the fact that one of Luckin's senior executive officers had been convicted of a criminal offense while managing a related entity that conducted business with Luckin. Luckin's Chief Marketing Officer, Fei Yang, was previously sentenced to eighteen months' imprisonment for violations of Chinese advertising laws when he was the co-founder and general manager of Beijing Koubei Interactive Marketing & Planning Co., Ltd. ("iWOM"). iWOM is a related party of QWOM, an affiliate of CAR, and one of the many Lu-related parties with which Luckin conducted business at the time of the IPO. Notably, although Fei Yang was identified as a co-founder of the Company prior to the IPO and was reportedly "one of the key architects of Luckin's hyper growth" strategy, his name did not appear in either the IPO or SPO Registration Statement.

519.    The foregoing red flags should have caused the Underwriter Defendants to conduct additional due diligence before drafting and disseminating the IPO and SPO Registration Statements. By overlooking these red flags, the Underwriter Defendants negligently failed to

conduct reasonable due diligence into the accuracy and completeness of the representations contained in the IPO and SPO Registration Statements, and are liable for the misstatements and omissions contained in the registration statements.

520.     Following two consecutive quarters in which Luckin reported admittedly misstated operating metrics, the Underwriter Defendants once again facilitated Luckin's sale of securities, including 15.87 million ADSs, to investors.  In the January 2020 SPO, the Underwriter Defendants ignored the same red flags that existed with respect to Luckin's business structure and operating model, internal controls over financial reporting, and related-party transactions as existed at the time of the IPO.   In addition, the Underwriter Defendants negligently overlooked numerous additional red flags which, had they conducted reasonable due diligence, should have put them on notice that Luckin's financial statements throughout 2019 were materially misstated.

521.     *First*, Luckin's growth had purportedly reaccelerated rapidly following the IPO.  In its reported 2Q2019 results, Luckin announced that net revenues from products increased over ***698%*** year-over-year, and claimed that it had added 5.9 million new customers during 2Q2019 alone.  Luckin also claimed that the average monthly transacting customers in the quarter increased of ***410.6%*** over 2Q2018, and that average monthly total items sold in the quarter had increased ***589.7%*** from 2Q2018.  And again, in its reported 3Q2019 results, Luckin announced that its net revenues from products exceeded the high end of its guidance that quarter, representing a ***557.6%*** increase from 3Q2018, and claimed that its average monthly total items sold in the quarter had increased ***470.1%*** over 3Q2018.  This dramatic reacceleration in Luckin's growth should have caused the Underwriter Defendants to investigate and scrutinize Luckin's financial results for 2Q2019 and 3Q2019, particularly given the heightened risk of misstatements stemming from Luckin's heavy reliance on coupons and vouchers in recording revenue.  Had the Underwriter

Defendants not negligently overlooked this red flag, and had they conducted reasonable due diligence into Luckin's reported sales, they would have discovered that those sales had been materially misstated in the SPO Registration Statement

522.    *Second*, Luckin's purported 2019 financial results had not been subject to ***any*** outside audit, including the two quarters during which Luckin later admitted overstating its reported sales and expenses.  This fact should have prompted the Underwriter Defendants to conduct more thorough due diligence to ensure the accuracy of Luckin's purported financial results during this period.  Indeed, E&Y Hua Ming expressly stated in the audit opinion letter to Luckin's Board of Directors and shareholders included in the SPO Registration Statement that their audit was limited to Luckin's 2017 and 2018 financial results.  Thus, it was incumbent on the Underwriter Defendants to independently confirm that the financial results for the nine months ended September 30, 2019, which Luckin reported in the SPO Registration Statement, had not been materially misstated.  Had the Underwriter Defendants conducted this due diligence, they would have known that Luckin had misstated its revenue by approximately ***67%*** and its costs and expenses by approximately ***21.8%*** during the second and third quarters of 2019.

523.    *Third*, the Underwriter Defendants negligently overlooked the fact that Luckin had not remediated the material weaknesses in its internal controls over financial reporting that had existed at the time of the IPO.  As Defendants stated in the SPO Registration Statement, Luckin was still in the process of remediating these material weaknesses as of the date of the SPO.  Moreover, E&Y Hua Ming again disclaimed any audit opinion concerning Luckin's internal controls over financial reporting.   Accordingly, the Underwriter Defendants should have conducted reasonable due diligence concerning the effectiveness of Luckin's internal controls over financial reporting.  Had they done so, they would have discovered that Luckin still lacked any

internal audit function and that its internal controls were insufficient to prevent or detect Luckin's misstatements of revenue and expenses throughout 2019.

524.    *Fourth*, the sheer magnitude of the Exchange Act Defendants' fraud was an obvious red flag.  As the Company has admitted, it overstated its revenues by nearly ***100%*** between the second and fourth quarters of 2019, and its expenses by at least ***32%*** during this period.  Had the Underwriter Defendants conducted reasonable due diligence, they would have discovered the massive fabrication of transactions being perpetrated by Luckin's senior management.

525.    Confirming the Underwriter Defendants' total lack of diligence with respect to Luckin's SPO, very soon after the SPO, on January 31, 2020, the Anonymous Report raised serious questions about the accuracy of Luckin's reported financial results based on its independent investigation.  Specifically, the Anonymous Report compiled 11,260 hours of store traffic video and alleged on the basis of its observations that Luckin's number of items sold per store per day was misstated by ***at least 69%*** in 3Q2019 and ***88%*** in 4Q2019.  Similarly, the Anonymous Report reviewed 25,843 customer receipts and alleged that Luckin's net selling price per item was misstated by at least 12.3% and that Luckin's revenue from other products was misstated by as much as ***400%*** in 3Q2019.  Furthermore, the Anonymous Report alleged on the basis of third-party media tracking data that Luckin's 3Q2019 advertising expenses were misstated by ***over 150%***.

526.    Notably, the authors of the Anonymous Report had no access to Luckin management, unlike the Underwriter Defendants, yet was able to uncover evidence suggesting that Luckin was inflating its reported financial results.  If this third party was able to do this, then the Underwriter Defendants, who had access to far more information from the Company itself (as well as a duty to conduct due diligence), should have done so as well.

527.    The Underwriter Defendants not only failed to conduct a reasonable due diligence investigation before the offerings but also, through their analysts, strongly defended the Company against the Anonymous Report's accusations that Luckin's revenue and expenses were materially misstated.   For example, Haitong downplayed the Anonymous Report in a February 2, 2020 analyst report, calling it "written anonymously" and noting that "its biggest flaw . . . is the **selective data set** used to make the claims."   (emphasis in original).   Haitong concluded that "we believe that if the short report claims were true and that transactions and ASP [average selling price] were inflated, Luckin would have reported considerably lower cash flows and cash positions, which we believe are difficult to fabricate and undergo audits."

528.    Similarly, Credit Suisse issued a report on February 4, 2020 strongly defending the Company.   While Credit Suisse acknowledged that the Company "didn't provide any detail or supporting documents to rebut the allegations," it nonetheless attempted to discredit the Anonymous Report.   For example, Credit Suisse criticized the representativeness of the video evidence obtained by Muddy Waters, stating that it "only accounted for <0.3% of total operation hours in 4Q19."   Credit Suisse added that "[f]or LK, every single order that customers placed is online and automatically recorded in its system, and payments for orders went through third-party payment service providers. So it's not that hard for LK to provide such evidence to rebut this allegation."   Similarly, with respect to the Anonymous Report's allegations of overstated advertising expenses to inflate revenue and store-level profit, Credit Suisse suggested that "we believe this could be easily verified by auditors or a third party."   Credit Suisse concluded by assuring investors that it "found no hard evidence in the short-seller report to claim Luckin's business as fraudulent, and some of the allegations are baseless or have major flaws."   In similar

fashion, a Needham report issued on February 4, 2020 cited the Company's denial of all of the Anonymous Report's allegations and actually ***raised*** its price target to ***$40***.

E.    **As Information that Was Incorrectly Stated in, and Omitted from the Registration Statements Is Gradually Disclosed, the True Value of Luckin's ADSs Is Revealed**

529.    The IPO and SPO Registration Statements contained untrue statements of material fact and omissions of material fact that rendered the statements made in the registration statements misleading, as well as material omissions in violation of the affirmative disclosure obligations applicable to the registration statements.  As a result of these misstatements and omissions, the information disclosed in the IPO and SPO Registration Statements did not accurately reflect the risks associated with investments in Luckin ADSs, and therefore the initial offering price set for the IPO and the SPO did not reflect the true value of Luckin's ADSs.

530.    As the information concealed by the registration statements' misstatements and omissions was gradually disclosed to the market, the disclosure of this new information revealed the true value of Luckin ADSs, causing the trading price of Luckin ADSs to decline to close at $1.38, thereby damaging Plaintiffs and the Class.

531.    The following events, among others, revealed the relevant truth concealed by the misstatements and omissions in the IPO and SPO Registration Statements:

a.    On April 2, 2020, Luckin shocked the market when it published a press release announcing the suspension of the Company's Chief Operating Officer, J. Liu, the formation of an independent Special Committee, and an ongoing internal investigation.  The press release stated, in relevant part, that "***beginning in the second quarter of 2019, Mr. Jian Liu, the chief operating officer and a director of the Company, and several employees reporting to him, had engaged in certain misconduct, including fabricating certain transactions***."  The Company disclosed

that "***the aggregate sales amount associated with the fabricated transactions from the second quarter of 2019 to the fourth quarter of 2019 amount to around RMB2.2 billion [US$310.6 million]*** and that "***[c]ertain costs and expenses were also substantially inflated by fabricated transactions during this period***." As a result of the Company's disclosures, Luckin told investors that they should "***no longer rely upon the Company's previous financial statements and earning releases for the nine months ended September 30, 2019 and the two quarters starting April 1, 2019 and ended September 30, 2019, including the prior guidance on net revenues from products for the fourth quarter of 2019, and other communications relating to these consolidated financial statements***." As a result of this news, Luckin's ADS price collapsed—falling over ***75%*** from a closing price of $26.20 on April 1, 2020 to a closing price of $6.40 on April 2, 2020, wiping out billions of dollars of market capitalization;

b.  On April 6, 2020, Goldman Sachs revealed that Lu and Qian had defaulted on $518 million in margin loans secured by Luckin shares. In other words, while the Company's ADSs were artificially inflated by the misrepresentations and omissions in the registration statements, Defendants Lu and Qian had cashed out by pledging their inflated holdings as collateral for ***personal loans***, and thereafter defaulted on these obligations. The lender banks sought to liquidate the entities which had pledged the shares in order to collect on Lu's and Qian's debts. On this news, the price of Luckin's ADSs declined an additional ***18%***, to fall to their then lowest-ever price of $4.39 per ADS at close on April 6, 2020;

c.   On May 19, 2020, Luckin announced that it had received a notice that Luckin's ADSs would be officially delisted from NASDAQ.  The press release directly attributed the decision to the Company's previously announced fraud: "The Listing Qualifications Staff cited two bases for the delisting determination: (i) *public interest concerns as raised by the fabricated transactions disclosed by the Company in a Form 6-K on April 2, 2020*, pursuant to Nasdaq Listing Rule 5101; and (ii) *the Company's past failure to publicly disclose material information, citing a business model through which the previously disclosed fabricated transactions were executed*."  On May 20, 2020, when trading in Luckin's ADSs temporarily resumed, Luckin's ADS price immediately declined an additional *35.7%* from the closing price on April 6, 2020, before trading was initially halted on April 7, 2020, reaching an all-time low of $2.82 per ADS at close on May 20, 2020.  On the same day, Defendant Lu issued a press statement on WeChat in which he claimed that Luckin had "dealt with the relevant responsible persons, reorganized the board of directors, updated the management and actively carried out the rectification and reform as soon as possible according to the latest periodic investigation results."  Defendant Lu expressed surprise at NASDAQ's decision to delist the Company "without waiting for the final investigation results, which was unexpected, and I am deeply disappointed and regretful";

d.  On June 19, 2020, Luckin announced that it would hold an extraordinary general meeting on July 5, 2020 in order for shareholders to vote on resolutions to oust several other members of Luckin's Board, including Defendants Lu, Shao, Li, and E. Liu.  On June 20, 2020, the *Journal* reported that "[p]eople familiar with the

company said even though the meeting would oust Mr. Lu, it *appeared to be an attempt by the chairman to hang on to control and frustrate an internal investigation into the fake sales*."  According to the report, the "[t]he request to hold the meeting came in a letter to the board Friday from Haode Investment, one of the shareholding entities controlled by Mr. Lu." Significantly, Lu sought to replace Shao, who was overseeing the Company's internal investigation, with two new directors nominated by Lu's Haode, Zeng and Yang.  Moreover, the *Journal* reported that "*Lu has repeatedly not complied with requests by the special committee to interview him and gain access to his phone and laptop*," which "*has delayed the company's efforts to complete and publish the results of its internal probe and release audited financial results for 2019*."  This additional negative news caused Luckin's ADS price to decline *19.6%* from a closing price of $3.96 on June 18, 2020, to a closing price of $3.18 on June 22, 2020;

e.  On June 23, 2020, as a further consequence of its inability to complete and publish the results of its internal probe and release its audited financial results, Luckin announced that it had received a second notice from NASDAQ that its ADSs would be delisting due to its failure to file its Form 20-F Annual Report for 2019 and complete its investigation, dooming any appeal of NASDAQ's earlier determination to delist Luckin's ADSs.  In a press release, Luckin stated that its failure to file the Annual Report "*serves as an additional basis for delisting the Company's securities from the Nasdaq pursuant to Nasdaq Listing Rule 5250(c)(1)*."  This news caused Luckin's ADS price to decline an additional

***12.26%***, from a closing price of $3.18 on June 22, 2020 to a closing price of $2.79 on June 23, 2020; and

f.   Finally, on June 26, 2020, Luckin announced that it had notified NASDAQ's listing qualifications staff on June 24, 2020 that it would no longer be seeking an appeal of the NASDAQ decision to delist the Company's ADSs and that trading in its ADSs would be suspended at market open on June 29, 2020.  On this date, Luckin's ADS price declined an additional ***54%***, from a closing price of $3.00 on June 25, 2020 to a closing price of $1.38 on June 26, 2020.  Trading in Luckin's ADSs was suspended on June 29, 2020.

532.   These events, among others, revealed to the market that the IPO and SPO Registration Statements contained false statements and omissions of material fact concerning, among other things: (i) Luckin's compliance with laws and regulations, GAAP, and internal controls over financial reporting; (ii) the reasons for Luckin's increased earnings and growth leading up to the IPO and between the IPO and the SPO; (iii) Luckin's reported revenues and expenses; (iv) Luckin's related-party transactions; and (v) the terms of the margin loan facility.

**F.   The Registration Statements Contained Untrue Statements of Material Fact and Material Omissions in Violation of Section 11 of the Securities Act**

**1.   IPO Registration Statement**

**a.   The IPO Registration Statement Failed to Disclose Subsequent Events that Rendered Luckin's Reported Financial Results Materially Misleading**

533.   The IPO Registration Statement included Luckin's consolidated balance sheets as of December 31, 2017 and December 31, 2018; consolidated statements of cash flow and comprehensive loss for the period from June 16, 2017 (date of inception) through December 31, 2017 and for the year ended December 31, 2018; consolidated balance sheet data and statements

of cash flow and comprehensive loss for the three months ended March 31, 2019; and unaudited operating data and quarterly financial data for the four quarters of 2018 and three months ended March 31, 2019.

534.    The IPO Registration purported to disclose all "SUBSEQUENT EVENTS" in the notes to the IPO Financial Statements.  Note 20 to Luckin's consolidated financial statements for the period from June 16, 2017 (date of inception) through December 31, 2017 and year ended December 31, 2018 identified two subsequent events, including the issuance of additional Series B Preferred Shares on January 9, 2019 and the adoption of a share option plan for employees and directors on January 18, 2019.

535.    Note 15 to Luckin's unaudited interim financial statements, including for the first quarter of 2019, disclosed the following subsequent events: (i) in April 2019, Luckin "issued 173,182 Series B-1 convertible redeemable preferred shares to third-party investors at US$865.91 per share for an aggregate purchase consideration of US$149,960"; (ii) "[o]n April 16, 2019, the board of directors approved the dual-class share structure" under which "each Class A ordinary share is entitled to one vote and each Class B ordinary share is entitled to ten votes"; (iii) on April 16, 2019, "the board of directors also approved that the authorized share capital of "US$50,000 divided into 25,000,000,000 ordinary shares of a par value of US$0.000002 each"; (iv) in April 2019, Luckin entered into a joint venture with Louis Dreyfus Company Asia Pte. Ltd. "to incorporate a joint venture for constructing and operating a coffee roasting plant in China"; and (v) on April 26, 2019 Luckin issued 15,211 Series B-1 convertible redeemable preferred shares to TTCO Trust Corporation Limited for an aggregate purchase consideration of US$8,936.  The IPO Registration Statement did not include any other subsequent events.

536.     The IPO Financial Statements were materially false or misleading when issued.  As Luckin has admitted, by the time of the IPO, Luckin's senior management was actively engaged in a scheme to inflate the Company's revenue and expenses through massive fabricated transactions, resulting in an overstatement of Luckin's revenues by *40.3%* and expenses by *10.4%* in the second quarter of 2019—the quarter in which the IPO occurred.  The Company's admissions establish that this scheme arose before the IPO Financial Statements were filed with the SEC as part of the IPO.  Under ASC 855, Luckin was required to disclose all events "of such a nature that they must be disclosed to keep the financial statements from being misleading."  Given the magnitude and material nature of the fabricated transactions, under ASC 855, these transactions should have been disclosed as non-recognized subsequent events in the notes to the IPO Financial Statements.  By failing to disclose Luckin's overstatement of revenue and expenses as subsequent events in the notes to the IPO Financial Statements, the IPO Registration Statement violated GAAP.  Because the IPO Financial Statements were "not prepared in accordance with generally accepted accounting principles," they are "presumed to be misleading or inaccurate."  Regulation S-X, 17 C.F.R. § 210.4–01(a)(1).

> **b.     Misstatements and Omissions Regarding Luckin's Compliance with Laws and Regulations, GAAP, and Internal Controls over Financial Reporting**

537.     The IPO Registration Statement stated that Luckin's "***consolidated financial statements are prepared and presented in accordance with U.S. GAAP***."  The IPO Registration Statement included operating data and audited consolidated financial data for the periods from June 16, 2017 through December 31, 2017, and the year ended December 31, 2018, and operating data and unaudited quarterly financial data for the four quarters of 2018 and the three months ended March 31, 2019.  The IPO Registration Statement also represented that the Company's reported quarterly financial data "***includes all adjustments, consisting only of normal and***

***recurring adjustments, that we consider necessary for a fair representation of our operating results for the quarters presented***."

538.    The IPO Registration Statement's representations regarding Luckin's compliance with GAAP were materially false or misleading when made.  As Luckin has admitted, by the time of the IPO, it had begun inflating its revenue and expenses through fabricated transactions.  Luckin's fabrication of revenue and expenses in the second quarter of 2019—when the IPO occurred—resulted in material misstatements in net revenue, all metrics derived from net revenue, and operating costs and expenses.  As alleged above, Luckin's misstatements of its revenue and expenses, and reliance on undisclosed related-parties to facilitate its fabrication transactions, violated numerous GAAP principles, including ASC 605 (*Revenue Recognition*), ASC 605-50 (*Customer Payments and Incentives*), ASC 845 (*Nonmonetary Transactions*), and ASC 850 (*Related Party Disclosures*).  Even if Luckin's fabrication of revenue and expenses had yet to be reflected in Luckin's reported financial results, under ASC 855 (*Subsequent Events*), Luckin's ongoing fabrication of revenue and expenses should have been disclosed as subsequent events in the notes to the IPO Financial Statements.  Luckin's ongoing violations of GAAP at the time of the IPO rendered the IPO Registration Statement's claims regarding Luckin's compliance with GAAP materially incomplete and therefore misleading.

539.    The IPO Registration Statement stated that during the audit of Luckin's consolidated financial statements for the year ended December 31, 2018, the Company and its outside auditor, E&Y Hua Ming, identified two material weaknesses in the Company's internal control over financial reporting: (i) the "lack of sufficient accounting and financial reporting personnel with requisite knowledge and experience in application of U.S. GAAP and the Securities and Exchange Commission, or the SEC, rules"; and (ii) "lack of financial reporting policies and

procedures that are commensurate with U.S. GAAP and the SEC reporting requirements."  The

IPO Registration Statement also represented that:

> We are ***in the process of implementing a number of measures to address these material weaknesses identified***, including: (i) hiring additional accounting and financial reporting personnel with U.S. GAAP and SEC reporting experience, (ii) expanding the capabilities of existing accounting and financial reporting personnel through continuous training and education in the accounting and reporting requirements under U.S. GAAP, and SEC rules and regulations, (iii) developing, communicating and implementing an accounting policy manual for our accounting and financial reporting personnel for recurring transactions and period-end closing processes, and (iv) ***establishing effective monitoring and oversight controls for non-recurring and complex transactions to ensure the accuracy and completeness of our company's consolidated financial statements and related disclosures***.

540.    The IPO Registration Statement's representations about Luckin's efforts to

remediate its material weaknesses and deficiencies, including by "***establishing effective***

***monitoring and oversight controls***," were false or misleading because, as Luckin has admitted, at

the time of the IPO, Luckin lacked adequate internal controls over financial reporting sufficient to

prevent or detect the massive fabrication of revenue and expenses being perpetrated by its senior

management beginning in April 2019.   Indeed, Luckin did not "***charter[] an internal audit***

***function to test and evaluate its control functions***" until ***after*** Luckin's overstatement of revenue

and expenses was revealed to the market.  Furthermore, Luckin's Finance and Treasury functions,

basic transaction-level controls, were not overseen by its CFO.  As a result of these undisclosed

material weaknesses in Luckin's internal controls over financial reporting, by the time of the IPO,

Luckin's revenue and expenses had begun to be inflated through fabricated transactions.  Since

any purported remedial measures implemented by the Company had failed to prevent Luckin and

the Executive Defendants' ongoing financial misconduct at the time of the IPO, these measures

were plainly insufficient, rendering the IPO Registration Statement materially false or misleading.

541.   The IPO Registration Statement stated that Luckin's success depended on its ability to "*ensur[e] full compliance with relevant laws and regulations*."   It further stated that the Company "*may* be unsuccessful in operating our stores" and that "[t]he operating results of our stores have been and will continue to be subject to a number of factors," including Luckin's "*ability to ensure full compliance with relevant laws and regulations, and maintain adequate and effective control, supervision and risk management over our stores*."   The IPO Registration Statement also stated that Luckin's ability to successfully grow its business and brand recognition depended on its ability to "*stay compliant* with relevant laws and regulations."   Furthermore, the IPO Registration Statement stated that Luckin's ability "to successfully manage [its] rapid growth" depended on "effectively managing our supply chain and ensuring our third-party suppliers continue to meet our quality and other standards and satisfy our future operations' needs."

542.   The statements in the IPO Registration Statement regarding Luckin's compliance with relevant laws and regulations were materially false or misleading because, as Luckin has admitted, at the time of the IPO, Luckin's senior management was actively engaged in widespread financial misconduct, including the overstatement of Luckin's revenue and expenses.   The IPO Registration Statement's purported risk disclosures warning of *potential* risks due to non-compliance with relevant law or regulations were materially false or misleading because, by the time of the IPO, this risk of non-compliance had already materialized due to the ongoing financial misconduct by the Company's senior management.

543.   The IPO Registration Statement included a risk disclosure related to short sellers that acknowledged the possibility that Luckin could be accused of financial or accounting misconduct.  However, the IPO Registration Statement disclaimed awareness of any basis for short sellers to attack the Company with this kind of accusation:

Public companies that have substantially all of their operations in China have been the subject of short selling. Much of the scrutiny and negative publicity has centered on ***allegations of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and, in many cases, allegations of fraud***. As a result, many of these companies are now conducting internal and external investigations into the allegations and, in the interim, are subject to shareholder lawsuits and/or SEC enforcement actions.

***It is not clear what effect such negative publicity could have on us***. If we were to become the subject of any unfavorable allegations, ***whether such allegations are proven to be true or untrue***, we could have to expend a significant amount of resources to investigate such allegations and/or defend ourselves. ***While we would strongly defend against any such short seller attacks***, we may be constrained in the manner in which we can proceed against the relevant short seller by principles of freedom of speech, applicable state law or issues of commercial confidentiality. Such a situation could be costly and time-consuming, and could distract our management from growing our business. ***Even if such allegations are ultimately proven to be groundless***, allegations against us could severely impact our business operations, and any investment in the ADSs could be greatly reduced or even rendered worthless.

544.    The foregoing statements regarding the absence of any financial or accounting misconduct at the Company were materially false or misleading because, as Luckin has admitted, at the time of the IPO, Luckin's senior management was actively engaged in widespread financial misconduct, including the overstatement of Luckin's revenue and expenses. The IPO Registration Statement's purported risk disclosures warning of ***potential*** risks due to "allegations of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and, in many cases, allegations of fraud" were materially false or misleading because, by the time of the IPO, the risk of these allegations being made had already materialized due to the ongoing financial misconduct by Luckin's senior management.

### c.   Misstatements and Omissions Regarding Luckin's Business Model and Increased Earnings and Growth

545.    The IPO Registration Statement stated that Luckin had "*pioneered a technology-driven new retail model to provide coffee and other products with high quality, high affordability and high convenience to our customers*," and that this "*disruptive model has fulfilled the large unmet demand for coffee and driven its mass market consumption in China, while allowing [the Company] to achieve significant scale and growth since our inception*."  The IPO Registration Statement also claimed that Luckin's "*focus on technologies has enabled [it] to operate efficiently, [and] grow rapidly while maintaining quality control*."

546.    The IPO Registration Statement further stated that the Company's "*revenue growth is mainly driven by [its] ability to attract new customers and actively engage existing customers*" and that the growth of the Company's net revenues was "*primarily driven by the significant increase in the number of [its] transacting customers, [its] stores, and [its] products sold*."  The IPO Registration Statement attributed Luckin's ability to attract and retain customers to Luckin's "*new retail model . . . built upon [its] mobile apps and store network*," claiming that it "*leverage[d] big data analytics and AI to analyze [Luckin's] customer behavior and transaction data, which enables [it] to attract new customers and retain and engage existing customers to increase repurchases*."

547.    The statements in the IPO Registration Statement attributing Luckin's growth, including its growth in revenues, to factors such as its purportedly "*disruptive*" "*technology-driven new retail model*" were materially false or misleading when made.  By the time of the IPO, Luckin's growth rate had declined dramatically, from a 93.3% sequential increase in total net revenues during the fourth quarter of 2018 to just 2.8% during the first quarter of 2019, demonstrating the failure of Luckin's business model.  Contrary to the representations in the IPO

Registration Statement, at the time of the IPO, Luckin's revenues were being materially overstated through fabricated transactions.  Indeed, in 2Q2019 alone, which began on April 1, 2019, Luckin's revenues were overstated by over ***40%***.  This overstatement of revenues rendered materially false or misleading the IPO Registration Statement's claims regarding Luckin's business model and the reasons for Luckin's growth.  Having chosen to speak affirmatively about the reasons for Luckin's revenue growth and business expansion, it was materially misleading for the IPO Registration Statement not to disclose that Luckin's revenues were being materially inflated through fabricated transactions.

548.    The IPO Registration Statement also touted Luckin's purported "***store operational efficiency by leveraging technology***."   The IPO Registration Statement stated that Luckin "measure[s] [its] store performance with store level operating profit (loss), which is calculated by deducting cost of materials, store rental and other operating costs and depreciation expenses from net revenues from sales of freshly brewed drinks and other products."  It claimed that Luckin's "***technology-driven new retail business model significantly improves [its] operational efficiency***" and touted the fact that store-level operating loss as a percentage of net revenues had rapidly declined from 1,260.4% in 2017 to 44.3% in the first quarter of 2019.  The IPO Registration Statement further represented that "***store level operating costs, including cost of materials, store rental and other operating costs and depreciation expenses, will continue to decrease as percentage of our net revenues from sales of freshly brewed drinks and other products***."

549.    The statements in the IPO Registration Statement touting Luckin's store-level operational efficiency and claims that store-level operating costs would continue to decrease as a percentage of net revenues were materially false or misleading when made.  By the time of the IPO, Luckin's growth rate had declined dramatically, from a 93.3% sequential increase in total net

revenues during the fourth quarter of 2018 to just 2.8% during the first quarter of 2019, demonstrating the failure of Luckin's business model.  Contrary to the representations in the IPO Registration Statement, at the time of the IPO, Luckin's revenues were being materially overstated through fabricated transactions.  Indeed, in 2Q2019 alone, which began on April 1, 2019, Luckin overstated its revenues by over **_40%_**.  Given Luckin's ongoing reliance on fabricated transactions to inflate its revenues, the statements in the IPO Registration Statement that store-level operating losses were decreasing and "store level operating costs . . . will continue to decrease as percentage of our [Luckin's] revenues" were materially false or misleading when made.

### d. Misstatements and Omissions Regarding Luckin's Use of Coupons and Vouchers

550. The IPO Registration Statement stated that Luckin's "ability to cost-effectively attract new customers and retain existing customers is crucial to driving net revenues growth and achieving profitability," and claimed that Luckin had "**_invested significantly in branding, sales and marketing to acquire and retain customers since [the Company's] inception_**."  It further stated that the Company offered "**_various discount offers and deals in the form of vouchers and coupons_**" and "**_regularly offer[ed] coupons and vouchers to increase [Luckin's] customer base, retain [its] existing customers or promote new products_**."  The IPO Registration Statement specifically touted the Company's introduction of bulk corporate promotions, stating that Luckin had "**_opened [its] application programming interface to corporations with membership programs, where the corporations pay for [Luckin's] products in bulk in advance, and their members can then redeem these products_**."

551. The foregoing statements regarding Luckin's purported sales and marketing expenses, including its reliance on coupons and vouchers to increase revenues, were materially false or misleading when made.  As Luckin has admitted, by the time of the IPO, Luckin's revenues

and expenses were being overstated through fabricated transactions involving vouchers and coupons. Specifically, Luckin employees interviewed by the *Journal* reported using individual accounts registered with cellphone numbers to purchase vouchers for numerous cups of coffee. Consistent with these accounts, FE 1 and FE 3 both stated that Luckin's use of coupons and vouchers helped to facilitate its fabrication of revenue. Moreover, as reported by the *Journal*, around the time of the IPO, Luckin began selling massive amounts of fictitious bulk coffee vouchers to corporate customers, many of which had direct ties to Lu. The undisclosed reliance on coupons and vouchers to facilitate the overstatement of Luckin's revenues rendered these statements materially false or misleading.

### e.      Misstatements and Omissions Regarding Related-Party Transactions

552.    The IPO Registration Statement identified several related-party transactions involving Luckin's officers and directors, including loans from and to Qian and Lu. The IPO Registration Statement also disclosed that Luckin rented office space from UCAR and Luckin received advertising services from a company affiliated with CAR. Specifically, the IPO Registration Statement identified the following related party transactions:

#### Transactions with Ms. Jenny Zhiya Qian and Mr. Min Chen

In 2017, we received a loan from Ms. Jenny Zhiya Qian of RMB50 million and a loan from Mr. Min Chen, our then director, of RMB10 million to support our working capital management. The loan is interest-free with a term of one year and permits prepayment. We settled all the outstanding balance of the related party loans due to Ms. Jenny Zhiya Qian and Mr. Min Chen in 2018.

#### Transactions with Haode Investment, Haode Group, UCAR and QWOM

In 2017, we received a loan of RMB1.8 million from Haode Investment Inc., a shareholder of our company and an affiliate of Mr. Charles Zhengyao Lu, to support our working capital management. The loan is interest-free with a term of one year and permits prepayment. We settled all the outstanding balance of the related party loan due to Haode Investment Inc. in 2018.

In 2018, we provided a loan of RMB147.6 million (US$22.0 million) to Haode Group Inc., an affiliate of by [sic] Mr. Charles Zhengyao Lu. The loan is interest-free with a term of six months and permits prepayment. We settled all the outstanding balance of the related-party loan due from Haode Group Inc. in February 2019.

We rent certain office space from UCAR Inc. In 2018 and in the three months ended March 31, 2019, the amount for the rent for UCAR. Inc. was RMB3.2 million (US$0.5 million) and RMB 1.0 million (US$0.1 million), respectively, and as of December 31, 2018 and March 31, 2019, the amount due to UCAR. Inc. was RMB1.0 million (US$0.1 million) and RMB 1.0 million (US$0.1 million), respectively.

We received advertising service from Beijing QWOM Digital Technology Co., Ltd., or QWOM, an affiliate of CAR Inc., which is an affiliate of Mr. Charles Zhengyao Lu. In 2018 and in the three months ended March 31, 2019, the amount for advertising service fee for QWOM was RMB 42.9 million (US$ 6.4 million) and RMB 7.6 million (US$1.1 million), respectively, and as of December 31, 2018 and March 31, 2019, the amount due to QWOM was RMB 23.2 million (US$3.5 million) and RMB 7.0 million (US$1.0 million), respectively.

### Transaction with Primus

In 2017, we received a loan of RMB92.9 million from Primus Investments Fund, L.P., a shareholder of our company and an affiliate of Mr. Charles Zhengyao Lu, to support our working capital management. The loan is interest-free with a term of one year and permits prepayment. We settled all the outstanding balance of the related party loan due to Primus Investments Fund, L.P. in 2018.

### Transaction with Star Grove

In 2017, we received a loan of RMB227.5 million from Star Grove Global Limited, a shareholder of our company, to support our working capital management. The loan is interest-free with a term of one year and permits prepayment. We settled all the outstanding balance of the related party loan due to Star Grove Global Limited in 2018.

553.    The IPO Registration Statement's disclosures regarding Luckin's related-party transactions were materially incomplete and therefore materially false or misleading when made. Under ASC 850 (*Related Party Disclosures*), transactions with a related party or entity with common control relationships must be disclosed where information about the transactions "would make a difference in decision making."  ASC 850-10-10-1.  As the Company has admitted,

"*[e]vidence discovered to date demonstrates that the Company's former Chief Executive Officer, Ms. Jenny Zhiya Qian, former Chief Operating Officer, Mr. Jian Liu and certain employees reporting to them participated in the fabricated transactions and that the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties*."   Moreover, Luckin sold purported vouchers and made supplier payments to dozens of entities linked directly to Defendant Lu.   The SAMR determined that "*43 third-party related business entities, including Beijing Automotive Travel Business Consulting Services Co. Ltd., UCar, Zhengzhe International (Xiamen) Co. Ltd. aided and abetted Luckin in carrying out the misleading acts*."   As sources with knowledge of Luckin's internal investigation stated, Luckin "*found evidence that Mr. Lu had knowledge of certain related-party transactions that weren't properly disclosed*."

554.   With respect to each of these transactions, ASC 850 required Luckin to disclose: (i) the nature of the relationship; (ii) a description of the transactions (even if the transaction involved nominal amounts) including "information deemed necessary to an understanding of the effects of the transactions on the financial statements"; (iii) the dollar amount of the transactions for all periods that income statements were presented; and (iv) "amounts due from or to related parties."   ASC 850-10-50-1.   By failing to do so, the IPO Registration Statement's related-party disclosures were rendered materially false or misleading.

**f.      The IPO Registration Statement Misattributed the Reduced Growth in 1Q2019 to Seasonal Factors**

555.   During the first quarter of 2019, just before the IPO, Luckin's net revenue growth rate slowed dramatically.   While the Company had experienced a 93.3% sequential increase in total net revenues during the fourth quarter of 2018, its revenues grew by just 2.8% during the first quarter of 2019.   Moreover, its sequential growth in cumulative transacting customers declined

from 6.5 million in 4Q2018 to 4.3 million in 1Q2019, and the Company opened just 297 stores—

less than half of the 625 openings it needed to be on pace to hit its 2,500 store target for 2019.

556.    The IPO Registration Statement represented that the Company's reduced growth

during the first quarter of 2019 was due to seasonal factors:

> We experience seasonality in our business, primarily as a result of orders
> fluctuations in holiday seasons.   For example, we generally experience fewer
> purchase orders during Chinese New Year holidays which fall between late January
> and late February.   The decrease of sales during the holiday seasons is a typical
> pattern in the coffee market.

557.    The IPO Registration Statement similarly provided: "As in the case of customer

retention rate, we generally experience a seasonal decrease in transaction value per customer

(based on listed price) during the Chinese New Year holidays when most office workers go on

holiday."

558.    Those disclosures were false or misleading.   The downturn in Luckin's operating

results in the first quarter of 2019 was not due in whole or in significant part to short-term seasonal

factors, as the IPO Registration Statement represented.   Rather, as the Company has now admitted,

it began inflating its sales immediately after the end of the first quarter of 2019 to conceal its lack

of growth—something that would have been entirely unnecessary if the Company's first quarter

results were due to transient seasonal factors.   Moreover, Luckin's principal competitor, Starbucks,

did not report any seasonal impact of Chinese New Year on its sales in China.

### 2.    SPO Registration Statement

#### a.    The SPO Registration Statement Misstated Luckin's Revenues and Expenses

559.    The   SPO   Registration   Statement   included   "unaudited   interim   condensed

consolidated statements of comprehensive loss data" for the nine months ended September 30,

2019.   It stated that Luckin had generated total net revenues for the nine months ended September

30, 2019 of RMB2,929,216 thousand (US$413,634 thousand).  The SPO Registration Statement included the following chart purporting to reflect Luckin's net revenue growth in 2019:

| | Period from the inception date to December 31, 2017 | | For the year ended December 31, 2018 | | | For the nine months ended September 30, | | | |
| | | | | | | 2018 | | 2019 | | |
| | RMB | % | RMB | US$ | % | RMB | % | RMB | US$ | % |
| | | | | *(in thousands, except for percentages)* | | | | | | |
| **Net revenues :** | | | | | | | | | | |
| Freshly brewed drinks | 215 | 86.0% | 649,609 | 90,884 | 77.3% | 302,759 | 80.7% | 2,165,614 | 302,981 | 74.0% |
| Other products | 25 | 10.0% | 135,642 | 18,977 | 16.1% | 44,249 | 11.8% | 642,662 | 89,912 | 21.9% |
| Others | 10 | 4.0% | 55,444 | 7,757 | 6.6% | 28,254 | 7.5% | 120,940 | 16,920 | 4.1% |
| **Total net revenues** | **250** | **100.0%** | **840,695** | **117,618** | **100.0%** | **375,262** | **100.0%** | **2,929,216** | **409,813** | **100.0%** |

560.   The SPO Registration Statement touted that during the nine months ended September 30, 2019, Luckin's "***net revenues*** . . . ***increased by 680.6% from RMB375.3 million in the nine months ended September 30, 2018***."

561.   The SPO Registration Statement broke down Luckin's net revenue growth by category and touted the significant year-over-year growth in each category.  The SPO Registration Statement claimed that "[Luckin's] net revenues from freshly brewed drinks were RMB2,165.6 million (US$303.0 million) in the nine months ended September 30, 2019, ***increased by 615.3%*** from RMB302.8 million in the nine months ended September 30, 2018," and represented that "***[t]he growth of [Luckin's] freshly brewed drinks revenue was primarily driven by the significant increase in the number of*** . . . ***freshly brewed drinks sold***."

562.   The SPO Registration Statement claimed that "net revenues from other products were RMB642.7 million (US$89.9 million) in the nine months ended September 30, 2019, ***increased by 1,352.4%*** from RMB44.2 million in the nine months ended September 30, 2018," and represented that "***[t]he increase in other product revenue was primarily driven by the significant increase in the number of other products sold and newly launched product offering***."

563.   The SPO Registration Statement claimed that "other revenue was RMB120.9 million (US$16.9 million) in the nine months ended September 30, 2019, ***increased by 328.0%***

from RMB28.3 million in the nine months ended September 30, 2018," and represented that *"[t]he growth of . . . other revenue was in line with the increase of delivery orders*."

564.    The SPO Registration Statement also touted Luckin's purported decrease in net loss, stating that Luckin "recorded a net loss of RMB1,764.9 million (US$246.9 million) in the nine months ended September 30, 2019, compared to a net loss of RMB950.2 million in the nine months ended September 30, 2018."

565.    The statements in the SPO Registration Statement regarding Luckin's revenue growth, including its consolidated statements of comprehensive loss data for the nine months ended September 30, 2019, were materially false or misleading when made.  Luckin has admitted that all the financial results for 2Q2019 and 3Q2019 reported to the market, including net revenue and all metrics derived from net revenue, were materially overstated.  Luckin has admitted that it overstated Luckin's net revenue by *40.3%* and *88%* and in 2Q2019 and 3Q2019, respectively.  As a result of these material misstatements, Luckin retracted its reported financial results for 2Q and 3Q2019, and all "*other communications relating to these consolidated financial statements*," stating that "*investors should no longer rely upon the Company's previous financial statements and earning releases*."

566.    The misstatement of revenue in the SPO Registration Statement grossly exaggerated the growth and success of Luckin's business during the nine months ended September 30, 2019.  The SPO Registration Statement overstated the growth in Luckin's total net revenue for the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018 by *59%*.  Likewise, Luckin's net loss was vastly understated during this period.

567.    With respect to operating expenses, the SPO Registration Statement stated that Luckin's "operating expenses were RMB4,736.9 million (US$662.7 million) in the nine months

ended September 30, 2019, compared to RMB1,329.5 million in the nine months ended September 30, 2018," and stated that *"[t]he growth of our operating expenses was in line with [the Company's] business expansion*." It also represented that "operating expenses as a percentage of our net revenues decreased from 354.3% in the nine months ended September 30, 2018 to 161.7% in the nine months ended September 30, 2019, *mainly driven by the increased economies of scale and our technology-driven operations*."

568. These statements regarding Luckin's operating expenses in the nine months ended September 2019 were materially false or misleading. Luckin has admitted that its costs and expenses were overstated in 2Q2019 and 3Q2019 by *10.4%* and *32%*, respectively. As a result of these material misstatements, Luckin retracted its reported financial results for 2Q2019 and 3Q2019, including the reported costs and expenses, and "*other communications relating to*" these financial results, stating that "*investors should no longer rely upon the Company's previous financial statements and earning releases*."

569. Given Luckin's admitted overstatement of its operating expenses, the SPO Registration Statement's representations regarding Luckin's purported operating expenses, including that "*[t]he growth of our operating expenses was in line with [the Company's] business expansion*," were also materially false or misleading.

> **b.      The SPO Registration Statement Failed to Disclose Subsequent Events that Rendered Luckin's Reported Financial Results Materially Misleading**

570. The SPO Registration Statement included Luckin's consolidated balance sheets as of December 31, 2017 and December 31, 2018, consolidated statements of cash flows and comprehensive loss for the period from June 16, 2017 (date of inception) through December 31, 2017 and for the year ended December 31, 2018, and unaudited interim condensed consolidated

balance sheet data and statements of cash flow and comprehensive loss for the nine months ended September 30, 2019.

571.    The SPO Registration purported to disclose all "SUBSEQUENT EVENTS" in the notes to the SPO Financial Statements.  Note 20 to Luckin's 2017 and 2018 financial statements stated that "[o]n January 9, 2019, the Company issued additional 6,809 Series B Preferred Shares to Galaxy Shine Limited at US$734.37 per share for an aggregate purchase consideration of US$5,000" and that "[o]n January 18, 2019, [Luckin] adopted the 2019 share option plan providing for the grants of share options to its employees and directors."  Note 16 to Luckin's unaudited interim condensed consolidated financial statements, including for the nine months ended September 30, 2019 stated that on "July 23, 2019, the Company signed an Equity Joint Venture Agreement with Louis Dreyfus Company North Asia Pte Ltd. to transfer to it 40% of the Company's equity ownership in Luckin Roastery Technology (Xiamen) Co., Ltd." and that on "September 25, 2019, the Company signed an Equity Joint Venture Agreement with Louis Dreyfus Company Juices Holding B.V. to establish a joint venture to develop a co-branded not-from-concentrate juice business in China."  The SPO Registration Statement did not disclose any other subsequent events.

572.    The SPO Financial Statements were materially false or misleading when issued. As Luckin has admitted, beginning before the IPO and continuing through the date of the SPO, Luckin's senior management was actively engaged in a scheme to inflate the Company's revenue and expenses through massive fabricated transactions.  This scheme resulting in an overstatement of Luckin's revenues by *40.3%* and expenses by *10.4%* in the second quarter of 2019; an overstatement of Luckin's revenues by *88%* and expenses by *32%* in the third quarter of 2019; and an overstatement of Luckin's revenues by at least *95%* in the fourth quarter of 2019.  The

Company's admissions establish that its fabrication of revenue and expenses had been ongoing for three full quarters before the SPO Financial Statements were filed with the SEC as part of the SPO. Under ASC 855, Luckin was required to disclose all events "of such a nature that they must be disclosed to keep the financial statements from being misleading."  Given the magnitude and material nature of the fabricated transactions, under ASC 855, these transactions should have been disclosed as non-recognized subsequent events in the notes to the SPO Financial Statements.

573.    By failing to disclose Luckin's overstatement of revenue and expenses as subsequent events in the notes to the SPO Financial Statements, the SPO Registration Statement violated GAAP.  Because the SPO Financial Statements were "not prepared in accordance with generally accepted accounting principles," they are "presumed to be misleading or inaccurate." Regulation S-X, 17 C.F.R.  § 210.4–01(a)(1).

### c.    The SPO Registration Statement Contained False or Misleading Non-GAAP Financial Measures in Violation of Regulation G

574.    The SPO Registration Statements contained the following non-GAAP financial measures, including  adjusted operating loss, adjusted net loss, and non-GAAP net loss attributable to ordinary shareholders:

| | Period from the inception date to December 31, 2017 RMB | For the year ended December 31, 2018 | | For the nine months ended September 30, | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | RMB | US$ | 2018 RMB | 2019 RMB | US$ |
| | | | (in thousands) | | | |
| Operating loss | (56,207) | (1,598,006) | (223,568) | (954,235) | (1,807,688) | (252,904) |
| Adjusted for: Share-based compensation expenses | — | — | — | — | 111,210 | 15,559 |
| **Non-GAAP operating loss** | **(56,207)** | **(1,598,006)** | **(223,568)** | **(954,235)** | **(1,696,478)** | **(237,345)** |
| Net loss | (56,371) | (1,619,152) | (226,526) | (950,153) | (1,764,921) | (246,920) |
| Adjusted for: Share-based compensation expenses | — | — | — | — | 111,210 | 15,559 |
| Adjusted for: Change in the fair value of warrant liability | — | 19,276 | 2,697 | 991 | 8,322 | 1,164 |
| **Non-GAAP net loss** | **(56,371)** | **(1,599,876)** | **(223,829)** | **(949,162)** | **(1,645,389)** | **(230,197)** |
| Net loss attributable to our company's Ordinary Shareholders | (56,371) | (3,190,334) | (446,342) | (1,744,145) | (2,319,084) | (324,451) |
| Add: Accretion to redemption value of convertible redeemable preferred shares | — | 1,571,182 | 219,816 | 793,992 | 552,036 | 77,233 |
| Add: Share-based compensation expenses | — | — | — | — | 111,210 | 15,559 |
| Add: Change in the fair value of warrant liability | — | 19,276 | 2,697 | 991 | 8,322 | 1,164 |
| **Non-GAAP net loss attributable to our company's Ordinary Shareholders** | **(56,371)** | **(1,599,876)** | **(223,829)** | **(949,162)** | **(1,647,516)** | **(230,495)** |

575.    The SPO Registration Statement stated that Luckin defined "non-GAAP operating loss as operating loss excluding share-based compensation expenses, and non-GAAP net loss as

net loss excluding share-based compensation expenses and change in fair value of warrant liability." The SPO Registration Statement claimed that these non-GAAP financial measures "*help identify underlying trends in [Luckin's] business, provide further information about [its] results of operations, and enhance the overall understanding of [its] past performance and future prospects*."

576. The statements in the SPO Registration Statement regarding Luckin's non-GAAP financial measures were materially false or misleading when made. Luckin has admitted that all of the financial results for 2Q2019 and 3Q2019 reported in the SPO Registration Statement, including its non-GAAP financial measures, which were derived from Luckin's reported net revenues and expenses, were materially inflated. Luckin has admitted that it overstated its net revenue by *40.3%* and *88%* and in 2Q2019 and 3Q2019, respectively, resulting in massive inflation in Luckin's reported non-GAAP operating loss and net loss. As a result of these material misstatements, Luckin retracted its reported financial results for 2Q2019 and 3Q2019, and all "*other communications relating to these consolidated financial statements*," stating that "*investors should no longer rely upon the Company's previous financial statements and earning releases*." By issuing these false or misleading non-GAAP financial measures, the SPO Registration Statement violated Regulation G, 17 C.F.R. § 244.100.

### d. Misstatements and Omissions Regarding the Reasons for Luckin's Increased Earnings and Growth

577. The SPO Registration Statement made numerous misstatements falsely attributing Luckin's purported revenue growth to factors other than the overstatement of revenue. It claimed that Luckin had "*pioneered a technology-driven new retail model to provide coffee, tea and other products with high quality, high affordability and high convenience to [Luckin's] customers*," and that the Company's "*disruptive model has fulfilled the large unmet demand for coffee and*

*driven its mass market consumption in China, while allowing [it] to achieve significant scale and growth since [its] inception*."

578.  The SPO Registration Statement claimed that "*[t]he growth of [Luckin's] net revenues was primarily driven by the significant increase in the number of [its] transacting customers, effective selling prices and purchasing frequency per customer*."

579.  The SPO Registration Statement likewise attributed Luckin's rapid growth to its "*centralized technology system*," which the SPO Registration Statement claimed enabled Luckin "*to simplify and standardize [its] operations, which allows [it] to improve operational efficiency and quickly expand and scale up [its] business*."  The SPO Registration Statement stated that the Company's "*revenue growth is mainly driven by [its] ability to attract new customers and actively engage existing customers*."

580.  The SPO Registration Statement claimed that Luckin "leverage[d] big data analytics and AI to analyze [Luckin's] customer behavior and transaction data, which enables [it] to continually enhance [its] products and services, implement dynamic pricing and improve customer retention."  The SPO Registration Statement claimed that by "*leverag[ing] big data analytics and AI*," Luckin was able "*to attract new customers and retain and engage existing customers to increase repurchases*."  It stated that Luckin's "*focus on technologies has enabled [Luckin] to operate efficiently, grow rapidly while maintaining quality control*."  And it claimed that by "*leveraging our new retail model*, *[Luckin] experienced robust growth in net revenues* in 2018 *and in the nine months ended September 30, 2019*."

581.  The SPO Registration Statement's representations attributing Luckin's revenue growth to factors other than financial misconduct—like its "*technology-driven new retail model*," its "*centralized technology system*," an "*increase in the number of transacting customers*," its

"*leverag[ing] of big data analytics and AI*" and "*economies of scale*"—were materially false or misleading.  Contrary to the SPO Registration Statement's claims, the growth in Luckin's net revenues during 2Q2019 and 3Q2019 was driven in large part by the overstatement of revenues through fabricated transactions.  As a result, the statements in the SPO Registration Statement attributing Luckin's "*robust growth*" in revenues to legitimate factors, such as Luckin's purportedly disruptive "*new retail model*," were materially false or misleading when made.

582.    With respect to operating expenses, the SPO Registration Statement represented that:

> *As a result of increased economies of scale and technology-driven operations, [Luckin's] operating expenses as a percentage of [its] net revenues decreased significantly from 1,066.2% in the first quarter of 2018 to 138.3% in the third quarter of 2019, and similarly, [its] operating loss as a percentage of [its] net revenues decreased rapidly from 966.2% in the first quarter of 2018 to 38.3% in the third quarter of 2019.*

583.    The foregoing statement attributing the decrease in Luckin's operating expenses as a percentage of net revenues to "*increased economies of scale and technology-driven operations*" was false or misleading, since the admitted overstatement in Luckin's revenues made Luckin appear far more profitable that it actually was.  Moreover, having chosen to speak affirmatively about the reasons for Luckin's revenue growth and business expansion, it was materially misleading for the SPO Registration Statement not to disclose that Luckin's revenues were being materially overstated.

584.    With respect to sales and marketing expenses, the SPO Registration Statement claimed that Luckin had "*invested significantly in sales and marketing activities to promote our brand and our products and to deepen our relationships with customers*," and that Luckin "*regularly offer[ed] coupons and vouchers to increase our customer base, retain our existing customers or promote new products.*"

585.    The SPO Registration Statement's claims regarding Luckin's purported investments in sales and marketing activities were materially false or misleading because Luckin's total costs and expenses (including sales and marketing expenses) were materially overstated. Moreover, as documented by the Anonymous Report, third-party media tracking showed that Luckin's 3Q2019 advertising expenses were overstated by ***over 150%***.  Luckin also relied on the purported vouchers and coupons that the SPO Registration Statement touted to facilitate the Company's fabricated transactions.  Specifically, Luckin employees interviewed by the *Journal* reported using individual accounts registered with cellphone numbers to purchase vouchers for numerous cups of coffee.  Consistent with these accounts, FE 1 and FE 3 both stated that Luckin's use of coupons and vouchers helped to facilitate the overstatement of its revenues.  Moreover, as reported by the *Journal*, since the time of the IPO, Luckin had been selling massive amounts of fictitious bulk coffee vouchers to corporate customers, many of which had direct ties to Lu. Luckin's undisclosed reliance on coupons and vouchers to facilitate its overstatement of Luckin's revenue rendered the foregoing statements materially false or misleading.

**e.    Misstatements and Omissions Regarding Luckin's Compliance with Laws and Regulations, GAAP, and Internal Controls over Financial Reporting**

586.    The SPO Registration Statement represented that Luckin's "***consolidated financial statements are prepared and presented in accordance with U.S. GAAP***."  The SPO Registration Statement included "unaudited interim condensed consolidated statements of comprehensive loss data and summary unaudited interim condensed consolidated cash flow data for the nine months ended September 30, 2018 and 2019."

587.    The SPO Registration Statement's representations regarding Luckin's compliance with GAAP were materially false or misleading when made.  As Luckin has admitted, its revenue and expenses in the second, third, and fourth quarters of 2019 were overstated, leading to material

239

misstatements in net revenue, all metrics derived from net revenue, and operating costs and expenses.  Luckin has admitted that it overstated its revenues by *40.3%* and expenses by *10.4%* in the second quarter of 2019; that it overstated its revenues by *88%* and expenses by *32%* in the third quarter of 2019; and that it overstated its revenues by at least *95%* in the fourth quarter of 2019. The Company's admissions establish that Luckin's fabrication of revenue and expenses had been ongoing for three full quarters before the SPO Financial Statements were filed with the SEC as part of the SPO.

588.    As alleged above, the SPO Registration Statement's material misstatements of Luckin's revenue and expenses, and reliance on undisclosed related-parties to facilitate its fabricated transactions, violated numerous GAAP principles, including ASC 605 (*Revenue Recognition*), ASC 605-50 (*Customer Payments and Incentives*), ASC 845 (*Nonmonetary Transactions*), and ASC 850 (*Related Party Disclosures*).  Moreover, under ASC 855 (*Subsequent Events*), Luckin's ongoing fabrication of revenue and expenses should have been disclosed as subsequent events in the notes to the SPO Financial Statements.  Luckin's longstanding and ongoing violations of GAAP at the time of the SPO rendered the SPO Registration Statement's claims regarding Luckin's compliance with GAAP materially incomplete and therefore misleading.

589.    The SPO Registration Statement disclosed that during the audit of Luckin's consolidated financial statements for the year ended December 31, 2018, the Company and its outside auditor, E&Y Hua Ming, identified two material weaknesses in the Company's internal control over financial reporting: (i) the "lack of sufficient accounting and financial reporting personnel with requisite knowledge and experience in application of U.S. GAAP and the Securities and Exchange Commission, or the SEC, rules"; and (ii) "lack of financial reporting policies and

procedures that are commensurate with U.S. GAAP and the SEC reporting requirements."  The

SPO Registration Statement claimed that:

> To remediate our identified material weakness and improve our internal control over financial reporting, ***we are implementing a number of measures to address these material weaknesses identified***, including: (i) hiring additional accounting and financial reporting personnel with U.S. GAAP and SEC reporting experience, (ii) expanding the capabilities of existing accounting and financial reporting personnel through regular training and education in the accounting and reporting requirements under U.S. GAAP, and SEC rules and regulations, (iii) developing, communicating and implementing an accounting policy manual for our accounting and financial reporting personnel for recurring transactions and period-end closing processes, and (iv) ***establishing effective monitoring and oversight controls for non-recurring and complex transactions to ensure the accuracy and completeness of our company's consolidated financial statements and related disclosures***.

590.     The SPO Registration Statement claimed that:

> The process of designing and implementing an effective financial reporting system is a ***continuous effort*** that requires [Luckin] to anticipate and react to changes in [its] business and the economic and regulatory environments and to expend significant resources ***to maintain a financial reporting system that is adequate to satisfy our reporting obligation***.

591.     The SPO Registration Statement's representations about Luckin's efforts to

remediate its material weaknesses and deficiencies, including by "***establishing effective***

***monitoring and oversight controls***," were false or misleading.  As Luckin has admitted, it lacked

adequate internal controls over financial reporting sufficient to prevent or detect its overstatement

of revenues and expenses beginning in April 2019.  Indeed, Luckin did not "***charter[] an internal***

***audit function to test and evaluate its control functions***" until ***after*** Luckin's financial misconduct

was revealed to the market.   Furthermore, Luckin's Finance and Treasury functions, basic

transaction-level controls, were not overseen by its CFO.  As a result of these undisclosed material

weaknesses in Luckin's internal controls over financial reporting, Luckin overstated its revenue

and expenses throughout the second, third, and fourth quarters of 2019.  Any purported remedial

measures implemented by the Company had failed to prevent these misstatements and were therefore plainly insufficient.

592.     The SPO Registration Statement stated that Luckin's success depended on its ability to "*ensur[e] full compliance with relevant laws and regulations*."  It likewise stated that the Company "*may* be unsuccessful in operating [its] stores" and that "[t]he operating results of [its] stores have been and will continue to be subject to a number of factors," including Luckin's "*ability to ensure full compliance with relevant laws and regulations, and maintain adequate and effective control, supervision and risk management over our stores*."  The SPO Registration Statement further stated that Luckin's ability to successfully grow its business and brand recognition depended on its ability to "*stay compliant* with relevant laws and regulations." Furthermore, it claimed that Luckin's ability "to successfully manage [its] rapid growth" depended on "*effectively managing [its] supply chain and ensuring [its] third-party suppliers continue to meet [the Company's] quality and other standards and satisfy [its] future operations' needs*."

593.     The foregoing statements regarding Luckin's "*compliance*" with relevant laws and regulations were materially false or misleading because, as Luckin has admitted, it had been overstating its revenue and expenses through fabricated transactions since April 2019.  The purported risk disclosures warning of *potential* risks due to non-compliance with relevant laws or regulations were materially false or misleading because, at the time of the SPO, the risk of non-compliance had already materialized due to the ongoing financial misconduct by senior management.

594.     The SPO Registration Statement included a risk disclosure related to short sellers that acknowledged the possibility that Luckin could be accused of financial or accounting

misconduct.  However, it disclaimed awareness of any basis for short sellers to attack the Company

with this kind of accusation:

> Public companies that have substantially all of their operations in China have been the subject of short selling.  Much of the scrutiny and negative publicity has centered on allegations of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and, in many cases, allegations of fraud. As a result, many of these companies are now conducting internal and external investigations into the allegations and, in the interim, are subject to shareholder lawsuits and/or SEC enforcement actions.

> ***It is not clear what effect such negative publicity could have on us***. If we were to become the subject of any unfavorable allegations, ***whether such allegations are proven to be true or untrue***, we could have to expend a significant amount of resources to investigate such allegations and/or defend ourselves. ***While we would strongly defend against any such short seller attacks***, we may be constrained in the manner in which we can proceed against the relevant short seller by principles of freedom of speech, applicable state law or issues of commercial confidentiality. Such a situation could be costly and time-consuming, and could distract our management from growing our business. ***Even if such allegations are ultimately proven to be groundless***, allegations against us could severely impact our business operations, and any investment in the ADSs could be greatly reduced or even rendered worthless.

595.     The foregoing statements regarding the purported absence of any financial or

accounting misconduct at the Company were materially false or misleading because, as Luckin

has admitted, its revenue and expenses had been overstated through fabricated transactions since

April 2019, conduct which directly involved the Executive Defendants and other members of

Luckin's senior management.  Luckin's purported risk disclosures warning of ***potential*** risks due

to "***allegations of a lack of effective internal control over financial reporting resulting in***

***financial and accounting irregularities and mistakes, inadequate corporate governance policies***

***or a lack of adherence thereto and, in many cases, allegations of fraud***" were materially false or

misleading because, by the time of the SPO, the risk of these allegations had already materialized

due to Luckin's and the Executive Defendants' ongoing financial misconduct.

### f.    Misstatements and Omissions Regarding Related-Party Transactions

596.    The SPO Registration Statement identified the same related-party transactions involving Luckin's directors as were disclosed in the IPO Registration Statement.  The SPO Registration Statement did not disclose any other related-party transactions involving Lu or Qian or their affiliates.

597.    The SPO Registration Statement's disclosures regarding Luckin's related-party transactions were materially incomplete and therefore materially false or misleading when made. Under ASC 850 (*Related Party Disclosures*), transactions with a related party or entity with common control relationships must be disclosed where information about the transactions "would make a difference in decision making."  ASC 850-10-10-1.  As the Company has admitted, *"[e]vidence discovered to date demonstrates that the Company's former Chief Executive Officer, Ms. Jenny Zhiya Qian, former Chief Operating Officer, Mr. Jian Liu and certain employees reporting to them participated in the fabricated transactions and that the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties*."  Moreover, Luckin sold purported vouchers and made supplier payments to dozens of entities linked directly to Defendant Lu.  The SAMR determined that "*43 third-party related business entities, including Beijing Automotive Travel Business Consulting Services Co. Ltd., UCar, Zhengzhe International (Xiamen) Co. Ltd. aided and abetted Luckin in carrying out the misleading acts*."  As sources with knowledge of Luckin's internal investigation stated, Luckin "*found evidence that Mr. Lu had knowledge of certain related-party transactions that weren't properly disclosed*."

598.    With respect to each of these transactions, ASC 850 required Luckin to disclose: (i) the nature of the relationship; (ii) a description of the transactions (even if the transaction

involved nominal amounts) including "information deemed necessary to an understanding of the effects of the transactions on the financial statements"; (iii) the dollar amount of the transactions for all periods that income statements were presented; and (iv) "amounts due from or to related parties."  ASC 850-10-50-1.  By failing to do so, the SPO Registration Statement's related-party disclosures were rendered materially false or misleading.

### g.    Misstatements and Omissions Regarding the Margin Loan Facility

599.    The SPO Registration Statement disclosed that Defendants Lu, Qian and Lu's sister, Wong, had pledged a total of 488.4 million Luckin Class B shares, representing over ***42%*** of the total aggregate voting power in the Company, "to an affiliate of an underwriter to secure a borrowing."  However, the SPO Registration Statement did not provide any other disclosure to investors concerning the terms of the Facility Agreement under which these shares were pledged, nor any disclosure concerning the amounts borrowed or the risk of default.  Indeed, the SPO Registration Statement expressly disclaimed the risk of default, stating that Luckin was "***not aware of any arrangement that may, at a subsequent date, result in a change of control of [the] company***."

600.    The SPO Registration Statement's disclosures regarding the Margin Loan Facility were materially false or misleading.  Unbeknownst to investors, Lu and Qian borrowed ***$518 million*** from the Underwriter Defendants, effectively cashing out of a significant percentage of their inflated holdings in Luckin in exchange for personal loans.  Moreover, the Facility Agreement provided that if Luckin's ADS price declined by at least 50% from $29.10—the price on December 11, 2019, when the Facility Agreement was last amended—the total amounts owed under the Margin Loan Facility would be immediately due in full, and that failure to immediately pay would result in potential liquidation of the pledged shares.  The SPO Registration Statement misled

investors by failing to disclose the risk that Lu's and Qian's control of the Company could be significantly reduced in the event of a decline in Luckin's ADS price—precisely the risk that materialized.

### G. The Registration Statements Failed to Disclose Information Required to Be Disclosed Under SEC Regulations

601.     As alleged above in ¶¶ 441-87, the IPO and SPO Registration Statements omitted material information regarding, among other things: (i) Luckin's overstatement of revenue and expenses by means of fabricated transactions, which Luckin has admitted began in April 2019; and (ii) that "*the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties*."

602.     Luckin's undisclosed reliance on fabricated transactions to inflate its revenue and expenses, and reliance on undisclosed related-party transactions to facilitate these fictitious transactions, reflected material changes in Luckin's mode of conducting its business that were required to be disclosed under Item 101.  The IPO and SPO Registration Statements violated Item 101 by failing to disclose these fabricated transactions.

603.     The omissions concerning Luckin's fabrication of revenue and expenses and reliance on undisclosed related parties to facilitate these fictitious transactions also constituted "*known trends or uncertainties*" and "*unusual or infrequent events or transactions*" that were required to be disclosed under Item 303.  As the IPO and SPO Registration Statements stated, Luckin had purportedly "achieved rapid growth since [its] inception."  However, the IPO and SPO Registration Statements acknowledged that "[i]f [Luckin's] growth rates decline, investors' perceptions of [its] business and prospects may be adversely affected and the trading price of the ADSs could decline."  Thus, Luckin's ability to sustain its previous growth rates was of critical

importance to understanding Luckin's prospects for the future, which is one of the principal purposes of the disclosures required by Item 303.  The IPO and SPO Registration Statements had a duty to disclose Luckin's overstatement of its revenues and expenses through fabricated transactions, as these facts were "***material events and uncertainties known to management*** that would cause reported financial information ***not to be necessarily indicative of future operating results or of future financial condition***" and "***important trends and risks*** . . . ***reasonably likely to shape the future***."  Because the IPO and SPO Registration Statements failed to make the requisite disclosures, they failed to comply with Item 303.

604.    The omissions concerning Luckin's overstatement of revenue and expenses through fabricated transactions, and reliance on undisclosed related-party transactions to facilitate these transactions, also constituted "significant factors" that made the IPO and SPO "speculative or risky."  As the IPO and SPO Registration Statements stated, material risks that posed serious threats to the Company included Luckin's "***ability to ensure full compliance with relevant laws and regulations***" and the risk that Luckin would be subject to "***allegations of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and, in many cases, allegations of fraud***"—the precise risk that materialized during the Class Period.  As a result, the IPO and SPO Registration Statements had a duty to disclose Luckin's currently known non-compliance with relevant laws and regulations, lack of effective internal control over financial reporting resulting in accounting irregularities, and ongoing misstatements of revenue and expenses, as these undisclosed factors made an investment in Luckin extremely risky.  By failing to disclose these risks, the IPO and SPO Registration Statements gave investors a materially false or misleading impression of the Company's real vulnerability to allegations of financial

misconduct.  Because the IPO and SPO Registration Statements failed to make the requisite disclosures, they violated Item 503.

## XIV.   CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT III
### Violation of Section 11 of the Securities Act Against All Defendants

605.    Plaintiffs incorporate ¶¶ 435-604 by reference.  This claim is premised on the remedies available under Section 11 of the Securities Act and does not assert that the Underwriter Defendants or Director Defendants acted with fraudulent intent.

606.    The IPO and SPO Registration Statements contained untrue statements of material fact, omitted to state other facts necessary to make the statements made in them not misleading, and omitted facts required to be stated in them.

607.    Defendants Lu, Qian, J. Liu, Guo, Schakel, Li, and E. Liu each signed the IPO Registration Statement and caused it to be declared effective by the SEC on or about May 17, 2019.  Defendants Shao and Meier both signed letters of consent, which were filed as exhibits to the IPO Registration Statement, stating that, "[p]ursuant to Rule 438 under the Securities Act of 1933, as amended, I hereby consent to the references to my name in the Registration Statement on Form F-1 . . . of the Company and any amendments thereto, which indicate that I have accepted the nomination to become a director of the Company.  I further agree that immediately upon the Securities and Exchange Commission's declaration of effectiveness of the Registration Statement, I will serve as a member of the board of directors of the Company."  Defendants Lu, Qian, J. Liu, Guo, Schakel, Li, E. Liu, Shao, and Meier each signed the SPO Registration Statement and caused it to be declared effective by the SEC on or about January 10, 2020.

608.   Luckin is the registrant for the IPO and SPO and as issuer of the ADSs is strictly liable to Plaintiffs and the Class for the misstatements and omissions contained in the IPO and SPO Registration Statements.

609.   Each of the Defendants named in this Count is responsible for and is liable for the contents and dissemination of the IPO and SPO Registration Statement.

610.   As a result of their roles with Luckin and their direct access to information contradicting the statements in the IPO and SPO Registration Statements, the Executive Defendants reasonably should have known of the untrue and misleading statements of material fact contained in the IPO and SPO Registration Statements.  Indeed, Luckin's admissions establish the Executive Defendants' knowledge of many of the misrepresented and omitted material facts alleged in this Count.

611.   The Director Defendants likewise had access to internal reports and information which, had they conducted reasonable due diligence, would have put them on notice of the untrue and misleading statements of material fact contained in the IPO and SPO Registration Statements.

612.   The Underwriter Defendants were obligated to conduct an adequate due diligence investigation, and their negligent failure to do so was a substantial factor leading to the harm complained of in this Count.

613.   Together, the Defendants named in this Count caused the IPO and SPO Registration Statements to be filed with the SEC and to be declared effective, resulting in the issuance and sale of Luckin's ADSs, which were purchased by Plaintiffs and the other members of the Class.

614.   None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO and SPO Registration Statements were true and did not omit any material facts required to be stated in the

Registration Statements or facts that were necessary to make the statements made in the Registration Statements not false or misleading.  By reason of the conduct alleged in this Count, each Defendant named in this Count violated Section 11 of the Securities Act.

615.    Plaintiffs acquired Luckin ADSs in or traceable to the IPO and SPO.

616.    Plaintiffs and the Class have sustained damages as a result of the Securities Act violations alleged in this Count.

617.    At the time of Plaintiffs' purchases of Luckin ADSs, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged in this Count and could not have reasonably discovered those facts.

618.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which the initial complaint filed in this action is based and the time that complaint was filed.  Less than three years have elapsed between the time that the securities upon which this claim is brought were bona fide offered to the public and the time that the initial complaint and this Complaint were filed.

## COUNT IV
### Violation of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants

619.    Plaintiffs incorporate ¶¶ 435-604 by reference.  This claim is premised on the remedies available under Section 12 of the Securities Act, and does not assert that the Underwriter Defendants acted with fraudulent intent.

620.    This claim is asserted by Louisiana Sheriffs against the Underwriter Defendants on behalf of all persons who purchased from any of the Underwriter Defendants Luckin ADSs that were issued in or traceable to either Luckin's May 17, 2019 IPO or Luckin's January 10, 2020 SPO.

621.    By means of the IPO and SPO Registration Statements, each of the Underwriter Defendants offered, promoted, and sold Luckin ADSs in the IPO and SPO, and therefore is liable under Section 12(a)(2) of the Securities Act for the misrepresentations and omissions contained in the IPO and SPO Registration Statements.

622.    The Underwriter Defendants failed to conduct a reasonable investigation and did not possess a reasonable basis for the belief that the statements contained in the IPO or SPO Registration Statements, and identified in ¶¶ 533-604 above were true, were without omissions of material fact, and were not misleading.

623.    By reason of the conduct alleged in this Count, each of the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

624.    Lead Plaintiff Louisiana Sheriffs and other members of the Class who purchased Luckin ADSs from any of the Underwriter Defendants that were issued in or traceable to the IPO or the SPO have sustained damages because the value of their Luckin ADSs has declined precipitously.

625.    Lead Plaintiff Louisiana Sheriffs, individually and on behalf of the Class, seeks the remedies available under Section 12(a)(2) of the Securities Act for the Underwriter Defendants' violations.

626.    At the time of their purchases, Lead Plaintiff Louisiana Sheriffs and the Class were without knowledge of the wrongful conduct alleged in this Count and could not have reasonably discovered those facts more than one year before the filing of the initial complaint in this action. The initial complaint was filed within three years of the time that the Underwriter Defendants first sold Luckin ADSs to the investing public.

## COUNT V
### Violation of Section 15 of the Securities Act Against
### the Executive Defendants and the Director Defendants

627.    Plaintiffs incorporate ¶¶ 435-604 by reference.  This claim is premised on the remedies available under Section 15 of the Securities Act, and does not assert that the Director Defendants acted with fraudulent intent.

628.    This Count is brought under Section 15 of the Securities Act against the Executive Defendants and the Director Defendants.

629.    Each of the Executive Defendants and each of the Director Defendants was a control person of Luckin by virtue of his or her position as an owner, director or senior officer of Luckin.

630.    The Executive Defendants and Director Defendants oversaw all operations and financial controls at Luckin and Luckin could not have completed the IPO or SPO without these Defendants signing or authorizing their signatures on the IPO and SPO Registration Statements.

631.    As alleged above in ¶¶ 41-46, the Director Defendants also had a series of direct or indirect business or personal relationships with other directors or officers and major shareholders of Luckin.

632.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which the initial complaint filed in this action is based and the time that this Complaint was filed.  Less than three years has elapsed between the time that the securities upon which this claim is brought were bona fide offered to the public and the time that the initial complaint and this Complaint were filed.

## XV.    CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

633.    Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all persons

and entities who purchased or otherwise acquired Luckin ADSs from May 17, 2019 through April 1, 2020, inclusive, including those who purchased ADSs in or traceable to the Company's IPO on or about May 17, 2019 or the Company's SPO, on or about January 10, 2020, and were damaged thereby.

634.    Excluded from the Class are: (i) Defendants (as identified in this Complaint); (ii) present or former executive officers of Luckin, members of Luckin's Board of Directors, and members of the immediate families of each of the foregoing (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii))); (iii) any of the foregoing individuals' and entities' legal representatives, heirs, successors, or assigns; (iv) any entity in which Defendants have or had a controlling interest; (v) any employee benefit plan of Luckin; or (vi) any affiliate of Luckin.

635.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Luckin's ADSs were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and could only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class.  Following the SPO, Luckin had more than 53 million ADSs outstanding and available for trading on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Luckin and its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

636.    Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class purchased or otherwise acquired Luckin's ADSs during the Class Period at artificially inflated prices and were similarly affected by Defendants' wrongful conduct that violated the federal securities laws, as complained of in this Complaint.

637.    Plaintiffs will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action and securities litigation.  Plaintiffs have no interests that are adverse or antagonistic to the interests of other Class members.

638.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged in this Complaint. Plaintiffs know of no difficulty that will be encountered in managing this litigation that would preclude maintaining it as a class action.

639.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.   Whether Defendants violated the federal securities laws through the acts alleged in this Complaint;

    b.   Whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts;

    c.   Whether and to what extent the market prices of Luckin's ADSs were artificially inflated or distorted during the Class Period due to the misrepresentations or omissions of material facts complained of in this Complaint;

    d.   Whether the Defendants named under Section 10(b) of the Exchange Act acted with scienter;

e.   Whether reliance may be presumed under the fraud-on-the-market doctrine or the *Affiliated Ute* presumption; and

f.   Whether the members of the Class have sustained damages as a result of the conduct complained of in this Complaint, and if so, the proper measure of damages.

640.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other Class members who are not parties to the adjudications or substantially impair their ability to protect their interests.

641.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of in this Complaint, thereby making appropriate the relief sought in this Complaint with respect to the Class as a whole.

## XVI.   PRAYER FOR RELIEF

642.   **WHEREFORE**, Plaintiffs pray for relief and judgment, including:

a.   Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest on the damages, as allowed by law;

b.   Awarding extraordinary, equitable, or injunctive relief as permitted by law (including, but not limited to, rescission);

c.   Awarding Plaintiffs their costs and expenses incurred in this Action, including reasonable counsel fees and expert fees; and

d.   Awarding such other and further relief as may be just and proper.

## XVII.  JURY TRIAL DEMANDED

643.   Plaintiffs demand a trial by jury.


DATED: September 24, 2020                    Respectfully submitted,

**KESSLER TOPAZ MELTZER
& CHECK, LLP**

*S/ Sharan Nirmul*
Sharan Nirmul
Gregory M. Castaldo
Richard A. Russo, Jr.
Lisa M. Port
Nathan A. Hasiuk
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
gcastaldo@ktmc.com
rrusso@ktmc.com
llambport@ktmc.com
nhasiuk@ktmc.com

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
Salvatore J. Graziano
John Rizio-Hamilton
Jai Chandrasekhar
Kate W. Aufses
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
johnr@blbglaw.com
jai@blbglaw.com
kate.aufses@blbglaw.com

*Counsel for Lead Plaintiffs Sjunde AP-Fonden and Louisiana Sheriffs' Pension & Relief Fund and Lead Counsel for the Putative Class*

256