UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE LUCKIN COFFEE INC. SECURITIES
LITIGATION

Case No. 1:20-CV-01293-JPC-JLC

**MEMORANDUM OF LAW IN SUPPORT OF UNDERWRITER DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

## Table of Contents

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ...................................................................................... 2

  A.  The Luckin IPO and SPO ................................................................................ 2

  B.  Plaintiffs' Claims ............................................................................................ 4

ARGUMENT .............................................................................................................. 5

  I.  Plaintiffs' Claims Against Underwriters Arising from the IPO Should Be Dismissed ...... 7

    A.  Plaintiffs Allege No Basis to Conclude that the Underwriters Could Have Uncovered a Fraud That Was in Its Infancy at the Time of the IPO .................................. 8

    B.  The Particular Alleged Misstatements or Omissions in the IPO Registration Statement and Prospectus Do Not Support a Claim ...................................... 10

      i.  Alleged Misstatements and Omissions Concerning Revenues, Expenses, and Financial Statements Are Insufficient to State a Claim ................................. 11

      ii.  Alleged Misstatements and Omissions Concerning Internal Controls Are Insufficient to State a Claim ..................................................................... 15

      iii.  The Other Alleged Misstatements and Omissions in the IPO Registration Statement Are Not Actionable .................................................................... 16

    C.  Plaintiffs' Alleged "Red Flags" Further Demonstrate the Implausibility of Securities Act Claims Arising out of the IPO ................................................ 18

      i.  None of the Purported Red Flags Could Have Alerted the Underwriters to Fraud Before the IPO, Because the Fraud Did Not Yet Exist ............................ 19

      ii.  Most of the Purported Red Flags Were Fully and Accurately Disclosed in the Registration Statement .............................................................................. 21

  II.  The SPO-Based Claims Should Also Be Dismissed ....................................... 23

    A.  Plaintiffs Fail to Adequately Allege that Misstatements Relating to the SPO Were False ..... 23

    B.  Plaintiffs Fail to Adequately Allege Certain Misstatements and Omissions by the Underwriters in the SPO ..................................................................... 25

i

      i.   Plaintiffs Fail to Adequately Allege Any Misstatements or Omissions Relating to Financial Statements ................................................................................................ 25

      ii.  The Material Terms of the Margin Loan Facility Were Fully Disclosed ................... 26

   C.    Plaintiffs Fail to Adequately Allege Any Claim Arising Under Regulation S-K......... 27

III.  Plaintiffs Lack Standing To Bring Section 12 Claims Pursuant to the IPO ..................... 29

CONCLUSION.................................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arfa* v. *Mecox Lane Ltd.*,
    2012 WL 697155 (S.D.N.Y. Mar. 5, 2012) ...........................................................................12

*Arista Records, LLC* v. *Doe 3*,
    604 F.3d 110 (2d Cir. 2010)..............................................................................................5

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)..........................................................................................................5

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006)...............................................................................7

*In re Bank of Am. Sec. Corp. Derivatives & ERISA Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. 2010)...........................................................................13n

*In re Barclays Bank PLC Sec. Litig.*,
    2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017)................................................................29

*Barilli* v. *Sky Solar Holdings, Ltd.*,
    389 F. Supp. 3d 232 (S.D.N.Y. 2019).............................................................................15

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 544 (2007)..........................................................................................................5

*Caiafa* v. *Sea Containers Ltd.*,
    331 F. App'x 14 (2d Cir. 2009) ......................................................................................29

*In re Canandaigua Sec. Litig.*,
    944 F. Supp. 1202 (S.D.N.Y. 1996)................................................................................27

*In re CitiGroup Inc. Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010).............................................................................30

*City of Omaha Police and Fire Retirement System* v. *Evoqua Water Technologies Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020).........................................................................7, 20

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014)............................................................................................15

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ......................................................................8, 19

*Denny* v. *Barber*,
 576 F.2d 465 (2d Cir. 1978) ................................................................. 11

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
 553 F.3d 187 (2d Cir. 2009) ................................................................. 18n

*Endo* v. *Albertine*,
 863 F. Supp. 708 (N.D. Ill. 1994) ........................................................ 16

*Fisher* v. *Ross*,
 1996 WL 586345 (S.D.N.Y. Oct. 11, 1996) .......................................... 17

*In re Focus Media Ltd. Litig.*,
 701 F. Supp. 2d 534 (S.D.N.Y. 2010) .................................................. 12

*Gustafson* v. *Alloyd Co.*,
 513 U.S. 561 (1995) .............................................................................. 29

*Ho* v. *Duoyuan Global Water, Inc.*,
 887 F. Supp. 2d 547 (S.D.N.Y. 2012) .................................................. 12

*Holbrook* v. *Trivago N.V.*,
 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019) .......................................... 17

*Indiana Pub. Ret. Sys.* v. *SAIC, Inc.*,
 818 F.3d 85 (2d Cir. 2016) ............................................................. 28, 28n

*Janbay* v. *Canadian Solar, Inc.*,
 2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ....................................... 15

*Jiajia Luo* v. *Sogou, Inc.*,
 465 F. Supp. 3d 393 (S.D.N.Y. June 8, 2020) .................................. 10, 27

*Lin* v. *Interactive Brokers Group, Inc.*,
 574 F. Supp. 2d 408 (S.D.N.Y. 2008) .......................................... *passim*

*In re Longfin Corp. Securities Class Action Litig.*,
 2019 WL 1569792 (S.D.N.Y. Apr. 11, 2019) ........................................ 29

*Massachusetts Bricklayers and Masons Funds and Pipefitters' Retirement Fund
 Local 598* v. *Deutsche Alt-A Securities*,
 2010 WL 1370962 (E.D.N.Y. 2010) ..................................................... 30

*McKenna* v. *Wright*,
 386 F.3d 432 (2d Cir. 2004) ................................................................... 8

*Medina* v. *Tremor Video, Inc.*,
 640 F. App'x 45 (2d Cir. 2016) ............................................................ 28

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)..............................................................................6

*In re N2K, Inc. Sec. Litig.*,
  82 F. Supp. 2d 204 (S.D.N.Y. 2000)..........................................................13n, 18

*NECA-IBEW Pension Tr. Fund* v. *Bank of Am. Corp.*,
  2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012)..................................................6

*Nelson* v. *Paramount Commc'ns, Inc.*,
  872 F. Supp. 1242 (S.D.N.Y. 1994)..............................................................12

*In re OSG Sec. Litig.*,
  971 F. Supp. 2d 387 (S.D.N.Y. 2013)............................................................8

*Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008)..................................................... 15-17

*Peifa Xu* v. *Gridsum Holding Inc.*,
  2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020) ...........................................6n

*In re Perrigo Co. PLC Sec. Litig.*,
  435 F. Supp. 3d 571 (S.D.N.Y. 2020)........................................................12n

*Perry* v. *Duoyuan Printing, Inc.*,
  2013 WL 4505199 (S.D.N.Y. Aug. 22, 2013) ...........................................21

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004).........................................................................7

*Rothman* v. *Gregor*,
  220 F.3d 81 (2d Cir. 2000)..........................................................................9n

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
  351 F. Supp. 2d 334 (D. Md. 2004) ...........................................................22

*Scott* v. *General Motors Co.*,
  46 F. Supp. 3d 387 (S.D.N.Y. 2014)............................................... *passim*

*Singh* v. *Schikan*,
  106 F. Supp. 3d 439 (S.D.N.Y. 2015)..................................................10, 28

*Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*,
  33 F. Supp. 3d 401 (S.D.N.Y. 2014)...........................................................19

*Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*,
  645 Fed. Appx. 72 (2d Cir. 2016)...............................................................22

*Ultrafem Inc. Sec. Litig.*,
    91 F. Supp. 2d 678 (S.D.N.Y. 2000)...................................................................................29

*In re Wachovia Equity Securities Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)...........................................................................6, 6n

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004).................................................................. 14, 24-25

*In re Worlds of Wonder Sec. Litig.*,
    814 F. Supp. 850 (N.D. Cal. 1993) ................................................................................25

*Yi Xiang* v. *Inovalon Holdings, Inc.*,
    327 F.R.D. 510 (S.D.N.Y. 2018) ..................................................................................30

*Zucker* v. *Quasha*,
    891 F. Supp. 1010 (D.N.J. 1995) ..................................................................................13

## Regulations

17 C.F.R. § 229, *et. seq.*............................................................................................................27

## Rules

Rule 8(a)..................................................................................................................................6n

Rule 9(b) .................................................................................................................... 6, 6n, 7-8

## Statutes

15 U.S.C.
    § 77k(b)(3) ..................................................................................................................6, 14
    § 78u–4(b)(1)(B).................................................................................................................7

## Other Authorities

Public Company Accounting Oversight Board Auditing Standards (Dec. 15,
    2017) ..............................................................................................................................26n

Defendants Credit Suisse Securities (USA), Morgan Stanley & Co. LLC, KeyBanc Capital Markets Inc., and Needham & Company, LLC (the "Underwriters"), by their undersigned attorneys, respectfully submit this memorandum in support of their motion to dismiss the Consolidated Class Action Complaint for failure to state a claim (the "Motion").

### PRELIMINARY STATEMENT

Despite spilling more than 250 pages of ink in their Consolidated Class Action Complaint (the "Complaint"), Plaintiffs cannot muster allegations sufficient to sustain their alleged securities claims against the Underwriters of two public offerings of American Depositary Shares issued by Defendant Luckin Coffee Inc. ("Luckin").  Although Luckin has since admitted that certain of its employees inflated financial and performance metrics by engaging in fabricated transactions, Plaintiffs do not, and cannot, claim that the Underwriters were aware of the Luckin employees' secretive and complex scheme at the time of either offering.  Nor do Plaintiffs allege with the requisite particularity that the Underwriters should have been aware of the fraud, or that they breached any duty in conducting their due diligence in connection with the two offerings.  Instead, Plaintiffs premise their claims on the nebulous theory that the Underwriters should have somehow been able to uncover the truth of an elaborate scheme that Plaintiffs themselves describe as well-hidden.  But the Securities Act does not create clairvoyance as the standard of liability.

Plaintiffs' claims against the Underwriters arising from Luckin's May 17, 2019 initial public offering (the "IPO") should be dismissed as implausible.  Plaintiffs allege that Luckin's scheme was only hatched in April 2019, mere weeks before the IPO.  As a result, it is unclear whether the nascent fraud was even operating at the time of the IPO.  Plaintiffs also fail to offer any theory explaining what might have happened between the end of the first quarter of 2019 (the last period with complete data before the IPO) and the effective date of the registration statement weeks later that might have alerted Underwriters to any misconduct.  Nor do Plaintiffs allege that

the financial statements and metrics from the first quarter that were included in the IPO Registration Statement were materially false or misleading in any way.  To credit these claims would be to require an underwriter to predict a fraud before it emerges.  That impossible task is not consistent with the standards set by the federal securities laws, and is particularly inapplicable where, as here, the subject fraud is concentrated in falsifying financial statements and flouting accounting metrics, areas outside the ambit of an underwriter.

Plaintiffs also fail to sufficiently allege that the Underwriters could have known that statements in the offering documents for the January 10, 2020 secondary public offering (the "SPO") were false or misleading.  Indeed, Plaintiffs detail the intricacy of the alleged fraud and the steps that Luckin employees took to conceal it, explaining that even Luckin's outside auditor saw no indicia of fraud until *after* the SPO.  Plaintiffs do not provide any basis to suggest that the Underwriters knew, or should have known, of any false statements in the SPO's registration statement, or that any information shared with Underwriters prior to the SPO would have aroused any reasonable suspicion.  As a result, these claims should also be dismissed.[1]

## FACTUAL BACKGROUND[2]

### A.  The Luckin IPO and SPO

Founded in 2017, Luckin is a technology-driven Chinese coffee company.  Compl. ¶¶ 1-3. After undergoing a number of private rounds of fundraising, Luckin filed a Form F-1 Registration Statement on April 22, 2019, announcing its intention to conduct an initial public offering of American Depositary Shares ("ADS").  *Id*. ¶¶ 78-80.  Luckin filed an amended Form F-1/A

---

[1] The Underwriters join in the arguments set forth in the Memorandum of Law submitted by Luckin in support of its motion to dismiss, to the extent applicable to the claims against the Underwriters.  Among other arguments, the Underwriters adopt and will not repeat here Luckin's demonstration that Plaintiffs fail to allege that they purchased any Luckin ADS traceable to the IPO or the SPO Registration Statements.

[2] The facts alleged by Plaintiffs are taken as true herein for purposes of this motion only.

Registration Statement on May 6, 2019, and a Form F-1MEF and Prospectus on May 17, 2019 offering 33 million ADS to investors. *Id.* ¶¶ 80-81.[3]  On January 7, 2020, Luckin filed another Form F-1 Registration Statement announcing its intention to conduct a secondary public offering of ADS. *Id.* ¶ 121.  The Company filed an amended Form F-1MEF Registration Statement on January 9, 2020 and a Prospectus incorporating the Registration Statements on January 10, 2020. *Id.* ¶ 121.  Through the SPO, Luckin offered an additional 13.8 million ADS. *Id.* ¶¶ 119, 122.

Credit Suisse Securities (USA) LLC ("Credit Suisse"), Morgan Stanley & Co. LLC, China International Capital Corporation Hong Kong Securities Limited, Haitong International Securities Company Limited, KeyBank Capital Markets Inc., and Needham Company, LLC served as underwriters for both Luckin's IPO and SPO. *Id.* ¶¶ 7, 47-52.[4]

On January 31, 2020, an anonymous short seller report (the "Anonymous Report") was published by Muddy Waters Research, an investor specializing in short sale investment opportunities. *Id.* ¶ 159.  The Anonymous Report alleged that Luckin "had evolved into a fraud by fabricating financial and operating numbers starting in the 3rd quarter 2019." *Id.*  The Anonymous Report claimed to have based its conclusions, at least in part, on a review of over 11,000 hours of Luckin store traffic video over 981 store-days, and on-the-ground surveillance of Luckin stores by over 1,500 individuals. *Id.* ¶ 160.  Luckin denied the allegations in a February 3, 2020 press release. *Id.* ¶ 164.  On April 2, 2020, Luckin issued a press release stating that, based on the results of an independent investigation requested by its board of directors, Luckin's Chief Operating Officer Liu and several employees reporting to him "had engaged in certain misconduct,

---

[3] The Complaint refers to the original and amended registration statements and the final prospectus collectively as the "IPO Registration Statement."  Compl. ¶ 81.  Unless otherwise noted, capitalized terms have the same meaning ascribed to them in the Complaint.

[4] Though named as defendants, China International Capital Corporation Hong Kong Securities Limited and Haitong International Securities Company Limited have not been served in this action.

including fabricating certain transactions" and advising investors to "no longer rely upon the Company's previous financial statements and earnings releases for the nine months ended September 30, 2019 and the two quarters starting April 1, 2019 and ended September 30, 2019." *Id*. ¶ 174. The price of Luckin's ADS fell sharply upon the news. *Id*. ¶ 176. Luckin issued further press releases addressing the internal investigation on May 12, 2020 (*id*. ¶ 178), July 1, 2020 (*id*. ¶ 181), July 13, 2020 (*id*. ¶ 209) and September 2, 2020 (*id*. ¶ 212).

According to news reports, Luckin's auditor Ernst & Young Hua Ming LLP ("E&Y Hua Ming"), a non-party in this litigation, first became aware of concerning transactions during an on-site audit of Luckin's 2019 financial results on or around January 25, 2020. *Id*. ¶ 197. Following the publication of the Anonymous Report on January 31, 2020, E&Y Hua Ming sent an anti-fraud team to perform a closer inspection, which included forensic analysis of company computers, and made findings in mid-March 2020 that uncovered accounting fraud. *Id*. ¶ 198-200. E&Y Hua Ming issued a statement on April 3, 2020 that it had discovered management personnel engaging in fabricated transactions and presented its findings to Luckin's Audit Committee. *Id*. ¶ 196.

### B. Plaintiffs' Claims

Lead Plaintiffs purport to bring this suit on behalf of all purchasers of Luckin ADS from May 17, 2019 through April 1, 2020. Lead Plaintiff Sjunde AP-Fonden ("AP7") alleges that it purchased Luckin ADS on January 23, 2020, February 25, 2020 and February 28, 2020 (ECF 150-A), none of which were purchased directly from an underwriter or as part of a public offering. Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") alleges that it purchased Luckin ADS on January 8, 2020, January 9, 2020, and January 10, 2020 (ECF 150-B), including 22,400 shares from Credit Suisse in the SPO (Compl. ¶ 32).

Luckin revealed the results of its internal investigation in an April 2, 2020 press release, which Plaintiffs claim caused the share price of Luckin ADS to decline sharply on same-day trading. *Id.* ¶¶ 21-22). Plaintiffs seek to recover the losses they incurred as a result of the decline of the ADS. Plaintiffs bring a barrage of securities fraud claims pursuant to Section 10(b) of the Securities Exchange Act of 1934 against Luckin and other individual defendants. The Section 10(b) claims are not alleged against the Underwriters. As against the Underwriters, Plaintiffs allege only violations of Sections 11 and 12(a)(2) of the Securities Act of 1933, claiming that the Underwriters failed to conduct a reasonable due-diligence investigation, and that such an investigation would have uncovered the manipulated financial results at Luckin. These claims against the Underwriters should be dismissed.

## ARGUMENT

Plaintiffs' failure to state a claim against the Underwriters for violations of Section 11 and Section 12 of the Securities Act requires dismissal of those claims. To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). For a claim to have facial plausibility, "the complaint's factual allegations must be enough to raise the right to relief above the speculative level." *Arista Records, LLC* v. *Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

"Sections 11 [and] 12(a)(2) . . . of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions. Section 11 applies to registration statements, and

section 12(a)(2) to prospectuses and oral communications."[5]  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359-60 (2d Cir. 2010).  "Issuers are subject to virtually absolute liability under Section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 367-68 (S.D.N.Y. 2011).  Underwriters are thus subject to the "standard of reasonableness . . . required of a prudent man in the management of his own property."  15 U.S.C. § 77k(b)(3).  As a result, they have a duty to conduct due diligence prior to the offering, but that diligence must be reasonable, not perfect.  *See* 15 U.S.C. § 77k(b)(3).  "The securities laws do not require clairvoyance in the preparation of offering documents," and a misstatement or omission is only actionable where it was "material as of the date the offering documents became effective." *Lin* v. *Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 415-16, 421 (S.D.N.Y. 2008); *see also NECA-IBEW Pension Tr. Fund* v. *Bank of Am. Corp.*, 2012 WL 3191860, at *9 (S.D.N.Y. Feb. 9, 2012) ("A plaintiff may not plead Section 11 or Section 12(a)(2) claims with the benefit of 20/20 hindsight. . . . [T]he accuracy of offering documents must be assessed in light of the information available at the time they were published.") (citations omitted).

Plaintiffs' allegations fall woefully short of the stringent pleading requirements imposed by both Federal Rule of Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), which apply here because Plaintiffs' claims sound in fraud.[6]  Rule 9(b) requires

---

[5] "Because Sections 11 and 12(a)(2) are Securities Act siblings with roughly parallel elements, the Court will analyze the two together." *In re Wachovia Equity Securities Litig.*, 753 F. Supp. 2d 326, 368 (S.D.N.Y. 2011) (internal citations omitted).  All arguments concerning the insufficiency of the allegations regarding misstatements or omissions under Section 11 apply with equal force to Plaintiffs' Section 12 claim.

[6] Though Plaintiffs' claims sound in fraud and are subject to Rule 9(b), they also fail to meet even the lower, notice pleading standard of Rule 8(a), as the theory for Underwriters' negligence is implausible on the face of the Complaint.  *See Peifa Xu* v. *Gridsum Holding Inc.*, 2020 WL 1508748, at *9 (S.D.N.Y. Mar. 30, 2020) (if Rule 9(b) does not apply, "plaintiffs must still plead enough facts to make plausible their claim").

Plaintiffs to set forth "with particularity the circumstances constituting fraud." The PSLRA similarly compels Plaintiffs to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). Where, as here, Section 11 and 12 claims are "premised on allegations of fraud," these heightened particularity requirements apply to those claims as well. *Rombach* v. *Chang*, 355 F.3d 164, 171 (2d Cir. 2004).

The Court should disregard Plaintiffs' obvious attempt to avoid the application of Rule 9(b)'s and the PSLRA's heightened standards to their Section 11 and 12 claims by including boilerplate sentences "disclaim[ing] any claims of fraud against the Underwriter Defendants . . . ." Compl. ¶¶ 7, 439, 440; *In re Axis Capital Holdings Ltd. Sec. Litig.,* 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006) ("Courts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient."). The allegations and theory of liability underlying Plaintiffs' Section 11 and 12 claims are premised on the same fraudulent scheme that underpins their Section 10 fraud claims. *See City of Omaha Police and Fire Retirement System* v. *Evoqua Water Technologies Corp.*, 450 F. Supp. 3d 379, 401 (S.D.N.Y. 2020) (applying 9(b) to Section 11 claim based on the same theory as a fraud claim). Plaintiffs' repeated use of words "classically associated with fraud" to describe their claims against the Underwriters further undercuts their attempt to escape the reach of Rule 9(b) and the PSLRA. *Rombach*, 355 F.3d at 172. Indeed, the Securities Act section of the Complaint alone uses the words: (i) "fraud" or "fraudulent" 44 times; (ii) "fabricate" or "fabricated" 42 times; (iii) "false" 45 times; and (iv) "fictitious" five times. Plaintiffs' strained attempts to avoid Rule 9(b) and PSLRA pleading standards should be rejected.

## I.   Plaintiffs' Claims Against Underwriters Arising from the IPO Should Be Dismissed

Plaintiffs' own allegations preclude them from claiming that the Underwriters are responsible for any misstatements or omissions in connection with the Registration Statement and Prospectus for the May 17, 2019 IPO.

## A.  Plaintiffs Allege No Basis to Conclude that the Underwriters Could Have Uncovered a Fraud That Was in Its Infancy at the Time of the IPO

Plaintiffs fail to plead any facts sufficient to show that it was even remotely possible for the Underwriters to uncover the fraud at the time of the IPO.  Section 11 liability may only be imposed for information known or reasonably discoverable on the effective date of the Registration Statement.  *See Scott* v. *General Motors Co.*, 46 F. Supp. 3d 387, 393-94 (S.D.N.Y. 2014) ("[T]he relevant inquiry is not whether the statement later turned out to be correct, but rather whether the defendant knew or had reason to know, at the time the offering documents were filed, that the statement was untrue.") (quotations and alterations omitted), *aff'd*, 605 F. App'x 52 (2d Cir. 2015); *Lin*, 574 F. Supp. 2d at 416 (emphasizing that the registration statement must have been untrue or misleading "when such part became effective").  There is simply no basis to allege that reasonable diligence by the Underwriters could have uncovered the alleged fraud at Luckin prior to the IPO.

It is appropriate to dismiss Securities Act claims in situations like this, where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle it to relief."  *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 401 (S.D.N.Y. 2013) (quoting *McKenna* v. *Wright*, 386 F.3d 432, 436 (2d Cir. 2004)); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1181-82 (C.D. Cal. 2008) (granting in part underwriters' motion to dismiss where the complaint precluded allegations of accounting fraud in financial statements against underwriters).  While the Complaint is rife with conclusory statements claiming that a reasonable investigation would have uncovered the fraud (*e.g.*, Compl. ¶¶ 439, 494), it is noticeably devoid of any allegations that the Underwriters failed to fulfill their diligence obligations for the IPO or could have caused information relating to the fraud to be discovered.  Not only are such conclusory allegations insufficient under the particularity requirements of Rule 9(b), they contradict the non-conclusory allegations that show that the core of the misconduct occurred *after* the IPO.  Accepting

as true Plaintiffs' other allegations in the Complaint, there would have been no plausible way for the Underwriters to discover the misconduct prior to the IPO.

Plaintiffs insist that the fraud began in April 2019, alleging that "Luckin and the Executive Defendants began inflating the Company's sales, costs, and expenses in April 2019." *Id*. ¶ 493. But Plaintiffs do not plausibly allege that the Underwriters could have compiled, much less analyzed, these sales, costs, and expense figures on or before May 17, 2019.[7] Indeed, the Complaint fails to allege with particularity that the fraud had even begun at the time of the IPO. Plaintiffs import many of their allegations from a series of news articles, including a July 5, 2020 *Wall Street Journal* story reporting on the allegedly fraudulent bulk orders of coffee vouchers from corporate customers linked to Luckin officers and directors ("corporate voucher program"), which Plaintiffs frame as the primary mechanism for Luckin's fraud. Compl. ¶ 131; November 23, 2020 Declaration of Sheila C. Ramesh ("Ramesh Decl."), Ex. 7.[8] But Plaintiffs conveniently omit significant details included in the article, most notably that the "vast majority" of the fabricated corporate voucher transactions "were bought during the second half of 2019." Ramesh Decl., Ex. 7 at 2. Adopting another *Wall Street Journal* article, Plaintiffs allege that "around the time of the IPO in 2019, 'orders ***began*** flooding in under a ***fledging*** line of business that involved selling coffee vouchers in bulk to corporate customers,'" and that the program began "in late May 2019," *i.e.*, ***after*** the IPO. Compl. ¶¶ 134, 511 (emphasis added).[9] Underwriters, of course, cannot

---

[7] *See infra* Section I.B.i.

[8] The Court may consider the articles cited by plaintiffs. *See Rothman* v. *Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.").

[9] Plaintiffs try to resolve this flaw by again misrepresenting an underlying Wall Street Journal article. Here, they add an annotation to quotations from a May 28, 2020 report, noting that these orders began "[around the time of the IPO]." Compl. ¶ 134. But the article only states that the orders started in "late May 2019" and does not include any assessment of the timeline related to the IPO. *See* Ramesh Decl. Ex. 6.

reasonably be expected to detect and disclose events that had yet to occur.  "Section 11—by its plain language—speaks to the truth or falsity of 'any part of the registration statement[ ] *when such part became effective.*' . . . It is not sufficient that, at some point after the registration statement became effective, some subsequent event made it no longer accurate."  *Jiajia Luo* v. *Sogou, Inc.*, 465 F. Supp. 3d 393, 406 (S.D.N.Y. 2020) (quotations omitted).

As Plaintiffs themselves emphasize, the individuals who orchestrated the alleged fraud went to great lengths to conceal its existence and subvert any potential investigation.  Compl. ¶¶ 384-88.  Indeed, Plaintiffs concede that Luckin's outside auditor did not detect even a trace of impropriety before January 2020, rendering facially implausible any claim that the Underwriters' failure to do so seven months earlier constituted negligence.  *Scott*, 46 F. Supp. 3d at 394 (dismissing Securities Act claims that "fail[ed] to meet the plausibility standard established by *Twombly* and *Iqbal*").  The Underwriters cannot be held liable for failing to discover facts unknowable at the time of the relevant offering.  *Singh* v. *Schikan*, 106 F. Supp. 3d 439, 446 (S.D.N.Y. 2015) ("When pleading an actionable omission, plaintiffs must, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.") (quotations omitted).

### B. The Particular Alleged Misstatements or Omissions in the IPO Registration Statement and Prospectus Do Not Support a Claim

"Plaintiffs pleading Section 11 and 12 claims must state facts showing the allegedly omitted facts both existed and were known or knowable, at the time of the offering."  *Lin*, 574 F. Supp. 2d at 416 (quotations omitted).  Plaintiffs' failure to do either here for any of the putative misstatements or omissions relating to the IPO requires dismissal of their claims against the Underwriters.

###### i. Alleged Misstatements and Omissions Concerning Revenues, Expenses, and Financial Statements Are Insufficient to State a Claim

Although Plaintiffs assert a number of alleged misstatements or omissions, the crux of their Complaint is that Luckin's financial statements for the second and third quarters of 2019 were fraudulently represented.  Relying on Luckin's admissions and news reports, Plaintiffs allege that Luckin primarily accomplished this fraud by fabricating transactions with related parties, which they claim rendered the "IPO Financial Statements . . . materially false or misleading when issued." *E.g.*, Compl. ¶¶ 15-16, 536.  But there is no allegation that there were any falsehoods in the IPO Financial Statements.  Because the second and third quarters had not concluded by May 17, 2019, the only financial statements contained in the IPO Registration Statements were audited results for the 2017 and 2018 fiscal years and unaudited quarterly financial data for the first quarter of 2019. *Id.* ¶ 533.  Plaintiffs do not allege that these statements, or the data within them, were inaccurate or inflated, because they cannot.[10]  As a result, Plaintiffs' allegations concerning inflated revenues, expenses, and inaccurate financial statements cannot sustain any claim under Section 11.  *See Denny* v. *Barber*, 576 F.2d 465, 470 (2d Cir. 1978) ("In sum, the complaint is an example of alleging fraud by hindsight. For the most part, plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones.").

With the benefit of hindsight and without consideration of the limited information available to Underwriters at the time the IPO Registration Statement became effective, Plaintiffs focus on alleged omissions in the "subsequent events" discussed in the notes to the financial statements created pursuant to ASC 855.[11]  Compl. ¶¶ 536-38.  These allegations suffer from the same fatal

---

[10] In addition to the absence of any allegations of misstatements in the first quarter 2019 financial results, the Company's internal investigation, shepherded by a respected international law firm and forensic accountants, has revealed no evidence of misconduct prior to April 2019.  *See* Compl. ¶¶ 172, 181.

[11] "ASC 855 addresses the accounting consequences of 'subsequent events.' An entity required to file financial statements with the SEC must evaluate subsequent events that occur through the date that the

flaw of attempting to hold the Underwriters responsible for events that had either not yet occurred or could not have been tracked or analyzed by the Underwriters prior to the IPO.  *See Ho* v. *Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 569 (S.D.N.Y. 2012) (rejecting contentions based on subsequent short seller report where there were no allegations that the statement "was false in the 2006-2009 time periods when the IPO and SPO were conducted"); *Nelson* v. *Paramount Commc'ns, Inc.,* 872 F. Supp. 1242, 1246 (S.D.N.Y. 1994) (refusing to confer liability based on a subsequent event not known as of the date of the registration statement).  The purported inflation of revenues and expenses that occurred between the end of the first quarter and May 17, 2019 (if any) would not have been reflected in any full set of data intended to be incorporated into the Registration Statement.  *See In re Focus Media Ltd. Litig*., 701 F. Supp. 2d 534, 539-40 (S.D.N.Y. 2010); *Scott*, 46 F. Supp. 3d at 394 ("[T]he accuracy of offering documents must be assessed in light of the information available at the time they were published" and dismissing claims premised on purported revenue inflation that "continued to rise after the IPO").  There is simply no practical way for the Underwriters to have fully investigated mid-quarter financial results at the time of the IPO.

Moreover, there is no general duty to disclose mid-quarter financial results or updates on metrics.  *See In re Focus Media.*, 701 F. Supp. at 540 ("The case law reflects that courts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress.") (quotations omitted); *Arfa* v. *Mecox Lane Ltd.,* 2012 WL 697155, at *12 (S.D.N.Y. Mar. 5, 2012) (rejecting plaintiff's attempt to premise liability on financial data from a quarter in

---

financial statements are issued. ASC 855-10-25-1A. If such events 'provide additional evidence about conditions that existed at the date of the balance sheet,' then the entity must recognize the effects of those events in its financial statements. ASC 855-10-25-1."  *In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 583 (S.D.N.Y. 2020)).  We are not aware of any authority premising a Section 11 or 12 claim against an underwriter on an alleged violation of ASC 855.

progress).  While that may not absolve an issuer from disclosing certain material information of which it is aware,[12] Plaintiffs here fail to allege that the Underwriters had any opportunity to make further assessments beyond the work done on the first quarter 2019 results and metrics.  *See Zucker* v. *Quasha*, 891 F. Supp. 1010, 1019 (D.N.J. 1995) ("Defendants did not have a duty to disclose data from an ongoing fiscal quarter. . . . Even if Defendants had such an obligation, Plaintiff has not demonstrated that any compiled information in fact existed that could have been disclosed."), *aff'd,* 82 F.3d 408 (3d Cir. 1996).  In *Zucker*, the court dismissed claims against all defendants, including the issuer, where the allegations revolved around omissions related to trends and data from a quarter in progress, noting that "[f]ederal securities law does not require disclosure of facts that are purely hypothetical or not reasonably discoverable by the defendant." *Id.* at 1018.  If an issuer need not disclose such mid-quarter developments, the Underwriters here certainly cannot be liable for any such omission.

Similarly, Plaintiffs' reliance on the total revenue and cost inflation over the course of the last three quarters of 2019 (Compl. ¶¶ 474, 477) is irrelevant, as these aggregate numbers also could not have been known at the time of the IPO.  Plaintiffs' allegations that the fraud significantly ramped up in the third and fourth quarters (*Id.* ¶¶ 474, 477, 531) provides further support for the proposition that it was not discoverable during the second quarter.  The substantially smaller second quarter figures indicate two things: (i) that the fraud was not implemented for the entire

---

[12] Intra-quarter intervening events may trigger a non-issuer's duty to disclose only if it has reason to believe that there may have been material developments based on currently available information.  *See In re Bank of Am. Sec. Corp. Derivatives & ERISA Litig.*, 757 F. Supp. 2d 260, 304 (S.D.N.Y. 2010).  In order to trigger such a duty, the non-issuer would need to be both aware of the new information and deem that information to represent "an extreme departure from the range of results which could be anticipated *based on currently available information*." *See In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 208 (S.D.N.Y. 2000) (reasoning that the trends of past performance, along with sufficient warnings and risk factors on the potential for losses, dictated that the defendants had no duty to disclose interim financial information), *aff'd sub nom. In re N2K Inc. Sec. Litig.*, 202 F.3d 81 (2d Cir. 2000).

quarter, consistent with other allegations strongly suggesting that the true fraud occurred after the IPO; and (ii) as both a new development and one that was relatively small in magnitude, the effect of the fraud would not have been incorporated in any full set of data that Underwriters reasonably could have accessed or tested during the first six weeks of the second quarter.  *See Scott*, 46 F. Supp. 3d at 394 (dismissing Securities Act claims and cautioning that a plaintiff may not "state viable Section 11 claims by relying solely on hindsight to prove a misstatement").

Finally, the Underwriters were justified in relying on the financial statements, including the notes to the financial statements incorporated in the IPO Registration Statement, because they are considered "expertised" under the securities laws.  *See In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 684 (S.D.N.Y. 2004) ("Underwriters perform a different function from auditors. . . . They are not being asked to duplicate the work of auditors, but to conduct a reasonable investigation.").  Section 11 provides a statutory defense for non-issuers who conducted reasonable diligence regarding their investigation into the accuracy of the registration statement.  15 U.S.C. § 77k(b)(3).  This provision builds in a distinction between expertised and non-expertised portions of the registration statement, recognizing and seeking to balance both the unique role placed on underwriters and the inherent limitations facing underwriters in reviewing certain aspects of the issuer's business, particularly application of accounting guidelines.  *See In re WorldCom,* 346 F. Supp. 2d at 672 ("[T]his provision [] is in the Act because, almost by definition, it is reasonable to rely on financial statements certified by public accountants.").  Luckin's 2017 and 2018 financial statements were audited by E&Y Hua Ming, the Chinese affiliate of one of the largest and most well-regarded accounting firms in the world.  Compl. ¶ 54; Ramesh Decl. Ex. 2, IPO Registration Statement ("IPO RS") at 191.  And the first quarter 2019 results, though unaudited, showed nothing suspicious and are not alleged to have been inflated or otherwise inaccurate.  Plaintiffs do

not allege any basis to conclude that it was improper for the Underwriters to rely on the IPO Financial Statements.

### ii. Alleged Misstatements and Omissions Concerning Internal Controls Are Insufficient to State a Claim

Plaintiffs also cannot base their Section 11 claim on purported misstatements relating to weaknesses in Luckin's internal controls. The Registration Statement sufficiently disclosed the then-current weaknesses of those internal controls and the risk that Luckin may not be able to remedy those weaknesses. IPO RS at 32 (disclosing the possibility that Luckin would not be able to "implement and maintain an effective system of internal controls"); *see Barilli* v. *Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 (S.D.N.Y. 2019) ("[S]tatements regarding the introduction of internal controls do not, standing alone, constitute assertions that the controls are adequate, nor does a subsequent circumvention of such controls support an inference that descriptive statements about the implementation of such controls were false."). Indeed, Plaintiffs concede that Luckin disclosed two material weaknesses and the measures being implemented as remediation (Compl. ¶¶ 457-58), but claim that those disclosures must have been false or misleading because the measures did not prevent the financial misconduct that later materialized. These allegations are nothing more than an improper claim of fraud by hindsight and are insufficient to sustain a claim under the Securities Act. *See City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) ("We do not recognize allegations of 'fraud by hindsight.'"); *Janbay* v. *Canadian Solar, Inc.,* 2013 WL 1287326, at *9 (S.D.N.Y. Mar. 28, 2013) ("Plaintiffs have failed to allege that the controls were inadequate at the time the relevant statements were made.").

Plaintiffs also do not sufficiently allege that more robust internal controls would have detected the fraud in early 2019. *See Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*, 538 F.

Supp. 2d 662, 669 (S.D.N.Y. 2008) ("The securities laws do not require clairvoyance in the preparation of offering documents; these documents are not guarantees of an offering's subsequent success, nor do they insure investors against the vicissitudes of technology and industry."), *aff'd,* 347 F. App'x 617 (2d Cir. 2009).  In fact, Plaintiffs allege that Luckin's outside auditor was not able to uncover the fraud until an on-site audit in January 2020, at least eight months after the fraud allegedly began.  *See* Compl. ¶¶ 197-200 (alleging E&Y Hua Ming discovered the first signs of potential fraud on or around January 25, 2020).  Even state-of-the-art monitoring and oversight controls require time to collect, review, and analyze data.  Alleging that any external party, much less the Underwriters (who would not have had ready access to the company's internal systems), could have detected this type of fraud immediately is facially implausible.  *See Endo* v. *Albertine*, 863 F. Supp. 708, 732 (N.D. Ill. 1994) ("Underwriters cannot be expected to possess the intimate knowledge of corporate affairs of inside directors, and their duty to investigate should be considered in light of their more limited access.") (quotations omitted)).

### iii.   The Other Alleged Misstatements and Omissions in the IPO Registration Statement Are Not Actionable

Plaintiffs' claims that statements concerning (1) related party disclosures (Compl. ¶¶ 552-53), (2) compliance with laws, rules, and regulations (*id*. ¶¶ 541-42), and (3) Luckin's 2018 growth and first quarter 2019 reduced growth (*id*. ¶ 546-47), constitute misstatements or omissions fail for the same reason:  an underwriter is only subject to Section 11 liability for information that it could reasonably have discovered on the effective date of the registration statement.  These scattershot allegations do little more than "attempt to allege liability for disclosures not made because the material fact was unknowable or had not even occurred as of the critical date." *Panther Partners*, 538 F. Supp. 2d at 673.  As discussed in Section I.A, Plaintiffs concede that Luckin's fraudulent scheme was not fully operational until the second half of 2019, rendering it impossible

for Underwriters to detect any of these purported misstatements or omissions, and dooming any claims against them. *See Scott*, 46 F. Supp. 3d at 394 ("[T]he accuracy of offering documents must be assessed in light of the information available at the time they were published.").

First, Plaintiffs do not allege that any of the related party transactions purportedly occurring between April 1, 2019 and May 17, 2019 were material, much less observable by outside parties like the Underwriters. *See Panther Partners*, 538 F. Supp. 2d at 669 ("If [defendant] was either unaware of the problems, or if the problems did not meet the materiality threshold, . . . then no disclosure was required and [defendant] is not liable in conjunction with its offering statements."). Nor do Plaintiffs suggest that the fabricated transactions could have been reflected in financial or systems data, transaction testing, or vendor/customer files available to the Underwriters at the time of the IPO. These failures are fatal to the Securities Act claims against the Underwriters. *See id.* at 673 ("Plaintiff asks the Court to assume that Defendants *must* have known because something did in fact occur later; this is simply inadequate pleading."); *Fisher* v. *Ross*, 1996 WL 586345, at *7 (S.D.N.Y. Oct. 11, 1996) ("The undisputed evidence demonstrates, however, that the facts as they existed at the time of Prospectus were disclosed in the Prospectus, that the adverse impact of the delayed letters of credit was not recognized until well after the Offering Period . . . . The plaintiff's [Section 11] claim is classic fraud by hindsight and cannot survive.").

Second, because Plaintiffs do not allege that Luckin violated any laws before the date of the IPO Registration Statement, facts or events that would have rendered those disclosures false could not have been detected until well after the Registration Statement became effective. *See Holbrook* v. *Trivago N.V.,* 2019 WL 948809, at *11 (S.D.N.Y. Feb. 26, 2019) ("Plaintiffs alleging actionable omissions under Section 11 must at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.").

17

Third, again, there was no way for the Underwriters to detect any issues with representations concerning Luckin's 2018 growth or first quarter 2019 decline.[13]  As Plaintiffs acknowledge, Luckin's first quarter 2019 decline in growth was fully disclosed  (Compl. ¶¶ 555-56), and there was no fraud to detect in the earlier, accurate numbers.  As discussed in section I.B.iii, the Underwriters could not have known and caused to be disclosed information related to Luckin's growth rate for the still-in-progress second quarter of 2019 in the IPO.  *See In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d at 208 (finding disclosure of interim financial information for the quarter in progress at the time of the offering was not required to be disclosed under Section 11); *Lin*, 574 F. Supp. at 421 (holding the challenged omissions were non-actionable where defendants could not have known what financial results would be for a quarter ending seven weeks later).

In sum, Plaintiffs cannot contend that the Underwriters had an obligation to uncover a fraud that had not yet begun.

### C. Plaintiffs' Alleged "Red Flags" Further Demonstrate the Implausibility of Securities Act Claims Arising out of the IPO

Plaintiffs do not claim that the Underwriters knew of or participated in Luckin's fraud. Indeed, they expressly disclaim any allegations of fraud against the Underwriters.  Compl. ¶¶ 7, 439, 440.  Instead, Plaintiffs premise their claims on the theory that if the Underwriters had conducted a reasonable investigation, they "would have uncovered numerous red flags that called into question the accuracy of the IPO and SPO Registration Statements' representations . . ." (*id.* ¶ 493) which in turn would have led them to "discover[] that material information had been

---

[13] Moreover, the statements Plaintiffs point to regarding Luckin's "disruptive," "pioneering," and "technology-driven" business model are paradigmatic examples of mere puffery.  *See, e.g., ECA, Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009).

misstated or omitted from the IPO and SPO Registration Statements" (*id.* ¶ 494).  But, in fact, Plaintiffs' purported red flags further demonstrate the implausibility of their IPO-related claims.

Plaintiffs identify supposed red flags that, even if discovered and investigated by the Underwriters, could not have plausibly allowed the Underwriters to determine that the offering documents contain a material falsehood just days after the scheme began.  Again, Plaintiffs improperly seek to impose liability under the Underwriters for failing to predict the future.  *See In re Countrywide Fin.*, 588 F. Supp. 2d at 1181-82 ("In hindsight, it is appealing to say the same red flags could have put Underwriter Defendants on notice that the accounting-related statements were false or misleading.  But the present CAC does not adequately allege that Underwriter Defendants' . . . [investigation] during this period was unreasonable.").

### i. None of the Purported Red Flags Could Have Alerted the Underwriters to Fraud Before the IPO, Because the Fraud Did Not Yet Exist

The supposed red flags identified by Plaintiffs suffer from the same fatal flaw that doomed their alleged misstatements and omissions:  no matter what color the flag, the Underwriters simply could not have identified any fraud before the IPO, which occurred mere weeks after Plaintiffs allege that the fraud began.  For example, Plaintiffs allege that Luckin updated its ordering system to allow the use of non-sequential receipts in the second quarter of 2019, but do not claim that the change pre-dated the IPO, much less how it would have been reflected in information accessible to the Underwriters.  Compl. ¶ 512; *see Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 429 (S.D.N.Y. 2014) ("[T]he law is clear that an unseen red flag cannot be heeded.").  Indeed, the very anonymous sources on which Plaintiffs improperly rely to support this claim do not support Plaintiffs' chronology.  Compl. ¶ 57 (former employee joined Luckin in the fourth quarter of 2019), ¶¶ 55, 147 (former employee informed of supposed change in November 2019), ¶ 152 (former employee does not identify any date for supposed

change); *see City of Omaha*, 450 F. Supp. 3d at 424 (finding that the information provided by anonymous sources should only be relied upon where allegations are made "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged").

Nor can Plaintiffs rely on purported red flags that claim there was a "well-recognized increased risk of financial misstatements among companies in emerging markets such as China" (Compl. ¶¶ 497-502) or that Underwriters had "uncovered, but negligently overlooked, evidence that could have led to their discovery [of the fraud]" (*id.* ¶ 509) or that "Luckin's extensive related-party transactions should have caused the Underwriter Defendants to more closely scrutinize Luckin's relationships with third parties" affiliated with directors and officers of the companies (*id.* ¶¶ 514-15) or that the Underwriters improperly overlooked the criminal history of a senior Luckin executive (*id.* ¶ 518).  Again, there simply was no fraud to discover at the time of the IPO, and thus there could have been no related red flags.

Similarly, Plaintiffs cannot claim that participation by some of the Underwriters in a margin loan facility with two of Luckin's directors in September 2019 constitutes a red flag for the May 2019 IPO (*id.* ¶ 488).  Indeed, the fact that the Underwriters decided to enter this agreement after the IPO indicates precisely the opposite point:  that the Underwriters did everything possible and necessary to make themselves comfortable with Luckin's business.  If the Underwriters had any reason to believe that Luckin was potentially committing fraud, or that it was a riskier investment than it appeared, it is implausible that they would have extended their credit through the margin loan facility.  Plaintiffs do not, and cannot, offer any claim to the contrary.

ii. **Most of the Purported Red Flags Were Fully and Accurately Disclosed in the Registration Statement**

Although the timing of the IPO in relation to the alleged fraud renders all of Plaintiffs' purported red flags moot, most of Plaintiffs' alleged red flags fail for the separate and independent reason that the associated risks were fully disclosed.  Plaintiffs cannot pretend, with the clarity of hindsight, that statements properly disclosed and vetted in the IPO's Registration Statement now constitute red flags.   For example, Plaintiffs allege, without any particularity, that the Underwriters' "close[] associat[ion]" with Luckin was a red flag that should have prompted "heightened caution."  Compl. ¶ 503.  But these connections, such as they were, were fully disclosed (*see*, *e.g.*, IPO RS at 138-39), in addition to being irrelevant to whether the Underwriters could have discovered the fraudulent activity at Luckin before the IPO.

Plaintiffs' attempt to transform into red flags (1) the limited financial history of Luckin and weak internal controls identified by its external auditor (Compl. ¶¶ 495-96), (2) Luckin's complicated business structure (*id.* ¶ 513), (3) Luckin's significant growth and plans for further expansion (*id.* ¶ 506), and (4) Luckin's growth decline in the first quarter of 2019 Compl. (*id.* ¶¶ 507-08) fail for similar reasons.  First, each of these topics was fully disclosed and materially accurate at the time the Registration Statement was issued.  *See* IPO RS at 4, 67-68 (business structure), 16-17, 22, 24 (risks inherent in limited financial history and growth plans), 32-33 (material weaknesses in internal controls), 83-86 (first quarter 2019 results and metrics).  No matter how thoroughly anyone may have reviewed the company's records or investigated corporate practices prior to May 17, 2019, she would not have been able to uncover what was, at best, a barely-begun fraud.  And Plaintiffs can hardly claim that the Underwriters should have been suspicious that a large company had a complicated business structure or that a growing company had an aggressive growth strategy.  *See Perry* v. *Duoyuan Printing, Inc.*, 2013 WL 4505199, at *8

21

(S.D.N.Y. Aug. 22, 2013) (plaintiffs' contention that defendant "ignored a red flag apparent from [issuer's] 'highly-complex ownership structure' is unconvincing" and "if in fact it were true that having a complex ownership structure and/or primary offices in a foreign country amounted to red flags, the conduct of countless numbers of companies conducting business abroad through subsidiaries would be held in question"); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 388 (D. Md. 2004) (finding it "not uncommon . . . for large, publicly held companies to . . . have aggressive growth strategies."). Finally, the mere fact of a decline in growth could not have signaled that the company would respond by embarking on a new scheme to inflate key metrics in the *next* financial period. None of these supposed red flags is even facially plausible.

Nor is Plaintiffs' claim that the Underwriters should have been on notice and undertaken a more thorough investigation because of Luckin's "extensive reliance on promotional coupons and payment vouchers." Compl. ¶ 510. Plaintiffs deliberately confuse the "corporate voucher program" allegedly at the center of the fraud with Luckin's primary marketing strategy of offering free and discounted beverages in an attempt to create customer loyalty, a well-understood practice at the heart of Luckin's business model and disclosed in painstaking detail in its public filings and statements (*e.g.*, *id.* ¶¶ 455-56, 550; IPO RS at 97).[14] That the company offered promotions to customers is unremarkable and could not have tipped the Underwriters off to the misconduct that would later occur. *See Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 645 Fed. Appx. 72, 75 (2d Cir. 2016) ("It is only with the benefit of hindsight that these records can be characterized as red flags, but allegations of 'fraud by hindsight' are insufficient.").

---

[14] Again, the allegations in the Complaint suggest that the fabricated transactions effectuated through that program did not begin until, at the earliest, late May 2019 (Compl. ¶ 134).

II.   **The SPO-Based Claims Should Also Be Dismissed**

Luckin has admitted to the inflation of revenues, expenses, and other metrics that rendered its reported financial results unreliable for periods pre-dating the SPO.  Luckin has described the circumstances as a highly sophisticated and intricate scheme orchestrated by a tight inner circle of a small group of employees who went to great lengths to keep their scheme secret.  Compl. ¶ 181.  Plaintiffs' allegations mirror these admissions, describing the fraud as "elaborate" (*id*. ¶ 18) and "massive" (*id.* ¶ 130), and making note of "Luckin's practice of extreme secrecy" (*id.* ¶ 152).  These allegations preclude Plaintiffs' SPO-based Securities Act claims against the Underwriters, as even the most thorough investigation could not have rooted out the secret, complex fraud at issue here.

### A.  Plaintiffs Fail to Adequately Allege that Misstatements Relating to the SPO Were False

Plaintiffs' allegations deal a fatal blow to their SPO claim, because they demonstrate that the Underwriters could not have known that Luckin's statements were false at the time of the SPO.  *See Lin*, 574 F. Supp. 2d at 415 (alleged misstatements must be "material as of the date the offering documents became effective").  If it was not possible for the Underwriters to learn of the misstatements, they cannot be liable for failing to do so.

In overreaching to assert their claims against the Underwriters, Plaintiffs conveniently overlook their own allegations.  First, Plaintiffs assert that Luckin's auditor, E&Y Hua Ming did not become aware of the concerning transactions until around ***January 25, 2020***, more than two weeks *after* the SPO, as a part of their annual audit review.  Compl. ¶ 197.  That review was an in-depth exercise undertaken by a team of skilled and experienced audit professionals with the benefit of a full year's financial picture.  *Id.* ¶ 196.  Plaintiffs further allege that E&Y Hua Ming only sent a specialized anti-fraud team to investigate Luckin after the publication of the anonymous short

seller report on **January 31, 2020** (*id.* ¶ 199), three weeks *after* the SPO.  It took that specialized team until **mid-March 2020** to allegedly "uncover[] evidence of accounting fraud" and confirm the involvement of certain executives.  *Id.* ¶ 198-99.[15]  It would be even longer before E&Y Hua Ming was able to determine the extent of the fraud, identify potential wrongdoers, and push Luckin to make disclosures.  *Id.*  ¶ 198.  This type of intensive review by experts was neither feasible nor reasonably expected of Underwriters before the SPO offering.

Second, Plaintiffs also highlight the **January 31, 2020** Anonymous Report by Muddy Waters as one of the earliest reports of Luckin's fraud.  This report was released three weeks after the SPO after a massive undertaking that included the review of over 11,000 hours of Luckin store traffic video over 981 store-days, and on the ground surveillance of Luckin stores by over 1,500 individuals.  *Id.* ¶ 160.  Similarly, Luckin's own internal investigation, which began in March 2019, took 15 weeks and involved interviews of over 60 witnesses, a review of over 550,000 documents collected from over 60 custodians, and "extensive forensic accounting and data analytics testing."  *Id.* ¶¶ 172, 374.  That level of intense inquiry far exceeds the standard of reasonable diligence required of underwriters under the securities laws; if it were, the capital markets would likely freeze with inaction.

Plaintiffs fundamentally misstate the Underwriters' obligation in a registered offering, which is to satisfy the "standard of reasonableness shall be that required of a prudent man in the management of his own property."  *In re WorldCom*, 346 F. Supp. 2d at 663.  Underwriters have no duty to investigate the portions of registration statements expertised by others.  *See supra*

---

[15] Notably neither E&Y Hua Ming's public statements nor Plaintiffs' allegations assert that E&Y Hua Ming (or anyone else) discovered any issue prior to the SPO.  The order of events is further bolstered by the same media accounts on which Plaintiffs rely in the Complaint.  *See* Ramesh Decl. Ex. 5 (Yicai Global, "Auditor's Anti-Fraud Team Led to Luckin's Confession, Sources Say," (Apr. 3, 2020) (reporting E&Y Hua Ming only discovered fraud after dispatching an anti-fraud team in response to the Anonymous Report)).

section I.B.i.  Plaintiffs' description of the complex and secretive nature of Luckin's fraud and the difficulty that experts had in uncovering it suggest that only an auditor with accounting fraud expertise could have brought Luckin's fraud to light.  It is thus unsurprising that Plaintiffs do not and cannot allege, as they must, that the Underwriters knew the alleged statements were false at the time of the SPO.

### B.  Plaintiffs Fail to Adequately Allege Certain Misstatements and Omissions by the Underwriters in the SPO

Separately and independently, Plaintiffs' inability to sufficiently allege certain misstatements or omissions by the Underwriters in connection with the SPO requires, at the very least, the narrowing of the SPO claim to reflect those inadequacies.

#### i.  Plaintiffs Fail to Adequately Allege Any Misstatements or Omissions Relating to Financial Statements

That failure includes the absence of any misstatement or omission relating to the SPO's financial statements, including compliance with GAAP and the presentation of non-GAAP measures.  While financial information that has not been audited generally cannot be relied upon as expertised information, an underwriter is not required to step into the shoes of an auditor by auditing the company or "duplicat[ing] the work of auditors," even where there are red flags.  *In re WorldCom,* 346 F. Supp. 2d at 677, 684.  As a result, regardless of whether claims arising out of technical aspects of the financial statements may lie against the issuer or other defendants, such claims are misplaced against the Underwriters.

As discussed in section I.B.i, underwriters are entitled to rely upon expertised portions of offering documents.  *See In re Worlds of Wonder Sec. Litig.*, 814 F. Supp. 850, 867-68 (N.D. Cal. 1993) ("[The underwriter] had no duty to independently repeat the investigation done by [auditor].").  It follows that underwriters must also rely upon the underlying work of the auditors that checks and tests those financial statements, as an underwriter of public securities lacks the

experience, skills, and access needed to recreate and test the data that informs financial statements. For example, underwriters are not reasonably expected to perform transaction testing or match credits and debits on a balance sheet.[16]   Rather, they must rely to some degree on reviewing the auditor's and company's work to determine if there are areas ripe for further investigation.[17]   As a result, purported omissions regarding the accounting-specific disclosures—compliance with GAAP (Compl. ¶¶ 586-87), the reporting of non-GAAP financial measures (*id.* ¶¶ 574-75), and those required under adopted accounting guidelines (*id.* ¶¶ 572-73)—should be dismissed as to Underwriters.

### ii.   The Material Terms of the Margin Loan Facility Were Fully Disclosed

Plaintiffs also fail to plead any actionable misstatements or omissions related to the margin loan facility.   Plaintiffs allege that the SPO Registration Statement was misleading because it "fail[ed] to disclose the risk that Lu's and Qian's control of the Company could be significantly reduced in the event of a decline in Luckin's ADS price" under the terms of the margin loan agreement.   Compl. ¶ 600.   But, as Plaintiffs concede, the material terms relating to the facility were disclosed in the SPO Registration Statements.   Ramesh Decl. Ex. 4, SPO Registration Statement ("SPO RS") at 52; Compl. ¶ 599 ("The SPO Registration Statement disclosed that Defendants Lu, Qian and Lu's sister, Wong, had pledged a total of 488.4 million Luckin Class B

---

[16] *See* Public Company Accounting Oversight Board Auditing Standards (Dec. 15, 2017), *available at* https://pcaobus.org/Standards/Auditing/Documents/PCAOB_Auditing_Standards_as_of_December_15_2017.pdf (identifying, *inter alia*, the responsibilities and functions of the independent auditor to include: presenting cash flows and operating results in conformity with GAAP procedures, transaction testing, testing the completeness of information, and identifying areas of risk including the existence of unusual transactions and events that warrant investigation).

[17] E&Y Hua Ming's inability to identify and raise any issues relating to the fabricated transactions or associated misconduct (and Plaintiffs' decision not to fault them for that inability) confirms that no indicia of fraud were discoverable until after the SPO.

shares, representing over *42%* of the total aggregate voting power in the Company, 'to an affiliate

of an underwriter to secure a borrowing.'"). But Plaintiffs tellingly omit that the SPO Registration

Statement also disclosed:

> [C]ertain of our shareholders have pledged certain of our Ordinary Shares to
> secure borrowings. . . . The related facility agreements have provisions where
> additional shares will be pledged automatically in the event of a margin call. *If*
> *any lender enforces its security interests in such pledged shares upon an event*
> *of default, such lender may sell or otherwise dispose of any of the pledged*
> *shares without the transferee becoming bound to the terms of the lock-up*
> *agreement.* Any sale or perceived sale of the shares into the market may cause
> the trading price of ADSs to decline.

SPO RS at 52 (emphasis added). Plaintiffs pretend that the SPO's disclosures were materially

false or misleading because they did not alert investors to the possibility that Lu and Qian could

lose control of the company. *See* Compl. ¶ 600. But this disclosure exposes that claim as false.

Because the SPO Registration Statement revealed the risk of a change in control, *i.e.*, "the exact

risk that later materialized," Plaintiffs' "Section 11 claim will not lie as a matter of law." *Jiajia*

*Luo*, 2020 WL 3051019, at *11 (citation and quotations omitted).

### C. Plaintiffs Fail to Adequately Allege Any Claim Arising Under Regulation S-K

Plaintiffs' asserted violations of Items 101, 303, and 503 of Regulation S-K, 17 C.F.R. §

229, *et. seq.* (Compl. ¶¶ 601-04) also cannot sustain their claims against the Underwriters.[18] First,

as a foreign private issuer, Luckin filed its Registration Statements on a Form F-1, which does not

require any disclosures under Items 101 and 303. *See* Ramesh Decl. Exs. 1 & 3; Securities and

Exchange Commission, Form F-1 (*available at* https://www.sec.gov/files/formf-1.pdf); *Jiajia*

*Luo*, 465 F. Supp. 3d at 413 ("Item 303 is not applicable at all to a registration statement on Form

F-1."); *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1209 n.3 (S.D.N.Y. 1996) ("Item 101

---

[18] We are aware of no authority premising a Section 11 or 12 claim against an underwriter on an alleged
violation of Item 101, but note that the same principles governing claims pursuant to Items 303 and 503,
including the knowledge requirement, should be applied to purported violations of Item 101.

applies only to annual 10K reports.").  Separately, each of these claims is premised on the SPO's Registration Statement's purported omissions of the fabricated transactions used to overstate Luckin's revenue and expenses—information that was not known or knowable by Underwriters at the time of the SPO, as demonstrated by the fact that even a team forensic accountants could not uncover the fraud until they completed an intensive investigation *after* the SPO.  Compl. ¶¶ 198-99; *see Singh*, 106 F. Supp. 3d at 446 (in order to state a claim for a material omission, plaintiffs must plead that "allegedly omitted facts both existed, and were known or knowable, at the time of the offering").

An Item 303 claim requires "actual knowledge of the relevant trend or uncertainty," which Plaintiffs not only do not allege but affirmatively disclaim against the Underwriters (Compl. ¶ 440).  *See Indiana Pub. Ret. Sys.* v. *SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) ("The plain language of Item 303 confirms our previous assumption that it requires the registrant's actual knowledge of the relevant trend or uncertainty. . . . It is not enough that it should have known of the existing trend, event, or uncertainty.")[19]; *Medina* v. *Tremor Video, Inc.*, 640 F. App'x 45, 48 (2d Cir. 2016) (affirming dismissal of plaintiffs' Section 11 claims against company and underwriters for alleged violation of Item 303 because plaintiffs "allege[d] only suppositions of what defendants would have known or were in a position to know," which were "insufficient" to "draw the plausible inference that defendants had actual knowledge of the trends or uncertainties at the time the registration statement was issued") (citations and quotations omitted).  Where Item 303 and Item 503 violations are based on the same set of facts, courts apply the "rationale for determining the

---

[19] Moreover, liability under Item 303 depends on what is "presently known to management," not to non-issuers.  *See id.*  Neither the company nor its auditors were able to uncover the fraud until well after the SPO and only then through an intensive undertaking requiring forensic accounting and data testing.  *See* Compl. ¶¶ 172, 196-99, 374.  Underwriters could not have been in position to know of the fraud at the time of either offering.

former . . . [to] support the same determination of the latter." *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at *9 (S.D.N.Y. Sept. 13, 2017) (citations omitted), *aff'd*, 756 Fed. App'x. 41 (2d Cir. 2018). Because no reasonable investigation by the Underwriters could have uncovered the fabricated transactions at the time of the SPO, Plaintiffs' Items 101, 303, and 503 claims fail with regard to both offerings.

### III.   Plaintiffs Lack Standing To Bring Section 12 Claims Pursuant to the IPO

Section 12 liability is narrowly proscribed to only support a claim by a plaintiff who can "establish that it purchased the security directly from defendants through the public offering at issue." *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 585 (S.D.N.Y. 2010). "The Supreme Court has held that claims under Section 12(a)(2) may be brought by those who have purchased securities in 'initial public offerings' but not by those who purchased securities in a 'secondary market.'" *Caiafa* v. *Sea Containers Ltd.*, 331 F. App'x 14, 16-17 (2d Cir. 2009) (quoting *Gustafson* v. *Alloyd Co*., 513 U.S. 561, 571 (1995)); *see also In re Longfin Corp. Securities Class Action Litig.*, 2019 WL 1569792, at *7 (S.D.N.Y. Apr. 11, 2019) (dismissing Section 12 claims arising out of purchases on Nasdaq where plaintiffs claimed underwriters were sellers because they were instrumental in bringing the shares to market). Recognizing as much, Plaintiff AP7 does not purport to bring a Section 12 claim or represent a class of plaintiffs, nor could it, as the law states that a purchaser must purchase directly from underwriters as part of a securities offering to the public. *See In re Ultrafem Inc. Sec. Litig.,* 91 F. Supp. 2d 678, 693-94 (S.D.N.Y. 2000) ("Purchasers in private or secondary market offerings do not have standing to bring actions under Section 12(2).").

For the same reason, neither Plaintiff can state a claim under Section 12 regarding the IPO. The Complaint alleges that Louisiana Sheriffs "purchased or otherwise acquired Luckin securities through U.S. domestic transactions during the Class Period, including 22,400 ADS that it

purchased from Credit Suisse directly in the SPO." Compl. at ¶ 32. Louisiana Sheriffs'
accompanying PSLRA certification discloses three other purchases on the secondary market, but
none were alleged to have been from an Underwriter or purchased as part of the IPO (ECF 150-
2). *See In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d at 585 (dismissing Section 12 claims
where a "cursory review of the information provided makes clear that many of the listed purchases
must have been made in the secondary market because they were not made on dates on which any
initial offering was being made."). As neither Plaintiff purchased its shares in the IPO, those
claims must be dismissed on both an individual and class basis. *See Yi Xiang* v. *Inovalon Holdings,
Inc.*, 327 F.R.D. 510, 521 (S.D.N.Y. 2018) ("Because Roofers is the only named plaintiff is this
action, and Plaintiff does not dispute that Roofers does not have standing to sue on the Section
12(a)(2) claim, the Section 12(a)(2) claim is dismissed."); *Massachusetts Bricklayers and Masons
Funds and Pipefitters' Retirement Fund Local 598* v. *Deutsche Alt-A Securities*, 2010 WL
1370962, at *1 (E.D.N.Y. 2010) ("Plaintiffs lack standing to assert claims with respect to securities
they did not purchase."). To the extent any Section 12 claim survives this motion, the putative
class definition must be limited to those investors who purchased in the SPO from a named
defendant.

## CONCLUSION

Plaintiffs' claims against the Underwriters should be dismissed.

Dated: November 23, 2020
        New York, New York

Respectfully submitted,

By:  /s/ David G. Januszewski
**CAHILL GORDON & REINDEL LLP**
Herbert S. Washer
David G. Januszewski
Sheila C. Ramesh
Samuel G. Mann
32 Old Slip
New York, New York 10005
212-701-3000 (Telephone)
212-269-5420 (Facsimile)
hwasher@cahill.com
djanuszewski@cahill.com
sramesh@cahill.com
smann@cahill.com

*Attorneys for Defendants Credit Suisse (USA)*
*LLC, Morgan Stanley & Co. LLC, KeyBanc*
*Capital Markets Inc., and Needham &*
*Company, LLC*