UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Luckin Coffee Inc. Securities Litigation

20-cv-01293 (JPC) (JLC)

**MEMORANDUM OF LAW IN SUPPORT OF
LUCKIN COFFEE INC.'S MOTION TO DISMISS**

**DAVIS POLK & WARDWELL LLP**

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

Attorneys for Defendant
Luckin Coffee Inc.

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................4

    A.    Luckin's Public Offerings and Plaintiffs' Purchases of ADS ..........................4

    B.    The Registration Statements' Disclosures ........................................................6

    C.    Allegations of Fraud ......................................................................................7

    D.    This Litigation ..............................................................................................9

ARGUMENT .......................................................................................................10

    POINT I. — The Section 11 Claims Should Be Dismissed for Lack of Standing ........11

    A.    The CAC Fails to Plead a Plausible Basis for Section 11 Standing ...............11

    B.    AP7's Section 11 Standing Cannot Be Assumed Because Its Purchases Postdate the SPO ........................................................................................14

    C.    Louisiana Sheriffs' Section 11 Standing Cannot Be Assumed Because Its Purchases Postdate the Expiration of the IPO Lockup ............................15

    POINT II. — The CAC Does Not Allege Any Actionable Misstatement or Omission Regarding the Financial Statements in the IPO Registration Statement ........................................................................................17

    A.    The CAC Does Not—and Cannot—Plead Any Financial Information in the IPO Registration Statement Was False ....................................................18

    B.    The CAC Does Not Allege a Duty to Disclose the Fabricated Transactions in the IPO Registration Statement ...............................................18

        1.    The GAAP Rules Cited in the CAC Do Not Impose a Duty to Disclose .......19

        2.    Items 101 and 303 of SEC Regulation S-K Do Not Apply to Foreign Issuers' IPO Registration Statements ............................................................21

        3.    Item 503 of SEC Regulation S-K Does Not Give Rise to an Independent Duty to Disclose ......................................................................22

    POINT III. — The CAC Does Not Allege Any Actionable Misstatement or Omission Regarding the Former Chairman's and Former CEO's Loans .................................................................................................23

i

PAGE

POINT IV. — The CAC's Allegations Regarding Internal Controls Are Not Actionable ...............................................................................................26

POINT V. — The Alleged Misstatements Regarding Luckin's Technology and Business Model Are Non-Actionable Puffery .......................................29

CONCLUSION .................................................................................................................30

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Abuhamdan v. Blyth, Inc.*,
   9 F. Supp. 3d 175 (D. Conn. 2014)................................................................30

*Adair v. Kaye Kotts Assocs., Inc.*,
   No. 97 CIV. 3375 (SS), 1998 WL 142353 (S.D.N.Y. Mar. 27, 1998) .......................20

*In re Allergan PLC Sec. Litig.*,
   No. 18-CV-12089 (CM), 2019 WL 4686445 (S.D.N.Y. Sept. 20, 2019)...................28

*In re ARIAD Pharm. Sec. Litig.*,
   842 F.3d 744 (1st Cir. 2016)...............................................................12, 13, 14, 16–17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................2, 10, 12, 13, 16

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017)...........................................................27, 28–29

*In re Barclays Bank PLC Sec. Litig.*,
   No. 09 Civ. 1989 (PAC), 2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017),
   *aff'd*, 756 F. App'x 41 (2d Cir. 2018), *as amended* (Nov. 20, 2018) ........................21

*Barilli v. Sky Solar Holdings, Ltd.*,
   389 F. Supp. 3d 232 (S.D.N.Y. 2019).......................................................................27

*Barrett v. PJT Partners Inc.*,
   No. 16-CV-2841 (VEC), 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017).....................29

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).........................................................................2, 10, 12, 13, 16

*Brewer v. Breen*,
   No. 16 Civ. 7500 (ER), 2018 WL 565267 (S.D.N.Y. Jan. 23, 2018)...................29–30

*Burekovitch v. Hertz*,
   No. 01-CV-1277 (ILG), 2001 WL 984942 (E.D.N.Y. July 24, 2001) .......................25

*Caiafa v. Sea Containers Ltd.*,
   525 F. Supp. 2d 398 (S.D.N.Y. 2007)...........................................................12, 27–28

*In re Canandaigua Sec. Litig.*,
   944 F. Supp. 1202 (S.D.N.Y. 1996)...........................................................................21

PAGE(S)

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) ...................................................................12, 13, 14, 17

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)...................................................................................29

*Dalberth v. Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014)...............................................................................18–19

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003)...............................................................................10, 11

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).................................................................................28, 29

*Escott v. BarChris Constr. Corp.*,
    283 F. Supp. 643 (S.D.N.Y. 1968) ...........................................................................20

*In re Forcefield Energy Litig.*,
    No. 15 Civ. 3020, 2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) ..............................30

*Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*,
    862 F. Supp. 2d 322 (S.D.N.Y. 2012)........................................................................12

*Gamm v. Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019)....................................................................................4

*In re Glob. Crossing, Ltd. Sec. Litig.*,
    313 F. Supp. 2d 189 (S.D.N.Y. 2003)........................................................................12

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018)........................................................................29

*Ho v. Duoyuan Glob. Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012).................................................................13, 14

*Howard v. Arconic Inc.*,
    395 F. Supp. 3d 516 (W.D. Pa. 2019)........................................................................22

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
    936 F.2d 759 (2d Cir. 1991)....................................................................................11

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v.
Royal Bank of Scotland*, 783 F.3d 383 (2d Cir. 2015)................................................30

*In re Int'l Bus. Machs. Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998)....................................................................................18

PAGE(S)

*Jiajia Luo v. Sogou, Inc.*,
    465 F. Supp. 3d 393 (S.D.N.Y. 2020)....................................................................21, 28

*Johnson v. Sequans Commc'ns*,
    No. 11 CIV. 6341 PAC, 2013 WL 214297 (S.D.N.Y. Jan. 17, 2013).........................12

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986)..........................................................................................10

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)........................................................................12

*In re Merrill Lynch & Co. Research Rep. Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003)........................................................................18

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)........................................................................................10

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    643 F. Supp. 2d 366 (S.D.N.Y. 2009), *aff'd sub nom.*
    *In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)........................................................................................19

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ....................................................................................22

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018)........................................................................22

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)........................................................................................22

*Papasan v. Allain*,
    478 U.S. 265 (1986) ................................................................................................... 10

*In re ProShares Tr. Sec. Litig.*,
    728 F.3d 96 (2d Cir. 2013)..............................................................................11, 24, 27

*In re Proshares Tr. II Sec. Litig.*,
    No. 19-CV-0886 (DLC), 2020 WL 71007 (S.D.N.Y. Jan. 3, 2020).....................11, 22

*In re Puda Coal Sec. Inc. Litig.*,
    No. 11 Civ. 2598 (KEF), 2013 WL 5493007 (S.D.N.Y. Oct. 1, 2013) .............. *passim*

*Rochester Laborers Pension Fund v. Monsanto Co.*,
    883 F. Supp. 2d 835 (E.D. Mo. 2012)........................................................................30

P<small>AGE</small>(S)

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ...................................................................10

*In re Safeguard Scis.*,
    No. CIV.A.01-3208, 2004 WL 2700291 (E.D. Pa. Nov. 18, 2004) ...........................25

*Schaffer v. Horizon Pharma PLC*,
    No. 16-CV-1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ......................30

*Shields v. Citytrust Bancorp., Inc.*,
    25 F.3d 1124 (2d Cir. 1994)....................................................................10

*In re Skechers USA, Inc. Sec. Litig.*,
    444 F. Supp. 3d 498 (S.D.N.Y. 2020)........................................................30

*Stratte-McClure v. Morgan Stanley*,
    No. 09 Civ. 2017 (DAB), 2013 WL 297954 (S.D.N.Y. Jan. 18, 2013),
    *aff'd*, 776 F.3d 94 (2d Cir. 2015), *aff'd*, 598 F. App'x 25 (2d Cir. 2015) .............21, 22

*In re Sun Edison, Inc. Sec. Litig.*,
    300 F. Supp. 3d 444 (S.D.N.Y. 2018).........................................................30

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
    No. 17-cv-2169 (LAK), 2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019).....................22

*In re Winn-Dixie Stores, Inc. Sec. Litig.*,
    531 F. Supp. 2d 1334 (M.D. Fla. 2007)......................................................30

*Xu v. ChinaCache Int'l Holdings, Ltd.*,
    No. CV15-07952-CAS (RAOx), 2017 WL 114401 (C.D. Cal. Jan. 9, 2017) .............30

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ...................................................................17

S<small>TATUTES</small> & R<small>ULES</small>

17 C.F.R. § 229.105 ...................................................................................22

17 C.F.R. § 240.10b-5................................................................................. *passim*

15 U.S.C. § 77k....................................................................................... *passim*

15 U.S.C. § 77l(a)(2)...................................................................................11

15 U.S.C. § 77o..........................................................................................9

PAGE(S)

15 U.S.C. § 78j(b) ........................................................................................ *passim*

15 U.S.C. § 78t(a) .................................................................................................9

Fed. R. Civ. P. 9(b) .............................................................................................10

Fed. R. Civ. P. 12(b)(6).......................................................................................10


OTHER AUTHORITIES

FASB Statement of Concepts No. 8,
    "Conceptual Framework for Financial Reporting"......................................19

Financial Accounting Standards Board, *Accounting Standards Codification:*
    *About the Codification* (Dec. 2014),
        https://asc.fasb.org/imageRoot/71/58741171.pdf .......................................19

Securities and Exchange Commission, Form F-1,
    https://www.sec.gov/files/formf-1.pdf.......................................................21

Defendant Luckin Coffee Inc. ("Luckin" or the "Company") respectfully submits this memorandum of law in support of its motion to dismiss portions of the Consolidated Class Action Complaint ("CAC") filed by lead plaintiffs Sjunde AP-Fonden ("AP7") and Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs," together with AP7, "Plaintiffs").

## PRELIMINARY STATEMENT

On April 2, 2020, Luckin—a coffee company operating in China—announced that a special committee of its Board of Directors (the "Special Committee") was overseeing an internal investigation of issues identified during an audit of Luckin's 2019 financial statements. The announcement stated that the Special Committee had identified that beginning in the second quarter of 2019, Jian Liu, the then-Chief Operating Officer, and several employees reporting to him had engaged in misconduct that included fabricating transactions. The Special Committee recommended the suspension of Liu and the employees who were involved and the termination of dealings with parties involved in the fabricated transactions, which the Board accepted.

Over the next several months, Luckin made additional public disclosures. On May 12, 2020, Luckin announced that—based on evidence uncovered during the Special Committee investigation—the Board terminated Luckin's then-Chief Executive Officer Jenny Zhiya Qian, and Mr. Liu, the Chief Operating Officer who had already been suspended. On July 1, 2020, Luckin announced that the Special Committee's investigation was substantially completed and found that the fabrication of transactions began in April 2019, inflating Luckin's 2019 net revenue by approximately RMB 2.12 billion (approximately US$ 300 million), and expenses by RMB 1.34 billion (approximately US$ 190 million). In total, Luckin terminated 14 employees and subjected 15 additional employees to other disciplinary action as a result of the investigation.

1

Based on Luckin's disclosures, the CAC alleges that Luckin's registration statements for its May 2019 initial public offering ("IPO") and January 2020 secondary public offering ("SPO"), as well as other statements made by Luckin, contained material misstatements in violation of Section 11 of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.  In view of Luckin's disclosures, this motion does not seek to challenge the core of the CAC—that the fabricated transactions resulted in a material misstatement of Luckin's financial results beginning in the second quarter of 2019—however, the CAC's claims are overly broad, and the scope of this litigation should be narrowed as follows.

First, the CAC fails to plead Section 11 standing.  Section 11 claims are only available to investors whose purchases of securities are traceable to a particular registration statement.  However, the CAC fails to plead anything beyond a conclusory, formulaic recitation of the requirement that Plaintiffs' purchases of Luckin American Depositary Shares ("ADS") are traceable to either the IPO or SPO.  This conclusory allegation is insufficient to withstand a motion to dismiss under *Iqbal* and *Twombly*.  Indeed, *all* of Plaintiffs' purchases of Luckin ADS could have come from multiple sources:  (i) the ADS issued in the IPO; (ii) early-stage investors' sales of their pre-IPO shares; and/or (iii) the ADS issued in the SPO.  In the case of AP7, all of its purchases were made when ADS could have come from any of those three sources.  In the case of Louisiana Sheriffs, its purchases could have come from either the IPO or pre-IPO investors.  It is not possible for Plaintiffs to assume they have standing; instead, they must plead a plausible basis to assert which of their ADS are traceable to the IPO, and which are traceable to the SPO.  The CAC fails to satisfy this requirement.

Second, Plaintiffs have not stated a claim based on the financial statements in the IPO

registration statement because it only includes financial information through the end of the first quarter of 2019, i.e., March 31, 2019.  The fabricated transactions, however, are not alleged to have begun until the month after, April 2019.  Therefore, none of the financial information in the IPO registration statement was rendered false by the fabricated transactions.  Because Luckin did not "speak" to financial results post-dating March 31, 2019 in its IPO registration statement, there was no duty to disclose the fabricated transactions.  The CAC's reliance on various accounting rules and SEC regulations does not alter that conclusion.

Third, the CAC's allegations that Luckin's SPO registration statement was materially misleading in respect of personal loans of Luckin's former Chairman and former CEO fail because that registration statement disclosed that (i) the former Chairman and former CEO had pledged a significant number of shares as collateral for their loans; (ii) their lenders could sell pledged shares upon their default; and (iii) such sales could cause a decline in the price of Luckin's ADS.  Plaintiffs have not pleaded any duty for Luckin to make any further disclosures.

Fourth, the CAC's allegations that Luckin made material misrepresentations regarding its efforts to remediate weaknesses in its internal controls fail because Luckin warned investors that there was a risk those weaknesses may not be addressed effectively, and that such failure could result in misstatements in Luckin's financial statements.  Courts have routinely held that investors cannot state a claim under the federal securities laws in the face of such warnings.

Finally, the alleged material misstatements regarding Luckin's "disruptive" "technology-driven" business model being a driver of growth are non-actionable puffery.

For the reasons stated below, the Court should dismiss (i) Plaintiffs' Section 11 claim (Count III) in its entirety for lack of standing; (ii) all claims as they relate to the financial statements in Luckin's IPO registration statement; (iii) all claims based on the former

Chairman's and former CEO's personal loans; (iv) all claims based on alleged

misrepresentations regarding Luckin's remediation of internal control weaknesses, and (v) all

claims based on puffery regarding Luckin's growth prospects.

## BACKGROUND

A.   **Luckin's Public Offerings and Plaintiffs'
     Purchases of ADS**

Founded in June 2017, Luckin is a coffee company incorporated in the Cayman Islands

and headquartered in Xiamen, China.  (CAC ¶¶ 33, 61.)  Luckin sells freshly brewed coffee,

food, and other beverages to consumers primarily through its mobile application and "pick-up"

stores.  (*Id.* ¶¶ 61, 69.)  The Company grew rapidly, opening 2,370 stores in twenty-eight cities

in China within eighteen months of its founding.  (*Id.* ¶ 69.)

Pursuant to a Form F-1/A declared effective by the SEC on May 16, 2019 and a free

writing prospectus filed on May 17, 2019 amending the effective Form F-1, Luckin registered

276,000,000 Class A ordinary shares.  (Ex. A (May 6, 2019 Form F-1/A) at 2.)[1]  On May 17,

2019, Luckin completed its IPO, which offered 33 million ADS, representing 264,000,000 Class

A ordinary shares, on the NASDAQ exchange to investors at a price of $17 per ADS.  (CAC

¶¶ 33, 81.)  Each ADS represents eight Class A ordinary shares, and the underwriters of the IPO

had an option to purchase an additional 4,950,000 ADS within 30 days.  (Ex. B (May 17, 2019

IPO Registration Statement) at cover n.1.)  To facilitate this option, another Form F-1 was filed

on the date of the IPO, registering an additional 27,600,000 Class A ordinary shares.  (Ex. C

(May 17, 2019 Form F-1MEF) at 2.)  The underwriters exercised their option on June 14 and

---

[1] Luckin's IPO and SPO registration statements and other SEC filings are incorporated by reference into the CAC and are judicially noticeable as publicly filed documents.  *See Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (on a motion to dismiss, courts consider "in addition to the complaint, and written instruments attached, statements incorporated by reference, and public disclosure documents filed with the SEC").  The IPO and SPO Registration Statements are annexed as exhibits to the Declaration of Lawrence Portnoy.

June 18, 2019.  (Ex. D (January 10, 2020 SPO Registration Statement) at 166.)  Thus, a total of 37,950,000 ADS, representing 303,600,000 Class A ordinary shares, were registered and issued in connection with the IPO.  The Registration Statement disclosed that pre-IPO shareholders owned ordinary Class B shares that would constitute approximately 84.33% of outstanding shares after the completion of the IPO.  (Ex. B at cover n.1.)  The IPO Registration Statement explained that the depositary had the ability to distribute additional ADS not issued in the IPO (*id.* at 164) and could deliver ADS to investors who deposit ordinary shares (*id.* at 166).  The IPO Registration Statement also explained that Luckin and its "directors, executive officers, all of [its] existing shareholders and option holders and [the] concurrent private placement investor [] agreed, subject to some exceptions, not to transfer or dispose of, directly or indirectly, any ADSs, or any securities convertible into or exchangeable or exercisable for ADSs, for a period of 180 days" after the filing of the registration statement.  (*Id.* at 171.)  After the expiration of the lockup on November 12, 2019, those subject to the lockup were, pursuant to registration exemptions, able to convert their ordinary shares to ADS and trade them on the NASDAQ.  (*Id.*)

On January 10, 2020, Luckin conducted the SPO, which offered 13.8 million additional ADS to investors at a price of $42 per ADS.  (CAC ¶ 119.)  Credit Suisse, Morgan Stanley, CICC, Haitong, KeyBanc, and Needham underwrote both offerings.  (*Id.* ¶¶ 82, 120.)

Plaintiffs seek to represent a class of purchasers who acquired ADS between May 17, 2019 and April 1, 2020, inclusive.  (*Id.* ¶ 633.)  Plaintiff AP7 purchased 148,788 Luckin ADS over three transactions between January 23, 2020 and February 28, 2020.  (*Id.* Ex. A.)  Plaintiff Louisiana Sheriffs purchased 38,700 Luckin ADS over the course of three days beginning on January 8, 2020 and ending on January 10, 2020 (*id.* Ex. B); 22,400 of those ADS were allegedly

purchased directly from Credit Suisse in the SPO (*id.* ¶ 32.).[2]

**B.       The Registration Statements' Disclosures**

The IPO Registration Statement included Luckin's financial statements of loss and cash flow data covering the period between June 16, 2017 (when Luckin was founded) and March 31, 2019, the end of the first quarter of 2019.  (Ex. B at 72.)  The financial statements did not reflect any events or transactions occurring after March 2019.

Each of the IPO and SPO Registration Statements included a lengthy "Risk Factors" section informing investors of numerous risks and uncertainties that should be considered before investing in its ADS.  (*Id.* at 16–56; Ex. D at 17–61.)  For example, Luckin disclosed that its independent public accounting firm had identified two material weaknesses in Luckin's internal controls:  (1) a lack of sufficient accounting and financial reporting personnel with requisite knowledge of and experience with U.S. Generally Accepted Accounting Principles ("GAAP") and SEC rules, and (2) a lack of financial reporting policies and procedures commensurate with GAAP and SEC requirements.  (Ex. B at 33; Ex. D at 35.)  The Company stated that while it was "in the process of implementing a number of measures to address" the two material weaknesses (Ex. B at 33; Ex. D at 35), it warned investors at the time of the IPO that Luckin could not ensure that the measures would "fully address the material weaknesses" or "that we may conclude that they have been fully remediated."  (Ex. B at 33.)  Indeed, by the time of the January 2020 SPO, Luckin disclosed that "the remediation measures are still in the [sic] progress" and that they were not expected to be completed until "completion of our year-end financial closing procedures for 2019."  (Ex. D at 35.)  Luckin warned that if it failed to "achieve and maintain an effective internal control environment, it could result in material misstatements in [its] financial

---

[2] Louisiana Sheriffs sold all of its Luckin ADS on April 2, 2020, while AP7 has not disclosed any sales of Luckin ADS.  (CAC Exs. A & B.)

statements," an inability "to comply with applicable financial reporting requirements and related regulatory filings on a timely basis," changes in "the trading price of the ADSs," exposure "to increased risk of fraud or misuse of corporate assets," "potential delisting from the stock exchange," "regulatory investigations and civil or criminal sanctions," and restatements of "financial statements from prior periods."  (Ex. B at 33; Ex. D at 35.)

The SPO Registration Statement also disclosed that Charles Lu ("Lu"), Luckin's former Chairman of the Board; Jenny Qian ("Qian"), Luckin's former CEO; and Lu's sister together pledged 488.4 million Class B shares as collateral for loans (the "Margin Loan Facility").[3]  (Ex. D at 154.)  It also disclosed that Lu and Qian controlled approximately 60% of Luckin's voting power through their ownership of Class B shares (*id.* at 153), and cautioned investors that their pledged shares could be sold by their lenders in the event of default and that such sales could "cause the trading price of ADSs to decline" (*id.* at 52).

## C.    **Allegations of Fraud**

On January 31, 2020, Muddy Waters, a research investment firm, published an anonymous report, which alleged that Luckin "had evolved into a fraud by fabricating financial and operating numbers starting in 3rd quarter 2019."  (CAC ¶ 159.)  Luckin issued a denial of the anonymous report's allegations on February 3, 2020.  (*Id.* ¶ 164.)

On April 2, 2020, Luckin announced that its Board of Directors had formed a Special Committee to oversee an internal investigation of issues identified during an audit of Luckin's 2019 financial statements.  (*Id.* ¶ 174.)  The press release stated that the Special Committee, advised by Kirkland & Ellis LLP and FTI Consulting, had identified that Jian Liu ("Liu"), the

---

[3] The CAC is inconsistent with respect to the number and class of shares that were pledged.  (*Compare* CAC ¶¶ 154, 361, 488, 599 (488.4 million Class B shares), *with id.* ¶ 393 (95.4 million Class A shares and 515.4 million Class B shares)).  This memorandum uses 488.4 million Class B shares, which is consistent with the SPO Registration Statement.  (*See* Ex. D at 154.)

then-Chief Operating Officer of Luckin, and several employees reporting to him had engaged in misconduct that included fabricating certain transactions.  (*Id*.)  On the Special Committee's recommendation, the Board suspended Liu and the other employees implicated in the misconduct, and terminated dealings with parties involved in the fabricated transactions.  (*Id.*)  The press release also disclosed that Liu and the other employees fabricated sales transactions worth approximately RMB 2.2 billion "from the second quarter of 2019 to the fourth quarter of 2019," and an unquantified amount of costs and expenses during the period.  (*Id.*)

On May 12, 2020, Luckin issued a press release announcing that based on the Special Committee's additional findings, the Board had terminated Liu and Qian, and had placed six other employees on suspension or leave.  (*Id.* ¶ 178.)

On July 1, 2020, Luckin issued another press release announcing that the Special Committee's investigation was substantially completed and had found that "the fabrication of transactions began in April 2019," resulting in the inflation of Luckin's 2019 net revenue by approximately RMB 2.12 billion (approximately US$ 300 million) and expenses by RMB 1.34 billion (approximately US$ 190 million).  (*Id.* ¶ 181.)  The press release stated that, based on the Special Committee's findings and recommendations, (i) the Board had resolved to require Lu to resign from his position as Chairman of the Board; (ii) the Board had resolved to terminate 12 other employees who knew of or participated in the fabricated transactions; (iii) Luckin subjected an additional 15 employees to other disciplinary actions; and (iv) Luckin was in the process of terminating relationships with all third parties involved in the fabricated transactions.  (*Id.* ¶¶ 182–83.)  The press release also announced that Luckin had implemented "enhancements to its finance functions" and "engaged an internal controls consultant," and was "chartering an internal audit function to test and evaluate its control functions."  (*Id.* ¶ 184.)

D.     **This Litigation**

Between February 13, 2020 and April 10, 2020, four putative securities class actions were filed against Luckin in the Southern and Eastern Districts of New York, which were consolidated under this action.[4]   On June 12, 2020, The Honorable Lewis J. Liman appointed AP7 and Louisiana Sheriffs as co-lead plaintiffs, and Kessler Topaz Meltzer & Check LLP and Bernstein Litowitz Berger & Grossmann LLP as co-lead counsel.  On October 6, 2020, this case was reassigned to The Honorable John P. Cronan.

The CAC, filed on September 24, 2020, asserts claims under (i) Section 11 of the Securities Act of 1933 (the "Securities Act") against all defendants; (ii) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"); and SEC Rule 10b-5 against Luckin, Lu, Qian, Liu and Luckin's CFO; (iii) Section 12(a)(2) of the Securities Act against the underwriters of Luckin's IPO and SPO; and (iv) Sections 15 of the Securities Act and 20(a) of the Exchange Act against current and former executives and directors of Luckin.

The CAC alleges that Luckin's registration statements, press releases, and investor calls contained false or misleading information regarding Luckin's growth, revenues and expenses because Luckin failed to disclose the fabricated transactions in those communications.  (CAC ¶¶ 214–366, 533–604.)  The CAC also alleges that Luckin made misstatements and omissions concerning Lu's and Qian's pledges of Luckin shares as collateral to secure their personal loans. (*Id.* ¶¶ 361–62, 600.)  The CAC further alleges that Luckin's responses to the anonymous report, such as denials of the report's allegations and statements about its internal controls over financial reporting, were false and misleading.  (*Id.* ¶¶ 369–71, 544.)

---

[4] In addition to this putative class action, an "opt-out" action naming Luckin as a defendant has been filed and assigned to this Court.  *Kingstown Cap. Mgmt. v. Luckin Coffee, Inc.*, 1:20-cv-07029 (S.D.N.Y.).

Additionally, a parallel putative securities class action is pending in the Supreme Court of the State of New York, New York County, *In re Luckin Coffee Inc. Sec. Litig.*, 651939/2020 (N.Y. Sup. Ct.), as is a putative derivative action, *In re Luckin Coffee Inc. Derivative Litig.*, 652800/2020 (N.Y. Sup. Ct.).

## ARGUMENT

On a Rule 12(b)(6) motion to dismiss, only "well-pleaded factual allegations" are accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "[C]onclusory" allegations are "not entitled to be assumed true," *id.* at 681, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Securities fraud allegations under § 10(b) and Rule 10b-5 are subject to the pleading requirements of Rule 9(b), and a complaint making such allegations must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127–28 (2d Cir. 1994) (internal quotation marks and citation omitted). "[T]he heightened pleading standard of Rule 9(b) applies to Section 11 . . . claims insofar as the claims are premised on allegations of fraud." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010); *see* 15 U.S.C. § 77k(a). To establish Section 11 standing, a plaintiff must be able to demonstrate it purchased securities that are traceable to the allegedly defective registration statement. *DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003).

"To state a claim under Section 10(b) [of the Exchange Act], a complaint must allege material misstatements or omissions indicating an intent to deceive or defraud in connection with the purchase or sale of a security." *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986); *see* 15 U.S.C. § 78j(b); *see also* 17 C.F.R. § 240.10b-5 ("It shall be unlawful . . . [t]o make any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.").

A misstatement or omission must be material to be actionable under either the Securities Act or the Exchange Act.  15 U.S.C §§ 77k, 77l(a)(2) (Securities Act); 17 C.F.R § 240.10b-5 (Exchange Act).  The materiality inquiry under Section 11 of the Securities Act and Section 10(b) of the Exchange Act are the same.  *In re ProShares Tr. II Sec. Litig.*, No. 19-CV-0886 (DLC), 2020 WL 71007, at *8 (S.D.N.Y. Jan. 3, 2020).  Statements are material if "taken together and in context, [they] would have misled a reasonable investor about the nature of the investment."  *Id.* (quoting *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d, 759, 761 (2d Cir. 1991)).  Alleged misstatements "could not have misled" a reasonable investor where a "[r]egistration [s]tatement adequately warns investors of the risks alleged in the [complaint]" and accordingly cannot give rise to liability.  *ProShares Tr. II*, 2020 WL 71007, at *7–8 (citing *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013)).  "In judging whether an alleged omission was material in light of the information already disclosed to investors, [courts] consider whether there is a *substantial* likelihood that the disclosure of the [omitted material] would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information [already] made available."  *ProShares Tr.*, 728 F.3d at 102 (internal quotation marks and citations omitted).

## POINT I.

### The Section 11 Claims Should Be Dismissed for Lack of Standing

#### A.      The CAC Fails to Plead a Plausible Basis for
#### Section 11 Standing

Investors who "can trace their shares to an allegedly misleading registration statement

have standing to sue under § 11 of the 1933 [Securities] Act." *DeMaria*, 318 F.3d 170 at 178.

"Plaintiffs bear the burden of [pleading] that [their] shares are traceable to a registration

statement." *In re Puda Coal Sec. Inc. Litig.*, No. 11 CIV. 2598 KBF, 2013 WL 5493007, at *6

(S.D.N.Y. Oct. 1, 2013). The "plain intent and purpose of Section 11's strict [traceability]

requirement [is because] a lot of certainty is required regarding the provenance of shares to

obtain the strict liability of Section 11." *Id.* at *9.

  To survive a motion to dismiss, plaintiffs must plead "enough facts to state a claim to

relief that is plausible on its face," which requires more than the "formulaic recitation of the

elements of a cause of action." *Twombly*, 550 U.S. at 555, 570. Following *Twombly* and *Iqbal*,

the First and Ninth Circuits are the only circuit courts that have addressed whether conclusory

allegations of traceability are sufficient to plead Section 11 standing where, as here, an issuer has

issued securities pursuant to multiple registration statements. Both courts held the answer is

"no." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("Standing

alone, the conclusory allegation that plaintiffs 'purchased [a defendant's] common stock directly

traceable to the [defendant's] Secondary Offering' does not allow [the court] to draw a

reasonable inference" of Section 11 standing); *In re ARIAD Pharm. Sec. Litig.*, 842 F.3d 744,

756 (1st Cir. 2016) ("[A] general allegation that a plaintiff's shares are traceable to the offering

in question is nothing more than a 'formulaic recitation' of that element. . . . Accordingly, we

agree with the other circuit that has squarely addressed this issue and hold that such general

allegations alone are not sufficient to avoid dismissal." (citing *Twombly*, 550 U.S. at 555 and

*Century Aluminum*, 729 F.3d at 1107)).[5]

---

[5] While some decisions from the Southern District of New York that postdate *Iqbal* and *Twombly* have allowed Section 11 claims based on multiple registration statements to proceed beyond a motion to dismiss based on conclusory allegations of traceability, those decisions did not consider the implication of *Iqbal* (which held *Twombly* applies beyond the context of antitrust actions) on the analysis and, indeed, rely on pre-*Iqbal*-*Twombly* decisions.

Where, as here, a company has offered securities pursuant to more than one registration statement, pleading traceability becomes "more complicated" because "the plaintiff must prove that his or her shares were issued under the allegedly false or misleading registration statement, rather than some other registration statement." *ARIAD Pharm.*, 842 F.3d at 755 (quoting *Century Aluminum*, 729 F.3d at 1106) (internal quotation marks and alterations omitted).  As the Ninth Circuit observed, "experience and common sense tell us that . . . aftermarket purchasers usually will *not* be able to trace their shares back to a particular offering" where there is more than one offering.  *Century Aluminum*, 729 F.3d at 1107–08.  Therefore, "despite the difficulty in proving traceability, plaintiffs are not entitled to a presumption of traceability."  *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 561 & n.8 (S.D.N.Y. 2012) (internal quotation marks and citation omitted); *see also Puda Coal*, 2013 WL 5493007, at *6 ("It is simply not enough to note that he bought shares on the day of an offering in a marketplace actively trading issued shares, and rely on the similarity of date and share price to demonstrate that the shares were issued pursuant to, or were traceable to, the December 2010 Offering.").

Here, the CAC asserts Section 11 claims relating to the registration statements for both the May 2019 IPO and the January 2020 SPO.  (CAC ¶ 606.)  But instead of pleading a plausible basis to connect any of Plaintiffs' purchases to either offering, the CAC merely alleges that Plaintiffs' purchases were "in or traceable to the IPO and SPO."  (*Id.* ¶ 615.)  This conclusory allegation is "nothing more than a formulaic recitation" of the Section 11 traceability requirement, which is "not sufficient to avoid dismissal" under *Iqbal* and *Twombly*.  *ARIAD Pharm.*, 842 F.3d at 756; *see Century Aluminum*, 729 F.3d at 1108; *Duoyuan Glob. Water*, 887

---

*See, e.g., Johnson v. Sequans Commc'ns*, No. 11 CIV. 6341 PAC, 2013 WL 214297, at *16 n.17 (S.D.N.Y. Jan. 17, 2013) (citing pre-*Iqbal* case *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 407 (S.D.N.Y. 2007)); *Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 339 (S.D.N.Y. 2012) (citing pre-*Iqbal* and pre-*Twombly* cases *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006), and *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003)).

F. Supp. 2d at 561 (concluding plaintiffs could not allege a claim arising from the SPO because they failed to "offer any facts to support [plaintiffs'] conclusory statements that their shares can be traced to the SPO").

As described in more detail below, allowing Plaintiffs to proceed on the basis of the conclusory allegation that their ADS can be traced to the IPO or SPO is particularly inappropriate here because their purchases were all made when ADS issued from multiple sources were trading in the market, including ADS not issued pursuant to any registration statement (meaning Section 11 liability cannot be based on those ADS under any circumstance).

**B.    AP7's Section 11 Standing Cannot Be Assumed Because Its Purchases Postdate the SPO**

Schedule A of Exhibit A to the CAC reflects that *all* of AP7's purchases postdate the SPO.  This means that AP7's purchases were made when ADS trading in the market could have come from three potential sources:  (i) ADS issued pursuant to the IPO Registration Statement; (ii) pre-IPO shareholders who converted their shares into ADS (as described further below); or (iii) ADS issued pursuant to the SPO Registration Statement.  Because ADS are easily commingled in the market, it is not possible to assume the source of AP7's ADS.  *See Puda Coal*, 2013 WL 5493007 at *5–9 (considering and rejecting various tracing methods on summary judgment because they failed to satisfy Section 11's "strict requirements" to prove traceability, and noting "serious questions" as to whether plaintiff ever had a basis to allege Section 11 standing in light of his failure to investigate the source of his securities).  The CAC does not make any attempt to trace AP7's purchases to the original source of the ADS.  Accordingly, AP7's claims should be dismissed for lack of standing.  *See ARIAD Pharm.*, 842 F.3d at 756; *Century Aluminum*, 729 F.3d at 1108 ("the obvious alternative explanation is that [plaintiffs' shares] could instead have come from the pool of previously issued shares" (internal quotation

marks and citation omitted)); *Duoyuan Glob. Water*, 887 F. Supp. 2d at 561.

**C.      Louisiana Sheriffs' Section 11 Standing Cannot
          Be Assumed Because Its Purchases Postdate the
          Expiration of the IPO Lockup**

Luckin disclosed in connection with the IPO:  (i) Luckin's share capital consisted of

Class A and Class B shares; (ii) pre-IPO Shareholders (as defined in the Registration Statement)

owned Class B shares that would represent 84.33% of outstanding shares following the IPO;

(iii) Class B shares could be converted to Class A shares; and (iv) all of the 303,600,000 Class A

shares registered in connection with the IPO were converted to ADS and sold in the IPO.  (Ex. B

at cover n.1.)  The Registration Statement also explained that the depositary could issue new

ADS (*id.* at 164), any shareholder could exchange its shares for ADS (*id.* at 166), and that

Luckin and its "directors, executive officers, all of [its] existing shareholders and option holders

and [the] concurrent private placement investor [] agreed, subject to some exceptions, not to

transfer or dispose of, directly or indirectly, any ADSs, or any securities convertible into or

exchangeable or exercisable for ADSs, for a period of 180 days" after the filing of the IPO

Registration Statement (*id.* at 171).

Therefore, following the expiration of the 180-day lockup period (November 12, 2019),

the ADS trading on NASDAQ could have come from either the ADS offered pursuant to the IPO

Registration Statement, *or* Class A or Class B shares that were converted to ADS (until, of

course, even more ADS were issued in the SPO).  While ADS in the former category are

traceable to the IPO Registration Statement, those in the latter are not.  Therefore, any purchase

of ADS made after November 12, 2019 cannot be presumed to be traceable to the IPO

Registration Statement.

Exhibit B to the CAC reflects that *all* of Louisiana Sheriffs' purchases postdated

November 12, 2019, meaning the source of those ADS could have either been the IPO or pre-

IPO shareholders who converted their ordinary shares into ADS following the lockup period. The CAC does not attempt to trace any of Louisiana Sheriffs' purchases to the IPO; accordingly Louisiana Sheriffs lacks standing as to the IPO Registration Statement.

As to Louisiana Sheriffs' January 10, 2020 purchase of 22,400 ADS, the CAC alleges that those ADS were "purchased from Credit Suisse directly in the SPO for $42.00 per ADS." (CAC ¶ 32.)  This conclusory allegation, however, is insufficient to satisfy *Twombly* and *Iqbal* because no facts are pleaded regarding whether Credit Suisse sold Louisiana Sheriffs ADS that were issued pursuant to the SPO or ADS that were already in existence at the time of the SPO. Where the seller of securities could have pre-existing *and* new securities in its account, it is not possible to assume the source of the securities purchased by the plaintiff.  As Judge Forrest put it:  "Some shares could have been old shares, some new, who knows."  *Puda Coal*, 2013 WL 5493007, at *7.

Here, the CAC provides no basis—much less a plausible one—to conclude that on the date of the SPO, Credit Suisse's accounts only held new ADS issued in the SPO.  It is at least equally likely that a major broker like Credit Suisse would have pre-existing ADS in its books on the day of the SPO.  Before filing suit, Louisiana Sheriffs could have "request[ed] information regarding the provenance of [its] shares" including whether they came from Credit Suisse's pre-existing ADS, and the failure to conduct this basic "due diligence" raises "serious questions as to whether there was ever a sufficient basis to allege standing to assert a Section 11 claim."  *Id.* at *9.  Without any further factual allegations, the CAC's conclusory allegation is insufficient to survive a motion to dismiss.  *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (quoting *Twombly*, 550 U.S. at 557) (internal quotation

marks omitted)); *ARIAD Pharm.*, 842 F.3d at 756 ("the obvious alternative explanation is that they could instead have come from the pool of previously issued shares" (citing *Century Aluminum*, 729 F.3d at 1108) (internal quotation marks omitted)); *Century Aluminum*, 729 F.3d at 1108 ("To render their explanation plausible, plaintiffs must do more than allege facts that are merely consistent with both their explanation and defendants' competing explanation."); *see also Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014) (holding notation that prospectus was delivered with purchase was "merely consistent with the claim that [plaintiff] purchased his shares directly in the SPO"); *Puda Coal*, 2013 WL 5493007, at *6 (criticizing tracing methodology at summary judgment for failing "to show the only inventory of shares held by their broker were those from the offering at issue, as opposed to from inventory.").

\*      \*      \*

In sum, neither of the Plaintiffs has pleaded a plausible basis to assert their ADS purchases were traceable to either the IPO or SPO Registration Statements.  As a result, they lack standing to assert Section 11 claims.

## POINT II.

### The CAC Does Not Allege Any Actionable Misstatement or Omission Regarding the Financial Statements in the IPO Registration Statement

The CAC alleges the fabricated transactions began in April 2019; however, the IPO Registration Statement only reported financial results through the end of March 2019. Accordingly, the CAC does not—and cannot—plead any affirmative misstatements in the financial statements included in the IPO Registration Statement, nor does it plead a duty to disclose the fabricated transactions in that registration statement.  Therefore, the CAC's claims based on the financial statements in the IPO Registration Statement should be dismissed for failure to state a claim.

A.   **The CAC Does Not—and Cannot—Plead Any
Financial Information in the IPO Registration
Statement Was False**

The IPO Registration Statement, which became effective on May 17, 2019, included

Luckin's "consolidated statements of cash flow and comprehensive loss" covering June 16, 2017

through March 31, 2019.  (CAC ¶¶ 219, 245, 533.)  Plaintiffs have not alleged that Luckin's

financials from that period were inaccurate; to the contrary, the CAC alleges that the fabricated

transactions did not begin until April 2019.  (*Id.* ¶ 219.)  The fabricated transactions, therefore,

could not have rendered any of the financials in the IPO Registration Statement false.  *See In re

Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102, 109–10 (2d Cir. 1998) (affirming dismissal of

Section 10(b) and Rule 10b-5 claims because defendant's "statements were not misleading when

made" and contained "no representation of forward intent").

B.   **The CAC Does Not Allege a Duty to Disclose the Fabricated
Transactions in the IPO Registration Statement**

Because it pleads no false statement in the financial statements of the IPO Registration

Statement, the CAC fails to state a claim regarding those financial statements unless it alleges

Luckin breached a legal duty to disclose the fabricated transactions.  The CAC does not plead

any such duty.

To plead claims under Section 10(b), Rule 10b-5, and Section 11 on the basis of an

omission theory, a plaintiff must allege "a legal obligation to disclose the allegedly omitted

information."  *In re Merrill Lynch & Co., Inc. Research Rep. Sec. Litig.*, 272 F. Supp. 2d 243,

248, 261 (S.D.N.Y. 2003).  "[A] corporation is not required to disclose a fact merely because a

reasonable investor would very much like to know that fact.  Rather, an omission is actionable

under the securities laws only when the corporation is subject to a duty to disclose the omitted

facts."  *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (internal quotation marks

18

omitted).  A duty to disclose "may be imposed by statute or by regulation," or in the alternative "may arise when additional information is needed to make another statement, whether required or voluntarily made, not misleading."  *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009), *aff'd sub nom.*, *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010).

### 1.     The GAAP Rules Cited in the CAC Do Not Impose a Duty to Disclose

The CAC alleges that Luckin's failure to disclose the fabricated transactions in the IPO Registration Statement violated a number of GAAP requirements, namely Accounting Standards Codification ("ASC") 605, 605-50, 845, 850, and 855.[6]  (CAC ¶¶ 217–30, 250, 538.)  These provisions, however, concern only events that affect *the financial statement period*.  *See* FASB Statement of Concepts No. 8, "Conceptual Framework for Financial Reporting" ¶ 17 (GAAP's "[a]ccrual accounting depicts the effects of transactions, and other events and circumstances on a reporting entity's economic resources and claims in the periods in which those effects occur").  Specifically, the requirements provide that revenue should not be recognized until it is "realized or realizable" and "earned," ASC 605-10-25-1; that cash given by a vendor to a customer should be recorded as a reduction of revenue, ASC 605-50-45-2; how "reciprocal" "nonmonetary" transactions should be measured, ASC 845-10-05-2, ASC 845-10-30-3; that certain transactions with related parties should be disclosed, ASC 850-10-10-1; and that some subsequent events that render the financial statements misleading should be disclosed, ASC 855-10-50-2.

The CAC alleges that Luckin violated these provisions by failing to properly record or disclose "sham" transactions with related parties and other fabricated transactions.  (CAC ¶¶ 220, 223, 228, 230, 250, 538.)  But the CAC does not—and cannot—allege that any of those

---

[6] The ASC is the "source of authoritative generally accepted accounting principles" recognized by the Financial Accounting Standards Board ("FASB").  Financial Accounting Standards Board, *Accounting Standards Codification: About the Codification* at 4 (Dec. 2014), https://asc.fasb.org/imageRoot/71/58741171.pdf.

transactions impacted the financials in the IPO Registration Statement because it alleges the fabricated transactions began in April 2019, and the financial statements in the IPO Registration Statement do not include any revenue or transactions that occurred after March 31, 2019. Therefore, ASC 605, 605-50, 845, 850, and 855 did not impose a duty on Luckin to record or disclose the fabricated transactions in its IPO Registration Statement.

Indeed, the only accounting standard cited in the CAC that expressly relates to subsequent events is ASC 855 (*see* CAC ¶¶ 250, 538), but even this codification does not require disclosure.  ASC 855 requires disclosure of subsequent events if "they must be disclosed *to keep the financial statements from being misleading*."  ASC 855-10-50-2 (emphasis added).  Here, because the financial statements in the IPO Registration Statement did not include any transactions after March 31, 2019, disclosure of the fabricated transactions that the CAC alleges began in April 2019 was not required to "keep the [IPO Registration Statement's] financial statements from being misleading."  Therefore, ASC 855 did not require disclosure of the fabricated transactions in the IPO Registration Statement.  *Cf. Adair v. Kaye Kotts Assocs., Inc.*, No. 97 CIV. 3375 (SS), 1998 WL 142353, at *5 (S.D.N.Y. Mar. 27, 1998) ("An accurate report simply does not become misleading because an issuer suffers a material loss subsequent to the period covered by the report.  There must exist materially false or misleading information in the report itself.") (citing *Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643, 701 (S.D.N.Y. 1968) ("The purpose of reviewing events subsequent to the date of a certified balance sheet . . . is to ascertain whether any material change has occurred in the company's financial position which should be disclosed *in order to prevent the balance sheet figures from being misleading*." (emphasis added))).

In any event, while it does not appear any court has considered whether violations of

ASC 855 give rise to claims under federal securities laws, courts have uniformly rejected claims based on violations of analogous accounting standards—International Accounting Standard ("IAS") 10 and Auditing Standard ("AU") 560.[7]  *See Barclays Bank*, 2017 WL 4082305, at \*15 n.22 (dismissing claims where, *inter alia*, "Plaintiff cites no cases wherein IAS 10 and/or AU 560 violations gave rise, on their own, to a Section 11 claim"), *aff'd*, 756 F. App'x 41 (2d Cir. 2018), *as amended* (Nov. 20, 2018); *Stratte-McClure v. Morgan Stanley*, No. 09 CIV. 2017 (DAB), 2013 WL 297954, at \*7 (S.D.N.Y. Jan. 18, 2013) (even if there were a duty to disclose under AU 560, "Plaintiffs cite to no case law wherein such a failure to disclose gives rise to a Section 10(b) claim"), *aff'd but criticized on other grounds*, 776 F.3d 94 (2d Cir. 2015), *and aff'd*, 598 F. App'x 25 (2d Cir. 2015).  Therefore, even if ASC 855 required disclosure of the fabricated transactions—which it does not—violation of ASC 855 alone would not give rise to a cause of action under the federal securities laws.

### 2.    Items 101 and 303 of SEC Regulation S-K Do Not Apply to Foreign Issuers' IPO Registration Statements

Plaintiffs also argue that Luckin had a duty to disclose the fabricated transactions under Items 101 and 303 of SEC Regulation S-K.  (CAC ¶¶ 234, 242, 272–73, 602–03.)  This is incorrect, as Luckin's IPO Registration Statement was filed on a Form F-1,[8] which does not require any disclosures under Items 101 and 303.  "Item 303 is not applicable at all to a registration statement on Form F-1."  *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 413 (S.D.N.Y. 2020).  "Item 101 applies only to annual 10K reports."  *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1209 n.3 (S.D.N.Y. 1996).  Therefore, Luckin did not have a duty to disclose

---

[7] Like ASC 855, IAS 10 and AU 560 both require the "disclosure of those events occurring subsequent to the balance sheet date and before the issuance of the next financial statement that 'have a material effect on the financial statements.'"  *In re Barclays Bank PLC Sec. Litig.*, No. 09 CIV. 1989 (PAC), 2017 WL 4082305, at \*13 (S.D.N.Y. Sept. 13, 2017) (quoting AU § 560.01).

[8] Securities and Exchange Commission, Form F-1, *https://www.sec.gov/files/formf-1.pdf* ("Form F-1 shall be used for registration under the Securities Act of securities of all foreign private issuers . . . .").

under Items 101 or 303.[9]

### 3.   Item 503 of SEC Regulation S-K Does Not Give Rise to an Independent Duty to Disclose

Plaintiffs contend that Item 503 required Luckin to disclose, in the IPO Registration Statement, the fabricated transactions and lack of internal controls as risk factors.  (CAC ¶¶ 243, 274, 604.)  Item 503 (now Item 105) states, "Where appropriate, provide under the caption 'Risk Factors' a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105.[10]  Item 503 "track[s] Rule 10b-5" and requires only that a company make disclosures to prevent representations from being materially misleading.  *See In re Tempur Sealy Int'l, Inc. Sec. Litig.*, No. 17-CV-2169 (LAK), 2019 WL 1368787, at *11 (S.D.N.Y. Mar. 26, 2019) ("A court's inquiry with regard to Item 503 boil[s] down . . . to whether the Offering Documents were accurate and sufficiently candid." (internal quotation marks and citation omitted)); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 235 (S.D.N.Y. 2018) ("[C]ourts have generally found Item 503 violations to track Rule 10b-5 violations, including the familiar materiality standard." (internal quotation marks and citation omitted)); *see also Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 571–72 (W.D. Pa. 2019) ("Item 503 does not impose a stand-alone disclosure requirement and a failure to disclose cannot alone form the basis for § 11 liability.").

Here, as explained above, the IPO Registration Statement did not make statements about

---

[9] In addition, the Circuit Courts are split as to whether a violation of Item 303 can even form the basis of a securities claim.  *Compare Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (Item 303 "can serve as the basis for a Section 10(b) securities fraud claim"), *with In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054–56 (9th Cir. 2014) ("Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5.") *and Oran v. Stafford*, 226 F.3d 275, 287–88 (3d Cir. 2000) (Item 303 violations do "not automatically give rise to a material omission under Rule 10b-5.").

[10] "On March 20, 2019, the SEC adopted amendments to certain disclosure requirements in Regulation S-K, moving what was previously Item 503 to Item 105."  *In re Proshares Tr. II Sec. Litig.*, No. 19-CV-0886 (DLC), 2020 WL 71007, at *9 n.7 (S.D.N.Y. Jan. 3, 2020).  To be consistent with the CAC, the Company refers to this provision as Item 503 herein.

revenues or transactions that occurred after March 31, 2019.  Accordingly, the fabricated

transactions, which the CAC alleges began in April 2019, did not render any financial

information in that document misleading.

Moreover, Plaintiffs are incorrect in alleging that Luckin failed to disclose deficiencies in

its internal controls over financial reporting.  (*See* CAC ¶¶ 243, 274, 604.)  The Risk Factors

section of the IPO Registration Statement clearly warned investors that Luckin's auditor had

identified material weaknesses in Luckin's internal controls, and that Luckin was "in the process

of implementing a number of measures to address" those weaknesses.  (Ex. B at 32–33.)  The

Company also stated that it could not assure that the remedial measures would "fully address the

material weaknesses" that had been identified.  (*Id.* at 33.)  As explained more fully in Point IV,

*infra*, these disclosures do not form the basis of a claim under the federal securities laws.

\*     \*     \*

Because the CAC does not sufficiently plead that Luckin violated a duty to disclose under

GAAP or SEC Regulation S-K, Counts I and III of the CAC should be dismissed with respect to

the financial statements in the IPO Registration Statement.

## POINT III.

### The CAC Does Not Allege Any Actionable Misstatement or Omission Regarding the Former Chairman's and Former CEO's Loans

The CAC alleges that the SPO Registration Statement included material misstatements

and omissions by (i) failing to disclose that Lu and Qian borrowed $518 million; (ii) failing to

disclose the risk that a default of Lu and/or Qian could result in liquidation of the pledged shares,

thereby reducing Lu's and Qian's control over Luckin; and (iii) falsely stating that it was "not

aware of any arrangement that may, at a subsequent date, result in a change of control of our

company."  (CAC ¶¶ 361–62, 599–600.)  But, as explained below, this information is either not

23

material, was disclosed, or is insufficiently pleaded.

As Plaintiffs admit, the SPO Registration Statement fully disclosed that Lu, Qian, and Lu's sister "had pledged a total of 488.4 million Luckin Class B shares" as collateral "to secure a borrowing."  (*Id.* ¶¶ 361, 599; Ex. D at 154 (stating the amount of each pledge); *id.* at 52 ("[C]ertain of our shareholders have pledged certain of our Ordinary Shares to secure borrowings.").)  This pledge represented over $2.5 billion as of the time of the SPO (488.4 million Class B shares are equivalent to 61.05 million ADS,[11] and the SPO offering price was $42 per ADS).  Any reasonable investor would have understood that only a significant loan amount would require a pledge of this size.  The additional disclosure that the CAC alleges should have been made—the specific loan amount of $518 million—would not have affected the total mix of information and therefore is not material.  *Cf. In re Proshares Tr. Sec. Litig.*, 728 F.3d 96, 104 (2d Cir. 2013) (holding "it is implausible" that additional disclosure of allegedly omitted information—that ETF may suffer "actual loss" as compared to underlying index— would have altered total mix of information where registration statement disclosed risk that ETF may "diverge significantly" from underlying index).

The risk of a default leading to Lu's and Qian's loss of control was also disclosed.  The SPO Registration Statement included a table reflecting that following the SPO, Lu and Qian would control 36.82% and 23.73% of voting power in Luckin, respectively, totaling approximately 60%.  (CAC ¶¶ 156, 392, 490; Ex. D at 153.)  The table also reflected that Lu and Qian's approximately 145.5 million and 146.1 million pledged shares represented 30% and 47% of their total shares, respectively.  (Ex. D at 153–54.)  A reasonable investor would have understood that if Lu and Qian lost the shares they pledged, their voting power would have been

---

[11] "Each ADS represents eight of our Class A ordinary shares" (Ex. D at cover), and "[e]ach Class B ordinary share is convertible into one Class A ordinary share" (*id.* at 53).

reduced to 25.77% for Lu (36.82%, less 30%), and 12.58% for Qian (23.73%, less 43%),

reducing their collective voting power from 60% to 38.35%.

Moreover, the SPO Registration Statement disclosed:

> The related facility agreements have provisions where *additional shares* will be pledged automatically in the event of a margin call. If any lender enforces its security interests in such pledged shares upon an event of default, *such lender may sell or otherwise dispose of any of the pledged shares* without the transferee becoming bound to the terms of the lock-up agreement. *Any sale or perceived sale of the shares into the market may cause the trading price of ADSs to decline.*

(*Id.* at 52 (emphasis added); *see also id.* at 187–88.) Thus, investors knew Lu and Qian's lenders

were entitled to have even more shares pledged as collateral, sell any pledged shares upon a

default, and that such sales may cause the price of the ADS to decline. The securities laws do

not require Luckin to make additional disclosures. *See Burekovitch v. Hertz*, No. 01-CV-1277

(ILG), 2001 WL 984942, at *9 (E.D.N.Y. July 24, 2001) ("While a controlling shareholder's

decision to commit large quantities of his stock as security in margin trading undoubtedly has the

potential to affect the price of that stock, plaintiff has not and cannot allege an affirmative duty"

under either the federal securities laws or common law "to keep the public appraised of such a

decision"); *In re Safeguard Scis.*, No. CIV.A.01-3208, 2004 WL 2700291, at *3–4 (E.D. Pa.

Nov. 18, 2004) (dismissing Section 10(b) claim on summary judgment because defendants had

no duty to disclose founder's pledges of stock as collateral for his margin trading activities).

Finally, the CAC alleges that Luckin's statement that it was "not aware of any

arrangement that may, at a subsequent date, result in a change of control of our company" was

false. (CAC ¶¶ 156, 361, 490, 599.) However, the CAC fails to plead any basis to demonstrate

the falsity of this statement. The CAC does not allege that Luckin was aware that Lu and Qian

would fail to meet their personal loan obligations, resulting in their defaults.[12]  Moreover, because the CAC alleges Lu and Qian orchestrated the fraud, it is not clear why their loss of control of Luckin would be material, or cause any loss, to investors who presumably would prefer the alleged wrongdoers to be removed from Luckin (as they have been).

For these reasons, the Court should dismiss with prejudice Counts I and III of the CAC with respect to Lu's and Qian's loans.

## POINT IV.

### The CAC's Allegations Regarding Internal Controls Are Not Actionable

The CAC alleges that Luckin falsely represented that it was "in the process of implementing" measures to address material weaknesses in its internal controls, including by "establishing effective monitoring and oversight controls for non-recurring and complex transactions."  (CAC ¶¶ 251, 457, 487, 591.)  According to the CAC, these statements were false because (1) the fabricated transactions demonstrate "Luckin lacked *any* internal audit function or other internal controls sufficient to prevent" Luckin's "misstatement of revenue and expenses," and (2) Luckin allegedly "admitted in July 2020 that it did not 'charter[] an internal audit function to test and evaluate its control functions' until *after* it retracted its reported financial results for 2019."  (*Id.* ¶ 487.)  Neither of these theories supports a cause of action.

First, the registration statements' disclosures regarding measures to remediate internal control weaknesses are not actionable because they did not contain any guarantees that the measures would be effective.  To the contrary, the IPO Registration Statement expressly warned investors that "we cannot assure you that these measures may fully address the material weaknesses and deficiencies in our internal control over financial reporting or that we may

---

[12] Similarly, to the extent the CAC alleges Luckin should have disclosed details regarding the terms of Lu's and Qian's loans, that theory fails because the CAC does not plead any basis to demonstrate that Luckin had knowledge of the terms of Lu's and Qian's personal loans.

conclude that they have been fully remediated." (Ex. B at 33.) Absent a guarantee that "controls will perform perfectly in every instance," a company cannot be liable for its statements regarding the strengths of its controls simply "because they may have failed to detect some weaknesses in its financial reports." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 648 (S.D.N.Y. 2017); *see also Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 (S.D.N.Y. 2019) ("[S]tatements regarding the introduction of internal controls do not, standing alone, constitute assertions that the controls are adequate, nor does a subsequent circumvention of such controls support an inference that descriptive statements about the implementation of such controls were false."). Moreover, Luckin's IPO and SPO Registration Statements fully disclosed the exact risk that materialized:

> [I]f we fail to achieve and maintain an effective internal control environment, *it could result in material misstatements in our financial statements* and could also *impair our ability to comply with applicable financial reporting requirements* and related regulatory filings on a timely basis. As a result, our businesses, financial condition, results of operations and prospects, as well as the *trading price of the ADSs, may be materially and adversely affected.* Additionally, ineffective internal control over financial reporting could expose us to *increased risk of fraud* or misuse of corporate assets and *subject us to potential delisting* from the stock exchange on which we list, *regulatory investigations* and civil or criminal sanctions. *We may also be required to restate our financial statements from prior periods*.

(Ex. B at 33; Ex. D at 35 (emphasis added).) These warnings are fatal to Plaintiffs' claims based on Luckin's internal controls. *See In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) ("[W]hen a registration statement warns of the exact risk that later materialized, a section 11 claim will not lie as a matter of law." (internal quotation marks, alterations, and citation omitted)); *Sky Solar*, 389 F. Supp. 3d 232, 253–54, 265 (S.D.N.Y. 2019) (dismissing claim based on statements describing implementation of internal controls where, as here, weakness of internal controls and risk of continued weakness was disclosed); *Caiafa v. Sea Containers Ltd.*, 525 F.

Supp. 2d 398, 411 (S.D.N.Y. 2007) (dismissing claim because defendant disclosed weaknesses

in its internal controls); *see also Sogou*, 465 F. Supp. 3d at 411–12 (dismissing Securities Act

claims where defendant "warned of the exact risk that was threatened and later materialized").[13]

Second, the CAC alleges that Luckin's July 1, 2020 press release revealed that Luckin

"did not 'charter[] an internal audit function to test and evaluate its control functions'" until after

it retracted its 2019 financial results, rendering its prior disclosures false.  (CAC ¶¶ 252, 487,

591.)  However, the CAC fails to identify any representation made by Luckin prior to the July 1,

2020 press release that it *had* an internal audit function.  Nor does the CAC allege that Luckin

represented it was going to charter an internal audit function as part of the remedial measures

that Luckin was "in the process of implementing" as of the IPO and SPO.  Indeed, even

assuming that chartering an internal audit function was one of the remedial measures referred to

in the registration statements, Luckin disclosed that those "remediation measures [were] *still in*

*the* [sic] *progress*" at the time of the January 2020 SPO, and that they were not expected to be

completed until "completion of our year-end financial closing procedures for 2019."  (Ex. D at

35 (emphasis added).)  Luckin's 2019 financial report was not released as of the July 1, 2020

press release.  Therefore, the CAC fails to allege any statement was rendered false by Luckin's

July 1, 2020 disclosure that it "is chartering an internal audit function."  *Cf. Banco Bradesco*, 277

F. Supp. 3d at 648 (plaintiff did not adequately allege actionable misstatements regarding

internal controls where it was "not alleged that [defendant] did not, in fact, conduct the

---

[13] In any event, the statements in the registration statements regarding internal controls are non-actionable puffery.  *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205–06 (2d Cir. 2009) (statements touting "highly disciplined" risk management team that "set the standard for best practices in risk management" were puffery); *Sky Solar*, 389 F. Supp. 3d 232, 253–54, 265 (S.D.N.Y. 2019) (statement regarding adherence to "strong" and "rigorous" internal controls were puffery); *In re Allergan PLC Sec. Litig.*, No. 18-CV-12089 (CM), 2019 WL 4686445, at *22 (S.D.N.Y. Sept. 20, 2019) ("[G]eneral descriptors like 'robust' . . . fall into the category of commonplace statements too general to cause reliance by a reasonable investor." (internal citations omitted)).

evaluations described in those statements," among other allegations); *Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017) (dismissing Section 10(b) claim regarding internal controls because "[plaintiff] has not identified any statement in the Code of Conduct that is a specific factual representation that [defendant] has in place any particular internal control that, in fact, it does not have").

In short, the CAC fails to plead an actionable misstatement based on Luckin's statements that it was implementing measures to address internal control weaknesses.

## POINT V.

### The Alleged Misstatements Regarding Luckin's Technology and Business Model Are Non-Actionable Puffery

The CAC alleges that Luckin's statements regarding its "disruptive" and "technology-driven" model, and other general statements, misleadingly attribute Luckin's growth and operations to non-fraudulent factors.  (*See* CAC ¶¶ 259, 261, 284, 295–96, 320, 330–31, 345, 547, 549, 569, 581, 583.)  But these statements are classic puffery, and therefore not actionable under the federal securities laws.  Statements of puffery do not give rise to securities violations because they are "too general to cause a reasonable investor to rely upon them."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (Exchange Act); *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 n.43 (2d Cir. 2014) (applying *ECA* to Securities Act claims).

Courts have routinely found that statements (i) touting "unique" business models and "technology"—like Luckin's statements regarding its "disruptive" and "technology-based" model" (CAC ¶¶ 259, 295, 320, 547, 581);[14] (ii) regarding drivers of efficiencies—such as

---

[14] *See Gregory v. ProNAi Therapeutics, Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018) (statement that "technology," among other factors, gave "competitive advantages" was puffery); *Brewer v. Breen*, 16 Civ. 7500 (ER), 2018 WL 565267, at *8–9 (S.D.N.Y. Jan. 23, 2018) (statements that "business model," including "innovative

Luckin's statements that its "technology-driven" model improved efficiency (*id.* ¶¶ 261, 296, 320, 345, 549);[15] and (iii) that expenses are "in line" with expectations—such as the ones made by Luckin (*id.* ¶¶ 284, 330, 331, 569, 583)[16] are non-actionable puffery because such statements are too general for a reasonable investor to rely upon them.  Accordingly, the CAC's assertions regarding Luckin's business model and technology platform, the resulting efficiencies and growth, and the other general statements discussed above are insufficient to sustain a claim.

## CONCLUSION

For the reasons stated above, the Court should dismiss (1) the Section 11 claim for lack of standing (Count III), (2) all claims based on alleged misrepresentations or omissions in the financial statements of the IPO Registration Statement, (3) all claims based on alleged misrepresentations or omissions regarding Lu's and Qian's loans, (4) all claims based on Luckin's representations that it was in the process of implementing measures to improve internal controls, and (5) all claims based on Luckin's touting of its "unique" business model, "disruptive technology," efficiencies as a result, and expenses being "in line" with expectations as non-actionable puffery.

---

solutions," were "clearly differentiated and in high demand" was non-actionable puffery); *Schaffer v. Horizon Pharma PLC*, 16-CV-1763 (JMF), 2018 WL 481883, at *9, *14 (S.D.N.Y. Jan. 18, 2018) ("statements by Defendants extolling their 'unique commercial business model'" were puffery); *Abuhamdan v. Blyth*, 9 F. Supp. 3d 175, 190 (D. Conn. 2014) (statement that its "market model and technology savvy is truly transforming the health and direct selling industries" was non-actionable puffery); *Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 869 (E.D. Mo. 2012) (description of "literally a game changing technology" was merely puffery).

[15] *See In re Sun Edison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 489 (S.D.N.Y. 2018) ("generalized explanation" of a driver of "operational efficiency" was puffery); *In re Forcefield Energy Litig.*, 15 Civ. 3020 (NRB), 2017 WL 1319802, at *16 (S.D.N.Y. Mar. 29, 2017) (statement that a "transition to Nasdaq" helped in becoming a "global provider of efficient energy solutions" was puffery); *Xu v. ChinaCache Int'l Holdings Ltd.*, CV15-07952-CAS (RAOx), 2017 WL 114401, at *10 (C.D. Cal. Jan. 9, 2017) ("improved efficiency" was non-actionable puffery); *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1347 (M.D. Fla. 2007) (successful implementation of "operational efficiencies" was puffery).

[16] *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland*, 783 F.3d 383, 388, 392 (2d Cir. 2015) (statement that performance of an acquired bank was "in line with expectations" was puffery); *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 517 (S.D.N.Y. 2020) (managing expenses to be "in line" with sales levels was puffery).

Dated:    New York, New York
          November 23, 2020

                              DAVIS POLK & WARDWELL LLP

                              By:          /s/ Lawrence Portnoy
                                   _____
                                   Lawrence Portnoy
                                   Brian S. Weinstein
                                   450 Lexington Avenue
                                   New York, New York 10017
                                   (212) 450-4000

                                   Jonathan K. Chang
                                   18/F, The Hong Kong Club Building
                                   3A Chater Road
                                   Central, Hong Kong SAR
                                   Telephone: +852 2533 1028

                              *Attorneys for Defendant Luckin Coffee Inc.*