**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE LUCKIN COFFEE INC. SECURITIES LITIGATION | Case No. 1:20-cv-01293-JPC-JLC<br><br>**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO LUCKIN COFFEE INC.'S MOTION TO DISMISS** |

**TABLE OF CONTENTS**

**Page**

I.      PRELIMINARY STATEMENT ........................................................................... 1

II.     STATEMENT OF FACTS ................................................................................. 2

    A.      Luckin Reports Explosive Growth........................................................... 2

    B.      Luckin's Public Offerings and the Underwriter Defendants' Touting of the Company ................................................................................................. 3

    C.      Luckin Fabricated Sales and Fraudulently Inflated Key Operating Metrics .......... 5

    D.      As Concerns Swirl in the Market, Defendants Issue False Denials........................ 6

    E.      Defendants Finally Admit the Truth........................................................ 7

III.    LUCKIN CONCEDES THE VAST MAJORITY OF THIS CASE.................................. 8

IV.     LEGAL STANDARD........................................................................................ 9

V.      STANDING .................................................................................................. 10

    A.      Lead Plaintiffs Sufficiently Allege Standing for the IPO .................................... 10

    B.      Lead Plaintiffs Sufficiently Allege Standing for the SPO .................................... 13

VI.     LUCKIN'S MATERIAL MISSTATEMENTS AND OMISSIONS .............................. 15

    A.      Luckin's Material Misstatements and Omissions in the IPO F-1 ......................... 15

        1.      Misstatements and Omissions Regarding Financial Information ............. 15

            a.      GAAP Required Disclosure of the Fraudulent Transactions........ 15

            b.      Regulation S-K Required Disclosure of the Fraudulent Transactions ................................................................. 18

            c.      GAAP Required Disclosure of the Related-Party Transactions ................................................................. 21

        2.      Misstatements and Omissions Regarding Luckin's Internal Controls................................................................................. 22

        3.      Misstatements and Omissions Regarding Luckin's Business Model ....... 25

    B.      Material Misstatements and Omissions in the SPO F-1 ..................................... 28

1.    Misstatements and Omissions Regarding the Facility Agreement ........... 28

2.    Misstatements and Omissions Regarding Luckin's Costs, Business
        Model, and Efficiency............................................................................... 30

3.    Misstatements and Omissions Regarding Luckin's Internal
        Controls..................................................................................................... 30

VII.    CONCLUSION............................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adair v. Kaye Kotts Assocs., Inc.*,
1998 WL 142353 (S.D.N.Y. Mar. 27, 1998) .................................................................... 16

*In re Ariad Pharm., Inc. Sec. Litig.*,
842 F.3d 744 (1st Cir. 2016) .................................................................... 12, 13, 14

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017) .................................................................... 23, 25

*In re Barclays Bank PLC Sec. Litig.*,
2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017) .................................................................... 17, 20

*Barilli v. Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019) .................................................................... 24, 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................... 9

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017) .................................................................... 26, 27

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015) .................................................................... 9, 10, 11

*Burekovitch v. Hertz*,
2001 WL 984942 (E.D.N.Y. July 24, 2001) .................................................................... 29

*Caiafa v. Sea Containers Ltd.*,
525 F. Supp. 2d 398 (S.D.N.Y. 2007) .................................................................... 24

*Caiola v. Citibank, N.A., New York*,
295 F.3d 312 (2d Cir. 2002) .................................................................... passim

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) .................................................................... 13, 14

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) .................................................................... 9, 12, 14

*In re China Valves Tech. Sec. Litig.*,
979 F. Supp. 2d 395 (S.D.N.Y. 2013) .................................................................... 22

*Christine Asia Co. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) .................................................................... 19

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
701 F. Supp. 2d 506 (S.D.N.Y. 2010) .................................................................... 13, 20

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020) .................................................................... 10, 11, 24

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ........................................................................ 28

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011) .......................................................... 20

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
  2017 WL 2608243 (S.D. Tex. June 15, 2017) ............................................... 11

*In re Cytyc Corp.*,
  2005 WL 3801468 (D. Mass. Mar. 2, 2005) .................................................. 27

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
  413 F. Supp. 3d 187 (S.D.N.Y. 2019) .......................................................... 16

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
  323 F. Supp. 3d 393 (S.D.N.Y. 2018) ............................................................ 8

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ................................................................... 25, 28

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017) ..................................................... 18, 21

*In re Equinox Fund Mgmt., LLC*, SEC Release No. 4315,
  2016 WL 212680 (Jan. 19, 2016) ................................................................. 16

*In re EveryWare Glob., Inc. Sec. Litig.*,
  175 F. Supp. 3d 837 (S.D. Ohio 2016) ........................................................ 13

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) ..................................................... 24, 30

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017) .......................................................... 17

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ........................................... 26, 27, 28, 30

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000) .............................................................. 10, 26, 29

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  322 F. Supp. 2d 319 (S.D.N.Y. 2004) ..................................................... 17, 18

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
  2014 WL 2815571 (S.D.N.Y. June 23, 2014) ........................................... 22, 25

*Goldman v. Belden*,
  754 F.2d 1059 (2d Cir.1985) ........................................................................ 10

*Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012) .......................................................... 13

*Howard v. Arconic Inc.*,
  395 F. Supp. 3d 516 (W.D. Pa. 2019) .......................................................... 21

iv

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016) .................................................................. 15, 16, 17, 18, 21

*Jaroslawicz v. M&T Bank Corp.*,
   962 F.3d 701 (3d Cir. 2020) ................................................................................... 21

*Jiajia Luo v. Sogou, Inc.*,
   465 F. Supp. 3d 393 (S.D.N.Y. 2020) ............................................................... 24, 25

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) ............................................................... 25, 27

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006) .................................................................................. 27

*In re Marsh & McLennan Cos. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ............................................................... 10, 11

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014) ............................................................................. 28, 29

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013) ............................................................... 10, 11

*In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*,
   876 F. Supp. 2d 616 (D. Md. 2012)......................................................................... 13

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*,
   2003 WL 22882137 (S.D.N.Y. Dec. 4, 2003) ......................................................... 10

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
   455 Fed. App'x 10 (2d Cir. 2011) ........................................................................... 29

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
   2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)................................................... 19, 20

*In re Par Pharm., Inc. Sec. Litig.*,
   733 F. Supp. 668 (S.D.N.Y. 1990) .......................................................................... 26

*Perry v. Duoyuan Printing, Inc.*,
   2013 WL 4505199 (S.D.N.Y. Aug. 22, 2013)......................................................... 12

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015) ...................................................... 18, 25, 26

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
   2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019)........................................................... 24

*In re ProShares Tr. Sec. Litig.*,
   728 F.3d 96 (2d Cir. 2013) ............................................................................... 24, 29

*In re ProShares Tr. Sec. Litig.*,
   889 F. Supp. 2d 644 (S.D.N.Y. 2012) ..................................................................... 24

*In re Puda Coal Sec. Inc. Litig.*,
   11-cv-2598, ECF Nos. 47 & 78 ................................................................................ 12

v

*In re Puda Coal Sec. Inc. Litig.*,
2013 WL 5493007 (S.D.N.Y. Oct. 1, 2013) ........................................................................ 12

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007) ................................................................................. 17

*In re Safeguard Scis.*,
2004 WL 2700291 (E.D. Pa. Nov. 18, 2004) ...................................................................... 29

*SEC v. China NE. Petroleum Holdings Ltd.*,
27 F. Supp. 3d 379 (S.D.N.Y. 2014) ................................................................................... 21

*SEC v. Luckin Coffee, Inc.*,
Case No. 1:20-cv-10631-MKV, ECF No. 5-1 (S.D.N.Y. Dec. 16, 2020) ................................. 8

*In re Signet Jewelers Ltd. Sec. Litig.*,
389 F. Supp. 3d 221 (S.D.N.Y. 2019) ................................................................................. 26

*In re Signet Jewelers Ltd. Sec. Litig.*,
2019 WL 3001084 (S.D.N.Y. July 10, 2019) ....................................................................... 28

*Silverstrand Invs. v. AMAG Pharm., Inc.*,
707 F.3d 95 (1st Cir. 2013) ................................................................................................. 21

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
243 F. Supp. 3d 1109 (E.D. Cal. 2017) ............................................................................... 14

*Stratte-McClure v. Morgan Stanley*,
2013 WL 297954 (S.D.N.Y. Jan. 18, 2013) ........................................................................ 17

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015) ................................................................................................. 19

*Stream SICAV v. Wang*,
989 F. Supp. 2d 264 (S.D.N.Y. 2013) ................................................................................. 22

*Streit v. Bushnell*,
424 F. Supp. 2d 633 (S.D.N.Y. 2006) ................................................................................. 12

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)...................................................................................................... 10, 29

*Turner Ins. Agency, Inc. v. Farmland Partners Inc.*,
2019 WL 2521834 (D. Colo. June 18, 2019)....................................................................... 22

*United States v. Ebbers*,
458 F.3d 110 (2d Cir. 2006) ............................................................................................... 17

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005) ........................................................................... 24, 25

*Wallace v. IntraLinks*,
302 F.R.D. 310 (S.D.N.Y. 2014) ........................................................................................ 11

*In re Wilmington Tr. Corp.*, SEC Release No. 3582,
2014 WL 4467632 (Sept. 11, 2014) .................................................................................... 16

*In re WorldCom, Inc. Sec. Litig.*,
294 F. Supp. 2d 392 (S.D.N.Y. 2003) ................................................................................ 11

*In re WorldCom, Inc. Sec. Litig.*,
346 F. Supp. 2d 628 (S.D.N.Y. 2004) ............................................................................ 20, 21

*In re Xerox Corp. Sec. Litig.*,
165 F. Supp. 2d 208 (D. Conn. 2001) ................................................................................. 27

*Youngers v. Virtus Inv. Partners Inc.*,
195 F. Supp. 3d 499 (S.D.N.Y. 2016) ............................................................................... 26

**STATUTES & RULES**

17 C.F.R § 229.101 ................................................................................................................. 18

17 C.F.R § 229.303 ................................................................................................................. 18

17 C.F.R § 229.503 ................................................................................................................. 20

17 C.F.R. § 210.4–01 ............................................................................................................. 17

17 C.F.R. § 230.408 ............................................................................................................... 18

15 U.S.C. § 77k ......................................................................................................................... 9

Lead Plaintiffs Sjunde AP-Fonden and Louisiana Sheriffs' Pension & Relief Fund (together, "Lead Plaintiffs") submit this Memorandum of Law in Opposition to Luckin Coffee Inc.'s Motion to Dismiss.[1]

## I.    PRELIMINARY STATEMENT

This case arises from an admitted fraud committed by Luckin and its senior officers, which inflicted massive losses on Luckin's investors. In its brief, Luckin admits "the core" of this case, i.e., that beginning before its IPO, Luckin and its officers fabricated hundreds of millions of dollars of revenue through related-party transactions, and that this fraud artificially inflated the Company's reported revenues (by as much as 90%) and, in turn, its stock price. Luckin does not dispute that the CAC adequately alleges falsity, materiality, scienter and loss causation—all the key elements of a §10(b) Exchange Act claim. As a result of Luckin's concessions, no matter how the Court decides the remaining issues raised in Luckin's motion, the claims against Luckin under §10(b) of the Exchange Act will proceed for the entire Class Period.

Rather than challenge the merits of the case, Luckin's main argument is that Plaintiffs lack standing to assert claims under §11 of the Securities Act related to the IPO and SPO. Luckin is wrong: Lead Plaintiff Louisiana Sheriffs has standing to assert Securities Act claims related to both the IPO and SPO. As to the IPO, Louisiana Sheriffs purchased Luckin ADSs on January 8 and 9, 2020. At that time, all the shares in the market were issued pursuant to the final registration statement for the IPO (the "IPO F-1"). These purchases are plainly "traceable" to the IPO F-1. As explained *infra* at 10-13, under such circumstances, courts uniformly hold that standing is

---

[1] Unless otherwise noted, citations to "¶__" are to the Consolidated Class Action Complaint ("CAC") (ECF No. 150); capitalized terms have the same meanings ascribed to them in the CAC; internal quotation marks, citations and alterations are omitted in quotations; emphasis is added in quotations; and all references to "Ex. __" are to exhibits to the accompanying Declaration of Salvatore J. Graziano in Support of Lead Plaintiffs' Memorandum of Law in Opposition to Luckin Coffee Inc.'s Motion to Dismiss.

adequately alleged. As to the SPO, Louisiana Sheriffs purchased 22,400 ADSs "directly in" the offering, on the offering date, at the offering price, from Underwriter Defendant Credit Suisse. ¶32. Again, under such circumstances, courts uniformly hold that standing is adequately alleged.

Finally, Luckin challenges certain false statements and omissions in the IPO F-1 as well as in the final registration statement for the SPO (the "SPO F-1"). As explained herein, these arguments misconstrue the law and ignore critical (and often conceded) facts. The Court should deny Luckin's motion to dismiss as to all these claims.

## II.    STATEMENT OF FACTS

### A.    Luckin Reports Explosive Growth

Luckin—founded in June 2017 by Defendants Lu and Qian—is a retailer of coffee and pre-made food and beverages. ¶61. It called itself a disruptor in the Chinese coffee industry due to its technology-based model. ¶65. Luckin's mobile app allowed customers to purchase products and Luckin to send vouchers and coupons to customers. ¶66. The vouchers and coupons reduced the price of Luckin's coffee to as low as one-third Starbucks' price and attracted customers. *Id*. In the 18 months following the opening of Luckin's first store in June 2017, Luckin opened 2,370 stores in 28 cities in China. ¶69. Luckin reported meteoric growth during this time, with revenue rising from $35,302 in 2017 to $118.7 million in 2018, and its customer base growing from 11,000 in 2017 to over 12.5 million at the end of 2018. ¶¶71-72.

In January 2019, Luckin announced plans to open 2,500 new stores that year. ¶74. Defendant Qian dismissed concerns about Luckin's heavy operating losses, stating that they were part of a strategy to gain market share. *Id.* Luckin, however, stumbled in 1Q2019, opening just 297 stores—less than half the 625 openings it needed to be on pace to hit its target—and reporting revenue growth of 2.8% compared to 93.3% in 4Q2018. ¶75. Consequently, as Luckin considered

2

an IPO in the United States, investors focused on whether this was a transient "blip" and whether the Company's meteoric growth would continue. Massive undisclosed fraud followed.

### B. Luckin's Public Offerings and the Underwriter Defendants' Touting of the Company

In April 2019, Luckin announced its planned initial public offering of ADSs. ¶80. In May 2019, Luckin filed its IPO F-1, offering 33 million ADSs for $17.00 per ADS. ¶81. Underwriter Defendants Credit Suisse, Morgan Stanley, CICC, Haitong, KeyBanc, and Needham underwrote the IPO. ¶82. As a quid pro quo for selecting the Underwriter Defendants, Defendant Lu demanded $200 million in personal financing to be secured by his Luckin shares. ¶84. Credit Suisse and Morgan Stanley agreed, while at least one bank refused and walked away from the IPO. *Id.*

The IPO F-1 touted Luckin's purportedly disruptive business model, attributed its astronomical growth to its vouchers and coupons, and reassured investors that Luckin's internal controls and procedures, management systems, and accounting and auditing procedures and policies complied with all relevant laws. ¶¶90, 93, 257-61. While the IPO F-1 disclosed that Luckin's outside auditor had identified material weaknesses in Luckin's internal controls over financial reporting, it assured investors that "we are in the process of implementing a number of measures to address [the] material weaknesses," including "establishing effective monitoring and oversight controls for non-recurring and complex transactions to ensure the accuracy and completeness of our company's consolidated financial statements and related disclosures." ¶251. Luckin also disclaimed awareness of any basis for short sellers to accuse the Company of financial or accounting misconduct. ¶¶255, 274. The IPO F-1 also assured investors that Luckin's reduced growth in 1Q2019 was due to seasonal factors such as the Chinese New Year. ¶76.

The IPO closed on May 17, 2019. ¶85. Luckin reaped over $650 million in gross proceeds, and the Underwriters earned fees of $35.84 million. *Id.* After the IPO, the Underwriter Defendants'

analysts touted Luckin. ¶97. For example, in June 2019, Credit Suisse set a price target of $24, 32% above Luckin's trading price at the time, and touted Luckin's "disruptive" and "technology-driven new retail model" as "provid[ing] the company significant advantages in cost and customer engagement to drive the mass market coffee consumption in China." *Id.*

Luckin continued to report explosive growth following the IPO. In August 2019, Luckin reported second-quarter year-over-year net-revenue growth of over *698%* and the addition of 5.9 million new customers in the quarter. ¶103. In November 2019, Luckin reported third-quarter year-over-year net-revenue growth of *557.6%*, exceeding its guidance. ¶110. Luckin also reported that "[s]tore level operating profit in the quarter was . . . US$26.1 million . . . , compared to a loss of [US$17.64 million] in the third quarter of 2018." *Id.* The Underwriter Defendants' analysts also continued their favorable coverage, which, alongside Luckin's purportedly robust financial results, powered its ADS price from $17.00 in the May 2019 IPO to $35.11 in early January 2020. ¶118.

The SPO F-1 included Luckin's financial statements for the first three quarters of 2019 and stated that Luckin's net revenues in that period increased by *680.6%* year over year. ¶¶322-25. The SPO F-1 represented that these increases were primarily driven by a "significant increase" in product sales, Luckin's "technology-driven new retail model," and an increased number of customers. ¶¶321-25, 343. The SPO F-1 also reported increased operating expenses commensurate with the reported revenue growth. ¶329.

At the time of the SPO, Defendants Lu and Qian borrowed $518 million from several Underwriter Defendants and pledged 488.4 million Class B shares, which have ten times ordinary shares' votes, as collateral. ¶¶154, 157. These shares represented over 42% of Luckin's total aggregate voting power. ¶155. The SPO F-1 disclosed the number of pledged shares but denied that Lu and Qian could lose control of Luckin in case of a default, claiming that Luckin was "not

aware of any arrangement that may, at a subsequent date, result in a change of control of our company." ¶156.

On January 10, 2020, the SPO closed, and Luckin and the Underwriter Defendants sold 13.8 million ADSs to investors at $42.00 per ADS. ¶12. Luckin received over $448.6 million in proceeds from the SPO, and the Underwriter Defendants received $23 million in fees. *Id.*

### C.      Luckin Fabricated Sales and Fraudulently Inflated Key Operating Metrics

Unbeknownst to investors, Luckin's reported sales, profits, and other key operating metrics were vastly inflated by fraud throughout the Class Period. Luckin has now admitted that Defendants Lu, Qian, and J. Liu—and dozens of other employees—massively inflated Luckin's reported financial metrics by fabricating transactions. ¶130. As Luckin has admitted, "*the Company's former Chief Executive Officer, Ms. Jenny Zhiya Qian, former Chief Operating Officer, Mr. Jian Liu and certain employees reporting to them participated in the fabricated transactions and . . . the funds supporting the fabricated transactions were funneled to the Company through a number of third parties associated with the Company employees and/or related parties.*" ¶131. These transactions began *no later* than April 2019—*before the IPO*—and continued through at least 4Q2019. In total, Luckin fabricated *approximately $300 million* in fake sales, thereby overstating its revenue by *nearly 100%* between 2Q2019 and 4Q2019, and inflated costs by approximately $190 million. ¶¶17, 173, 181.

Defendants orchestrated these sham transactions through a web of entities related to Defendant Lu and other Luckin executives. ¶131. A related entity would buy vouchers redeemable for coffee, and Luckin would send the proceeds to another related entity as payments for raw materials. ¶483. As the *Wall Street Journal* reported, "the rafts of purchases and payments formed a loop of transactions that allowed the company to inflate sales and expenses with a relatively small amount of capital that circulated in and out of the company's accounts." ¶140.

Luckin carried out several other schemes to falsify its revenues as well. For example, it fabricated $28 to $42 million in sales by having employees purchase vouchers for numerous cups of coffee, and by mislabeling receipts to inflate the number of drinks sold. ¶¶142, 144. A former employee stated that store managers knew that Luckin was skipping numbers on receipts "to pump sales up." ¶146. Luckin also recorded fake payments to sham entities to make reported costs appear commensurate with reported revenues. ¶148. Chinese regulators who examined Luckin's internal systems reported finding approximately $140 million in questionable supplier payments. ¶149.

### D.    As Concerns Swirl in the Market, Defendants Issue False Denials

On January 31, 2020, shortly after the SPO, market participant Muddy Waters raised concerns that Luckin had fraudulently inflated its financial results. Muddy Waters published a report (the "Report") based on 11,260 hours of store-traffic video and the review of tens of thousands of receipts. ¶¶159-60. The Report concluded that "Luckin faked its numbers." ¶159.

On February 3, 2020, Luckin "***categorically den[ied] all allegations in the Report***," calling it "flawed" and "unsubstantiated" and its allegations "unsupported speculations and malicious interpretations of events." ¶164. Luckin stated: "all the Company's key operating data . . . are tracked in real time and can be verified. Luckin Coffee has a robust internal control system over data management to ensure the data integrity and consistency within its system as well as that of its third party partners." *Id.* The next day, Defendant Credit Suisse attempted to discredit the Report, criticizing Muddy Waters' video evidence, and stating that it "only accounted for <0.3% of total operation hours in 4Q19." ¶166. Credit Suisse added that "every single order that customers placed is online and automatically recorded in [Luckin's] system, and payments for orders went through third-party payment service providers. So it's not that hard for [Luckin] to provide such evidence to rebut this allegation." *Id*. Credit Suisse assured investors that it "found no hard evidence in the short-seller report to prove Luckin's business as fraudulent, and some of the

6

allegations are baseless or have major flaws." *Id*. Luckin's denials and Credit Suisse's defense assuaged investor concerns, and the ADS price continued to rise despite the Report. ¶¶169, 171.

### E.    Defendants Finally Admit the Truth

On April 2, 2020, Luckin stunned the market by admitting that its senior executives had fabricated hundreds of millions of dollars of sham "sales." ¶¶172-73. Following an internal investigation by a special committee of the Board of Directors, Luckin admitted that, beginning in April 2019, before the IPO, its executives fabricated over $310 million in sales between the 2Q2019 and 4Q2019. ¶174. Luckin admitted that "beginning in the second quarter of 2019, Mr. Jian Liu . . . and several employees reporting to him . . . *fabricat[ed] certain transactions*," and "the aggregate sales amount associated with the fabricated transactions from the second quarter of 2019 to the fourth quarter of 2019 amount to around *[US$310 million]. Certain costs and expenses were also substantially inflated by fabricated transactions*. . . ." *Id.*

Luckin's ADS price fell over *75%* in response to this news, from a closing price of $26.20 on April 1, 2020 to a closing price of $6.40 on April 2, 2020. ¶176. Numerous additional developments further revealed the magnitude of Luckin's fraud. In May 2020, Luckin terminated Qian as CEO and J. Liu as COO. ¶178. In June 2020, it was reported that the Chinese authorities had obtained emails in which Lu gave direct orders to commit accounting fraud. ¶192. Later that month, trading in Luckin's ADSs on NASDAQ was permanently suspended. (The ADSs continue to trade over-the-counter.) ¶188. Then, in July 2020, a Cayman Islands court appointed joint provisional liquidators to oversee Luckin's operations and negotiate with its creditors. ¶213.

In September 2020, SAMR, China's State Administration for Market Regulation, confirmed that "between April 2019 and December 2019, . . . *Luckin Company inflated its sales revenue, costs, profit and other key indicators of its business operations*. . . . *[and] 43 third-party related business entities* . . . aided and abetted Luckin in carrying out the misleading acts . . . ."

¶194. In December 2020, Luckin agreed with the SEC to be permanently enjoined from violating the Exchange Act and pay a $180 million civil penalty, which will be offset by any cash payment by Luckin to its security holders under any scheme of arrangement approved by the Cayman Islands court. *See SEC v. Luckin Coffee, Inc.*, Case No. 1:20-cv-10631-MKV, ECF No. 5-1 (S.D.N.Y. Dec. 16, 2020). At the same time, Luckin's joint provisional liquidators stated that they intended to negotiate a scheme of arrangement with Luckin's creditors, including the ADS investors who are claimants in this action. *See* Ex. A §§ 7.2, 7.4.

## III.    LUCKIN CONCEDES THE VAST MAJORITY OF THIS CASE

Luckin concedes that the majority of Lead Plaintiffs' claims—including the §10(b) claims for the entire Class Period—will proceed to discovery. Luckin's "motion does not seek to challenge the core of the CAC—that the fabricated transactions resulted in a material misstatement of Luckin's financial results beginning in the second quarter of 2019." Mem. of Law in Supp. of Luckin Coffee Inc.'s Mot. to Dismiss ("LC Br.") 2. Thus, Luckin admits the falsity of its financial results for 2Q2019 through 4Q2019. ¶¶275-77, 299-301. Luckin also concedes that most of its other misleading statements and omissions during the Class Period are actionable under §10(b). *See* ¶¶278-80, 311-13; *see, e.g.*, *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 450 (S.D.N.Y. 2018) ("Defendants do not move in their opening brief to dismiss any claims based on this statement. . . . Therefore, Defendants have waived the argument.").[2] Luckin also does not dispute the §10(b) elements of scienter or loss causation.

Similarly, Luckin does not dispute many of the material misstatements and omissions that form the basis for Lead Plaintiffs' §11 claims. Luckin concedes that the IPO F-1: (i) misleadingly

---

[2] Luckin does not dispute the majority of the misleading statements and omissions alleged in the CAC during the Class Period, including those described in ¶¶275-83, 285-90, 297-313. To the extent it contests any other of Lead Plaintiffs' claims based on misstatements and omissions outside the IPO and SPO F-1s, its arguments fail, as detailed below.

8

disclosed risks associated with Luckin's ability to "ensur[e] full compliance with relevant laws and regulations" when Luckin was already violating relevant laws and regulations (¶¶541-42); (ii) misled investors about the risk that short sellers might accuse Luckin of fraud (¶¶543-44); (iii) misled investors regarding Luckin's use of coupons and vouchers (¶¶550-51); and (iv) misleadingly attributed Luckin's reduced growth in 1Q2019 to seasonal factors (¶¶555-58). Likewise, Luckin concedes that the SPO F-1 (i) materially misstated Luckin's financial results for the nine months ended September 30, 2019 (¶¶559-69); (ii) violated GAAP (¶¶570-73, 586-88); (iii) violated SEC Regulation G (¶¶574-76); (iv) misleadingly disclosed risks associated with Luckin's ability to "ensur[e] full compliance with relevant laws and regulations" (¶¶592-93); (v) misled investors about the risk that short sellers might accuse Luckin of fraud (¶¶594-95); and (vi) misled investors regarding Luckin's use of coupons and vouchers (¶¶584-85).

Thus, this Action will proceed to discovery, including at least the §10(b) claims against Luckin for the entire Class Period. Plaintiffs' other claims against Luckin should also be sustained.

## IV.    LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a plaintiff's complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 724 (S.D.N.Y. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

Under §11, specified categories of defendants are liable for material misrepresentations or omissions in public offerings of securities to any plaintiffs who purchased the securities in or traceable to the registration statement. *See* 15 U.S.C. § 77k(a). A defendant's omissions are

9

actionable where it has "a legal obligation to disclose the allegedly omitted information." *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, 2003 WL 22882137, at *4 (S.D.N.Y. Dec. 4, 2003). Even absent such an affirmative obligation, once a defendant makes a disclosure, it has "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002); *see also Nanopierce Techs.*, 2003 WL 22882137, at *4.

A misrepresentation is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "Materiality is a mixed question of law and fact," and "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are *so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance*." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985)).

## V.     STANDING

### A.     Lead Plaintiffs Sufficiently Allege Standing for the IPO

Luckin contends that Lead Plaintiffs have failed to allege standing to assert §11 claims related to the IPO. It is wrong. "[T]o establish standing under § 11 at the motion to dismiss stage, Plaintiffs need only assert that they purchased shares 'issued pursuant to, or traceable to the public offerings.'" *BioScrip*, 95 F. Supp. 3d at 746; *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 403 (S.D.N.Y. 2020) (same); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006) (same); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 324 (S.D.N.Y. 2013) (sustaining §11 claims based on purchases from a secondary offering where plaintiffs pleaded only that purchases were traceable to the secondary offering). "[T]racing is a merits issue" that need not be established at the pleading

stage. *Wallace v. IntraLinks*, 302 F.R.D. 310, 319 (S.D.N.Y. 2014); *see also In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *5 (S.D. Tex. June 15, 2017) (same).

Here, Louisiana Sheriffs alleges that it purchased Luckin shares "traceable to the IPO." ¶615. That allegation is sufficient to allege standing under §11, even post-*Twombly*. *See, e.g.*, *Evoqua*, 450 F. Supp. 3d at 403 ("[Plaintiff] alleges that it purchased Evoqua stock pursuant or traceable to the offerings. This is enough to confer standing at this stage to assert a § 11 claim."); *MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d at 324 (same); *Marsh*, 501 F. Supp. 2d at 491 (same). At most, courts look to the timing of plaintiffs' purchases to determine whether the allegation of traceability is plausible. Here, the allegation that "Plaintiffs acquired Luckin ADSs in or traceable to the IPO" (¶615) is plausible because Louisiana Sheriffs purchased Luckin ADSs on January 8 and 9, 2020, at a time when the shares in the aftermarket had been issued in a ***single*** offering (the IPO) and pursuant to a ***single*** registration statement (the IPO F-1). Courts routinely hold that aftermarket purchases in these circumstances are "traceable" to an IPO. *See, e.g.*, *BioScrip*, 95 F. Supp. 3d at 746 ("aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11").[3]

Luckin attempts to circumvent this well-supported allegation of traceability by offering a barrage of speculation, hypothesizing that Louisiana Sheriffs cannot trace the shares it purchased on January 8 and 9, 2020 back to the IPO because they ***may*** have ***theoretically*** come from pre-IPO shareholders who converted their Class B shares into ADSs following the lock-up period and then sold them into the open market. LC Br. 15. Luckin's unsupported conjecture fails.

First, Defendant's argument contradicts the CAC. Luckin asks the Court to accept its

---

[3] Defendants' arguments that AP7 cannot establish traceability are irrelevant. In all events, Louisiana Sheriffs' purchases provide standing for the Securities Act claims related to the IPO and SPO. *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 422 & n.21 (S.D.N.Y. 2003) (holding that "it is unnecessary to reach th[e] argument" that one plaintiff lacked standing where "the Complaint has adequately alleged that at least [two plaintiffs] have standing").

11

speculation that such conversions—which are not alleged anywhere in the CAC—actually occurred, draw the adverse inference that Louisiana Sheriffs' purchases derived from those hypothetical conversions, and then conclude, as a matter of law, that Louisiana Sheriffs will be unable to prove traceability. This is, of course, the opposite of what the Court must do at the pleading stage. *Chambers*, 282 F.3d at 152; *Streit v. Bushnell*, 424 F. Supp. 2d 633, 642 (S.D.N.Y. 2006) ("The Court cannot ground a ruling on a motion to dismiss on the defendant's speculation").

Second, there is no reason to credit Defendant's speculation. Defendant has offered no evidence that *any* pre-IPO shareholders converted shares to ADSs and sold them before Louisiana Sheriffs' purchases, *see* LC Br. 5, 15, let alone evidence indicating that these purported conversions and sales so exceeded the number of shares purchased by Louisiana Sheriffs so as to render Plaintiffs' standing allegations deficient as a matter of law. *See Perry v. Duoyuan Printing, Inc.*, 2013 WL 4505199, at *10-11 (S.D.N.Y. Aug. 22, 2013) (rejecting standing argument based on disclosure in prospectus that pre-IPO shares would become "freely tradeable" after IPO).

Defendant's authorities are inapposite or support Plaintiffs. For instance, *In re Puda Coal Sec. Inc. Litig.*, 2013 WL 5493007, at *5-6 (S.D.N.Y. Oct. 1, 2013), was a ***summary-judgment*** decision after full discovery and has no bearing on the §11 pleading standard. To the extent it is relevant, however, *Puda Coal* supports Plaintiffs because, at the motion to dismiss stage, the court ***sustained*** plaintiff's §11 claims based on the allegation that it "acquired shares of the Company's common stock pursuant to and/or traceable to the false offering materials issued in connection with the December offering." *Puda Coal Sec. Inc. Litig.*, 11-cv-2598, ECF Nos. 47 & 78.

In Defendant's other cited cases, it was ***undisputed*** that plaintiff's aftermarket purchases occurred ***after*** shares that came from sources ***other than*** the relevant offering entered the market. For instance, in *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 756 (1st Cir. 2016), the

12

traceability allegation was insufficient because "15.3 million shares were issued in connection with the . . . offering, but an additional 166 million were outstanding at that time." Similarly, in *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013), the traceability allegation was insufficient because, at the time of the aftermarket purchases, the company had conducted multiple offerings. *See also Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 561 (S.D.N.Y. 2012) (same). In fact, the *Century Aluminum* court observed that tracing "***poses no obstacle***" where, as here, at the time of the plaintiff's aftermarket purchases, "a company's shares have been issued in a single offering under the same registration statement." 729 F.3d at 1106.

## B.   Lead Plaintiffs Sufficiently Allege Standing for the SPO

The CAC alleges that Louisiana Sheriffs purchased "22,400 ADSs" from "Credit Suisse" "directly in the SPO" at the offering price of "$42.00 per ADS." ¶¶32, 470. This more than satisfies the pleading standard: the CAC specifies that Louisiana Sheriffs purchased ADSs ***directly in*** the SPO from a specific Underwriter Defendant at the SPO price. *See, e.g.*, *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 511 (S.D.N.Y. 2010) (allegation that "Plaintiffs 'purchased shares of iStar common stock directly in the Secondary Offering'. . . suffices at this stage in the litigation"); *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 658 (D. Md. 2012), *aff'd sub nom. Yates v. Mun. Mortg. & Equity*, LLC, 744 F.3d 874 (4th Cir. 2014) (allegations that plaintiff purchased shares at offering price on date of secondary offering "are adequate" under *Twombly* and *Iqbal*); *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 866 (S.D. Ohio 2016), *aff'd sub nom. IBEW Local No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017). In fact, Defendant does not cite ***a single case*** holding that such an allegation was insufficient to establish standing at the pleading stage.

Defendant's speculation that it is "at least equally likely that a major broker like Credit Suisse would have pre-existing ADS in its books on the day of the SPO," LC Br. 16, fails for

13

multiple reasons. First, Defendant's speculation contradicts the CAC, which is presumed to be true at this stage. *Chambers*, 282 F.3d at 152. Second, there is no basis to lend any credence to Defendant's extreme speculation on a Rule 12(b)(6) motion to dismiss where all inferences are to be made in Plaintiffs' favor. Defendant would have to show that *all 22,400* ADSs that Credit Suisse sold Louisiana Sheriffs came from a source other than the SPO—but it has not shown that a *single* ADS came from a different source. LC Br. 16. Indeed, the fact that the Underwriter Defendants fully exercised their overallotment option for the SPO, ¶122, strongly suggests that demand for ADSs on the date of the SPO exceeded any inventory the Underwriter Defendants held, making it even more likely that Louisiana Sheriffs' purchases were of ADSs issued in the SPO.[4]

Again, Defendant's authorities are either inapt or acknowledge plaintiffs' standing where they allege purchases directly in a secondary offering. *See Ariad*, 842 F.3d at 756 ("The plaintiffs could have met this bar by pleading that they 'purchased their shares directly in the secondary offering itself.'") (quoting *Century Aluminum*, 729 F.3d at 1106). In *Century Aluminum*, unlike here, the plaintiffs conceded that they purchased in the aftermarket, *not* in the SPO directly. *See* 729 F.3d at 1106. Consequently, courts have rejected Defendant's argument as a misapplication of *Century Aluminum. See, e.g.*, *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1114 (E.D. Cal. 2017) (defendant "misapplies *Century Aluminum*, which addressed the purchase of shares on the open market. . . . Lead Plaintiffs[] . . . allege that they purchased their shares on the date of the Secondary Offering at the offering price. [Defendant's] possible alternative origins of Lead Plaintiffs' stock thus do not demonstrate that the allegations fail to meet the plausibility standards of *Twombly* and *Iqbal*.").

---

[4] Notably, the Underwriter Defendants, including Credit Suisse, from which Louisiana Sheriffs purchased its SPO ADSs directly, do *not* raise this "inventory" argument or provide any factual support for it. *See* UW Br. 2 n.1.

14

## VI.    LUCKIN'S MATERIAL MISSTATEMENTS AND OMISSIONS

### A.    Luckin's Material Misstatements and Omissions in the IPO F-1

The IPO F-1 contained numerous categories of material misrepresentations and omissions, all of which are set forth in the CAC at ¶¶245-74, 533-58, 601-04. As discussed above, Luckin does not dispute many of these allegations. *Supra* at 8-9. The arguments that Luckin raises against some of these alleged misstatements and omissions fail.

#### 1.    Misstatements and Omissions Regarding Financial Information

##### a.    GAAP Required Disclosure of the Fraudulent Transactions

Luckin has admitted—and its regulators have confirmed—that the fraudulent transactions began no later than April 2019. *See, e.g.*, ¶¶130-31, 181, 194. Under ASC 855, Luckin had a duty to disclose these fraudulent transactions before the filing of Luckin's final IPO prospectus on May 17, 2019. ¶¶81, 248-50, 536. ASC 855 requires a company filing a financial statement with the SEC to evaluate the impact of "subsequent events through the date the financial statements are issued." ASC 855-10-25-1A. Under this requirement, "[s]ome nonrecognized subsequent events"—i.e., "events that provide evidence about conditions that did not exist at the date of the balance sheet but arose after the balance sheet date but *before financial statements are issued*"— "may be of such a nature that they must be disclosed to keep the financial statements from being misleading." ASC 855-10-50-2; ASC 855 10-25-3 (emphasis in original). These subsequent events are "not recognized *in* the financial statements" but must still be disclosed to comply with GAAP. ASC 855. The registrant must disclose "[t]he nature of the event" and "[a]n estimate of its financial effect, or a statement that such an estimate cannot be made." ASC 855-10-50-2.

By failing to disclose the existence of the fraudulent transactions, Luckin violated ASC 855, rendering the IPO F-1 materially false or misleading. *See, e.g.*, *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016) ("financial statements . . . which are not prepared in accordance

15

with [GAAP are] presum[ptively] . . . misleading or inaccurate"); *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 207 (S.D.N.Y. 2019) (same).

Luckin acknowledges that ASC 855 "expressly relates to subsequent events," yet it asserts that ASC 855 does not apply because the IPO F-1 "did not include any transactions after March 31, 2019," *approximately one day* before Luckin admits the fraudulent transactions began. LC Br. 20. But this argument ignores that ASC 855 requires disclosing "Type II" subsequent events, i.e., events *post-dating* the reported financial period that must still be disclosed to prevent the filing from being materially misleading. *See* ASC 855. Luckin's failure to disclose a known fraud that occurred after March 31, 2019, but before the IPO, violated GAAP. *See In re Equinox Fund Mgmt., LLC*, SEC Release No. 4315, 2016 WL 212680, at *6-7 (Jan. 19, 2016) (finding false statements in violation of ASC 855 based on failure to disclose event after balance-sheet date); *see also In re Wilmington Tr. Corp.*, SEC Release No. 3582, 2014 WL 4467632, at *8-9 (Sept. 11, 2014) (same).

Instead of addressing the actual requirements of ASC 855, Luckin raises a series of false analogies. First, relying on *Adair v. Kaye Kotts Assocs., Inc.*, 1998 WL 142353 (S.D.N.Y. Mar. 27, 1998), Luckin broadly asserts that a company's financial report cannot become misleading as a result of subsequent material events. LC Br. 20. However, *Adair* addressed whether an *independent auditor* "was required to update its audit report with financial results it had not certified." 1998 WL 142353 at * 4. *Adair* says nothing about an *issuer's* liability for failing to disclose material information arising before filing a financial report that renders the report misleading. *See* ASC 855 at S99-2 ("[a] *registrant* . . . ha[s] responsibilities with regard to post-balance-sheet-date subsequent events"). Adopting Luckin's arguments would abrogate ASC 855.

Next, Luckin cites cases assessing liability for violations of the International Accounting Standards ("IAS") and Auditing Standards ("AU") to argue that Luckin's GAAP violations do not

16

give rise to liability under the federal securities laws. LC Br. 20-21. However, GAAP violations standing alone render financial statements presumptively misleading. *SAIC, Inc.*, 818 F.3d at 93; 17 C.F.R. § 210.4–01(a)(1)).[5] Further, the IPO F-1 represented that Luckin's financial statements and disclosures complied with GAAP, ¶95, and so its violation of ASC 855 is independently actionable due to this affirmative misrepresentation. *See, e.g.*, *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544-45 (S.D.N.Y. 2017) (GAAP compliance statements actionable where company admitted to accounting "misconduct" in violation of GAAP).

At best, Defendant's arguments raise a factual question as to whether Luckin violated GAAP, which cannot be determined on a motion to dismiss. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 656–57 (S.D.N.Y. 2007) ("At the motion to dismiss stage, the plaintiffs' assertion that certain practices were not [GAAP compliant] must be taken as true."); *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 339 (S.D.N.Y. 2004) (determining a GAAP violation "difficult to decide as a matter of law.").

Further, even proving technical compliance with GAAP would not absolve Luckin of liability here, given its admission to widespread fraud pre-dating the IPO. *See United States v. Ebbers*, 458 F.3d 110, 126 (2d Cir. 2006) ("GAAP . . . imposes an overall requirement that the statements as a whole accurately reflect the financial status of the company."); *Glob. Crossing*, 322 F. Supp. 2d at 340 ("under both GAAP and the securities laws, business entities . . . are required to provide whatever additional information would be necessary to make the statements in

---

[5] Even if the Court considers the cited IAS and AU cases, Luckin's argument still fails. For example, *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at *15 (S.D.N.Y. Sept. 13, 2017) holds only that IAS 10 and AU 560 violations do not give rise to a §11 claim when "a reasonable investor would not have considered the omitted interim financial information and write-downs *material*." *Id.* at *15. *Barclays* does not support Defendant's argument that violations of IAS 10 or AU 560 are insufficient to support claims under §11 as a matter of law. Here, a reasonable investor would clearly have considered the omitted information material, and Defendant does not argue otherwise. LC Br. 2. Similarly, the court in *Stratte-McClure v. Morgan Stanley*, 2013 WL 297954, at *7 (S.D.N.Y. Jan. 18, 2013) declined to find a duty to disclose where "Plaintiffs pled no facts that give rise to a duty under AU 560."

their financial reports fair and accurate") (citing Rule 10b–5(b)); *see also* 17 C.F.R. § 230.408.

### b.     Regulation S-K Required Disclosure of the Fraudulent Transactions

Luckin's failure to disclose material facts regarding its fraudulent transactions in the IPO F-1 also violated SEC Regulation S-K, Items 101 and 303. 17 C.F.R §§ 229.101, 229.303; ¶¶234-35, 272-74, 602-03. Item 101 requires disclosure of any material changes in Luckin's mode of conducting its business (¶¶234, 602), and Item 303 requires disclosure of (i) any unusual or infrequent transactions that materially affected the amount of reported income from continuing operations, and (ii) any known trends or uncertainties that had or that the registrant reasonably expects will have a material impact on net sales or revenues or income from continuing operations (¶¶235, 603). A company's *possible* exposure to civil liability arising from a known fraud is material and must be disclosed under Item 303. *See SAIC, Inc.*, 818 F.3d at 96 ("SAIC's possible exposure to significant civil and even criminal liability" required disclosure under Item 303, even though the fraud concerned "a single contract out of SAIC's more than 10,000 ongoing contracts" and "was worth a fraction of SAIC's yearly revenues"); *see also In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 465 (S.D.N.Y. 2017) ("[T]he fact that some of Eletrobras's officers have been engaged in conduct . . . that resulted in serious criminal consequences, an overhaul of Eletrobras's corporate governance system, and the replacement of the board of directors and management is not 'so obviously unimportant to a reasonable investor' to be immaterial"); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015) (failure to disclose bribery scheme was material because its revelation would "call into question the integrity of the company as a whole").

Luckin incorrectly contends that these disclosure obligations do not apply to foreign issuers. *See* LC Br. 21-22; UW Br. 27-28. Luckin ignores that under Part I, Item 4.a of Form F-1, the IPO F-1 was required to include the information specified by Part I of Form 20-F, which

18

requires substantially identical information as Items 101 and 303:

| Form F-1 Requirement | Reg. S-K Requirement |
| --- | --- |
| Registrant must disclose "[t]he important events in the development of the company's business, e.g. . . . . any material changes in the mode of conducting the business." Form 20-F, Part I, Item 4.A.4 | Registrant must disclose "the general development of the business of the registrant," including "[a]ny material changes to a previously disclosed business strategy," and "the business done and intended to be done by the registrant." Item 101(a)(1), (c). |
| Registrant must disclose "unusual or infrequent events . . . materially affecting the company's income from operations, indicating the extent to which income was so affected." *Id.* at Item 5.A. | Registrant must disclose "any unusual or infrequent events or transactions . . . that materially affected the amount of reported income from continuing operations and . . . the extent to which income was so affected." Item 303(a)(3)(i). |
| Registrant must disclose "any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, [or] income from continuing operations." *Id.* at Item 5.D. | Registrant must disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Id.* at (a)(3)(ii). |

Contrary to Defendant's argument, courts regularly apply Item 303's disclosure obligations to foreign companies' filings, including Form F-1. "[T]he SEC has stated that its interpretations of Item 303 apply to [Management Discussion & Analysis disclosures] drafted pursuant to Item 5 of Form 20-F, *which does apply to foreign corporations*. Accordingly, the Court will interpret [Item 5 of Form 20-F] as calling for the same disclosure as Item 303 of Regulation S-K." *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *7 n.5 (S.D.N.Y. Sept. 27, 2020); *see also id.* at *7-11 (finding violations of Item 303 in Form F-1 adequately alleged); *Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (foreign defendants filing under Form 20-F "had a duty to disclose under [Item 303]").[6]

---

[6] As Luckin concedes, LC Br. 22 n.9, the Second Circuit has held that violations of Item 303 can give rise to liability under the federal securities laws. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015).

Defendant also violated Item 503, 17 C.F.R § 229.503, which requires a registration statement to disclose "the most significant factors that make the offering speculative or risky," including material changes occurring between a company's reported financial statements and the offering itself.[7] *See Citiline*, 701 F. Supp. 2d at 514-15 & n.2 (failure to disclose changes between "the end of the third quarter of 2007, when [defendant] issued a 10–Q report, and the time of the secondary offering" violated Item 503 and supported §11 claims). "The same facts underlying an Item 303 violation may also support an Item 503 violation, and a court's rationale for determining the former may also support the same determination of the latter." *Jianpu Tech.*, 2020 WL 5757628, at *7 (quoting *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at *9 (S.D.N.Y. Sept. 13, 2017), *aff'd* 756 F. App'x 41 (2d Cir. 2018)). Here, the IPO F-1 failed to disclose a number of significant factors that rendered the IPO speculative or risky, including risks related to Luckin's fraudulently inflated revenue and undisclosed related-party transactions. ¶¶243, 274, 604.

Luckin acknowledges that "courts typically analyze the sufficiency of Item 503 disclosures with the familiar materiality standard," *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011); LC Br. 22, and does not contest that the fraudulent transactions were material. Instead, Luckin asserts that it was not obligated to disclose them under Item 503 because the IPO F-1 included financial reports only through 1Q2019. *Id.* at 22-23. Defendant's argument is illogical given that factors making an IPO "speculative" or "risky" are inherently forward looking. *See In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 691 (S.D.N.Y. 2004) (omissions "concern[ing] the profitability of [defendant]'s long-distance voice business and the impact that decreasing profit margins in that part of its business were having ***and would have on WorldCom's ability to compete***" could be found material by a jury and violate Item

---

[7] On March 20, 2019, the SEC amended Regulation S-K, moving what was previously Item 503 to Item 105. This brief refers to Item 503 for consistency.

503); *Silverstrand Invs. v. AMAG Pharm., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013) (Item 503 claim may be premised on registrant's failure to disclose a "risk factor [that] could adversely affect the registrant's present *or future business expectations*"); *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 716 (3d Cir. 2020) (same).[8] The fraudulent transactions posed extreme risks and should have been disclosed. *SAIC, Inc.*, 818 F.3d at 96.

Luckin also claims that the Risk Factors section of the IPO F-1 "warned investors that Luckin's auditor had identified material weaknesses in Luckin's internal controls." LC Br. 23. As discussed below, this "warning" does not shield Defendant from liability. *Infra* at 24-25.

### c.    GAAP Required Disclosure of the Related-Party Transactions

Luckin incorrectly argues that ASC 850 did not require disclosure of its fraudulent related-party transactions in the IPO F-1 because the fraudulent transactions did not affect the financial statements in the IPO F-1. LC Br. 19-20. However, Defendant chose to address related-party transactions in the IPO F-1, discussing direct loans from Qian and Lu, rented office space from UCAR, and advertising services affiliated with CAR. ¶¶264, 552. Having spoken about related-party transactions, Defendant assumed a duty to speak completely and truthfully. *Caiola*, 295 F.3d at 331. Luckin violated that duty by omitting the fraudulent transactions, which were unquestionably material in that they involved funneling funds through related-parties to drive the then-existing fraud. ¶¶264-65, 271, 552-53. "[T]he absence of the related-party information from [Luckin's] SEC filings necessitates the conclusion that those filings are misleading as a matter of law." *SEC v. China NE. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 391 (S.D.N.Y. 2014); *see also Eletrobras*, 245 F. Supp. 3d at 464-66 & n.8 (sustaining claims based on failure to disclose

---

[8] Defendant relies on *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516 (W.D. Pa. 2019), to state that Item 503 violations alone do not support a §11 claim. LC Br. 22. That out-of-circuit case is an outlier. *See WorldCom*, 346 F. Supp. 2d at 691 (sustaining §11 claims based on violation of Item 503); *Jaroslawicz*, 962 F.3d at 716 (same); *Silverstrand*, 707 F.3d at 106 (same).

related-party transactions related to bribery scheme).

Further, ASC 850 independently required Luckin to fully disclose its fraudulent related-party transactions in the IPO F-1. Defendant does not challenge Plaintiffs' allegations in paragraphs 266 and 554, which: (i) explain that under ASC 850-10-10-1, disclosure is required whenever the "information about the transactions 'would make a difference in decision making'" (and not only when the transactions affect the prior-period financials), a condition obviously satisfied as to the fraudulent related-party transactions, and (ii) list a variety of required disclosures, the vast majority of which do not relate to the prior-period income statement. Luckin's omissions are actionable for this independent reason as well. *See, e.g.*, *Turner Ins. Agency, Inc. v. Farmland Partners Inc.*, 2019 WL 2521834, at \*2-3 (D. Colo. June 18, 2019) (sustaining claims based on failure to disclose related-party transactions under ASC 850); *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 407 (S.D.N.Y. 2013) (same, citing ASC 850).

### 2.    Misstatements and Omissions Regarding Luckin's Internal Controls

Statements about a company's internal controls "directly at odds with [defendant's] alleged conduct" are actionable. *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at \*5 (S.D.N.Y. June 23, 2014); *see also Stream SICAV v. Wang*, 989 F. Supp. 2d 264, 274 (S.D.N.Y. 2013) ("It is well-settled that, when defendants knowingly or recklessly fail to follow policies announced in their public filings, they may cause those filings to be materially misleading in that the disclosed policy no longer reflects actual practice.") (alterations omitted). Luckin represented that it was "in the process of implementing a number of measures to address the[] material weaknesses identified" in its internal controls, and was "establishing effective monitoring and oversight controls for non-recurring and complex transactions to ensure the accuracy and completeness of our company's consolidated financial statements and related disclosures." ¶¶251, 539. Luckin violated these assurances in the months preceding the IPO. Far from "establishing

22

effective monitoring and oversight controls," senior executives were exploiting Luckin's materially deficient controls to engage in fraudulent transactions. ¶¶131-33, 141, 149. In fact, Luckin did not "charter[] an internal audit function to test and evaluate its control functions" until *after* Luckin's overstatement of revenue and expenses was revealed to the market. ¶¶252, 540.

Luckin argues that because the IPO F-1 did not guarantee "that the measures would be effective," its internal control statements are not actionable. LC Br. 26. But even Defendant's cases show that statements about internal controls do not have to be guarantees to be actionable. By speaking about Luckin's internal controls, Defendant became obligated to disclose the whole truth, especially as these statements implied that Defendant was not subverting the accuracy and completeness of its financial statements and related disclosures. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 661 (S.D.N.Y. 2017) (by speaking "to its investors on the topic of bribery and other corruption . . . in a manner that could be reasonably interpreted as suggesting at least that the Company's senior-most executives were not at the same time engaging in such activities, Bradesco was under a duty to speak the whole truth"); *Caiola*, 295 F.3d at 331.

Further, even aspirational statements about internal controls are actionable to the extent "investors could have relied at least on the notion that the Company held such aspirations." *Banco Bradesco*, 277 F. Supp. 3d at 660. Luckin held no actual aspirations to remediate the material weaknesses in its internal controls, given that senior officers were actively committing fraud when it filed the IPO F-1. *See id.* ("In alleging that executives in the highest echelons of the Company were actively involved in bribing a government official during the time these statements were made, Plaintiff has adequately alleged that no such aspirations were at play.").[9]

---

[9] Defendant's reliance on *Banco Bradesco* is misplaced. LC Br. 27. The court there dismissed claims related to the design and effectiveness of Bradesco's internal controls because plaintiff alleged "nothing about the design . . . management or execution of [the company's] processes." 277 F. Supp. 3d at 648. However, the court sustained claims about the company's "anti-corruption policies and efforts" because management "was fully aware that the policy was

Defendant next argues that the risk warnings in the IPO and SPO F-1s that Luckin's ineffective internal controls "could result in material misstatements in our financial statements" are "fatal" to Lead Plaintiffs' claims. LC Br. 27. This purported warning is insufficient to preclude liability because it failed to disclose that the supposedly theoretical risk had already materialized. *See, e.g.*, *Evoqua*, 450 F. Supp. 3d at 409 ("Warning of risks that could occur at some future date does not warn investors that those risks have already come to pass."); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) ("Here it is alleged that at the time that VDM Holding was warning investors about regulatory risk, it knew . . . employees were violating NYSE rules."); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 518 (S.D.N.Y. 2013) (holding actionable "specific representations . . . that construed a present certainty as a future possibility"); *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.,* 2019 WL 2360942, at *4 (S.D.N.Y. Mar. 4, 2019) (defendants were experiencing "current problems, not potential ones, and representing otherwise was untruthful").

Thus, Defendant's reliance on *ProShares* and similar cases is inapt, as the risks there had not already manifested before defendants' warnings. *See In re ProShares Tr. Sec. Litig.*, 889 F. Supp. 2d 644, 649, 651 (S.D.N.Y. 2012) (warning filed June 2006; risk manifested "[d]uring the latter half of 2008"), *aff'd In re ProShares Tr. Sec. Litig.*, 728 F.3d 96 (2d Cir. 2013); *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 (S.D.N.Y. 2019) (claims based on "subsequent misconduct"); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 404, 411 (S.D.N.Y. 2007) (warning filed in 2004; risk manifested after "May 10, 2005"); *Jiajia Luo v. Sogou, Inc.*, 465 F.

---

not effective." *Id.* at 659, 661. Here, Plaintiffs allege that contrary to Luckin's claims that it had instituted "measures to address the[] material weaknesses identified" in its internal controls, Luckin (i) knew its most senior executives were actively committing fraud when these statements were made, and (ii) failed to timely implement the controls it said it was implementing, i.e., it did not "charter[] an internal audit function to test and evaluate its control functions" until after fraud was revealed. ¶¶131-33, 141, 149, 251-52, 539-540.

24

Supp. 3d 393, 411 (S.D.N.Y. 2020) (defendants "warned of the exact risk that was threatened and *later* materialized").[10]

Finally, Luckin argues that its failure to implement an internal audit function did not render its disclosures false because Luckin did not claim to have an internal audit function, and because it disclosed that its remediation would not be complete until the 2019 financials were completed. LC Br. 28. However, Plaintiffs do not allege that Luckin falsely claimed to have an internal audit function or that it completed its remediation. Rather, Plaintiffs assert that Luckin's admitted fraud and failure to charter an internal audit function contradicted its claims about its efforts to remediate its internal controls. ¶¶251-52, 539-540. *See Banco Bradesco*, 277 F. Supp. 3d at 660.

### 3.    Misstatements and Omissions Regarding Luckin's Business Model

Luckin touted its "disruptive" business model and "technology-driven" efficiencies to explain Luckin's growth and conceal the fraudulent transactions driving that growth. ¶¶257-61, 545-49. Where a defendant purports to describe the drivers of its growth, but omits that fraud is a driver, the statements are actionable. *See Van der Moolen*, 405 F. Supp. 2d at 401 (once defendant "puts . . . the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success"); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (statements attributing defendant's success to its "business principles" and "dedication to complying with the letter and spirit of the laws" "while it allegedly knew the

---

[10] Defendant asserts in a footnote that Luckin's statements about its internal controls were puffery. LC Br. 28 n. 13. As discussed *infra* at 25-28, puffery is a fact-intensive inquiry which "depends, in part, on the context in which [a statement] is made." *Petrobras*, 116 F. Supp. 3d at 381. Luckin's misstatements concealed a known fraud carried out by Luckin's senior executives, and investors can reasonably rely on statements made "in an effort to reassure the investing public about the Company's integrity." *Id.* Defendant's cited cases are inapplicable because they do not address situations where defendants knew information directly contradicting their statements. *See Goldman Sachs*, 2014 WL 2815571, at *5 (distinguishing *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009), from cases where defendants' "representations about its purported controls . . . were ***directly at odds with its alleged conduct***"); *Barilli*, 389 F. Supp. 3d at 254 (statements "made to reassure the public about the company's integrity, while management was aware of corruption within the company" not puffery).

25

contrary was true" were actionable and not mere puffery); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677-78 (S.D.N.Y. 1990) (statements attributing FDA approvals to issuer's expertise were misleading where statements failed to disclose bribery scheme contributing to approval).

Defendant argues that its statements about Luckin's "disruptive" business model were immaterial "puffery" as a matter of law. LC Br. 29-30. Statements are inactionable as puffery, however, only if they are so "obviously unimportant to a reasonable investor that ***reasonable minds could not differ on the question of their importance*.**" *Ganino*, 228 F.3d at 162. "[M]ateriality is a mixed question of law and fact" and therefore generally should not be decided on the pleadings. *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 515 (S.D.N.Y. 2016); *see also Petrobras*, 116 F. Supp. 3d at 381 (whether a statement is puffery "depends, in part, on the context in which [a statement] is made"); *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229 (S.D.N.Y. 2019) (same).

Here, numerous facts preclude a finding that Defendant's statements were immaterial as a matter of law. Luckin's extraordinary growth made it an attractive investment. Luckin repeatedly touted its "disruptive" business model as the driver of the "significant scale and growth" reported in the IPO, and a key aspect of its "unique" value proposition. ¶¶65, 90-93, 257-61, 545. These statements were meaningful to investors. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191 (S.D.N.Y. 2010) (statements about "[o]rganic growth" not puffery because growth "was represented by Defendants to be the focus of E\*TRADE's business"). Moreover, these statements were made in the context of reassuring investors about Luckin's slowdown in growth in 1Q2019. ¶¶75-76. *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) ("[W]hen the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become

26

material to investors."). Indeed, analysts parroted Defendant's statements as reasons for investors to buy its ADSs. *See, e.g.*, ¶97 (Credit Suisse touting Luckin's "disruptive" and "technology-driven new retail model" as "provid[ing] the company significant advantages in cost and customer engagement"); ¶¶97-99 (Haitong stating that Luckin "has applied what we see as a revolutionary business model"). Analysts would not have latched onto these specific claims if they were "too general" for a reasonable investor to rely on. *See, e.g.*, *In re Cytyc Corp.*, 2005 WL 3801468, at *9 n.23 (D. Mass. Mar. 2, 2005) (noting that "two analysts repeated the statement" in holding defendant's statement were "not puffery").

Confirming the materiality of the above statements, Luckin repeated them in January 2020 to reassure investors when the Report raised questions about its financial results. Luckin stated that the Report "demonstrates a fundamental misunderstanding of the Company's business model," and that "Luckin Coffee's pioneering business model has enabled the Company to become the leading and fastest growing player driving coffee consumption in China." ¶164. *See BHP*, 276 F. Supp. 3d at 79 (statements made to "reassure the investing public" are material); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) (statement "went well beyond puffery: it was a direct response to an analyst's inquiry").

Finally, that (i) these statements concerned the ***present state*** of Luckin's business, and (ii) Defendant made these statements while knowing that Luckin's sales were driven by fraud, further support finding the statements actionable. *Lapin*, 506 F. Supp. 2d at 240; *see In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218 (D. Conn. 2001) (statement not puffery where defendants "made specific statements . . . knowing they were contrary to the company's actual situation"); *Freudenberg*, 712 F. Supp. 2d at 190 (statements that company had a "sound business" and would

27

continue to be a "growth proposition" were actionable when defendants knew they were untrue).[11]

## B.    Material Misstatements and Omissions in the SPO F-1

Luckin's SPO F-1 contained numerous categories of material misrepresentations and omissions. *See* ¶¶321-66, 559-604. Luckin does not dispute that most of these misstatements and omissions were misleading and material. Luckin raises defenses only against the claims based on material misstatements and omissions regarding (i) the Facility Agreement; (ii) Luckin's technology, business model, and costs; and (iii) Luckin's internal controls. LC Br. 23-30.

## 1.    Misstatements and Omissions Regarding the Facility Agreement

Luckin stated that it was not "***aware of any arrangement that may, at a subsequent date, result in a change of control of [the] company***." ¶¶599-601. Once Luckin spoke, it had "a duty to be both accurate and complete," which it violated. *Caiola*, 295 F.3d at 331. Luckin ***did*** know of such an arrangement. Under the Facility Agreement, Lu and Qian borrowed $518 million from the Underwriter Defendants, using artificially inflated Luckin stock as collateral. ¶¶154-58. The pledged shares risked liquidation if Luckin's ADS price declined at least 50%—a likely outcome if the fraud was revealed. ¶157. This is precisely what occurred. ¶¶202-03, 409.

Luckin's argument that its disclosures were sufficient fails. Even if, as Luckin contends, "[a]ny reasonable investor would have understood that only a significant loan amount would require a pledge of this size," LC Br. 24, Defendant ***disclaimed*** the existence of any agreement that may lead to a change in control, ¶599. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *16 (S.D.N.Y. July 10, 2019) (where a "purported 'disclosure' is accompanied by a corporate denial, it is no 'disclosure' at all"); *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251

---

[11] Defendant's cited cases are inapposite. The court in *ECA* found plaintiff's claims regarding defendants' integrity and risk management "too general to cause a reasonable investor to rely upon them." 553 F.3d at 205-06. Here, Luckin's statements concerned the core of its business and the reasons for its success, and investors clearly relied on them. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 n.43 (2d Cir. 2014), merely applies *ECA* to Securities Act claims, and Luckin does not explain how it applies to any of Defendant's statements.

28

(2d Cir. 2014) (disclosures must be read in context of "comforting statements in the prospectus").[12]

Luckin's argument that it did not know that Lu and Qian "would fail to meet their personal loan obligations," LC Br. 25-26, misses the point. It ignores the CAC's uncontested allegation that Luckin "misled investors by failing to disclose *the risk* that Lu's and Qian's control of the Company could be significantly reduced in the event of a decline in Luckin's ADS price." ¶600. Luckin's admissions establish its knowledge of this risk. Luckin concedes that Lu and Qian controlled 60% of Luckin's voting power, and that the shares they pledged "represented 30% and 47% of their total shares, respectively." LC Br. 24. Further, Luckin does not dispute its knowledge that at the time of the SPO, Lu and Qian were misstating Luckin's revenue and expenses, significantly inflating its ADS price. *Id.* at 2-3. Thus, contrary to its statements in the SPO F-1, Luckin knew that the Facility Agreement *could* lead to a change in control.[13]

Finally, Luckin incorrectly asserts that its Chairman and CEO losing control would not matter to investors because Lu and Qian engaged in fraud. LC Br. 26. The fraud was concealed at the time of the SPO, and materiality is assessed objectively based on the "'total mix' of information made available." *TSC Indus.*, 426 U.S. at 449. Defendant cannot establish that this information was "so obviously unimportant to a reasonable investor," *Ganino*, 228 F.3d at 162, particularly given the significant decline in Luckin's ADS price once the terms of the Facility Agreement were disclosed—after Lu and Qian were both implicated in the fraud. ¶¶202, 409. *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x 10, 16 (2d Cir. 2011).

---

[12] Defendant's cases are inapposite. Unlike Luckin's denial of the risk of a change in control, the defendants in *Proshares* warned that the ETFs at issue could "diverge significantly" from the underlying indices. 728 F.3d at 140. Defendant's other authorities simply confirm that a company must disclose information to prevent a filing from being "inaccurate, incomplete, or misleading." *Burekovitch v. Hertz*, 2001 WL 984942, at *9 (E.D.N.Y. July 24, 2001) (no duty to disclose share pledges absent "previous disclosure"); *In re Safeguard Scis.*, 2004 WL 2700291, at *4 (E.D. Pa. Nov. 18, 2004) (same).

[13] Luckin's related argument that the CAC fails to plead that "Luckin had knowledge of the terms of Lu's and Qian's personal loans," LC Br. 26 n.12, is specious. As Luckin notes, the SPO F-1 specifically references the "provisions" of "[t]he related facility agreements." *Id.* at 25 (quoting SPO F-1 at 52).

### 2.      Misstatements and Omissions Regarding Luckin's Costs, Business Model, and Efficiency

The SPO F-1 repeated Luckin's material misstatements about its "disruptive" business model and "technology-driven" efficiencies. ¶¶577-81. Defendant's puffery arguments fail for the reasons detailed above. *Supra* at 25-28. Additionally, the SPO F-1 stated that "[t]he growth of our operating expenses was in line with [our] business expansion," and Luckin's costs were "mainly driven by the increased economies of scale and our technology-driven operations." ¶¶284, 329-31, 567-69, 582-83. In truth, as Luckin has admitted, its expenses were fraudulently overstated by material amounts. ¶¶149, 330, 477. Mischaracterizing Luckin's increased expenses as a product of business growth rather than fraud misled investors. *Freudenberg*, 712 F. Supp. 2d at 191; *see also Caiola*, 295 F.3d at 331.

Contrary to Defendants' claim, LC Br. 30, these statements were not puffery. First, they were factual and "readily capable of verification." *Facebook, Inc., IPO*, 986 F. Supp. 2d at 465 & n.22. Credit Suisse said Luckin's business expense could be "easily verified by auditors or a third party" to defend Luckin against the Report. ¶528. Second, Luckin denied the Report's claims about "overstated advertising expenses," demonstrating their importance to investors. ¶164. Third, Luckin knew that its costs were in fact driven by fraud, which supports finding these statements actionable. *Supra* at 22-25.[14]

### 3.      Misstatements and Omissions Regarding Luckin's Internal Controls

The SPO F-1's statements about internal controls are also actionable. *Supra* at 22-25.

## VII.   CONCLUSION

The Court should deny Luckin's Motion to Dismiss.

---

[14] Defendants' cited cases are all inapposite as they involved general statements incapable of verification, and none involved the failure to disclose a known fraud. LC Br. 30 n.15.

Dated: January 22, 2021

Respectfully submitted,

*/s/ Salvatore J. Graziano*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

Salvatore J. Graziano
John Rizio-Hamilton
Jai Chandrasekhar
Kate W. Aufses
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
johnr@blbglaw.com
jai@blbglaw.com
kate.aufses@blbglaw.com

**KESSLER TOPAZ MELTZER
 & CHECK, LLP**

Sharan Nirmul
Gregory M. Castaldo
Richard A. Russo, Jr.
Lisa M. Port
Nathan A. Hasiuk
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
gcastaldo@ktmc.com
rrusso@ktmc.com
llambport@ktmc.com
nhasiuk@ktmc.com

*Counsel for Lead Plaintiffs Sjunde AP-Fonden
and Louisiana Sheriffs' Pension & Relief Fund
and Lead Counsel for the Putative Class*

## CERTIFICATE OF SERVICE

On January 22, 2021, I caused the foregoing document to be filed with the Clerk of Court

by using the Court's electronic filing system, which sent notice to all counsel of record.


/s/ Salvatore J. Graziano_____
Attorney for Lead Plaintiffs