**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE LUCKIN COFFEE INC. SECURITIES LITIGATION | Case No. 1:20-cv-01293-JPC-JLC<br><br>**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO UNDERWRITER DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   BACKGROUND ................................................................................................. 3

III.  ARGUMENT ..................................................................................................... 4

     A.    The Required Elements and Applicable Pleading Standards .............................................. 4

     B.    Plaintiffs' Securities Act Claims Do Not Sound In Fraud ................................................. 5

     C.    The Underwriter Defendants' Affirmative Defense of Due Diligence Cannot Be Considered At The Pleading Stage ................................................................................ 8

     D.    The Underwriter Defendants' Argument That "Reasonable Diligence" Could Not Have Uncovered The Ongoing Fraud At Luckin Prior To The IPO Fails ......................... 12

     E.    The Underwriter Defendants' Arguments Concerning The "Red Flags" Fail .................. 15

     F.    Defendants' Remaining Arguments Concerning The IPO F-1 Fail ................................. 18

     G.    The SPO F-1 Contained Material Misrepresentations And Omissions ........................... 23

     H.    The Complaint Alleges Actionable Misrepresentations Under Regulation S-K .............. 27

     I.    Plaintiffs Have "Class Standing" for Section 12 Claims Related to the IPO ................... 28

IV.   CONCLUSION .................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)......................................................................................4

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)............................................................................................4, 15

*In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*,
2012 WL 12893520 (C.D. Cal. Feb. 16, 2012)...................................................................12

*In re Citigroup, Inc. Bond Litig.*,
723 F. Supp. 2d 568 (S.D.N.Y. 2010)................................................................................5, 6

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
701 F. Supp. 2d 506 (S.D.N.Y. 2010)...................................................................................7

*In re Dynex Cap., Inc. Sec. Litig.*,
2006 WL 314524 (S.D.N.Y. Feb. 10, 2006).......................................................................30

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ................................................................................12

*Escott v. BarChris Const. Corp.*,
283 F. Supp. 643 (S.D.N.Y. 1968) .....................................................................................10

*In re Facebook, Inc., IPO, Sec. & Deriv. Litig.*,
2013 WL 11319408 (S.D.N.Y. Dec. 12, 2012) ..................................................................19

*FDIC v. Morgan Stanley Cap. I Inc.*,
2015 WL 1381875 (D. Colo. Mar. 24, 2015) .....................................................................12

*Fed. Deposit Ins. Corp. v. Chase Mortg. Fin. Corp.*,
2013 WL 5434633 (S.D.N.Y. Sept. 27, 2013).....................................................................12

*Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*,
68 F. Supp. 3d 439 (S.D.N.Y. 2014)......................................................................10, 23, 24

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017)...............................................................................................2, 14

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*,
858 F. Supp. 2d 306 (S.D.N.Y. 2012)....................................................................................9

*Feyko v. Yuhe Int'l, Inc.*,
2013 WL 3467067 (C.D. Cal. July 10, 2013).......................................................................12

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)..............................................................................4

*In re Fuwei Films Sec. Litig.*,
  634 F. Supp. 2d 419 (S.D.N.Y. 2009)..........................................................................5, 12

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
  95 F. Supp. 2d 169 (S.D.N.Y. 2000)...........................................................................7, 8

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983).................................................................................................5, 24

*Hevesi v. Citigroup Inc.*,
  366 F.3d 70 (2d Cir. 2004)............................................................................................30

*Hicks v. Morgan Stanley & Co.*,
  2003 WL 21672085 (S.D.N.Y. July 16, 2003) .............................................................30

*Holmes v. Baker*,
  166 F. Supp. 2d 1362 (S.D. Fla. 2001) ........................................................................12

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)............................................................................................28

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)...........................................................................12

*In re Lehman Brothers Sec. & ERISA Litig.*,
  684 F. Supp. 2d 485 (S.D.N.Y. 2010)........................................................................1, 12

*In re Lehman Brothers Sec. & ERISA Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011)............................................................................9

*Lin v. Interactive Brokers Grp., Inc.*,
  574 F. Supp. 2d 408 (S.D.N.Y. 2008)...........................................................................27

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011).......................................................................................4, 5

*Medina v. Tremor Video, Inc.*,
  640 F. App'x 45 (2d Cir. 2016) ....................................................................................28

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)..........................................................................................12

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145, 157 (2d Cir. 2012)........................................................................5, 12, 28

iii

*Oran v. Stafford*,
　226 F.3d 275 (3d Cir. 2000)..................................................................................19

*Panther Partners, Inc. v. Jianpu Tech. Inc.*,
　2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020).........................................................27

*Perry v. Duoyuan Printing, Inc.*,
　2013 WL 4505199 (S.D.N.Y. Aug. 22, 2013).........................................................17

*In re Prestige Brands Holdings, Inc.*,
　2006 WL 2147719 (S.D.N.Y. July 10, 2006) .........................................................12

*In re Refco, Inc. Sec. Litig.*,
　503 F. Supp. 2d 611 (S.D.N.Y. 2007)...................................................................5, 6

*Rieckborn v. Jefferies LLC*,
　81 F. Supp. 3d 902 (N.D. Cal. 2015) .....................................................................12

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
　351 F. Supp. 2d 334 (D. Md. 2004) ..................................................................17, 18

*SEC v. China N.E. Petroleum Holdings Ltd.*,
　27 F. Supp. 3d 379 (S.D.N.Y. 2014)......................................................................21

*Singh v. Schikan*,
　106 F. Supp. 3d 439 (S.D.N.Y. 2015).....................................................................27

*In re Snap Inc. Sec. Litig.*,
　2018 WL 2972528 (C.D. Cal. June 7, 2018) .........................................................22

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
　547 F.3d 406 (2d Cir. 2008)...................................................................................10

*In re Suprema Specialties, Inc., Sec. Litig.*,
　438 F.3d 256 (3d Cir. 2006)................................................................................5, 8

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*,
　202 F. Supp. 2d 8 (S.D.N.Y. 2001) .....................................................................9, 10

*In re Wachovia Equity Sec. Litig.*,
　753 F. Supp. 2d 326 (S.D.N.Y. 2011).....................................................................12

*In re WorldCom, Inc. Sec. Litig.*,
　294 F. Supp. 2d 392 (S.D.N.Y. 2003)........................................................................5

*In re WorldCom, Inc. Sec. Litig.*,
　346 F. Supp. 2d 628 (S.D.N.Y. 2004).............................................................. passim

*In re WorldSpace Sec. Litig.*,
  2008 WL 2856519 (S.D.N.Y. July 21, 2008) ..........................................................................7

*In re Ziff-Davis, Inc.*,
  2000 WL 877006 (S.D.N.Y. June 30, 2000) ..........................................................................22

**STATUTES**

15 U.S.C. § 77k(b)(3)(A) ..........................................................................................................9

Lead Plaintiffs Sjunde AP-Fonden and Louisiana Sheriffs' Pension & Relief Fund (together, "Lead Plaintiffs") submit this Memorandum of Law in Opposition to the Underwriter Defendants' Motion to Dismiss.[1]

## I.    PRELIMINARY STATEMENT

The Underwriter Defendants' main argument is that the Court should conclude—as a matter of law at the pleading stage—that no amount of reasonable due diligence possibly could have uncovered one of the largest, most audacious, and widespread frauds in recent financial history. As detailed herein, this argument fails for many reasons. To start, under the Securities Act, "due diligence" is an affirmative, fact-based defense on which the Underwriter Defendants bear the burden of proof. To carry that burden, they must adduce detailed fact and expert evidence proving, *inter alia*, what diligence was reasonable under the circumstances; exactly what diligence they in fact conducted; what diligence they did not conduct and why that failure was justified; what they learned during their diligence; and how they reacted to that information. Given the highly fact-intensive nature of this affirmative defense, courts widely hold that it cannot be entertained at the pleading stage. *See, e.g.*, *In re Lehman Brothers Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 494 (S.D.N.Y. 2010), *aff'd*, *In re Lehman Brothers Mortg.-Backed Sec. Litig.*, 650 F.3d 167 (2d Cir. 2011) (due diligence defense is "an issue inappropriate for consideration on a motion to dismiss") and authorities cited *infra*. The Underwriter Defendants have not offered a shred of evidence on any of the issues noted above. The Court cannot possibly conclude, as a matter of law, that their affirmative defense bars Lead Plaintiffs' Securities Act claims at the

---

[1] Unless otherwise noted, citations to "¶__" are to the Consolidated Class Action Complaint ("CAC" or "Complaint"); capitalized terms have the same meanings ascribed to them in the Complaint; internal quotation marks, citations and alterations are omitted in quotations; and emphasis is added in quotations.

pleading stage. This argument should be reserved for the jury, or, at the earliest, considered at summary judgment.

Further, even if the Court could consider this affirmative defense now, the facts show that the Underwriter Defendants' due diligence was essentially nonexistent or, at best, pitifully deficient. The Underwriter Defendants had a duty to "verify[] the accuracy and completeness of information provided to potential investors." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 131 (2d Cir. 2017). As detailed in the CAC, and contrary to what the Underwriter Defendants assert, the fraud at Luckin began in April 2019, ***before*** the Company's May 17, 2019 IPO. During 2Q2019—the quarter during which the IPO occurred—Luckin overstated its net revenues by 40.3%, demonstrating that the fraud was already of significant magnitude precisely at the time when the Underwriter Defendants were supposed to be "diligencing" Luckin's business. Moreover, prior to the IPO, no fewer than 12 red flags indicated that Luckin's business deserved heightened scrutiny—including discrepancies between the number of coffees that Luckin claimed to sell and the number of coffee cups taken out of inventory, as well as an extensive web of related-party transactions. The Underwriter Defendants apparently ignored these red flags in a rush to take Luckin public and collect tens of millions of dollars in fees.

With the Underwriter Defendants obliviously sitting on the sideline, the fraud continued unabated through Luckin's January 2020 SPO. By that time, Luckin's most senior officers and dozens of other employees had exploited fraudulent transactions with more than 40 related entities to artificially inflate Luckin's revenues by nearly 90% for 3Q2019—facts that the Underwriter Defendants could have uncovered with anything remotely approaching reasonable diligence. In fact, just weeks after the SPO, an outside investor publicly accused Luckin of fraud based on information it had gathered without access to Luckin's books or executives—access that the

Underwriter Defendants enjoyed but apparently made no use of. Stunningly, in response to these accusations, the Underwriter Defendants attacked the reports of fraud and defended Luckin's business as legitimate—demonstrating that the Underwriter Defendants completely lacked any understanding of Luckin while they repeatedly hyped its shares to the unsuspecting public.

In sum, the CAC's allegations strongly suggest that the Underwriter Defendants conducted no meaningful diligence on Luckin's business. As a result, it is inconceivable that their "due diligence" affirmative defense could be accepted as a matter of law at the pleading stage, before any discovery into the matter has occurred. The Court should entirely deny the Underwriter Defendants' motion to dismiss.

## II.    BACKGROUND

A description of Luckin's misconduct is set forth in the CAC and in Lead Plaintiffs' Memorandum of Law in Opposition to Luckin Coffee Inc.'s Motion to Dismiss ("Lead Plaintiffs' Opposition to Luckin's Motion"), which Lead Plaintiffs incorporate here. As to the Underwriter Defendants, Plaintiffs have asserted strict-liability and negligence claims under Sections 11 and 12(a)(2) of the Securities Act stemming from Luckin's IPO and SPO. ¶435. Plaintiffs base their claims against the Underwriter Defendants on their negligence alone—specifically, their failure to conduct a reasonable due-diligence investigation into the accuracy and completeness of the statements in Luckin's IPO and SPO Registration Statements (the "IPO F-1" and "SPO F-1," respectively). ¶¶435, 439, 493-94, 519-20, 612.

Specifically, as detailed in the CAC, the Underwriter Defendants negligently disregarded numerous red flags that were present at the time of Luckin's IPO and that, if investigated, would have revealed the false and misleading statements contained in Luckin's offering documents. ¶¶493-528. But in their rush to bring Luckin to market and collect their multimillion dollar fees, the Underwriter Defendants negligently failed to conduct the level of reasonable due diligence that

3

is required of them—and which investors rely on them to undertake. The Underwriter Defendants ignored the same red flags in connection with the SPO regarding Luckin's business structure and operating model, internal controls over financial reporting, and related-party transactions that existed at the time of the IPO, as well as additional red flags, which, had they conducted reasonable due diligence, should have put them on notice that Luckin's financial statements throughout 2019 were materially misstated. Further underscoring the Underwriter Defendants' negligence, a third party (Muddy Waters) uncovered evidence of a massive fraud at Luckin without any of the access to Luckin's management and records that the Underwriter Defendants enjoyed. Had the Underwriter Defendants not acted negligently, and had they conducted reasonable due diligence before the offerings, they would have uncovered that the IPO F-1 and SPO F-1 contained untrue statements of fact and omitted other material facts.

## III.    ARGUMENT

### A.    The Required Elements and Applicable Pleading Standards

"To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a plaintiff's complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 724 (S.D.N.Y. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *see also Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010).

Sections 11 and 12(a)(2) of the Securities Act allow a plaintiff to recover damages resulting from untrue statements made in connection with the offering and registration of securities. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). The required elements of these

claims impose "a relatively minimal burden": a Securities Act plaintiff "need only show a material misstatement or omission to establish his *prima facie* case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Plaintiffs need not allege scienter, reliance, or causation under Sections 11 and 12(a)(2). *See In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 434 (S.D.N.Y. 2009). Given these minimal elements, Section 11 operates as a "virtually absolute liability provision." *In re Suprema Specialties, Inc., Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006).

Further, because fraud is not an element of Section 11 or 12(a)(2) claims, Plaintiffs must satisfy only the "short and plain statement requirements" of Federal Rule of Civil Procedure 8. *Litwin*, 634 F.3d at 715; *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 406 (S.D.N.Y. 2003). "Nor do the heightened pleading standards of the Private Securities Litigation Reform Act apply to such non-fraud claims." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 157 (2d Cir. 2012). As explained below, Plaintiffs have fulfilled their "relatively minimal burden" under these standards. *Herman & MacLean*, 459 U.S. at 382.

### B.    Plaintiffs' Securities Act Claims Do Not Sound In Fraud

The Underwriter Defendants assert that Plaintiffs' Section 11 and 12(a)(2) claims sound in fraud because they are "premised on the same fraudulent scheme that underpins their Section 10 fraud claims." Mem. of Law in Supp. of Underwriter Defs.' Mot. to Dismiss the Consol. Class Action Compl. ("UW Br.") 7. Thus, the Underwriter Defendants argue, Plaintiffs must satisfy the more stringent pleading standards of Rule 9(b) and the PSLRA. *Id*. at 6-7. This argument fails.

Where Section 11 claims are contained in the same complaint as Section 10(b) fraud claims, the Court must examine the "gravamen" of each set of claims to determine which are fraud-based and which are negligence-based. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 631-32 (S.D.N.Y. 2007). As the court held in *In re Citigroup, Inc. Bond Litig.*, 723 F. Supp. 2d 568 (S.D.N.Y. 2010):

5

> A court must closely scrutinize the pleadings in their entirety so as to determine whether the claims sound in negligence or in fraud. Here, when considered as a whole, the gravamen of plaintiff's complaint is not fraud but is instead carefully structured so as to sound in negligence.

*Id.* at 586

Here, as in *Refco* and *Citigroup*, the "gravamen" of Plaintiffs' Securities Act claims against the Underwriter Defendants is negligence—not fraud. *Id*. As in *Refco*, the Complaint is carefully structured as, essentially, two separate complaints to clearly distinguish between Plaintiffs' negligence claims and fraud claims. *Refco*, 503 F. Supp. 2d at 632; *compare* Compl. §§IV-XII *with* §§XIII-XIV. Plaintiffs have identified the Defendants for the two sets of claims distinctly from one another. *Refco*, 503 F. Supp. 2d at 632; ¶40 (defining "Exchange Act Defendants"); ¶436 (alleging against whom Securities Act claims are asserted). The factual allegations relevant to Plaintiffs' Securities Act claims (¶¶441-532) are pleaded separately from those underpinning the Exchange Act claims (¶¶61-213). *Refco*, 503 F. Supp. 2d at 632. The Securities Act section of the Complaint also alleges false and misleading statements and omissions in the IPO F-1 and SPO F-1 alone (¶¶533-604), whereas the Exchange Act section of the Complaint alleges false and misleading statements and omissions not only in the IPO and SPO F-1s, but also on Company conference calls, in the Company's reported financial results, and in other public statements by the Company (¶¶244-371). *Refco*, 503 F. Supp. 2d at 632.

"As to the defendants' intent . . . [the Securities Act] claims are carefully couched in the language of negligence." *Id.* For example, Plaintiffs allege, "The Securities Act claims against the Underwriter Defendants and the Director Defendants are premised upon their negligent failure to conduct a reasonable due-diligence investigation into the accuracy and completeness of the representations contained in the IPO and SPO Registration Statements." ¶439; *see also* ¶493 (again specifying that negligence is the basis of the claims).

Plaintiffs expressly disclaim any allegations of fraud or scienter for these strict liability and negligence claims. ¶¶435-40; *see also* Compl. Counts III-IV. All of Plaintiffs' allegations of fraud and scienter are separately pleaded in the Exchange Act section of the Complaint. To the extent Plaintiffs' Securities Act allegations reference Luckin's fabrication of revenue and expenses, such allegations attribute that fraud solely to ***Luckin and its executives***—not to the Underwriter Defendants. *Compare* ¶¶474-87 (detailing Luckin Defendants' material inflation of revenue and expenses) *with* ¶¶493-528 (detailing the Underwriter Defendants' negligent due diligence).

In sum, Plaintiffs' claims against the Underwriter Defendants are classic negligence claims under the Securities Act, and they do not sound in fraud. As such, Plaintiffs are not required to plead their Securities Act claims against the Underwriter Defendants with particularity. *See In re WorldSpace Sec. Litig.*, 2008 WL 2856519, at *5 (S.D.N.Y. July 21, 2008) (claims did not sound in fraud where plaintiff alleged that defendants had a "duty to make a reasonable and diligent investigation of the statements contained in the [offering materials]," which were "negligently prepared," "resulting in alleged material misstatements and omissions"); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 513 (S.D.N.Y. 2010) ("Because the CAC carefully avoids allegations that the underwriters sought to hide unpleasant facts from the market in order to render the offering more successful, the Court concludes that the allegations against the underwriters sound in negligence and are not governed by Rule 9(b).").

Moreover, even if the Court determines that Plaintiffs' Securities Act claims must meet the heightened pleading standards of Rule 9(b) and the PSLRA, the Complaint satisfies those standards. Rule 9(b) requires only that the Complaint specify the false statements and omissions by pleading "who, what, where, when and why"—akin to the first line of a newspaper story. *See Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 174 (S.D.N.Y.

2000) ("no lack of specificity in plaintiff's allegations" where "[t]he 'who, what, where, when and why' all are set forth with abundant clarity"); *see also Suprema Specialties*, 438 F.3d at 277. The Complaint easily meets this threshold. Indeed, Luckin has ***admitted*** that many of the alleged misstatements—including Luckin's financial results for the second, third, and fourth quarters of 2019—were false when made. As to those statements that Luckin has not admitted were false, the Complaint pleads them adequately, providing the requisite "who, what, where, when, and why" for all of the alleged misstatements and omissions.

### C.    The Underwriter Defendants' Affirmative Defense of Due Diligence Cannot Be Considered At The Pleading Stage

As set forth more fully in the CAC and Lead Plaintiffs' Opposition to Luckin's Motion, Luckin's IPO F-1 was materially untrue and misleading because it: (i) failed to disclose subsequent events in violation of GAAP (¶¶533-36); (ii) misrepresented Luckin's compliance with laws, regulations, and GAAP, and the measures that Luckin was taking to remediate material weaknesses in its internal controls over financial reporting (¶¶537-42); (iii) made misleading statements about the risk that short sellers could accuse the Company of fraud (¶¶543-44); (iv) contained material misrepresentations and omissions concerning Luckin's business model and the reasons for Luckin's increased earnings and growth (¶¶545-49); (v) contained material misstatements and omissions regarding Luckin's use of coupons and vouchers (¶¶550-51); (vi) contained misstatements and omissions regarding Luckin's related-party transactions (¶¶552-54); (vii) misleadingly attributed Luckin's reduced growth in the 1Q2019 to seasonal factors (¶¶555-58); and (viii) omitted the information required under Items 101, 303, and 503 (¶¶601-04). To the extent that the Underwriter Defendants assert that these misstatements and omissions are not adequately pleaded, those arguments overlap with the Luckin Defendants' essentially identical arguments, and are addressed fully in Lead Plaintiffs' Opposition to Luckin's Motion.

The Underwriter Defendants' main argument is that they cannot be liable for any of the alleged misstatements and omissions because "[t]here is simply no basis to allege that reasonable diligence by the Underwriters could have uncovered the alleged fraud at Luckin prior to the IPO." UW Br. 8. This argument fails for the primary reason that the Underwriter Defendants are attempting to mount an affirmative due diligence defense, which is premature at the pleading stage.

Section 11 of the Securities Act offers the affirmative defense known as the "due diligence defense" to all defendants other than the issuer of the securities, including underwriters. The defense provides that "as regards any part of the registration statement not purporting to be made on the authority of an expert," a defendant will not be liable upon a showing that "he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3)(A). This defense imposes a negligence standard. *See In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004).

As is true of all affirmative defenses, the defendants asserting a due diligence defense under Section 11 bear the burden of ***proving*** their due diligence based on ***evidence***. *Id*. at 683*; see also Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 329 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013); *In re Lehman Brothers Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 317 (S.D.N.Y. 2011) ("In order to establish the due diligence defense, each defendant has the burden to prove that 'after reasonable investigation, [he or she had] reasonable ground to believe and did believe' that the Offering Materials were true and did not contain any material misstatements or omissions.") (quoting 15 U.S.C. § 77k(b)(3)(A)); *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*,

9

202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001); *Escott v. BarChris Const. Corp.*, 283 F. Supp. 643, 683 (S.D.N.Y. 1968).

The due diligence defense cannot be used to obtain dismissal of Securities Act claims at the pleading stage because it "requires an exquisitely fact intensive inquiry into all of the circumstances surrounding the facts upon which the Section 11 claim is premised." *Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc*., 68 F. Supp. 3d 439, 466 (S.D.N.Y. 2014), *aff'd*, 873 F.3d 85 (2d Cir. 2017) (quoting *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 638268, at \*11 (S.D.N.Y. Mar. 21, 2005)). "Such questions of reasonableness are mixed questions of law and fact that are often reserved for the trier of fact." *Id.* The due diligence defense is thus singularly inappropriate for resolution at the pleading stage because affirmative defenses must be "clear from the face of the complaint, and matters of which the court may take judicial notice." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

Given the "exquisitely fact intensive inquiry" that the due diligence defense requires, an underwriter must put forth both fact and expert evidence, at the conclusion of discovery, regarding what level of diligence is considered reasonable under the circumstances of the particular offerings at issue and in light of any then-existing red flags; what investigation they actually conducted; what investigation they did not conduct and why that failure was reasonable; what they found during their investigation; and how they responded to what they found. *See WorldCom*, 346 F. Supp. 2d at 674-78.

Thus, courts may only consider the due diligence defense at summary judgment or at trial, when they are presented with fact and expert evidence on all of the issues noted above. For example, in *WorldCom*, Judge Cote surveyed the summary judgment case law concerning the due

diligence defense and described the kind of extensive evidentiary showings it requires. *See id.* at

676. For example, Judge Cote noted that in *Weinberger v. Jackson*,

> The underwriters had over twenty meetings with various management personnel, covering all aspects of the company's business. Company personnel were specifically questioned about the development and scheduled availability of products, related operating systems and applications software. The underwriters also contacted many of [the issuer's] suppliers, customers, and distributors, who were asked extensive questions about the company's operations. The underwriters reviewed company documents including operating plans, product literature, corporate records, financial statements, cont[r]acts, and lists of distributors and customers. They examined trade journals and other industry-related publications to ascertain industry trends, market trends and competitive information.... When any negative or questionable information was developed as a result of their investigation, the underwriters discussed it with the appropriate persons and arrived at informed decisions and opinions.

*Id.* (quoting *Weinberger v. Jackson*, 1990 WL 260676, at *3 (N.D. Cal. Oct. 11, 1990)) (alterations

in original).

Judge Cote also described that in *In re International Rectifier Securities Litigation*, the

underwriters' diligence included:

> [A] review of the issuer's internal financial forecasts, contracts, and other important documents; interviews of the issuer's major customers, outside quality consultants, attorneys, auditor, and nearly a dozen of the issuer's managers; written verification from the issuer's management that the information in the prospectus was correct; and a cold comfort letter from the issuer's outside accountants indicating that there had been no material changes in the issuer's financial position since its last audit.

*Id.* at 677 (quoting *In re Int'l Rectifier Sec. Litig.*, 1997 WL 529600, at *3 (C.D. Cal. Mar. 31,

1997)).

As these examples make plain, the Underwriter Defendants face an enormous burden in

asserting the affirmative defense of due diligence, one they can satisfy only by marshalling very

detailed fact and expert evidence. For this reason, courts are clear that any purported factfinding

of this nature is inappropriate and premature at the motion to dismiss stage. *See WorldCom*, 346

F. Supp. 2d at 677 ("[C]ourts have continued to insist that underwriters demonstrate that they have

11

conducted a meaningful investigation *before granting summary judgment*."); *NECA-IBEW Health*, 693 F.3d at 157 n.8  (because defendants bear the burden of proving affirmative defenses under Section 11, they are "unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)"); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 n.7 (2d Cir. 2010) (same); *Fed. Deposit Ins. Corp. v. Chase Mortg. Fin. Corp.*, 2013 WL 5434633, at *9 (S.D.N.Y. Sept. 27, 2013) (resolution of due diligence defense not appropriate on motion to dismiss); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 379 (S.D.N.Y. 2011) (same); *Lehman Brothers*, 684 F. Supp. 2d at 494 (due diligence defense is "an issue inappropriate for consideration on a motion to dismiss"); *Fuwei Films*, 634 F. Supp. 2d at 419 n.10 ("Defendants may, *on a motion for summary judgment*, avail themselves of the various 'due diligence' or 'reasonable care' affirmative defenses provided  for  by sections 11 and  12(a)(2)"); *In re Prestige Brands Holdings, Inc.*, 2006 WL 2147719, at *9 (S.D.N.Y. July 10, 2006) (refusing to take a position on the merits of underwriters' due diligence defense at motion to dismiss); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 296 (S.D.N.Y. 2003) ("[C]ertain defendants may raise their due diligence as an affirmative defense *at trial*.").[2] The Underwriter Defendants' attempt to circumvent clear legal precedent, and the Federal Rules of Civil Procedure, should be rejected.

### D. The Underwriter Defendants' Argument That "Reasonable Diligence" Could Not Have Uncovered The Ongoing Fraud At Luckin Prior To The IPO Fails

Even if the Court were to consider the adequacy of the Underwriter Defendants' due diligence at this stage, there is no basis whatsoever for the Court to conclude—as a matter of law— that no amount of "reasonable diligence" could have uncovered the ongoing fraud at Luckin prior

---

[2] *See also Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 914 (N.D. Cal. 2015); *FDIC v. Morgan Stanley Cap. I Inc.*, 2015 WL 1381875, at *8 (D. Colo. Mar. 24, 2015); *Feyko v. Yuhe Int'l, Inc.*, 2013 WL 3467067, at *4 (C.D. Cal. July 10, 2013); *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, 2012 WL 12893520, at *6 (C.D. Cal. Feb. 16, 2012); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 639 (S.D. Tex. 2003); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1372-73 (S.D. Fla. 2001) ("due diligence defense is beyond the four corners of the complaint and cannot be resolved at the motion to dismiss stage of the proceeding").

to the IPO. First, the Complaint adequately alleges that the fraud at Luckin existed at least a month prior to its IPO, and the Company has admitted as much. ¶474 (quoting July 2020 press release that includes admission that, "***the fabrication of transactions began in April 2019***."); *see also* ¶¶ 493, 540, 591, 593, 595, 601. The Company has also admitted that, during 2Q2019, when the IPO occurred, it overstated its net revenues by 40.3%, having reported RMB870 million (US$122.8 million) in net revenue compared to its actual net revenue of RMB620 million (US$87.5 million). Thus, at the time of the IPO, the fraud was already of a significant magnitude. ¶474.

Second, had the Underwriter Defendants conducted "reasonable diligence" in response to the red flags that Plaintiffs enumerate in the Complaint, they would have discovered the ongoing fraud. The Complaint alleges the following red flags were present at Luckin prior to the Company's IPO, which should have triggered the Underwriter Defendants' investigation into potential fraud at the Company (¶¶493-94, 519), but in response to which the Underwriter Defendants negligently failed to take action:

- Luckin's extremely limited financial history, having been founded in June 2017, and the material weaknesses in Luckin's internal controls over financial reporting identified by its auditor, E&Y Hua Ming (¶¶495-96);

- The well-recognized risk of financial misstatements among companies in emerging markets such as China, including warnings issued by the Public Companies Accounting Oversight Board, the SEC, and the U.S. Department of State; the Underwriter Defendants' own experience with fraud among Chinese entities seeking to conduct public offerings; and Luckin's CFO, Defendant Schakel's outsider-status and lack of familiarity with Chinese languages (¶¶497-502);

- The close association of certain Underwriter Defendants, including Credit Suisse and Morgan Stanley, with Luckin and its directors and officers, including Defendants Lu and Schakel (¶¶503-05);

- The risks inherent in Luckin's business model, which prioritized growth over operating profit, and Luckin's historical reliance on private fundraising to finance its operations (¶506);

- The decline of Luckin's supposedly exponential growth at the time of its IPO, which Luckin attributed to the Chinese New Year (¶¶507-08);

13

- Reports that employees of the Underwriter Defendants uncovered, but negligently overlooked, evidence that "there were discrepancies between the number of coffees that the company claimed to be selling and the number of coffee cups that were being taken out of inventory," "concerns [that] were flagged to senior management [of the Underwriter Defendants] but were not seen as significant" (¶509);

- Luckin's extensive reliance on promotional coupons and payment vouchers, which presented a well-recognized risk of fraud and should have alerted the Underwriter Defendants to the possibility that Luckin was utilizing transactions based on coupons and vouchers to engage in fraudulent financial reporting (¶¶510-11);

- Luckin's introduction, in 2Q2019, of an "update" to its ordering system that allowed for non-sequential receipts and which, in turn, allowed Luckin to "increase the number of cups [of coffee] recorded as sold" and allowed for inflated sales (¶512);

- Luckin's complicated business structure, which comprised more than 61 subsidiaries and affiliates, including entities registered in the Cayman Islands, British Virgin Islands, Hong Kong, and mainland China (¶513);

- Luckin's extensive related-party transactions, including its relationships with third parties affiliated with or controlled by Defendant Lu (¶¶514-15);

- Defendant Lu's demand that certain Underwriter Defendants, including Credit Suisse, Morgan Stanley, CICC, and Haitong, enter into the highly unusual $518 million Margin Loan Facility with Defendants Lu and Qian (¶¶516-17); and

- A Luckin senior executive officer's conviction and imprisonment for violations of Chinese advertising laws while managing a related entity that conducted business with Luckin (¶518).

Underwriters of public offerings are tasked with "the primary responsibility for verifying the accuracy and completeness of information provided to potential investors," *Nomura*, 873 F.3d at 131, and function as the "first line of defense with respect to material misrepresentations and omissions in offering documents," *WorldCom*, 346 F. Supp. 2d at 662. And here, the Underwriter Defendants concede that they are required to conduct "reasonable"—though "not perfect"— diligence. UW Br. 6 ("Underwriters are thus subject to the 'standard of reasonableness . . . required of a prudent man in the management of his own property.'"). In this case, however, in response to the red flags enumerated above, the Underwriter Defendants appear to have conducted no

14

meaningful investigation whatsoever. That cannot be the standard of care that underwriters of public offerings are required to undertake.

Moreover, additional facts reveal the utter lack of diligence—let alone "reasonable" diligence—that the Underwriter Defendants took in preparing for Luckin's IPO. For instance, the fabricated transactions that underpinned Luckin's fraud were undertaken via numerous related-party transactions involving Luckin's highest-ranking executives. ¶¶552-54. Any "reasonable" due diligence on the part of the Underwriter Defendants would have included an examination of these highly suspicious related-party transactions. ¶¶514-15. Furthermore, the author of the Anonymous Report (the "Report")—a third party, entirely unrelated to Luckin, the Underwriter Defendants, or the IPO itself—was able to uncover evidence suggesting Luckin's financial results were inflated without access to Luckin's management or internal documents. Unlike the Report's authors, the Underwriter Defendants had access to Luckin's management and documents, but negligently made no use of it. ¶¶525-26.

In sum, the Underwriter Defendants ask the Court to ignore all these well-pled allegations and conclude as a matter of law that the Underwriter Defendants' investigation was reasonable and legally sufficient—before they have put forth a *shred* of evidence as to what their investigation included or excluded; why it was reasonable under the circumstances; what they discovered; and how they responded to that information. This is exactly the opposite of what the Court may do at this stage, when the Complaint's allegations are accepted as true and Plaintiffs—not Defendants—get the benefit of inferences. *See Chambers*, 282 F.3d at 152. At a minimum, the Underwriter Defendants' due diligence defense raises fact issues that cannot be resolved at this stage.

## E.    The Underwriter Defendants' Arguments Concerning The "Red Flags" Fail

The Underwriter Defendants incorrectly argue that Plaintiffs cannot premise their Securities Act claims on the alleged "red flags" because they "improperly . . . impose liability

15

under [sic] the Underwriters for failing to predict the future." UW Br. 18-19. Broadly, the Underwriter Defendants argue that the "red flags" cannot support Plaintiffs' claims because they (i) could not have alerted the Underwriter Defendants to the existence of the fraud before the IPO (*id*. at 19-20); (ii) were disclosed (*id*. at 21-22); or (iii) with respect to the Margin Loan Facility, revealed that the Underwriter Defendants investigated Luckin's business and were satisfied enough to invest in it (*id*. at 20). None of these arguments warrants dismissal.

The Underwriter Defendants contend that they "simply could not have identified any fraud before the IPO." *Id.* at 19. However, they admit that the IPO occurred "weeks *after* Plaintiffs allege that the fraud began" (*id*.), and the Complaint clearly alleges that serious "red flags" existed *prior to* the IPO that the Underwriter Defendants should have investigated in the course of reasonable due diligence. For instance, the Complaint alleges that Luckin's extremely limited history of financial results (having been founded barely two years before the IPO)—combined with the fact that its outside auditor E&Y Hua Ming had identified several material weaknesses in Luckin's internal controls over its financial reporting in its audit of Luckin's *2018* financial results—should have triggered significant diligence by the Underwriter Defendants. ¶¶495-96.

Further, the Complaint alleges that there is a well-recognized increased risk of financial misstatements among companies in emerging markets like China, and that the SEC, PCAOB, and State Department have warned of this risk. ¶¶497-98. Plaintiffs further allege that the Underwriter Defendants themselves had firsthand experience with Chinese companies that were engaged in fraud and attempting to conduct public offerings. ¶¶499-500. And the simple fact that Luckin's CFO, Defendant Schakel, is not a native of China and, apparently, speaks no Chinese—yet was expected to oversee the financial operations, results, and reporting of a complex Chinese

company—would have raised alarm bells if the Underwriter Defendants had been engaged in reasonable diligence. ¶¶501-02.

The Complaint also alleges red flags that were more specific to Luckin—including the inherent risks of its business model and practices (¶506), its reliance on coupons and vouchers (¶¶510-12), its declining growth prior to the IPO (¶¶507-08), its complicated corporate structure (¶513), and its myriad of related-party transactions (¶¶514-15)—that should have also triggered an investigation. Setting aside the fact that the Company has since admitted that the fraud began a month before the IPO, the red flags alleged in the Complaint clearly existed prior to the IPO.

The fact that many of the red flags were disclosed (UW Br. 21-22) misses the point, and also undermines the Underwriter Defendants' argument. Even if certain red flags were disclosed to investors, Luckin's fraud was not. As such, Luckin's investors were forced to rely on the Underwriter Defendants' diligence of the Company's statements, which the Underwriter Defendants appear to have inappropriately taken at face value. Further, if anything, the fact that these red flags were disclosed (and therefore unquestionably known by the Underwriter Defendants) should have triggered deeper diligence by the Underwriter Defendants—which it evidently did not. Instead, the Underwriter Defendants' failure to conduct the requisite level of due diligence in response to the known red flags led to the issuance of offering materials that contained untrue statements of fact and omitted material facts.

Defendants' cited cases do not help them. In *Perry v. Duoyuan Printing, Inc.*, 2013 WL 4505199, at *8 (S.D.N.Y. Aug. 22, 2013) (UW Br. 21-22), the court held that the single red flag of a "highly-complex ownership structure" is not dispositive; here, by contrast, Plaintiffs allege the existence of 12 pre-IPO red flags—all of which were available for the Underwriter Defendants to discover with minimal diligence. The holding in *In re Royal Ahold N.V. Sec. & ERISA Litig.*,

351 F. Supp. 2d 334, 388 (D. Md. 2004) (UW Br. 22) that "aggressive growth strategies" are "not uncommon" similarly misses the mark. Plaintiffs do not fault Luckin for pursuing an aggressive growth strategy—they seek to hold the Underwriter Defendants liable for negligently failing to investigate, prior to Luckin's IPO, what lay beneath that strategy.

## F.    Defendants' Remaining Arguments Concerning The IPO F-1 Fail

First, the Underwriter Defendants argue that "there is no allegation that there were any falsehoods in the IPO Financial Statements." UW Br. 11. The Complaint clearly alleges, however, that the IPO F-1 contained numerous untrue statements of material fact and material omissions, and the Underwriter Defendants were responsible for all of them. ¶¶533-58. The Underwriter Defendants contend that Plaintiffs cannot base a claim on "alleged omissions in the 'subsequent events' discussed in the notes to the financial statements" because they are "attempting to hold the Underwriters responsible for events that had either not yet occurred or could not have been tracked or analyzed by the Underwriters prior to the IPO." UW Br. 11-12. As the Complaint makes clear, however, the "subsequent events" that Defendants failed to disclose in the financial statements concerned a fraud that existed at the time of the IPO and was of such egregious nature and magnitude that it should have been disclosed to render the financial statements not misleading. ¶¶533-36. Contrary to the cases cited by the Underwriter Defendants, which assert that Securities Act liability cannot be based on facts not known at the time of the registration statement (UW Br. 11-12), the Complaint alleges that the subsequent events that should have been disclosed were indeed known prior to the IPO: Luckin has since admitted that it began fabricating transactions at least a month before the IPO. ¶474; *see* Lead Plaintiffs' Opposition to Luckin's Motion at 5.

The Underwriter Defendants next set up the strawman argument that "there is no general duty to disclose mid-quarter financial results or updates on metrics." UW Br. 12. This is irrelevant. Plaintiffs do not challenge the Underwriter Defendants' failure to disclose mid-quarter results;

they challenge their non-disclosure of the fraud ongoing at Luckin during its IPO, which was conducted pursuant to a false and misleading F-1. But even if Plaintiffs were seeking disclosure of mid-quarter results, the Underwriter Defendants concede that "[i]ntra-quarter intervening events may trigger a non-issuer's duty to disclose [] if it has reason to believe that there may have been material developments based on currently available information." *Id.* at 13 n.12.

The Underwriter Defendants' cited exception applies here. Had the Underwriter Defendants undertaken the "reasonable" diligence required by the securities laws, they would have had "reason to believe" that "material developments"—i.e., a fraud of extraordinary magnitude—had emerged that required disclosing. *See, e.g.*, *In re Facebook, Inc., IPO, Sec. & Deriv. Litig.*, 2013 WL 11319408, at *23 (S.D.N.Y. Dec. 12, 2012) (once "inadequacies and flaws" in an upcoming IPO became apparent, rendering prior statements materially misleading, defendant had a duty to correct prior statements) (citing *Oran v. Stafford,* 226 F.3d 275, 286 (3d Cir. 2000) (a duty to disclose arises when prior statements "become misleading when viewed in the context of subsequent events")).

The Underwriter Defendants next argue that they could justifiably rely on Luckin's financial statements because "they are considered 'expertised' under the securities laws." UW Br. 14; *see also id.* at 24-26. But not *all* of the financial statements incorporated in the IPO F-1 were audited, including the "unaudited operating data and quarterly financial data for the four quarters of 2018 and three months ended March 31, 2019." ¶533. The Underwriter Defendants are wrong to suggest that an "expertised" defense applies to such unaudited financial statements (UW Br. 14); it does not. As the Court held in *WorldCom*, "[U]nderwriters remain responsible for unaudited interim financial information as in the case of other non-expertised information." 346 F. Supp. 2d at 666.

19

Moreover, in the very next sentence of their brief, the Underwriter Defendants concede that their responsibility is not merely to rely blindly on the expertise of others—it is "to conduct a reasonable investigation." UW Br. 14. (citing *WorldCom*, 346 F. Supp. 2d at 684). The Underwriter Defendants further concede that they "must rely to some degree on reviewing the auditor's and company's work to determine if there are areas ripe for further investigation." *Id.* at 26. The Complaint clearly alleges that they did no such "reasonable investigation" here, and negligently failed to probe the "areas ripe for further investigation." *Id*. at 14, 29.

The Underwriter Defendants next argue that, because Luckin's F-1 "sufficiently disclosed the then-current weaknesses of [Luckin's] internal controls and the risk that Luckin may not be able to remedy those weaknesses," Plaintiffs' allegations are "an improper claim of fraud by hindsight." *Id.* at 15. The Underwriter Defendants here mischaracterize the Complaint's allegations against them, which have nothing to do with "fraud" or "hindsight." Again, the Complaint alleges that Luckin's fraud was occurring **before** the IPO, rendering the statements in the IPO F-1 materially untrue **at the time** of the IPO. Plaintiffs further allege that the internal controls disclosures in the IPO F-1 were themselves materially untrue, ¶¶539-40, as set forth more fully in Lead Plaintiffs' Opposition to Luckin's Motion at 22-25. As such, Defendants' purported disclosures were far from "sufficient"—they, in fact, disclosed nothing.

The Underwriter Defendants subsequently argue that other disclosures in the IPO F-1 are not actionable, including the statements concerning: (i) related party transactions; (ii) compliance with laws, rules, and regulations; and (iii) Luckin's declining growth in 1Q2019. UW Br. 16. As discussed in Lead Plaintiffs' Opposition to Luckin's Motion, ASC 850 required disclosure of the related party transactions in the IPO F-1, and the Underwriter Defendants do not dispute this requirement. Lead Plaintiffs' Opposition to Luckin's Motion at 21-22. Instead, the Underwriter

Defendants argue that Plaintiffs "do not allege that any of the related party transactions purportedly occurring between April 1, 2019 and May 17, 2019 were material, much less observable by outside parties like the Underwriters." UW Br. at 17.

However, as discussed above, the fraud began in April 2019, prior to Luckin's IPO. Further, Luckin overstated its net revenue by more than 40% in the quarter during which the IPO occurred, demonstrating that the undisclosed related-party transactions undertaken around the time of the IPO were material. *Supra* at 13; *see SEC v. China N.E. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 391 (S.D.N.Y. 2014) ("Given the number of transactions and their value, the materiality of these exchanges is apparent."). Moreover, "even if these transactions were fewer and of lesser value," given that the undisclosed related-party transactions were used to facilitate Luckin's overstatement of its revenue and expenses, "it is hard to imagine that the allegations in the Complaint would not be important to a reasonable investor." *Id.* The Underwriter Defendants' argument that these related party transactions were undetectable merely repeats their flawed due diligence argument and should be rejected. *Supra* at Sections C-D.

The Underwriter Defendants go on to reiterate the same argument with regard to Luckin's compliance with laws, rules and regulations, claiming that Plaintiffs "do not allege that Luckin violated any laws before the date of the IPO" and that any facts rendering Luckin's disclosures false "could not have been detected until well after the Registration Statement became effective." UW Br. 17. These arguments contradict the Complaint, which cites Luckin's admission that it violated numerous laws and regulations though fabricated transactions beginning in April 2019. ¶¶474-75. Moreover, these arguments fail because any reasonable diligence would have uncovered that fraud.

21

The Underwriters Defendants also argue that "Luckin's first quarter 2019 decline in growth was fully disclosed." UW Br. 18. In so arguing, they ignore Plaintiffs' actual claim—that the IPO F-1 *falsely attributed* Luckin's reduced growth in 1Q2019 to seasonal factors. ¶¶555-58. Instead, the Underwriter Defendants again point to a strawman, claiming that Plaintiffs base their claim on Defendants' failure to disclose "Luckin's growth rate for the still-in-progress second quarter of 2019 in the IPO." UW Br. 18. Not so. Plaintiffs allege that Luckin's slowing growth in 1Q2019 was not a transient event related to seasonal factors, but that Luckin began inflating its sales following the declines in 1Q2019 to conceal its lack of growth. The IPO F-1 should have disclosed the true cause of Luckin's declining 1Q2019 growth. *See, e.g.*, *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *8 (C.D. Cal. June 7, 2018) (sustaining §11 claim based on failure to disclose true cause of slowdown in growth prior to IPO) ; *In re Ziff-Davis, Inc.*, 2000 WL 877006, at *3 (S.D.N.Y. June 30, 2000) (sustaining §11 claim based on failure to dislose true cause of revenue decline in prospectus).

Finally, the Underwriter Defendants argue that, contrary to Plaintiffs' well-pleaded allegations, the Underwriter Defendants' entry into the Margin Loan Facility absolves them of liability for negligence, stating their entry into the Margin Loan Facility "indicates . . . that the Underwriters did everything possible and necessary to make themselves comfortable with Luckin's business." UW Br. 20. Again, not so. As the Complaint alleges, had the Underwriter Defendants fulfilled their obligation to conduct reasonable due diligence in connection with the IPO, they would not have entered into the Margin Loan Facility in the first place. ¶¶516-17. In fact, setting aside the suspicious terms of the Margin Loan Facility, the Underwriter Defendants had an even simpler reason to investigate further: at least one prospective underwriter declined to participate in Luckin's IPO due to Defendant Lu's demand that all underwriters participate in the

22

agreement as a condition of their involvement in the IPO. ¶517. Again, the Underwriter Defendants inappropriately and prematurely ask this Court to conclude as a matter of law that the Underwriter Defendants' entry into the Margin Loan Facility proves their reasonable diligence and their satisfaction with Luckin's business. Such a fact-intensive question cannot be resolved on a motion to dismiss. *E.g.*, *Nomura*, 68 F. Supp. 3d at 466.

## G.    The SPO F-1 Contained Material Misrepresentations And Omissions

The Underwriter Defendants' negligence also resulted in the inclusion of false and misleading statements and omissions in Luckin's SPO F-1. ¶¶559-604. As set forth more fully in the Complaint and Lead Plaintiffs' Opposition to Luckin's Motion, the SPO F-1: (i) materially misstated Luckin's revenues and expenses for the 2Q2019 and 3Q2019, and the nine months ended September 30, 2019 (¶¶559-69); (ii) failed to disclose subsequent events in violation of GAAP (¶¶570-73); (iii) contained false or misleading non-GAAP financial measures in violation of Regulation G (¶¶574-76); (iv) contained material misrepresentations and omissions concerning the reasons for Luckin's increased earnings and growth (¶¶577-85); (v) materially misrepresented Luckin's compliance with laws, regulations, and GAAP, and the measures that Luckin was taking to remediate the material weaknesses discovered in its internal controls (¶¶586-93); (vi) made misleading statements about the risk that short sellers could accuse the Company of fraud (¶¶594-95); (vii) materially misrepresented Luckin's reliance on related-party transactions (¶¶596-98); (viii) contained material misrepresentations concerning the Margin Loan Facility (¶¶599-600); and (ix) omitted the information required under Items 101, 303, and 503 (¶¶601-04). To the extent that the Underwriter Defendants contend that Plaintiffs have failed to adequately plead any of these misstatements and omissions in the SPO F-1, these arguments are addressed in Lead Plaintiffs' Opposition to Luckin's Motion.

23

The Underwriter Defendants concede that the financial statements in the SPO F-1 were false, stating that "Luckin has admitted to the inflation of revenues, expenses, and other metrics that rendered its reported financial results unreliable for periods pre-dating the SPO." UW Br. 23. They argue, however, that Plaintiffs' Securities Act claims are somehow "misplaced against the Underwriters." *Id*. at 25. The Underwriter Defendants cite no authority for their contention that these claims are "misplaced" against them. The Securities Act is clear that once a plaintiff establishes a material misstatement or omission in an offering document—as all parties **concede** has been done here—underwriters are statutorily liable for those misstatements or omissions unless they can establish their due diligence, or another affirmative defense, following discovery. *See supra* at Section C. As set forth more fully above and in Lead Plaintiffs' Opposition to Luckin's Motion, Plaintiffs have fulfilled their burden of pleading material misstatements and omissions in Luckin's SPO F-1, and the claims against the Underwriter Defendants must be sustained. *See Herman & MacLean*, 459 U.S. at 382 (1983) (plaintiff "need only show a material misstatement or omission to establish his *prima facie* case" under Section 11).

The Underwriter Defendants also assert that "even the most thorough investigation could not have rooted out the secret, complex fraud at issue here." UW Br. 23. As they did in the context of the IPO, the Underwriter Defendants again attempt to assert an "exquisitely" fact-intensive due diligence defense that cannot be considered at the pleading stage. *Nomura*, 68 F. Supp. 3d at 466.

But even if the Court entertains the Underwriter Defendants' premature attempt at a due diligence defense, the Underwriter Defendants' assertion is facially implausible, and Plaintiffs have adequately fulfilled their burden of pleading negligence. The Company has admitted that its fraudulent fabrication of transactions began in April 2019 and continued throughout the remainder of 2019. ¶474. By Luckin's January 2020 SPO, the fraud was extraordinary in size and egregious

in nature. For instance, the fraud involved Luckin's most senior executives, including Defendants Lu, Qian, and J. Liu, and dozens of other employees. ¶¶474-75. Luckin's regulators later confirmed that Defendant Lu gave direct orders to Company employees to engage in accounting fraud. ¶475. By the end of 2019, Luckin had utilized fabricated, fraudulent transactions to overstate its net revenues by between 80% and 90%. ¶474. The fraud allowed Luckin to fabricate about $300 million in net revenue (*id.*); to fabricate $190 million in expenses, thus overstating its costs by as much as 32.25% (¶477); and to make over $140 million in fictitious supplier payments (¶478). Regulators later determined that more than 40 third-party entities, all related to Luckin and/or its executives, "aided and abetted Luckin in carrying out" the fraud. ¶¶479-83. These facts suggest that even a cursory investigation—not necessarily an "intensive review by experts" (UW Br. 24)— would have uncovered the fraud.

The fact that a third-party uncovered the fraud in the weeks surrounding Luckin's SPO— while lacking the access to the Company and its management that the Underwriter Defendants enjoyed—further suggests that the Underwriter Defendants' investigation, if they undertook any, was inadequate. The Report was released on January 31, 2020, a mere three weeks after Luckin conducted its SPO, suggesting that the Report's authors were investigating—and discovered—the fraud at Luckin at approximately the same time that the SPO took place. ¶486.

The Underwriter Defendants attempt to minimize the Report by arguing that it was a "massive undertaking that included the review of over 11,000 hours of Luckin store traffic video over 981 store-days, and on the ground surveillance of Luckin stores by over 1,500 individuals," describing it as an "intense inquiry [that] far exceeds the standard of reasonable diligence required of underwriters . . . ." UW Br. 24. Of course, the Court cannot determine on the pleadings "the standard of reasonable diligence required of underwriters" under circumstances such as these,

25

much less whether the Underwriter Defendants satisfied it. Once the Underwriter Defendants have marshalled fact and expert evidence on these subjects, they may lodge these arguments in a motion for summary judgment. *See, e.g.*, *WorldCom*, 346 F. Supp. 2d at 677. Until then, regardless of whether the Underwriter Defendants were required to investigate potential fraud at Luckin with the same level of scrutiny that the authors of the Report chose to undertake, the fact remains that the Underwriter Defendants have yet to establish that they undertook any scrutiny at all—and it appears they did ***essentially nothing***.

Additionally, when the Report was published, certain Underwriter Defendants, including Credit Suisse, claimed that the allegations raised in the Report could be easily diligenced and thus rejected. Credit Suisse claimed that the Report's video evidence "only accounted for <0.3% of total operation hours in 4Q19," far from the "massive undertaking" they now describe (UW Br. 24), and that "it's not that hard for [Luckin] to provide . . . evidence to rebut this allegation" of fraud. ¶528. Having minimized the investigation on which the Report was based, the Underwriter Defendants cannot ***now*** credibly assert that it vastly exceeded what was reasonably required of them before they reaped tens of millions of dollars in fees.

Moreover, the Underwriter Defendants' own analysts defended the Company in response to the Report, further underscoring the Underwriter Defendants' lack of diligence. Both Haitong's and Credit Suisse's analysts attempted to discredit the allegations contained in the Report, defending Luckin's business and falsely reassuring investors that Luckin's own underwriters had no concerns. ¶¶527-28. The fact that the Underwriter Defendants continued to ignore the fraud even when a third party brought it to their attention confirms their lack of diligence.

Finally, the Underwriter Defendants argue that Plaintiffs cannot premise their SPO claims on misstatements or omissions related to the Margin Loan Facility because "the material terms

relating to the facility were disclosed in the SPO Registration Statements." UW Br. 26. This argument misses the point. As set forth more fully in Lead Plaintiffs' Opposition to Luckin's Motion, the SPO F-1 falsely disclaimed the risks inherent to the Facility Agreement (which the Underwriter Defendants would have discovered had they conducted reasonable diligence), thus rendering any disclosures about the Margin Loan Facility in the SPO false and misleading. ¶490.

**H.      The Complaint Alleges Actionable Misrepresentations Under Regulation S-K**

The IPO and SPO F-1s omitted material facts in violation of Items 101, 303, and 503 of Regulation S-K. Apart from an erroneous assertion that Items 101 and 303 do not apply to Form F-1, which is addressed in Lead Plaintiffs' Opposition to Luckin's Motion, the Underwriter Defendants contend that the claims based on Regulation S-K must fail because "no reasonable investigation by the Underwriters could have uncovered the fabricated transactions at the time of the SPO . . . ." UW Br. 29. For the reasons discussed at length above in Sections C-D, this assertion fails.

Defendants additionally argue that "[a]n Item 303 claim requires 'actual knowledge of the relevant trend or uncertainty,' which Plaintiffs not only do not allege but affirmatively disclaim against the Underwriters." *Id.* at 28. Contrary to this assertion, "plaintiffs need not plead defendants' knowledge as there is no scienter requirement in Section 11." *Panther Partners, Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *10 (S.D.N.Y. Sept. 27, 2020) (quoting *Turkcell*, 202 F. Supp. 2d at 12). Plaintiffs need only "plead facts to demonstrate that allegedly omitted facts both existed, and were known ***or knowable***, at the time of the offering." *Id.* at 8 (quoting *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008)); *accord Singh v. Schikan*, 106 F. Supp. 3d 439, 446 (S.D.N.Y. 2015) (cited in UW Br. 28). Since the omitted facts

about Luckin's fraud could have been discovered with reasonable due diligence, they were "knowable," and the omissions are actionable against the Underwriter Defendants.[3]

## I.      Plaintiffs Have "Class Standing" for Section 12 Claims Related to the IPO

The Underwriter Defendants do not dispute that Plaintiffs have properly alleged standing for the Section 12 claims related to the SPO. However, the Underwriter Defendants contend that Plaintiffs lack standing to assert Section 12 claims based on the IPO because neither Plaintiff bought IPO shares directly from one of the Underwriter Defendants, and instead purchased in the aftermarket.

It is true that Plaintiffs did not buy directly in the IPO, and thus, may lack individual standing to assert Section 12 claims related to the IPO on their own behalf. Regardless, they do have standing to assert Section 12 claims related to the IPO *on behalf of the putative class*, which is known as "class standing." In *NECA-IBEW*, the Second Circuit held that a lead plaintiff may possess "class standing—that is, standing to assert claims on behalf of purchasers" in an offering— even where the lead plaintiff "clearly lacks standing to assert such claims on its [own] behalf because it did not purchase" in the offering. 693 F.3d at 158. As the court explained, "the class standing analysis is different." *Id.* After canvassing the relevant Second Circuit and Supreme Court law, the court held:

> [I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) he personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of

---

[3] The Underwriter Defendants cite *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85 (2d Cir. 2016), but that case involved only Rule 10b-5 claims, had no underwriter defendants, and applied a knowledge requirement for Item 303 violations only to "the registrant" and to "*management.*" *Id.* at 95 (emphasis in original). They also cite *Medina v. Tremor Video, Inc.*, 640 F. App'x 45 (2d Cir. 2016), a Section 11 case that discusses whether "defendants" had actual knowledge of omissions sufficient to violate Item 303, but in context this refers only to the issuer and executive defendants, not the underwriters. The *Medina* court asked in relation to Item 303 whether "defendants knew at the time they issued the Registration Statement . . . about the trends or uncertainties, which they came by hard experience [later] to learn were affecting their business," and the court referred to a "potential future impact on defendants' business"—which can only refer to the issuer of the registration statement and to its business, not the underwriters. *Id.* at 49 & n.2.

28

concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants.

*Id.* at 162. These requirements are met here. First, Plaintiffs suffered harm from Defendants' illegal conduct: the IPO F-1 contained untrue statements of material fact and omitted material facts, and Plaintiffs suffered a loss on the Luckin ADSs that they purchased when the fraud concealed by those misstatements and omissions was revealed. *See id.* (holding that plaintiff satisfied the first prong where it purchased securities and suffered losses).

Second, that misconduct implicates "the same set of concerns" as the conduct alleged to have caused injury to other members of the putative class by the same defendants. Indeed, other members of the putative class were injured in the exact same way, by the exact same misstatements and omissions, in the exact same IPO F-1. Notably, the Second Circuit has stated that where, as here, the misrepresentations are the same, class standing exists even when the plaintiff did ***not*** purchase in or traceable to the offering at issue:

> Indeed, one could imagine a series of corporate debt offerings, issued over the course of a year, all of which contained an identical misrepresentation about the issuing company's impending insolvency. Sections 11 and 12(a)(2) claims brought by a purchaser of debt from one offering would raise a "set of concerns" nearly identical to that of a purchaser from another offering: the misrepresentation would infect the debt issued from every offering in like manner, given that all of it is backed by the same company whose solvency has been called into question. In that case, the inappropriateness of denying class standing on the happenstance of the misrepresentation's location in one offering versus another seems patent.

*Id.* at 163.

This situation presents an ***even stronger*** case for class standing under Section 12 as to the IPO because: (i) the misrepresentations and omissions were made in connection with a ***single*** offering, i.e., the IPO, and (ii) Plaintiffs purchased "traceable to" the IPO, and thus, already have individual standing to pursue Section 11 claims related to the IPO. Given those facts, Plaintiffs unquestionably have class standing to pursue Section 12 claims related to the IPO.

29

Finally, should the Court doubt the appropriateness of class standing for the Section 12 claim related to the IPO, the proper time to fully analyze the issue is at class certification, not at the motion to dismiss stage. *See id.* at 159 ("there is support for the proposition" that this question is properly viewed as "whether Rule 23 considerations could be satisfied at the proper time—not at this motion-to-dismiss stage"). Even then, Lead Plaintiffs will only need satsifty the typicality requirement of Rule 23, rather than show standing for all claims. *See Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004) ("it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim"); *see also Hicks v. Morgan Stanley & Co.*, 2003 WL 21672085, at *5 (S.D.N.Y. July 16, 2003) (in the class context, "the proper inquiry is typicality rather than standing"); *In re Dynex Cap., Inc. Sec. Litig.*, 2006 WL 314524, at *12 (S.D.N.Y. Feb. 10, 2006) (same), *vacated in part on other grounds by Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190 (2d Cir. 2008). At the class certification stage, Plaintiffs may propose an additional class representative who purchased in the IPO and who has individual standing for Section 12 claims, mooting any issue altogether. *See Hevesi*, 366 F.3d at 82-83 (lead plaintiff may add additional class representatives to address any individual standing issues).[4]

## IV.    CONCLUSION

The Underwriter Defendants' motion to dismiss should be denied in its entirety.

---

[4] To the extent the Underwriter Defendants adopt Luckin's arguments, including that Plaintiffs fail to allege that they purchased any Luckin ADS traceable to the IPO or SPO F-1s, those arguments fail for the reasons set forth in Lead Plaintiffs' Opposition to Luckin's Motion at 10-14.

Dated: January 22, 2021

Respectfully submitted,

*/s/ Salvatore J. Graziano*

**BERNSTEIN LITOWITZ BERGER**
**  & GROSSMANN LLP**

Salvatore J. Graziano
John Rizio-Hamilton
Jai Chandrasekhar
Kate W. Aufses
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
johnr@blbglaw.com
jai@blbglaw.com
kate.aufses@blbglaw.com


**KESSLER TOPAZ MELTZER**
** & CHECK, LLP**

Sharan Nirmul
Gregory M. Castaldo
Richard A. Russo, Jr.
Lisa M. Port
Nathan A. Hasiuk
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
gcastaldo@ktmc.com
rrusso@ktmc.com
llambport@ktmc.com
nhasiuk@ktmc.com

*Counsel for Lead Plaintiffs Sjunde AP-Fonden*
*and Louisiana Sheriffs' Pension & Relief Fund*
*and Lead Counsel for the Putative Class*

31

**CERTIFICATE OF SERVICE**

On January 22, 2021, I caused the foregoing document to be filed with the Clerk of Court

by using the Court's electronic filing system, which sent notice to all counsel of record.

*/s/ Salvatore J. Graziano*_____
Attorney for Lead Plaintiffs