# APPENDIX OF UNPUBLISHED OPINIONS

2004 WL 35445, 57 Fed.R.Serv.3d 455

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Siteworks Contracting Corp. v. Western Sur. Co., S.D.N.Y., November 14, 2006

2004 WL 35445
United States District Court,
S.D. New York.

CONSOLIDATED EDISON, INC., Plaintiff, Counterclaim Defendant,

v.

NORTHEAST UTILITIES, Defendant, Counterclaim Plaintiff.

No. 01 Civ. 1893(JGK).
|
Jan. 7, 2004.

**Synopsis**

**Background:** Proposed acquirer in failed merger sued target, alleging breach of merger agreement. Target counterclaimed for breach of contract and parties moved and cross moved for summary judgment. The District Court, 249 F. Supp.2d 387, denied motions. Thereafter, shareholder of target moved to intervene, on behalf of himself and other shareholders as of date that acquiring corporation allegedly repudiated merger agreement.

**Holdings:** The District Court, Koeltl, J., held that:

shareholder had standing to intervene;

shareholder could intervene as of right; and

alternatively, permission to intervene would be granted,

Intervention motion granted.

*OPINION and ORDER*

KOELTL, J.

 **\*1** The case arises out of a failed $3.6 billion merger between Consolidated Edison, Inc. ("Con Ed") and Northeast Utilities ("NU"). The plaintiff and counterclaim defendant, Con Ed, has moved to dismiss or, in the alternative, to stay, a counterclaim by NU. NU alleges that Con Ed repudiated and breached the Merger Agreement, and it seeks to recover a $1.2 billion "lost premium" on behalf of its current and future shareholders. In addition, Robert Rimkoski ("Rimkoski") has submitted a motion to intervene pursuant to Rule 24 of the Federal Rules of Civil Procedure. Rimkoski has already filed a breach of contract claim against Con Ed in the New York State Supreme Court, New York County, on behalf of the NU shareholders of record on March 5, 2001, the day that Con Ed allegedly repudiated the Merger Agreement. *See Rimkoski v. Consol. Edison, Inc.,* No. 03/109095 (N.Y. Sup.Ct. filed May 16, 2003). Rimkoski has represented that he will promptly dismiss the action in New York State Court if he is permitted to intervene in this case. Concerned with the threat of double liability, Con Ed has supported Rimkoski's

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.    1

2004 WL 35445, 57 Fed.R.Serv.3d 455

motion to intervene so that the claims of all those allegedly harmed by Con Ed's alleged breach can be decided by this Court. The intervention is opposed by NU, which argues that those who sold their NU shares no longer have standing to assert a claim.

I.

This Court previously denied Con Ed's motion for summary judgment dismissing the counterclaim. *See Consol. Edison, Inc. v. Northeast Utils.,* 249 F.Supp.2d 387, 416–17 (S.D.N.Y.2003). In an opinion dated March 21, 2003, this Court found that NU shareholders are intended third-party beneficiaries under the Merger Agreement, and, as a promisee, NU had standing to sue on behalf of its shareholders. *Id.* at 416 (citing *Assoc. Teachers of Huntington, Inc. v. Bd. Of Educ.,* 33 N.Y.2d 229, 351 N.Y.S.2d 670, 306 N.E.2d 791, 794 (N.Y.1973)). The decision, however, left open the question that has become central to the motions before the Court: Which class of shareholders is the appropriate third-party beneficiary-the shareholders of record at the time of Con Ed's alleged breach on March 5, 2001 (the "March 5 Class"), or the shareholders of record at the time that a judgment against Con Ed is entered or collected (the "Judgment Class")?

Con Ed urges that NU's third-party beneficiary claim should be dismissed because a shareholder's breach of contract claim is personal to the shareholders at the time of the alleged breach of contract and NU cannot represent the March 5 shareholders. Rimkoski seeks to intervene to represent the March 5 Class of shareholders. NU responds that the right to recover the "lost premium" damages for the NU shareholders was automatically assigned to subsequent holders of the stock and that it can represent the interests of those shareholders. NU opposes the intervention of Rimkoski on the grounds that Rimkoski has no standing because he gave up his claim to the lost premium when he sold his shares. NU contends that only current holders of NU shares have any interest in the lost premium.

 **\*2**  Although both Con Ed and NU have asserted that there is a clear answer to the question of which shareholders have the right to the alleged lost premium, they admit that there is no case or rule of law directly on point. Con Ed has argued that any right to sue vested in the March 5 shareholders, not those who purchased stock after the alleged breach. Analogizing to federal securities laws, Con Ed argues that the claim for the "lost premium" is personal to the shareholders at the time the claim accrued and that the right to sue for breach of contract does not inhere in the stock itself and is not automatically transferred with its sale. *See, e.g., Bluebird Partners, L.P. v. First Fid. Bank,* 85 F.3d 970, 974 (2d Cir.1996) (prohibiting subsequent bondholder from suing for alleged violation of Trust Indenture Act because plaintiff itself was not injured and "federal securities law claims are not automatically assigned to a subsequent purchaser upon the sale of the underlying security"). Con Ed thus contends that NU's counterclaim for the alleged lost premium should be dismissed because NU cannot adequately represent and litigate the rights of former stockholders, nor can it receive any damage awards owed to them.

NU distinguishes the federal securities cases because claims for fraud and misrepresentation, for example, are more personal in terms of causation and injury than a breach of contract claim. In contending that the right to sue is an interest in the stock and is automatically transferred to subsequent shareholders, NU relies on section 8–302(a) of the New York Uniform Commercial Code ("N.Y. U.C .C.") and section 13–107 of the New York General Obligations Law ("G.O.L."). Section § 8–302(a) provides that a purchaser of a "security acquires all *rights in the security* that the transferor had or had power to transfer." N.Y. U.C.C. § 8–302(a) (emphasis added). But it is not clear that the right to sue a third-party for breach of contract-as opposed to rights relating to title and ownership–is a right "in the security." *See Haber v. Fireman's Fund Ins. Co.,* No. 98 Civ. 1740, 2000 WL 943562, at *6 (S.D.N.Y. July 10, 2000) (interpreting N.Y. U.C.C. § 8–302(a), then codified as § 8–301). Similarly, G.O.L. § 13–107 explicitly provides that a transfer of any *bond* automatically vests in the transferee all claims that the transferor had against certain parties, such as the obligor, trustee, depository, and guarantor. But it is not clear what that statute means for any claims relating to stock. Moreover, Con Ed points to one New York State Court case that declined to apply the statute to claims against third parties who could not be characterized as the obligor of the bond, a trustee or depository, or a guarantor of the obligation. *Licht v. Donaldson, Lufkin & Jenrette Sec. Corp.,* No. 24560/82, slip op. at 4–5 (N.Y.Sup.Ct. Sept. 9, 1983). The statute does not, Con Ed argues, apply to a breach of contract claim that the corporate issuer has against a third party.

**\*3**  As Con Ed and NU were developing their competing theories, Rimkoski filed his motion to intervene. The proposed intervenor agrees with Con Ed and argues that the March 5 Class and not the Judgment Class has the right to sue for the alleged breach. The intervenor argues, however, that he is not suing for a "lost premium."[1] Rimkoski claims to be seeking expectancy damages, measured by the difference between the price at which Con Ed promised to purchase the NU shares and the market price of NU stock the day after the repudiation. (*See* Rimkoski Counterclaim, attached at Aff. of Ira A. Schochet in Supp. of Robert Rimkoski's Mot. to Intervene ("Schochet Aff."), sworn to May 23, 2003, Ex. A.) Rimkoski contends that NU is misconstruing the nature of the contract claim and damages remedy, and he argues that those who purchased NU shares after the breach, unlike those who held stock on March 5, had no expectancy interest in the merger.

[1]    As this Court explained in its decision on the motions for summary judgment, *Consol. Edison,* 249 F.Supp. at 395, the "lost premium" reflects the fact that Con Ed, as part of the Merger Agreement, promised to purchase NU shares at the expected price of $ 26.50 per share. Prior to the time that rumors of the merger began to circulate, NU shares were trading at $18.56 per share. Con Ed was thus expected to pay a premium of more than forty percent over the "unaffected" price for each of NU's 137 million then outstanding shares. The cost of the premium would thus have been over $1 billion, a substantial portion of the $3.6 billion total cost for the stock.

Con Ed has supported Rimkoski's motion to intervene, while NU has opposed it primarily for the same reason it opposes Con Ed's motion to dismiss its counterclaim. Both Con Ed and NU, however, have used the motion to intervene as an opportunity to advance more analogies and arguments about which is the proper shareholder class. Despite very thorough research and thoughtful briefing by all parties, the parties have unearthed no case directly on point, and the issue is thusfar undecided.[2]

[2]    As these motion have been pending, another suit against Con Ed was filed in this Court, seeking damages on behalf of March 5 shareholders. *Siegel v. Consol. Edison, Inc.,* No. 03 Civ. 1893 (S.D.N.Y. filed Oct. 24, 2003). The plaintiff's claims in that case are duplicative of those raised by Rimkoski, and no responsive pleadings have yet been filed.

## II.

There are thus two main motions before the Court. The first motion by Con Ed is to dismiss NU's "lost premium" counterclaim. It raises the substantive legal question of which class owns the right to sue Con Ed. The second motion is Rimkoski's motion to intervene. If Rimkoski has presented a meritorious motion to intervene, there is a substantial reason to grant that motion and defer consideration of the motion to dismiss. All parties have a substantial interest in a final and binding adjudication in a single court, which will determine whether it is the March 5 Class or the Judgment Class that has the right to sue Con Ed for damages based on the alleged breach of the Merger Agreement. Therefore, the Court will first address the Rimkoski motion to intervene.

## III.

NU urges the Court initially to deny Rimkoski's motion to intervene because Rimkoski and the March 5 Class allegedly lack "standing" to assert a claim against Con Ed for breach of contract. NU argues essentially that Rimkoski lacks "standing" because he, and other members of the March 5 Class, do not have the right to sue for the alleged lost premium.

Rimkoski has responded, correctly, that NU's argument concerns the merits of the claims by the Rimkoski Class rather than the Court's jurisdiction to hear them. In *Bell v. Hood,* the United States Supreme Court explained that "it is well settled that the failure to state a proper cause of action calls for judgment on the merits and not for a dismissal for want of jurisdiction." *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946). The Court of Appeals for the Second Circuit recently enforced that distinction while admitting that questions of jurisdiction and the legal merits of claim "are easily, and often, confused." *Carlson v. Principal Fin. Group,* 320 F.3d 301, 305–06 (2d Cir.2003) (vacating decision where district court "essentially, and incorrectly, believed that its subject matter jurisdiction was contingent on [the plaintiff's] ability to state a claim under ERISA").

**\*4**    Rimkoski seeks to intervene as a defendant in this action pursuant to the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367(a).[3] Thus, this is not a case where the Court lacks subject matter jurisdiction because a claim under a federal statute is so "insubstantial" or "frivolous" that there is no basis for federal jurisdiction. *See Bell v. Hood,* 327 U.S. at 682–83. It is possible that the thrust of NU's argument for lack of standing is that because the "lost premium" claim allegedly cannot, as a matter of law, belong to the March 5 Class, the March 5 Class has no interest in the lawsuit and Rimkoski's claim is nonjusticiable. There is, under NU's argument, no case or controversy under Article III, § 2 of the Constitution. To have standing to assert a claim that raises a sufficiently justiciable case or controversy, Rimkoski simply needs to allege a "minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered 'a distinct and palpable injury." ' *Havens Realty Corp. v.. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (quoting *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)), *quoted by Fair Housing in Huntington Comm. v. Town of Huntington,* 316 F.3d 357, 362 (2d Cir.2003); *see also United States v. Cambio Exacto, S.A.,* 166 F.3d 522, 527 (2d Cir.1999) (emphasizing that "it is *injury* that is at the heart of the standing question").

3       Rimkoski seeks to assert a state law breach of contract claim against Con Ed. Rimkoski is a citizen of New York, and thus there is no diversity between Rimkoski and Con Ed, a New York corporation with its principal place of business in New York. Under 28 U.S.C. § 1367(b), the Court may not exercise supplemental jurisdiction over "claims by plaintiffs against persons made parties" under Rule 24 if doing so would destroy complete diversity. However, the Court of Appeals has ruled that § 1367(b) does not prevent a non-diverse defendant-intervenor from pursuing claims against the plaintiff. *See Viacom Int'l, Inc. v. Kearney,* 212 F.3d 721, 727 (2d Cir.2000).
    The effect of this rule and its application to this case is illustrated by *Merrill Lynch & Co. v. Allegheny Energy, Inc.,* No. 02 Civ. 7689, 2003 WL 21254420 (S.D.N.Y. May 30, 2003). In that case, Allegheny Energy, Inc. ("Allegheny") and Allegheny Energy Supply Co. ("Supply") sued Merrill Lynch in state court. *See id.* at *1. Merrill Lynch subsequently sued Allegheny in federal court under diversity jurisdiction. *Id.* Although Supply and Merrill Lynch were not diverse, the court found that it would be possible for Supply to intervene under Rule 24(b) as a defendant and assert a claim against Merrill Lynch. *Id.* at *2–*3. Citing *Viacom,* the district court observed that the purpose of § 1367(b) was to prevent plaintiffs from sidestepping the diversity requirements and that the provision did not, therefore, prevent claims brought by an intervening defendant. *Id.* at *3; *see Viacom,* 212 F.3d at 726–27.
    In this case, Rimkoski is intervening as a defendant in a case already pending, and Con Ed, as the plaintiff, is not asserting a claim against Rimkoski. Section 1367(b), therefore, does not bar Rimkoski's claim. Because Rimkoski's claim is part of the same case and controversy-namely, the claim already being asserted by NU against Con Ed-the Court may exercise jurisdiction over Rimkoski's claim under § 1367(a).

It is plain that Rimkoski and the March 5 shareholders have alleged a sufficient injury in fact: the distinct and palpable, concrete and particular financial harm that Con Ed would not purchase their shares at a premium and that the value of their shares dropped as a result of the Merger Agreement's failure. When Con Ed repudiated the Agreement, Rimkoski had a legal right to sue Con Ed. The legal issue is whether that right passed to subsequent transferees of the stock. The purpose of the Article III case or controversy requirement-along with concepts such as standing and ripeness-is to ensure that appropriate parties with a sufficiently concrete dispute and a sufficient stake in the outcome are litigating before the Court. *See Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (describing "the gist of the question of standing" as: "Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions?"); *Cambio Exacto,* 166 F.3d at 526–27. Rimkoski has alleged a distinct and palpable injury and has a stake in the determination of which shareholder class can seek damages for its alleged injury. Rimkoski's March 5 Class is clearly an appropriate party to litigate whether the March 5 Class or the Judgment Class has the right to sue for Con Ed's alleged breach.

NU's argument confuses "standing" as a constitutional issue of jurisdiction and justiciability with the merits of the legal claim. The Court's subject matter jurisdiction over Rimkoski's claim does not depend on a finding that Rimkoski will prevail on the merits of his claim that he suffered damages from Con Ed's alleged breach. Rimkoski has "standing" to bring his claim and the Court has jurisdiction to decide it even if he ultimately fails to prevail on the claim. *See Flanigan v. Gen. Elec. Co.,* 242 F.3d 78, 86 (2d Cir.2001) (determining on summary judgment that subclass of plaintiffs lacked "standing to pursue" breach of fiduciary duty claim under ERISA).

**\*5** The recent case, *In re Stock Exchs. Options Trading Antitrust Litig.,* 317 F.3d 134 (2d Cir.2003), is instructive on the power of the district court to assert jurisdiction over a class action regardless of the ultimate merits of the underlying claims. In that case, the district court had dismissed claims brought in a class action suit. Based on the dismissal, the court found that it lacked jurisdiction to review and approve class settlements that were reached with certain defendants prior to the court's ruling. *Id.* at 143–44. The Court of Appeals affirmed the district court's decision to dismiss the claims but reversed the refusal to exercise jurisdiction over the proposed class settlements. *Id.* at 150. Citing *Bell v. Hood* and *Baker v. Carr,* the Court of Appeals held that once a plaintiff has asserted "jurisdiction-conferring claims [that] are not insubstantial on their face, 'no further consideration of the merits of the claim is relevant to a determination of the court's jurisdiction of the subject matter.'' ' *Id.* (quoting *Baker v. Carr,* 369 U.S. at 199).

In this case Rimkoski has asserted a basis for jurisdiction based on the Court's supplemental jurisdiction. He has alleged sufficient injury to have his claim adjudicated whatever the ultimate merits of his claim under New York law.

III.

Rimkoski has satisfied the requirements to intervene as of right as a defendant in this action. To intervene as of right pursuant to Federal Rule of Civil Procedure 24(a)(2), the proposed intervenor must: "(1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *Catanzano v. Wing,* 103 F.3d 223, 232 (2d Cir.1996) (quoting *N.Y. News, Inc. v. Kheel,* 972 F.2d 482, 485 (2d Cir.1992)). Each requirement must be satisfied. *Farmland Dairies v. Comm'r of Agriculture & Markets,* 847 F.2d 1038, 1043 (2d Cir.1988). NU, aside from the standing argument, has challenged Rimkoski's motion to intervene as of right on the first and fourth requirements, arguing that the motion is not timely and that NU can adequately represent the interests of the March 5 Class.

The determination of the timeliness of an application is committed to the discretion of the district court. *Id.* at 1043–44. Courts are guided by four factors: (1) the length of time the applicant knew or should have known of his interest before making the motion; (2) prejudice to existing parties resulting from the applicant's delay; (3) prejudice to the applicant if the motion is denied; and (4) the presence of unusual circumstances militating for or against a finding of timeliness. *Id.* at 1044.

Although Rimkoski's motion to intervene was filed over two years after the alleged breach and filing of Con Ed's lawsuit, the motion is still timely under the circumstances. When the Merger Agreement was first repudiated and this suit began, NU announced that it was suing Con Ed on behalf of the company and its shareholders. (*See* Schochet Aff., Exs. F, G (providing news accounts of NU's promise to sue Con Ed to protect interests of shareholders damaged by repudiation).) Only after the argument on the motions for summary judgment before this Court did Rimkoski become aware of NU's intent to recover only on behalf of current and future shareholders, rather than the shareholders at the time of the alleged breach.

**\*6** Moreover, the issue of *which* shareholder class is the appropriate beneficiary has only recently crystallized. On May 16, 2003, shortly after the Court's summary judgment opinion was announced, Rimkoski filed suit against Con Ed in state court. On July 1, 2003, Con Ed filed the motion to dismiss NU's counterclaim on the grounds that NU's current shareholders are not the proper beneficiaries. On July 16, 2003, NU responded to Con Ed's motion, and on July 24, 2003, Rimkoski filed his motion to intervene. Rimkoski's actions were responsive to the motions being briefed for the Court, and Rimkoski's motion was specifically tailored to arguments raised by NU in its July 16 submission.

The timing of Rimkoski's motion is not unduly prejudicial to NU or Con Ed. The motion was made soon after it became plain that there were issues in this litigation as to which class of shareholders had the right to pursue the claim for the alleged lost premium. Moreover, the intervention by Rimkoski will allow the issue of Con Ed's liability to the March 5 Class to be decided in this litigation, and it will avoid the risk of conflicting determinations and double liability for Con Ed to the March 5 Class and the Judgment Class. Under the circumstances, the motion is timely.

Rimkoski is clearly an interested party asserting a claim that is central to the litigation. The breach of contract claim and request for damages plainly satisfy the Rule 24(a)(2) requirement that the intervenor show a "direct, substantial, and legally protectable interest in the subject matter of the action." *United States v. City of New York,* 198 F.3d 360, 365 (2d Cir.1999) (internal quotations omitted) (distinguishing between direct and collateral issues raised by intervenors and examining whether court has the power to provide requested relief). The intervenor's rights could be impaired by any obligations or judgments reached in this litigation, as, for example, by rulings that found that Con Ed owed damages to the Judgment Class rather than the March 5 Class. *See Mortgage Lenders Network, Inc. v. Rosenblum,* 218 F.R.D. 381, 384 (E.D.N.Y.2003) (identifying risk of inconsistent rulings as potential impairment of intervenor's rights). Moreover, NU has presented nothing-aside from its "standing" argument-to suggest that Rimkoski has not satisfied the second and third requirements in the Rule 24(a)(2) analysis.

Finally, despite NU's assertions that its only concern is to prove Con Ed's breach and recover the lost premium, NU cannot adequately protect the interests of Rimkoski and the March 5 shareholders. While NU claims that it and Rimkoski have the same ultimate objective in proving that Con Ed breached the Merger Agreement, NU and Rimkoski have conflicting objectives in determining who should receive any damages. NU has affirmatively argued that the Judgment Class and not the March 5 Class has the right to any "lost premium" damages. Furthermore, NU faces possible liability to Con Ed, and its litigation strategy may be influenced by the possibility of negotiating all of the claims in this case. Rimkoski and the March 5 Class, meanwhile, would have no interest in reducing any liability of NU. Rimkoski and the March 5 shareholders should be joined in this case so that all interested parties have an opportunity to be heard. Rimkoski's motion to intervene as of right is granted.

## IV.

**\*7** Even if there were no right to intervene, the Court would grant permissive intervention under Rule 24(b)(2). Permissive intervention is allowed when the applicant's claim or defense and the main action have "a question of law or fact in common." Fed.R.Civ.P. 24(b)(2). In determining whether to exercise its discretion and grant the motion to intervene, a court must "consider whether the intervention will unduly delay or prejudice the rights of the original parties." *Id.*

There are plainly common issues of law and fact, and, as explained above, there would be no undue prejudice or delay. The intervention will not prejudice Con Ed and, in fact, will relieve Con Ed of the risk of duplicative litigation and double liability. NU will not be unduly prejudiced and will benefit from not having to litigate Rimkoski's state court action. Allowing Rimkoski to intervene will promote judicial efficiency, fairness, and finality. After all parties are brought into the litigation, they will be able to refine their positions and address questions raised by the Court in the earlier argument of the motions.

## V.

Con Ed's pending motion to dismiss NU's alleged "lost premium" counterclaim should be dismissed without prejudice to renewal after Rimkoski has filed, and the Court has decided, the motion for class certification of the March 5 shareholders. Rimkoski has already agreed that he will dismiss his state court action, and Con Ed has represented that it will not oppose the class action motion. Thus, it should be possible to bring all interested parties into this litigation and to decide the conflicting claims promptly.

While NU urges the Court to deny Con Ed's motion to dismiss NU's "lost premium" counterclaim, there is no assurance that any such decision, in the absence of representatives of the March 5 Class, would be binding on the March 5 Class or protect Con Ed from conflicting double liability. Moreover, any such decision that plainly affects the interests of the March 5 Class should only be made after the March 5 Class has had an opportunity to be fully heard on the issue of which class of shareholders has the right to such a claim.

*Conclusion*

Rimkoski's motion to intervene is granted, and Rimkoski should file his answer and counterclaim by January 5, 2004. Con Ed's motion to dismiss NU's counterclaim is denied without prejudice to renewal. Rimkoski is directed to file his motion for class certification by January 15, 2004.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 35445, 57 Fed.R.Serv.3d 455

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 2215457
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

FIRST DATA MERCHANT SERVICES LLC, Plaintiff,

v.

MM DEVELOPMENT COMPANY d/b/a Planet 13; Sistem Commerce City LLC d/b/a Silver Stem Fine Cannabis; KTZ Holdings, Inc. d/b/a Silver Stem; GTR Source, LLC; New York City Marshal Stephen W. Biegel; ML Factors Funding Limited Liability Company; Pelican Communications, Inc. d/b/a The Pelican Group; Linx Card, Inc.; and Givv, Inc., Defendants.

19-cv-10964 (PKC)
|
Signed 05/06/2020

**Attorneys and Law Firms**

John Wellington Peterson, Polsinelli, P.C., Nashville, TN, for Plaintiff.

Peter Jason Scoolidge, Scoolidge Peters Russotti & Fox LLP, New York, NY, for Defendant MM Development Company.

Svetlana Sobel, Syosset, NY, for Defendants Sistem Commerce City LLC, KTZ Holdings Inc.

Sari E. Kolatch, Cohen Tauber Spievack & Wagner, P.C., New York, NY, for Defendant GTR Source, LLC.

Krystina Rose Maola, Gallo Vitucci Klar LLP, New York, NY, for Defendant Pelican Communications, Inc.

OPINION AND ORDER

CASTEL, U.S.D.J.:

 **\*1**  Plaintiff First Data Merchant Services LLC ("First Data") brought this interpleader action against nine defendants, each of whom, First Data represents, has a claim to the disputed funds in First Data's possession (the "Disputed Funds"). The Disputed Funds total $619,560.55. (Compl. (Doc 1).) Four creditors of defendant-claimant Linx Card, Inc. ("Linx")—Strand View Enterprises, LLC; Sunrise Pharmacy LLC; Blue Wave Management LLC; and Inland Medical Consultants, LLC d/b/a Advanced Therapeutics (collectively, the "Intervenor-Defendants")—move to intervene in this action pursuant to Rule 24, Fed. R. Civ. P. (Doc 66.) They seek to intervene as of right pursuant to Rule 24(a), Fed. R. Civ. P., or alternatively, by permission pursuant to Rule 24(b), Fed. R. Civ. P. Intervenor-Defendants' motion to intervene as of right will be granted.

DISCUSSION

First Data processed payment card transactions for defendant-claimant GiVV, a subsidiary of Linx. (Doc 1 ¶ 15.) First Data terminated GiVV's account in February 2019, and held a reserve of $22,235, pursuant to its agreement with GiVV, for the purpose of settling chargebacks or reversals against GiVV's merchant account. (Id.) First Data also processed payment card transactions for defendant-claimant Pelican, but terminated Pelican's account in May 2019. (Id. ¶ 16.) In connection with Pelican's account, First Data held a reserve of $597,325.55, pursuant to its agreement with Pelican, to settle remaining chargebacks or reversals against Pelican's account. (Id.) These reserve funds together make up the Disputed Funds. (Id. ¶ 17.)

2020 WL 2215457

Beginning in or about June 2019, First Data began receiving demands with respect to the Disputed Funds. First Data received a Levy and Demand from Marshal Biegel on behalf of defendant-claimant GTR Source notifying First Data of GTR Source's New York Supreme Court judgment against Linx and GiVV in the amount of $5,190,734.98, exclusive of interest. (Id. ¶ 18.) The notice demanded that First Data satisfy the judgment with the Disputed Funds. (Id.) In September 2019, First Data received a subpoena notifying it of defendant-claimant ML Factors Funding's claim to the Disputed Funds, and seeking restraint of the same. (Id. ¶ 19.) Also in September 2019, First Data received a demand letter addressed to Linx from defendant-claimant Silver Stem, demanding payment of $114,962, exclusive of interest. (Id. ¶ 20.) In October 2019, defendant-claimant MM Development filed a lawsuit in California state court against Linx and GiVV, and also named First Data as a defendant in that suit for the purpose of recovering the Disputed Funds. (Id. ¶ 21.) First Data represents that it cannot determine which defendant-claimants are rightfully entitled to the Disputed Funds. (Id. ¶ 22.)

First Data filed this interpleader action on November 26, 2019. (Doc 1.) The complaint also sought injunctive relief, The Court granted First Data's motion for a preliminary injunction on March 24, 2020. (Doc 76.) Intervenor-Defendants filed their motion to intervene on February 18, 2020, attaching their proposed answer and cross-claim. (Doc 66-1.) Intervenor-Defendants allege that Linx issued each of them promissory notes reflecting Intervenor-Defendants' corresponding loans to Linx. (Cross-Claim ¶¶ 14-17.) Each note became due and payable six months after the date of issue, but Linx never paid any amount due on the notes and remains in default. (Id. ¶¶ 18-19, 22.) Intervenor-Defendants allege that the Disputed Funds at issue in this litigation constitute assets of Linx and collateral under the promissory notes, and therefore, that they are entitled to the Disputed Funds in partial satisfaction of the amounts owed to them under the notes. (Id. ¶ 23.) Intervenor-Defendants' motion is unopposed.

**\*2** Rule 24(a), Fed. R. Civ. P. has been simplified "in favor of 'practical considerations' to allow courts to reach pragmatic solutions to intervention problems." United States v. Hooker Chems. & Plastics Corp., 749 F.2d 968, 983 (2d Cir. 1984) (citations omitted). A party may intervene as of right pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure if: "(1) the motion is timely; (2) the applicant asserts an interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the other parties," MasterCard Int'l, Inc. v. Visa Int'l Serv. Ass'n, Inc., 471 F.3d 377, 389 (2d Cir. 2006). Failure to satisfy any of these four factors "is a sufficient ground to deny the application." "R" Best Produce. Inc. v. Shulman–Rabin Mktg. Corp., 467 F.3d 238, 241 (2d Cir. 2006) (internal quotation marks and citation omitted). Applying this Rule "requires that its components be read not discretely, but together." Hooker Chems. & Plastics, 749 F.2d at 983.

Intervenor-Defendants satisfy each factor required to intervene as of right. First, their motion is timely. Timeliness is "determined within the sound discretion of the trial court from all the circumstances." United States v. Pitney Bowes, Inc., 25 F.3d 66, 70 (2d Cir. 1994). Although "[t]imeliness defies precise definition," courts consider: "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." Id. This action was commenced on November 26, 2019, and Intervenor-Defendants moved to intervene less than three months later, on February 18, 2020. This litigation remains in its early stages; neither the existing parties nor the progress of this case would be prejudiced by their intervention. Intervenor-Defendants represent that they only learned of Linx's inability to repay the loan amounts when they discovered news articles about this litigation, and that they had believed Linx had other sources of funds. (Doc 66 at 5.) Intervenor-Defendants' ability to recover any amount due on the loans is already in doubt, and therefore, they may be prejudiced if their present motion were denied.

Second, Intervenor-Defendants assert an interest relating to the Disputed Funds. To satisfy this element, a party seeking to intervene as of right must have a "direct, substantial, and legally protectable" interest in the property or transaction at issue. Brennan v. N.Y.C. Bd. of Educ., 260 F.3d 123, 129 (2d Cir. 2001) (internal quotation marks and citation omitted). Intervenor-Defendants represent that they hold Linx promissory notes in the aggregate principal sum of $1.7 million, that Linx is in default on its repayment obligations, and that the Disputed Funds constitute assets of Linx to which Intervenor-Defendants have a senior claim pursuant to the collateral provision of the promissory notes. (Doc 66 at 4.)

2020 WL 2215457

Third, without intervention, Intervenor-Defendants' ability to recoup their loans to Linx may be further frustrated. Intervenor-Defendants acknowledge that the Disputed Funds are only a fraction of what is owed to them under the promissory notes, but that Linx's limited assets apart from the Disputed Funds makes recovery outside of this litigation even more unlikely. The Court concludes that denying Intervenor-Defendants' motion may "as a practical matter impair or impede their ability to protect their interests." New York Pub. Interest Research Grp., Inc. v. Regents of Univ. of State of N.Y., 516 F.2d 350, 352 (2d Cir. 1975) (per curiam).

**\*3**  Finally, none of the existing parties represents Intervenor-Defendants' interests. Satisfying this element requires only a "minimal" showing. Trbovich v. United Mine Workers of Am., 404 U.S. 528, 538 n.10 (1972). As Intervenor-Defendants point out, the nature of interpleader actions such as this one involve competing claims for the same limited assets. The defendant-claimants named by First Data are all, like the Intervenor-Defendants, seeking to obtain the Disputed Funds for themselves. Intervenor-Defendants may therefore intervene to litigate their own claims to these Funds.

CONCLUSION

For these reasons, Intervenor-Defendants' motion to intervene as of right is GRANTED. The Clerk is directed to terminate the motion (Doc 66).

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 2215457

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 1:20-cv-01293-JPC    Document 285-1    Filed 06/07/21    Page 12 of 32

2020 WL 6381343
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

Michael GOMES, et al., Plaintiffs,

v.

EVENTBRITE, INC., et al., Defendants.

Case No. 5:19-cv-02019-EJD
|
Signed 10/30/2020

**Attorneys and Law Firms**

Charles Henry Linehan, Lionel Z. Glancy, Pavithra Rajesh, Robert Vincent Prongay, Kara M. Wolke, Lesley F. Portnoy, Glancy Prongay and Murray LLP, Laurence Matthew Rosen, The Rosen Law Firm, P.A., Los Angeles, CA, Jonathan Richard Horne, The Rosen Law Firm, P.A., New York, NY, for Plaintiff Michael Gomes.

Jonathan Richard Horne, The Rosen Law Firm, P.A., New York, NY, Laurence Matthew Rosen, The Rosen Law Firm, P.A., Kara M. Wolke, Glancy Prongay & Murray LLP, Los Angeles, CA, for Plaintiff The Eventbrite Investor Group.

John T. Jasnoch, Scott+Scott Attorneys at Law LLP, San Diego, CA, for Plaintiff Charles Robinson.

Laurence Matthew Rosen, The Rosen Law Firm, P.A., Kara M. Wolke, Glancy Prongay & Murray LLP, Los Angeles, CA, for Plaintiff Bruce Bones.

Patrick Edward Gibbs, Jeffrey David Lombard, Shannon Marie Eagan, Esq., Cooley Godward Kronish LLP, Palo Alto, CA, Heather Marie Speers, Cooley LLP, San Diego, CA, for Defendants Eventbrite, Inc., Julia Hartz, Randy Befumo, Katherine August-deWilde, Roelof Botha, Andrew Dreskin, Kevin Hartz, Sean P. Moriarty, Lorrie M. Norrington, Helen Riley, Steffan C. Tomlinson.

Anna Erickson White, Morrison & Foerster LLP, San Francisco, CA, for Defendants Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Allen & Company LLC, RBC Capital Markets, LLC, SunTrust Robinson Humphrey, Inc., Stifel, Nicolaus & Company, Incorporated.

**ORDER GRANTING MOTION TO INTERVENE; CONTINUING HEARING DATE FOR MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

Re: Dkt. Nos. 62, 65

EDWARD J. DAVILA, United States District Judge

**\*1** This action arises out of Defendants' alleged violations of Section 11 and 15 of the Securities Act of 1933, Item 303 of SEC Regulation S-K, and Section 10(b) and 20(a) of the Securities Exchange Act of 1934. Presently before the Court are: (1) Lead Plaintiffs Michael Gomes, Melvin Pastores, Mohit Uppal and Bruce Bones's (collectively "Plaintiffs") motion for preliminary approval of class action settlement ("Motion"); and (2) Eventbrite shareholders Crystal L. Clemons and Christina Cotte's motion to intervene for the purpose of requesting a 90 day continuance of the hearing on the Motion. Both motions are scheduled to be

2020 WL 6381343

heard on October 29, 2020. For the reasons stated below, the Court will grant the motion to intervene and continue the hearing date for Plaintiffs' Motion.

## I. BACKGROUND

### A. Federal Court Suit

Plaintiffs initiated this suit in April of 2019. Dkt. No. 1. The crux of the suit is that Defendants allegedly made misleading statements to and concealed known risks from investors about Eventbrite's acquisition and integration of Ticketfly, LLC. Plaintiffs purchased Eventbrite securities during Eventbrite's September 2018 Initial Public Offering ("IPO"). The Class Period is between September 20, 2018 and May 1, 2019. The case was related and consolidated with another suit. Dkt. Nos. 9, 36. Plaintiffs filed an amended complaint on December 11, 2019. Dkt. No. 42.

By order dated April 28, 2020, the Court granted Defendants' motion to dismiss with leave to amend. Dkt. No. 59. Plaintiffs elected not to file a second amended complaint. The parties reached a settlement in principle less than two months later on June 17, 2020, and on August 7, 2020, Plaintiff filed the instant Motion for approval of the proposed $1.9 million settlement. Dkt. No. 62.

In the Motion, Plaintiffs refer to a securities class action against Eventbrite in San Mateo Superior Court captioned *In re EventBrite, Inc. Shareholder Litig.*, No. 19civ2798 ("State Court Action") and indicate that the case was dismissed on June 23, 2020, following "significant discovery." Dkt. No. 62 at 12.

The proposed settlement agreement includes a release that covers the Securities Act claims at issue in both the instant federal court action and the State Court Action, as well as a release that covers the Exchange Act claims only at issue in the federal court action. Dkt. No. 66 at 6. No oppositions to the Motion have been filed and Defendants do not oppose the Motion. Dkt. No. 64.

### B. Intervenors

The intervenors are plaintiffs in the State Court Action ("State Court Plaintiffs"). They seek to intervene under Federal Rule of Civil Procedure 24 for the purpose of requesting a continuance of the hearing on the Motion until after the California State Court rules on any demurrer to the State Court Plaintiffs' second amended complaint, which State Court Plaintiffs estimate will take approximately ninety days.[1] State Court Plaintiffs assert the proposed settlement purports to resolve all claims, including their own, and yet it was secretly negotiated without any notice to them or to the State Court. As a result, State Court Plaintiffs believe that they are impacted by the proposed settlement and that their interests are not adequately represented in the federal action.

[1]     State Court Plaintiffs intend to propose the following schedule: amended complaint by November 6, 2020; demurrer by December 7, 2020: hearing on or about December 30, 2020. *See* Molumphy Decl. in Support of Reply, at ¶5 (Dkt. No. 69-1).

 **\*2**  State Court Plaintiffs further assert that Plaintiffs have misrepresented to this Court that the State Court Action was dismissed, when in fact it has not been. State Court Plaintiffs explain that San Mateo County Superior Court Judge Marie S. Weiner upheld State Court Plaintiffs' standing under § 12(a)(2) of the Securities Act of 1933 ("Securities Act"), the allegations of "seller" liability under § 12(a)(2), as well as "control person" allegations under § 15 of the Securities Act. Judge Weiner also granted State Court Plaintiffs leave to amend their complaint and allowed them to take further discovery.

After learning of Plaintiffs' settlement of the federal court action, on September 23, 2020, Judge Weiner lifted all stays on discovery and ordered Eventbrite to produce significant discovery by October 16, 2020. *See* Molumphy Decl., Ex. 3 at 2 (Dkt. No. 65-1). Notably, Judge Weiner also stated in her order that "the [Motion] by the federal plaintiffs *misleadingly* tell the federal district judge that this Court has 'dismissed' the claims asserted in this state court action, and implies that Plaintiffs had full opportunity for discovery-and that this is one of the reasons why the settlement amount is so low compared to potential

damages." *Id.* at 11 (emphasis in original). Notwithstanding Judge Weiner's characterization of the Motion, Plaintiffs here insist they accurately described the status of the State Court Action in their Motion. Dkt. No. 67 at 18.

The State Court Plaintiffs move to intervene for the limited purpose of requesting a continuance the hearing on the Motion until after the California State Court rules on any demurrer to the State Court Plaintiffs' second amended complaint.[2] State Court Plaintiffs' stated purpose in seeking intervention is straightforward. State Court Plaintiffs assert that this Court and the Eventbrite stockholders on whose behalf the federal action is prosecuted deserve to know whether the California State Court Plaintiffs' claims are upheld in the State Court Action before any decision on the Motion. In the alternative, State Court Plaintiffs ask the Court to require Plaintiffs and Defendants to amend the notice of the proposed settlement to identify the pendency and procedural posture of the State Court Action so that Eventbrite stockholders have full information when deciding whether to opt-out or object. As a third alternative, State Court Plaintiffs assert that it would be within the Court's discretion to deny the Motion on the basis that the proposed settlement is not fair, adequate, or reasonable.

[2]    State Court Plaintiffs' counsel asked Plaintiffs to voluntarily defer the hearing on the Motion, but Plaintiffs refused. Molumphy Decl., Dkt. No. 65 at 9-10.

In response, Plaintiffs asks the Court to (i) deny the State Plaintiffs' motion to intervene, (ii) treat the State Plaintiffs' motion to intervene as an objection to preliminary approval of the Settlement, (iii) overrule State Plaintiffs' objection, and (iv) preliminarily approve the Settlement. Defendants also oppose the motion to intervene.

## II. Legal Standards

In the Ninth Circuit, there are four requirements for intervention as of right under Federal Rule of Civil Procedure 24(a)(2): (1) the application for intervention must be timely; (2) the applicant must have a "significant protectable interest" relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the "existing parties may not adequately represent the applicant's interest." *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998). These requirements "are broadly interpreted in favor of intervention." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011). Alternatively, Rule 24(b) allows for permissive intervention. "[P]ermissive intervention requires (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 843 (9th Cir. 2011).

## III. DISCUSSION

### A. Timeliness

**\*3**  Neither Plaintiffs nor Defendants object to the motion to intervene as untimely. As such, this case is distinguishable from a few of the cases relied upon by Plaintiffs and Defendants in opposition to the motion to intervene. *See Cody v. SoulCycle, Inc.*, 2017 WL 8811114, at \*4 (C.D. Cal. Sept. 20, 2017) (post preliminary approval of settlement, denying motion to intervene as untimely and for failure to show impaired interest); *Lane v. Facebook, Inc.*, 2009 WL 3458198, at \*3 (N.D. Cal. Oct. 23, 2009) ("Accordingly, the motion for leave to intervene would be denied as untimely even if it otherwise had merit."); *Cohorst v. BRE Props., Inc.*, 2011 WL 3475274, at \*6 (S.D. Cal. Aug. 5, 2011) (post preliminary approval, denying motion to intervene as untimely and where proposed intervenor could "opt-out of the class and pursue her own damages action against Defendants ... [or] raise any objections to the settlement at the time of the Final Hearing").

### B. "Significant Protectable Interest"

State Court Plaintiffs possess a significantly protectable interest by virtue of being members of the class in the federal suit. *See, e.g., Cicero v. Directv, Inc.*, 2010 WL 11463634, at \*4 (C.D. Cal. Mar. 2, 2010) ("As both Proposed Intervenors are member of the class, they have significant protectable interest relating to the subject of the instant action.").

2020 WL 6381343

## C. State Court Plaintiffs' Impaired or Impeded Ability to Protect Interest

The primary dispute centers on the third requirement for intervention as a right: that the applicant must be so situated that disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest. *Donnelly v. Glickman*, 159 F.3d at 409. In the context of settlements, courts have frequently denied intervention by putative class members where they can adequately protect their interests via the Rule 23 opt-out mechanism. *See, e.g., Zepeda v. PayPal, Inc.*, 2014 WL 1653246, at *5–6 (N.D. Cal. Apr. 23, 2014) (holding that intervention was not warranted because putative interveners may object to the settlement or opt out of the class and there was a failure to show inadequacy of representation); *Cicero*, 2010 WL 11463634, at *2 ("the proposed settlement terms make clear that any class member has the right to opt out and object before final approval"); *Alaniz v. Cal. Processors, Inc.*, 73 F.R.D. 269, 289 (N.D. Cal. 1976) ("the ability to opt out precludes the Intervenors from satisfying the impairment-of-interest test."); *Grilli v. Metro. Life Ins. Co.*, 78 F.3d 1533, 1536–38 (11th Cir. 1996) (affirming denial of intervention in class action because intervenors could object to the settlement or opt out); *Davis v. J.P. Morgan Chase & Co.*, 775 F. Supp. 2d 601, 605–06 (W.D.N.Y. 2011) (same); *In re DHB Indus., Inc.*, 2007 WL 2907262, at *2 (E.D.N.Y. Sept. 30, 2007) (same); *Gallucci v. Boiron, Inc.*, 2012 WL 12864924, at *2 (S.D. Cal. Apr. 25, 2012) (same).

Unlike the cases cited above, however, State Court Plaintiffs assert that they cannot effectively object or consider whether to opt-out of the settlement while the State Court Action is still pending. This Court is persuaded by State Court Plaintiffs' argument primarily because Plaintiffs have represented that the settlement is justified, in part, by the status of the State Court Action. Given Plaintiffs' representation, it is reasonable to await the outcome of the State Court's ruling on any demurrer to the State Court Plaintiffs' second amended complaint so that all class members have more information to evaluate the proposed settlement. If instead preliminary approval is granted now, notice to the class will be sent without any mention of the State Court Action or the claims and damages being asserted, and class members will likely have to submit a claim, object, or opt-out before the State Court rules on the anticipated demurrers. Allowing the settlement to proceed in this manner would, as a practical matter, would impair or impede State Court Plaintiffs' and other class members' interests.

 **\*4**  Further, the cases cited by both Federal Plaintiffs and Eventbrite are distinguishable because they involved motions to intervene to object to settlements, including motions to intervene after preliminary approval was granted. *See, e.g., Feller v. Transamerica Life Ins. Co.*, 2018 WL 6025839, at *4 (C.D. Cal. Nov. 16, 2018) (denying motion to intervene that had been filed a month after settlement had been preliminarily approved); *In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2016 WL 4376623, at *4 (N.D. Cal. Aug. 17, 2016) (denying motion to intervene that was filed day before court preliminarily approved class action settlement); *Zamora v. Ryder Integrated Logistics, Inc.*, 2014 WL 9872803, at *2 (S.D. Cal. Dec. 23, 2014) (denying motion to intervene that was filed weeks after court preliminarily approved class action settlement). As stated previously, State Court Plaintiffs are not intervening for the purpose of objecting to the settlement. Instead, they seek a relatively short continuance of the hearing on the Motion so that they will be better informed in their evaluation of the proposed settlement. Notably, Plaintiffs and Defendants do not assert that the requested continuance would cause them, or class members, prejudice.

The third requirement for intervention as of right is satisfied.

## D. Adequacy of Representation

The burden to show inadequacy of representation is minimal. *See Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n.10 (1972) ("The requirement of the Rule is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal."). Here, State Court Plaintiffs argue that the interests of class members are inadequately represented given that Plaintiffs: (1) negotiated a settlement releasing claims in the State Case without bothering to notify the court-appointed Lead Counsel in the State Case, (2) did not use a mediator, (3) did not seek discovery from Eventbrite (or the State Court Plaintiffs), (4) did not attempt to amend their complaint, despite leave to do so by this Court, (5) mischaracterized the status of the State Case in preliminary approval motion papers (and didn't even mention the State Case in proposed notices to class members), and (6) now refuse to agree to a short continuance to determine if valuable claims belonging to the Class will be upheld in the State Case.

State Court Plaintiffs' proffer above is more than sufficient to show that Plaintiffs' representation of State Court Plaintiffs' interests in the federal action "may be" inadequate. Further, the damages calculations prepared by each group of plaintiffs are far apart, which also suggests representation "may be" inadequate. According to Plaintiffs' calculations, their maximum § 11 damages are $33.5 million and their potential § 10(b) damages are $121.9 million. In contrast, State Court Plaintiffs calculate their potential maximum § 11 damages as between $67.2 million and $73.4 million based upon the filing date of the State Court Action, and the potential aggregate § 10(b) damages as between $163 million and $206.2 million.

## IV. CONCLUSION

For the reasons stated above, State Court Plaintiffs have satisfied the four requirements for intervention as of right under Federal Rule of Civil Procedure 24(a)(2). The motion to intervene is GRANTED, and accordingly the Court will continue the hearing date for Plaintiffs' motion for preliminary approval of class action settlement. The court tentatively sets Plaintiffs' motion for hearing at 9:00 a.m. on March 18, 2021. No later than February 11, 2021, the parties shall submit an updated status report to advise the Court of the status of the State Court Action.

In the event the State Court Action does not proceed on the timeline proposed by State Court Plaintiffs, this Court expects all parties to meet and confer and agree upon a new hearing date for the motion for preliminary approval of class action settlement without engaging in additional motion practice.

**\*5  IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 6381343

**End of Document**                                   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1779345
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jihad A. HACHEM, Plaintiff,

v.

GENERAL ELECTRIC INC., et al., Defendants.
The Cleveland Bakers and Teamsters Pension Fund, Plaintiff,

v.

General Electric Company, et al., Defendants.

17-CV-8457 (JMF)
|
18-CV-1404 (JMF)
|
Signed April 11, 2018
|
Filed 04/12/2018

**Attorneys and Law Firms**

Lesley Frank Portnoy, Glancy Prongay & Murray LLP, Christopher J. Keller, Francis Paul McConville, Labaton & Sucharow LLP, New York, NY, for Plaintiff.

Blake Thomas Denton, Miles Norman Ruthberg, Latham & Watkins LLP, New York, NY, Sean M. Berkowitz, Latham & Watkins LLP, Chicago, IL, William J. Trach, Latham & Watkins LLP, Boston, MA, for Defendants.

MEMORANDUM OPINION AND ORDER

JESSE M. FURMAN, United States District Judge

 **\*1**  In these consolidated securities-fraud putative class actions, familiarity with which is presumed, the Court must decide whether to reopen the process for appointment of lead plaintiff and lead counsel. That process was triggered in the first instance by the filing of a complaint on November 1, 2017, alleging that, between July 21, 2017, and October 20, 2017, the General Electric Company ("GE") and certain GE executives made false and misleading statements principally concerning the results and trends in GE's "Power segment." (Docket No. 1 ("Compl.")).[1] Following the publication of notice concerning those allegations pursuant to the Private Securities Litigation Reform Act ("PSLRA"), the Court appointed the Arkansas Teachers Retirement System ("ATRS") as Lead Plaintiff and Labaton Sucharow LLP as Lead Counsel. (Docket No. 52). On February 20, 2018, however, the Cleveland Bakers and Teamsters Pension Fund ("Cleveland B&T") filed a new action alleging that, between February 26, 2013, and January 24, 2018, GE and certain GE executives made false and misleading statements concerning not only GE's Power division, but also its long-term care ("LTC") insurance business. (18-CV-1404 ("*Cleveland B&T*"), Docket No. 1 ("*Cleveland B&T* Compl."), ¶¶ 1, 93, 118). Cleveland B&T now moves to intervene and to vacate the Court's Order appointing ATRS Lead Plaintiff; ATRS cross-moves to strike a new PSLRA notice published by Cleveland B&T based on the new claims. (Docket Nos. 56, 62). Thus, both motions raise the same question: whether the expanded claims and class period in the Cleveland B&T action warrant republication of notice pursuant to the PSLRA and reopening of lead plaintiff motion practice.

Case 1:20-cv-01293-JPC    Document 285-1    Filed 06/07/21    Page 18 of 32

Hachem v. General Electric Inc., Not Reported in Fed. Supp. (2018)
2018 WL 1779345

1     Unless otherwise noted, all record citations are to the docket in 17-CV-8457 (JMF).

Upon review of the parties' papers and relevant case law, the Court reluctantly concludes that republication is warranted and that the lead plaintiff process must be reopened. "Although courts typically disfavor republication when a complaint is amended, courts have required new notice where the amended complaint substantially alters the claims or class members." *Waldman v. Wachovia Corp.*, No. 08-CV-2913 (SAS), 2009 WL 2950362, at \*1 (S.D.N.Y. Sept. 14, 2009). The inquiry into whether republication is warranted is qualitative, "turning on a comparison of the two complaints and an assessment of whether, in light of the amendments, 'entire classes of potential lead plaintiffs [were] left out of the notice procedure.' " *Dube v. Signet Jewelers Ltd.*, No. 16-CV-6728 (JMF), 2017 WL 1379385, at \*1 (S.D.N.Y. Apr. 14, 2017) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05-CV-1898 (SAS), 2005 WL 1322721, at \*2 (S.D.N.Y. June 1, 2005)). Applying that standard, courts have held that republication is warranted where, in light of changes in either or both the class period or the nature of the claims asserted, it is "likely that individuals who could now be considered potential lead plaintiffs would have disregarded the earlier notice." *Kaplan v. S.A.C. Capital Advisors, L.P.*, 947 F. Supp. 2d 366, 367-68 (S.D.N.Y. 2013); *see, e.g.*, *Dube*, 2017 WL 1379385, at \*1; *In re Leapfrog Enters., Inc. Sec. Litig.*, No. 03-CV-5421 (RMW), 2005 WL 5327775, at \*3-4 (N.D. Cal. July 5, 2005); *In re Select Comfort Corp. Sec. Litig.*, No. 99-CV-884 (DSD) (JMM), 2000 WL 36097395, at \*2 (D. Minn. May 12, 2000).

 **\*2** That is the case here. The initial notice listed a class period of only three months—"between July 21, 2017, and October 20, 2017"—and cited only the underperformance of GE's Power segment in describing the putative class claims. (Docket No. 6, Ex. A, at 1). By contrast, Cleveland B&T's Complaint covers a class period of almost five *years* and includes, in addition to claims regarding General Electric's Power segment, substantial allegations concerning GE's LTC business. (*Cleveland B&T* Compl. ¶¶ 1, 93). Underscoring the scope of those differences, while the initial complaint alleged only one stock price drop of \$1.51 per share (*see* Compl. ¶ 24), Cleveland B&T's Complaint alleges additional stock drops, including declines of \$1.47, \$1.12, and \$1.43 per share, all related to news about GE's LTC business. (*See Cleveland B&T* Compl. ¶¶ 17-24). Taken together, these changes "alter[ ] dramatically the gravamen of the claims alleged against Defendants." *Dube*, 2017 WL 1379385, at \*1. They "make it likely that individuals who could now be considered potential lead plaintiffs would have disregarded the earlier notice, and that '[a]llowing plaintiffs in this case to proceed without publishing a new notice reflecting their additional claims would potentially exclude qualified movants from the lead plaintiff selection process.' " *Kaplan*, 947 F. Supp. 2d at 367 (quoting *Bombardier*, 2005 WL 1322721, at \*3).

In arguing otherwise, ATRS cites a related case, *Tampa Maritime Association-International Longshoremen's Association Pension Plan v. General Electric Company*, No. 17-CV-9888 (JMF), which was filed during the original notice period and consolidated with this action on December 29, 2017. (Docket No. 16).[2] The Complaint in *Tampa Maritime* alleged claims relating not only to GE's Power segment, but also to its LTC business, and included a class period of between December 15, 2016, and November 10, 2017. (*See* 17-CV-9888, Docket No. 1, at ¶¶ 1, 5). Plaintiff in *Tampa Maritime* (which, notably, was also represented by Labaton Sucharow LLP) published a separate PSLRA notice on December 20, 2017, advising investors of the expanded class period and allegations and noting that the deadline to file lead plaintiff motions was January 2, 2018—namely, the deadline set by this Court based upon the original notice published on November 2, 2017. (*See* Docket No. 64, Ex. 10, at 5-6; *see also id.* at Ex. 4). On its face, that notice might have sufficed, as the gap between it and the Cleveland B&T Complaint is comparatively smaller, but for one problem: Investors were given only fourteen days' notice (a period that included Christmas and New Year's, no less) of the deadline to file motions for appointment as lead plaintiff.[3] The PSLRA, however, contemplates sixty days' notice before the deadline for motions. *See* 15 U.S.C. § 78u4(a)(3)(A)(II); *see In re Crayfish Co. Sec. Litig.*, No. 00-CV-6766 (DAB), 2002 WL 1268013, at \*2 (S.D.N.Y. June 6, 2002) (discussing the PSLRA's timeliness requirements). And separate and apart from what the statute contemplates, thirteen days during the holiday season does not afford investors sufficient time to decide whether to seek appointment and file motion papers. (*See* Docket No. 67, at 8 (noting that "[m]any public pension funds require board approval prior to making a lead plaintiff motion, a step favored and sometimes also required by courts"); 18-CV-1404, Docket No. 9, at 4 (similar)).

2018 WL 1779345

[2]     ATRS also contends that Cleveland B&T's motion should be denied because Cleveland B&T's losses are "a small fraction of the ATRS' losses." (Docket No. 63 ("ATRS Br."), at 1-2). But the issue here is not whether Cleveland B&T should be appointed lead plaintiff instead of ATRS; it is whether the process should be reopened to all putative class members, some of whom may well have a greater financial interest than both ATRS and Cleveland B&T.

[3]     Needless to say, the present predicament could have been avoided had any party alerted the Court to the material differences between the original notice and the notice published in connection with *Tampa Maritime* and sought an appropriate extension of the deadline to file motions for appointment. No party did so.

Accordingly, with some misgivings given the delay that will result, the Court concludes that its January 19, 2018 Order appointing ATRS as Lead Plaintiff and Labaton Sucharow LLP as Lead Counsel must be vacated and the lead plaintiff process reopened. As ATRS itself notes (*see* ATRS Br. 11-12), the general practice in conducting lead plaintiff motion practice is to use the "longest, most inclusive" class period available on the theory that it "encompasses more potential class members and damages." *Hom v. Vale, S.A.*, No. 15-CV-9539 (GHW), 2016 WL 880201, at \*4 (S.D.N.Y. Mar. 7, 2016) (citing cases). Here, that calls for using the allegations in the Cleveland B&T Complaint and the notice issued on February 16. 2018 in connection with that Complaint as the basis for lead plaintiff motion practice. That notice specified that any motions for appointment of lead plaintiff would have to be filed by April 17, 2018. (Docket No. 58, Ex. 1). In light of the uncertainty prompted by ATRS's and Cleveland B&T's motions, however, the Court concludes that the deadline should be extended in the interests of justice. *See Coopersmith v. Lehman Bros., Inc.*, 344 F. Supp. 2d 783, 791 (D. Mass. 2004) (citing cases for the proposition that "under some circumstances, the PSLRA's 60 day requirement can be extended"). Accordingly, any member of the putative class who wishes to seek appointment as lead plaintiff shall file a motion by **May 4, 2018**; and any opposition to a motion shall be filed by **May 11, 2018**. No replies are permitted absent leave of the Court. Unless and until the Court orders otherwise, a conference shall be held on **May 23, 2018**, at **4:30 p.m.** in **Courtroom 1105** of the Thurgood Marshall Courthouse, 40 Centre Street, New York, New York to consider any motions. In light of the foregoing, Defendants' deadline to answer or move to dismiss is extended to thirty days after the newly appointed lead plaintiff identifies the operative complaint.

 **\*3**  For the reasons stated above, Cleveland B&T's motion to vacate is GRANTED, and ATRS's cross-motion to strike is DENIED. Further, Cleveland B&T's motion to intervene is GRANTED, as it plainly has a "claim ... that shares with the [original] action a common question of law or fact," and the Court does not find that intervention will "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B), (b)(3).

The Clerk of Court is directed to terminate Docket Nos. 56 and 62.

SO ORDERED.


**All Citations**

Not Reported in Fed. Supp., 2018 WL 1779345

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 327653

2021 WL 327653
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

SEA TOW SERVICES INTERNATIONAL, INC., Plaintiff,

v.

TAMPA BAY MARINE RECOVERY, INC., a Florida corporation; Erich A.
Jaeger; Abigail Jaeger; Kathleen Moreno; and Raul Moreno, Defendants.

20-CV-2877(JS)(SIL)
|
Signed 02/01/2021

**Attorneys and Law Firms**

For Plaintiff: Mitchell A. Stein, Esq., Stein Law, P.C., 24 Woodbine Avenue, Suite 4, Northport, New York 11768, Scott Michael Kessler, Esq., Akerman LLP, 520 Madison Avenue, 20th Floor, New York, New York 10022, Steven R. Wirth, Esq., Akerman LLP, 401 East Jackson Street, Suite 1700, Tampa, Florida 33602.

For Defendants Tampa Bay Marine Recovery Inc., Erich A. Jaeger & Abigail Jaeger: John Alexander Karol, Esq., Avi Strauss, Esq., Richard L. Rosen, Esq., The Richard L. Rosen Law Firm, PLLC, 110 East 59th Street, 23rd Floor, New York, New York 10022, Sarah Gogal Passeri, Esq., Holland & Knight LLP, 31 West 52nd Street, New York, New York 10019.

For Defendants Kathleen Moreno & Raul Moreno: Jason H. Baruch, Esq., Noel Boeke, Esq., Paul Punzone, Esq., Sarah Gogal Passeri, Esq., Holland & Knight LLP, 100 North Tampa Street, Suite 4100, Tampa, Florida 33602.

For Proposed Defendant Tampa Bay Marine & Towing, Inc.: Jason H. Baruch, Esq., Noel Boeke, Esq., Paul Punzone, Esq., Sarah Gogal Passeri, Esq., Holland & Knight LLP, 100 North Tampa Street, Suite 4100, Tampa, Florida 33602.

ORDER

SEYBERT, District Judge:

 **\*1**  Before the Court is Proposed Defendant Tampa Bay Marine Towing & Services, Inc.'s ("TBMT") Motion to Intervene ("Motion") (Mot., ECF No. 48) and accompanying memoranda of law in support thereof (TBMT Br., ECF No. 49; Reply, ECF No. 68). Defendants Kathleen Moreno, Raul Moreno (the "Moreno Defendants"), Erich A. Jaeger, Abby Jaeger and Tampa Bay Marine Recovery Inc. ("TBMR," and together with Erich A. and Abby Jaeger, the "Jaeger Defendants") do not oppose the Motion to Intervene. Plaintiff Sea Tow Services, International, Inc. ("Plaintiff" or "Sea Tow") opposes intervention. (Opp., ECF No. 52.) For the reasons that follow, the Motion is GRANTED.

BACKGROUND[1]

[1] The facts are drawn from the Amended Complaint (Am. Compl., ECF No. 73) and the parties' briefs.

I. The Breakdown of Sea Tow and TBMT's Relationship

2021 WL 327653

Sea Tow is an international marine assistance provider and franchisor of "Sea Tow" trademarks. Sea Tow provides assistance for boaters on the water, including mechanical assistance, towing and other services on a member and non-member basis. In order to offer its service across the globe, Sea Tow enters into franchise agreements like the one underpinning the present dispute.

On January 29, 2015, the Moreno Defendants purchased 100% of Proposed Defendant TBMT, a Sea Tow franchisee for the Tampa Bay Area of Responsibility ("AOR"), from Eugene N. Shute, IV ("Shute"). (Am. Compl. ¶ 26.) The Moreno Defendants paid a portion of the purchase price with a promissory note, payable by TBMT and the Moreno Defendants to Shute (hereafter, the "Shute Note"). (Id. ¶ 41.) The Moreno Defendants also secured three separate loans from Synovus Bank to finance the acquisition of TBMT and provide working capital for their investment (hereafter, the "Synovus Loans"). (Id. ¶ 53.) On April 23, 2015, Sea Tow and TBMT entered into a Franchise Agreement to govern TBMT's operations. (Id. ¶ 22; Franchise Agreement, Frohnhoefer Decl., Ex. C, ECF No. 15-2.)

The Franchise Agreement includes certain requirements and provisions relevant to the present Motion. First, the Moreno Defendants were required to personally guarantee TBMT's obligations under the Franchise Agreement. (Am. Compl. ¶ 28-29; Franchise Agreement § 9.18) Second, the Franchise Agreement provided that the franchisee would be deemed in default and the agreement would terminate automatically in the event the franchisee was subject to a suit to foreclose any lien or mortgage against the franchisee or its franchised business and such suit was not dismissed within thirty days. (Am. Compl. ¶ 32; Franchise Agreement § 16.1.) Third, the Franchise Agreement further provided that, upon termination of the agreement, TBMT would be required to reimburse Sea Tow the pro rata portion of any membership fees received.[2] (Am. Compl. ¶ 33; Franchise Agreement § 17.11.)

[2]  Customers pay to be members of Sea Tow and to receive covered services from Sea Tow franchisees. The membership fees are paid to Sea Tow, which apportions the fees to the appropriate franchisee, provided the franchisee is in good standing and not in default under the franchise agreement. (Am. Compl. ¶¶ 30-31.)

**\*2**  Notwithstanding the apparent success of Proposed Defendant TBMT as an enterprise, the Moreno Defendants struggled to meet their financial obligations. First, sometime in 2017, the Moreno Defendants and TBMT defaulted on the Shute Note, prompting Shute to file a lawsuit to collect on it. (Am. Compl. ¶ 42.) To settle the lawsuit, TBMT and the Moreno Defendants entered into a new promissory note, with Sea Tow guaranteeing performance thereunder (hereafter, the "New Note"). (Id.) In its Amended Complaint, Sea Tow alleges that at the time it guaranteed the New Note, it relied on "false representations made by TBMT and the Moreno Defendants." (Id. ¶ 114.) Second, the Moreno Defendants defaulted on the Synovus Loans, prompting Synovus Bank to commence a collection action on April 10, 2019 against the Moreno Defendants and TBMT (the "Synovus Action"). (Id. ¶ 55.) The Synovus Action was not dismissed within thirty days, which Sea Tow contends triggered the automatic termination clause under the Franchise Agreement. (Id. ¶¶ 57-58.) The Moreno Defendants dispute the application and enforceability of the termination clause, including in their motion to dismiss. (See, e.g., Moreno Defs. Br., ECF No. 58 at 11-21.)

On October 31, 2019, Sea Tow, TBMT and the Moreno Defendants executed a Termination and Relinquishment Agreement ("TARA") that provided Sea Tow would appoint a manager to oversee the Tampa Bay AOR. (Am. Compl. ¶ 60.) On November 11, 2019, Sea Tow appointed Tampa Bay Marine Recovery, Inc. ("TBMR"), owned and operated by Kathleen Moreno's son, Erich Jaeger, to provide services to Sea Tow customers within the Tampa Bay AOR pursuant to a Manager Delegation Agreement. (Id. ¶ 65.) By entering into the Manager Delegation Agreement, Sea Tow believes it passed on the opportunity to sell TBMT on the open market. (Id. ¶¶ 116-19.)

Shortly thereafter, on February 19, 2020, Proposed Defendant TBMT filed for bankruptcy protection in the United States Bankruptcy Court for the Middle District of Florida. ("Main Bankruptcy Case," No. 20-BK-1418.) In the Main Bankruptcy Case, TBMT commenced an adversary proceeding against Sea Tow, disputing Sea Tow's termination of the Franchise Agreement, among other actions. ("Florida AP," No. 20-AP-390.) On December 7, 2020, the Main Bankruptcy Case was dismissed, and the Florida AP was dismissed without prejudice. (Main Bankruptcy Case, No. 20-BK-1418, Order, ECF No. 155.)

2021 WL 327653

II. Sea Tow Files Suit

On June 29, 2020, Sea Tow initiated this action against the Moreno and Jaeger Defendants. Sea Tow alleges three counts against the Moreno Defendants for (1) fraud, (2) breach of the guaranty, and (3) breach of the implied covenant of good faith and fair dealing. On September 4, 2020, the Moreno Defendants filed a motion to stay these proceedings pending the Main Bankruptcy Case (Mot. to Stay, ECF No. 32), but Magistrate Judge Locke denied the motion shortly after the Main Bankruptcy Case was dismissed (Min. Entry, ECF No. 46). Accordingly, Defendants sought leave to file their motions to dismiss and answers to Sea Tow's complaint, and the Court set a briefing schedule. (See Dec. 23, 2020 Elec. Order.)[3] Shortly after Defendants requested leave to file motions to dismiss, Proposed Defendant TBMT filed the present Motion to Intervene, which Plaintiff, unsurprisingly, opposes. Further, after TBMT filed its Motion to Intervene and the Defendants filed their respective motions to dismiss, Plaintiff exercised its right to amend its complaint. (ECF No. 74.)[4]

[3]     The parties are also litigating a protective order. (E.g., Jan. 21, 2021 Elec. Order.)

[4]     The Court recognizes that Federal Rule of Civil Procedure 24(c) requires "a pleading setting forth the claim or defense for which intervention is sought," and that, because Plaintiff filed its Amended Complaint while the Motion to Intervene was pending, TBMT's accompanying pleading, filed with its Motion, does not address the Amended Complaint. (See TBMT's Proposed Answer, Affirmative Defenses, and Counterclaims, ECF No. 49-1.) However, "nothing in Rule 24(c) ... obligates an applicant for intervention to amend his proposed defenses and counterclaims while the motion to intervene is still pending," especially where, as here, the accompanying pleading fulfills the purpose of Rule 24(c) by informing the Court and the parties of the position the proposed defendant intends to assert. Piedmont Paper Products, Inc. v. American Financial Corp., 89 F.R.D. 41, 42-43 (S.D. Ohio 1980).

DISCUSSION

 **3**  As each side delights in pointing out, the present dispute has the parties disavowing earlier litigation positions. In its motion to dismiss the Florida AP, for example, Sea Tow argued that TBMT could and perhaps should raise the claims it brought in the adversary proceeding in the instant lawsuit, through intervention or otherwise. (See TBMT Br. at 4-5 (quoting Sea Tow's Reply in support of its motion to dismiss the Florida AP).) For its part, TBMT declined to intervene in this action during the pendency of the Main Bankruptcy Case, preferring to raise its claims in the bankruptcy case and related adversary proceedings. Now the shoe is on the other foot, as it were, with TBMT seeking to intervene as a defendant in this lawsuit and Sea Tow opposing its request. The Court looks past the parties' strategic statements and to the substance of Federal Rule of Civil Procedure 24 ("Rule 24") to resolve the present dispute.

I. Intervention as of Right

"The purpose of the rule allowing intervention is to prevent a multiplicity of suits where common questions of law or fact are involved. However, the rule is not intended to allow for the creation of whole new suits by intervenors." Washington Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co., 922 F.2d 92, 97 (2d Cir. 1990). There are two types of intervention under Rule 24: (1) intervention as of right under Rule 24(a)(2), and (2) permissive intervention under Rule 24(b). Rule 24(a)(2) provides:

On timely motion, the court must permit anyone to intervene who ... claims an interest relating to the property or transaction that is subject to the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Therefore, an applicant must establish the following to intervene as a matter of right: "(1) a timely motion; (2) an interest relating to the property or transaction that is the subject of the action; (3) an impairment of that interest without intervention; and (4) the movants' interest is not adequately represented by the other parties in the litigation." Nu-Chem Labs., Inc. v. Dynamic Labs., Inc., No. 96-CV-5886, 1998 WL 35180780, at *2 (E.D.N.Y. 1998) (Seybert, J.) (citing United States v. Pitney Bowes, Inc., 25 F.3d 66, 70 (2d Cir. 1994)). The test is "flexible," and courts "generally look at all the factors together rather than focus narrowly on a single one." Basciani Foods, Inc. v. Mid Island Wholesale Fruit & Produce, Inc., No. 09-CV-4585, 2011 WL

2021 WL 327653

17524, at *3 (E.D.N.Y. 2011) (Seybert, J.). Nevertheless, "[f]ailure to satisfy any one of these requirements is sufficient ground to deny the application." Friends of E. Hampton Airport, Inc. v. Fed. Aviation Admin., No. 15-CV-0441, 2016 WL 792411, at *4 (E.D.N.Y. 2016) (Seybert, J.) (quoting In re Pandora Media, Inc., No. 12-CV-8035, 2013 WL 6569872, at *5 (S.D.N.Y. Dec. 13, 2013) (emphasis in original) (citation omitted)). District courts have considerable discretion in deciding motions to intervene under Rule 24(a)(2). See Basciani, 2011 WL 17524, at *3.

The parties dispute each requirement for intervention as of right. The Court addresses their arguments in turn.

### A. Whether TBMT's Motion Is Timely

Courts have the "discretion to evaluate the timeliness of a motion to intervene based on all the circumstances including, '(1) how long the applicant had notice of the interest before it made a motion to intervene; (2) prejudice to existing parties resulting from the delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness.' " Keybank, Nat'l Ass'n v. Quality Payroll Sys., Inc., No. 06-CV-3013, 2007 WL 9710295, at *5 (E.D.N.Y. 2007) (Seybert, J.) (quoting Pitney Bowes, Inc., 25 F.3d at 70).

Having evaluated the foregoing factors, the Court finds TBMT's motion is timely. First, this case is in its early stages -- Plaintiff recently filed its first amended complaint, mooting the pending motions to dismiss, and discovery has not yet commenced -- so "neither the existing parties nor the progress of this case would be prejudiced by [TBMT's] intervention." First Data Merch. Servs. LLC v. MM Dev. Co., No. 19-CV-10964, 2020 WL 2215457, at *2 (S.D.N.Y. May 6, 2020); see also Nu-Chem Labs., Inc., 1998 WL 35180780 at *3. It is true, as Sea Tow points out, that TBMT knew about the present action since it was filed on June 29, 2020. Yet at that time, TBMT was pursuing reorganization through bankruptcy, and the Court is disinclined to hold against TBMT its decision to preserve the automatic stay and its belief, which proved incorrect, that the Florida AP was the proper forum for this dispute. Rather, the Court notes that as soon as the Main Bankruptcy Case was dismissed, TBMT quickly moved to intervene, filing its motion less than two weeks later.

**\*4** Moreover, intervention will not prejudice Sea Tow by unnecessarily complicating the case or generating costly or duplicative discovery. (See Opp. at 8-9.) Any complexity brought about by TBMT's intervention here pales in comparison to the complexity identified in Washington Electric Cooperative, which Sea Tow cites, where the Second Circuit affirmed the denial of a motion to intervene brought by a state agency because it would have transformed a "conventional contractual dispute between two parties" for under one million dollars in damages into one in which two plaintiffs, one purporting to represent the interests of six interested non-parties, sought over six million dollars in damages. 922 F.2d at 97 (discussing one of several reasons that the district court did not abuse its discretion in denying the motion). The Court also anticipates that intervention will streamline, not duplicate, discovery, because TBMT has discoverable information related to several agreements and issues relevant here. With TBMT as a party-defendant, there will be no issue as to whether the Moreno Defendants have possession over certain TBMT documents such that they are obligated to disclose them in the course of discovery.

Last, and as discussed infra, because TBMT has significant contractual interests in this litigation, the Court concludes that TBMT is likely to be prejudiced if it cannot intervene. Accordingly, TBMT's motion is timely.

### B. Whether TBMT Has a Legal Interest in the Litigation

To intervene as of right, the proposed intervenor must have more than a "remote or contingent" interest in the transaction that is subject of the action; rather, it must establish an interest that is "direct, substantial, and legally protectable." Nu-Chem Labs., Inc., 1998 WL 35180780, at *3 (citing New York News, Inc. v. Kheel, 973 F.2d 484, 486 (2d Cir. 1992)).

The Court finds that Proposed Defendant TBMT has an interest in this litigation that is direct, substantial and legally protectable, because the Court must adjudicate the validity of the termination of TBMT's Franchise Agreement to determine whether the Moreno Defendants (and TBMT) are liable for the pro rata share of membership fees TBMT received after the Franchise Agreement was terminated but before the parties entered into the TARA. Simply put, according to Sea Tow's allegations, TBMT

is a party to several of the at-issue agreements, including the original sales agreement for TBMT (Am. Compl. ¶ 26); Franchise Agreement; Guaranty (Guaranty, Kessler Decl., Ex. A, ECF No. 34-1); the Shute Note and New Note (Am. Compl. ¶¶ 41-42); and the TARA (Am. Compl. ¶ 60); among other potentially relevant agreements that may be disclosed through discovery. Thus, this case is unlike Mastercard International Inc. v. Visa International Services Ass'n, where the Second Circuit affirmed the district court's denial of Visa's motion to intervene because Visa was "a stranger to the contractual dispute between MasterCard and FIFA." 471 F.3d 377, 390 (2d Cir. 2006). TBMT is anything but a stranger here, and Sea Tow's allegations will require the Court to interpret and adjudicate its rights under several agreements to which it is a party.

Moreover, Plaintiff alleges that TBMT -- not just the Moreno Defendants -- made false representations to Sea Tow when it guaranteed the New Note. (Am. Compl. ¶¶ 114-15.) This is not surprising, since TBMT is a central actor in the alleged fraud scheme, the object of which was to free TBMT of its raft of liabilities and return the Tampa Bay AOR to TBMT's control. (Id. ¶¶ 110-21.) For example, to further the alleged scheme, Sea Tow alleges TBMT abused the bankruptcy process by disclosing certain confidential financial information in the Main Bankruptcy Case. (Id. ¶¶ 87-92.)

Based on Sea Tow's allegations against TBMT, as well as TBMT's contractual interests, the Court concludes that TBMT has an interest in the present litigation.

### C. Whether TBMT's Interest Would Be Impaired without Intervention

The third requirement is satisfied where prospective intervenors demonstrate "that the disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest." Pitney Bowes, Inc., 25 F.3d at 69-70. TBMT raises "stare decisis" concerns, but "[b]ecause this is not a case of first impression involving the resolution of new legal issues but a conventional contractual dispute, the doctrine of stare decisis also will not control future, related actions by [proposed intervenor]." Washington Elec. Coop., Inc., 922 F.2d at 98. TBMT is not facing products liability litigation across "twenty-two" separate forums, like the proposed intervenor in Sackman v. Liggett Group, Inc., 167 F.R.D. 6, 21 (E.D.N.Y. 1996), a case relied on by TBMT in support of its position. (See TBMT Br. at 10.) The real issue for TBMT is not stare decisis, but collateral estoppel, also known as issue preclusion. Specifically, if the Court finds that the Franchise Agreement terminated by its own terms based on the Synovus Action remaining pending against TBMT for more than thirty days, and that the termination clause is valid, then that holding as to the validity of the termination clause may be binding on TBMT in future actions. This is the case even though TBMT is not a party here, because it could be held "in privity" with the Moreno Defendants. Where issue preclusion "may impair a proposed intervenor's ability to vindicate its interests in a separate lawsuit, courts have found the requisite impairment of interest to satisfy Rule 24(a)." Home Ins. Co. v. Liberty Mut. Ins. Co., No. 87-CV-0675, 1990 WL 188925, at *5 (S.D.N.Y. Nov. 20, 1990) (citations omitted); see also New York v. Gutierrez, No. 08-CV-2503, 2008 WL 5000493, at *6 (E.D.N.Y. Nov. 20, 2008); Keybank, Nat'l Ass'n, 2007 WL 9710295, at *6. Moreover, as noted supra, this litigation will adjudicate TBMT's rights and obligations under several agreements, including the Franchise Agreement, Guaranty, and the Shute and New Notes. (See Am. Compl. ¶¶ 163-169.) Accordingly, TBMT's interest would be impaired without intervention.

### D. Whether TBMT's Interest Is Adequately Represented by the Moreno Defendants

**\*5** The intervening party bears the burden of providing that its interests are not adequately represented by the existing parties, but that burden is "minimal." Keybank Nat'l Ass'n, 2007 WL 9710295, at *6. However, the Second Circuit has "demanded a more rigorous showing of inadequacy in cases where the putative intervenor and a named party have the same ultimate objective." Butler, Fitzgerald & Potter v. Sequa Corp., 250 F.3d 171, 179 (2d Cir. 2001) (quoting Wash. Elec. Co-op., Inc., 922 F.2d at 98). Where the court finds there is an identify of interest, the party seeking intervention must rebut the presumption of adequate representation, such as by demonstrating "collusion, adversity of interest, nonfeasance, or incompetence." Id.

Here, TBMT and the Moreno Defendants, represented by the same counsel, have the same ultimate objective: dismiss Sea Tow's claims and perhaps even revive certain rights under the Franchise Agreement. Because the Court finds an identity of interest exists, TBMT must rebut the presumption of adequate representation. To do so, TBMT argues that, "[a]s principal obligor [under the Franchise Agreement], TBMT has additional defenses and direct counterclaims that the Moreno's cannot

2021 WL 327653

effectively raise," specifically, counterclaims relating to TBMT's purported continuing interest and rights under the Franchise Agreement. (TBMT Br. at 11-12.) Moreover, TBMT contends there is daylight between its interests and those of the Moreno Defendants, because in the event the Moreno Defendants are found liable, they will possess a right of action against TBMT for indemnification. (Reply at 5.)

Although a close call, based on TBMT's showing, and in the interest of fulfilling Rule 24's purpose of "prevent[ing] a multiplicity of suits where common questions of law or fact are involved," Washington Elec. Coop., Inc., 922 F.2d at 97, the Court finds that TBMT has rebutted the presumption of adequate representation here. As the court in Fredericks v. Shapiro recognized in this context, a guarantor (here, the Moreno Defendants) does not adequately represent the rights of a principal obligor (here, TBMT) where the principal obligor seeks to assert counterclaims that are not available to the guarantor. 160 F.R.D. 26, 28 (S.D.N.Y. 1995). Additionally, TBMT's and the Moreno Defendants' interests may "diverge" in the event Sea Tow prevails on its claims against the Moreno Defendants, at which point the Moreno Defendants would seek indemnification from TBMT. Steinhardt v. Shadow, No. 16-CV-4222, 2018 WL 4278334, at *2 (S.D.N.Y. Mar. 6, 2018) ("Under New York law ... a guarantor is 'equitably entitled to full indemnity against the consequences of a principal obligor's default.' "); see also Home Ins. Co., 1990 WL 188925, at *6 (finding no adequate representation where "potential conflict of interest" could arise between the proposed intervenor and its insurer in indemnification and contribution context).

Accordingly, for the foregoing reasons, the Court concludes that TBMT has met the requirements to intervene as of right.

### E. Sea Tow's Remaining Arguments

Sea Tow makes two additional arguments against intervention: (1) TBMT filed its motion in the name of "Tampa Bay Marine & Towing, Inc.," an entity that does not exist, rather than "Tampa Bay Marine Towing & Service, Inc.," the franchisee (Opp. at 14); and (2) TBMT's motion should be denied because its counterclaims are futile (id. at 11-13). First, however slipshod, the Court finds TBMT's mistake amounts to no more than a scrivener's error and is not a basis to deny the motion. And Sea Tow's second argument puts the proverbial cart before the horse. As the Second Circuit explained in Brennan v. New York City Board of Education:

**\*6** "[E]xcept for allegations frivolous on their face, an application to intervene cannot be resolved by reference to the ultimate merits of the claims which the intervenor wishes to assert following intervention, but rather turns on whether the applicant has demonstrated that its application is timely, that it has an interest in the subject of the action, that disposition of the action might as a practical matter impair its interest, and that representation by existing parties would not adequately protect that interest.... The sufficiency of an interest entitles the intervenor to contest the merits of his/her claim based on that interest. An interest that is otherwise sufficient under Rule 24(a)(2) does not become insufficient because the court deems the claim to be legally or factually weak.

260 F.3d 123, 129–30 (2d Cir. 2001) (internal citations omitted). Accordingly, the Court is not persuaded by Sea Tow's remaining arguments.

### II. Permissive Intervention

In the alternative, the Court finds that TBMT has met the requirements for permissive intervention under Rule 24(b). Permissive intervention "is discretionary with the trial court." H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc., 797 F.2d 85, 89 (2d Cir. 1986). " 'In exercising its discretion,' the court must 'consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.' " Citizens Against Casino Gambling in Erie Cnty. v. Hogen, 417 F. App'x 49, 50 (2d Cir. 2011) (citing H.L. Hayden Co. of N.Y., 797 F.2d at 89 (2d Cir. 1986) (quoting Rule 24(b))). "Additional relevant factors include the nature and extent of the intervenors' interests, the degree to which those interests are adequately represented by other parties, and whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." H.L. Hayden Co. of N.Y., 797 F.2d at 89.

As noted <u>supra</u>, the Court finds intervention will not delay proceedings, which remain in their early stages, or prejudice Sea Tow. Moreover, TBMT's involvement will significantly contribute to the full development of the underlying factual issues, given its role in the allegedly fraudulent scheme and connection to the disputed agreements.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

<u>CONCLUSION</u>

Accordingly, for the reasons stated herein, Proposed Defendant TBMT's Motion to Intervene is GRANTED. **IT IS HEREBY ORDERED** that:

(1) The Clerk of the Court shall add Tampa Bay Marine Towing & Services, Inc. as a defendant in this action. TBMT has equal standing with the original parties; however, TBMT is subject to the proceedings that have occurred prior to its intervention, such as the Agreed Preliminary Injunction (ECF No. 25); and

(2) The Defendants shall answer or move to dismiss Sea Tow's Amended Complaint within twenty (20) days of receipt of this Memorandum and Order.

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 327653

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3398965
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Ibrahim TURKMEN, et al., Plaintiffs,

v.

John ASHCROFT, Robert Mueller, James W. Ziglar, Dennis Hasty, Michael
Zenk, James Sheridan, Salvatore Lopresti, and Joseph Cuciti, Defendants.

No. 02–CV–2307 (JG).
|
June 30, 2010.

**Attorneys and Law Firms**

Rachel Anne Meeropol, Jennifer M. Green, Matthew D. Strugar, Shayana Devendra Kadidal, New York, NY, Kimberly Helene Zelnick, Michael Winger, Stephanie Yu, Covington & Burling, New York, NY, for Plaintiffs.

Brian D. Miller, Dennis C. Barghaan, Larry L. Gregg, Richard W. Sponseller, Office of the United States Attorney, Alexandria, VA, Ernesto H. Molina, Office of Immigration Litigation, Craig Lawrence, U.S. Attorney's Office, D.D.C., Washington, DC, for Defendants.

*REPORT & RECOMMENDATION*

GOLD, S., United States Magistrate Judge.

**Introduction**

 ***1**  This case was originally brought as a putative class action by four named plaintiffs, each a non-citizen who was detained on immigration violations after the September 11, 2001 terrorist attacks. Docket Entry 1. The current operative pleading, the Third Amended Complaint, is brought on behalf of seven named plaintiffs who assert constitutional violations with respect to their conditions of confinement. Docket Entry 109. Five of these plaintiffs were detained at the Metropolitan Detention Center in Brooklyn (the "MDC plaintiffs") and two were held at the Passaic County Jail in New Jersey (the "Passaic County" plaintiffs).

The Third Amended Complaint asserts, among other causes of action, claims against the United States pursuant to the Federal Torts Claims Act, 28 U.S.C. § 2674, and claims against various public officials pursuant to *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The plaintiffs' claims are described at length in the Memorandum and Order issued by United States District Judge Gleeson granting in part and denying in part a motion to dismiss brought by certain defendants, *Turkmen v. Ashcroft,* 2006 WL 1662663 (E.D.N.Y. June 14, 2006), and in the decision of the Second Circuit affirming that decision in part, vacating it in part, and remanding the case for further proceedings, 589 F.3d 542 (2d Cir.2009).

The five MDC plaintiffs entered into a settlement agreement with the United States last August. Pursuant to that agreement, these plaintiffs dismissed all of their claims against each of the defendants, including those brought against individual defendants pursuant to *Bivens,* thus leaving the putative class without any named plaintiffs who had been detained at the MDC.

2010 WL 3398965

Six proposed intervenors—each of whom, like the plaintiffs who settled their claims, was detained at the MDC after the September 11 attacks—now move for leave to intervene and, together with the two remaining Passaic County plaintiffs, to file a Fourth Amended Complaint. Docket Entry 704. The proposed new pleading adds the intervenors' claims and supplements the factual allegations of the pending complaint with additional details learned in the course of discovery.[1] The proposed pleading asserts claims against eight of the existing *Bivens* defendants but not against the United States.[2]

[1]     Plaintiffs also seek to add a § 1985 claim based on the same factual predicate as their *Bivens* claims.

[2]     The term "defendants" is used below to refer to the eight individuals identified as defendants in plaintiffs' proposed Fourth Amended Complaint.

By Order dated March 15, 2010, United States District Judge Gleeson referred plaintiffs' motion to me for report and recommendation. I heard argument on the motion on June 22, 2010, and reserved decision. For the reasons stated below, I respectfully recommend that the motion be granted.

**Discussion**

A. *Intervention*

Intervention is governed by Rule 24 of the Federal Rules of Civil Procedure. Rule 24(a) affords a right to intervene to any person who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Rule 24(b) authorizes a court to permit the intervention of any person who asserts a claim "that shares with the main action a common question of law or fact."

**\*2**  The proposed intervenors are situated similarly to the MDC plaintiffs who have settled their claims, and seek to continue some of the putative class action *Bivens* claims that were previously asserted by the five MDC plaintiffs who have settled. If the MDC plaintiffs had not settled their claims, and if a class were ultimately certified, the intervenors would have been members of that class. For these reasons, the proposed intervenors meet the requirements of both Rule 24(a) and 24(b).

Facts similar to those presented here led to a decision approving intervention in *Eckert v. Equitable Life Assurance Society,* 227 F.R.D. 60 (E.D.N.Y.2005). *Eckert,* like this case, was commenced as a proposed class action. Subsequently, the only named plaintiff settled his claim, and a new proposed class representative sought to intervene. The court held that, at least in the context of a putative class action, a lawsuit is not rendered moot even when all claims of the sole named plaintiff are settled, and that intervention was proper as of right pursuant to Rule 24(a) and permissively pursuant to Rule 24(b). 227 F.R.D. at 64.

Defendants do not challenge these basic principles governing intervention. Nor do defendants dispute that the claims of the proposed intervenors meet the requirements imposed by either Rule 24(a) or (b). Rather, defendants oppose intervention on two grounds. First, incorporating arguments set forth in a separate memorandum of law filed by the United States, defendants argue that intervention should not be permitted in light of the settlements reached by the MDC plaintiffs and the conduct of plaintiffs' counsel during the negotiations leading to those settlements. Second, defendants contend that the pending intervention motion is untimely.

Although no longer a party to this litigation, the United States has submitted a memorandum of law in opposition to the pending motion for leave to intervene and amend. Docket Entry 709. The United States argues that intervention should be denied because the agreements made by the five settling plaintiffs terminated the claims of all putative class members who were detained at the MDC.

**WESTLAW**   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3398965

I find the arguments made by the United States in this regard unpersuasive. The United States contends that the settlement agreements it reached with the five settling MDC plaintiffs were binding contracts terminating the MDC litigation in its entirety. Docket Entry 709 at 8 *et seq.* However, while a putative class action complaint was pending at the time the settlement agreements were made, no class had been certified. Accordingly, the actions of the named plaintiffs could not bind absent class members such as the proposed intervenors. *See, e.g.,* Fed. R. Civ. P. 23(e) (requiring notice to absent class members and court approval before a settlement may bind a class); *Shelton v. Pargo,* 582 F.2d 1298, 1314–15 (4th Cir.1978) (noting that "pre-certification dismissal does not legally bind absent class members"), *quoted with approval in In re Austrian & German Bank Holocaust Litig.,* 2001 WL 228107, at *4 (S.D.N.Y. Mar.8, 2001); *Cf. Mendez v. The Radec Corp.,* 260 F.R.D. 38, 46 (W.D.N.Y.2009) (citing cases for the proposition that "when a district court decides a motion for summary judgment before a class has been certified, that decision will not bind putative class members"); *Caruso v. Candie's, Inc.,* 201 F.R.D. 306, 311 (S.D.N.Y.2001) (stating that a "class action judgment is binding on all class members ... [unless] absent members ... were not accorded due process of the law").

 **\*3** Although the United States contends that plaintiffs' counsel had authority, or apparent authority, to bind absent class members, the basis for that contention is unclear. Generally, an attorney's conduct may bind a client. Here, however, plaintiffs' counsel did not actually represent the proposed intervenors or other absent class members, and certainly was not acting on their behalf, when they negotiated the settlement of the MDC plaintiffs' claims. To the contrary, the general rule is that a limited attorney-client relationship arises between potential class members and class counsel *upon class certification. Tedesco v. Mishkin,* 629 F.Supp. 1474, 1483 (S.D.N.Y.1986). *See also Van Gemert v. Boeing Co. .,* 590 F.2d 433, 440 n. 15 (2d Cir.1978); *Fulco v. Continental Cablevision, Inc.,* 789 F.Supp. 45, 47 (D.Mass.1992) (citing cases and finding that the relationship arises upon an order certifying a class). The government's apparent authority argument is equally without merit; apparent authority arises from the actions of a principal, not those of an agent. *See, e.g., Cohen v. Utica First Ins. Co.,* 436 F.Supp.2d 517, 529 (E.D.N.Y.2006); Restatement (Third) of Agency § 3.03.

Moreover, as noted above, even an agreement to settle the claims of all named plaintiffs does not render a putative class action moot, at least where a motion for class certification has been filed or plaintiff has not yet had a reasonable opportunity to move for certification. *Eckert,* 227 F.R.D. at 63; *see also In re Nat'l Austl. Bank Secs. Litig.,* 2006 WL 3844463 (S.D.N.Y. Nov.8, 2006). Here, plaintiffs sought leave to move for class certification on October 5, 2005. Docket Entry 388. I deferred briefing on the motion until after discovery that is yet to be completed. Minute Entry dated Nov. 16, 2005. Thus, plaintiffs have not had a reasonable opportunity to move for class certification, and the settlement reached by the named MDC plaintiffs does not render the claims of the proposed intervenors moot.

The spark igniting the government's opposition is its contention that plaintiffs' counsel misled the government's attorneys during the negotiations leading up to the settlement agreements. Plaintiffs' counsel left the United States—and, candidly, this Court as well—with the impression that the settlement agreements would have the practical effect, at least as far as anyone could foresee, of terminating the MDC aspect of this litigation. The United States contends that it went forward with the settlement and tendered the settlement proceeds in reliance on this understanding. In fact, though, plaintiffs' counsel had already agreed to represent the proposed intervenors and to seek leave to intervene on their behalf *before* any settlement proceeds were paid. Tr. of June 22, 2010 ("Tr.") at 5. Nevertheless, plaintiffs' counsel did not disclose this information until *after* the MDC plaintiffs received their settlement checks.

 **\*4** I expressed my views about these events during a proceeding held on November 23, 2009. Tr. of Nov. 23, 2009, Docket Entry 697. Although defendants and the United States dwell on the conduct of plaintiffs' counsel, I do not find the settlement negotiations to be particularly relevant to the pending motion for the following reasons. First, although defendants argue that plaintiffs' counsel should suffer some consequence for their conduct, *see. e.g.,* United States' Mem. in Opp., Docket Entry 709, at 5–8; Tr. at 34, the adverse consequences of denying the pending motion would be borne primarily by absent class members. Second, although the United States may have tendered settlement funds expecting a degree of closure that has not been achieved, the United States is no longer a party to this action, and those defendants who are named in the proposed Fourth Amended Complaint did not rely to their detriment upon any misimpression engendered by the conduct of plaintiffs' counsel. Accordingly,

even assuming that plaintiffs' counsel improperly failed to make their intentions and those of the proposed intervenors known before the settlement proceeds were paid, the outcome of the pending motion would be unaffected.

Finally, defendants argue that the motion for leave to intervene is not timely. Rule 24 requires that intervention be sought "[o]n timely motion." Whether a motion to intervene is timely "is to be determined from all the circumstances ... by the court in the exercise of its sound discretion." *NAACP v. New York,* 413 U.S. 345, 366, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973). Relevant considerations include the length of time the proposed intervenor knew or should have known of his interest before making the motion, prejudice to existing parties from the applicant's delay, prejudice to the applicant if the motion is denied, and any unusual circumstances. *Mastercard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.,* 471 F.3d 377, 390 (2d Cir.2006).

When all of the circumstances of this case are taken into account, it becomes apparent that the motion to intervene is timely. The need for intervenors did not arise until the five MDC plaintiffs named in the Third Amended Complaint settled their claims. Those plaintiffs did not agree to settlement terms until August 13, 2009. The settlement agreement was not reduced to writing and consummated until October of 2009. By letter dated November 2, 2009, plaintiffs' counsel indicated their intention to seek leave to file a Fourth Amended Complaint with the proposed intervenors as plaintiffs. At that time, an appeal from Judge Gleeson's decision granting in part and denying in part a motion to dismiss made by certain defendants was pending before the Second Circuit. During a conference held on November 23, 2009, this Court ruled that no motion should be filed pending further action by the Second Circuit. The Circuit issued its mandate on February 25, 2010, Docket Entry 700, and plaintiffs' counsel sought a briefing schedule for the motion now before the Court by letter dated March 3, 2010, Docket Entry 699. These facts demonstrate that the proposed intervenors acted promptly once they knew of their interest.

**\*5** The prejudice to the proposed intervenors if their motion is denied would be considerable, but not overwhelming. If the motion were denied, proposed intervenors could, and presumably would, file a new action asserting the same claims as those pled in the proposed Fourth Amended Complaint. Plaintiffs' Reply Mem., Docket Entry 713, at 16–17. For the same reason, however, any prejudice to defendants if the motion is granted would also not be particularly substantial. Moreover, because defendants asserted qualified immunity defenses and moved to dismiss, they have not been required to respond to discovery demands or submit to depositions. Thus, any change in the pleadings will not result in defendants being subjected to duplicative discovery demands. For these reasons, the relative prejudice to intervenors and defendants is not a strong factor in favor of granting or denying the motion.

Having considered all of the relevant circumstances, and despite the amount of time that has elapsed since this litigation was commenced, I conclude that the proposed intervenors' motion is timely. For all the reasons stated above, I respectfully recommend that the proposed intervenors' motion be granted.

B. *Leave to Amend*

The second prong of plaintiffs' motion seeks leave to file a Fourth Amended Complaint. In addition to adding the proposed intervenors as named plaintiffs, the Fourth Amended Complaint adds new factual allegations, apparently based upon information plaintiffs learned during discovery. Defendants contend that plaintiffs' motion should be denied on the same grounds discussed above; that is, defendants argue that plaintiffs' motion for leave to amend is untimely and that the conduct of plaintiffs' counsel during settlement negotiations warrants denial of the motion. In addition, defendants argue that leave should be denied because the Supreme Court's decision in *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), indicates that plaintiffs were not entitled to the discovery that provides the basis for the proposed new factual allegations.

Leave to amend should be freely granted. Fed. R. Civ. P. 15(a)(2). Generally, courts will deny leave to amend only where there is evidence of "undue delay, bad faith, undue prejudice to the non-movant, or futility." *Milanese v. RustOleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001) (*citing Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Defendants do not contend in opposing this motion that the amendments plaintiffs seek to make would be futile. Although defendants argue that plaintiffs' counsel acted in bad faith during the course of settlement negotiations, I find that argument of little relevance to the pending motion for the reasons discussed above.

2010 WL 3398965

Nor has there been undue delay. Although the parties' submissions do not indicate precisely when plaintiffs learned the new information they seek to add to their complaint, it is certainly the case, as demonstrated above, that plaintiffs promptly moved for leave to amend once the Second Circuit issued its mandate. Moreover, as the Second Circuit pointed out in its opinion in this case, the Supreme Court had not yet announced its holdings in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Iqbal* at the time of the district court's decision, and that decision was therefore reached in the context of "an outdated pleading standard." *Turkmen,* 589 F.3d at 546. Although it has been eight years since plaintiffs first filed this case and they have already amended their complaint three times, much of the delay has been occasioned by defendants' interlocutory appeals, the rolling production of discovery by the government throughout the lawsuit, and the inherent complexity of the litigation.

**\*6** Defendants have failed to offer any persuasive reason why, having moved promptly after remand for leave to amend, plaintiffs should not be permitted to conform their pleadings to the heightened standard only recently imposed by the Supreme Court. To deny plaintiffs that opportunity would require them to defend the adequacy of a pleading drafted before that heightened standard was established, even while they assert they now have sufficient evidence and information to meet the heightened standard. The law, which encourages "liberal amendment in the interests of resolving cases on the merits," 3 Moore's Federal Practice § 15.02[1], does not demand such a result.

With respect to prejudice, as noted above, plaintiffs would file a new complaint similar to the proposed Fourth Amended Complaint if their motion were denied. During oral argument, I asked counsel for defendant Ashcroft, who argued on behalf of all defendants, why the likelihood of a new action pressing the same claims did not undermine any argument that allowing plaintiffs leave to amend in this case would be prejudicial. Counsel's only response was that plaintiffs would not be permitted in a newly filed case to make use of discovery provided by the United States in this action, because that discovery was provided pursuant to a protective order limiting its use to the litigation of this case.

The premise of defendants' argument is faulty. If the proposed intervenors brought a new action asserting the same claims as those made by the MDC plaintiffs in the Third Amended Complaint, the new action would be so closely related to this one that the Court would likely grant plaintiffs the right to use the discovery obtained in this case as evidence in the new one despite the limitations in the protective order. Even if plaintiffs made such an application and I denied it because of the protective order, plaintiffs would no doubt seek the same documents and information they obtained from the government in this case by means of new discovery demands served on the United States as a non-party. Having already culled and reviewed the materials for privilege, the United States would likely be able to produce the discovery without difficulty and with little if any basis to oppose production. In either event, defendants would face the same claims brought by the same plaintiffs armed with the same discovery. For this reason, defendants' claim of prejudice rings hollow.

Defendants also contend that the Supreme Court's *Iqbal* decision holds that plaintiffs should be precluded from making use of discovery obtained from the United States while defendants' motions to dismiss on grounds of qualified immunity were pending. Tr. at 38–39. Defendants' argument misconstrues the portion of the *Iqbal* opinion on which it relies. In the section of the decision at issue, the Supreme Court was addressing Iqbal's argument that a heightened pleading standard should not be required where, as here, discovery was limited because defendants had raised a qualified immunity defense. 129 S.Ct. at 1953. The Supreme Court rejected that argument, at least in part by stressing that "[t]he basic thrust of the qualified-immunity defense is to free officials from the concerns of litigation, including avoidance of disruptive discovery." *Id.* In the portion of the opinion relied upon by defendants, the Supreme Court went on to state as follows:

> **\*7** It is no answer to these concerns to say that discovery for petitioners can be deferred while pretrial proceedings continue for other defendants. It is quite likely that, when discovery as to the other parties proceeds, it would prove necessary for petitioners and their counsel to participate in the process to ensure the case does not develop in a misleading or slanted way that causes prejudice to their position. Even if petitioners are not yet themselves subject to discovery orders, then, they would not be free from the burdens of discovery.

2010 WL 3398965

*Id.* Considered in context, it is clear that the Supreme Court was indicating in this passage only that defendants asserting a qualified immunity defense are entitled to test the adequacy of a pleading by moving to dismiss it even before discovery is taken from other parties, and that the pleading must meet the heightened standard announced in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), even though no discovery has occurred. While *Iqbal* may therefore guide courts deciding whether and to what extent to permit discovery when defendants assert a defense of qualified immunity by way of a motion to dismiss, the decision does not bar the use of discovery legitimately taken pursuant to a court-ordered case management schedule. Here, the discovery at issue has already taken place, and permitting plaintiffs to rely on it at this stage would not impose the "burdens" of "participating in the [discovery] process" on defendants. The plaintiffs obtained the discovery properly, and neither the decision in *Iqbal* nor any other circumstance suggests that they should not be permitted to make use of it.

**Conclusion**

For the reasons stated above, I respectfully recommend that plaintiffs' motion for leave to intervene and to file a Fourth Amended Complaint be granted. Any objections to the recommendations made in this Report must be filed within fourteen days of this Report and Recommendation and, in any event, on or before July 19, 2010. Failure to file timely objections may waive the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3398965

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.