# EXHIBIT C

May & June 2004 Volume XVII Number  5 & 6



Professional Liability Underwriting Society

**PLUS**

*the quintessential source of information and education on professional liability*

# JOURNAL
## ARTICLE REPRINT

# ATTACKING PLAINTIFFS–STYLE DAMAGES DURING MEDIATION OF SECURITIES CASES

by David H. Topol

The majority of securities class-action lawsuits settle, and settlement discussions – typically mediations – often begin at the same starting point: plaintiffs-style damages, which are figures that give the plaintiffs the benefit of the doubt as to every issue.  Indeed, in discussing a potential settlement with insurers, defense counsel often focus myopically on plaintiffs-style damages.  Mediators also often attempt to use stratospheric plaintiffs-style damages to justify an equally stratospheric settlement.

This approach to calculating damages harms insurance carriers and their insureds for at least three reasons.  First, a defendant's ability to negotiate a reasonable settlement is significantly weakened when the starting point for negotiations is what plaintiffs could achieve in an absolute best-case scenario.  This is particularly true when, the theory underlying typical plaintiffs-style damages suffers from a number of fundamental flaws that make it readily susceptible to challenge.  A better approach to articulating an opening position on damages at mediation would entail a strategy that more effectively seeks to undercut this plaintiffs-style figure with a reasoned defense-style analysis.

A second issue that harms carriers and their insureds in these cases, and which exacerbates the first problem, is that defense counsel is sometimes not prepared to develop a defendants-style theory of damages at the mediation stage, which may take place shortly after the court denies a motion to dismiss.  Instead, defense counsel often waits to undertake this analysis until later in the case.  Since damages are typically a central issue during settlement negotiations, the failure to invest in a damages analysis at an earlier stage of the case may be unsound.

Third, and perhaps most significantly, the plaintiffs-style damages model overstates plausible damages actually recoverable at trial by a substantial amount.  For example, the authors of one study concluded that plaintiffs-style damages may overstate the "true" damages by at least a factor of four.[1]  The authors of another study examined the actual claims submitted at the end of two securities cases and compared them with the computer models of damages that had been developed.  The study found that in one case the actual damages were only 26% of the modeled damages, and in the other case, the actual damages were only 40% to 64% of the modeled damages.[2]  Thus, the starting point for negotiations is often overstated by 400% or more.

This article articulates some basic strategies for attacking plaintiffs-style damages.  Part I provides an overview of how damages are calculated in securities class-action lawsuits and defines key terms.  Part II, identifies critical arguments that can be made to attack plaintiffs-style damages calculations and suggests some steps that insurers and insureds can take to ensure that damages have been adequately analyzed prior to mediation.  Since plaintiffs-style damages are typically well in excess of the entire insurance tower, it is an important topic for all carriers (primary and excess) to understand.

## OVERVIEW OF DAMAGES CALCULATIONS IN SECURITIES CASES

At its core, a damages calculation under Section 10(b) of the Securities Exchange Act of 1934 is based on the premise that, during the class period, the stock of the defendant company was inflated as a result of a violation of securities law – that is, a material misstatement or a material omission.  Calculation of damages requires addressing two questions:  (1) how much was each share of stock damaged as a result of the violation – the share price inflation? and (2) how many shares were impacted by the violation?



*David Topol is a partner in the professional liability practice at Wiley Rein & Fielding LLP. He represents insurance carriers in connection with a variety of professional liability policies, including directors and officers liability, banking, mutual fund, and investment adviser policies. He can be reached at dtopol@wrf.com.*

PROFESSIONAL LIABILITY UNDERWRITING SOCIETY JOURNAL – MAY & JUNE 2004 REPRINT

## Calculating Share Price Inflation

The basic theory underlying the calculation of share price inflation is that when investors purchased the securities of a company that made misrepresentations, they paid an inflated amount for their shares because the market overvalued the shares based on erroneous information. For example, in a case involving improper revenue recognition practices, a company's stock price may be inflated because investors assumed that the company's revenue stream was higher than was actually the case. The share price inflation on any given day is the difference between the actual price of the stock on that day and what the price would have been that day had all of the subsequently disclosed information been available to investors. Since it is impossible to know for certain what the amount of inflation actually was on any given day, damages calculations seek to estimate the inflation.

Two methodologies are used for calculating share price inflation: the **constant ribbon** approach and the **comparable index** approach. Both methodologies share a common feature: they rely on the assumption that the stock price after all material information has been disclosed accurately reflects the "true" value of the stock.[3] The decline in the stock price following the disclosure then provides the basis for calculating the share price inflation on each day of the class period.

The constant ribbon approach attempts to estimate a "constant" value for the inflation and then apply that value to the "ribbon" that reflects the company's share price during each day of the class period. Three different techniques are used for estimating the constant value of the ribbon. One technique is the **constant true value ribbon**. This technique assumes that the price of the stock at the end of the class period is its "true value" and that the amount of inflation on any given day is the amount that the stock was trading above this constant value. This technique, however, makes no effort to take into account any other influence on a company's stock price, such as general economic or industry-wide factors or company-specific developments that were disclosed, and it is therefore used less frequently than the other constant ribbon techniques.

A second technique that is used to estimate the constant value of the ribbon is the **constant dollar ribbon**. This technique assumes that the amount of inflation in the stock price is the same throughout the entire class period and that the amount of inflation is reflected in the amount of the drop in the stock price immediately following disclosure of the material information. For example, if a company's stock price falls from $50 to $40 at the end of the class period, this technique assumes that the price of the stock was inflated by $10 at all times during the class period. Thus, on a day when the share price was $75, the constant dollar ribbon technique assumes that the share price would have been $65 if all material information had been disclosed, and on a day when the share price was $58, the technique assumes that the share price would have been $48 if all material information had been disclosed.

A third technique for estimating the constant value of the ribbon is the **constant percentage ribbon**, which is similar to the constant dollar ribbon, and also assumes that the amount of inflation affecting the stock price is the same throughout the entire class period. However, rather than calculating inflation in dollars, this technique uses percentages. For example, if the stock price dropped from $50 to $40 following disclosure of material information, this technique would assume that at all times the stock price was inflated by 25% ($10 = 25% of $40). To the extent that the stock price reached $100 during the class period, the inflation on that day would have been $20 ($20 = 25% of $80). And if the stock price reached $75, the inflation on that day would have been $15 ($15 = 25% of $60). If the stock price has risen or fallen dramatically, the constant dollar ribbon and the constant percentage ribbon techniques will produce larger differences relative to each other.

An alternative to the constant ribbon methods is the **comparable index methodology**. This approach assumes that a company's stock price rises and falls consistent with changes in similar stocks, which can be measured based on a comparable stock index, such as the NASDAQ, the S&P500 or an index of a particular segment of an economy (*e.g.*, an index of pharmaceuticals for a class-action lawsuit involving a pharmaceutical company). The relative position of the company's stock compared to the index immediately following disclosure of the misrepresentations is presumed to accurately reflect the relative value of the company's stock to the index. The share price inflation is then measured based on the extent to which the stock price reached a higher level during the class period than it would have reached if it had simply tracked the comparable index. In theory, this methodology takes into account the fact that general economic and industry-wide factors will affect the price of a company's stock.

## Determining the Number of Shares Damaged

In order to calculate damages in a securities class-action lawsuit, it is also necessary to determine how

[1] John Finnerty & George Pushner, *An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions*, 8 Stan. J.L. Bus. & Fin. 213, 246 (2003).

[2] Kenneth R. Cone & James E. Laurence, *How Accurate are Estimates of Aggregate Damages in Securities Fraud Cases?*, 49 Bus. Law. 505, 506 (1994).

[3] The 1995 Private Securities Litigation Securities Reform Act provides that "the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated in the market." 15 U.S.C. § 78u-4(e)(i). This 90-day "look back" or "bounce back" provision suggests that the stock price immediately following an announcement of new information may not be the most appropriate basis for comparison because the stock may rebound to a higher level as the disclosure is placed into proper perspective by investors.

**PROFESSIONAL LIABILITY UNDERWRITING SOCIETY JOURNAL – MAY & JUNE 2004 REPRINT**

many shares of stock were purchased each trading day and held throughout the class period. For instance, while 100,000 shares of a company's stock might have been purchased on the first day of the class period, some investors who purchased those shares will have sold them prior to the end of the class period. The term "*ins and outs*" is often used to refer to shares that are bought (go "in" to the class) and sold (go "out" of the class) within the class period. In theory, the ins and outs have suffered no injury because investors purchased and sold those shares based on the same alleged misrepresentations. If, however, the company made partial corrective disclosures, then a damages analysis would need to take into account when during the class period the ins and outs were purchased and sold.

Data on ins and outs is generally available for institutional investors; however, the number and timing of the ins and outs must be estimated at the mediation stage for other investors. For example, the available data will generally reflect how many shares of a company's stock were bought and sold on the fifth day of the class period, but not how many of the shares that were sold that day were sold by investors who had purchased them on the first four days of the class period (and were therefore uninjured by the misrepresentations since they both bought and sold at the inflated stock price).

Plaintiffs traditionally have favored a methodology that is referred to as the *single-trader model* or the *proportionate decay model* to determine how many shares were purchased and held throughout the class period. This model assumes that there is a single type of trader who is equally likely to trade shares of defendant's stock on any given day. Thus, under this model, "all outstanding shares have an equal probability of trading during the class period."[4] The single-trader model makes an assumption about how many of the shares that were purchased on a given day of the class period were sold by investors who had purchased the shares during the class period. For example, if, on average, 1% of a company's shares were traded each day during the class period, the model would assume that on day 2 of the class period when 10,000 shares were purchased, 1% (100) of those shares were purchased from individuals who had bought the stock the day before and the other 9,900 were purchased from investors who had acquired the shares prior to the start of the class period. Under this approach, if the class period was 100 days and a 1% rate was used, the model would assume that at the end of the class period, 63% of all issued and outstanding shares of the company would have entered the market during the class period.[5]

The **multi-trader model**, by contrast, attempts to take into account that there are different types of investors with different types of objectives and, therefore, stock purchasing and selling habits.[6] Among these types are very active investors who will buy and sell a stock multiple times during a class period. Thus, for example, in the above hypothesis, a multi-trader model might assume that 20% of a company's shares are held by active traders and that those traders are 20 times more likely to trade the stock on a given day. By using this approach for the example in the prior paragraph, the number of shares impacted is cut almost in half to 35%[7] – which could potentially cut the damages calculation in half.

## AVENUES FOR ATTACKING PLAINTIFFS-STYLE DAMAGES CALCULATIONS

The manner in which damages have been calculated in a securities case always warrants close scrutiny because the decision as to which methodologies to use can alter calculations of damages by hundreds of millions of dollars. At least four avenues exist for attacking plaintiffs-style damages calculations, each of which can have a substantial impact on damages in the case.

### Event Studies

Although few reported decisions address securities damages calculations, one issue that has been addressed by a number of courts is the need for an *event study*, which is a detailed analysis of all events during and immediately following the class period, in order to "distinguish between the fraud-related and non-fraud-related influences on the stock's price behavior."[8] An event study is necessary because the stock price of a company can rise or fall during the class period and immediately after the class period for three different reasons that have nothing to do with the fraud at issue: (1) general economic developments (*e.g.*, a stock market bubble), (2) factors specific to the economic sector in which the company competes, and (3) company-specific events that are unrelated to the alleged fraud (*e.g.*, management turnover, mergers, development of a new product). In addition, an event study can take into account the fact that the alleged misrepresentations or disclosures may have taken place over time and that, as a result, their effect will not have been "constant" throughout the class period.

As one court explained, "[a] proper measure of damages in the securities context thus requires elimination of that portion of the price decline or price difference which is unrelated to the alleged wrong."[9] This is generally done through "the event

[4] Michael Y. Scudder, *The Implications of Market-Based Damages Caps in Securities Class Actions*, 92 Nw. U. L. Rev. 435, 450 (1997).

[5] William H. Beaver, *Stock Trading Behavior and Damage Estimation in Securities Cases*, at 3 (1997), http://www.cornerstone.com/Fram_res.html.

[6] A third approach that is sometimes used for determining how many shares were damaged is the *accelerated-trading model*. This model attempts to account for variations in types of investors by assuming that shares that have been recently traded have a higher probability of being traded again. It is based on studies "finding that a share that has traded (during the damage period) is four to five times more likely to trade again than a share that has not yet traded." John Finnerty & George Pushner, *An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions*, 8 Stan. J.L. Bus. & Fin., 213, 231 (2003).

[7] William H. Beaver, *Stock Trading and Damage Estimation in Securities Cases*, at 3.

[8] *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993).

PROFESSIONAL LIABILITY UNDERWRITING SOCIETY JOURNAL – MAY & JUNE 2004 REPRINT

study method, an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation."[10]  In fact, a number of courts have refused to admit expert testimony by damages experts who have failed to perform some type of event study or similar analysis.[11]

The constant ribbon methodologies ignore the influences of other events by simplistically assuming that share price inflation is uniform throughout the entire class period.  And while the comparable index method theoretically factors in non-company-specific factors that influence stock price, it does not account for other events at the company that are unrelated to the alleged fraud, which also can influence the stock price.  Moreover, the failure to perform an event study does not have a neutral effect in which damages will sometimes increase and sometimes decrease as a result.  Rather, since plaintiffs-style damages generally start with the assumption that the entire drop in the stock price is a result of the alleged fraud, the event study will almost always decrease damages.

The decision in *In re Imperial Credit Industries, Inc. Securities Litigation,*[12] which was a securities class action lawsuit by individuals who purchased stocks and bonds of Imperial Credit Industries, Inc. ("ICII"), illustrates the relevance of an event study.  Plaintiffs alleged that the stock price was inflated because ICII inflated the value of its equity interest in another company, Southern Pacific Funding Corporation ("SPFC"), which filed for bankruptcy at the end of the class period.  The court granted summary judgment for the defendants, holding that the plaintiffs had failed to meet their burden of proof on the issue of damages because their expert did not perform an event study.  The court noted that at an early stage of the litigation plaintiffs had also alleged misrepresentations concerning investments in a second company, Franchise Mortgage Acceptance Corp. ("FMAC"), but had dropped those allegations.  The court explained that "[a]lthough Plaintiffs dropped these assertions as part of their consolidated pleadings, they now need to differentiate between FMAC-related effects on ICII's stock price, which are not actionable, and SPFC-related effects on ICII's stock price, which may or may not be actionable.  Absent an event study or similar analysis, Plaintiffs cannot draw this distinction."[13]  Similarly, the court took "judicial notice" of other events toward the end of and immediately after the class period "which might have influenced the drop in stock prices of ICII and/or SPFC, specifically, the Russian default, the Asian crisis and the Long Term Capital default, and  . . . these external events resulted in dramatic changes in interest rates, thereby affecting participants in the credit industry, such as ICII and SPFC."[14]

It is clear that should the case go to trial, the plaintiffs' expert will need to adjust his or her damages calculation based on an event study and that the defendants' expert will use an event study to attack plaintiffs-style damages theory.  These analyses will take into account the influence of various events, both internal and external to the company, on the stock price.  In light of the fact that an events study generally provides a basis to reduce damages, often substantially, such a study can also play a critical role in attacking damages at mediation.  Indeed, to the extent that the events study demonstrates that the stock price was driven by factors other than the purported misrepresentations, the defense to liability may also be strengthened.

**Choice of Index**

Numerous indices measure the performance of particular segments of the stock market.  For example, Dow Jones, Standard & Poors and Russell publish dozens of indices, based on various criteria, such as industry sector, market capitalization, type of security and country.

Yet, notwithstanding the large number of potential indices against which to benchmark a stock's performance, plaintiffs-style damages (and the measurement of them by defendants in preparation for mediation) frequently point only to the S&P 500 or the NASDAQ, even though the companies that comprise the index may bear little relevance to the company involved in the litigation.  Drug companies, manufacturing companies and banks, as sectors, will not perform the same as each other or as the broader stock market.  Even subsets of those indices or specialized indices may be much more relevant.  For example, an index of the banking sector, weighted toward the largest national banks, may be preferable to the S&P 500 but still have limited value when analyzing the stock price of a smaller, regional bank.

In one reported case, a court found the analysis by a securities plaintiffs' expert to be flawed because it benchmarked a small-cap telecommunications company against the S&P Telecommunications Index, "rather than a more precisely correlated portfolio of securities."[15]  The court noted that the stock at issue is "far more volatile than the stocks – such as AT&T and MCI, which compose the Telecom Index," which could have raised damages over their "true" level.[16]  By contrast, in a case involving alleged securities fraud by a small supermarket chain, the court accepted comparison to an index that had been developed by the defendant for purposes of the litigation and that was "comprised of a group of small supermarkets specifically chosen as representative of" the defendant's business.[17]

[9] *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014-15 (C.D. Cal. 2003).

[10] *In re Gaming Lottery* Sec. Litig., No. 96 Civ. 5567, 2000 WL 193125, at *1 (S.D.N.Y. Feb. 16, 2000).

[11] *See, e.g., In re Oracle Sec. Litig.*, 829 F. Supp. at 1181 (As a result of failure to perform an event study, "the results reached . . . cannot be evaluated by standard measures of statistical significance."); *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000) ("Torkelsen's testimony is fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information and he did not challenge the event study performed by defendants' expert"); *In re Executive Telecard, Ltd. Sec. Litig.,* 979 F. Supp. 1021 (S.D.N.Y. 1997) (holding expert's methodology to be unreliable for failure to conduct an event study or regression analysis); *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d at 1016 (excluding expert report because "absent an event study or similar analysis, Plaintiffs cannot eliminate that portion of the price decline of ICII's and/or SPFC's stock which is unrelated to the alleged wrong"). *Compare RMED Int'l Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2000 WL 310352, at *6 (S.D.N.Y. Mar. 24, 2000) (admitting expert testimony where damages expert "conducted a microanalysis of each company-specific event which could have influenced Sloan's stock price, methodically charting those events on a daily basis.  The result is a seventy-page 'Event Analysis' containing a textual summary of each event placed next to the daily closing price of Sloan's stock.").

PROFESSIONAL LIABILITY UNDERWRITING SOCIETY JOURNAL – MAY & JUNE 2004 REPRINT

Accordingly, another avenue of attacking plaintiffs-style damages entails a careful examination of potential, appropriate comparable indices. Indeed, given the amount of money at stake in many securities cases, it may be desirable to have the defense expert create a fixed-time index based on a set of companies that appears most comparable, and to do so in advance of the mediation. While such an index will not consider variations in the stock price based on company-specific factors, it can help to account for broader industry and economic factors.

To be sure, by reviewing a number of indices to choose the most favorable one, the defense may be criticized by the plaintiff at the mediation for having engaged in cherry picking. Assuming however, that the defense counsel can make a credible argument as to why the selected index is most appropriate, the defense's position at the mediation is enhanced by a substantially lower number. In the proper case, defense counsel may want to put forward a number of indices for comparison in mediation.

It is, however, important to note that reliance on an index alone has another important limitation. While an appropriate index may capture the effects of general economic and industry-wide factors, it does not take into account company-specific factors that are unrelated to the alleged fraud. For example, an index would not account for the fact that during the class period, the company's price had risen when it was identified as a potential takeover target or introduced an important new product. Even when the company news is less dramatic, careful consideration of developments unique to the company is likely to be well worthwhile. Thus, while it may be appropriate to analyze damages using both an index and an events study, reliance on the index alone may overstate damages.

### Choice of Constant Dollar Ribbon v. Constant Percentage Ribbon

The decision whether to use the constant dollar ribbon or the constant ribbon approach is also one that can make a material difference in the calculation of damages. If the price of the stock is higher on the last day of the class period than it was in prior days, then the constant dollar ribbon is more favorable to the plaintiff. Conversely, if the price of the stock is lower on the last day of the class period than it was in prior days, then the constant percentage ribbon approach is more favorable to the plaintiff.

For example, if the price on the last day of the class period is $15, and the price then falls to $10 following all relevant disclosures (and ignoring the 90-day look back period), this represents an inflation of $5 using the constant dollar ribbon method and an inflation of 50% using the constant percentage ribbon method. If the price on an earlier day in the class period had been $12, then the inflation would be $5 under the constant dollar ribbon method and $4 under the constant percentage ribbon method. By contrast, if the price on a prior day had been $30, then the inflation would still be $5 under the constant dollar ribbon method, but it would be $10 under the constant percentage ribbon method.

### Single-Trader v. Multi-Trader Models

A significant flaw with reliance on the single-trader model is that a disproportionate share of the volume of stock sold on any day will be by active traders who buy and sell shares during the class period and, in some cases, on the same day. This has the effect of overstating damages because to the extent that a disproportionate amount of the share volume traded is by high activity investors who buy and sell multiple times, this means that there are "fewer different shares participating in the trading process. Since damages can only be incurred in connection with transactions, the single-trader model's assumption of uniform trading propensities – unless absolutely correct – inflates damaged volume estimates."[18]

Indeed, at least two courts have expressly rejected the single-trader model in light of this flaw. In one case, a federal district court for the Northern District of California explained that the single-trader model will overestimate damages because:

> [t]his model appears to assume that all investors are equally likely to trade so that a "proportional" number of shares are assumed to come from shareholders who are long-term holders and from those who are "in-and-out" traders. Yet a share traded may have a much greater than proportional probability of being re-traded during the Class Period due to the disproportionate influence on trading of short-term traders, arbitrageurs, and similar market participants. Failure to weight the likelihood of trading to reflect the characteristics of trading peculiar to Oracle would likely result in a serious overestimation of aggregate damages.[19]

More recently, the U.S. District Court for the Northern District of Illinois recognized the potential errors in the single-trader model and rejected its use on *Daubert* grounds, reasoning that it does not meet any of the standards, "has never been tested against reality," "has never been accepted by professional

[12] 252 F. Supp. 2d 1005 (C.D. Cal. 2003).

[13] *Id.* at 1015.

[14] *Id.* at 1015-16.

[15] *In re Executive Telecard, Ltd. Sec. Litig.*, 979 F. Supp. at 1027.

[16] *Id.*

[17] *RMED Int'l Inc. v. Sloan's Supermarkets, Inc.*, 2000 WL 310352, at *9.

[18] Marcia Kramer Mayer, *Best-Fit Estimation of Damaged Volume in Shareholder Class Actions; the Multi-Sector, Multi-Trader Model of Investor Behavior* (NERA Oct. 2000); at http://www.nera.com/_template.cfm?c=6167&o=3737; *see also* Kenneth R. Cone & James E. Laurence, *How Accurate Are Estimates of Aggregate Damages in Securities Fraud Cases?*, 49 Bus. Law. 505, 513 (1994) ("The [proportionate decay] model's assumption that all shares are equally likely to trade probably represents its greatest weakness. This assumption is false. . . . [T]he most active traders necessarily represent a disproportionate fraction of volume, while inactive investors may hold large portions of the float off the market during any given period.").

[19] *In re Oracle Sec. Litig.*, 829 F. Supp. at 1182.

**PROFESSIONAL LIABILITY UNDERWRITING SOCIETY JOURNAL – MAY & JUNE 2004 REPRINT**

economists," and "seems to be a theory developed more for securities litigation than anything else."[20]

Thus, damages calculations that are used for purposes of mediation should only rely on the multi-trader model.[21] Remarkably, though, defense counsel often makes an initial presentation to the mediator that gives both types of calculations and references plaintiffs-style damages, even though "[i]t is difficult to avoid concluding that, when all is said and done, the Proportional Decay Model – grounded as it is upon several dubious assumptions – amounts to a glorified guess designed to yield as high a damages figure as possible."[22]

## PRACTICAL STEPS FOR ADDRESSING DAMAGES

An insurer and its insureds can take three steps in light of the weaknesses in plaintiffs-style damages and the likelihood that such damages are overstated. First, since mediation is almost inevitable, in cases involving potentially large damages, it may make sense to ensure that defendants begin to undertake a rigorous damages analysis at an early stage of the case so that they will be well-prepared for mediation. While the cost of this analysis may climb into the six figures, the cost may be justified by the potential to save substantial amounts in settlement negotiations. Since plaintiffs-style damages calculations may overstate damages as much as four-fold, a more realistic model can do more than simply shave a few dollars off of a large damages estimate. In addition, to the extent that the case does not settle, this analysis will be necessary in preparation for trial.

Even in cases where potential damages will be high, notwithstanding a rigorous damages analysis by the defense, it may be beneficial to undertake this analysis. To be sure, when a well-done damages analysis reduces a realistic worst-case scenario from $1.8 billion to $800 million, the exposure is still substantial and likely to create pressure to settle at a high amount. Nevertheless, the reduced damages may still provide a way to arrive at a relatively more favorable result in negotiations, particularly if, as is often the case, plaintiffs' liability allegations are also vulnerable to attack.

Second, since damages will be used by the plaintiffs, the mediator (and at times the insured) to argue for a larger settlement, a detailed understanding of the

damages analysis by the carriers' counsel is critical. For example, where an event study is used to drive down the number, it is important for the carrier to understand what assumptions underlie the event study and the litigation risks associated with the assumptions. The analysis may also reveal basic errors in plaintiffs' calculation of damages.

Third, steps can be taken in advance of the mediation to ensure that settlement discussions start from a more realistic damages estimate, rather than from the artificially inflated plaintiffs-style numbers. If courts are unwilling to accept a damages calculation that fails to contain an events analysis or that uses the single-trader model, defendants should not even reference those numbers in mediation. It is troubling enough that plaintiffs point to such numbers despite the fact that, as courts have recognized, they have no validity. Defendants, however, should take no steps to suggest that those figures have any credibility or that they serve as useful markers for negotiations.

---

[20] *Kaufman v. Motorola, Inc.*, No. 95 C 1069, 2000 WL 1506892, at *2 (N.D. Ill. Sept. 21, 2000).

[21] In *Bell v. Fore Sys., Inc.*, No. Civ. A. 97-1265, 2002 WL 32097540 (W.D. Pa. July 11, 2002), a district court held that the use of an aggregate damages calculation at trial would violate the PLSRA, which requires individualized damages determinations. However, the court also recognized that aggregate damages were appropriate for purposes of evaluating a settlement. *Id.* at *4.

[22] Robert A. Alessi, *The Emerging Judicial Hostility to the Typical Damages Model Employed By Plaintiffs In Securities Class Action Lawsuits*, 56 Bus. Law. 483, 486 (2001).



**This article originally appeared in the May & June 2004 issues of the PLUS Journal, the monthly publication of the Professional Liability Underwriting Society.**

Contact PLUS for more information at: 5353 Wayzata Blvd., Suite 600 ● Minneapolis, MN 55416
Phone: 800-845-0778 or 952-746-2580 ● Fax 952-746-2599 ● www.plusweb.org