# EXHIBIT D



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Validating Aggregate Securities Class Damage Estimates

By **Narinder Walia and Adam Werner** (February 24, 2021, 4:10 PM EST)

How accurate are aggregate damages estimated by plaintiffs in securities class actions relative to investors' actual damages? Reliable and accurate damage estimates can be very helpful to both plaintiffs and defense attorneys, especially in mediation and settlement contexts.

But until recently there wasn't any credible evidence for or against the accuracy of aggregate damage estimates. A 2020 Cornerstone Research study[1]  provides the best evidence we have seen that sheds light on the aforementioned question.

This article supplements Cornerstone's findings and extends their analysis to document systematic differences in damage estimates contingent on the size of actual damages.



Narinder Walia

The use of aggregate damage estimates in securities class actions has quietly disappeared from expert testimony presented to courts prior to settlement. Aggregate damages are still routinely calculated by both plaintiffs and defendants but are rarely presented in motions and reports that are subject to cross examination.

One reason for this trend is the increasing assault on investors' trading models that are used to convert per-share damages, or inflation, into total damages for the entire class.



Adam Werner

Trading models are representations of the actual trading behavior of individual investors. These models come in a few different flavors, the most common being the single-trader model — or STM or proportional trading model — and the two-trader model — or TTM, an example of the generalized group of multitrader models.

In the STM, all investors are assumed to be identical to one another and they trade with the same frequency. In the TTM, investors are of two types — a small subset that trades at a high frequency and the remaining investors who trade at a low frequency.

The most common TTM assumes that roughly 20% of investors account for approximately 80% of daily trading volume. Trading models are highly simplified characterizations of thousands of investors in a typical security, each with their unique trading outlook and behaviors. But simplicity is not the primary reason for the decline in legal usage of trading models.

The value of an economic model lies in the accuracy of its predictions or estimates compared to actual observed outcomes. Until recently, trading models used in securities class actions have never really been robustly tested in this regard and, as a result, have become vulnerable to valid criticisms.

Courts are understandably reluctant to sanction their use, absent sound evidence that these models actually work.[2] In other words, can we trust that damages estimated using these trading models are, on average, equal to the actual damages suffered by the class?

One challenge in answering this question is that we cannot measure actual damages directly, even after the settlement distribution has concluded. Typically, claims administrators estimate the total recognized loss, or approved claims, based on valid damage claims submitted by class members.

In a perfect world, total approved claims should be identical to actual damages if all damaged investors file properly documented claims, but this is hardly ever the case. In practice, total approved claims are smaller than total actual damages by some uncertain amount, but approved claims are still the best proxy we have for actual damages.

**Interpreting the Study's Approved Claims Rate**

The headline finding of the Cornerstone study is that, in its sample of 102 settlements in Securities Exchange Act Rule 10b-5 cases, the total valid claims submitted by the class and approved by the claims administrator are, on average, 66% of damages estimated by plaintiffs.

Cornerstone calls this number the approved claims rate. This ratio of approved claims to estimated damages can be thought of as a test of the estimation model's accuracy.

With a perfect trading model and a well-administered claims process, the approved claims rate should be approximately 100%. A rate of over 100% implies that the model estimates are lower than actual damages and a rate below 100% indicates that the estimated damages are higher than actual damages.

While the 66% average rate may appear to suggest that plaintiffs' damage estimates are considerably higher than actual damages, one has to consider the following details to put this number in perspective.

First, the approved valid claims — the numerator of the approved claims rate — as determined by the claims administrators are almost always lower than the actual damages suffered by the class. It is highly unlikely that every single class member will file a claim.

Even the most diligent claims administrator is unlikely to reach every one of the thousands or tens of thousands of class members. And among those investors who file a valid claim, a subset is typically disqualified due to improper or missing documentation.

Additionally, if damages to an investor are small, they may rationally choose not to bother with filing a claim. Even if a perfect trading model is used to estimate the damages in the denominator, one would expect the approved claims rate to be below 100%.

Second, claims administrators usually apply additional filters to deny claims by certain class members who file otherwise valid claims. For example, shares acquired as a gift or inheritance are sometimes excluded from approved claims. These exclusions are not directly modeled in the STM or TTM based damage calculations.

Hence, the total valid claims approved by claims administrators are lower than the total damages estimated by an otherwise perfect model that does not incorporate these exclusions. Again, this results in an expected approved claims rate of less than 100%.

Third, when faced with a range of estimates for plaintiffs' aggregate damages, Cornerstone chose to use the highest estimate in the range for their calculation of the approved claims rate. This could be misleading in certain situations. In many instances, the range of damage estimates are bookended by the STM based estimate at the high end of the range and the TTM estimate at the low end.

The TTM is generally a closer representation of actual trading patterns and, in practice, most economic experts have recognized this and moved away from using the STM. Had Cornerstone chosen the lower estimate of plaintiffs' aggregate damages in the denominator, the average approved claims rate in their study could have been significantly higher than 66%.

Fourth, before the publication of the Cornerstone study in 2020, there did not exist any reliable, large-sample benchmark for the approved claims rate. Anecdotal numbers in the range of 20% to

30% were often cited[3] but these were based on just one or two data points.

Even without the caveats noted above, the average approved claims rate of 66% based on a sample of 102 class actions is a significant upgrade to the evidence supporting aggregate damage estimates. After making corrective adjustments to Cornerstone's calculations, this rate is likely even higher. In other words, damage estimates calculated using the TTM are, on average, fairly close to the total approved damage claims.

Fifth, and finally, accepting the 66% average approved claims rate figure as is — without making any of the corrections and adjustments listed above — is not a mark against the trading models used to estimate aggregate damages. It is usually a subjective judgement on how close a model's estimate needs to be to the true value for that model to be deemed useful.

One famous finance rule of thumb[4] uses a factor of 2 around the true value to construct a zone of acceptable estimates, i.e., if the true value is 100% and the financial model produces estimates ranging from 50% to 200% then the model is valid. This admittedly subjective but well pedigreed rule validates plaintiffs' damage estimates included in Cornerstone's dataset.

**Systematic Differences in the Approved Claims Rate**

We conducted our analysis in the spirit of the Cornerstone study, but with a few meaningful differences. First, we have a slightly larger sample of 190 securities class actions compared to the 102 data points in the Cornerstone study.

Our sample is based on all securities class action settlements that had claims filing deadlines between Jan. 1, 2015, and Dec. 31, 2019. We identified 435 such settlements and 190 of these had approved claims and damage estimates data disclosed in court filings.

The vast majority of the cases in our sample deal exclusively with damages to shareholders under Rule 10b-5 of the Securities Exchange Act. A handful of cases include a secondary, usually minor, damage component related to preferred shares, bonds, options or Section 11 of the Securities Act. Excluding these data points from the full sample does not change our conclusions.

Second, in cases where plaintiffs provide a range of aggregate damage estimates, we use the lower end of the range — frequently associated with the TTM based damage estimate — to calculate the approved claims rate.[5]

Third, in addition to the overall averages, we discuss results for subsets of the full sample, based on size of the total approved claims. We present results for three subsets of the data — large cases, defined as those with approved claims of over $100 million, medium cases with approved claims between $20 million and $100 million, and small cases with approved claims of less than $20 million.

For our full sample of 190 class action settlements, we find that the median approved claims rate is 87% and the weighted average rate is 104%. The simple average is also 104%.[6] The approved claims rates range from 6% to 897% and a majority of the cases — 120 out of 190 — fall in the 50% to 200% range.

Overall, while there are a few outliers, plaintiffs' estimates of damages are, on average, remarkably close to the total damages recognized by claims administrators.

However, this convergence of damage estimates and approved claims does not hold for subsets of the full sample. Even before we calculated subsample averages, it was quite clear from simply eyeballing the data that the approved claims rate is higher for larger cases than it is for smaller cases, as illustrated in Figure 1.



Figure 1 - Approved Claims Rate

*Securities Class Actions Sorted by Total Approved Claims, Largest ($8.64 billion) to Smallest ($0.64 million)*

This distinct pattern is confirmed by the subsample averages shown in Table 1. Estimated aggregate damages for larger and medium sized cases are fairly close to the total approved claims, on average, i.e., claims rate is in the vicinity of 100%.

In many of these cases, estimated damages are considerably smaller than approved claims. It is only for very small cases that estimated damages are significantly larger than approved claims. In fact, the 131 large and medium sized cases have a median approved claims rate of 104% compared to 41% for the 59 small cases.

*Table 1 - Approved Claims Rates*

|  | Observations | Approved Claims Rate (Average) | Approved Claims Rate (Median) |
|---|---|---|---|
| Full Sample | 190 | 104% | 87% |
| Large Cases ($100M and above) | 72 | 107% | 120% |
| Medium Cases ($20M to $100M) | 59 | 77% | 89% |
| Small Cases ($20M and below) | 59 | 39% | 41% |

This is an unexpected result since there are no systematic differences in damage models and associated assumptions and parameters used for large, medium and small cases.

It seems implausible that differences in the approved claims rates are being driven by the damage

models. It appears to us more likely that variation in the claims administration process is producing the pattern we observe for approved claims rates.

A credible argument can be made that approved claims for large and medium sized class actions are a closer proxy for total damages than approved claims for smaller cases are. Larger cases attract more exposure and press than smaller cases.

Claims administrators have more resources to reach out to all damaged investors in larger cases. These investors generally have greater losses in absolute dollar terms and hence are more likely to file a claim.

In addition, there is greater institutional ownership in these large companies and institutions are more likely to have systems in place for filing properly documented claims. As a result, damaged investors are more likely to file claims in larger cases than in smaller cases.

There is some empirical evidence for this theory. Response rates for notices sent by claims administrators to class members in medium and large cases are in the 30% to 40% range, while the response rates for smaller cases are typically under 10%. This would explain why low approved claims rates are observed mostly in small class action settlements.

It is possible that small cases are overrepresented in Cornerstone's dataset of 102 class action settlements, resulting in the low average approved claims rate that they report.

**Conclusion**

We find that plaintiffs' estimates of damages are, on average, reliable and accurate predictors of actual real-world damages in securities class actions. While courts have been skeptical of trading models and the aggregate damage estimates they generate, our dataset offers compelling evidence to counter this skepticism.

Empirically well-supported damage models that accurately translate per-share inflation into aggregate damages are very useful tools for both defense and plaintiffs attorneys.

The battle of the experts is best fought over what the appropriate per-share inflation figures should be. Comparatively, once the inflation measure is sorted, estimating aggregate damages should be a far less contentious matter.

Our results should provide confidence to counsel on both sides to use aggregate damages based on trading models. Specifically, we endorse the use of the TTM or similar multitrader variants to estimate aggregate damages in securities class actions.

---

*Narinder Walia is a consultant and Adam Werner, Ph.D., is an affiliated expert at Crowninshield Financial Research Inc.*

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of the firm, its clients or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

[1] "Approved Claims Rates in Securities Class Actions: Evidence from 2015–2018 Rule 10b-5 Settlements", by Catherine Galley, Nick Yavorsky, Filipe Lacerda, and Chady Gemayel of Cornerstone Research. Downloaded from https://www.cornerstone.com/Publications/Articles/Approved-Claims-Rates-in-Securities-Class-Actions-Evidence-from-2015-2018-Rule-10b-5-Settlements/Approved-Claims-Rates-in-Securities-Class-Actions—Evidence-from-2015–201.pdf (© 2020 by Cornerstone Research, Inc.).

[2] In Kaufman v. Motorola Inc., the Northern District Court of Illinois rejected expert testimony regarding the Single-Trader Model used in securities class actions to estimate aggregate damages. The Court noted that, "the model has never been tested against reality." In the Broadcom Corp. Securities Litigation case the Court precluded the use of the Two-Trader Model to generate an

Case 1:20-cv-01293-JPC Document 289-4 Filed 06/07/21 Page 7 of 7

aggregate damages estimate, noting that the model "has not been tested against "real world" conditions."

[3] "Approved Claims Rates In Securities Class Actions", by Catherine Galley, Erin McGlogan and Pierrick Morel of Cornerstone Research. Published by Law360 on April 10, 2017. Downloaded from https://www.law360.com/articles/911463.

[4] In his 1986 Journal of Finance essay "Noise", Fisher Black hypothesized that the efficient market model is valid if the price is within a factor of 2 of value, i.e. the price is more than half of value and less than twice the value.

[5] To be clear, we use the low end of the Plaintiffs' estimated range and not the estimates produced by Defendants, which are usually lower than the Plaintiffs' lowest estimate.

[6] For an apples-to-apples comparison with Cornerstone's results, we also calculated the approved claims rate using the highest estimate of aggregate damages. Cornerstone calculates the average and median rate for their dataset of 102 settlements to equal 65.8% and 58.2%. The corresponding figures for our dataset of 190 settlements are 80.9% and 66.2%.

---

All Content © 2003-2021, Portfolio Media, Inc.