**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re Luckin Coffee Inc. Securities Litigation* | Case No. 1:20-cv-01293-JPC |

**Supplemental Memorandum of Law**
**In Support of Request to Intervene**

**AFN Law PLLC**
Angus F. Ni
41 Madison Ave, 31st Floor,
New York, NY 10010
(646) 453-7294
angus@afnlegal.com

*Attorney for Intervenor Lai Ye*

**TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................. 1

II. FACTS .................................................................................................................... 2

III. ARGUMENT .......................................................................................................... 6

    A. The Notice Methodology Is Inadequate Because It Fails to Account for Foreign Investors, Ongoing Litigation in China, and Luckin's WFOE/VIE Structure ...................................................................................................... 6

    B. The Notice Must Inform Class Members of Facts Unique to This Case .............. 10

IV. CONCLUSION ..................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                                                   **Page(s)**

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997)......................................................................................................14

*Audet v. Fraser*,
    332 F.R.D. 53 (D. Conn. 2019)......................................................................................6

*Cohen v. Luckin Coffee Inc.*,
    2020 U.S. Dist. LEXIS 103647 (S.D.N.Y. June 12, 2020)...............................6, 7, 8

*Cooper v. Miller Johnson Steichen Kinnard, Inc.*,
    2003 U.S. Dist. LEXIS 6946 (D. Minn. Apr. 21, 2003) ............................................13

*Cty. of Suffolk v. Long Island Lighting Co.*,
    710 F. Supp. 1428 (E.D.N.Y. 1989) ..........................................................................13

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)..........................................................................................14

*In re JSC BTA Bank*,
    434 B.R. 334 (Bankr. S.D.N.Y. Aug. 23, 2010) ..........................................................8

*Schick v. Berg*,
    2004 U.S. Dist. LEXIS 6842 (S.D.N.Y. Apr. 20, 2004)............................................12

*Semtek Int'l Inc. v. Lockheed Martin Corp.*,
    531 U.S. 497, 121 S. Ct. 1021, 149 L. Ed. 2d 32 (2001)..........................................12

*Stewart Org. v. Ricoh Corp.*,
    487 U.S. 22 (1988)......................................................................................................13

**Statutes**

11 U.S.C. § 1520................................................................................................4, 8, 10

28 U.S.C. § 2072(a) ..............................................................................................................12

28 U.S.C. § 2072(b) .........................................................................................................1, 12

Pursuant to the Court's May 28, 2021 order and Rule 24 of the Federal Rules of Civil Procedure, proposed intervenor Lai Ye ("Ye") respectfully submits this supplemental memorandum of law in support of his request to intervene in this action.

## I.  INTRODUCTION

Three unique facets of this case make the views of the proposed intervenors critical to ensuring the procedural integrity of this proceeding.

*First*, there are various shareholder class actions and opt-out litigations before this and other courts, both here, in New York state court, in Canada, and in China.  But the proposed Notice methodology provides no mechanism for notifying *known* Chinese shareholders, many of whom are already suing Luckin in China.

*Second*, there is a Cayman court-supervised reorganization that has been "recognized" in this district as a "foreign main proceeding" under Chapter 15 of the bankruptcy code—which only provides for enforcement of reorganization plans emanating from the recognized foreign main proceeding "within the territorial jurisdiction of the United States." Yet, in asking this court to certify and notice a global class, the parties fail to explain how this Court can enforce any Cayman scheme outside of U.S. territory, and when courts in China have asserted competing jurisdiction.

*Third*, this Court only presides over a U.S. class action in which a class has been provisionally certified under Rule 23 so that Luckin's Cayman liquidation trustees can negotiate with a defined class of its shareholders who hold claims within *this* case.  Rule 23 was promulgated under the Rules Enabling Act, which makes clear that "[s]uch rules shall not abridge, enlarge or modify any substantive right." 28 U.S.C. §§ 2072(b).  But, in presenting a traditional Notice and opt-out methodology for defining the class, the stipulating parties did not highlight to the Court the fact that its certification order *will* abrogate the substantive rights of opt-outs. This is because, following the notice and opt out process here, Lead Plaintiffs and the JPLs will contend in the

Cayman proceeding that Lead Plaintiffs represent a sufficient number of votes such that they alone will be able to "cram down" a Scheme they negotiated with the JPLs and extinguish any opt-out claims in the process. In short, so long as the opt outs do not number above 50% of those appearing in Cayman and do not hold more than 25% of the voters' claim value, Lead Plaintiffs will still "speak" for them under this Court's Rule 23 certification order—making the opt outs illusory.

In effect, though they only represent a class certified in *this* case, Lead Plaintiffs intend to override the substantive claims of those who affirmatively chose to not be a part of it—a course that Rule 23 does not contemplate, that the Rules Enabling Act explicitly prohibits, and which no Federal Court, to our knowledge, has ever accepted.

## II. FACTS

Ye is the Plaintiff in a direct action against Luckin Coffee Inc. ("Luckin" or the "Defendant-Debtor") and its underwriters, entitled *Ye v. Luckin Coffee, Inc. et al*. 1:21-cv-02020-JPC (the "Ye Direct Action"), which is pending before your honor. Mr. Ye lives in China.

China's securities law was revised in 2020. The revisions introduced a provision allowing Chinese investors to sue foreign-listed companies domestically for losses suffered in China as a result of fraud by such companies. *See* Ex. A, at 1 (Article 2).[1] The revised law took effect on March 1, 2020, and on April 21, 2021 the Chinese Supreme Court promulgated regulations providing that the Shanghai Financial Court, in addition to the Beijing Financial Court, shall have extraterritorial jurisdiction over lawsuits brought pursuant to the revised law. *See* Ex. B.

Shortly thereafter, a number of Chinese investors commenced suit against Luckin in the Shanghai Financial Court, with the law firm handling that suit stating afterwards that it had

---

[1] All Exhibit references are to the accompanying transmittal declaration of Angus F. Ni.

received over a hundred inquiries from investors seeking to join the suit.[2]  Almost simultaneously, other investors also commenced suit in the Beijing Financial Court. *See* Ex. C.

Here, Luckin and the Lead Plaintiffs, by stipulation, propose to provide notice to "all" members of the shareholder Cayman Scheme Creditor Class (the "Creditor Class") by: (i) asking Luckin's "transfer agent and/or depositary bank" to provide "a list" of those who purchased or otherwise acquired ADSs; and (ii) to conduct publication notice on Lead Plaintiffs' counsels' websites, on The Wall Street Journal, and through a press release on PR Newswire. ECF No. 258 ("Notice Stipulation") ¶¶ 3-4, 6-7.  Recognizing that the transfer agent is unlikely to possess the names and contact information of actual beneficial holders, the stipulating parties propose that the "Notice Administrator" shall use "reasonable efforts" to notice "nominee purchasers such as brokerage firms and other persons and entities who may have purchased … Luckin ADSs … for the beneficial interest of persons or entities other than themselves." *Id.* ¶ 5.  As the proposed Notice itself makes clear, "reasonable efforts" to notice these unidentified "nominee purchasers" shall consist of constructive publication notice, asking them to come forward with their clients' names, which notice will only be made in English, and only on U.S. publications. ECF No. 258-1 ("Notice") ¶ 35; *see also* Notice Stipulation ¶¶ 6-7.

During the May 28, 2021 teleconference, Lead Plaintiffs explained their intention to negotiate a settlement for the provisionally certified "class," but were not precise about what would be done with the negotiated settlement in the U.S.  As counsel for Lead Plaintiffs stated, "[t]here are a number of possible courses this could take.  But certainly, your Honor, one course is that we ***have a successful settlement in the Cayman***, and ***then*** we bring that to the United States, to Judge Glenn, potentially to you. … [¶¶] … [A]t the very least it would be presented to Judge Glenn in

---

[2] *See* Luckin Coffee sued by US stock investors in Shanghai, first case of its kind - CnTechPost

the United States, if not as well to your Honor." Ex. D, at 18:15-19, 20:22-24 (emphasis added). These statements suggest that the JPLs and Lead Plaintiffs are contemplating bringing a confirmed Scheme after it is *fait accompli* in Cayman for this Court to *enforce* in the U.S.—thus avoiding Rule 23(e)'s requirement to seek *this* Court's final approval of any settlement they negotiate.

Regardless of what is presented to Judge Glenn or this Court and when, counsel for the JPLs accepted that "the JPLs would … move for – in front of the bankruptcy court … to have the order of the Cayman court sanctioning the scheme apply with equal force and effect ***within the territorial jurisdiction of the United States***." *Id.* at 21:5-13 (emphasis added); *see also* ECF 276 (JPLs' Letter), at 5 ("JPLs may also seek assistance from the bankruptcy court presiding over the Chapter 15 case with respect to the Scheme's applicability ***within the territorial jurisdiction of the United States*** once it is sanctioned.") (emphases added). [3] The JPLs' counsel also acknowledged that "there was not a class certified under law" in the Chapter 15 caselaw the JPLs are relying upon to obtain certification of this negotiation class. Ex. D, at 21:14-22:1.

Finally, both the Lead Plaintiffs and JPLs operated assuming that the standard Rule 23 class certification and opt-out process, in which notice precedes opt-outs who would then independently assert their own rights in litigation, were applicable to, and meaningful in this situation. As Counsel for the JPLs stated, "[following notice, w]e would then have a group of parties that would opt out. And that would inform us as to who we would be interacting with between the opt-outs and the lead plaintiff group." *Id.* at 14:13-16. Luckin's counsel agreed, stating that "[t]he purpose of the notices, of course, is to inform the class of the proceedings and

---

[3] The JPLs recognized that the bankruptcy Court's ability to sanction the Cayman scheme is limited to "the territorial jurisdiction of the United States" because that is the exact wording of the applicable statute. *See* 11 U.S.C. § 1520(a)(1)-(4) (repeatedly making clear that the provisions of the bankruptcy code incorporated via Chapter 15 only "apply with respect to … property … that is within the territorial jurisdiction of the United States.")

give them an opportunity to opt out." *Id*. at 22:7-9. Lead Plaintiffs developed further upon these assumptions, stating that "what we have with regard to the opt-outs … is a misguided effort to obstruct the class in the hopes that that's going to improve the benefit for the opt-outs and not for the class." *Id*. at 16:9-11.

None of the Lead Plaintiffs, the JPLs, or Luckin highlighted the fact that, so long as opt-outs do not exceed 50% of those voting in Cayman or 25% of the value of those who vote, their normal right to continue litigating on their own behalf will be ***extinguished*** in a confirmed scheme of reorganization. In other words, opting out here does not entitle the opt-out to independently continue to litigate their own cases —as contemplated by Rule 23. Indeed, so long as the JPLs, Luckin, and the Lead Plaintiffs believe the certified negotiation class encompasses 50% of the Creditor Class's voting power and 75% of the economic value of those voting, the JPLs and Luckin would have no reason to negotiate with the opt-outs, but only with the Lead Plaintiffs—making the act of opting out illusory.

More pointedly: if the proposed Notice is approved by this Court, without revision to strip out, at a minimum, the completely unprecedented effort to accord the Lead Plaintiffs voting power in the Cayman proceeding prior to any class settlement approved by this Court, this Court may well be facilitating the elimination of such opt-out rights, to the irrevocable prejudice of the very opt out shareholder rights this Court is required to protect under Rule 23(e).

In sum, though the stipulating parties have been ambiguous about it, to pass muster under Rule 23, this unprecedented case must involve at least these procedural stages: (i) certification of a negotiation "class" in the context of a Chapter 15 proceeding to negotiate in a Cayman corporate reorganization; (ii) presentation of a negotiated proposed Scheme to this and the bankruptcy court for notice and an opportunity to opt-out under Rule 23(e) prior to any voting on such proposed Scheme in the Cayman proceeding; (iii) returning to a Cayman court for a vote on the proposed

Scheme under Cayman law; and (iv) presentation of any sanctioned Scheme to the bankruptcy court presiding over the Chapter 15 proceeding for enforcement "within the territorial jurisdiction of the United States." The proposed Notice is the *first* step in stage (i) of this process.

### III. ARGUMENT

#### A. The Notice Methodology Is Inadequate Because It Fails to Account for Foreign Investors, Ongoing Litigation in China, and Luckin's WFOE/VIE Structure

As set forth *supra*, Chinese courts have statutory jurisdiction over the debtor and claims arising out of Chinese investors' trades in the debtor's U.S.-listed ADRs. Furthermore, an unknown – but certainly large – membership of the provisionally certified class are in China. In addition, many of these investors have already commenced suit in China but have not been invited to the reorganization proceedings. The class and proposed Notice therefore contain fatal flaws.

*First*, citing *res judicata* concerns, numerous courts in this Circuit have refused to certify classes encompassing class members residing in countries where enforceability of the class judgment will be unlikely—which fact Judge Liman found to create an issue over "whether a class should be certified at all" when appointing the Lead Plaintiffs in this case. *See Cohen v. Luckin Coffee Inc.*, 2020 U.S. Dist. LEXIS 103647, at *16 (S.D.N.Y. June 12, 2020) (reviewing cases).

Another line of cases looks at the issue from the front end: whether foreign courts have personal jurisdiction over defendants in the first place. Courts adopting this analysis have agreed to certify classes of foreign investors where foreign courts would be unlikely to assert personal jurisdiction over defendants—obviating any *res judicata* concerns since those foreign investors could not sue defendants in their home countries anyway. *See e.g. Audet v. Fraser*, 332 F.R.D. 53 (D. Conn. 2019) (overruling *res judicata* arguments for non-certification and certifying a class including foreign investors where Defendants were based in and acted exclusively within the U.S.).

Here, regardless of which analysis is adopted, certification of a negotiation class over un-noticed, un-identified Chinese investors is of dubious enforceability. Chinese courts *have* statutory jurisdiction and *are* presiding over shareholder suits against Luckin. They are unlikely to recognize a U.S. judgment that purports to deprive Chinese investors of the ability to sue Luckin or to confer their voting rights in the Cayman bankruptcy upon a "representative" certified through foreign procedures without actual notice or affirmative consent to be so represented.

***Second***, the enforceability of this Court's judgements in China is important because Luckin is organized as a Cayman holding company that relies on "a series of contractual arrangements [with a "variable interest entity" or "VIE"] … to obtain control over" Luckin's Chinese on-shore operations. Ex. E (Luckin F-1), at 70. Concerning these "contractual arrangements," Luckin's Form F-1 Registration Statement depicted Luckin's corporate structure using a "offshore / onshore" division, with a dotted line and arrow indicating a "contractual relationship" as opposed to "shareholding ownership" with the onshore "VIE":



*Id.* at 4. As the above graph shows and as Luckin's Registration Statement further makes clear, while there are many "onshore" subsidiaries, Luckin's registration statement disclosed that it "conducts its businesses in the PRC through … the VIE," in which it does not own any equity. *Id.* at F-8 to F-9 ("The equity interest of the VIE is legally held by PRC individuals").

In sum, Luckin's entire asset base is in China, held in an entity that Luckin owns no interest in but with whose owners it has a series of contracts that are of uncertain legality in China. Reflecting these above realities, Luckin warned that:

> Substantially all of the assets of [Luckin] are located outside the United States. As a result, it may be difficult or impossible for you to bring an action against us or against these individuals in the United States in the event that you believe that your rights have been infringed under the U.S. federal securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and officers.

*Id.* at 41. Indeed, Luckin's Registration Statement even spelled out that:

> [A]ccording to the PRC Civil Procedures Law, courts in the PRC ***will not enforce*** a foreign judgment against us or our directors and officers if they decide that the judgment violates the basic principles of PRC law or national sovereignty, security or public interest. As a result, it is uncertain whether and on what basis a PRC court would enforce a judgment rendered by a court in the United States or in the Cayman Islands.

*Id.* at 69 (emphasis added). These facts add to the substantial doubt over whether this Court's eventual judgment will be enforceable in China under the Notice and opt-out schema as presented—underscoring the need to ensure that the negotiation class to be certified is well defined and sufficiently noticed.

***Third***, though substantially *all* of the debtor's operating assets are China, counsel for the JPLs recognized that the Chapter 15 court can only apply a foreign reorganization plan to "with respect to … property … that is within the territorial jurisdiction of the United States." 11 U.S.C. § 1520(a)(1)-(4); *see also* Ex. D, at 21:5-13; ECF 276, at 5.

A threshold procedural question therefore arises: if the Chapter 15 proceeding is the procedural mechanism through which the Cayman reorganization will be confirmed in the U.S., can the Court even certify a class seeking to influence – indeed, compromise and extinguish – the claims of unrepresented, unnoticed foreigners, which compromise may also impact property that is outside of "the territorial jurisdiction of the United States?" 11 U.S.C. § 1520; *see also In re JSC BTA Bank*, 434 B.R. 334 (Bankr. S.D.N.Y. Aug. 23, 2010) (refusing to stay foreign litigation under §1520 where such litigation does not affect property of the debtor "within the territorial jurisdiction of the United States.").

Indeed, there are even more litigations pending in *other* countries. For example, the JPLs very first report to the Grand Court of the Cayman Islands stated that Luckin "presently face class action claims in U.S. federal and state courts, ***and in a Canadian court***." Ex. F ¶ 7.2.2. (emphasis added). Yet, recognizing that this Court has no power over actions *outside* of the U.S., the JPLs' most recent June 4, 2021 status report to Judge Glenn only contained, under "Litigation Parties" a listing of parties to "Litigation pending in the United States." Ex. G.

These issues mean that the Court should hesitate before certifying a class for the purposes of negotiating releases of, at a minimum, Chinese investors' claims. Accordingly, to ensure: (i) that a Cayman court facing these same above objections would validate a certified negotiation class's vote; and (ii) that an eventual class judgment confirming the Cayman scheme could be enforced in China, the Court should conduct a searching inquiry into whether the provisional class can ultimately be certified to negotiate on behalf of investors in China. Should the Court conclude that, under the unique circumstances of this case, Chinese courts would be unlikely to enforce a judgment obtained on behalf of Chinese investors through proxies constructively obtained through the investors' inaction, the Court should de-certify the class as to China-based investors, or certify an ***opt in*** class with respect to Chinese investors, which would require notice in Chinese and in

China, rather than in English and only in the U.S. as currently contemplated. Even if the Court decides otherwise, it should still order that the notice be modified to account for the unique facts of this case as discussed *infra*, and be disseminated in China and in Chinese, so that investors there would be afforded some measure of notice and an opportunity to object.

### B. The Notice Must Inform Class Members of Facts Unique to This Case

In addition to these inadequacies in the notice *methodology*, the content of the Notice also leaves much to be desired. For example, the Notice is presently phrased to confuse readers and discourage opt-outs. It states that: "if you choose to be excluded … you may not be entitled to participate in or be eligible to share in any Settlement reached." Notice ¶ 21(b). It does not state the risks of not opting-out, such as the fact that inaction by class members will enable a "cram down" settlement for much less than the class-member would have preferred. Nor does it explain the fact that the very act of excluding oneself will inherently reduce Luckin's ability to negotiate such a settlement. *Id.*

In the same breath, the Notice also states that excluding oneself means inability to participate in any settlement "*except* for where the Settlement is effected by a [Cayman] Scheme … which may be binding on all members of the Class irrespective of whether they choose to be excluded from the Class or not." *Id.* (emphasis added). By characterizing the possibility of enforced cram down as an opportunity to participate in an eventual settlement even if the class member opts out, the Notice implies that exclusion is not meaningful. But this fails to make clear that such an enforced Scheme can only be accomplished by Lead Plaintiffs single-handedly *if* class members ***do not*** choose to opt out. Nor does it make clear that a crammed down settlement would be whatever Lead Plaintiffs and Luckin want it to be.

This phrasing, calculated to discourage opting out and confuse readers, invites—indeed, requires—the Court's scrutiny for several reasons.

***First***, while there is always some incentive on the part of settling parties to a class action to promote class member inaction, Lead Plaintiff and Luckin's need to procure such inaction is particularly pronounced in this case because the breadth of the class is *determinative* of their ability extinguish other litigants' and opt-outs' negotiating leverage and accordingly negotiate only with one another. Indeed, the threshold required for that is known: 75% of the value of those who appear to vote in Cayman—a figure that every additional opt out places further beyond reach.

***Second***, Lead Plaintiffs and Luckin intend to point the U.S. and Cayman courts to *each other* as the ultimate guardian of the class's interests. Before this Court, Lead Plaintiffs are already insisting that "in the Cayman proceedings so far, none of … the shareholder creditors on the phone … are being excluded." Ex. D, at 16:5-7.[4] The JPLs also claimed that "the Winslow parties [and the opt outs] … almost have an extra right, because they can also raise fairness issues in the Cayman Islands …" *Id.* at 35:14-19. The idea is that this Court should conduct scant scrutiny of the content of notice and procedural basis for certification because anyone who does not like what the class does will be protected by the Cayman court's process for approving a Scheme.

Likewise, while the JPLs have yet to make any statement to the Cayman court about the integrity of the provisionally certified "negotiation" class, when it comes time to do so, they will undoubtedly point to the rigor of the present notice and opt out procedures—supervised by this Court—as an indicia that the Lead Plaintiffs' constructive procurement of voting proxies was procedurally fair and may be relied upon to credit a vote cast by the Lead Plaintiffs. Conversely, all the opt-outs will point to any deficiencies in the certification process before this Court to argue that the Lead Plaintiffs are not entitled to vote their claimed "proxies" before the Cayman court. In short, because the rigor of this Court's supervision of the certification process will be cited as

---

[4] *See also* Ex. D, at 52:17-19 (Lead Plaintiffs stating that "[opt outs] will object in the Cayman.")

reason for the Cayman court to recognize the certified class's "proxy" vote—which recognition would be an issue of first impression in the Cayman islands—the Court should ensure that the process before it is sound.

*Third*, as presented, the JPLs and Lead Plaintiffs' statements to the Court simply assume that opt-outs *will*, by virtue of opting out, have a say in the negotiations before the Cayman court. Even this Court was under the impression that "it may be that the class counsel votes on [investors'] behalf -- 'may' is used, I think, intentionally here, because it will be for the Grand Cayman courts to decide -- **but if someone doesn't like that, they can just opt out**." *Id.* at 25:17-21. Taking this cue, Lead Plaintiffs emphasized that "[i]f [the proposed intervenors are] concerned about their inability to object, they have objected at every turn. They have objected before you twice, they have objected before Judge Glenn. They will object in the Cayman. Let's see who they are. Let's see if they're in the class or out the next time we have to deal with their objections." *Id.* at 52:16-21. In other words, Rule 23 provides, and the Stipulating parties have proffered the assumption that if a class member does not like what she reads after notice is disseminated, she can opt out, which opt out shall entitle her own voice to be heard.

Rule 23 was promulgated pursuant to the Rules Enabling Act, which allows the Supreme Court "to prescribe general rules of practice and procedure … for cases in the United States district courts …." 28 U.S.C. § 2072(a). However, "[s]uch rules shall not abridge, enlarge or modify any substantive right." 28 U.S.C. §§ 2072(b); *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 503, 121 S. Ct. 1021, 149 L. Ed. 2d 32 (2001) (citations omitted). Thus, the act of opting out is supposed to protect the opt-out's substantive right to have her own say. *See Schick v. Berg*, 2004 U.S. Dist. LEXIS 6842, at *13 (S.D.N.Y. Apr. 20, 2004) ("So long as Plaintiff retained the right to opt-out of the class, [counsel's] actions were not preclusive as to [Plaintiff]'s substantive legal rights in the [Class] Litigation.").

The stipulating parties did not disabuse the Court of this assumption. To quote the JPLs' counsel's statements to the Court during the May 28, 2021 hearing: "[following notice, w]e would then have a group of parties that would opt out. And that would inform us as to who we would be interacting with between the opt-outs and the lead plaintiff group." Ex. D, at 14:13-16.

But while that may be true for normal "opt-out" class settlements, it is not the case here. A normal opt out is entitled to continue litigating, and inherent in the procedural act of opting out is the substantive right ***not*** to be bound by the class action and to ***continue*** asserting one's own substantive claims independently.  But here, the opt outs, so long as they do not reach certain threshold percentages of those appearing to vote in Cayman, would ***still*** be "represented" by the class they opted out of, as the JPLs would have no reason to negotiate with anyone else so long as they can negotiate with the vote-holding Lead Plaintiffs—certified to be so by this Court. The circularity is obvious: Lead Plaintiffs and the JPLs urge the Court to certify a class and issue their proposed Notice based on the assumption that the act of opting out means that opt outs' substantive rights would be preserved.  But the very act of certifying a broad class after scant Notice means that the actual opt outs would ***not*** be heard, and their substantive rights extinguished.

In short, following Notice, the JPLs would indeed be "inform[ed] … as to who we would be interacting with between the opt-outs and the lead plaintiff group." *Id.* at 14:13-16. The implication being that those new opt-outs would then be invited to the table. But, as the foregoing discussion illustrates, the unspoken reality will be that if the opt-outs do not reach certain thresholds, the JPLs would have no need to "interact[] with" them at all.

Of course, it is in Lead Plaintiffs and the JPLs' interest to leave this information out of the Notice to ensure that opt outs do not reach those thresholds. This motivated the stipulating parties' phrasing of the Notice to discourage opting out, and furthermore, proffer a U.S. and English-only method of dissemination despite knowing full well that a large portion of the class (***including one***

*of the Lead Plaintiffs*) were resident abroad. This falls short of providing the "full and fair" notice sufficient to enable class members to "consider the proposed decree and develop a response." *Cty. of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1428, 1433 (E.D.N.Y. 1989).

Tellingly, Lead Plaintiffs' only response to these concerns during the May 28, 2021 teleconference was to state that opt-outs have no standing. Ex. D, at 50:1-5. As the foregoing explanation shows, however, that is incorrect. Opt-outs have standing to object to procedures leading up to certification here because their ability to be heard in the Cayman scheme negotiations may well be extinguished by this Court's certification order alone.

Indeed, "where the applicability of a [rule] is in question," the rule "must be measured against the statutory requirement[s] of the Rules Enabling Act." *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 27 n.5 (1988)). Here, the fact that the substantive right of opting out can be made meaningless by the Court's certification order raises serious questions as to whether the Rule 23 process can be applied as Lead Plaintiffs and the JPLs propose, because doing so would in effect create a "non-opt out" class, and thus "abridge … a substantive right" in violation of the Rules Enabling Act. *See Cooper v. Miller Johnson Steichen Kinnard, Inc.*, 2003 U.S. Dist. LEXIS 6946, at *13 (D. Minn. Apr. 21, 2003) (the court cannot "compromise the due process rights of absent class members. ... the Rules Enabling Act does not 'abridge, enlarge or modify any substantive right.' … Because the Court concludes that the proposed non opt-out class would compromise substantive rights, certification of a class under Rule 23(b)(1)(B) would be inappropriate.") (Citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 613 (1997)).

It is well established that "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995); *Amchem Prods.* 521 U.S. at 623 ("Rule 23(e) . . . protects unnamed class members from unjust or unfair settlements affecting their rights when the

representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise.") (internal quotation marks omitted). Because certification of an ill-defined negotiation class will abridge the substantive right of ***opt-out direct litigants*** to litigate their claims, or even to be heard in the Scheme negotiations, the proposed intervenors have standing, and the Court must build appropriate safeguards into the Notice and certification process to protect the integrity of its certification order.

## IV. CONCLUSION

For these reasons, the Court should grant permission to intervene, reject the current Notice, and instead order publication of a notice designed to inform and reach a broad audience. To that end, proposed Intervenor Ye respectfully reserves the right to submit proposed revisions to the Notice content, methodology, and opt-out process should the Court grant permission to intervene following briefing and a hearing.

Respectfully Submitted,

Dated: June 7, 2021                                    **AFN LAW PLLC**

By: _____

Angus F. Ni
41 Madison Ave, 31st Floor,
New York, NY 10010
(646) 453-7294
angus@afnlegal.com

*Attorney for Intervenor Lai Ye*