# EXHIBIT D

L5SGlucC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In re Luckin Coffee Inc.
Securities Litigation,

                        20 Civ. 1293 (JPC)


------------------------------x
                        New York, N.Y.
                        May 28, 2021
                        2:00 p.m.

Before:

                    HON. JOHN PETER CRONAN,

                    District Judge

                        APPEARANCES

BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
     Attorneys for Lead Plaintiffs
BY:  SALVATORE J. GRAZIANO

KESSLER TOPAZ MELTZER AND CHECK LLP
     Attorneys for Lead Plaintiffs
BY:  SHARAN NIRMUL

LOWENSTEIN SANDLER, LLP
     Attorneys for Lead Plaintiffs
BY:  MICHAEL S. ETKIN

DAVIS POLK & WARDWELL
     Attorneys for Defendants Luckin Coffee Inc.
BY:   LAWRENCE J. PORTNOY
          ALLISON LEHRER

DLA PIPER LLP (US)
     Attorneys for JPL
BY:   CRAIG R. MARTIN
   CARYN SCHECHTMAN

GIBSON, DUNN & CRUTCHER, LLP
     Attorneys for Defendant Meier
BY:   JASON J. MENDRO

L5SGlucC

(Appearances continued)

CAHILL GORDON & REINDEL LLP
    Attorneys for Underwriter Defendants
BY:  DAVID JANUSZWEWSKI

ROBBINS GELLER RUDMAN & DOWD LLP
    Attorneys for State Class
BY:  BRIAN E. COCHRAN

BROWN RUDNICK LLP
    Attorneys for Kingstown
BY:  SIGMUND S. WISSNER-GROSS

ROLNICK KRAMER SADIGHI LLP
    Attorneys for Winslow Funds
BY:  FRANK T.M. CATALINA
   LAWRENCE ROLNICK
   BRANDON FIERRO

AFN LAW PLLC
    Attorneys for Lai Ye
BY:  ANGUS NI

SHAPIRO HABER & URMY LLP
   Attorneys for State Class
BY:  EDWARD F. HABER

(The Court and all parties present remotely)

THE COURT:   Good afternoon everyone.  We are here for In Re Luckin Coffee Inc. Securities Litigation, which is a lead case and the lead Docket No. is 20 Civ. 1293.  Before we begin, I remind everyone on the line -- and I know we have a lot of people on the line -- that we are on a telephone line that is open to the public and the press on a listen-only basis.  The Court prohibits the recording and rebroadcasting of court conferences including this one.  Any violations of that could result in sanctions.  Second, I note that we have a court reporter on the line.  I will do my best as well, but please try to speak as clearly as you can, anyone who is talking during this conference, so we can be sure to have an accurate transcript.  And given the number of attorneys who may be speaking this afternoon, it is especially important that you identify yourself before you speak so the reporter knows who is talking and attributes statements to the correct individual.

So let me find out which attorneys and which parties are on the line.  I will start with the lead plaintiff.  Who do we have on the line for the lead plaintiff?

MR. GRAZIANO:   Good afternoon, your Honor.  It's Salvatore Graziano from Bernstein Litowitz firm.  Also on the line is Sharan Nirmul from the Kessler Topaz firm and Michael Etkin from the Lowenstein firm.  All of us are on behalf of the lead plaintiffs.

L5SGlucC

THE COURT:   Thank you.  And I just want to make sure I got that last name.  Michael, what is that?

MR. GRAZIANO:   Etkin, E-T-K-I-N.

THE COURT:   Good afternoon, Mr. Graziano, Ms. Nirmul and Mr. Etkin.

Let me now turn to Luckin.  Who is on the line representing Luckin?

MR. PORTNOY:   Lawrence Portnoy from Davis Polk & Wardwell.  And with me is my colleague, Allison Lehrer.

THE COURT:   Good afternoon, Mr. Portnoy and Ms. Lehrer.

For the joint provisional liquidators, do we have counsel on the line?

MR. MARTIN:   Yes, your Honor, this is Craig Martin from DLA Piper representing the joint provision liquidators. And I have my partner, Caryn Schechtman on the line as well. And I may have someone on the line from the Campbells law firm in the Cayman Islands.  We were trying to find someone to make sure we had someone on from that firm.  If they're on, they should announce themselves.

It sounds like maybe they haven't made it on.  It's just myself and my partner, Caryn Schechtman.

THE COURT:   Thank you, Mr. Martin and Ms. Schechtman.

Let's go to the Winslow Funds next.  Is counsel for the Winslow Funds on?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L5SGlucC

MR. CATALINA:    Good afternoon, your Honor.  This is Frank Catalina for the Winslow Funds, joined by my colleagues Lawrence Rolnick and Brandon Fierro.

THE COURT:    Good afternoon to all of you.

I'll refer to the next group as the state class plaintiffs.  Do we have counsel on the line for them?

MR. COCHRAN:    This is Brian Cochran from Robbins Geller on behalf of the state class plaintiffs.

MR. HABER:    Your Honor, this is Edward Haber from Shapiro, Haber & Urmy also on behalf of the state class plaintiffs.

THE COURT:    Good afternoon.  Can I just get the last person who spoke, that name again.

MR. HABER:    Edward Haber, H-A-B-E-R, your Honor.  And the firm is Shapiro, Haber & Urmy.

Good afternoon, Mr. Haber and also Mr. Cochran.

Let me next check if we have anyone on the line for Kingstown Capital.

MR. WISSNER-GROSS:    Good afternoon, your Honor.  Sigmund Wissner-Gross on behalf of the Kingstown parties.

THE COURT:    Good afternoon, Mr. Wissner-Gross.

And then is anyone on the line representing Lai Ye?

MR. NI:    Good afternoon, your Honor.  Angus Ni on behalf of Lai Ye.

THE COURT:    Good afternoon, Mr. Ni.

L5SGlucC

And let me also ask if Mr. Bequai -- I apologize if I am mispronouncing your last name -- who is proceeding pro se, if he's on the line?

Are there any other counsel on the line for any of the plaintiffs or defendants?

MR. JANUSZEWSKI:   Good afternoon.  You have David Januszewski from Cahill Gordon.  We represent the six underwriter defendants.

MR. MENDRO:   Good afternoon, your Honor.  This is Jason Mendro from Gibson Dunn & Crutcher on behalf of defendant Meier.

THE COURT:   Thank you both.

Let me start by explaining the issues that I think we need to cover today.  As background, just under three months ago, on March 2nd, the lead plaintiffs filed a proposed stipulation and order that would preliminarily certify the class for settlement purposes.  There were objections from the state class plaintiffs and the Winslow Funds, and the Kingstown entities also joined in this objection.  I held a conference a couple of days after that on March 4th.  And following that conference, I entered the proposed stipulation.  And I did that for reasons I explained in an order that I also issued at that time.  And those main reasons were findings that I made that the state class plaintiffs, the Kingstown entities and the Winslow Funds had only pointed to some amorphous harm that the

L5SGlucC

provisional certification would cause them in light of the

parallel state suit.  And also, I concluded that those entities

would not face any prejudice from the certification because the

joint provisional liquidators were working with them to resolve

their claims against Luckin as well.

Probably the next relevant event occurred on

March 31st when Luckin filed a suggestion of bankruptcy.  That

notified the Court of an automatic stay as to Luckin.  Luckin,

of course, is a debtor in a provisional liquidation in the

Grand Court of the Cayman Islands.  I understand that Judge

Glenn in the Bankruptcy Court has excepted from the stay this

case, to the extent the stay is lifted to allow settlement

discussions to go forward.  Otherwise, I understand that all

cases against Luckin are stayed pending the bankruptcy.

Now, the impetus for this conference is that the lead

plaintiff and Luckin filed a stipulation and proposed notice on

May 14th at Docket No. 258.  Three days later, the Winslow Fund

filed a letter saying they objected to that notice and filed a

motion to intervene a day later.

As a quick footnote, I note that for any future

motions, parties should file a premotion letter in accordance

with my individual rules.  With respect to this motion, I only

ordered letter briefing in response, which I received.  I also

received from several entities letters generally speaking that

were in opposition to the proposed notice and report of

L5SGlucC

intervention.  Those came from the state plaintiffs; the Kingstown entities, which I should note are the plaintiffs in a related case before this court; Mr. Bequai, who, as I mentioned, is pro se and appears to be an investor with a case going in Fairfax County, Virginia; Lai Ye, who also is a plaintiff in a related case before me.  And I believe those were the main submissions I received.  And all of these entities have some degree of parallel proceedings, parallel suits going on.

Also, the lead plaintiff, as I indicated a moment ago, had filed oppositions, letters in opposition to the Winslow Funds' motion and the state plaintiffs' motion as well.  Luckin also has filed a letter opposing the Winslow Funds' motion. And finally, the joint provisional liquidators, through their US counsel at DLA Piper, filed a letter with additional information about the Cayman proceeding and why, in their view, the motion to intervene should be rejected.  There were some other, I think, smaller logistical requests, such as having a court reporter for this proceeding, which we do, of course.

But is there anything else I am leaving out?  Are there any other filings on issues that we should be addressing this afternoon?  Mr. Graziano, are you aware of any?

MR. GRAZIANO:   Your Honor, I am not.  I think you covered everything.

THE COURT:    Mr. Catalina?

L5SGlucC

MR. CATALINA:    Your Honor, I'm not aware.  I also believe you covered everything.

THE COURT:    Mr. Cochran?

MR. COCHRAN:    No, your Honor.

THE COURT:    Mr. Wissner-Gross?

MR. WISSNER-GROSS:    No, your Honor.

THE COURT:    Mr. Ni?

MR. NI:    No, your Honor.

THE COURT:    Mr. Portnoy?

MR. PORTNOY:    Nothing else, your Honor.

THE COURT:    And any of the other attorneys who I may not have mentioned, if they're aware of anything else, they should chime in now.

So let me start, then.  I think it would be helpful for me to hear from the lead plaintiff and Luckin and the joint provisional liquidators for some questions I have, a little bit about the proposed notice, but also about the status of the Grand Cayman proceeding.  I will then go on to the arguments from the proposed intervenors, and I'll give you an opportunity to respond to those as well.  But I wanted to make sure that everyone is on the same page as to what is going on here.  So maybe I'll start with Mr. Martin, then.  And I received your letter, which was quite helpful, but can you give me an update as to the state of the liquidation proceedings in Grand Cayman?

MR. MARTIN:    Yes, your Honor.  Can you hear me all

L5SGlucC

right?  Am I off mute appropriately?

THE COURT:    I can hear you well.

MR. MARTIN:    The status of the proceeding -- to add to some of what was in your summary -- is that Luckin has filed public statements indicating that they have entered into a restructuring support agreement with certain bondholders to pursue a separate scheme with those bondholders.  They have also publicly filed notice of an investment agreement that would potentially provide some funding for some of the schemes.  And then the JPLs recently turned to beginning negotiations with various shareholders.

And then on May 20th, after giving notice, held a meeting of the various parties, many of whom are on this phone call that would qualify as shareholder creditors, potential creditors.  At that meeting, the JPLs encouraged the formation of an ad hoc group or steering committee to permit negotiations between Luckin and the shareholders, shareholder classes.  I understand that the status of that is that the creditor parties that participated in that meeting are still speaking about that.  The JPLs did not impose any requirements or conditions on the formation of that group.  It's not a group that is required to be formed under the Cayman statute.  It's something that the JPLs recommended to the creditors as a means of facilitating negotiations.

In connection with that, there has been negotiations

L5SGlucC

over nondisclosure agreements to permit the sharing of information. And subject to the finalization of those agreements, it's my expectation that the JPLs would begin negotiations with shareholder parties over a potential scheme of arrangement for the shareholders, shareholder creditors as well.

I'll pause there. That gives you the factual update. I don't want to go on too long if I'm not being responsive to the Court.

THE COURT: Thank you. That is helpful.

I had a couple of questions about the process in Grand Cayman in your letter, and you touched just now on it a little bit. I understand that the scheme would be presented to the Grand Court and would require the convening hearing and then the sanctions hearing. How is the scheme itself that is presented prepared? In other words, do the JPLs prepare the scheme after discussing relevant issues with creditors and the debtor or do the debtor and creditors come up with the scheme and then it's submitted to the Grand Court? Can you shed any insight on that?

MR. MARTIN: Yes. And maybe I can do it by way of example to the restructuring support agreement that we negotiated with the bondholders. That will provide a good example for the Court. In that agreement, there was an agreement to support a scheme if it complied with certain

L5SGlucC

requirements that were listed on a term sheet. And so the Cayman law firm for the JPLs is now drafting that scheme with input from counsel from both the bondholders and the company.

And that document will have certain requirements. There's something called an explanatory statement that perhaps parallels to what we would call a disclosure statement in the Chapter 11 process. And in that explanatory statement, there are facts and circumstances relevant to deciding whether to accept or reject the scheme that must be explained, including what's called a comparator, which is something that's required to show the creditor class subject to the scheme that the consideration provided under the scheme is fair and better than what might be an alternative.

Once that document has been drafted, most likely, we think it would be the JPLs would petition the Grand Cayman court to convene a creditors meeting and to schedule a final what they call a sanction hearing or approval. So at that first hearing, the Court would evaluate the creditors that were subject to the scheme and provide a notice of a formal meeting, at which creditors would be able to meet and consider the scheme and vote on the scheme. If that meeting results in the requisite majorities being obtained, there's both a number, a count, majority of creditors appearing and voting and a value requirement; 75 percent in value of creditors appearing and voting. Then the JPLs would have obtained the requisite

L5SGlucC

creditor majorities.  And they then present the scheme to the Court for sanction, at which parties that are subject to the scheme have the opportunity to appear and be heard with respect to the scheme and object to it if that's what they feel is appropriate or offer their support.

That's a brief summary of the process.  So like many complicated transactions, there would be someone that has the lead with the pen, and that might be the attorneys at the Campbells law firm that represents the JPLs.  But I would anticipate that the parties to the scheme and the company would be involved in commenting on those drafts and providing feedback.  And there would be back and forth between the parties before the scheme is finalized.

THE COURT:    Thank you.

And how would that work in a situation like this, assuming that I were to issue the notice, the proposed notice and that entities opt out?  From what I understand, those entities would still be subject to whatever is determined at the sanction hearing.  Would those entities who opt out still be part of those discussions in developing the scheme, or would that be limited to, here, the lead plaintiffs, if that makes sense?

MR. MARTIN:    No, and obviously, every creditor or potential creditor is of a different size and a different characteristic, but the intent of the JPLs is to ensure that

L5SGlucC

those parties have the right to participate and that we will be communicating with them. The right to participate is, of course, driven by Cayman law. And if they are subject to the treatment under the scheme, they have a right to be heard. And because of that, naturally, we would be interested in their views on the scheme because we would have to have everyone agree to an arrangement. And that's why, as we noted in our letter -- and I think some others did as well -- that when we convened the meeting on May 20th to propose a steering committee or an ad hoc group, we invited everyone, irrespective of if we thought they might opt out or not.

So I would anticipate that if your Honor were to approve the opt-out notice, it would go out. We would then have a group of parties that would opt out. And that would inform us as to who we would be interacting with between the opt-outs and the lead plaintiff group.

THE COURT:    Thank you. That's very helpful. I understand.

Mr. Martin, under Cayman law, who has the final say as to what goes in the scheme that goes to the Grand Court? In other words, if some creditors are of one view, others are of different view, do the JPLs serve as potentially the decider there if there's disagreement?

MR. MARTIN:    Obviously a bit of a hypothetical, but ultimately, the JPLs have been appointed to facilitate a

L5SGlucC

restructuring between the company and the creditors.  So if the

JPLs believe that they had a scheme that could be approved by

creditor vote, they would have the right to seek approval of

that from the Cayman court.  I don't want to overstate that,

however.  Because if, in the hypothetical that you laid out,

your Honor, the company were to tell us they absolutely

wouldn't support the scheme, that would obviously be

meaningful.  We wouldn't want to propose a scheme that Luckin

didn't think that they could implement and perform upon.  And

likewise, if 80 percent of the creditors didn't like a scheme,

I doubt we would undertake the cost and expense of proposing it

and seeking to prosecute it if we thought we couldn't

accomplish the scheme.  So implicit in a scheme being drafted

and proposed to the Cayman Court for creditors meeting and

approval is that the JPLs will -- at least in good faith and

reasonableness -- believe that they will accomplish that

scheme, so when they undertake the cost of approval, they think

they will have a fair opportunity of doing so.

THE COURT:    Thank you.

Let me now turn to Mr. Graziano.  I have reviewed the

proposed notice.  And I thought I'll give you a chance to walk

through it a little bit -- obviously not line by line or

anything close to that -- but discuss it with an eye on what it

does and what it doesn't do.  There seems to be some

disagreement as to what the notice purports to do and what it

L5SGlucC

doesn't.

MR. GRAZIANO:    Your Honor, may I just make some brief comments on the earlier questions?  Would that be okay?

THE COURT:    Sure.

MR. GRAZIANO:    I just want to add that in the Cayman proceedings so far, none of the creditors -- in terms of the shareholder creditors on the phone -- are being excluded.  We can all work together to maximize the recovery for all.  But unfortunately, what we have with regard to the opt-outs, I think, is a misguided effort to obstruct the class in the hopes that that's going to improve the benefit for the opt-outs and not for the class.  It's not realistic.  But I do think that's what's happening.  And then the state class people I'll talk about separately.

Let's turn to the notice, as your Honor requested. The notice is an attempt to be as similar as your typical securities class action notice as possible, but also to be accurate and informative.  So the notice, therefore, has to mention what may happen in the Cayman.  All the language in the notice regarding what may happen in the Cayman specifically uses that word "may."  It doesn't add any legal rights to the class certification your Honor has already granted.  It doesn't add any legal powers to the lead plaintiffs --

THE COURT:    Sorry, I should have said this at the beginning to the court reporter, assuming that Mr. Graziano cut

L5SGlucC

out for you as well as he did for me, please feel free to interrupt at any point if you are having trouble hearing or following. Mr. Graziano, I think your last one or two sentences cut out. Can you just rewind a bit and repeat those.

MR. GRAZIANO:   I was saying -- and forgive me if I'm repeating some -- that the notice speaks to the informative, beyond your typical securities class action notice, as to what may happen in the Cayman. Because that is an important informational piece. The purpose of the notice is not to expand our rights as lead plaintiffs or lead counsel. It is to inform. It is to give the class members the opportunity to opt out. In terms of what it says may happen in the Cayman, it repeatedly uses the word "may." It's not saying what will happen, because that is unknown. It is not counting on things being certain, because they may have to be determined in Cayman. But it is designed to provide information to the class so that they may opt out. It is not designed to increase our rights.

But as lead plaintiffs, we can, your Honor, speak for the class. As lead plaintiffs, we can, your Honor, settle for the class. So none of that is changed. But the notice is intended to broadly advise potential class members of their rights to opt out. Getting clarity, setting an opt-out deadline and getting clarity as to who is in the class and who has opted out is very important for this process to be

L5SGlucC

productive. Otherwise, the JPLs, we, Luckin will never know who is in the class. And it could be very difficult to reach any resolutions.

THE COURT:    Thank you.

Mr. Graziano -- I'm sorry if I may be jumping around a bit -- can you tell me how you see this playing out with respect to the litigation before me? The stay is lifted only for purposes of essentially settlement discussions in connection with the Cayman litigation. Is the idea that once that is approved, whatever is finalized in Cayman is approved, to the extent that it needs to be approved by the bankruptcy court here, which is another question I have as to how that would play out, then we would be in a position to move forward with the case before me and resolve it as appropriate?

MR. GRAZIANO:    There are a number of possible courses this could take. But certainly, your Honor, one course is that we have a successful settlement in the Cayman, and then we bring that to the United States, to Judge Glenn, potentially to you. This settlement, by the way, it doesn't have to, but it could be a broader settlement, if counsel for the underwriters are on the phone. I don't intend to put them on the spot today, but I'm just suggesting, as class counsel, we may settle with more parties. We may bring that to you. Obviously, that would be different, that would have a second class notice go out, because now the class would see different parties in the

L5SGlucC

settlement class.

I'm speaking in hypotheticals, because I don't know exactly how successful we will be in the Cayman.  But there will be a number of opportunities for us to come back to your Honor.  And what Judge Glenn did in his carve-out was specifically -- in Paragraph 4 -- carve-out all of our abilities to come back to you to continue with class proceedings as needed.  And this notice is just one example of a class proceeding that otherwise would have been stayed but is not.

THE COURT:    Mr. Graziano, can you talk a little bit about how this procedure fits in with Rule 23?  You are using the term settlement a bit.  A scheme that would be voted on in the Caymans and potentially approved, is that a settlement? How does that relate to Rule 23?

MR. GRAZIANO:    We, in this case, your Honor, will always be focused on our class before you.  So if there is a broader scheme put into place in the Caymans that obtains a recovery for all shareholders --

THE COURT:    Mr. Graziano, I think that sentence right before you cut out a little bit.  Can you just repeat that.

MR. GRAZIANO:    I apologize.  I don't know what's happening on the phone today.  In the Cayman, our position is always going to be on behalf of the class.  If the scheme in the Cayman is broader than our Rule 23 class, we are not there

L5SGlucC

with that purpose.  We are not there to be some kind of superpower.  We are focused on our Rule 23 certified class and not beyond that.  I understand, in the Cayman, there are different rules and consequences.  But that is a function of Cayman law, not Rule 23.  We are speaking on behalf of the class in the Cayman because it's been certified before your Honor.

THE COURT:    Mr. Graziano, what would I then be approving with respect to your class pursuant to Rule 23?

MR. GRAZIANO:    The process will depend upon what exactly happens in the Cayman.  But certainly, there's an opportunity for us to come back before this court to present a settlement.  That is something we are contemplating, yes.

THE COURT:    And talking about specifically the scheme that Mr. Martin spoke about and wrote about, assuming that there is a scheme that goes through the entire process in the Grand Cayman and is approved -- or sanctioned, I guess is the right word -- by the Grand Court and that scheme, as I understand it, would entail reorganization of capital, if that scheme is sanctioned by the Grand Court, does that then need to be approved by Judge Glenn for it to have affect in the US?

MR. GRAZIANO:    That is our understanding, that at the very least it would be presented to Judge Glenn in the United States, if not as well to your Honor.

THE COURT:    Mr. Martin, is that your understanding as

L5SGlucC

well?

MR. MARTIN:    Yes, your Honor.  And I think in one of the letters that the lead plaintiffs wrote, they cited a case called *Ocean Rig,* which Judge Glenn decided where he pursued that process with respect to a Cayman scheme.  So under Chapter 15 of the United States Bankruptcy Code, if the scheme is sanctioned by the Cayman court, the JPLs would have the opportunity to move for -- in front of the bankruptcy court -- for what's called additional assistance under a specific provision of the bankruptcy code to have the order of the Cayman court sanctioning the scheme apply with equal force and effect within the territorial jurisdiction of the United States.

THE COURT:    And Mr. Martin, that case you just mentioned, did that involve a class?  And if not, does that matter?

MR. MARTIN:    So when you use the term "class," I assume you mean, your Honor, a class like in this situation, not a class of creditors that they would use in the Cayman scheme, so that's the distinction I'm making when I answer this question.  The answer to that is no.  The primary class claims that has been addressed under schemes have occurred with respect to insurance and asbestosis claims under English law, which may have some persuasive effect in the Cayman Islands. So no matter where -- there was not a class certified under law

L5SGlucC

in the *Ocean Rig,* to answer that question specifically.

THE COURT:    Mr. Portnoy, I haven't given you a chance to chime in.  Is there anything you wish to add to what we've been talking about?

MR. PORTNOY:    No, I very much agree with the comments of Mr. Martin and Mr. Graziano.  I guess I would underscore the clarity point that Mr. Graziano was making.  The purpose of the notices, of course, is to inform the class of the proceedings and give them an opportunity to opt out.  There's also a purpose from the defense perspective, and that is, after the opt-outs come in, defendants then know who they're negotiating with, who is in the class represented by the class lawyers, who is outside the class not represented by the class lawyers. That's an important event in a case like this where all parties have indicated really a willingness to sit down and see if this can be resolved.  But a necessary step in seeing whether a case like this can be resolved is understanding which lawyers are representing which claimants, which is why we think it is necessary for this notice to go out and for the opt-out process -- whether that generates limited opt-outs or a larger set of opt-outs -- we think it's important for that process to go forward.

THE COURT:    Thank you.

Let me now turn to the proposed intervenors.  And after each proposed intervenor speaks, Mr. Graziano or

L5SGlucC

Mr. Martin or Mr. Portnoy to the extent there's anything you wish to respond to I'll let you do that. But let me start with the Winslow Funds.

Mr. Catalina, do you want to take a few moments to explain the basis for your objection and why you think that Winslow should be allowed to intervene here?

MR. CATALINA:    Thank you, your Honor. Frank Catalina for the Winslow Funds.

So I think it makes sense to discuss what it is that the lead plaintiffs, Luckin and the JPLs are trying to accomplish here and why it's antithetical to Rule 23 and the due process rights that Rule 23 are meant to protect. And some of the comments that we just heard kind of highlight some of those concerns. But it is clear that the lead plaintiffs, Luckin and the JPLs are trying to combine an entire creditor class of securities fraud claimants and really empower the lead plaintiffs' counsel to negotiate those claims, to settle those claims and to have the power to vote through an approval of a scheme that would settle out all those claims, including against underwriters and third parties. So this is naturally beneficial to Luckin and the JPLs because, although they may communicate and discuss with other securities fraud claimant creditors in preparing the scheme, they really would only have to get the approval of class counsel if they can aggregate that voting power. So the only way that this can be accomplished is

L5SGlucC

to aggregate voting power.  So I want to address some of the arguments that we've seen in the letters to your Honor and that we just heard on the phone about the proposed notice not bestowing any legal rights.

The proposed notice does say that your voting rights in the Cayman scheme may be affected.  It says, if you remain a member of the class, the class representatives and class counsel will have the power to cast votes on behalf of the class, which may be deemed to be a vote cast by you as a member of the class.  Now, Mr. Graziano is correct that the word "may" is included in the notice.  But unless class counsel was going to seek to be able to cast votes on behalf of absent class members in the Cayman scheme, there would be no reason to tell the absent class members that class counsel may be able to vote for them.  So I understand that, ultimately, a Cayman court will have to determine whether class counsel will be able to aggregate and cast those votes.  But the clear purpose of putting that language in the notice is to obtain the proxies of absent class members such that they can get over the hurdle to approve a scheme in the Cayman proceedings.  There's no reason otherwise to include the voting language in the notice.

And I'll note, your Honor's provisional order certifying a class did not specifically bestow the power upon class counsel to vote for absentee class members in the Cayman proceeding.  However, as we understand Cayman law, the meeting

L5SGlucC

that would be convened to cast votes that Mr. Martin discussed, he used the words "appearing" and "voting."  And so voting can either be done by appearing at the meeting or by proxy.

So it's clear that what they're going to do after this notice is approved, if your Honor approves it, is take this down to the Cayman court, say we have the proxies of all of the nonopting out absent class members, and we have their proxies by virtue of giving them notice that we were seeking to use their votes and notice that was approved by a federal court in New York, and then they made the choice to let us cast those votes.  So that's the purpose here for putting the voting rights --

THE COURT:    Let me ask you a little about that.  I'm not sure why that's necessarily problematic, given that the notice is letting the class members know that that's a possibility if they don't opt out.  I mean, this seems to be putting the class members on notice that it may be that the class counsel votes on their behalf -- "may" is used, I think, intentionally here, because it will be for the Grand Cayman courts to decide -- but if someone doesn't like that, they can just opt out.

MR. CATALINA:    The problem is that the opt-out becomes elusory.  If the class counsel is able to aggregate the votes in this way and to aggregate enough votes to clear the hurdle to approve a scheme in the Cayman Islands, there's no opting

L5SGlucC

out of the scheme, okay. So those class members that choose to opt out will have this scheme essentially crammed down. There's no opportunity to opt out of that scheme. And therefore, the --

THE COURT:    I'm sorry, but it sounds like they would be able to vote when there needs to be 75 percent for the scheme to go forward to the sanctions hearing, the final hearing.

MR. CATALINA:    Right. But if class counsel is able to aggregate votes simply through this notice procedure, where they can aggregate a large enough number of votes -- even from class members who were never going to receive this notice, as Mr. Ni's letter astutely pointed out -- then use those votes, then class counsel can approve whatever scheme they want. And the problem is, your Honor, that class members have a constitutional due process right, which is embodied in Rule 23, to not only opt out, but to opt out and retain their claims and be able to assert them. So what we have here are these parallel proceedings. We have a proceeding in the Cayman Islands where every class member is going to be a member of the class of creditors that will be bound by what occurs in the Cayman Islands. And in fact, that's in the notice also. It says, even if you opt out, a scheme approved by the Cayman Islands may be binding upon you.

Now, how does that offend due process concerns here?

L5SGlucC

Well, the class members here have a constitutional due process

right to opt out and retain their claims and pursue them as

they see fit, if they don't want to follow along with the

class.  However, what's going to happen is the class counsel is

going to approve a scheme based on their super majority voting

power that actually compromises and eliminates the claims that

class members here in the United States have an unqualified

constitutional right to retain by opting out.

And it was very interesting how Mr. Graziano answered

what would occur after that happens.  Because this court is

likely to have no meaningful Rule 23 oversight, as it's

required to do in regular Rule 23 practice, over that

settlement.  And in Mr. Graziano' letter to the Court, the

oversight they contemplated was that the Cayman court will

review and approve the scheme, and then it will be brought to

the bankruptcy court in New York for what are essentially

domestication proceedings.  And so it would essentially be

referring a reorganization plan to the bankruptcy court and

just domesticating it, not under a Rule 23 standard.  There

would be no Rule 23 review of whether class members and

opt-outs constitutional rights were preserved in the scheme

that was approved in the Cayman Islands.  And in his letter to

the Court, there's no mention of ever coming back to this court

for Rule 23 review and approval.  And in fact, on the phone,

there was similar wishy-washy language saying, potentially we

L5SGlucC

would bring this to you, we would have the opportunity to bring this to the Court, that's something we may contemplate, at the very least, we would go before Judge Glenn, if not your Honor.

So it's clear that what is going to happen is that class members who wish to exercise their constitutional and Rule 23 preserved rights to opt out and retain their claims are going to have them extinguished in the Cayman proceedings. And just another point about extinguishing those claims against underwriters, officers and directors, and third parties, it's clear from the notice -- they say in the notice that class counsel may compromise claims against parties other than Luckin. I would point your Honor to your Honor's provisional certification order. Your Honor did not certify a class empowered to settle claims against any party other than Luckin. Your Honor's provisional certification order certified the class, quote, "for settlement purposes only with respect to plaintiffs' claims against Luckin." So the idea that they are empowered to go down to the Cayman Islands and compromise and give away claims of opting out class members against parties other than Luckin is not only contrary to constitutional due process protection, contrary to the entire Rule 23 procedure, but it's directly contrary to your Honor's provisional order certifying the class.

The class members should have to affirmatively grant a proxy to vote in the Cayman proceedings so that there is an

L5SGlucC

actual meaningful opt-out option that doesn't result in their

losing their claims.  Otherwise, it's just an elusory opt-out

option.

And I just want to say one thing about some of these

claims too, and particularly in Winslow's case, but also for

all of the class members.  We're in a situation where an issuer

defrauded numerous investors in several public offerings, which

is not in itself unusual.  And it's not unusual for a bad

actor, a fraudulent issuer to end up in bankruptcy after doing

such a thing.  This is quite common.  The class members have

very strong claims under the 1933 Securities Act against very

solvent investment banks and underwriters who are present here

in New York.  In fact, Winslow has unique claims that are

unique against the class claims due to Credit Suisse's making

direct oral statements to Winslow.  There's a reason that the

1933 Securities Act puts that joint and several liability with

underwriters.  And part of that is, when the fraudulent issuer

goes belly up, the defrauded parties can look to what they know

is a solvent, reputable company for recovery.

And so not only is granting the ability for the lead

plaintiffs to go to the Cayman Islands and extinguish our

claims against both Luckin and all of these third parties --

not only is it unconstitutional and a violation of our due

process rights, totally antithetical to Rule 23 and the due

process rights embodied in Rule 23, but it will frustrate the

L5SGlucC

very statutory scheme put together by Congress in 1933 to allow investors to seek recovery from solvent, reputable underwriters in situations such as these.  So it goes beyond the scope of your Honor's order.  It will violate due process rights of class members to have a meaningful opportunity to opt out and pursue their claims.  And there will be no further Rule 23 review in this court after this court approves a notice allowing the lead plaintiffs, Luckin and the JPLs -- who, by the way, are in total unison on this matter against the class members here who lost significant sums of money in this fraud -- so it goes against all of those principles, and that's the problem with the notice, your Honor.

And since nobody is raising these issues, none of the parties are -- and in fact they do everything on stipulation, and they never even made a motion to certify a class -- we seek to intervene so that there is a party in this case who can actually attempt to preserve the due process rights of class members, make sure there's meaningful Rule 23 review, and do the things that none of the parties in the case are doing.

THE COURT:    Thank you, Mr. Catalina.  Right now, the Winslow Funds are technically part of the class; right?

MR. CATALINA:    That is correct, your Honor.  Both under the definitions in your Honor's order, in the complaint and the notice, yes, we are.  And there has been no opt out decision point yet in this case.

L5SGlucC

THE COURT:    Can you say why you seem to think that the lead plaintiffs would not be adequately representing the interests of the Winslow Funds?

MR. CATALINA:    Yes, your Honor.  Because they're quite clearly attempting to usurp and negate our due process rights to pursue these claims in a way that we see fit, right.  So they and the JPLs have made clear their intention to -- contrary to your Honor's order -- settle out claims against the underwriter parties and other third parties in the Cayman proceeding, which would result in revoking the rights for Winslow Funds and other class members to pursue those claims. And in fact, I'm sure if you were to ask if they would be okay with simply staying within the confines of your Honor's order and only dealing with settlement with Luckin, taking out the language in the notice about voting essentially by proxy and compromising claims against the other parties, then I'm sure that they would not agree to that and they would insist on that language remaining in there.  But essentially, they're attempting to extinguish our claims, whether we like that or not.  And that's just not a Rule 23 procedure, right.  I mean, Rule 23 and the US Constitution guarantee that we are able to opt out and take our claims with us and do with them what we will.  So any lead plaintiff who is going to extinguish our due process rights to pursue our claims in the manner we see fit is, by definition, not representing us adequately.

L5SGlucC

THE COURT:    Mr. Catalina, you have the right to opt out, you would have the right to opt out under the notice.  And then, at that point, doesn't it become an issue really with the Grand Cayman court and not really with this court?  Aren't these points that are more appropriate to argue before the Grand Court in the Cayman Islands, essentially, that the scheme -- assuming this is the view -- is not fair as to your clients?  And then, if appropriate, to the bankruptcy court, if it needs to go there for approval?

MR. CATALINA:    No, this is the appropriate court, your Honor.  The Cayman Islands court does not have a Rule 23.  It's not subject to the United States Constitution.  It is not concerned with protecting our due process rights or making sure that Rule 23 is applied.  The Cayman Islands court is interested in implementing a scheme of arrangement under Cayman Islands law.  This court should be supervising the class action that is before this court and making sure that the constitutional due process rights of class members are preserved, that Rule 23 is followed, and that class members retain whatever due process rights they have to actually opt out in a meaningful way and pursue claims.  It should not empower a lead plaintiff to go to the Cayman Islands, to aggregate votes, and to use those votes to extinguish rights that if it tried to do so in this court it would not be able to do.

L5SGlucC

THE COURT:   Thank you.  Let me got back to Mr. Graziano, unless you think Mr. Martin or Mr. Portnoy should --

MR. GRAZIANO:   Your Honor, I changed phones, so hopefully this won't happen again.

Your Honor's last question has it exactly right.  And Winslow is really complaining about the Cayman, not Rule 23.  Winslow has been aggregating claims.  Winslow is trying to get more votes in the Cayman.  We don't know how things are going to play out in the Cayman.  But there are no due process rights being violated.  There is no elusory opt-out.  This is a real opt-out.  If the class were to settle with additional parties beyond Luckin, your Honor would be presented with that information for approval.  Those parties, let's say hypothetically the underwriters -- and I keep apologizing because I'm just saying it as a hypothetical to them; they're not talking to us, so I don't want to create any misimpressions -- but let's say they did, they would want a release in the United States from your Honor on behalf of the class.  They would get a class-wide release in a final approval proceeding before your Honor.

The difference here, your Honor, is all of the claims against Luckin are stayed.  So we sometimes have cases where the statute of limitations has expired before the class notice goes out, because the Supreme Court has tightened up the language relating to the statute of repose.  And sometimes we

L5SGlucC

tell class members, you can opt out, but if you opt out, you may have no claim.  Here, the claims against Luckin, the entity, are stayed.  Winslow can't litigate them.  We can't litigate them.  This Cayman proceeding is the way to seek resolution.  How things will play out, we don't know.

Are we prohibiting Winslow from coming?  Absolutely not.  They are welcome to participate.  We can work with them to improve the recovery for all.

Ironically, they want exactly what they are claiming we will get.  They want to have the biggest vote.  They want to suppress the class.  And they will absolutely, your Honor, opt out of this class the moment they have to.  So it is unfair for them to claim they're both a class member and then opt out.  We should set this opt-out deadline and see what they do.  And it seems to be pretty strongly that they intend to opt out of the class when they have to, and they will.

THE COURT:    Thank you.

Before I move on probably to Mr. Cochran, let me just ask if Mr. Martin or Mr. Portnoy has anything they wish to add.

MR. MARTIN:    Your Honor, this is Craig Martin, if I may be heard.

THE COURT:    You may.

MR. MARTIN:    I just wanted to make a few points.  I normally don't like to cite to the bankruptcy code section unless it's necessary because it makes me sound like a bit of a

L5SGlucC

nerd. I do agree with Mr. Graziano that your Honor's point is the correct one, which is, when we get to the bankruptcy court, if we get to the bankruptcy court, the bankruptcy code has a section 1506, which creates a public policy exception. Which, if the allegations are correct, that something in this process which may occur occurs and it violates the Constitution, then 1506 of the bankruptcy code says that nothing prohibits the bankruptcy court from not taking the action or refusing to take action if doing so would be manifestly contrary to the public policy of the United States.

So I would anticipate that if we get to a point where we're seeking to present the scheme for recognition in the United States and if we have not been able to reach a resolution with the Winslow parties and they raise these objections, many of the arguments that they've just made would be made to the bankruptcy court as a basis for addressing their objection to the scheme. And in that regard, they almost have an extra right, because they can also raise fairness issues in the Cayman Islands and manifestly contrary to public policy issues in the United States.

The second point I would like to make under US bankruptcy law, of course, is that it's not unusual in a bankruptcy case for a class of creditors to be bound by a resolution of a corporate debtor under Chapter 11. The voting requirements are actually less under the US bankruptcy code.

L5SGlucC

50 percent in number, which is the same as in the Cayman Islands. In the United States, the voting threshold is 66 and 2/3 percent; and in the Cayman Islands, it's 75 percent. Additionally, there are plain rules under US law regarding third-party releases and the requirement of payment of consideration. And so like Mr. Graziano, I don't want to pick on the underwriters or say that there's anything certain, but if they were to agree to a settlement and that was to be implemented and they were to pay consideration for that settlement, it may be something that's viewed as entirely appropriate and consistent with US law.

So I wanted to make those two points as to what might happen in a Chapter 11 case, because I think you have heard a lot about some of what is being proposed is inappropriate or unconstitutional. And I wanted to put this framework in maybe an analogous context.

And finally, I won't engage on the allegations that somehow the JPLs are in line with the lead plaintiffs and the company. The JPLs are appointed by court order and have certain statutory and fiduciary obligations, and I fully intend to carry those out and look forward to working with Winslow and the lead plaintiffs and the other creditors and Luckin to resolve the issues.

THE COURT:    Thank you.

MR. MARTIN:    That would be my response to that

L5SGlucC

argument.

THE COURT:    Thank you, Mr. Martin.  And I think we covered a lot with respect to this.  But Mr. Portnoy, if there's anything you wish to add, I will let you do that as well.

MR. PORTNOY:    Thank you, your Honor.  The only two points I would make very briefly is the Winslow plaintiffs, in response to your question about whether they are still technically in the class, said yes.  But let's keep in mind, they have filed their own litigation.  So it is an absolutely clear real-world opt out.  They are effectively out of the class.  They have indicated that they intend to be out of the class.  Therefore, their arguments that they are somehow seeking to in any way protect the class or protect the class' rights to due process I think really do ring hollow.  The class has the opt-out rights.  The notice is to get them a notice of that opt-out right, enable them to opt out, if that's what they want to do. It's getting the notice out, getting the opt-out process going which serves the due process efforts and not anything else.

THE COURT:    Thank you.

Let me move next to Mr. Cochran for the state class. Is there anything you wish to add?  There's obviously no need to address stuff we have already spoken about.  Is there anything further you wish to add?

L5SGlucC

MR. COCHRAN:    Yes, your Honor.  This is Brian Cochran on behalf of the state class plaintiffs.

I just want to reiterate what the requested relief is before the Court today, which is simply an opportunity to respond formally via briefing to the proposed notice.  There are so many issues, some of which have been raised already.  There are others, some specific to our case, the state class case, especially because we're dealing with a situation where there was a stipulated class certification order, which is now being used to essentially provide what we believe to be defective notice.  But one thing that is stated in that notice is the power to cast votes on behalf of that provisional class.  There hasn't been an opportunity really to demonstrate that the elements of Rule 23 have been established and that this notice is appropriate under Rule 23.  So I think the opportunity to make these arguments in a formal filing is critically important because of the issues that have already been raised about the due process concerns.  We have our own due process concerns that haven't even been addressed yet.

So in addition to effectively enabling the federal class plaintiff to control, essentially dictate, the outcome of the restructuring agreement because they would have, by way of this purported proxy, voting rights on behalf of all absent class members, the issue is the claims in our case are also broader than the claims being represented by the federal class

L5SGlucC

plaintiffs.  We include a class of note purchasers.  And while the provisional certification order and the proposed notice don't address those claims, there's a real concern that we have that the creditor class -- so the class with respect to the restructuring proceedings -- would be the same.  So effectively, the federal lead plaintiff would be a committee of one voting on whatever restructuring they want that would obviously favor their own claims, extinguishing our claims against third parties, the solvent underwriter banks, and claims that the federal plaintiffs don't even possess with respect to the note holders.  That is a real concern.  And we would like the opportunity to address those in a formal briefing.

I think we appreciate the opportunity to join the hearing today.  We take the position we have a right to intervene, because this clearly impacts our interests.  We clearly have overlapping, but in some respects divergent, interests from the federal plaintiffs.  Those interests are at risk because of this proposed procedure.  But even if the Court doesn't believe we have the right to intervene, we would respectfully request that the Court exercise its discretion to allow us to intervene and to put these issues in a formal filing where we can cite exhibits.

For example, we haven't had the opportunity to address our own order that we have received in the state court

L5SGlucC

proceedings, in which Justice Sherwood appointed us as colead counsel for the securities act claim. It's an order that no settlement negotiations shall be conducted without our approval and participation. And yes, I think the liquidators have opened the tent and invited us to negotiate. We had that meeting last week, where an ad hoc committee was proposed. Unfortunately, the federal class plaintiffs have sent the provisional certification order that was entered, effectively used that to say we're not interested in discussing with the other claimant creditors forming this committee. We've had that opportunity. We've tried to reach out. We're hoping that ultimately we can work together to reach this type of a resolution. But if the federal class plaintiff views themselves as sole majority voters for all creditors, what incentive do they have to work with anybody else? What incentive do they have to consider anybody else's interests, other than their own and their clients?

And I know the point that's been made that the proposed notice, in some respects, says the votes cast by the federal plaintiff may be considered to bind you as a member of the class. But it's important that the entire proposed notice is read, which says that the class counsel will have that power. So it's very different than what you're hearing today at the hearing, than what was put in the letters. If the notice was accurate, it would say something to the effect of,

L5SGlucC

we will seek to have this power recognized by the Cayman Islands court, this is an unsettled legal issue. That's not what it says. It says, class counsel will have the power to cast votes. Where does that power come from?

So this proposed notice, even though, in some respects, there are acknowledgments that the Cayman Islands court may act in a certain way or another way -- and clearly, we don't know how that's going to ultimately be resolved in front of the Cayman Islands court -- certainly, the proposed notice and the accuracy of the proposed notice and sufficiency under Rule 23 is an issue for this court. And it's a situation where we're at a critical juncture. If this notice goes out without remedying the defects that we have identified, you can't unring the bell, you can't put the genie back in the bottle.

So we would urge the Court simply to allow us to intervene for the limited purposes of laying these issues before the Court for consideration. And maybe there's a way to revise the notice to address these concerns. So your Honor, the point I want to emphasize is simply, my goal today is not to lay out all of the concerns that we have with the notice, but simply to request the ability to formally file a response.

THE COURT:    Thank you, Mr. Cochran.

Why don't I hear from Mr. Wissner-Gross and then Mr. Ni before I go back to Mr. Graziano.

L5SGlucC

So Mr. Wissner-Gross, is there anything you wish to add?

MR. WISSNER-GROSS:    Your Honor, I think both counsel, Mr. Catalina and Mr. Cochran, have made most of the points that I would make.  I do want to underscore one point.  And I appreciate your Honor, I certainly understand from your comments that there be no prejudice to anyone who is seeking or potentially may opt out, but there's an elephant in the room and I think the point has been made -- but it's probably worth understanding briefly again -- in the Cayman Islands as I have been advised, for the court to approve a scheme, there are two requirements in the voting process.  First, 50 percent of the votes cast have to be cast in favor of the scheme.  And secondly, 75 percent of the economics, of the value, has to approve.

It's pretty clear that what the JPL -- in discussions with Mr. Graziano and his clients, as well as with Luckin's counsel -- they have determined that if they can get Mr. Graziano to act as proxy for the class, they will meet that 50 percent threshold.  And that, as a result, while there has been an overture of participating in the ad hoc group, Mr. Cochran has correctly noted that the efforts have been stymied by Mr. Graziano, it would appear.

So what's the elephant in the room?  The elephant in the room is that potential opt-out voters clearly have opt-out

L5SGlucC

rights.  If the notice goes out and class counsel has the right to vote for everyone, even those who opt out, everybody understands that he will have that 50 percent threshold.  And everyone understands that, while the law is unsettled, from what I've been advised in the Cayman on certain issues, it is not unsettled that the Cayman court will have the power to issue releases far broader than this court would under the circumstances here.  And that, as a practical matter, the Cayman court would be able to issue broad releases that would eliminate our opt-out right.

In the case of the Kingstown parties, we have named at least one defendant in our case, the Ernst & Young China division, that's not named in the class.  So assuming that the notice is recognized and a deal is cut by Mr. Graziano and his client with the JPLs and submitted in the proposed scheme that includes release, not only of the underwriters, but also Ernst & Young, which is not even named in the class, as I understand it, the Cayman court does have the power to grant those broad releases.

And then the next step, I think, as Mr. Catalina has correctly noted, Mr. Graziano has deftly and skillfully kept open the option that he would not come back before the Southern District for approval, but rather with the Cayman court issuing an order approving the scheme, what we anticipate is that the JPLs then would come back before the bankruptcy court, perhaps,

L5SGlucC

and seek -- almost as a matter of comity -- to seek approval to be recognized before a foreign court.

So our concern is that the elephant in the room is that opt-out rights in reality are rendered elusory by this notice. We've named at least one defendant that's named in the class. We don't really see that there's an urgency to get this notice done today. We think that this should be done in an orderly way. We'd like to have an opportunity to intervene, note for the record our objections.

I join in what Mr. Catalina and Mr. Cochran had stated. I don't have any further comments to add at this point.

THE COURT:    Thank you.

And Mr. Ni, is there anything you wish to add for your client?

MR. NI:    Yes, your Honor. And I'll try to be brief. So there's sort of a cart before the horse problem here, and I think there's a failure by the lead plaintiffs counsel and the JPLs to understand the predicate that needs to occur before their negotiation plan can succeed. There are layers of procedural problems that the notice touches on in both Cayman and in China. The lead plaintiffs and the JPLs are saying all these attempts to intervene are premature, because any objections to the lead plaintiffs' voting power should be presented to the Cayman court. Well, if your Honor certified

L5SGlucC

the notice process and all this goes ahead and negotiations happen, they're going to go in front of the Cayman court. And the lead plaintiff and Luckin are going to go there and argue that this court presided over a rigorous, highly disciplined process by which constructive representation was obtained under Rule 23, including a wonderful notice and opt-out process routinely practiced under US law and cite this court's certification orders when persuading the Cayman court to sanction a 75 percent, quote, unquote, vote by a certified class. That means this process has to be disciplined now for everyone's own good, as well as for the class' interests.

So before your Honor they point to the Cayman court saying, the Cayman court is going to be protecting the interests of the class members. And in Cayman, they're going to point to this court's certification order to claim 75 percent voting power and tell the Cayman, it's all good to certify a scheme, because this court certified 75 percent of the voting power. So layer one is that there's going to be a problem, if this class attempts to vote 75 percent. First of all, this court's certification order is rigorous enough to survive a Cayman law challenge. If they try to eke by a 75 percent vote in front of the Cayman court, say to the Cayman court there's no need for an absent class member, say, in China to be notified, because this US court has certified a class of, quote, all shareholders who don't opt out before the SDNY.

L5SGlucC

Furthermore, there's a res judicata problem in China. The lead plaintiffs and the JPLs themselves seem not to have fully grasped the contours of what they're going to achieve. Let's be very pragmatic. China passed a law in 2018 to allow domestic investors in China to sue foreign-listed companies for fraud. Luckin is a wholly foreign-owned enterprise in China with something called variable interest entity structure, which basically boils down to that its operations and all of it is onshore, that is domestic to China, cash on hand are subject to Chinese law and only onshore in China. There are Chinese investors suing Luckin right now in Chinese domestic courts, who would technically be opt-outs from this action, who never received any notice of this action, nor were asked to join the ad hoc committee. The Chapter 15 case law is clear that a US bankruptcy court does not get to stay Chinese cases or any foreign cases.

So these facts mean that it's unclear whether the Cayman reorganization, if it does not involve Chinese investors or other foreign investors, is even enforceable in China, as to the variable entities that own Luckin's onshore domestic operations. And I just read from Luckin's own registration statement. And I quote, "It may be difficult or impossible for you to bring an action against us or against individuals in the United States, in the event that you believe your rights have been infringed under the US federal securities laws or

L5SGlucC

otherwise.  Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and officers.  For more information see civil liabilities." So they have a whole section explaining to all investors that any judgment a US court orders against them might be completely unenforceable in the Cayman Islands and in China.

So for Luckin to now -- the Rule 23 certification process and to have this reorganization that they are trying to undertake and cram down be enforceable in China, actual notice to Chinese investors and protection of their opt-out rights is critical.  Otherwise, the Cayman may not get the vote recognized on the Chinese mainland, when they will inevitably face objectors there when they try to go domesticate this in China.  So while they may cram this through, the notice is the initiating step in all of this.  It's the first step in all the things that will need to happen before the Cayman court, before this court, before Chinese courts eventually to get any settlement done.  Care taken at this stage with respect to notice is necessary to protect all parties from uncertainty in the future.

I know that this process has seemed to play out in an adversarial way with a lot of what seems to be like almost knee-jerk opposition to each other's submissions.  So the point

L5SGlucC

of my letter was to set forth the practical realities that all parties in this negotiation should think about. The negotiation class is highly unlikely to be accepted in China, if it does not convey from the get-go rigorous procedural fairness to Chinese investors.

And I'll quote to the JPL's letter too, their latest letter to the Court. "The JPL may also seek assistance from the bankruptcy court combining the Chapter 15 case with respect to the scheme's applicability within the territorial jurisdiction in the United States once it's sanctioned." So the bankruptcy court and this court only have, under Chapter 15, an ability to sanction an approved scheme, if approved in Cayman, in the United States, not in China. And the JPL counsel just said earlier, when talking to your Honor, if the Chinese operating entity says the scheme cannot work, they won't even be able to present it. So to make sure that the Chinese operating entity will accept whatever schemes will be presented, will the JPLs going to apply to the Chinese court for the Chinese equivalent of a Chapter 15 stay of all the Chinese litigations that are pending there and invite those plaintiffs to Cayman to join in the negotation as well?

What if the Chinese court says that the Chinese investors are not subject to the jurisdiction of the US court because of the 2018 law? And if so, that would automatically put out all Chinese investors from the negotiation class. So

L5SGlucC

is your Honor going to be approving a class of potentially more than 75 percent voting power without actually knowing that it will be eventually enforceable?

These are all questions that will arise from an improperly drafted notice that does not provide proper notice and proper procedural protections that will pass muster before a Cayman and a Chinese court. So that's important because all of Luckin's money is in China. And if a Chinese court doesn't approve it coming out to pay settlements, nobody is getting paid here.

So we're all willing to work together with the JPL and the lead plaintiffs to do this, but we don't want what we accomplish to be unenforceable and be blown up by the operating entity itself when they suddenly realize, we have to domesticate this in China for us to accept it. So that's why we have to ensure that the notice, as was drafted, is as procedurally protective of all investors' interest as possible.

THE COURT:    Thank you, Mr. Ni.

Maybe it might make sense to go to Mr. Graziano or Mr. Portnoy to see if either of them can address what you just said, especially since it's fresh in our head. Mr. Portnoy or Mr. Graziano, do you have any thoughts on the concerns that Mr. Ni just raised?

MR. GRAZIANO:    Sure. This is Salvatore Graziano, and then I will let Luckin's counsel, Mr. Portnoy, add to what I'm

L5SGlucC

about to say.  But Mr. Ni has a client.  His client is on notice.  His client presumably can communicate with him in English or another language.  Mr. Ni has no standing to speak for Chinese-speaking individuals who live in China.  He doesn't represent them.  He doesn't represent a class of them.

More importantly, your Hoonor, the ADS securities in this case were traded in the United States.  The documents were in English.  We will be operating pursuant to our Rule 23 class before your Honor.  Whatever concerns he's raising about what may or may not happen in China really have nothing to do with anything we've discussed so far.  They almost seem to be just another attempt to obstruct notice.

All we're talking about today is getting out a notice, it sets an opt-out deadline.  It adds nothing to your Honor's class certification in terms of building rights.  Mr. Ni, as everyone else on the phone is welcome on the ad hoc committee.  It is not correct that we are opposed to that committee.  We have spent the whole week drafting a document that we can circulate probably by the weekend outlining what we see as being on the committee does, in terms of rights and all of that.  So that's my response.  And I guess I'm starting to go beyond Mr. Ni, so let me pause there and see if Mr. Portnoy or the Court has anymore questions or comments.

MR. PORTNOY:    With respect to Mr. Graziano's comments on the notice, I agree wholeheartedly.  With respect to his

L5SGlucC

comments on the committee, that is really sort of a plaintiffs' side effort, which we are not privy to. But certainly, with respect to the notice and I think, with all due respect, the irrelevance of the comments regarding the Chinese investors, I concur with Mr. Graziano.

THE COURT:    Thank you.

So Mr. Graziano, you could continue addressing other points that were made by Mr. Ni, Mr. Wissner-Gross and Mr. Cochran.

MR. GRAZIANO:    Sure. I would put the opt-outs sort of in one group, so that includes Mr. Wissner-Gross and Mr. Ni, and also primarily Winslow. Setting the opt-out deadline will confirm they will all opt out. The case law they cite for intervention doesn't apply to them. They are hostile to the class. They are not interested in strengthening the class, as some of their cases show. They want to opt out. And they just can't have it both ways. Opting out will make things more clear and more productive, in terms of the ad hoc committee. Time is important. There's a note holder settlement that's already ahead of us. The 180 million recovered by the SEC can go to them instead of us, so that is a concern, a serious one.

The state court class, plaintiffs counsel, Mr. Cochran, spoke. But he purports himself, as he said, to represent a class, a class that is functionally a complete subset of our federal class. Our federal class is broader,

because unlike his '33 Act claims, which we fully cover, we also include '34 Act claims, which his state court has no jurisdiction to cover. He claims that one unique group he purports to represent in the state court are note holders. But those are not even at issue. Nothing the ad hoc committee is going to be doing is going to be talking about the note holders at all. I imagine -- and I don't want to put words in his mouth -- Mr. Cochran is going to go to the Cayman and purport to speak for a class. That would be particularly ironic, because he is, in his own self-interest, obstructing the very class that he claims to care about.

So I don't think any of these parties today, your Honor, have really raised a solid cognizable reason for intervening. I think delay is a serious concern. And I think the notice should be issued and we should set the opt-out deadline. If they're concerned about their inability to object, they have objected at every turn. They have objected before you twice, they have objected before Judge Glenn. They will object in the Cayman. Let's see who they are. Let's see if they're in the class or out the next time we have to deal with their objections.

THE COURT:    Thank you.

Maybe we'll go to Mr. Portnoy next and see if there's anything else you wish to add in addition to what you have said already and Mr. Graziano said.

L5SGlucC

MR. PORTNOY:    Thank you, your Honor.  Nothing further from me.

THE COURT:    And Mr. Martin, let me just check if there's anything you wish to add after the last few attorneys spoke?

MR. MARTIN:    I don't think so, your Honor.  I think the ground has been covered.  And we certainly appreciate you allowing us to participate in this.  And my only further desire would be that if you have any lingering questions over the process in the Cayman Islands that you need answering, we're available to answer them.

THE COURT:    Thank you.

Let me just ask everyone to give me one moment just to look through my notes.

MR. CATALINA:    Your Honor, this is Frank Catalina, if I may, may I just very briefly make one point that I don't think has been clearly made that I didn't want to leave out.

THE COURT:    You may.

MR. CATALINA:    Thank you, your Honor.

And I know this is addressed somewhat in our papers, but I just want to make the point that Rule 23 -- nowhere in Rule 23, which governs these proceedings and governs the certification of a class does it allow a class to be used for the purpose of collecting voting proxies and voting them.  And we cited the recent *Opius* litigation case from the Sixth

L5SGlucC

Circuit.  I know lead plaintiffs have said, that's not from the Second Circuit, that's from the Sixth.  However, as the Sixth Circuit very clearly laid out, Rule 23 confers very particular powers on a class, and that is to litigate or to settle.  And those are laid out in black and white.  Rule 23, nowhere in that rule does it allow a class representative to aggregate proxies by inaction, not even by opting in, but by lack of opting out, to take those proxies and vote them in a foreign reorganization proceeding.  So it's just not in the rule, and it's not allowed by Rule 23.  I just wanted to expressly make that point, which I don't think I expressly made earlier.  And I appreciate the opportunity, your Honor.

THE COURT:   Thank you.  I appreciate you making that point.  I did see it in your papers.

If Mr. Graziano, Portnoy or Martin wish to respond to that, specifically, I'm happy to hear you.  Otherwise, you can rest on your papers.

MR. GRAZIANO:   Your Honor, forgive me, just a very brief response.  What you have just heard is an attempt to reconsider your Honor's class certification order, and that time has passed.  The case is fully distinguishable for other reasons, but I think I'll just rest on that point.

THE COURT:   Thank you.

Like I said before, just give me one moment to quickly look at my notes, and I'll quickly circle right back.  I'm

L5SGlucC

going to just go on pause on my end.

(Recess)

THE COURT:   So I think it might be beneficial to give the opportunity for further briefing that was requested earlier, but I do need to keep this on a tight schedule because I don't want unnecessary delays here.  So let me tell you what I was thinking.  By June 4th, entities that have not moved to intervene may file a motion to intervene.  I think Winslow and Kingstown both have filed motions.  I believe Kingstown's was an exhibit to a letter that incorporated largely those argued by Winslow.  I will treat that as a motion.

For any motions to intervene, you should include the basis, the arguments on the merits, since that will be a basis for intervention.  So you can incorporate your arguments on the notice, how the notice relates to Rule 23.  I think any analogous situation, whether under the US or under English law, might be useful, if there are that you can point to.

And for Winslow and Kingstown, by June 4th, you also can file your own brief challenging the notice, which I will -- hold on -- for Winslow and Kingstown, if there's anything further you wish to add, you can file a brief by then as well. I obviously have a lot of submissions already, but I want to give you the opportunity as well, if there's anything you wish to add, since we are setting that deadline for the briefing for the others.  And then by a week after that, by June 11th, any

L5SGlucC

opposition brief.  And then I will aim to resolve the issue soon after that.

Does anyone have any concerns with that schedule?

MR. ROLNICK:    Your Honor, this is Lawrence Rolnick, Rolnick Kramer Sadighi.  I'm just wondering, in light of the fact that it's Memorial Day on Monday and a lot of people are traveling, if the date could be moved from that Friday to the following Monday.

THE COURT:    Sure.  And I apologize, who just spoke and who do you represent?

MR. ROLNICK:    Lawrence Rolnick.  I'm with Frank Catalina representing the Winslow Funds.

And I'm just saying instead of making that submission on Friday if it could be the following Monday to give us the weekend, because a lot of people are not in the office until after the holiday, people will be coming back.

THE COURT:    Sure.  So that will be June 7th and June 14th.  I'll adjust those deadlines to those dates, so the following Monday and to June 14th.

MR. ROLNICK:    Thank you, your Honor.

THE COURT:    Thank you all for your excellent arguments today.  Like I said, after I receive the briefing, I will issue an order soon thereafter, because I know that there is some time pressure here.  But I hope everyone has a good Memorial Day weekend.  Sorry we went a little bit late on a Friday

L5SGlucC

afternoon with this, but I think it was very helpful.  Have a

good rest of the day.

(Adjourned)