**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LUCKIN COFFEE INC. SECURITIES LITIGATION | Case No. 1:20-cv-01293-JPC-JLC |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS'**
**MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION**

June 10, 2022

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ..................................................................1

II.    THE SETTLEMENT WARRANTS FINAL APPROVAL.................................5

    A.    Lead Plaintiffs and Class Counsel Have Adequately Represented the Class in This Action .................................................................................7

    B.    The Settlement Was Negotiated at Arm's Length ...................................8

    C.    The Settlement Provides the Class Adequate Relief, Considering the Costs, Risks, and Delay of Litigation and Other Relevant Factors ........9

        1.    The Complexity, Expense, and Likely Duration of the Litigation .............9

        2.    The Risks of Continued Litigation.............................................11

            a.    Risks to Enforcing Any Judgment Obtained ..................................13

            b.    Risks to Establishing Liability and Damages ...............................13

            c.    Risks to Maintaining the Class Action Through Trial .................15

        3.    The Reaction of the Class to Date............................................15

        4.    Stage of the Proceedings and Amount of Discovery Completed..............16

        5.    Ability of Luckin to Withstand a Greater Judgment.................................17

        6.    The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and the Risks of Litigation .......................18

    D.    The Remaining Rule 23(e)(2) Factors Also Support the Settlement ....................20

III.    THE PLAN OF ALLOCATION WARRANTS APPROVAL...........................22

IV.    NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS .......................................................................24

V.    CONCLUSION...................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
   298 F.R.D. 171 (S.D.N.Y. 2014) ............................................25

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ............................................8

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ............................................14

*In re Barrick Gold Sec. Litig.*,
   314 F.R.D. 91 (S.D.N.Y. 2016) ............................................7

*Beckman v. KeyBank, N.A.*,
   293 F.R.D. 467 (S.D.N.Y. 2013) ............................................16

*In re China Sunergy Sec. Litig.*,
   2011 WL 1899715 (S.D.N.Y. May 13, 2011) ............................................10, 19

*Christine Asia Co., Ltd. v. Jack Yun Ma*,
   2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ............................................7, 15, 16

*In re Citigroup Inc. Bond Litig.*,
   296 F.R.D. 147 (S.D.N.Y. 2013) ............................................10

*In re Citigroup Inc. Sec. Litig.*,
   2014 WL 2112136 (S.D.N.Y. May 20, 2014) ............................................6

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ............................................ *passim*

*City of Providence v. Aeropostale, Inc.*,
   2014 WL 1883494 (S.D.N.Y. May 9, 2014) ............................................5, 6, 8

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001) ............................................9

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) ............................................24

*Emeterio v. A&P Rest. Corp.*,
   2022 WL 274007 (S.D.N.Y. Jan. 26, 2022) ............................................6

ii

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
 343 F. Supp. 3d 394 (S.D.N.Y. 2018) ............................................................................... *passim*

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ................................................................... 13, 22

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
 279 F.R.D. 151 (S.D.N.Y. 2011) ............................................................................................. 22

*In re Gilat Satellite Networks, Ltd.*,
 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ................................................................. 10, 11

*In re Glob. Crossing Sec. & ERISA Litig.*,
 225 F.R.D. 436 (S.D.N.Y. 2004) ..................................................................................... 16, 17

*In re Hi-Crush Partners L.P. Sec. Litig.*,
 2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ....................................................................... 16

*In re IMAX Sec. Litig.*,
 283 F.R.D. 178 (S.D.N.Y. 2012) ..................................................................................... 14, 22

*In re LinkedIn User Privacy Litig.*,
 309 F.R.D. 573 (N.D. Cal. 2015) ............................................................................................ 10

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
 233 F.R.D. 306 (E.D.N.Y. 2006) ........................................................................................ 9, 10

*Maley v. Del Glob. Techs. Corp.*,
 186 F. Supp. 2d 358 (S.D.N.Y. 2002) .............................................................................. 17, 18

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ....................................................................... 25

*Martignago v. Merrill Lynch & Co., Inc.*,
 2013 WL 12316358 (S.D.N.Y. Oct. 3, 2013) ........................................................................ 16

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) ............................................................................ 19

*Newman v. Stein*,
 464 F.2d 689 (2d Cir. 1972) .................................................................................................... 18

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
 330 F.R.D. 11 (E.D.N.Y. 2019) ....................................................................................... 11, 18

*In re Polaroid ERISA Litig.*,
 240 F.R.D. 65 (S.D.N.Y. 2006) ................................................................................................ 8

*Shapiro v. JPMorgan Chase & Co.*,
    2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ...............................................................5, 8, 18

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2020 WL 4196468 (S.D.N.Y. July 21, 2020) ........................................................................22

*In re Sturm, Ruger, & Co., Inc. Sec. Litig.*,
    2012 WL 3589610 (D. Conn. Aug. 20, 2012) ................................................................18, 19

*Tchrs.' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
    2004 WL 1087261 (S.D.N.Y. May 14, 2004) .......................................................................10

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)............................................................................14, 15

*In re Veeco Instruments Inc. Sec. Litig.*,
    2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)........................................................................15

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)...............................................................................................5, 6, 24

**Statutes**

15 U.S.C. § 78u-4(a)(7) ...............................................................................................................25

**Other Authorities**

Fed. R. Civ. P. 23 ........................................................................................................ *passim*

Court-appointed Lead Plaintiffs and Class Representatives Sjunde AP-Fonden ("AP7") and Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs" and, together with AP7, "Lead Plaintiffs"), on behalf of themselves and the Class, respectfully submit this Memorandum of Law in support of their motion, pursuant to Federal Rule of Civil Procedure ("Rule") 23, for: (i) final approval of the proposed settlement of the above-captioned action ("Action") on the terms set forth in the Stipulation and Agreement of Settlement dated October 20, 2021 (ECF No. 315) ("Stipulation" or "Stip."); and (ii) approval of the proposed plan for allocating the net proceeds of the Settlement to the Class ("Plan of Allocation" or "Plan").[1]

## I.   PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiffs have agreed to settle this securities class Action in full in exchange for a $175,000,000 cash payment from Luckin Coffee Inc. ("Luckin"), on behalf of all Defendants' Released Parties. As detailed in the Joint Declaration and summarized herein, the Settlement is the culmination of a complex and multi-jurisdictional litigation, encompassing substantive and procedural laws of the United States, the Cayman Islands, and the Peoples Republic of China ("PRC" or "China"). From the outset of this Action, obtaining any meaningful recovery for the Class presented an uphill battle. Luckin, which had raised approximately $1 billion through two public offerings of ADSs in the United States, collapsed shortly after its secondary offering due to a massive fraud that was largely confessed by the Company, but blamed on a handful of senior executives. The fraud propelled Luckin's Cayman

---

[1]    Capitalized terms not defined herein have the meanings set forth in the Stipulation or in the Joint Declaration of Sharan Nirmul and Salvatore J. Graziano in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation and (II) Class Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Joint Declaration" or "Joint Decl."). The Joint Declaration is an integral part of this submission and, for the sake of brevity herein, the Court is respectfully referred to it for a detailed description of, *inter alia*: the claims asserted, the procedural history of the Action, the negotiations resulting in the Settlement, the risks of continued litigation, compliance with the Court-approved notice plan, and the Plan of Allocation. Citations to "¶ __" herein refer to paragraphs in the Joint Declaration and citations to "Ex. __" herein refer to exhibits to the Joint Declaration.

Islands parent into insolvency proceedings. Whatever assets Luckin owned after the fraud was revealed were largely located in the PRC through a network of its PRC subsidiaries. Other than the securities it issued in the United States, Luckin had no physical nexus to the United States. Further, Luckin's executives were principally based in the PRC and failed to appear in this Action, despite Lead Plaintiffs serving them in the PRC. Luckin's PRC auditor had been exculpated by Chinese regulators for any role in the fraud and also had no presence in the United States. Finally, claims against the Underwriter Defendants arising out of Luckin's public offerings provided unique challenges and more limited damages. Against this backdrop, and despite the odds stacked against a meaningful recovery, Lead Plaintiffs overcame these difficulties to reach the Settlement.

In the absence of this Settlement, continuing litigation presented formidable obstacles to the Class obtaining a larger recovery (or any recovery). Luckin's insolvency proceedings meant that the Class was competing with other creditors for Luckin's remaining assets. As it would become apparent through Lead Plaintiffs' extensive due diligence, Luckin's assets in China were subject to strict government regulations and restrictions on their withdrawal and its assets outside of the PRC were very limited. Thus, if Luckin could not find a way through the Cayman Islands insolvency proceeding to compromise the debts of its creditors and was forced to dissolve, the likelihood that the Class would recover anything through a liquidation was extremely low.

Further complicating matters, the insolvency proceedings in the Cayman Islands were recognized as a foreign main proceeding in the United States through Chapter 15, and thus the Action had been stayed against Luckin. The remaining Defendants in the Action provided limited or highly uncertain avenues of recovery. All but one of the Individual Defendants were Chinese residents or nationals and, despite being served internationally via The Hague Convention procedures, had not appeared in the Action. The risk of non-collection of any judgment against

these Individual Defendants was, therefore, all but absolute. In addition, Lead Plaintiffs' claims against the Underwriter Defendants presented no panacea. The Underwriter Defendants also claimed that they were misled by Luckin based on the fabricated transactions at issue in the Action and stood to present significant due diligence defenses to Lead Plaintiffs' claims. Luckin's internal investigation had concluded that the fraud had only begun after Luckin's May 2019 IPO which added to the potential strength of this due diligence defense. Moreover, the traceability requirement of the Securities Act claims provided a challenge to the Class's ability to recover a substantial portion of their damages from any of the Underwriter Defendants.

The Cayman Islands insolvency proceedings presented its own set of intractable problems to a favorable resolution for the Class. The largest known set of creditors in the Cayman Islands insolvency proceedings were the holders of Luckin's $460 million 0.75% notes. The insolvency proceedings had accelerated payment of these notes and Luckin had entered into a restructuring agreement with a majority of the noteholders to stave off dissolution but that agreement had a six-month funding requirement to avoid default. Under Cayman Islands law, any scheme of compromise with these noteholders had to also provide a compromise with Luckin's other creditors and those creditors included all members of the then-putative Class. At the very outset, when the Cayman Islands insolvency proceeding became public, Lead Plaintiffs secured Cayman Islands counsel and registered the then-putative Class's claims with the Joint Provisional Liquidators ("JPLs") of Luckin. However, whether a Cayman Islands court would recognize the ability of Lead Plaintiffs to represent the Class and approve any settlement with them over the objections of other creditors of Luckin (including opt-out plaintiffs) created a potentially insurmountable risk of failure of the insolvency proceedings, both as a vehicle for the Class to

recover anything from Luckin, for Luckin to compromise its claims with the noteholders, and for Luckin to avoid dissolution.

Given the foregoing and after extensive consultation with various law firms retained to navigate the complexities of Luckin's insolvency proceedings in the Cayman Islands, Luckin's parallel Chapter 15 bankruptcy proceedings in the United States, and circumstances with Chinese regulators, Lead Plaintiffs and Class Counsel negotiated a class certification stipulation with Luckin's counsel for presentation to this Court. Over objections from a variety of competing creditors of Luckin, including op-out litigants, Lead Plaintiffs successfully obtained certification of the Class, thereby substantially improving the negotiating position of the Class in the Cayman Islands proceedings. By representing the interests of the Class in an Ad Hoc Committee of Luckin's creditors, Lead Plaintiffs were able to obtain critical insights into Luckin's financial condition, the availability of assets in the PRC and outside of the PRC to fund a Class settlement, and various other information that informed a sound and effective settlement strategy that could maximize the Class's position relative to other creditors. Nonetheless, various creditors in the Cayman Islands proceeding objected to Lead Plaintiffs acting as representatives for the Class and made clear that they would stymie any settlement process through the Cayman Islands proceeding.

Given these dynamics, over several months of protracted negotiations, Lead Plaintiffs were successful in convincing Luckin and the JPLs that rather than attempt to reach a disputed settlement through the Cayman Islands' "scheme of arrangement", the parties would settle their claims with the certainty and finality provided by Rule 23 through this Court's procedures. In the course of their negotiations with Luckin, Lead Plaintiffs obtained detailed schedules of the funds accessible to Luckin and believe the Settlement represents virtually all of the remaining funds available to Luckin. The Settlement reached here has also been approved by the fiduciary JPLs in

the Cayman Islands as fair and reasonable to Luckin's creditors, and endorsed by the Cayman Islands Grand Court.

The Settlement has the full support of the Court-appointed Lead Plaintiffs, which are sophisticated institutional investors that took an active role in supervising the litigation and settlement negotiations. *See* Ex. 1, ¶¶ 5, 10; Ex. 2, ¶¶ 5, 10. The Class's reaction has also been positive. While the June 24, 2022 deadline to object has not yet passed, following a robust notice campaign—consisting of the mailing of over 560,000 Settlement Notices, publication of summary notice in *The Wall Street Journal* and over *PR Newswire*, and a dedicated informational website, there has been only one objection, specifically limited to the Plan of Allocation. ¶¶ 94-96, 113-17.

Given the foregoing considerations and the factors addressed below, Lead Plaintiffs and Class Counsel respectfully submit that: (i) the Settlement readily meets the standards for final approval under Rule 23, and is a fair, reasonable, and adequate result for the Class and (ii) the Plan of Allocation is a fair and reasonable method for equitably distributing the Net Settlement Fund.

## II.    THE SETTLEMENT WARRANTS FINAL APPROVAL

Rule 23(e)(2) requires judicial approval of any class action settlement. While the decision to grant such approval lies within the court's discretion, this discretion should be guided by this Circuit's "general policy favoring settlement, especially with respect to class actions." *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *6 (S.D.N.Y. Mar. 24, 2014); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("We are mindful of the strong judicial policy in favor of settlements, particularly in the class action context."). [2] Moreover, absent fraud or collusion, a court "should be hesitant to substitute its judgment for that of the parties who

---

[2]        All internal citations, quotation marks, and footnotes have been omitted, and emphasis has been added unless otherwise indicated.

negotiated the settlement." *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *4 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015).

Under Rule 23(e)(2), the Court should approve a class action settlement if it finds it to be "fair, reasonable, and adequate." *Emeterio v. A&P Rest. Corp.*, 2022 WL 274007, at *5 (S.D.N.Y. Jan. 26, 2022). In making this determination, the Court should examine both the negotiating process leading to the settlement, and the settlement's substantive terms. *See Visa*, 396 F.3d at 116; *In re Citigroup Inc. Sec. Litig.*, 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014). To this end, Rule 23(e)(2) provides that a court should consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Consistent with this guidance, courts in this Circuit have long considered the factors enumerated in *City of Detroit v. Grinnell Corp.* in deciding whether to approve a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343

F. Supp. 3d 394, 409 (S.D.N.Y. 2018), *aff'd*, *In re Facebook, Inc. IPO Class Action Settlement*, 822, 822 F. App's 40 (2d Cir. 2020).[3]

At the preliminary approval stage, this Court considered the Rule 23(e)(2) factors in assessing the Settlement, and found it to be fair, reasonable, and adequate, subject to further consideration at the Settlement Hearing. ECF No. 319, ¶ 1. Nothing has changed to alter these findings, and the factors supporting the Court's determination to preliminarily approve the Settlement apply equally now. Accordingly, Lead Plaintiffs and Class Counsel respectfully submit that the Settlement is fair, reasonable, and adequate and warrants final approval.

### A.    Lead Plaintiffs and Class Counsel Have Adequately Represented the Class in This Action

The first Rule 23(e)(2) factor—whether Lead Plaintiffs and Class Counsel "have adequately represented the class"—favors approval of the Settlement. *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) ("the adequacy requirement entails inquiry as to whether: 1) plaintiffs' interests are antagonistic to the interest of other members of the class and 2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation"). In certifying the Class in March 2021, the Court found Lead Plaintiffs and Class Counsel had satisfied Rule 23(a)(4)'s adequacy requirement, and appointed KTMC and BLB&G as Class Counsel. ¶ 47. Following their appointment, Lead Plaintiffs and Class Counsel have continued to adequately represent the Class in their prosecution of the Action and in negotiating the Settlement.

---

[3]    The Advisory Committee Notes to the 2018 Amendments to Rule 23 explain that the four Rule 23(e)(2) factors are not intended to "displace" any factor previously adopted by the courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23, Advisory Comm. Notes to 2018 Amendments, Subdivision (e)(2). Accordingly, Lead Plaintiffs discuss below the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four Rule 23(e)(2) factors, but also discuss the application of the *Grinnell* factors. *See, e.g., Christine Asia Co., Ltd. v. Jack Yun Ma*, 2019 WL 5257534, at *8 (S.D.N.Y. Oct. 16, 2019) (noting "[t]he factors set forth in Rule 23(e)(2) have been applied in tandem with the Second Circuit's *Grinne[ll]* factors").

Here, Lead Plaintiffs have diligently supervised and participated in the Action on behalf of the Class, and through their efforts have provided meaningful assistance to Class Counsel. Lead Plaintiffs' efforts included, *inter alia*, communicating regularly with counsel, reviewing substantive pleadings and briefs, and participating in settlement negotiations. *See* Ex. 1, ¶¶ 5, 10; Ex. 2, ¶ 5, 10. In addition, Lead Plaintiffs—whose claims are based on a common course of alleged wrongdoing by Defendants and are typical of other Class Members—have no interests antagonistic to the Class. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (the investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions).[4]

Likewise, Lead Plaintiffs retained counsel highly experienced in securities litigation. *See* Ex. 6A-4; Ex. 6B-3. Class Counsel actively pursued the Class's claims and, despite the circumstances stemming from Luckin's insolvency proceedings and the limitations on its ability to pay, skillfully negotiated a favorable Settlement for the Class. ¶¶ 53-54. *See Shapiro*, 2014 WL 1224666, at *2 (counsel "experience[d] in prosecuting complex class actions, strongly believe the Settlement is in the best interests of the Class, an opinion which is entitled to great weight").

### B.     The Settlement Was Negotiated at Arm's Length

Rule 23(e)(2)(B) supports final approval because the Settlement is the result of intensive, good-faith bargaining between highly experienced counsel. *See Aeropostale*, 2014 WL 1883494, at *4 ("initial presumption of fairness and adequacy applies" where "Settlement was reached by experienced, fully-informed counsel after arm's-length negotiations"). Lead Plaintiffs and Class Counsel agreed to resolve the Action with Luckin after extensive arm's-length discussions. The

---

[4]     *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

ground-work for these discussions was laid by Class Counsel initiating contact with the JPLs in connection with the Cayman Islands insolvency proceedings through Cayman Islands counsel. ¶ 53. These discussions required consultation with bankruptcy counsel, Cayman Islands counsel, PRC counsel, and analysis of complicated issues concerning damages and valuation as well as settlement with a Chinese- and Cayman Islands-based Defendant. *See generally*, ¶¶ 54-55. Even after agreeing to the material terms of the Settlement set forth in the Term Sheet, the Parties spent additional weeks negotiating the Stipulation, which included a thorough analysis of the opt outs received in connection with Class Notice. ¶¶ 56-57. Where, as here, a settlement agreement is the product of non-collusive, arm's-length negotiations, courts have afforded it a presumption of fairness. *See Facebook*, 343 F. Supp. 3d at 408; *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). The Court can thus take comfort that the Class's interests were protected throughout the negotiations that led to the Settlement.

### C.    The Settlement Provides the Class Adequate Relief, Considering the Costs, Risks, and Delay of Litigation and Other Relevant Factors

Rule 23(e)(2)(C) overlaps considerably with many of the *Grinnell* factors. All of these factors entail "a 'substantive' review of the terms of the proposed settlement" and evaluate the fairness of the "relief that the settlement is expected to provide to" the Class (Fed. R. Civ. P. 23(e)(2), Advisory Comm. Notes to 2018 Amendments, Subdivision (e)(2), Paragraphs (c) & (D)), and weigh in favor of the Settlement.

### 1.    The Complexity, Expense, and Likely Duration of the Litigation

Rule 23(e)(2)(C)(i) and the first *Grinnell* factor support final approval of the Settlement, as courts consistently recognize that the expense, complexity, and possible duration of the litigation are key factors in evaluating the reasonableness of a settlement. *See In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006) ("Class action suits readily lend

themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."); *In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 155 (S.D.N.Y. 2013) ("[T]he more complex, expensive, and time consuming the future litigation, the more beneficial settlement becomes as a matter of efficiency to the parties and to the Court.").[5]

This Action was unquestionably complex. It involved statements and representations made by a Chinese company through a variety of different media. *See generally* ECF No. 150. Many of the documents obtained during Lead Plaintiffs' investigation were in Chinese and required review and translations by a Chinese-native attorney. ¶ 22. In addition, Lead Plaintiffs had to navigate Luckin's complex Cayman Islands insolvency proceedings which presented substantial uncertainties as to how class action claims would be treated in that forum, as well as its U.S. bankruptcy proceeding, which resulted in a stay of the case against the principal Defendant. ¶¶ 48, 78. Had the Action continued against the remaining Defendants, Lead Plaintiffs would face various impediments to discovery given that Luckin is a Cayman Islands corporation with principle executive offices in China, and the majority of the Individual Defendants are foreign nationals residing in China. ¶¶ 80-81. Thus, developing an adequate factual record to present to a jury would be extremely difficult and expensive. *See In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (holding that the expense and protracted nature of discovery of Chinese defendants favored settlement); *Tchrs.' Ret. Sys. of La. v. A.C.L.N., Ltd.*, 2004 WL 1087261, at *2 (S.D.N.Y. May 14, 2004) (approving settlement in an action against a foreign company, where many of the defendants, witnesses, and documents were located abroad, beyond the court's subpoena power); *In re Gilat Satellite Networks, Ltd.*, 2007 WL 1191048, at *10

---

[5]     "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015).

(E.D.N.Y. Apr. 19, 2007) ("[T]he costs of litigating are anticipated to be 'extremely high,'" since defendant corporation is located overseas, "which will increase the cost and complexity of discovery.").

Moreover, given that the Action was at the motion to dismiss stage, in the absence of the Settlement (and assuming, although highly unlikely, that Luckin was not involuntarily dissolved through the Cayman Islands insolvency proceedings if the "scheme of arrangement" failed and the stay of litigation against Luckin was lifted), litigating this Action through full merits and expert discovery, summary judgment, and trial would have required substantial additional time and expense. Post-trial motions and appeals would invariably have followed, resulting in additional years of complex and expensive litigation. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 36 (E.D.N.Y. 2019) ("Settlement is favored if settlement results in substantial and tangible present recovery, without the attendant risk and delay of trial."). In contrast, the Settlement avoids the risk, expense, and delay of continued litigation while providing a favorable near-term recovery for the Class.

### 2.    The Risks of Continued Litigation

In assessing the fairness, reasonableness, and adequacy of a settlement, a court should also consider "the risks of establishing liability," "the risks of establishing damages," and "the risks of maintaining the class action through the trial." *Grinnell*, 495 F.2d at 463. In this assessment, "the Court [is not required] to adjudicate the disputed issues or decide unsettled questions; rather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *Payment Card Interchange*, 330 F.R.D. at 36-37. Here, Lead Plaintiffs undoubtedly faced significant risks to achieving a better result for the Class through continued litigation.

Lead Plaintiffs faced numerous risks and uncertainties at the time of Settlement, in particular with respect to Luckin's ability to pay, the complexities and risks of navigating Luckin's

Cayman Islands insolvency proceedings, and enforcing any judgment obtained in the Action against Luckin or the other individual and corporate Defendants located in China. ¶ 61. *First*, had the Action continued, Lead Plaintiffs would have faced significant challenges to proving liability and damages against any solvent Defendant in the Action and in securing payment for any judgment obtained. ¶ 63. As noted above, at the time of settlement, Luckin had entered into provisional liquidation proceedings in the Cayman Islands and commenced a proceeding under Chapter 15 of the U.S. Bankruptcy Code, which stayed the litigation of claims against it. ¶ 62. There was no guarantee that Luckin would be able to emerge as a going concern because if the Scheme failed and Luckin could not reach a Grand Court approved compromise with its creditors, it would likely have entered involuntary dissolution proceedings and all creditors would have had to share in any recoverable assets from Luckin available through dissolution. ¶ 61. Moreover, there were a number of uncertainties about how a scheme under the Cayman Islands proceedings would be conducted, which raised the risk that opt-out plaintiffs could successfully oppose a scheme proposed by Luckin and the Class, or could support an alternate scheme that would substantially lower the Class's recovery, or that the scheme could be administered in a manner that made it more difficult for the Class to recover. ¶ 62.

*Second*, Luckin's assets were primarily located in China, and were subject to strict regulations by Chinese authorities who had indicated that they would only allow funds to leave the country to restructure $460 million of the Company's convertible senior notes. ¶ 63. *Finally*, Luckin was the only viable Defendant and source of funds that could satisfy a judgment because most of the other Individual Defendants had not appeared or were located in China and because the Securities Act claims against the Underwriter Defendants faced unique challenges related to

traceability and the due diligence defense. ¶¶ 81-87. The $175 million Settlement is reasonable (and, indeed, highly beneficial to the Class) in light of these significant risks.

### a.   Risks to Enforcing Any Judgment Obtained

Even if Lead Plaintiffs had overcome all the hurdles noted above and secured a judgment, the risks to the collectability of a judgment was especially acute here. Luckin—the issuer of the securities forming the basis of the Action—was in liquidation proceedings. In addition, funding a settlement or enforcing a judgment against Luckin was made substantially more difficult because the vast majority of Luckin's assets were held by Chinese entities, deposited in Chinese banks, and subject to strict regulations and restrictions regarding the expatriation of funds. ¶¶ 72-79.

Moreover, even if Luckin had not discharged its liabilities to Lead Plaintiffs through bankruptcy, there would be significant challenges in enforcing any judgment against Luckin's assets located in China. Similarly, there were risks to securing and enforcing a judgement against the Executive Defendants—the only Defendants, besides Luckin, that were subject to Lead Plaintiffs' Exchange Act claims—and the Director Defendants, as they were all foreign nationals and all but one—Thomas Meier, a Director Defendant who resides in Switzerland—were residents of China and did not enter an appearance in the Action. ¶¶ 30, 81. Two of the six Underwriter Defendants were also based in China. ¶ 30.

### b.   Risks to Establishing Liability and Damages

While Lead Plaintiffs were confident in their ability to prove Defendants' liability and the full amount of the Class's damages, further litigation is always a risky proposition, and that was particularly true in this case. *See generally, In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010) (noting courts in this district "have long recognized that [securities] litigation is notably difficult and notoriously uncertain"). At the time of settlement, motions to dismiss had been filed by Luckin, the Underwriter Defendants, and Defendant Meier

and each was pending before the Court when the Settlement was reached. ¶¶ 33-39, 63. If Lead Plaintiffs survived these motions, in whole or in part, they would face substantial challenges of proof, at summary judgment and trial, that these Defendants were liable for the material misstatements and omissions alleged in the Action. In particular, with respect to the Securities Act claims, Lead Plaintiffs faced substantial challenges to proving that the Underwriter Defendants and Defendant Meier failed to perform adequate due diligence to have discovered the alleged fraud. ¶ 87.

Moreover, with respect to the Securities Act claims, there were additional risks to establishing that Class Members purchased Luckin ADSs traceable to the allegedly false or misleading statement. ¶¶ 83-86. Here, following a lock-up period after the IPO, pre-IPO shares were permitted to be converted to ADSs. Defendants contended that any ADSs purchased after the lock-up period could not be presumed traceable to the IPO. In addition, with respect to the SPO, Defendants had a strong argument that only ADSs purchased directly in that offering could be traced to that offering, as any other purchases could be ADSs issued in the IPO, SPO, or converted pre-IPO shares. *Id.* If Defendants prevailed on these issues, the likely maximum damages on the Securities Act claims would be extremely low, possibly $127 million to $157 million. ¶ 86.

Had the Action continued, Lead Plaintiffs also would have faced challenges with respect to loss causation and damages. *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL 903236, at *9 (S.D.N.Y. Apr. 6, 2006) (noting "the legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages"). The parties would have had to rely heavily on expert testimony to resolve these issues and, as courts have recognized, the uncertainty as to which side's experts' view might be credited by a jury presents a substantial risk. *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 193

(S.D.N.Y. 2012) ("[I]t is well established that damages calculations in securities class actions often descend into a battle of experts."); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2008) (in this "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found").

### c.    Risks to Maintaining the Class Action Through Trial

The Court certified the Class for purposes of negotiating and implementing a settlement on March 5, 2021. ¶ 47. However, while Lead Plaintiffs believe the case is fully appropriate for class treatment, there were substantial risks and uncertainty as to whether the Cayman Islands Grand Court would recognize the Class in any "scheme of arrangement" in the Cayman Islands proceedings. For example, it was uncertain and unlikely that the Grand Court would permit Lead Plaintiffs to act on behalf of the Class as a whole in those proceedings. As a result, absent the Settlement, a scheme could have been adopted that was contrary to the interests of the Class and might have extinguished the Class's claims on far less favorable terms.

### 3.    The Reaction of the Class to Date

The reaction of the class to a proposed settlement is a significant factor. *See, e.g.*, *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *7 (S.D.N.Y. Nov. 7, 2007). As of June 8, 2022, Epiq has mailed over 560,000 Settlement Notices to potential Class Members and nominees. *See* Ex. 3, ¶ 9. The Settlement Notice sets out the essential terms of the Settlement and informs potential Class Members of, among other things, their right to object to the Settlement, as well as the procedure for submitting a Claim. While the June 24, 2022 deadline for Class Members to object has not yet passed, only one objection—limited to the Plan of Allocation (*see* III below)—has been received. ¶¶ 113-117. Lead Plaintiffs will file reply papers by July 15, 2022 addressing this objection in more detail, as well as any additional objections received.

### 4.      Stage of the Proceedings and Amount of Discovery Completed

"When considering this *Grinnell* factor, the question is whether . . . counsel possessed a record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the defenses asserted by Defendants, and the value of Plaintiffs' causes of action for purposes of settlement." *Christine Asia Co.*, 2019 WL 5257534, at *11; *Martignago v. Merrill Lynch & Co., Inc.*, 2013 WL 12316358, at *6 (S.D.N.Y. Oct. 3, 2013) ("The pertinent question is whether counsel had an adequate appreciation of the merits of the case before negotiating."). "To satisfy this factor, parties need not have even engaged in formal or extensive discovery." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *7 (S.D.N.Y. Dec. 19, 2014) (noting that the PSLRA prohibits discovery until the motion to dismiss is denied); *see also In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004) ("Formal discovery is not a prerequisite; the question is whether the parties had adequate information about their claims.").[6]

There can be no question that Lead Plaintiffs and Class Counsel had sufficient information to assess the adequacy of the Settlement. As detailed in the Joint Declaration, Lead Plaintiffs and Class Counsel negotiated the Settlement only after: (i) conducting an exhaustive investigation, including reviewing voluminous publicly available information regarding the Company, locating and interviewing witnesses in China, and consulting with experts regarding key accounting, financial, economic, and due diligence issues; (ii) drafting the detailed Complaint; (iii) opposing motions to dismiss; and (iv) navigating the complexities of Luckin's insolvency proceedings in the Cayman Islands (assisted by Cayman Islands counsel), the parallel Chapter 15 bankruptcy proceedings in the United States (assisted by bankruptcy counsel), and circumstances with Chinese

---

[6]      Although the Action settled early in the proceedings, courts encourage early settlement of class actions "because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere." *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 474 (S.D.N.Y. 2013) (early settlements should be encouraged when warranted by the circumstances of the case).

regulators (assisted by a PRC law firm). ¶ 6. With information gleaned from these efforts, Class Counsel moved and obtained provisional certification of the Class allowing Lead Plaintiffs to engage in settlement negotiations with Luckin despite its ongoing insolvency proceedings. ¶¶ 45-48. The parties' settlement negotiations were intensive and included extensive research and analysis of Luckin's available resources to fund a potential settlement and exploration of possible alternatives to a cash settlement. ¶ 73. In addition, as part of these negotiations, Lead Plaintiffs received detailed information about Luckin's available assets and liabilities and retained a highly experienced consulting firm (Loop Capital) to analyze Luckin's ability to pay. ¶54. Thus, by the time the Settlement was reached, Lead Plaintiffs were well-versed in the strengths and weaknesses of the case, and had the requisite information to make an informed decision about the relative benefits of litigating versus settling the Action. *See Facebook*, 343 F. Supp. 3d at 412 (finding support for settlement where plaintiffs and their counsel had "sufficient understanding of the case to gauge the strengths and weaknesses of their claims as well as the adequacy of the settlement").

### 5.    Ability of Luckin to Withstand a Greater Judgment

Even if Lead Plaintiffs were able to prevail at trial, they would still face the very real risk that Luckin and the Individual Defendants would be unable to satisfy a greater judgment (or any judgment) after further litigation. Here, given Luckin's insolvency proceedings and the uncertainty as to whether it would be able to emerge from these proceedings as a going concern with Lead Plaintiffs' claims not extinguished through a dissolution proceeding, along with the fact that the vast majority of Luckin's assets were held by Chinese entities, deposited in Chinese banks, and subject to the strict regulations and restrictions regarding the expatriation of funds in China, it was unlikely that Luckin would have the resources (or the ability) to contribute any additional amounts to satisfy a future judgment. ¶¶ 72-79. *See Glob. Crossing*, 225 F.R.D. at 460 (since the companies

had filed for bankruptcy, "without the proposed settlement, class members might well receive far less than the settlement would provide to them, even if they could prevail on their claims"); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 365 (S.D.N.Y. 2002) (in light of the company's "dire financial condition, it is unlikely that the Company could withstand a substantial judgment," making a greater recovery than the settlement difficult). The very significant risk here that continued litigation would yield a smaller recovery—or no recovery at all—several years in the future weighs heavily in favor of the Settlement.

> **6.      The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and the Risks of Litigation**

The final two *Grinnell* factors—the reasonableness of the settlement in light of the best possible recovery and the risks of litigation—also weigh in favor of approving the Settlement. As the Second Circuit has explained, there is "a range of reasonableness with respect to a settlement" that "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *see also Payment Card Interchange*, 330 F.R.D. at 48 (in considering a settlement's reasonableness, "a court must compare the terms of the compromise with the likely rewards of litigation"); *Shapiro*, 2014 WL 1224666, at *11 (recognizing "that the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes"). The $175 million cash Settlement meets this threshold.

Here, the Settlement Amount—$175,000,000—is significant by any measure. The recovery provides a near-term, tangible cash benefit to the Class and eliminates the substantial risk that the Class could recover less, or nothing at all, if the Action continued. Indeed, the Settlement Amount represents a meaningful percentage of the Class's *maximum* damages that could be established at trial, as estimated by Lead Plaintiffs' damages consultant. Had Lead Plaintiffs

overcome *all* of the potential obstacles to establishing liability, loss causation, and damages, *maximum* damages were estimated to be approximately $2.75 billion. ¶ 90. Accordingly, the Settlement represents approximately 6.4% of this *maximum* damages figure. *Id*. This level of recovery falls well within the range of recoveries obtained in other securities class actions. *See, e.g., In re Sturm, Ruger, & Co., Inc. Sec. Litig.*, 2012 WL 3589610, at *7 (D. Conn. Aug. 20, 2012) (approving settlement representing approximately 3.5% of estimated damages); *China Sunergy*, 2011 WL 1899715, at *5  (noting average settlements "have ranged from 3% to 7% of the class members' estimated losses"); *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving a recovery of approximately 6.25%, which was "at the higher end of the range of reasonableness").

Lead Plaintiffs recognized, however, that recovering their damages consultant's maximum damages figure would be no easy feat, and had a jury or the Court found any of Defendants' arguments regarding whether they were liable for any statements alleged to have been materially misleading, or whether any of the corrective disclosures caused all, some, or none of the Class's damages persuasive, the Class's damages would have been reduced, or even eliminated, and the Settlement would represent a larger portion of damages. *See Facebook*, 343 F. Supp. 3d at 414 ("Even if $35 million amounts to one-tenth–or less–of Plaintiffs' potential recovery, the risk of a zero–or minimal–recovery scenario are real.").

Most significantly, as noted above, Luckin had entered into insolvency proceedings in July 2020 and its insurers had disclaimed coverage of any potential settlement or judgment reached in the Action. ¶ 89. As such, the Class's *realistic* recoverable damages in the Action were driven by Luckin's ability to fund a settlement or satisfy a judgment from resources Luckin held outside China or that Chinese regulators would permit it to expatriate in connection with its Restructuring.

*Id.* To that end, as of July 31, 2021, Luckin had $736 million in China and only approximately $40 million outside of China, which had already been earmarked for the JPLs' expenses in executing the Restructuring. ¶ 72. Moreover, Luckin was only able to obtain approval from Chinese regulators for the removal of $185 million from China at that time, but these funds were already dedicated to restructuring of Luckin's debt to its convertible noteholders. *Id. See also* Ex. 4. Luckin's available funds consisted of the minimal insurance available to Luckin, funds that Luckin had direct access to in overseas accounts, additional funds that SAFE might permit Luckin to expatriate from China, and funds expected from a new investment from an outside private equity firm. ¶ 54. After extensive review and analysis, including with Lead Plaintiffs' financial expert and the JPLs' input, Lead Plaintiffs believe that the Settlement amount represented nearly all of Luckin's available funds. ¶ 55. Considered against the extensive risks involved with prosecuting this Action further, including Luckin's ability to pay, the Settlement Amount is reasonable and, thus, this factor also supports final approval.

### D. The Remaining Rule 23(e)(2) Factors Also Support the Settlement

In evaluating the Settlement, Rule 23(e)(2) instructs courts to also consider: (i) the effectiveness of the proposed method of distributing the relief provided to the class, including the method of processing class member claims; (ii) the terms of any proposed award of attorney's fees, including the timing of payment; (iii) any other agreement made in connection with the proposed settlement; and (iv) whether class members are treated equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv), (e)(2)(D). These factors also support final approval of the Settlement.

*First*, the proposed method of distribution and claims processing ensures equitable treatment of Class Members. *See* Fed. R. Civ. P. (e)(2)(C)(ii), (e)(2)(D). Class Members' Claims will be processed and the Net Settlement Fund distributed pursuant to a standard method routinely approved in securities class actions. Epiq will review and process all Claims received, provide

Claimants with an opportunity to cure any deficiency or request judicial review of the denial of their Claims, if applicable, and will ultimately mail or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund, as calculated pursuant to the Plan. *See infra* Section III; ¶¶ 102-112. Importantly, none of the Settlement proceeds will revert to Defendants. *See* Stip., ¶ 16.

*Second*, the relief provided by the Settlement remains adequate upon consideration of the terms of the proposed award of attorneys' fees, including the timing of any such Court-approved payments. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii). As discussed in the Fee Memorandum, the 17.5% fee request, to be paid upon the Court's approval, is reasonable in light of the efforts of Plaintiffs' Counsel's efforts, the recovery obtained, and the risks in the litigation.[7] Additionally, the 17.5% request is supported by other fee awards in this Circuit. *See* Fee Memorandum, Section III.[8]

*Lastly*, as previously disclosed, the only agreement the Parties entered into in addition to the initial Term Sheet and the Stipulation was a confidential Supplemental Agreement regarding requests for exclusion. *See* Stip., ¶ 41; *see also* Fed. R. Civ. P. 23(e)(2)(C)(iv). The Supplemental Agreement provided Luckin with the option to terminate the Settlement if, in the event the Court permitted a second opportunity to opt out of the Class in connection with the Settlement, total damages of those who validly request exclusion exceeded certain conditions. Given that the Court did not permit a second opportunity to opt out, the Supplemental Agreement is moot.

For the reasons set forth above and in the Joint Declaration, the Settlement is fair, reasonable, and adequate when evaluated under any standard, or set of factors and, therefore, warrants the Court's final approval.

---

[7]   In connection with its fee request, Class Counsel also seek payment from the Settlement Fund of Plaintiffs' Counsel's Litigation Expenses in the total amount of $721,462.68 and reimbursement of Lead Plaintiffs' costs in the aggregate amount of $5,430. ¶ 118.

[8]   Approval of attorneys' fees is entirely separate from approval of the Settlement, and neither Lead Plaintiffs nor Class Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stip., ¶ 19.

III.     THE PLAN OF ALLOCATION WARRANTS APPROVAL

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See IMAX*, 283 F.R.D. at 192. A plan of allocation is fair and reasonable as long as it has a "rational basis." *FLAG Telecom*, 2010 WL 4537550, at *21; *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020). Generally, a plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable. *See IMAX*, 283 F.R.D. at 192. In determining whether a plan of allocation is reasonable, courts give great weight to the opinion of experienced counsel. *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011).

Here, the Plan, which was developed in consultation with Lead Plaintiffs' damages consultant, is a fair and reasonable method for allocating the Net Settlement Fund among Class Members. ¶ 102. The Plan is designed to equitably distribute the Net Settlement Fund to Class Members who timely submit valid Claim Forms demonstrating they suffered economic losses from Defendants' alleged misrepresentations and omissions. ¶ 104. Further, the Plan takes into account the statute under which the economic losses occurred, such that all Class Members who purchased/acquired Luckin ADSs during the Class Period have a potential claim under Section 10(b) of the Exchange Act and those Class Members who purchased/acquired Luckin ADSs in or traceable to Luckin's IPO or SPO also have a potential claim under the Securities Act. *Id.*

More specifically, to have an Exchange Act loss, a Claimant must have purchased/ acquired Luckin ADSs during the Class Period and held those ADSs through at least one of the alleged corrective disclosures that removed alleged artificial inflation related to that information. ¶ 105. A Claimant's Exchange Act loss will depend upon several factors, including the date(s) when the Claimant purchased/acquired their Luckin ADSs, and whether such shares were sold and if so, when and at what price, taking into account the PSLRA's statutory limitation on recoverable

damages. *Id*. Securities Act losses, on the other hand, are based upon the statutory formula for damages set forth at Section 11(e) of the Securities Act and take into account when the first complaint in the Action was filed ("date of suit") and when the Stipulation was executed ("date of judgment"). In order to have a Securities Act loss, a Claimant must have purchased/acquired Luckin ADSs: (i) directly in either the IPO or SPO; (ii) during the period after the IPO and before the SPO (when all shares were traceable to the IPO); or (iii) after the SPO through the end of the Class Period and are able to submit documentation tracing the specific shares they purchased/acquire to shares issued in the IPO or SPO. ¶ 106.

Under the Plan, the Recognized Loss Amount for each Luckin ADS purchased/acquired during the Class Period will be *the greater of*: (i) the Exchange Act Loss Amount, if any; *or* (ii) the Securities Act Loss Amount, if any. Ultimately, each Authorized Claimant's *pro rata* share of the Net Settlement Fund will be determined by dividing the Authorized Claimant's Recognized Claim (i.e., the sum of a claimant's Recognized Loss Amounts as calculated under the Plan) by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount of the Net Settlement Fund. ¶¶ 108-109. Thereafter, following Settlement approval and upon the Court's entry of the Class Distribution Order, the Net Settlement Fund will be distributed to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. ¶ 109.

The Plan was fully disclosed in the Settlement Notice. To date, there has been one objection to the Plan. ¶ 111. That objection, submitted by Robert C. Rach (ECF No. 321), contends that the purchase price used in the calculation of losses for Luckin ADSs purchased through the exercise of an option should be the purchase price paid as a result of the obligation under the Claimant's option contract as opposed to the closing price of the Luckin ADSs on the date of exercise. ¶ 114. As detailed in the Joint Declaration, the calculation set forth in the Plan for claims of ADSs

acquired through the exercise of an option or other derivative securities is appropriate. ¶ 116. Lead Plaintiffs did not assert claims on behalf of options and thus, the additional damages Mr. Rach suffered as a result of entering into a put option obligating him to purchase Luckin ADSs at a price different (and much higher) than the market price that day were damages attributable to his trading in Luckin options, rather than to his trading of the eligible security, Luckin ADSs. ¶ 117. This objection to the Plan should be overruled. Accordingly, Class Counsel believe that the Plan is fair, reasonable, and adequate and should be approved.

## IV.    NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The notice provided to the Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974). The Settlement Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable"—i.e., it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Visa*, 396 F.3d at 114.

In accordance with the Preliminary Approval Order, Epiq began mailing the Settlement Notice Packet to all potential Class Members and nominees (in bulk) who previously received the Class Notice, as well as other potential Class Members identified through reasonable effort, on November 15, 2021 and, as of June 8, 2022, has disseminated over 560,000 Settlement Notices to potential Class Members and nominees. *See* Ex. 3, ¶¶ 9, 10. Epiq also published the Summary Settlement Notice in *The Wall Street Journal* and over *PR Newswire*. *Id.*, 14. In addition, Epiq updated the website for Class Notice, www.LuckinCoffeeSecuritiesLitigation.com, to provide information about the Settlement, including downloadable copies of the Settlement Notice, Claim

Form, Stipulation, Preliminary Approval Order, and Complaint. *Id.*, ¶ 96. Luckin also issued notice pursuant to CAFA. ECF No. 320.

Collectively, the notices apprise Class Members of, among other things: (i) the amount of the Settlement; (ii) the reasons why the Parties are proposing the Settlement; (iii) the Class definition and exclusions therefrom; (iv) the estimated average recovery per affected Luckin ADS; (v) the maximum amount of attorneys' fees and expenses that will be sought; (vi) the identity and contact information for a representative of Class Counsel available to answer questions concerning the Settlement; (vii) the right of Class Members to object to the Settlement; (viii) the binding effect of a judgment on Class Members; (ix) the dates and deadlines for certain Settlement-related events; and (x) the opportunity to obtain additional information about the Action and the Settlement by contacting Class Counsel, the Claims Administrator, or visiting the website. *See* Fed. R. Civ. P. 23(c)(2)(B); 15 U.S.C. § 78u-4(a)(7). The Settlement Notice also contains the Plan of Allocation and provides Class Members with information on how to submit a Claim Form in order to be eligible to receive a distribution from the Net Settlement Fund. *See* Ex. 3 at Exs. A & B.

In sum, the notices provide sufficient information for Class Members to make informed decisions regarding the Settlement, fairly apprises them of their rights with respect to the Settlement, is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Rule 23, the PSLRA, and due process. *See, e.g., In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 182-83 (S.D.N.Y. 2014); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *12-13 (S.D.N.Y. Dec. 23, 2009).

## V.    CONCLUSION

For the reasons set forth herein and in the Joint Declaration, Lead Plaintiffs respectfully request that the Court grant final approval of the Settlement and approve the Plan of Allocation.

Dated: June 10, 2022

Respectfully submitted,

**KESSLER TOPAZ MELTZER**
**& CHECK, LLP**

*s/ Sharan Nirmul*
Sharan Nirmul
Gregory M. Castaldo
Richard A. Russo, Jr.
Nathan A. Hasiuk
Lisa M. Port
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
gcastaldo@ktmc.com
rrusso@ktmc.com
nhasiuk@ktmc.com
llambport@ktmc.com

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

*s/ Salvatore J. Graziano*
Salvatore J. Graziano
John Rizio-Hamilton
Jai Chandrasekhar
Kate W. Aufses
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
johnr@blbglaw.com
jai@blbglaw.com
kate.aufses@blbglaw.com

*Counsel for Lead Plaintiffs Sjunde AP-*
*Fonden and Louisiana Sheriffs' Pension &*
*Relief Fund and Class Counsel*