**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE LUCKIN COFFEE INC. SECURITIES LITIGATION | Case No. 1:20-cv-01293-JPC-JLC |

**JOINT DECLARATION OF SHARAN NIRMUL AND SALVATORE J. GRAZIANO IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION AND (II) CLASS COUNSEL'S <u>MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES</u>**

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................................ 1

II.    PROSECUTION OF THE ACTION ......................................................................... 6

       A.    Background ....................................................................................................... 6

       B.    Initiation of the Action and Appointment of Lead Plaintiffs and Class Counsel ...... 7

       C.    Lead Plaintiffs' Investigation and Preparation of the Complaint ............................ 7

       D.    Filing and Service of the Complaint ......................................................... 10

       E.    Defendants' Motions to Dismiss the Complaint ....................................... 12

       F.    Luckin Enters Into Provisional Liquidation Proceedings ........................ 15

       G.    Certification of the Class for Purposes of Settlement ............................... 16

III.   SETTLEMENT NEGOTIATIONS ......................................................................... 19

IV.    RISKS OF CONTINUED LITIGATION ............................................................... 22

       A.    Risks and Uncertainties in Enforcing any Judgment at the Time of Settlement ..... 25

       B.    The Majority of Luckin's Assets Were Located in China and Not Within Its Control ................................................................................................ 27

       C.    Luckin Was the Only Realistically Viable Defendant ............................... 31

             1.    The Executive Defendants and Most of the Director Defendants Were Located in Mainland China ........................................................... 32

             2.    The Securities Act Claims Against the Underwriter Defendants and Director Defendants Faced Very Significant Risks ................................ 32

V.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT OF THE POTENTIAL RECOVERY IN THE ACTION ....................................................... 34

VI.    ISSUANCE OF NOTICE OF THE SETTLEMENT TO THE CLASS AND THE REACTION OF THE CLASS TO DATE ........................................................................ 36

VII.   PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ............ 39

i

A.    The Proposed Plan of Allocation is Fair and Reasonable ........................................ 39

B.    The Rach Objection to the Plan of Allocation Should be Rejected ......................... 44

VIII.    THE FEE AND LITIGATION EXPENSE APPLICATION ............................................ 46

A.    The Fee Application ................................................................................................ 47

1.    Lead Plaintiffs Have Authorized and Support the Fee Application .............. 47

2.    The Time and Labor Devoted to the Action by Plaintiffs' Counsel ............. 48

3.    The Experience and Standing of Class Counsel ............................................ 50

4.    The Standing and Caliber of Defendants' Counsel ....................................... 50

5.    The Risks of the Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases .................... 51

6.    The Reaction of the Class to the Fee Application ......................................... 52

B.    The Litigation Expense Application ........................................................................ 53

IX.    ADDITIONAL EXHIBITS AND INFORMATION ........................................................ 56

X.    CONCLUSION ................................................................................................................ 58

SHARAN NIRMUL and SALVATORE J. GRAZIANO declare as follows:

## I.    INTRODUCTION

1.    I, Sharan Nirmul, am a member of the bars of Pennsylvania, New Jersey, New York, and Delaware, the U.S. District Courts for the Eastern District of Pennsylvania, Southern District of New York, District of New Jersey, and District of Delaware, and the U.S. Courts of Appeals for the Second, Third, and Seventh Circuits. I am a partner in the law firm of Kessler Topaz Meltzer & Check, LLP ("KTMC"), one of the Court-appointed Class Counsel firms in the Action. KTMC represents one of the Court-appointed Lead Plaintiffs, Sjunde AP-Fonden ("AP7").

2.    I, Salvatore J. Graziano, am a member of the bars of New York, the U.S. District Courts for the Southern and Eastern Districts of New York, and the Eastern District of Michigan, and the U.S. Courts of Appeals for the First, Second, Third, Fourth, Sixth, Ninth, and Eleventh Circuits. I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), one of the Court-appointed Class Counsel firms in the Action. BLB&G represents one of the Court-appointed Lead Plaintiffs, Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs"). AP7 and Louisiana Sheriffs are collectively referred to herein as "Lead Plaintiffs" or "Class Representatives" and KTMC and BLB&G are collectively referred to as "Class Counsel."[1]

3.    We have personal knowledge of the matters stated in this Joint Declaration based on our active supervision of and participation in the prosecution and settlement of the Action. We respectfully submit this Joint Declaration in support of Lead Plaintiffs' motion, under Rule 23(e)(2) of the Federal Rules of Civil Procedure, for final approval of the proposed settlement of

---

[1]    All capitalized terms used herein that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated October 20, 2021 (ECF No. 315) (the "Stipulation").

the Action with Defendant Luckin Coffee Inc. ("Luckin" or the "Company"), for $175 million in cash (the "Settlement").

4.      We also respectfully submit this Joint Declaration in support of: (i) Lead Plaintiffs' motion for approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Class Members (the "Plan of Allocation" or "Plan") and (ii) Class Counsel's motion for an award of attorneys' fees in the amount of 17.5% of the Settlement Fund for all Plaintiffs' Counsel;[2] payment of litigation expenses incurred by Plaintiffs' Counsel in the total amount of $721,462.68; and payment of $5,430.00 in reimbursement for the costs of Lead Plaintiffs directly related to their representation of the Class (the "Fee and Expense Application").

5.      In support of these motions, Lead Plaintiffs and Class Counsel are also submitting: (i) the exhibits attached hereto; (ii) the Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum"); and (iii) the Memorandum of Law in Support of Class Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee Memorandum").

6.      The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $175 million for the benefit of the Class.  This beneficial Settlement was achieved as a direct result of Lead Plaintiffs' and Class Counsel's efforts to diligently investigate, prosecute, and negotiate a resolution of the Action against highly skilled opposing counsel and under unusually complex and novel circumstances where Luckin's liquidation proceedings in the Cayman Islands and limited access to assets held by its subsidiaries

---

[2]      Plaintiffs' Counsel are Class Counsel KTMC and BLB&G; bankruptcy counsel for the Class, Lowenstein Sandler LLP ("Lowenstein"); and additional counsel for Lead Plaintiff Louisiana Sheriffs, Klausner, Kaufman, Jensen & Levinson ("Klausner Kaufman").

in China created circumstances in which any cash recovery in the Action for the Class, if litigation had proceeded, was unlikely to exceed the $175 million Settlement obtained.  As discussed in more detail below, Plaintiffs' Counsel's efforts in the Action included, among other things: (a) conducting an exhaustive international investigation concerning the misrepresentations and omissions made by Defendants, including performing an extensive review and analysis of public filings, transcripts of Luckin's earnings calls and industry conferences, Company presentations, media reports, and financial analyst research reports concerning Luckin, locating and interviewing witnesses in China, and consulting with experts regarding accounting, due diligence, and financial economics issues; (b) drafting and filing the detailed consolidated complaint dated September 24, 2020 (ECF No. 150) (the "Complaint"); (c) briefing Lead Plaintiffs' opposition to Defendants' motions to dismiss the Complaint; (d)  navigating the unusual complexities of Luckin's liquidation proceedings in the Cayman Islands, parallel Chapter 15 bankruptcy proceedings in the United States, and circumstances with Chinese regulators; (e) obtaining provisional certification of the Class that allowed Lead Plaintiffs to negotiate a settlement with Luckin despite its then-ongoing liquidation proceedings and, relatedly, overseeing mailing of the Class Notice to potential Class Members; (f) engaging in intensive, arm's-length settlement negotiations with Luckin's Counsel, including extensive research and analysis of the extent of Luckin's available cash to fund any potential settlement and exploration of possible alternatives to a cash settlement; and (g) drafting and negotiating the Stipulation and related settlement documentation.

7.      Lead Plaintiffs and Class Counsel believe that the proposed $175 million Settlement represents an excellent result for the Class, considering the significant risks in the Action, the amount of the potential recovery, and, in particular, the limits on Luckin's ability to pay any larger amount.  As discussed further below, given the facts that, at the time of the

Settlement, Luckin was in liquidation proceedings in the Cayman Islands and its ability to access funds held in its operating subsidiaries in the People's Republic of China ("China" or "PRC") was strictly limited by Chinese authorities, combined with the uncertainty of Lead Plaintiffs' ability to enforce a foreign judgment against Luckin in China, meant that the $175 million Settlement represented a very significant portion of Luckin's available and accessible funds. Class Counsel believe that further litigation or pursuit of a settlement through a "scheme of arrangement" in the Cayman Islands courts would have presented substantial procedural and substantive legal hurdles and delay and, in all likelihood, would have led to a less desirable outcome for the Class. Finally, under the circumstances of the Action, a settlement with Luckin (including a release of claims against the other Defendants) was the outcome that produced the best result for the Class because (a) the Executive Defendants and all but one of the Director Defendants were located in China, had not appeared in the Action, and enforcing any judgment against them in China was likely to be extremely difficult, if not entirely impossible; (b) the claims against the Underwriter Defendants presented substantial risks that were not present in the claims against Luckin, including (i) serious concerns about satisfying the traceability requirement of claims under the Securities Act of 1933 ("Securities Act") against the Underwriter Defendants and (ii) strong potential "due diligence" defenses; and (c) Luckin was unwilling to make a substantial settlement payment without a release of claims against the Underwriter Defendants (and other Defendants) because of agreements that would have permitted the other Defendants to pursue indemnification claims against Luckin and thereby frustrate its efforts to emerge out of liquidation proceedings through this Settlement.

8. The close attention paid and oversight provided by the Lead Plaintiffs throughout this case is another factor in favor of the reasonableness of the Settlement. In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give

control over securities class actions to sophisticated investors, and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts by improving the quality of representation in this type of case. H.R. Conf. Rep. No. 104-369, at *34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733. Here, Lead Plaintiffs were actively involved in overseeing the litigation and settlement negotiations and have endorsed the Settlement as fair and reasonable. *See* Declaration of Richard A. Gröttheim, Chief Executive Officer of AP7 ("Gröttheim Decl."), attached as Exhibit 1, at ¶¶ 5-6; Declaration of Osey "Skip" McGee, Executive Director of Louisiana Sheriffs ("McGee Decl."), attached as Exhibit 2, at ¶¶ 5-6.

9.      In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. The Plan of Allocation, which was developed in consultation with Lead Plaintiffs' damages consultant, provides for the distribution of the Net Settlement Fund on a *pro rata* basis to Class Members who submit Claims that are approved for payment by the Court. Each Claimant's share of the Net Settlement Fund will be calculated based on his, her, or its losses attributable to the alleged misstatements and omissions, taking into account the different types of claims possessed by different Class Members.

10.      Class Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risks. Class Counsel prosecuted this case on a fully contingent basis, incurred significant litigation expenses, and bore all the risk of an unfavorable result. For their efforts in prosecuting the case and negotiating the Settlement, Class Counsel are applying for an award of attorneys' fees in the amount of 17.5% of the Settlement Fund for all Plaintiffs' Counsel. As discussed in the Fee Memorandum, the 17.5% fee request is within the range of fees that courts in this Circuit and elsewhere have awarded in securities and other complex class actions with comparable recoveries.

11.    Class Counsel's Fee and Expense Application also seeks payment of litigation expenses incurred by Plaintiffs' Counsel in connection with the institution, prosecution, and settlement of the Action totaling $721,462.68 plus reimbursement of $5,430.00 to Lead Plaintiffs for their costs directly related to their representation of the Class, as authorized by the PSLRA.

12.    For all of the reasons discussed in this Joint Declaration and in the accompanying supporting memoranda and declarations, including the result obtained and the significant litigation risks discussed fully below, Lead Plaintiffs and Class Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate in all respects, and that the Court should approve them under Federal Rule of Civil Procedure 23(e)(2).    For similar reasons, and for the additional reasons discussed below, we respectfully submit that Class Counsel's Fee and Expense Application is also fair and reasonable and should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Background

13.    Luckin is a Cayman Islands corporation with principal executive offices in Fujian, China.    During the Class Period, Luckin operated an extensive network of retail coffee stores in China.    Luckin reported increasing revenues in the offering materials for Luckin's initial public offering of American Depository Shares ("ADSs") on May 17, 2019 ("IPO"), in the quarters following the IPO, and in the offering materials for Luckin's secondary public offering on January 10, 2020 ("SPO" and, together with the IPO, the "Offerings").

14.    On January 31, 2020, an anonymous report was published by Muddy Waters Research, suggesting that Luckin's increased revenues were fraudulent.    On April 2, 2020, Luckin voluntarily disclosed that nearly $300 million of its sales between the second and fourth quarters of 2019 were associated with fabricated transactions and advised investors to "no longer rely upon the Company's previous financial statements and earnings releases for the nine months ended

6

September 30, 2019 and the two quarters starting April 1, 2019 and ended September 30, 2019, including the prior guidance on net revenues from products for the fourth quarter of 2019, and other communications relating to these consolidated financial statements." Following these revelations, the price of Luckin ADSs dropped dramatically. On June 29, 2020, trading of Luckin ADSs on the NASDAQ was suspended.

**B.    Initiation of the Action and Appointment of Lead Plaintiffs and Class Counsel**

15.    Beginning in February 2020, a series of lawsuits alleging that Luckin and the other Defendants had violated United States securities laws were filed in this Court.

16.    On April 13, 2020, AP7 and Louisiana Sheriffs moved for consolidation of the related actions, appointment as lead plaintiffs under the PSLRA, and approval of their counsel as lead counsel. ECF Nos. 61, 63, 67-68. Seventeen other competing individuals, entities or groups of individuals and/or entities also moved for appointment as lead plaintiff(s).

17.    On May 15, 2020, the Court consolidated all related actions into this Action. ECF No. 104.

18.    Following full briefing by the proposed plaintiff groups on the motions for appointment as lead plaintiff(s), on June 12, 2020, the Court appointed AP7 and Louisiana Sheriffs as Lead Plaintiffs pursuant to the PSLRA and approved Lead Plaintiffs' selection of KTMC and BLB&G as Lead Counsel. ECF No. 118.

**C.    Lead Plaintiffs' Investigation and Preparation of the Complaint**

19.    Following the appointment of AP7 and Louisiana Sheriffs as Lead Plaintiffs, Class Counsel launched a comprehensive investigation of the alleged fraud in order to prepare the detailed consolidated Complaint. In preparing the Complaint, Class Counsel conducted a comprehensive factual investigation and detailed analysis of the potential claims that could be asserted on behalf of investors in Luckin ADSs related to the alleged fraud.

20.     While various news outlets had reported on aspects of the Luckin fraud, the Complaint filed by Class Counsel was the first comprehensive account, and required Class Counsel to conduct extensive independent research into the claims of Lead Plaintiffs and the Class. Moreover, between June 12, 2020, when Lead Plaintiffs and counsel were appointed, and September 24, 2020, when Lead Plaintiffs filed the Complaint, numerous additional developments related to Luckin occurred in the United States, China, the British Virgin Islands ("BVI"), and the Cayman Islands.  As such, Class Counsel had to constantly monitor all available sources of information in order to gather the most up-to-date information.

21.     Class Counsel's investigation included a review of all available English-language public sources, including: (a) public filings made by Luckin with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and other public statements issued by Defendants; (c) the Muddy Waters short-seller report; (c) research reports issued by securities and financial analysts; (d) media and news reports and other publicly available information concerning Luckin and Defendants; (e) transcripts of Luckin's earnings and other investor conference calls; (f) publicly available presentations, press releases, and interviews by Luckin and its employees; (g) press releases and other public statements by U.S. and Chinese regulators, including the SEC, China Securities Regulatory Commission ("CSRC"), China's Ministry of Finance, and China's State Administration for Market Regulation ("SAMR"); (h) documents filed in proceedings involving Luckin including public court filings in the United States, the BVI, and the Cayman Islands; and (i) economic analyses of the movement and pricing of Luckin's publicly traded ADSs.

22.     Class Counsel hired a Chinese-native attorney in order to review available Chinese-language public sources, including news articles, regulatory filings and press releases by government regulators in China, the source materials relied on by Muddy Waters, court filings in

Hong Kong, business registration records, and social media postings.  The attorney prepared summaries of the source materials for the litigation team, many of which were then professionally translated for use in the Complaint.  Class Counsel also utilized machine translation software in order to expedite the review of lengthy Chinese-language documents.

23.    Class Counsel also retained a well-qualified Cayman Islands law firm, Bedell Cristin Cayman Partnership ("Bedell Cristin"), to obtain access to restricted court filings in both the BVI and the Cayman Islands courts and to provide Class Counsel with expert advice related to matters of BVI and Cayman Islands law.

24.    Class Counsel retained investigators in China in order to conduct interviews with former Luckin employees.  Class Counsel's investigators identified approximately 800 potential witnesses in China, and made contact with approximately twenty witnesses.  Of these witnesses, Class Counsel's investigators conducted detailed interviews and follow up interviews with six witnesses.  The information provided by these witnesses was included in the Complaint.

25.    Class Counsel also made direct contact with journalists reporting on Luckin in the PRC and Hong Kong in order to develop additional investigative leads.

26.    Throughout the course of the investigation, Class Counsel continued to monitor both English and Chinese language news outlets, social media postings, regulatory filings and announcements, and court filings in the U.S., China, the BVI, and the Cayman Islands to incorporate the most up to date information in the Complaint.

27.    Class Counsel also consulted with accounting, due diligence, and economic experts in order to analyze the information developed through their investigation.  The analysis provided by Lead Plaintiffs' accounting consultant assisted Class Counsel in pleading Defendants' alleged violations of GAAP and other SEC regulations in the Complaint.  Class Counsel consulted with

9

an expert consultant in due diligence in preparing the Securities Act claims against the Underwriter Defendants. Class Counsel also consulted with a financial economics consultant in order to analyze the true value of Luckin's ADSs, the corrective information related to Luckin revealed to the market, loss causation issues, and the potential damages of Lead Plaintiffs and the Class. The analyses provided by Lead Plaintiffs' financial economic consultant assisted Class Counsel in pleading the claims in the Complaint.

### D.    Filing and Service of the Complaint

28.    On September 24, 2020, Lead Plaintiffs filed the detailed 256-page Complaint, based on their exhaustive investigation. The Complaint asserts claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") against Luckin; Charles Zhengyao Lu ("Lu"), a co-founder of the Company and Chairman of its Board of Directors during the Class Period; Jenny Zhiya Qian ("Qian"), a co-founder of the Company and its former Chief Executive Officer; Jian Liu ("J. Liu"), Luckin's former Chief Operating Officer; and Reinout Hendrik Schakel ("Schakel"), Luckin's Chief Financial Officer and Chief Strategy Officer,[3] and under Section 20(a) of the Exchange Act against the Executive Defendants. The Complaint also alleges claims under Section 11 of the Securities Act against all Defendants, under Section 12(a)(2) of the Securities Act against the Underwriter Defendants[4], and under Section 15 of the Securities Act against the Executive Defendants and Director Defendants.[5]

---

[3]    Lu, Qian, J. Liu, and Shackel are collectively referred to as the "Executive Defendants" and, with Luckin, as the "Exchange Act Defendants."

[4]    The "Underwriter Defendants" are Credit Suisse Securities (USA) LLC, Morgan Stanley & Co. LLC, China International Capital Corporation Hong Kong Securities Limited, Haitong International Securities Company Limited, KeyBanc Capital Markets Inc., and Needham & Company, LLP.

[5]    The "Director Defendants" are Hui Li, Erhai Liu, Jinyi Guo, Sean Shao, and Thomas P. Meier.

29. The Complaint alleges, among other things, that Defendants included material misstatements and omissions in the offering documents for the IPO and the SPO regarding, *inter alia*: (i) Luckin's compliance with laws and regulations, GAAP, and internal controls over financial reporting; (ii) the reasons for Luckin's increased earnings and growth leading up to the IPO and between the IPO and the SPO; (iii) Defendants' reported revenues and expenses; and (iv) Luckin's related-party transactions. The Complaint also alleges that the offering materials for the SPO omitted material facts concerning the margin loan facility some of the underwriters for the SPO entered into with Lu and Qian. Additionally, Lead Plaintiffs allege that between the IPO and SPO, Luckin and certain other Defendants made material misstatements and omissions regarding, among other things, Luckin's operating expenses and financial reports, and, following the SPO, falsely denied allegations contained in the report published by Muddy Waters Research on January 31, 2020.

30. At the time of Class Counsel's investigation and the filing of the Complaint, all of the Executive Defendants and Director Defendants named in the Complaint resided outside of the United States—most of them in mainland China and one in Switzerland. In addition, two of the six Underwriter Defendants were located in Hong Kong.

31. As part of their investigation, Class Counsel conducted research using publicly available information, including property and business registration records, social media postings, and news reports, in order to identify addresses for each of the Executive Defendants and Director Defendants.

32. Class Counsel researched international service of process under The Hague Convention and retained an international process server in order to effectuate service of the Complaint on the Defendants domiciled in foreign countries. Class Counsel successfully served

11

the two Underwriter Defendants located in Hong Kong, and attempted service on those Executive Defendants and Director Defendants located in mainland China for whom Class Counsel were able to locate a viable address. Class Counsel successfully served Defendant Lu through the China Central Authority. Class Counsel also obtained a waiver of service from Defendant Meier's counsel.

### E.    Defendants' Motions to Dismiss the Complaint

33.    On November 23, 2020, Luckin moved to dismiss certain portions of the Complaint. ECF Nos. 210-212. Luckin did not challenge the core allegations of the Complaint that certain fabricated transactions had resulted in a material misstatement of Luckin's financial results beginning in the second quarter of 2019, but moved to dismiss one count of the Complaint and certain other portions of the Complaint. Specifically, Luckin moved to dismiss Lead Plaintiffs' claim under Section 11 of the Securities Act against it, contending that Lead Plaintiffs lacked standing to assert those claims against Luckin because they could not prove whether the ADSs they purchased had been issued in the IPO or the SPO or were sold by pre-IPO investors, and therefore could not meet the "traceability" requirement for that claim. This argument raised significant risk that all of Lead Plaintiffs' claims against the Underwriter Defendants would be dismissed at the motion to dismiss stage or after discovery.

34.    In addition, Luckin contended that Lead Plaintiffs had not stated a claim with respect to certain categories of their alleged misstatements (unrelated to the fabricated transactions). *First*, Luckin contended that Lead Plaintiffs did not state a claim with respect to the alleged misstatements in the financial statements in the IPO registration statement because it only included financial information as of March 31, 2019, but the fabricated transactions were not alleged to have begun until April 2019. *Second*, Luckin argued that the allegations that the SPO registration statement was materially misleading with respect to personal loans to Luckin's former

12

Chairman and former CEO were not viable because that registration statement made adequate disclosures about the loans. *Third*, Luckin contended that its statements regarding its efforts to remediate weaknesses in its internal controls were not materially misleading because Luckin had warned investors that there was a risk those weaknesses may not be addressed effectively, and that such failure could result in misstatements in Luckin's financial statements. *Finally*, Luckin argued that the alleged misstatements regarding Luckin's "disruptive" and "technology-driven" business model being a driver of growth were non-actionable puffery.

35.     Also on November 23, 2020, the Underwriter Defendants moved to dismiss the Complaint as against them in its entirety. ECF Nos. 204-206.[6] The Underwriters Defendants further contended that Lead Plaintiffs did not adequately allege that the Underwriter Defendants were aware of the scheme of certain Luckin employees to inflate Luckin's financial and performance metrics by engaging in fabricated transactions, pointing out the fact that, as alleged in the Complaint, this scheme was secretive and in particular that, at the time of the IPO, the fraud had only just been hatched a few weeks earlier (and it was not clear if the false transactions had yet begun as of the IPO). The Underwriters Defendants also argued that Lead Plaintiffs did not adequately allege that they should have been aware of the fraud (based on "red flags"), or that they failed to conduct adequate due diligence in connection with the two Offerings.

36.     Lead Plaintiffs opposed these motions to dismiss on January 22, 2021. ECF Nos. 220-222. First, with respect to Luckin's argument concerning the traceability requirement for the Section 11 claims, Lead Plaintiffs argued that, at the pleading stage, Lead Plaintiff Louisiana

---

[6]     The motion was initially filed by the four Underwriter Defendants based in the United States. ECF Nos. 204-206. The two Hong Kong-based Underwriter Defendants subsequently filed a joinder. ECF No. 231.

Sheriffs had established that it had standing to assert Securities Act claims related to both the IPO and the SPO, because Louisiana Sheriffs (a) purchased Luckin ADSs on January 8 and 9, 2020 when all the shares in the market were issued pursuant to the final registration statement for the IPO, and (b) purchased Luckin ADSs directly in the SPO on the offering date, at the offering price, from one of the Underwriter Defendants.  Lead Plaintiffs also explained why the Complaint adequately alleged material misstatements and omissions related to (a) Luckin's financial information as of the IPO; (b) Luckin's related-party transactions; (c) Luckin's internal controls; and (d) Luckin's business model.

37.     In response to the Underwriter Defendants' motion to dismiss, Lead Plaintiffs argued that the Court should not entertain the Underwriter Defendants' affirmative, fact-based defense of "due diligence" at the pleading stage and, in any event, that the Court could not conclude—as a matter of law at the pleading stage—that reasonable due diligence would not have uncovered the audacious and widespread fraud at Luckin.  ECF No. 222.

38.     On February 4, 2021, Defendant Meier filed a motion to dismiss the Complaint. ECF Nos. 224-225.  Mr. Meier argued that the Court lacked personal jurisdiction over him because he was a Swiss citizen who only served as a non-employee director and member of the Audit Committee on the board of a company based in China and that this did not suffice to establish "minimum contacts" in the jurisdiction.  Mr. Meier also adopted Luckin's arguments regarding dismissal of the Section 11 claim for lack of standing and certain categories of misstatements for lack of falsity.  Finally, Mr. Meier argued that the claim under Section 15 of the Securities Act against him should be dismissed because the Complaint did not adequately allege his culpable participation or control of Luckin.

39.      Lead Plaintiffs opposed Mr. Meier's motion on May 5, 2021.  ECF No. 256.  Lead Plaintiffs argued that, because Mr. Meier had held himself out as a Luckin board member and Audit committee member and either signed or consented to be referenced in the registration statements used to solicit Luckin investors in the United States, he was subject to this Court's jurisdiction for any materially false and misleading information contained within those public filings.  Lead Plaintiffs further argued that Mr. Meier's control person status for Section 15 was established through his signing of the Registration Statements and his role on Luckin's Audit Committee at the time of the alleged false statements and that "culpable participation" is not a requirement for pleading control under Section 15.

## F.      Luckin Enters Into Provisional Liquidation Proceedings

40.      While the Action was proceeding in this Court, Luckin entered into provisional liquidation proceedings.

41.      Specifically, on July 15, 2020, Luckin announced that, by order of the Grand Court of the Cayman Islands ("Grand Court"), joint provisional liquidators ("JPLs") had been appointed over the Company following the presentation of a winding-up petition filed by a Luckin creditor.

42.      In December 2020, Luckin reached a settlement with the SEC in which it agreed to pay a $180 million fine, which could be offset by any settlement Luckin reached with either the holders of Luckin's convertible bonds or Luckin's shareholders (including those at issue in this Action) in connection with the Cayman Islands proceedings.  On January 29, 2021, Luckin's JPL's disclosed that they had reached an agreement in principle with holders of Luckin's convertible bonds, and that they would separately seek to resolve the claims of investors in Luckin ADSs that are members of the Class in the Action.

43.      Thereafter, on February 5, 2021, Luckin's JPLs commenced a proceeding under Chapter 15 of the U.S. Bankruptcy Code, captioned *In re Luckin Coffee Inc. (In Provisional*

15

*Liquidation)*, No. 21-10228 (MG) (Bankr. S.D.N.Y.), to recognize the Cayman Islands provisional liquidation proceedings as a foreign main proceeding in order to seek certain protections under the U.S. Bankruptcy Code, including a stay of litigation against Luckin.

44.    Class Counsel worked vigorously to ensure that the interests of the Class were protected in Luckin's liquidation process, which included retention of United States bankrupcty counsel, Lowenstein Sandler LLP ("Lowenstein"), as well as continuing to consult with Cayman Islands counsel Bedell Cristin regarding procedures and practices in the Cayman Islands liquidation proceedings.  A pivotal moment in the highly uncertain process was Class Counsel's success in persuading Luckin to stipulate to class certification before this Court for settlement purposes.

**G.    Certification of the Class for Purposes of Settlement**

45.    On March 2, 2021, Lead Plaintiffs and Luckin filed a stipulation and proposed order provisionally certifying the Class for purposes of negotiating and implementing a settlement.  ECF No. 235.

46.    The Court held a hearing on certification of the Class on March 4, 2021, at which the plaintiffs in certain individual actions and plaintiffs in a state court putative class action asserting Securities Act claims (some of whom had unsuccessfully moved for lead plaintiff status in this Action) objected to certification.  These plaintiffs all sought to benefit through the uncertain Cayman Islands proceedings, and presumably sought to obstruct class certification for their own advantage.

47.    On March 5, 2021, the Court issued an Order (i) granting provisional class certification of the Class for settlement purposes; (ii) certifying a class consisting of all persons and entities (and their beneficiaries) that purchased or otherwise acquired the ADSs of Luckin between May 17, 2019 through July 15, 2020, inclusive; (iii) appointing Lead Plaintiffs AP7 and

16

Louisiana Sheriffs as Class Representatives; and (iv) appointing KTMC and BLB&G as Class Counsel. ECF No. 245. This Order provided for potential decertification of the Class if a "scheme of arrangement" (or "Scheme") was not adopted by the Grand Court of the Cayman Islands, but made any such potential decertification "subject to any extension or variation by further stipulation of" Luckin and Lead Plaintiffs. *Id*. ¶ 4.

48.     As discussed above, Class Counsel and Lowenstein took an active role in protecting the interest of the Class in the bankruptcy process, which included ensuring that the proposed Recognition Order submitted to the Bankruptcy Court, which provided for a stay of litigation against Luckin, included a carve-out that allowed Lead Plaintiffs in this Action to continue to move forward with Rule 23 requirements as to Defendant Luckin and to negotiate a potential settlement on behalf of Class Members, as authorized by the Court's March 5, 2021 Certification Order. Following a hearing in the Bankruptcy Court at which the objectors again opposed this relief, Bankruptcy Judge Martin Glenn entered a Recognition Order dated March 30, 2021, *In re Luckin Coffee Inc. (In Provisional Liquidation*), Case No. 21-10228-MG, ECF No. 48 (Bankr. S.D.N.Y. Mar. 30, 2021) that contained that carve-out from the automatic stay of litigation. *Id*. at ¶4(ii)

49.     On May 14, 2021, Lead Plaintiffs and Luckin filed a stipulation and proposed order regarding dissemination of class notice to potential Class Members. ECF No. 258. State court plaintiffs and other opt-out plaintiffs again objected—this time to the form of the proposed Class Notice—and Class Counsel responded to their objections. On July 6, 2021, the Court issued an Order approving the form and manner of notifying the Class of the pendency of the Action as a class action. ECF No. 304.

50.     Pursuant to the July 6, 2021 Order, and beginning on July 13, 2021, the Court-authorized notice administrator, Epiq Class Action & Claims Solutions, Inc. ("Epiq") mailed the

Notice of Pendency of Class Action ("Class Notice") to potential Class Members and nominees. ECF No. 309, at ¶¶ 6-10. Pursuant to the Order, Epiq also caused a summary class notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on August 5, 2021 and developed a case-dedicated website, www.LuckinCoffeeSecuritiesLitigation.com. *Id.* at ¶¶ 11, 14.

51. The Class Notice advised potential Class Members that the Class had been "provisionally certified for the purpose of effectuating a potential settlement with Luckin ***in this Action*** and pursuant to the relevant legislation under Cayman Islands law, including ***but not limited to*** presenting a scheme of arrangement under section 86 of the Companies Act." ECF No. 309, Ex. A, at ¶ 18 (emphasis added).[7] The Class Notice provided Class Members with the opportunity to request exclusion from the Class, explained that right, and set forth the procedures for doing so, including a postmark deadline of September 17, 2021. *Id.* ¶¶ 20-26. The Class Notice expressly advised Class Members:

> **If you remain a member of the Class**, and a Settlement is reached on behalf of the Class, you will be bound by all past, present, and future orders and judgments in the Action related to the Settlement, whether favorable or unfavorable, and you may be eligible to receive a share of that Settlement. If you remain a member of the Class and a Settlement is reached, you will not be able to pursue (or continue to pursue) a lawsuit on your own behalf with regard to any of the claims that are released by the Settlement. If a Settlement is reached, the claims released under the Settlement may include all claims arising out of the facts alleged in the Complaint and may include claims asserted against all Defendants and certain related parties.

---

[7] The Class Notice discussed the "Potential Decertification of the Class" if a "Scheme" was not adopted by the Grand Court of the Cayman Islands but, consistent with the Court's March 5, 2021 Certification Order, noted that any such potential decertification was "subject to any extension or variation by further stipulation of Luckin and Lead Plaintiffs." *Id.* ¶ 19.

*Id*. ¶ 21.a.  The Class Notice also advised Class Members that it would be within the Court's discretion whether to permit a second opportunity to request exclusion if there was a settlement. *Id*.

52.     On October 8, 2021, Lead Plaintiffs filed the Declaration of Alexander P. Villanova of Epiq, who reported that Epiq had mailed a total of 455,352 Class Notices to potential Class Members and nominees via first-class mail.  ECF No. 309, at ¶ 10.  Out of the hundreds of thousands of Class Notices mailed, a total of one hundred and ten (110) requests for exclusion from the Class were received.  *See* Stipulation (ECF No. 315) at App. 1; ECF No. 309 at ¶¶ 15-16 & Ex. C.  Nearly all of the institutions and individuals who previously objected to the Court's certification of the Class and the sending of the Class Notice to Class Members submitted requests for exclusion from the Class.  Specifically, all of the opt-out plaintiffs who were pursuing their own actions requested exclusion from the Class and the state-court plaintiffs did not request exclusion.

## III.     SETTLEMENT NEGOTIATIONS

53.     In connection with Luckin's insolvency proceedings and facilitated by the JPLs, Lead Plaintiffs and Luckin begin discussing the possibility of resolving the Action.  Thereafter, while the Class Notices were being mailed, Lead Plaintiffs and Luckin began directly negotiating a potential resolution.  The Parties explored the possibility of resolving the claims through a "scheme of arrangement" in the Cayman Islands liquidation proceeds or through a direct settlement of this Action.  A settlement through a "scheme of arrangement" was highly uncertain given the lack of clarity as to how the Class would be counted or treated in the Cayman Islands proceedings and all of the objections that the state-court plaintiffs and opt-out plaintiffs likely would continue to raise in the Cayman Islands and U.S. courts.  Due to Luckin's provisional liquidation

19

proceedings, any such resolution, whether through a "scheme of arrangement" or through a direct settlement, required the consent of the JPLs and approval of the Grand Court.

54.    As the settlement negotiations intensified, Class Counsel were able to obtain from Luckin a detailed schedule of assets available to Luckin and their sources, which included the minimal insurance available to Luckin, funds that Luckin had direct access to in overseas (non-China) accounts, funds that China's State Administration of Foreign Exchange ("SAFE") would permit Luckin to expatriate from China, and funds expected from a new investment from an outside private equity firm; as well as a schedule of the uses to which those funds had been committed, such as payments to the Noteholders and Restructuring costs.  Class Counsel carefully reviewed this information and retained a consulting firm, Loop Capital, to assess Luckin's ability to pay based on the information and documents provided.  Class Counsel also retained Chinese counsel to assess the viability of further extraction of assets from China.  The settlement negotiations were hard fought and further complicated by the fact that Luckin's potential agreements with various constituencies (such as the Noteholders or the potential outside investor) were all intertwined and contingent on one another.  Following lengthy, hard-fought negotiations, Lead Plaintiffs and Luckin reached an agreement in principle to settle the Action and executed a Term Sheet memorializing their agreement on September 20, 2021.

55.    Because the Term Sheet was negotiated before the September 17, 2021 postmark deadline for requests for exclusion and finalized shortly thereafter and while timely requests for exclusion were still being received in the mail, and because (as discussed below) Luckin's ability to fund a settlement was the most significant factor driving the settlement negotiations, Luckin and Lead Plaintiffs negotiated in the Term Sheet a "global" settlement amount of $187.5 million, which was subject to downward adjustment based on the value of claims of persons and entities who

requested exclusion from the Class, as calculated by their Recognized Claims under the proposed

Plan of Allocation as a percentage of the total estimated Recognized Claims for all Class Members

agreed to by the Parties. After extensive review and analysis, including with Lead Plaintiffs'

ability-to-pay consultant and the JPL's input, Lead Plaintiffs believe that the global cash settlement

amount agreed to in the Term Sheet represented virtually all of Luckin's available funds, once its

other commitments such as payments to Noteholders were accounted for. In addition, Lead

Plaintiffs agreed to establish a substantially longer period than normal for Luckin to make payment

of the Settlement Amount (eight months rather than a typical 10 or 20 business days), so that

Luckin would have the time necessary to obtain the funds to pay the maximum settlement amount

possible.

56. After a thorough analysis of the requests for exclusion received and further

negotiations of the specific terms of the Settlement, the Parties executed the Stipulation on October

20, 2021, which set forth the Parties' full and complete binding agreement to settle the Action.

The Stipulation provides that Luckin, on behalf of all Defendants' Released Parties, will pay or

cause to be paid $175,000,000 into an interest-bearing escrow account controlled by Class Counsel

in exchange for Class Members' release of claims against Luckin and the other Defendants'

Released Parties. The $175,000,000 represents the Class's *pro rata* recovery of the global

settlement amount, with all opt-out claims being treated in the same way.

57. On October 20, 2021, the Parties also entered into a confidential Supplemental

Agreement which provided Luckin with the option to terminate the Settlement if the total damages

of the persons and entities who validly requested exclusion from the Class met certain conditions

set forth in the Supplemental Agreement. Because the requests for exclusion from the Class

received in response to the Class Notice did not trigger Luckin's termination option under the

Supplemental Agreement and the Court did not require a second opportunity to request exclusion from the Class in connection with the Settlement, the Supplemental Agreement is now moot.

58.     On October 21, 2021, the Grand Court approved proceeding with the Settlement as set forth in the Stipulation.  Such approval was required under Cayman Islands law, Schedule 3, Part 1, paragraph 5 of the Cayman Islands' Companies Act (2021 Revision).

59.     Thereafter, on October 25, 2021, Lead Plaintiffs filed their Unopposed Motion for an Order Preliminarily Approving Proposed Settlement and Authorizing Dissemination of Settlement Notice to the Class (ECF Nos. 313-316), which included a copy of the Stipulation (ECF No. 315) and a memorandum in support (ECF No. 314).

60.     On October 26, 2021, the Court entered its Revised Order Preliminarily Approving Settlement and Providing for Notice of the Settlement (ECF No. 319) ("Preliminary Approval Order"), which preliminarily approved the Settlement and established a schedule for events related to the Settlement.

## IV.    RISKS OF CONTINUED LITIGATION

61.     Lead Plaintiffs faced numerous risks and uncertainties at the time of Settlement, in particular with respect to Luckin's ability to pay, the complexities and risks of navigating Luckin's Cayman Islands liquidation proceedings, the implications of whether the Cayman Islands liquidation proceeding could result in a dissolution of Luckin and the extinguishing of any claims against it for whatever proceeds might be available in a liquidation, and enforcing any judgment obtained in the Action against Luckin, if it emerged from the liquidation proceeding with Class claims still intact, or the other individual and corporate Defendants located in China.  Had the Action continued, Lead Plaintiffs would have faced significant challenges to proving liability and

22

damages against any solvent Defendant in the litigation and in securing payment for any judgment obtained. The numerous risks that Lead Plaintiffs faced are summarized below.

62.    *First*, at the time of settlement, Luckin—the issuer of the securities that formed the basis for this Action—had entered into provisional liquidation proceedings in the Cayman Islands and commenced a proceeding under Chapter 15 of the U.S. Bankruptcy Code, which stayed the litigation of claims against it. The goal of the provisional liquidation proceedings in the Cayman Islands was to facilitate Luckin reaching a compromise among all its creditors in order for it to avoid a dissolution. The mechanism for this compromise was a so-called "scheme of arrangement" supervised by JPLs appointed by order of the Grand Court to facilitate negotiations between Luckin and all of its creditors, voting of all creditors by number and claim size for the approval of the Scheme, and ultimate approval of the Scheme by the Grand Court. There were a number of uncertainties about how a "scheme of arrangement" under the Cayman Islands proceedings would be conducted, which raised the risk that opt-out plaintiffs could successfully oppose a scheme proposed by Luckin and the Class or could support an alternate scheme that would substantially lower the Class's recovery. Alternately, the Cayman Islands proceedings could have resulted in a scheme that was drawn up by the opt-out plaintiffs and far less favorable to the Class, or administrated outside the United States without the protections afforded Class Members from a U.S. settlement overseen by a U.S. court.

63.    *Second*, all of the Executive Defendants, and all but one of the Director Defendants were residents of the PRC and despite being served internationally via The Hague Convention procedures, had not appeared in the litigation. Luckin, the Underwriter Defendants and one outside director, Mr. Meier (the only Defendants who appeared in the action) had filed motions to dismiss the Complaint, which were fully briefed and pending. Even if Lead Plaintiffs had defeated these

pending motions, in whole or in part, they would have faced additional risks to proving their claims against these Defendants at summary judgment and trial.  These risks included a significant argument about traceability and a substantial due diligence defense by the Underwriter Defendants, who would have asserted that the alleged fraud at Luckin was hidden from them.  Indeed, Luckin's publicly disclosed internal investigation concluded that the fraud began shortly after the IPO but before the SPO.  If that narrative had been borne out in fact discovery against the Underwriter Defendants, it would have trimmed the claims against the Underwriter Defendants to only those investors who purchased directly in the SPO, a substantially smaller claim because of traceability concerns.[8]  And, to the extent that Lead Plaintiffs were able to obtain a judgment against the Director Defendants or Executive Defendants, enforcing such judgment against these Defendants would have presented significant challenges.  Given these realities, Luckin was the only viable Defendant and a source of funds that could satisfy a judgment but, as noted above, had entered insolvency proceedings and moreover its assets were primarily located in China, and were subject to strict regulations by Chinese authorities who had indicated that they would only allow funds to leave the country to restructure $460 million of the Company's convertible senior notes.

64.    In sum, there can be no doubt that Luckin's financial condition, the Cayman Islands proceedings, and the hurdles of enforcing a judgment made achieving a recovery in this Action more challenging (and urgent).  In the face of these unique and considerable hurdles, Lead Plaintiffs and Class Counsel were able to negotiate a resolution of the Action that provides a very favorable recovery for the Class under the circumstances.

---

[8]    Indeed, the total damages for Class Members who purchased directly in the SPO were only $64 to $94 million.

65.     The $175 million Settlement is reasonable (and, indeed, highly beneficial to the Class) in light of these significant risks.

## A.     Risks and Uncertainties in Enforcing any Judgment at the Time of Settlement

66.     At the time of the Settlement, the future collectability of a post-verdict judgment had been thrown into doubt by the Cayman Islands liquidation proceeding, and Luckin's ability to emerge from insolvency was uncertain.  Luckin had acknowledged that it was unable to pay its debts and applied for the appointment of JPLs to help the Company present a compromise arrangement to its creditors.  The Company further acknowledged that as a matter of Cayman Islands law, the monies that it held could be considered the proceeds of a crime, and thus the Company could not pay its debts without triggering the Cayman Islands' anti-money laundering laws.  The JPLs were charged with, subject to the Grand Court's ultimate approval, "developing and proposing a restructuring of the Company's indebtedness in a manner designed to allow the Company to continue as a going concern" (the "Restructuring").

67.     As noted above, on February 5, 2021, the JPLs filed a petition under Chapter 15 of the U.S. Bankruptcy Code in the Southern District of New York to recognize the Cayman Islands liquidation proceeding as a foreign main proceeding and to seek protections under U.S. law, including a stay of all U.S. litigation against Luckin.  Thus, obtaining any litigated judgment against Luckin in the Action, let alone its enforcement, was dependent on the JPLs successfully completing the Restructuring and Luckin emerging from insolvency.

68.     The Restructuring was a complicated multi-step process that required the JPLs to satisfy several creditors at once, including (i) holders of $460 million convertible senior notes ("CBs"), who were senior to ADS shareholders, (ii) current or former ADS shareholders, including Lead Plaintiffs, who were claimants in this Action and other related cases, including the opt-out and state-court plaintiffs, and (iii) regulators in the U.S. and China that could impose fines or

restitution orders on the Company.  To accomplish this, the JPLs had to take several interdependent steps, including securing an agreement with the CBs to restructure their outstanding debt, settling with the SEC and other regulators, and settling with the ADS shareholders.  To finance all these necessary steps, the JPLs had to repatriate funds from China by navigating onerous regulations and obtain fresh capital by negotiating an investment agreement with an outside private equity firm.

69.     None of this was certain at the time of Settlement.  While the JPLs had reached significant milestones in achieving the Restructuring, they also acknowledged that there were many issues to resolve.  For instance, the restructuring agreement with the CBs was still contingent on submitting the agreement to the Grand Court for approval by September 21, 2021, and thereafter convening a meeting of the bondholder creditors and obtaining their final agreement.  Moreover, the restructuring agreement with the CBs and the investment agreement with the private equity firm which provided the lion's share of refinancing, had several unmet closing conditions, the least of which was obtaining approval for the Restructuring in the Grand Court, which in turn depended in part on a successful settlement of this Action.

70.     As mentioned above, the SEC had imposed a $180 million penalty on Luckin that could be offset by any settlement Luckin reached with either the holders of Luckin's convertible notes or Luckin's shareholders.  However, Luckin had already committed to spend that much in connection with its restructuring of its debt to the convertible noteholders, and the SEC had indicated that it was willing to credit that amount in full against Luckin's penalty.  If that occurred, then any settlement obtained by the Class of ADS purchasers would not be assisted by any offset of the SEC penalty.  Class Counsel reached out to the SEC directly on this point and held a

conference call with SEC staff on the issue, but had not received a favorable response from the SEC at the time the Settlement was reached.

71.     Finally, at the time of settlement, there was still the possibility of further action by the U.S. or Chinese regulators that could have impacted Luckin's ability to emerge from insolvency. Thus, holding out for a larger settlement or pressing forward with litigation threatened to upset the delicate balance the JPLs had achieved in the Restructuring and would have threatened Luckin's ability to emerge from insolvency and negatively impacted Lead Plaintiffs' chances of obtaining and enforcing any judgment in this Action.

**B.     The Majority of Luckin's Assets Were Located in China and Not Within Its Control**

72.     Funding a settlement or enforcing a judgment against Luckin was made substantially more difficult because Luckin ran its business through subsidiaries in China. At the time of settlement, the vast majority of Luckin's assets were held by Chinese entities, deposited in Chinese banks, and subject to strict regulations and restrictions regarding the expatriation of funds. As of July 31, 2021, Luckin had $736 million in China and only approximately $40 million outside of China, which had already been earmarked for the JPLs' expenses in executing the Restructuring. Furthermore, as explained in detail below, the Company was only able to obtain approval from Chinese regulators for the removal of $185 million from China, which Luckin was required to spend on restructuring the CB debt.

73.     Class Counsel researched and explored alternatives, but concluded that it was unlikely that any additional funds could have been obtained from China. As described in the attached Declaration of Fang Zhao (Ex 4), a PRC attorney that Class Counsel consulted during the Parties' settlement negotiations, China maintains a strict system of foreign exchange control, and SAFE regulates and categorizes all foreign exchange transactions involving cross border

conversion and remittance of funds into and out of China. SAFE distinguishes between less-regulated "current account" transactions for international trade and cross border payables and receivables for goods and services, and heavily regulated "capital account" transactions covering securities capital inflow and outflow, including payments to foreign shareholders such as Lead Plaintiffs and the Class. The permitted capital account transactions are securitization of loans, overseas lending, debt repayment, share transfer, and—relevant here—capital reduction, *i.e.*, payments of capital to foreign securities holders.

74.     Early in the Cayman liquidation proceedings, the JPLs and Luckin had engaged with SAFE to determine the extent of capital that could be removed from China and used to fund the Restructuring. During their discussions, SAFE found that capital reduction was the only viable means for remitting funds from China. Capital reduction required Luckin to complete several complex steps: (1) notify its creditors, (2) file an application with China's Administration of Market Regulation ("AMR"), (3) clear China's taxing authority, (4) obtain approval from SAFE's local and central authorities, and finally (5) demonstrate a clear purpose with supporting evidence for the use of the funds.

75.     According to Luckin's Chinese counsel,[9] the most onerous and uncertain step was obtaining SAFE approval, which is at the regulator's sole discretion. Although there is no objective test that ensures obtaining approval, SAFE will typically consider the amount of the capital reduction and whether it warrants strict oversight, the purpose of the capital reduction, and the effect of a capital reduction on the onshore company, and in particular any effect on the onshore company's ability to meet the demands of onshore creditors, onshore employees, and other onshore

---

[9]     *See* July 9, 2021, Memorandum re Remittance of Onshore Funds out of China, from King & Wood Mallesons, attached hereto as Exhibit 4A.

stakeholders.    SAFE ultimately allowed a ***maximum*** capital reduction of $250 million, but imposed several conditions, including that the funds would be used for the "genuine needs" of the Restructuring and the capital reduction would not harm the Company's onshore business operations or creditors.  The hard quota of $250 million was the estimated amount of offshore funding required to fund the Restructuring *without* additional funding from other investors.  In other words, it was SAFE's view that a total of $250 million would cover all the claims of both the CBs and the ADS creditors.  In addition, Luckin was only able to demonstrate the need for and remit $185 million to fund the CB restructuring and could not justify a higher amount because any amount pertaining to a potential settlement with ADS holders was contingent and unknown at the time.

76.    While $65 million of the maximum $250 million capital reduction was still theoretically available at the time of settlement, according to Luckin's counsel, SAFE would likely perceive any additional capital reductions as unnecessary.  Luckin believed SAFE would not allow a second capital reduction, "as they [SAFE] will almost certainly regard this as risking the financial stability of the onshore entity and create significant [] risk for the Company and thereby impacting the Company's onshore operations."  Ex. 4A, at 6.

77.    An experienced attorney practicing in the PRC retained by Class Counsel reviewed the assertions made by Luckin's Counsel concerning the limitations on Luckin's available cash and concluded that the restrictions on the availability of funding Luckin described were accurate and valid to the best of her knowledge.  *See* Zhao Decl. ¶ 3.  Ms. Zhao concluded that she had no reason to doubt Luckin's assessment "that SAFE would likely deny any attempt to access funds beyond the $185 million that had already been permitted.  It is, in fact, consistent with my experience and understanding of SAFE operations that SAFE would view any additional capital

29

reduction and remittance of funds offshore as risking the financial stability of Luckin China and therefore it would deny any near-term application to remove additional funds," *id*. ¶ 5, and that "there is no other feasible way to expatriate cash from China beyond the level of funds approved by SAFE." *Id.* ¶ 6.

78.     Lead Plaintiffs could have rejected the Settlement and continued to attempt a proposed "scheme of arrangement" in the Cayman Islands or risked taking the Action to a verdict, but these alternatives were highly uncertain and likely to be much less favorable for the Class. *First*, there were many uncertainties with respect to proceeding through a "scheme of arrangement" in the Cayman Islands proceedings. As discussed in the Declaration of Laura Hatfield of Bedell Cristin (Ex. 5), experienced Cayman Islands counsel, the law in the Cayman Islands concerning treatment of class-action claims in the context of a "scheme of arrangement" was uncertain. For example, it was not clear how the claims of individual claimants would be valued for purposes of voting on approval of such a scheme, or if Lead Plaintiffs would be able to represent the interest of the Class as a whole in those proceedings and, in particular, whether, with respect to any vote on adoption of a "scheme," Lead Plaintiffs would be able to vote on behalf of the Class as a whole (all ADSs purchasers who did not request exclusion) or only their individual shares. This uncertainty created the real possibility that the opt-out plaintiffs, who had divergent interest from the Class, might successfully object to any scheme proposed for the benefit of the Class or potentially adopt an alternative scheme that would allow for substantially lower recovery for the Class.

79.     Assuming that no "scheme" that released the Class claims was ultimately agreed upon in the Cayman Islands proceedings, and assuming that Luckin did not enter involuntary dissolution following the failure of the scheme as would likely have occurred if the scheme failed,

and assuming Lead Plaintiffs successfully obtained a judgment against Luckin after the stay of litigation was lifted, there was still no guarantee that Luckin's assets that remained in China could be obtained through enforcement of a U.S. judgment.  The United States and China are not party to an international agreement for the recognition of foreign judgments, and there have only been two United States judgments ever to be recognized and enforced by Chinese courts.  *See* Mark Sachs, Charlotte Hill & Justine Porter, *A Brave New World: Enforcement of Foreign Judgments in China*, Int'l Bar Ass'n (April 2020).  Similarly, the Chinese legal expert consulted by Class Counsel concurred that enforceability of any judgment obtained against Luckin against the assets of Luckin or Luckin China in China "would be highly uncertain" and that Chinese courts would not enforce a U.S. judgment against Luckin (the Cayman parent company) to allow direct access to assets held by Luckin's subsidiaries in China.  Zhao Decl. ¶ 7.

###### C.      Luckin Was the Only Realistically Viable Defendant

80.      The significant obstacles to obtaining a recovery larger than the proposed Settlement through litigation were further heighten by the fact that Luckin was the only Defendant subject to the jurisdiction of the Court against whom the claims in the Action had a high likelihood of success.  *First*, at the time of the Settlement, all the Executive Defendants, and all but one of the Director Defendants were Chinese nationals and had not entered an appearance in the Action. *Second*, the Securities Act claims against the Underwriter Defendants and outside Director Defendants faced substantial risks.  *Finally*, it was not possible to reach a substantial settlement with Luckin while simultaneously preserving potential claims against the Underwriter Defendants or the other Defendants because those Defendants had agreements that required Luckin to indemnify them and thus Luckin would not agree to a settlement if it did not also resolve the claims against the other Defendants.

### 1.    The Executive Defendants and Most of the Director Defendants Were Located in Mainland China

81.    All of the Executive Defendants, and all but one of Director Defendants were residents of the PRC and despite being served internationally via The Hague Convention procedures, had not appeared in the Action.  Even if jurisdiction could have been obtained over these Defendants, enforcing any U.S. judgment obtained against these Defendants to access their assets in the PRC would have faced the same substantial hurdles described above concerning enforcement of a judgment against Luckin.  Thus, any ultimate recovery from these individuals Defendants was highly uncertain.

### 2.    The Securities Act Claims Against the Underwriter Defendants and Director Defendants Faced Very Significant Risks

82.    Lead Plaintiffs' claims against the Underwriter Defendants and Director Defendants were brought (and only viable) under the Securities Act.  As a result, these claims were made significantly more challenging by the fact that the relevant securities were issued in more than one public offering, giving rise to a strong traceability defense, and the fact that the non-issuer Defendants also possessed a strong potential "due diligence" defense.

83.    Section 11 requires the plaintiff to "trace" its shares to a particular offering made pursuant to a particular registration statement.  If the plaintiff cannot prove that the shares for which he is seeking to recover were issued pursuant to the allegedly defective registration statement, the plaintiff has no claim under Section 11.  *See, e.g., In re Initial Public Offering Sec. Litig.*, 227 F.R.D. 65, 117 (S.D.N.Y. 2004).

84.    Here, the relevant ADSs were issued in more than one offering.  Specifically, on May 17, 2019, Luckin issued 33 million ADSs in the IPO.  Thereafter, on June 14 and 18, the Underwriter Defendants exercised options in connection with the IPO adding an additional 4,950,000 shares.  Following a 180-day lock-up period following the IPO (which ended on

32

November 12, 2019), pre-IPO Class A and B common shares could be converted to ADSs. Defendants contended that any purchases of ADSs made after November 12, 2019 could not be presumed to be traceable to the IPO, as they could also have been converted to pre-IPO Class A or B shares.

85.    On January 10, 2020, Luckin conducted the SPO, issuing 13.8 million shares. Defendants argued that any purchase after the SPO could have come from the IPO, converted Class A or B shares, or the SPO.[10]

86.    If the Underwriter Defendants' arguments about traceability had succeeded and only Class Members who purchased directly in the IPO or the SPO and held through a corrective disclosure were able to assert claims, Lead Plaintiffs' damages consulted estimated that the total damages for the Class on those claims would be only $127 to $157 million (if Lead Plaintiffs were otherwise fully successful at trial).

87.    The Underwriter Defendants and outside Director Defendants also had a substantial due diligence defense to the Securities Act claims asserted against them that could have made recovery on these claims substantially more difficult.    The central focus of the alleged misstatements in the Action was that certain Luckin executives had inflated Luckin's revenue by fabricating transactions from approximately April to September 2019.    The Underwriter Defendants would have had strong arguments that this fraud was secretive and had been hidden from them.  This argument would have been particularly strong with respect to claims arising from the IPO Registration Statement, as the fraud was only in its early stages at that time.  While Lead

---

[10]    While these same traceability arguments also affected Lead Plaintiffs' Securities Act claims against Luckin, these arguments were of lesser concern with respect to Luckin because Lead Plaintiffs possessed strong claims under Section 10(b) of the Exchange Act against Luckin that they did not have against the Underwriter Defendants.

Plaintiffs argued that this fact-intensive affirmative defense should not be the basis for dismissing the Securities Act claims at the motion to dismiss stage, there were substantial risks that, at subsequent stages of the case, including at summary judgment and at trial, that the Underwriter Defendants and outside Director Defendants might have prevailed on their argument that they had conducted adequate due diligence in connection with the respective Offerings and were not aware (and did not have reason to be aware) of the existence of fabricated transactions or the other alleged misstatements.

*     *     *     *     *

88.    Based on all the factors summarized above, Lead Plaintiffs and Class Counsel respectfully submit that it was in the best interest of the Class to accept the immediate and substantial benefit conferred by the $175 million Settlement, instead of incurring the significant risk that the Class would recover a lesser amount, or nothing at all, through further litigation.

## V.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT OF THE POTENTIAL RECOVERY IN THE ACTION

89.    The Settlement is also reasonable when considered in relation to the range of potential recoveries that might be obtained if Lead Plaintiffs continued to litigate the Action. As discussed above, Luckin entered into liquidation proceedings in July 2020, and its insurers had disclaimed coverage of any potential settlement or judgment reached in the Action. Moreover, Lead Plaintiffs' ability to enforce any judgment against Luckin's assets in China or against any of the other Defendants located in China, raised substantial hurdles and uncertainties for recovery. The realistic maximum recovery that could be obtained in the Action was thereby driven by Luckin's ability to pay based on the amount of funds that Luckin held outside China or that Chinese regulators would permit it to expatriate in connection with its Restructuring. As discussed above, in the course of the settlement negotiations, Class Counsel received detailed information about the

34

funds available to Luckin (including the sources of those funds and Luckin's other expenses) and retained an ability-to-pay expert to analyze the information received. Based on that information, Class Counsel believe that the Settlement achieved represents virtually all of Luckin's available funds at the time of the settlement.

90.     Nonetheless, the $175 million Settlement is itself a highly reasonable recovery in relation to the Class's maximum damages that could be proven at trial, notwithstanding the significant ability-to-pay issues and the substantial uncertainties regarding enforcement and recovery on any judgment. Lead Plaintiffs' damages consultant has estimated the Class's *maximum* aggregate damages to be approximately $2.75 billion. Accordingly, the $175 million Settlement represents approximately 6.4% of the *maximum* damages that could be established for the Class (without regard to the significant ability-to-pay issues present in the case). This amount compares favorably to recoveries obtained in many other securities class actions. *See In re PPDAI Grp. Inc. Sec. Litig.,* 2022 WL 198491, at *12 (E.D.N.Y. Jan. 21, 2022) (approving settlement representing "6.4% of the maximum estimated aggregate damages" as "within a reasonable range"); *In re Sturm, Ruger, & Co. Sec. Litig.*, 2012 WL 3589610, at *7 (D. Conn. Aug. 20, 2012) (approving settlement that represented approximately 3.5% of estimated damages, and noting that it exceeded the average recovery in shareholder litigation); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) ("average settlement amounts in securities fraud class actions where investors sustained losses over the past decade . . . have ranged from 3% to 7% of the class members' estimated losses"); *In re Merrill Lynch & Co. Rsch. Reports Sec. Litig.*, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving recovery of 6.25%, which was "at the higher end of the range of reasonableness"). Accordingly, the recovery obtained here would be a good recovery as compared to the average securities action, but is *particularly favorable* in

35

the context of this case where Luckin's ability-to-pay concerns sharply limited the *realistic recovery amount* to a much lower amount than potentially provable maximum damages.

91.    For all these reasons, Lead Plaintiffs and Class Counsel respectfully submit that the Settlement is fair, reasonable, and adequate, and that it is in the best interests of the Class to accept the immediate and substantial benefit conferred by the Settlement.  In the absence of the Settlement, there is a significant risk that the Class might recover a lesser amount, or nothing at all, after additional protracted and arduous litigation, particularly in light of these significant ability-to-pay issues.

## VI.    ISSUANCE OF NOTICE OF THE SETTLEMENT TO THE CLASS AND THE REACTION OF THE CLASS TO DATE

92.    The Court's Preliminary Approval Order directed that notice of the Settlement be provided to the Class, including mailing of the Notice of (I) Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Settlement Notice") and Proof of Claim and Release Form ("Claim Form").  The Preliminary Approval Order set June 24, 2022 as the deadline for Class Members to submit objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, and set the final approval hearing for July 22, 2022.

93.    Pursuant to the Preliminary Approval Order, Class Counsel instructed Epiq, the Claims Administrator, to begin disseminating copies of the Settlement Notice and Claim Form (together, the "Settlement Notice Packet") by mail.  The Settlement Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation and Class Members' rights to participate in the Settlement, or object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application.  The Settlement Notice also informs Class Members of Class Counsel's intent to apply for attorneys' fees in an amount not to exceed 25% of the

36

Settlement Fund and for payment of Litigation Expenses incurred in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $1,000,000, which amount may include the reasonable costs and expenses incurred directly by Lead Plaintiffs related to their representation of the Class. Epiq disseminated the Settlement Notice Packet to all potential Class Members who had previously been identified in the prior mailing of the Class Notice, as well as to any additional potential Class Members who were identified in response to dissemination of the Settlement Notice Packet. *See* Declaration of Alexander P. Villanova Regarding: (A) Mailing of the Settlement Notice and Claim Form; (B) Publication of the Summary Settlement Notice; and (C) Report on Claims Received ("Villanova Decl."), attached hereto as Exhibit 3, at ¶¶ 2-9.

94.     On November 15, 2021, Epiq mailed 455,320 copies of the Settlement Notice Packet to potential Class Members and nominees by first-class mail. *See* Villanova Decl. ¶¶ 5-7. Through June 8, 2022, Epiq had disseminated a total of 564,464 Settlement Notice Packets to potential Class Members and nominees. *Id*. ¶ 9.

95.     In addition to mailed notice, Epiq caused the Summary Settlement Notice to be published in *The Wall Street Journal* and to be transmitted over *PR Newswire* on November 30, 2021. *See id*. ¶ 10.

96.     Class Counsel also caused Epiq to update the dedicated website for the Action, www.LuckinCoffeeSecuritiesLitigation.com, to provide potential Class Members with information concerning the Settlement, including important dates and deadlines in connection therewith, and access to downloadable copies of the Settlement Notice and Claim Form, as well

as copies of the Stipulation and other relevant documents. *See id.* ¶ 14.[11]   Additionally, Epiq maintains a toll-free telephone number and interactive voice-response system to respond to inquiries regarding the Settlement. *See id.* ¶¶ 11-13.

97.    As set forth above, the deadline for Class Members to file objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application is June 24, 2022.  To date, one objection—which is addressed only to one aspect of the Plan of Allocation—has been received.  ECF No. 321.  Class Counsel will file reply papers on July 15, 2022, after the deadline for submitting objections has passed, which will address all further objections that may be received.

98.    The Settlement Notice also informed Class Members that if they wished to participate in the Settlement they must submit a Claim Form to Epiq, with supporting documentation, postmarked (if mailed), or submitted online by March 15, 2022.  *See* Settlement Notice at p. 3 and ¶¶ 25, 41; Claim Form at pp. 1, 8.  Epiq has continued to receive and process Claims received after March 15, 2022 and will if valid, recommend their acceptance for payment from the Settlement, subject to the Court's approval.

99.    Epiq has received approximately 44,826 Claims, including 20,656 Claims that were filed electronically by or on behalf of institutions and 24,170 Claims that were submitted by or on behalf of individuals.  *See* Villanova Decl.  ¶ 15.  These Claims are still being processed and are subject to a deficiency process (in which Class Members will be given the chance to cure any deficiencies in their Claims) and further reviews and audits for quality control and fraud prevention.  *Id.* ¶ 17.  Based on Epiq's preliminary review to date of the Claims received, the

---

[11]    Class Counsel have also made copies of the Settlement Notice and Claim Form available on their own websites, www.blbglaw.com and www.ktmc.com.

Claims received in the Action represent a total of $1,803,114.197 in Recognized Claims under the proposed Plan of Allocation. *See id*. ¶ 16. While this number may change as Claims are reviewed and processed, the proposed $175 million Settlement represents approximately 10% of the value of Recognized Claims received.

## VII.   PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

100.   Pursuant to the Preliminary Approval Order, and as set forth in the Settlement Notice, all Class Members who want to participate in the distribution of the Net Settlement Amount (*i.e.*, the Settlement Fund less (a) any Taxes, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court; (d) any attorneys' fees awarded by the Court; and (e) any other costs or fees approved by the Court) were required to submit a valid Claim Form with all required information postmarked (if mailed), or online through the website, www.LuckinCoffeeSecuritiesLitigation.com, no later than March 15, 2022. As set forth in the Notice, the Net Settlement Amount will be distributed among Class Members according to the plan of allocation approved by the Court.

101.   The Plan of Allocation proposed by Lead Plaintiffs and Class Counsel is set forth in Appendix A to the Notice. *See* Villanova Decl. Ex. A at pp. 13-18. If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Authorized Claimants.[12]

### A.   The Proposed Plan of Allocation is Fair and Reasonable

102.   Class Counsel believe that the Plan provides a fair and reasonable method to equitably allocate the Net Settlement Amount among Class Members, taking into account the

---

[12]   An "Authorized Claimant" means a person or entity who or which submits a Claim to the Claims Administrator that is approved by the Court for payment from the Net Settlement Fund.

damages each Class Member suffered and the statute under which their claim(s) arose. Class Counsel developed the Plan of Allocation in consultation with Lead Plaintiffs' damages consultant and his team of professionals.

103.    The proposed Plan of Allocation is designed to achieve an equitable and rational distribution of the Net Settlement Fund. However, it is not a formal damages analysis, and the calculations made pursuant to the Plan are not intended to be estimates of, nor indicative of, the amounts that Class Members might have been able to recover after a trial or the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Plan ¶ 1. Instead, the calculations under the Plan are only a method to weigh the claims of Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Amount. *Id.*

104.    Specifically, the Plan of Allocation creates a framework for equitable distribution of the Net Settlement Fund among Class Members who suffered economic losses as a result of Luckin's alleged violations of the federal securities laws. The Plan also takes into the account the statute under which those violations arose, such that all members of the Class who purchased Luckin ADSs during the Class Period have a potential claim under Section 10(b) of the Exchange Act, and all members of the Class who purchased Luckin ADSs in or traceable to Luckin's May 17, 2019 IPO or January 10, 2020 SPO also have a potential Securities Act claims.

105.    **Exchange Act Loss Amounts**. The formula for calculating a Claimant's Exchange Act Loss Amount under the Plan is the same as that typically used in plans of allocations in other securities class action asserting Section 10(b) claims. In general, an Exchange Act Loss Amount will be calculated for each purchase or acquisition of a Luckin ADS during the Class Period. That amount is equal to (a) the difference between the estimated artificial inflation in the price of Luckin ADSs on the date of purchase and the estimated artificial inflation on the date of sale, or (b) the

40

difference between the actual purchase price and sales price of the stock, whichever is less. *See* Plan ¶¶ 4, 7. Lead Plaintiffs' damages consultant calculated the amount of artificial inflation in the price of Luckin ADSs by considering price changes in Luckin ADSs in reaction to public disclosures allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces. *See id.* ¶ 2. Claimants who did not hold their Luckin ADSs over one of the disclosure dates in the Plan of Allocation—that is, those who sold their shares before the first disclosure date or who purchased and then sold all their shares between two such disclosure dates—will have no Exchange Act Loss Amount as to those transactions under the Plan because the level of alleged artificial inflation would be the same on their date of purchase as on their date of sale. *Id.* ¶¶ 3-4, 7.[13]

106. **Securities Act Loss Amounts**. Claimants who purchased shares of Luckin ADSs (a) directly in either the May 2019 IPO or January 2020 SPO, (b) during the period after the IPO but before the SPO when all shares were traceable to the IPO, or (c) after the SPO through the end of the Class Period and are able to submit documentation tracing the specific shares they purchased to shares issued in the IPO or SPO, may have a Securities Act Loss Amount on these purchases. *See* Plan ¶¶ 8-9. The Securities Act Loss Amount is calculated based on the statutory formula for

---

[13] In addition, in accordance with the PSLRA, Exchange Act Loss Amounts for Luckin ADSs sold during the 90-day period after the end of the Class Period are further limited to the difference between the purchase price and the average closing price of the ADS from the end of the Class Period to the date of sale. Plan of Allocation ¶ 7(c)(iii). Exchange Act Loss Amounts for Luckin ADSs still held as of the close of trading on October 13, 2020, the end of the 90-day period, will be the lesser of (a) the amount of artificial inflation on the date of purchase or (b) the difference between the purchase price and $2.75, the average closing price for the stock during that 90-day period. *Id.* ¶ 7(d).

damages under Section 11 of the Securities Act, *see* 15 U.S.C. § 77k(e).  Specifically, the Plan

provides that:

> (a) for shares sold before the suit was brought (April 2, 2020), the Securities Act Loss Amount is the purchase price per share (not to exceed the offering price) minus the sale price;

> (b) for shares sold after the suit was brought and before October 20, 2021 (the date the Stipulation was executed)[14], the Securities Act Loss Amount is the purchase price per share (not to exceed the offering price) minus the greater of (i) the sale price per share or (ii) $1.38, the closing price of Luckin ADSs on April 2, 2020; and

> (c) for shares still held as of October 20, 2021, the Securities Act Loss Amount is the purchase price per share (not to exceed the offering price) minus $1.38.

*See* Plan ¶¶ 8-9.

107.    For purposes of calculations under the Plan of Allocation, "purchase price" and

"sales price" means the actual price paid or received, respectively, excluding fees, taxes, and

commissions.  *See* Plan ¶ 14.  *However*, if a Claimant received Luckin ADSs through the

conversion of another security, the "purchase" price applied to that acquisition shall be the closing

market price of the Luckin ADSs on the date the ADSs are received, *id.*, and, if a Claimant

purchased or sold the Luckin ADSs through an option, the purchase/sale date of that Luckin ADS

is the exercise date of the option and the purchase/sale price is the closing market price of the

Luckin ADSs on the date of exercise.  *See* Plan ¶ 17.  The purpose of these provisions is to ensure

that if (for example) a Class Member purchased Luckin ADSs during the Class Period at an inflated

price due to their trading in other securities (such as options on Luckin ADSs) they are not included

---

[14]    The date the Stipulation was executed is a substitute for the "date of judgment" under the statute in this formula.  *See* 15 U.S.C. § 77k(e).

in this Action.  Thus, their damages under the Plan will be calculated based on the market price of the Luckin ADSs at the time of purchase or sale, so that their damages under the Plan will reflect their damages attributable to their trading in Luckin ADSs (as opposed to damages attributable to their trading in options or other derivative securities for which claims were not brought in this Action).

108.    **"Recognized Loss Amounts"** and **"Recognized Claim" Amounts**.  Finally, for each Claimant's purchase or acquisition of a Luckin ADS during the Class Period, an overall "**Recognized Loss Amount**" will be calculated, which will be the *greater* of the Exchange Act Loss Amount or Securities Act Loss Amount for each eligible purchase or acquisition.  *See* Plan ¶¶ 6, 10.  Lead Plaintiffs expect that for the great majority of eligible transactions the Exchange Act Loss Amount will be the greater of the two values.  The "greater of" approach adopted by the Plan, however, allows eligible Class Members to recover their statutory-based Securities Act Loss Amount even if they purchased and sold shares between alleged corrective disclosures and thus would not be eligible for an Exchange Act Loss Amount on that transaction.

109.    The sum of the Recognized Loss Amounts for all of a Claimant's eligible purchases or acquisitions of Luckin ADSs during the Class Period is the claimant's "**Recognized Claim**." *Id.* ¶ 10.  The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  *Id.* ¶ 18.

110.    Lead Plaintiffs and Class Counsel believe that the Plan of Allocation is designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Class Members based on losses they suffered on transactions in Luckin ADSs that were attributable to the conduct alleged in the Complaint, taking into account the statutory basis of each Class Member's claim.

43

111.    Finally, as noted above, through June 8, 2022, more than 560,000 copies of the Settlement Notice, which contains the Plan of Allocation, and advises Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Class Members and nominees.  S*ee* Villanova Decl. ¶ 9.  To date, just one objection to the proposed Plan of Allocation has been received.

112.    Accordingly, Class Counsel respectfully submit that the Plan of Allocation is fair and reasonable, and should be approved by the Court.

### B.    The Rach Objection to the Plan of Allocation Should be Rejected

113.    The one objection received to date, from Robert C. Rach (ECF No. 321) (the "Rach Objection") is directed only to the approval of the Plan of Allocation, not to the Settlement itself. The Rach Objection, together with any other objections that may be received, will be addressed in greater detail in Lead Plaintiffs' reply papers, which will be filed on July 15, 2022, after the June 24, 2022 deadline for filing objections has passed.

114.    However, the Rach Objection will be briefly addressed here.  Mr. Rach objects to the provision of the Plan of Allocation that provides that the purchase price used in calculations under the Plan for Luckin ADSs purchased through the exercise of an option is the closing price of the Luckin ADSs on the date of exercise (rather than the purchase price paid as a result of the obligation under the Claimant's option contract).  *See* Rach Objection (ECF No. 321) at 1 and Plan ¶ 17.  Mr. Rach contends that this provision is inequitable because it understates his loss on the transaction.  To give a concrete example, based on Mr. Rach's trading, and in accord with a put option he had previously entered into:  he purchased 1,000 Luckin ADSs at the inflated price of $38 per ADS on April 17, 2020, on which date the market closing price of Luckin ADSs was $4.39, and then sold those 1,000 ADSs for $2.69 per ADS on May 20, 2020.

115.    Under the proposed Plan of Allocation, *see* Plan ¶ 7(b), Mr. Rach's Recognized Loss Amount on this transaction would be ***the lesser of*** (a) the estimated artificial inflation on the date of purchase under Table A ($3.81) minus the estimated artificial inflation on the date of sale under Table A ($1.33) or $2.48 per ADS; or (b) the purchase price per share (considered to be $4.39 per share, under Plan ¶ 17) minus the sale price per share ($2.69), or $1.70 per ADS.   Thus, Mr. Rach's Recognized Loss Amount on this transaction would be $1,700.  Mr. Rach argues that his recognized loss should be much higher because the put option contract he entered into required him to purchase Luckin ADSs on April 17, 2020 at a much higher price ($38.00) and thus his out-of-pocket loss on the transaction was considerably higher.

116.    As will be discussed more fully in Lead Plaintiffs' reply papers, the calculation set forth in the proposed Plan of Allocation for claims of ADSs acquired through the exercise of options and other derivative securities is appropriate.  The only security included in the Class was Luckin ADS.  No claims were asserted in this Action on behalf of purchasers of options (or other securities).  Accordingly, the Plan seeks to allocate the Net Settlement Fund among Class Members based on damages they suffered directly as a result of their trading in Luckin ADSs, as distinct from any damages they may have suffered as a result of trading in options or other derivative securities.  The additional damages that Mr. Rach suffered as a result of entering into a put option obligating him to purchase Luckin ADSs at $38 in April 2020 (rather than at the market price that day) were damages attributable to his trading in Luckin options, rather than to his trading in Luckin ADSs.

117.    The Settlement does not release any claims related to trading in options (or any other securities other than Luckin ADSs), *see* Stipulation ¶ 1(pp) ("Released Plaintiffs' Claims" are limited to claims that "relate to or arise from the purchase or acquisition of Luckin ADSs during

the Class Period"), and, therefore, the Settlement does not preclude Mr. Rach from asserting his own claims for damages flowing from his trading in Luckin options, if he wishes to do so. Additionally, from a fairness prospective, compensating Mr. Rach and other similarly situated Class Members who purchased option contracts that are not part of the Class's claims or the Settlement releases here would unfairly dilute the recoveries to be paid to Class Member who actually purchased Luckin ADSs on the open market.  In short, Class Counsel believe that it was reasonable to design a proposed Plan of Allocation that did not provide extra compensation for claimants based on their options trading where ADSs were the only security included in the Class.

## VIII.   THE FEE AND LITIGATION EXPENSE APPLICATION

118.    In addition to seeking final approval of the Settlement and Plan of Allocation, Class Counsel are applying to the Court for an award of attorneys' fees in the amount of 17.5% of the Settlement Fund, including any interest earned, on behalf of all Plaintiffs' Counsel (the "Fee Application").[15]  Class Counsel also request payment for expenses that they incurred in connection with the prosecution of the Action from the Settlement Fund in the total amount of $721,462.68 and reimbursement to Lead Plaintiffs in the aggregate amount of $5,430.00 for costs that AP7 and Louisiana Sheriffs incurred directly related to their representation of the Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4).

119.    The legal authorities supporting the requested fee and expenses are set forth in Class Counsel's Fee Memorandum.  The primary factual bases for the requested fees and expenses are summarized below.

---

[15]    Plaintiffs' Counsel include Class Counsel KTMC and BLB&G; bankruptcy counsel for the Class, Lowenstein; and additional counsel for Lead Plaintiff Louisiana Sheriffs, Klausner Kaufman.

### A.    The Fee Application

120.    For their efforts on behalf of the Class, Class Counsel are applying for a fee award for all Plaintiffs' Counsel to be paid from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances, and has been recognized as appropriate by the U.S. Supreme Court and the Second Circuit for cases of this nature.

121.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks and complexities of the litigation, and the fully contingent nature of the representation, Class Counsel respectfully submit that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 17.5% fee award is fair and reasonable for attorneys' fees in common fund cases such as this, particularly given the facts and circumstances of this case, as well as within the range of percentages awarded in securities class actions in this Circuit with comparable settlement amounts.

### 1.    Lead Plaintiffs Have Authorized and Support the Fee Application

122.    Lead Plaintiffs AP7 and Louisiana Sheriffs are sophisticated institutional investors that have closely supervised, monitored, and actively participated in the prosecution and settlement of the Action.  *See* Gröttheim Decl. ¶¶ 3-5; McGee Decl. ¶¶ 3-5.

123.    Lead Plaintiffs have evaluated the Fee Application and fully support the fee requested.  Gröttheim Decl. ¶ 7; McGee Decl. ¶ 7.  Both Lead Plaintiffs entered into retainer agreements with one of the Class Counsel firms at the outset of the litigation, and the 17.5% fee requested is consistent with or lower than the permissible rate under these two retainer agreements.

Whereas Louisiana Sheriffs' retention agreement would have authorized a fee request of up to 25% of the net settlement, AP7's retention agreement limits Class Counsel's fee to 17.5%.

124. Moreover, after reaching the Settlement, Lead Plaintiffs again reviewed and approved the requested fee and believe it is fair and reasonable in light of the result obtained for the Class, the substantial risks in the litigation, and the quality of the work performed by Class Counsel. Gröttheim Decl. ¶ 7; McGee Decl. ¶ 7. Lead Plaintiffs' endorsement of Class Counsel's fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2.    The Time and Labor Devoted to the Action by Plaintiffs' Counsel

125. Plaintiffs' Counsel devoted substantial time to the prosecution of the Action. As described above in greater detail, the work that Plaintiffs' Counsel performed in this Action included: (i) conducting an extensive international investigation into the alleged fraud; (ii) drafting and filing a detailed consolidated complaint based on this investigation; (iii) briefing and opposing Defendants' motions to dismiss; (iv) working extensively to monitor and protect the interests of the Class in Luckin's highly uncertain Cayman Islands liquidation proceedings and parallel proceedings in U.S. bankruptcy court; (v) consulting extensively throughout the litigation with experts and consultants in accounting, due diligence, financial economics, Chinese SAFE regulations, and ability-to-pay analysis; and (vi) engaging in lengthy and complex arm's-length settlement negotiations with Luckin and the JPLs that required careful consideration of Luckin's ability to access funds and highly complex cross-border issues such as the operation of a "scheme of arrangement" under Cayman Islands law and Chinese regulatory limits on Luckin's access to cash held by its subsidiaries in China.

126.    Throughout the litigation, Class Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. As the lead partners on the case, we personally monitored and maintained control of the work performed by other lawyers at BLB&G and KTMC throughout the litigation.  Other experienced attorneys at Class Counsel firms were also involved in the drafting of pleadings, motion papers, and in the settlement negotiations.  More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

127.    Attached hereto as Exhibits 6A through 6D are declarations in support of Class Counsel's motion for attorneys' fees and litigation expenses on behalf of each of the Plaintiffs' Counsel firms: (a) co-Class Counsel KTMC; (b) co-Class Counsel BLB&G; (c) bankruptcy counsel Lowenstein; and (d) additional counsel for Lead Plaintiff Louisiana Sheriffs, Klausner Kaufman (the "Fee and Expense Declarations").  Each of the Fee and Expense Declarations includes a schedule summarizing the lodestar of the firm and the litigation expenses it incurred. The Fee and Expense Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current hourly rates.  The Fee and Expense Declarations were prepared from contemporaneous daily time records regularly maintained and prepared by the respective firms, which are available at the request of the Court.  The first page of Exhibit 6 is a chart that summarizes the information set forth in the Fee and Expense Declarations, listing the total hours expended, lodestar amounts, and litigation expenses for each Plaintiffs' Counsel firm and gives totals for the numbers provided.

128.    As set forth in Exhibit 6, Plaintiffs' Counsel collectively expended a total of 9,381.4 hours in the investigation and prosecution of the Action.  The resulting lodestar is $6,596,079.75.

49

129.    The requested fee of 17.5% of the Settlement Fund is $30,625,000, plus interest accrued at the same rate as the Settlement Fund, and therefore represents a multiplier of approximately 4.6 on Plaintiffs' Counsel's lodestar.    As discussed in further detail in the Fee Memorandum, the requested multiplier cross-check is within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere, and is particularly appropriate here where external circumstances resulting from Luckin's liquidation dictated that a prompt settlement would be in the best interests of the Class.

### 3.    The Experience and Standing of Class Counsel

130.    As demonstrated by the firm resumes included as Exhibits 6A-4 and 6B-3 hereto, KTMC and BLB&G and are among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases, and are consistently ranked among the top plaintiffs' firms in the country.    We believe our firms' extensive experience in the field and the ability of our attorneys added valuable leverage during the settlement negotiations.

### 4.    The Standing and Caliber of Defendants' Counsel

131.    The quality of the work performed by Class Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.    Here, Defendants were represented by experienced and extremely able counsel including Davis Polk & Wardwell on behalf of Luckin, Cahill Gordon & Reindel LLP on behalf of the Underwriter Defendants, Gibson, Dunn & Crutcher LLP on behalf of Director Defendant Meier, and Campbells, on behalf of the JPLs.    All of these firms vigorously represented their clients.    In the face of this skillful opposition,

50

Class Counsel were nonetheless able to negotiate with Defendants to settle the case on terms that are favorable to the Class.

**5.      The Risks of the Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases**

132.    This prosecution was undertaken by Class Counsel on an entirely contingent basis. The risks assumed by Class Counsel in prosecuting these claims to a successful conclusion are described above. Those risks are also relevant to an award of attorneys' fees.

133.    From the outset of their retention, Class Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Class Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case such as this requires. With an average lag time of several years for such cases to conclude, the financial burden on contingent-fee counsel is far greater than on firms that are paid on an ongoing basis. Indeed, Class Counsel received no compensation during the course of the Action and have collectively incurred over $700,000 in litigation expenses in prosecuting the Action for the benefit of the Class.

134.    Class Counsel also bore the risk that no recovery would be achieved. Despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured. As discussed herein, from the outset, this case presented multiple risks and uncertainties that could have resulted in no recovery whatsoever or a judgment that could not be enforced.

135.    Class Counsel know from experience that the commencement and ongoing prosecution of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and legal arguments that are needed to sustain

51

a complaint or win at class certification, summary judgment and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

136.    Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can occur only if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

137.    Class Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Class, as described above. In circumstances such as these, and in consideration of the hard work and the excellent result achieved, we believe the requested fee is reasonable and should be approved.

### 6.    The Reaction of the Class to the Fee Application

138.    As stated above, through June 8, 2022, 564,464 Settlement Notice Packets had been mailed to potential Class Members advising them that Class Counsel would apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund. *See* Villanova Decl. ¶ 9. In addition, the Court-approved Summary Settlement Notice was published in *The Wall Street Journal* and transmitted over *PR Newswire* on November 30, 2021. *Id.* ¶ 10. To date, no objections to the request for attorneys' fees has been received. Any such objections that may be received will be addressed in Class Counsel's reply papers to be filed on July 15, 2022, after the deadline for submitting objections has passed.

139.    In sum, Class Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the fully contingent nature of the representation, Class Counsel respectfully submit that a fee award of 17.5% is fair and reasonable, and is consistent with and supported by the fee awards that courts have granted in other comparable cases.

B.    **The Litigation Expense Application**

140.    Class Counsel also seek payment from the Settlement Fund of $721,462.68 in litigation expenses that were reasonably incurred by Plaintiffs' Counsel in connection with commencing, litigating, and settling the claims asserted in the Action.

141.    From the outset of the Action, Class Counsel were aware that they might not recover any of their expenses and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved. Class Counsel also understood that, even assuming that the case was ultimately successful, a subsequent award of expenses would not compensate them for the lost use of the funds advanced by them to prosecute the Action. Accordingly, Class Counsel were motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

142.    Plaintiffs' Counsel have incurred a total of $721,462.68 in litigation expenses in connection with the prosecution of this Action. These expenses are summarized in Exhibit 7, which identifies each category of expense, such as expert/consultant fees, fees for retention of foreign counsel, and on-line research, as well as the amount incurred for each category. These

expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in Plaintiffs' Counsel's hourly rates.

143. The largest expense, $404,089.16, or approximately 56%, was expended for the retention of experts and consultants. As noted above, Class Counsel consulted with experts and consultants in the fields of accounting, financial economics, due diligence, and Luckin's ability to pay during their investigation and the preparation of the Complaint, in preparation for settlement negotiations, and in connection with the development of the proposed Plan of Allocation.

144. Another substantial component of the expenses was for employment of specialized Cayman Islands counsel, the firm of Bedell Cristin, which provided valuable advice to Lead Plaintiffs and the Class on how to navigate the provisional liquidation process in the Cayman Islands. Lead Plaintiffs incurred a total of $203,616.21 in costs and fees for Bedell Cristin's work on this matter. In addition, Class Counsel consulted with experienced PRC counsel concerning Chinese legal and regulatory issues in order to review and confirm the validity of Luckin's claims about the limits on their ability to obtain funds held in China and concerning the enforceability of any U.S. judgment in China. Lead Plaintiffs incurred a total of $17,528.31 for the work of this PRC counsel.

145. Another large component of Plaintiffs' Counsel's litigation expenses was for online legal and factual research, which was necessary to conduct the factual investigation and identify potential witnesses, prepare the Complaint, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss, and conduct research in connection with the bankruptcy proceedings and settlement negotiations. The total charges for this on-line research amounted to $40,691.99, or 6% of the total amount of Plaintiffs' Counsel's expenses.

54

146. The other expenses for which Class Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, outside investigative services, court fees, telephone costs, copying, and postage and delivery expenses.

147. All of the litigation expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Lead Plaintiffs. See Gröttheim Decl. ¶ 8; McGee Decl. ¶ 8.

148. In addition, Lead Plaintiffs seek reimbursement of the reasonable costs that they incurred directly in connection with their representation of the Class. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum at 20-21. Lead Plaintiff AP7 seeks reimbursement of $3,750.00 for 15 hours expended in connection with the Action by its Chief Executive Office, who spent time communicating with Class Counsel and reviewing pleadings and motion papers. *See* Gröttheim Decl. ¶¶ 9-10. Lead Plaintiff Louisiana Sheriffs seeks reimbursement of $1,680.00 for 20 hours expended in connection with the Action by its Executive Director. *See* McGee Decl. ¶¶ 9-10.

149. The Settlement Notice informs potential Class Members that Class Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $1,000,000. The total amount requested, $726,892.68 ($721,462.68 for Plaintiffs' Counsel's expenses and $5,430.00 for Lead Plaintiffs' expenses), is significantly below the $1,000,000 that Class Members were advised could be sought. To date, no objections to the request for Litigation Expenses have been received.

150. In sum, the expenses incurred by Plaintiffs' Counsel and Lead Plaintiffs were reasonable and necessary to represent the Class and achieve the Settlement. Accordingly, Class

55

Counsel respectfully submit that the application for payment of these expenses should be approved.

## IX.    ADDITIONAL EXHIBITS AND INFORMATION

151.    Attached hereto are true and correct copies of the following documents previously cited in this Declaration:

Exhibit 1:    Declaration of Richard Gröttheim, Chief Executive Officer of AP7, in Support of: (I) Class Representatives' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Class Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 2:    Declaration of Osey "Skip" McGee, Jr., Executive Director of Louisiana Sheriffs' Pension and Relief Fund, in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Class Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 3:    Declaration of Alex P. Villanova Regarding (A) Dissemination of the Settlement Notice and Claim Form; and (B) Publication of the Summary Settlement Notice

Exhibit 4:    Declaration of Fang Zhao

Exhibit 5:    Declaration of Laura Hatfield

Exhibit 6:    Summary of Plaintiffs' Counsel's Lodestar and Expenses

Exhibit 6A:    Declaration of Sharan Nirmul on Behalf of Kessler Topaz Meltzer & Check, LLP in Support of Class Counsel's Motion for Attorneys' Fees and Litigation Expenses, Filed

Exhibit 6B:    Declaration of Salvatore J. Graziano on Behalf of Bernstein Litowitz Berger & Grossmann LLP in Support of Class Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 6C:    Declaration of Michael S. Etkin on Behalf of Lowenstein Sandler LLP in Support of Class Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 6D:    Declaration of Robert D. Klausner on Behalf of Klausner, Kaufman, Jensen & Levinson in Support of Class Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 7:    Breakdown of All Plaintiffs' Counsel's Expenses by Category

152.    In addition, attached hereto as Exhibit 8 is a true and correct copy of an order issued by the United States District Court for the Northern District of California in April 2021 in an unrelated action where BLB&G served as lead counsel for a different lead plaintiff, SEB Investment Management, and as class counsel for a certified class. *See SEB Inv. Mgmt. v. Symantec Corp.*, 2021 WL 1540996 (N.D. Cal. Apr. 20, 2021).  As reflected in the order, counsel for a lead plaintiff movant (that was not appointed) raised questions about BLB&G's hiring of a former employee of the lead plaintiff in that case.  Following discovery and extensive briefing, the court found that the evidence did not establish a *quid pro quo*, and allowed BLB&G to continue as class counsel.  *See id.* at *1-2.[16]  The court nevertheless ordered BLB&G to bring the order to the attention of any court in which BLB&G seeks appointment as class counsel.  *See id*. at *2.  While the Class in the Action had already been certified by the Court and KTMC and BLB&G were approved as Class Counsel by the Court's March 5, 2021 Order, prior to the entry of the order in *Symantec*, BLB&G is submitting this order to the Court in an abundance of caution.

153.    Also attached hereto are true and correct copies of the following documents cited in the Fee Memorandum:

Exhibit 9:    *In re Wilmington Trust Sec. Litig.*, No. 10-cv-00990-ER, slip op. (D. Del. Nov. 19, 2018), ECF No. 842.

Exhibit 10:    *In re Pfizer Inc. Sec. Litig.*, No. 04-cv-09866 (LTS), slip op. (S.D.N.Y. Dec. 21, 2016), ECF No. 727.

Exhibit 11:    *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL No. 122 (CLB), slip op. at 8 (S.D.N.Y. June 12, 2003), and 2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003).

---

[16] The *Symantec* action was subsequently resolved with a $70 million settlement for the benefit of the class, and the settlement was approved by the court.

Exhibit 12:    NERA ECONOMIC CONSULTING, RECENT TRENDS IN SECURITIES CLASS ACTION LITIGATION: 2021 FULL-YEAR REVIEW (2022).

Exhibit 13:    *In re Doral Fin. Corp. Sec. Litig.*, No. 05-md-1706, slip op. (S.D.N.Y. July 17, 2007), ECF No. 107.

Exhibit 14:    *In re 3Com Corp. Sec. Litig.*, No. C-97-21083, slip op. (N.D. Cal. Mar. 9, 2001), ECF No. 180.

## X.    CONCLUSION

154.    For all the reasons set forth above, Lead Plaintiffs and Class Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable and adequate. Class Counsel further submit that the requested fee in the amount of 17.5% of the Settlement Fund should be approved as fair and reasonable, and the request for Plaintiffs' Counsel's Litigation Expenses in the amount of $721,462.68 and Lead Plaintiffs' costs, in the amount of $5,430.00, should also be approved.

We declare, under penalty of perjury, that the foregoing is true and correct.

Dated: June 10, 2022                    Respectfully submitted,


_____                    _____
    Sharan Nirmul                              Salvatore J. Graziano