# Exhibit 4

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

IN RE LUCKIN COFFEE INC.
SECURITIES LITIGATION

Case No. 1:20-cv-01293-JPC-JLC

**DECLARATION OF FANG ZHAO**

I, Fang Zhao, hereby declare as follows:

1.    I am a partner in the Yun Zheng Law Firm, based in Shanghai, and a practicing lawyer in the People's Republic of China ("China" or "PRC").  I have been practicing law in the PRC for over 20 years. I was called to the Bar of England and Wales in 2017. I also sit as an arbitrator of Hong Kong International Arbitration Centre, the China International Economic and Trade Arbitration Commission, Beijing Arbitration Commission, Shanghai International Arbitration Centre and the Shen Zhen Court of International Arbitration.  Before joining in Yu Zheng, I had been a partner of Beijing Jun He Law Offices Shanghai Office, from February 2011 to June 2013. I submit this declaration to provide certain facts related to China's legal and regulatory regime that may be relevant to the consideration of the proposed Settlement.

2.    Class Counsel in this Action retained me and my firm in 2021 to provide advice on Chinese law and regulation in connection with their negotiations with Luckin Coffee Inc. ("Luckin" or "Luckin Cayman"), and, in particular, concerning Luckin's ability to access assets held by its subsidiaries in China, including Luckin Coffee (China) Co., Ltd. ("Luckin China") for the purposes of paying any settlement obtained or judgment reached in this Action, whether in a United States court or as part of liquidation proceedings in the Cayman Islands.  In connection with this work, I reviewed a memorandum dated July 9, 2021 prepared by King & Wood Mallesons, counsel for

Luckin, that was subsequently publicly filed in Luckin's Cayman Island liquidation proceedings (the "KWM Memo"). A copy of the KWM Memo is attached as Exhibit A.

3. I believe, based on my experience and knowledge of Chinese regulations of foreign-exchange transactions, that the restrictions on the availability of funding to Luckin described in the KWM Memo are accurate and valid to the best of my knowledge. In particular, the KWM memo reports that Luckin could only obtain approval for the remittance of $185 million out of the PRC. While I am not in a position to independently verify Luckin's interactions with the government of China, I can confirm that the government of China, through the State Administration of Foreign Exchange of the PRC ("SAFE") maintains strict controls over foreign-exchange transactions, including the remittance of funds out of the PRC, and has wide discretion to impose restrictions on Chinese entities trying to expatriate funds from China, especially for capital account requirements.

4. I agree with the assessment in the KWM Memo that, based on the circumstances described, "capital reduction" was the only feasible method for Luckin China to remit funds out of the PRC to Luckin Cayman and that Luckin China's quota for capital reduction of $250 million USD served essentially as a "hard cap" on the amount of funds that could be remitted. Increasing the limit of $185 million discussed in the KWM Memo, which was based on a spending plan that had been approved by SAFE, would have required approval by SAFE, which approval could have been withheld in SAFE's discretion. Luckin China would have no ability to appeal such a determination by SAFE.

5. I have no reason to doubt the KWM Memo's assessment that SAFE would likely deny any attempt to access funds beyond the $185 million that had already been permitted. It is, in fact, consistent with my experience and understanding of SAFE operations that SAFE would

view any additional capital reduction and remittance of funds offshore as risking the financial stability of Luckin China and therefore it would deny any near-term application to remove additional funds. As explained in the KWM Memo, the SAFE approval was predicated on an existing, enforceable offshore funding requirement created by the Restructuring Support Agreement dated March 16, 2021 ("RSA") that Luckin Coffee entered into with certain holders of Luckin's $US 460,000,000 .75% convertible senior notes due 2025 ("CBs") that were in default. These notes were senior in interest to all other Luckin creditors and the RSA required a minimum cash consideration of $150 million to be distributed to the holders of the CBs by June 14, 2021 (the deadline being subsequently extended). Unlike the CB note holders, holders of claims based on Luckin's ADRs solely had contingent claims and as a result, SAFE did not view these contingent claims as being reasonably estimable sufficient to satisfy the requirements for a capital reduction. The difficulty for these contingent claim holders is that they would have been required to reduce their contingent claims to a judgment and then attempt to secure SAFE approval for an additional outbound payment exceeding the approved limit of $185 million. As described below, this strategy was subject, at a minimum to the risks of the non-enforceability of foreign judgments in China.

6.      In my view, there is no other feasible way to expatriate cash from China beyond the level of funds approved by SAFE as described in the KWM Memo. Other alternatives such as issuing notes to the Class would not be feasible because issuing notes to non-Chinese entities would require SAFE approval and SAFE would not approve payment of such notes.

7.      Class Counsel also asked me to provide an opinion on the enforceability of any judgment obtained against Luckin against the assets of Luckin or Luckin China in China. Such enforceability would be highly uncertain. First, theoretically Chinese courts may enforce a United

States court judgment in accordance with the principle of reciprocity, with the condition that such enforcement may not violate fundamental Chinese law and policy.  In practice, while a few Chinese courts have enforced U.S. court judgments in recent years, such enforcement has been and will be subject to strict scrutiny of the court on a case-by-case basis.  Secondly, and perhaps more importantly, for any enforcement to be possible there must be assets within China that are directly owned by the Luckin Cayman (the parent company that would be subject to the U.S. judgment).  Chinese courts would not enforce a U.S. judgment against Luckin Cayman to allow direct access to assets of Luckin China.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this __3rd__ day of June, 2022.

_____
Fang Zhao

#3103458

4

# Exhibit A

# Memorandum

**Confidential settlement communication – Without prejudice**

| | |
|---|---|
| **To** | Luckin Coffee Inc (In Provisional Liquidation) Ad Hoc Shareholder Claimant Committee |
| **From** | King & Wood Mallesons |
| **Date** | July 9, 2021 |
| **Subject** | Remittance of Onshore Funds out of China |

# 1      Introduction

## 1.1     Scope of issues

We have been asked by Luckin Coffee Inc. (In Provisional Liquidation) ("**Luckin Coffee**" or "**Company**") and Luckin Coffee (China) Co., Ltd. ("**Luckin China**") to address   the following questions in this memorandum:

(i)     What is the legal basis for the approved quota for capital reduction of USD250 million and why is only an estimated USD185 million of this quota assumed to be allowed to be remitted out of PRC?

(ii)    Is there any other additional funding source viable under the PRC's legal framework that allows funds remitted from onshore to offshore to compensate SH Litigants (as defined below)?

We understand that this memorandum will be provided to you for the purpose of assisting settlement discussions.  Accordingly, the contents of this memorandum shall be treated confidentially and on a without prejudice basis.  Additionally, by providing you this memorandum, neither we, Luckin Coffee, nor Luckin China, intends to waive any privilege applicable to legal advice previously rendered by this firm to our clients.

## 1.2     Background

Luckin Coffee, a company incorporated in the Cayman Islands, is the holding company of all subsidiaries, including investment holding companies in BVI and Hong Kong and various operating companies in China (including Luckin China and other onshore Luckin operational companies, collectively as the "**Onshore Companies**").

A simplified offshore/onshore holding structure of the Luckin Coffee group from the top down is displayed below.



Currently, Luckin Coffee is in default under the US$460,000,000 0.75% convertible senior notes due 2025 ("**CB**") as a result of the appointment of the Joint Provisional Liquidators ("**JPLs**") ordered by the Cayman Court on July 15, 2020. Pursuant to a Restructuring Support Agreement ("**RSA**") dated March 16, 2021 entered into by Luckin Coffee and certain holders of the CB, the Company was required to satisfy financing milestone obligations, including obtaining reasonable assurance of funding outside the PRC in an amount sufficient to satisfy the minimum cash consideration to be distributed to the holders of the CB under the RSA by June 14, 2021 (such minimum is USD150 million).

As explained in more detail below, to date the Company has completed the PRC regulatory approval process, including obtaining relevant approvals from the State Administration of Foreign Exchange ("**SAFE**", including its local branches) of the PRC through a designated PRC foreign exchange handling bank, to transfer funds out of the PRC through a planned capital reduction within a quota of USD250 million. In a spending plan the Company submitted to the PRC handling bank and local SAFE, USD185 million is estimated to be remitted out of PRC by the end of 2021 for payment of restructuring expenses (USD35 million) and distribution of the Cash Consideration under the RSA (USD150 million).

Luckin Coffee is also exposed to potential claims from certain U.S. equity litigants (including class action lead plaintiffs) of Luckin Coffee (the "**SH Litigants**"). We understand the SH Litigants have not yet obtained a court judgment and are therefore contingent creditors only and unable to seek to undertake direct action against the Company at this time in contrast to the CBs.

## 1.3     Scope of this memorandum

This memorandum is confined to and prepared on the basis of the publicly available laws of PRC in force as at the date hereof, our observations of the market practices in PRC thus far and as of the date hereof.  We have not investigated, and we do not give any opinion expressly or by implication on, the laws of any other jurisdiction and we have assumed that no such other laws would affect the advice rendered herein.

In this Memorandum, "**PRC**" or "**China**" refers to the mainland of the People's Republic of China and, unless otherwise defined herein, the laws and regulations in capitalized forms

refer to the laws and regulations of PRC (which, for the purpose of this Memorandum only, excluding the laws and regulations of Hong Kong Special Administrative Region, Macau Special Administrative Region and Taiwan), and "**approval**" of SAFE may take the form of, including but not limited to, confirmation from the designated foreign exchange banks that approved quota for conversion of RMB into USD has been received from SAFE (or its local counterpart) for transmission of such funds outside of the PRC, or notification from the designated foreign exchange banks to the Company that transmission of such funds outside of the PRC has been processed.

## 2    Overview of PRC Foreign Exchange Control

China maintains a strict system of foreign exchange control and SAFE (including its local branches) regulates and categorizes all foreign exchange transactions involving cross-border conversion and remittance of funds into and out of PRC, into current account items (primarily covering international trade or service transactions that involve cross-border payables and receivables frequently taking place) and capital account items (primarily covering equity investment, debt investment and securities investment transactions that involve cross-border capital inflow and outflow). Under the current account channel, Renminbi ("**RMB**") generally may be freely converted into foreign currencies (and vice versa) by the presentation of valid commercial documents evidencing the underlying transactions and other supporting documents, without the prior approval by SAFE. Foreign exchange transactions under the capital account channel are generally more heavily regulated and more strictly controlled than those under the current account channel.

Generally speaking, the following channels may be relevant to remittance of onshore funds out of PRC where relevant conditions are satisfied and prerequisite procedures are completed:

(i)    *channels under the current account channel*: outbound remittance of funds under:

    a)    distribution of dividends; and

    b)    international compensation;

We will explain in section 3.2 that neither of the current account channels is available / applicable to Luckin Coffee.

(ii)    *channels under the capital account channel*: outbound remittance of funds under:

    a)    cross-border security;

    b)    overseas lending;

    c)    repayment of foreign debts;

    d)    capital reduction; and

    e)    share transfer

In light of the circumstances in which Luckin Coffee and its Onshore Companies find themselves and according to the Company's discussions with SAFE (as explained in more detail below), the only viable channel for the Onshore Companies to remit funds out of PRC to Luckin Coffee is by way of capital reduction. Other channels/funding sources would not work for various reasons (we will set out analysis in section 3.2 below).

## 3        Responses to Questions

**3.1        What is the legal basis for the approved quota for capital reduction of USD250 million and why is only estimated USD185 million of this quota assumed to be allowed to be remitted out of PRC with reasonable certainty?**

3.1.1    ***Capital reduction as the sole permitted channel***: According to the Company's discussions with SAFE, the channel permitted by SAFE for the Onshore Companies to remit funds out of PRC to Luckin Coffee is limited to <u>capital reduction</u>.

In normal circumstances, a foreign invested enterprise is permitted to reduce the registered capital contributed by foreign shareholder(s) and remit the proceeds from such reduction out of PRC to the foreign shareholder(s). The capital reduction process is subject to the following prerequisite procedures:

(i)        notification to creditors: In accordance with PRC Company Law, an onshore company intending to apply for capital reduction shall notify their creditors within 10 days and make a public announcement in a newspaper within 30 days after a resolution to reduce registered capital is passed. Within 30 days of receiving the notice or within 45 days of the issuance of the public announcement if they fail to receive the notice, any dissenting creditors shall be entitled to request the onshore company pay off the debts or to provide guarantees/security. It takes at least 45 days to complete this notification process under normal circumstances.

(ii)       registration with local administration of market regulation ("**AMR**"): Having duly notified the creditors as stated above, the onshore company may then file an application with a local AMR where the onshore company was established for the registration of capital reduction.  It normally takes one to two weeks to complete the process after the AMR receives all the required application documents assuming no objections from creditors have been raised or all such objections have been resolved.

(iii)      tax clearance with tax authority: Pursuant to the relevant PRC tax laws and regulations, the foreign shareholder(s) of an onshore company have tax filing and payment obligations with respect to the reduced capital if there is any investment profit when reducing capital..

(iv)      SAFE approval in the form of foreign exchange registration of capital reduction: after completing the above procedures, the foreign invested enterprise can go to the PRC foreign exchange handling bank (delegated by SAFE) to apply for the foreign exchange registration of capital reduction in the system operated by SAFE and then apply for currency conversion and remittance of reduced capital funds out of PRC by presenting necessary supporting documents. See next section for more details regarding this step.

3.1.2    ***SAFE approval is at its own sole discretion***: In practice, however, the PRC handling bank may need to seek the guidance of the local branch of SAFE on whether to accept an application for foreign exchange registration of capital reduction. If the PRC applicant has special circumstances or it considers the amount of the contemplated capital reduction to be significant, the local branch of SAFE would conduct a careful review of the underlying foreign exchange transaction and grant any approvals as it sees fit. There is no objective test that ensures certainty of obtaining an approval. The local branch of SAFE will typically consider, among other things, whether the capital reduction is of a significant amount that should attract strict oversight, the purpose of the capital reduction, and the effect of a capital reduction on the onshore company, and in particular any effect on the onshore company's ability to meet the demands of onshore creditors, onshore employees and other

onshore stakeholders. Moreover, in sensitive situations (as in Luckin Coffee's case), the local branch of SAFE will need to seek approval from the central SAFE, which introduces another layer of uncertainty.

As a matter of policy, the PRC government applies stringent oversight when evaluating applications to move money offshore. The more assurance and comfort it has that an application for capital remittance by an onshore company is genuine, compliant with all applicable laws, regulations and SAFE rules and has a low risk of leading to business shutdowns or lay-off of employees of the onshore company, the greater the likelihood that such application will be approved.

In Luckin Coffee and the Onshore Companies' situation, the Company had multiple rounds of meetings with SAFE, during which the Company comprehensively explored and tested all possible ways to move onshore cash held by the Onshore Companies offshore. However, it is the Company's understanding based on these discussions that the only viable channel SAFE would consider in order to move funds offshore (not exceeding a limit) out of PRC  was through a capital reduction channel and they stressed that the SAFE approval for such capital reduction would be made subject to a number of conditions, including the usage of funds.

SAFE expressed that the following key criteria would need to be addressed (at a minimum) in order to justify an application for capital reduction:

(1) the contemplated capital reduction should serve the genuine needs of offshore funding requirements based on a reasonable estimate of total amount of compensation payable by Luckin Coffee to its creditors;

(2) the contemplated capital reduction would involve no material adverse risk to the available liquidity of the Onshore Companies on a going concern basis; and

(3) the contemplated capital reduction would not risk harming the interests of creditors of the Onshore Companies.

In addition to the above, SAFE also took into account of whether the risk to the financial stability of Luckin Coffee and the Onshore Companies could be demonstrably reduced as a result of the capital reduction. It should be noted that at the time of the Company's application, it was uncertain whether the audit closing condition to the Centurium and Joy Capital investment would be met and therefore SAFE's approval of a capital reduction was the only way that the Company could meet the financing milestone.

Through communications with SAFE, it was the Company's understanding that SAFE's preference is for the Company to only go through an application process once and therefore that the Company should ensure a sufficient quota to be requested to satisfy potential offshore funding requirements whilst also confirming there was a significant buffer of onshore liquidity to fund the onshore business operations.

Based on the supporting documents and data provided by the Company to address the abovementioned concerns, in particular taking into consideration the grave impact of an official liquidation (the likely consequence if the Company could not satisfy its payment obligations to the CBs), and after rounds of internal consultations with the central SAFE, the local SAFE eventually accepted the application and granted an approval via the PRC handling bank, allowing Luckin China to transfer funds out of the PRC through a planned capital reduction with a quota of USD250 million. This amount was the estimated amount of offshore funding required to fund all offshore creditors as well as fees and expenses to successfully close the offshore restructuring *absent* a completion of the 2019 audit (and

therefore external funding from Luckin's existing investors <u>not</u> being available) whilst taking into account Luckin's onshore liquidity position and ongoing onshore liquidity requirements, with the subsequent utilization of such quota needing to comply with a spending plan (see below section 3.1.3) and with all required underlying documentation, approved by the PRC handling bank (delegated by SAFE).

Given the above, the Company believes that it will be difficult for SAFE to allow a second capital reduction in the near term (i.e., allow further funds offshore), if at all, as they will almost certainly regard this as risking the financial stability of the onshore entity and create significant PR risk for the Company and thereby impacting the Company's onshore operations.

3.1.3    ***SAFE's oversight over fund remittance***: Even with SAFE approval of the USD250 million capital reduction, Luckin China must obtain final signoff from SAFE to move any amount of such funds offshore. As a general principle under the SAFE foreign exchange regime, all underlying foreign exchange transactions are required to be authentic and comply with applicable laws, regulations and SAFE rules and should be processed with requisite backup documents. Therefore, in practice, SAFE will still exercise scrutiny over the authenticity and compliance of each request to remit funds out of PRC, even if within the limits of the approved quota.

Therefore, every remittance of reduced capital funds out of PRC can be processed by the PRC handling bank (delegated by SAFE) only after the specific use of the funds to be remitted is verified as authentic and the amount and timing of each payment due and payable to offshore creditors is confirmed as consistent with all documents and information disclosed to or recorded in the system operated by SAFE (in capital reduction situation particularly, the amount requested to be remitted must (i) be consistent with the amount due and payable as evidenced by supporting documents, (ii) not exceed the approved quota when aggregated with other funds already remitted, and (iii) reflect a timeline for payment that does not substantially deviate from the payment schedule documented in the fund spending plan).

In light of the above, although the Company has an approved quota from SAFE for the capital reduction of up to USD 250m, it still needs to demonstrate a clear purpose with supporting evidence for the use of cash in order to actually remit funds. To address these concerns, the Company, as requested by the handling bank, put together a spending plan after the approval of the capital reduction, in which the sum of USD185 million was estimated and budgeted as USD150 million for payment of the Cash Consideration to the holders of CBs and USD35 million for payment of offshore restructuring fees and expenses for a total of USD185 million. The Company was not able to justify any higher amount than the USD185 million at such time, given that any amount pertaining to a potential SH Litigant settlement was and is still unknown.

It is the Company's hope that the remittance of the estimated USD185 million reduced capital funds offshore will be processed by the PRC handling bank by December 31, 2021 given that the Company is already in default under CBs and exposed to official liquidation. The need to transfer USD185 million can be evidenced by court orders from the Cayman Court, RSA and other supporting documents/data which can be submitted to the PRC handling bank and SAFE for review and verification. To date, USD35 million of the USD185 million has already been moved to a USD NRA (a non-resident account opened by an offshore entity with a PRC bank) account to pay offshore restructuring fees, some of the supporting documents of which currently are under review of the PRC handling bank (delegated by SAFE) before actual payment out of this account as required by SAFE.

We should caution that even the final approval of the USD150 million payment to the CBs for the Cash Consideration is not 100% guaranteed, given that it is theoretically possible that SAFE may yet decide at the last minute that, now that the 2019 audited financials have been released, Luckin Coffee's offshore funding source – i.e., the amount of equity raised from Centurium and Joy Capital – is more than sufficient to close the offshore restructuring, and therefore deny the transfer of USD150 million on the basis that they consider the remittance of capital from onshore to offshore to be unnecessary.

**3.2    Is there any other additional funding source that allows funds remitted from onshore to offshore to compensate SH Litigants?**

Other than capital reduction analyzed in above Section 3.1, we tend to view that no other funding source works as the following funding sources might not be accepted by SAFE:

(i)    ***Distribution of dividends***: a PRC company may distribute dividends to their foreign shareholder(s) where there are profits after making up all losses. However, this channel is not viable to Luckin as the Onshore Companies have no profits which could be distributed to their foreign shareholder(s).

(ii)   ***International compensation***: only if a foreign court judgment or an arbitral award in favor of the SH Litigants could be obtained affirming the compensation obligations of the Onshore Companies owing directly to the SH Litigants and SAFE approval could be granted (both of which we understand are very difficult to obtain because the SH Litigants do not have any claims against the Onshore Companies),  may the relevant Onshore Companies be able to remit the relevant funds out of PRC in order to satisfy their compensation obligations.

(iii)  ***Cross-border security***: a cross-border guarantee or security provided by the Onshore Companies and registered with SAFE would enable the Onshore Companies to make the payment under the guarantee/security out of the PRC to offshore creditors. We understand that none of the Onshore Companies have ever provided a guarantee or security for the obligations owed by Luckin Coffee to the SH Litigants; therefore, the channel of "cross-border security" may not be used to remit the funds to offshore.

(iv)   ***Overseas lending***: the Onshore Companies may try to register the overseas lending with SAFE and then lend funds to Luckin Coffee since they are indirectly held by Luckin Coffee. However, SAFE will have sole discretion to decide whether to register such overseas lending by taking into account the current situation of Luckin Coffee (as the borrower), e.g. the ability of Luckin Coffee to repay the offshore lending. Based on Luckin Coffee's liquidity, it appears highly unlikely Luckin Coffee would be able to repay any loans made by the Onshore Companies if the proceeds of those loans are to fund a settlement with the SH Litigants.  SAFE has already confirmed to the Company that this channel would not be a viable one.

(v)    ***Repayment of foreign debts***: if there are existing loans owed by the Onshore Companies to Luckin Coffee (or other offshore affiliates) and registered with SAFE as foreign debts, Onshore Companies may take advantage of the channel for repayment of such foreign debts to directly remit funds out of PRC that could be further applied to compensate the US Litigants. However, the Company has confirmed that no such foreign debt exists

(vi)   ***Share transfer***: a PRC company that has sufficient cash resources may purchase all or part of the shares in another company that is a wholly owned foreign entity ("**WFOE**") and then pay the purchase price out of PRC to the foreign shareholder(s) of such WFOE. The share transfer shall be registered with local AMR and a local PRC bank (delegated by SAFE) and in any  special case the PRC bank may seek guidance from

local SAFE if it deems necessary. This was explored with SAFE, who advised that this channel would not be accepted as a way to remit funds out of PRC.

## 4.1 Assumptions

In addition to any assumptions contained elsewhere in this memorandum, when preparing this memorandum we have made the following assumptions:

(a)     the factual information disclosed to us as contained in this memorandum is correct and true and there are no other facts relevant to this memorandum; and

(b)     each of the documents provided to us for review is duly executed and/or issued by appropriate, capable and duly authorized person(s) and/or authorities, up-to-date and in full force and effect without being amended, modified, repealed, renewed, replaced or otherwise changed in any manner.

This memorandum is strictly limited to the matters stated in it and does not apply by implication to any other matters.

## 4.2 Benefit

This memorandum is addressed to you only.  It may not be disclosed to or relied upon by any other person for any other purpose or quoted or referred to in any public document or filed with anyone without our prior written consent in each specific case.  It may not be disclosed to anyone else except that it may be disclosed, but only on the express basis that they may not rely on it, to any professional adviser of you or the SH Litigants or as required by law or regulation.

**Yours faithfully**

**King & Wood Mallesons**