# Exhibit 5

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE LUCKIN COFFEE INC.
SECURITIES LITIGATION

Case No. 1:20-cv-01293-JPC-JLC

## DECLARATION OF LAURA HATFIELD

I, Laura Hatfield, hereby affirm as follows:

1.      I am a partner at the law firm of Bedell Cristin Cayman Partnership ("**Bedell Cristin**"), a law firm in the Cayman Islands.  Bedell Cristin was retained by Lead Counsel on behalf of Lead Plaintiffs in or around July 2020 to assist in representing Lead Plaintiffs' interests in certain Cayman Islands Grand Court ("**Grand Court**") proceedings involving Luckin Coffee Inc. ("**Luckin**") as described below.

2.      I submit this Declaration to provide certain facts relating to the involuntary dissolution proceedings in the Grand Court involving Luckin that may be relevant to the consideration of the proposed Settlement.

## I.      Background of the Cayman Liquidation Proceeding

3.      By way of background, in the Cayman Islands there is a statutory process under section 86 of the Companies Act (2022 Revision) ( which is the most up to date version of what was the Companies Law, 2020), ("**Companies Act**"), where any Cayman Islands company, a creditor or shareholder or, if the company is in liquidation, its liquidator, may apply to the Grand Court to sanction a compromise or an arrangement (referred to as a "**Scheme**") with the company's

137097.0001/2883290-1

shareholders or creditors, or a group of them with similar rights (a **"Scheme Class"**) (collectively **"Stakeholders"**).

4.        Pursuant to the Scheme, which is a court-approved statutory contract, Stakeholders are asked to give up or vary some of their rights as creditors or shareholders, usually for the purpose of reorganizing a company's capital and/or indebtedness.  For a company in liquidation, the Scheme must achieve a better result for the Stakeholders than would occur if there was a complete dissolution of that company and enable the company to continue as a going concern.  Where a liquidator proposes a Scheme, the Court will consider if it should be put to the approval of Stakeholders and if so then the Grand Court will order a meeting of Stakeholders to ensure that the necessary statutory majority of the Stakeholders of each and every Scheme Class of Stakeholders approves the Scheme.  Under the Companies Act, the Scheme will be binding on all those whose rights are to be compromised by the Scheme, including dissenters, if (i) approved by a majority in number (the **"Numerosity Requirement"**) representing 75% by value (the **"Value Requirement"**) of those attending and voting at the Scheme Class meeting and (ii) sanctioned by the Grand Court.

5.        A meeting for creditors to vote on a Scheme can be convened only by order of the Grand Court "in such manner as the court directs," which means the Grand Court will exercise its discretion about the procedure by which the meeting will be convened and also the mechanisms by which the statutory majorities will be calculated.  The Grand Court will give appropriate voting directions consistent with the statutory purpose.  Once the creditors approve a Scheme, then the Grand Court will decide whether to sanction it, which will include consideration of whether the proposed Scheme is fair

2

137097.0001/2883290-1

6.    In the Cayman Islands a company is insolvent if it is unable to pay its debts as they fall due, i.e. a cash flow insolvency.  A company which is cash flow insolvent but which can satisfy the Grand Court that it may be able to compromise with its creditors to give up or vary some of their rights to cure its insolvency may enter into provisional liquidation and have Joint Provisional Liquidators ("**JPLs**") appointed by order of the Grand Court to supervise and control the management of the company under the powers given to them by the Grand Court order and statute. The role of the JPLs includes the power to seek to achieve a compromise that maximizes the return to the company's Stakeholders while allowing the company to continue as a going concern.  The JPLs are court officers and act as independent fiduciaries to all Stakeholders.

7.    On July 15, 2020, based on a petition from a Luckin creditor, the Grand Court issued an order appointing JPLs under this statutory authority and their power included the power to explore a potential resolution with all of Luckin's creditors through the Scheme process.

8.    Under Cayman Islands law, Luckin investors who had commenced litigation or asserted claims against Luckin, such as the Lead Plaintiffs as well as the various plaintiffs who have asserted claims in other U.S. securities litigation against Luckin, have unliquidated, contingent claims against Luckin ("**Shareholders**").  As such, they are considered creditors of Luckin and in order for any Scheme to be approved by the Grand Court, Luckin would be required to provide for a resolution of all of these contingent claims.

9.    In addition, Luckin had creditors ("**Noteholders**") whose rights arose under the 0.75 percent convertible senior notes due 2025 which Luckin had issued ("**Notes**").   The commencement of winding-up proceedings and the appointment of the JPLs caused the Notes to default, meaning that Luckin's repayment obligations were accelerated and the debts due under the Notes were due and owing and not contingent.  In a liquidation, the Noteholders' and the

3

137097.0001/2883290-1

Shareholders' debts would rank equally for payment *pari passu* but the JPLs consider the Noteholders and the Shareholders to be two distinct Scheme Classes of creditors for the purpose of a Scheme. For a Scheme to be effective both Scheme Classes would have to vote for the Scheme.

## II.    Risks and Uncertainties to Recovery for the Class Through the Scheme

10.    In every Scheme, the Grand Court will decide the Scheme Class of creditors to be convened to vote on a Scheme and how those creditors in a Scheme Class should have their votes tabulated as to both the Numerosity Requirement and the Value Requirement. This determination will be made in accordance with Cayman Islands substantive and procedural law once a Scheme has been negotiated and presented to the Grand Court for voting at a convened creditors meeting.

11.    Given that the Shareholders' claims were contingent and not liquidated, there was no clear evidence of the value of any of the Shareholders' debts and so the JPLs would have to consider what approach should be taken in any Scheme to count votes to meet the Value Requirement and seek the approval of that approach by the Grand Court. However, any Shareholder could challenge the approach taken by the JPLs.

12.    For the Numerosity Requirement, there was also uncertainty as Cayman Islands law does not have an exact equivalent to U.S. Class Action claims where I am informed by U.S. Counsel that the exact numbers and identity of the Shareholders who would be parties to the case brought by the Lead Plaintiffs would not be known at the time of any meeting of Shareholders held for the purpose of voting on the Scheme. In that situation, the JPLs would have to consider what approach should be taken in any Scheme to count votes to meet the Numerosity Requirement and seek the approval of that approach by the Grand Court. However, any Shareholder could challenge the approach taken by the JPLs.

4

137097.0001/2883290-1

13.    An additional potential issue is that any Shareholder or any Noteholder could challenge the fairness of the Scheme treatment of either of the two Scheme Classes.

14.    Accordingly, although Lead Plaintiffs represented a putative class of Luckin Shareholders ("**Class**") under U.S. federal law in the federal securities class action ("**U.S. Federal Case**"), it was untested under Cayman Islands law whether that fact would constitute sufficient authority to negotiate and vote on behalf of each of these putative Class members.  It was also untested under Cayman Islands law how the aggregate value of the putative Class member claims would be determined.

15.    Lead Counsel began discussions with the JPLs to determine whether more certainty could be achieved about the ability of the putative Class in the U.S. Federal Case to achieve a resolution of their claims through the Scheme mechanism.  Lead Counsel shared with the JPLs and Luckin a detailed report, prepared in consultation with their experts, reflecting the calculation of aggregate Class damages.  Additionally, Lead Counsel initiated discussions with Luckin's counsel about agreeing to a motion to certify the U.S. Federal Case as a class action so as to facilitate settlement discussions and potentially mitigate a risk that a Scheme would not be approved by the Grand Court.

16.    Even with the certification of the U.S. Federal Case as a class action for purposes of reaching a settlement of the U.S. Federal Case with Luckin, and the appointment of Lead Plaintiffs to represent the interest of the Class members in the Scheme proceedings, there still existed considerable risk and uncertainty as to whether the Scheme would be achievable and ultimately benefit Class members.  In particular, as explained below, a number of Shareholders with divergent interests were opposed to the concept of Lead Plaintiffs acting as representative parties for Class members in the U.S. Federal Case for the purposes of any Scheme.

5

17.    In or around June 2021, the JPLs convened a special meeting of all known Shareholders and asked for all those Shareholders to form an Ad Hoc Committee of Creditors (the "**AHCC**") to collectively evaluate any proposals from Luckin and the JPLs for resolution through the Scheme.  After about 3 months of concerted efforts by the JPLs to bring about a consensus amongst all Shareholders on proposals by Luckin for terms of a Scheme, it became clear that several of the opt-out groups from the U.S. Federal Case, i.e., the Winslow Funds and the Kingstown entities, would not vote for a Scheme on the terms proposed and indeed would challenge the holding of meetings and outcome of any resolution voted for under the Scheme on the fairness basis.

18.    This compounded the uncertainty of how votes cast by Lead Plaintiffs on behalf of Class members in the U.S. Federal Case would ultimately be treated by the Grand Court.  Even if the requisite majorities to approve a Scheme were satisfied, to the extent it was approved on the basis of votes cast by Lead Plaintiffs on behalf of Class members, it was likely that the opt-outs would challenge the validity of any Scheme both in the Grand Court as well as in U.S. Bankruptcy Court.  In the event a Scheme was not approved by the Grand Court, or not recognized by the U.S. Bankruptcy Court, there was substantial risk that Luckin would not be able to exit liquidation proceedings in the Cayman Islands, which would have resulted in the Shareholders and the Noteholders ranking equally as creditors entitled to be paid out of the assets of Luckin.

19.    This was a particularly fraught position for the Class in this case.  This is because Luckin is a holding company and is the Ultimate Beneficial Owner through BVI and Hong Kong entities of operating companies in the PRC.  According to the JPLs' reports to the Grand Court, Luckin's main assets are its shareholding in the subsidiary companies.  The cash assets of shareholder equity raised in the IPO and SPO had been used to fund the subsidiary companies and

6

in particular the PRC operating companies. As of November 20, 2020, Luckin had approximately U.S. $27.9 million in cash in the Cayman Islands and its operating subsidiaries had approximately U.S. $700 million in cash held in the PRC. All money that would be made available for payment to creditors in a successful Scheme was contingent on a Scheme being voted for by the requisite number of Stakeholders holding sufficient value, then sanctioned by the Grand Court. In addition, the JPLs indicated in their reports and in discussions with the AHCC that any cash located in PRC had to be approved by the PRC authorities for distribution to Luckin given Luckin is located outside of the PRC. At the time of discussion of the Scheme, the required approval had been obtained for a limited amount of cash to be paid out of the PRC by the PRC operating company subsidiaries for the purposes of a Scheme or other resolution with creditors. Absent a successful Scheme or other resolution with creditors, any liquidators of Luckin would have had very limited cash assets and would have to attempt to realize the value of the assets of Luckin's operating subsidiaries in PRC through the ownership structure by taking control of the BVI and Hong Kong subsidiaries and then ultimately the operating companies in the PRC. A dissolution of Luckin would have rendered it extremely difficult (and expensive) for liquidators to recover any funds from Luckin subsidiaries, including those funds held by the PRC operating companies subsidiaries that were presently available for creditors at the time of discussion of a Scheme.

20.     Moreover, the existence of a liquidation in the Cayman Islands created an automatic stay on any litigation against Luckin and Chapter 15 recognition (which had been obtained) and meant there would be a stay on any U.S. litigation against Luckin unless court orders to lift the stay could be obtained. If the debts due to Class members in the U.S. Federal Case did not become liquidated and ascertained through a judgment in the U.S. Federal Case, then the Cayman Islands

7

liquidators would estimate the value of their contingent debts for the purposes of the liquidation and any challenge to that estimate would have to be brought in the Grand Court.

### III.    Resolution of the U.S. Federal Claims Through the U.S. Federal Court and Approval of the Settlement by the Grand Court

21.    Given the uncertainty as to whether Shareholders such as the Class in the U.S. Federal Case could achieve the certainty of recovery through the Scheme process and whether Luckin could achieve resolution of its debts and exit liquidation in the Cayman Islands, the JPLs authorized Luckin to engage in settlement discussions with the Lead Plaintiffs to resolve the Class claims through the U.S. Federal Case. The JPLs were of the view that resolving those U.S. Federal Case Class claims together with the Scheme to resolve the Noteholders claims would enable Luckin to return to solvency.

22.    The JPLs were kept apprised of the settlement discussions. Once an agreement was achieved, the JPL's were required to assess, consistent with its fiduciary obligations to all Stakeholders of Luckin, whether the agreement was fair and reasonable to all Stakeholders. Thereafter, the JPLs applied to the Grand Court for its approval of the settlement between the Lead Plaintiffs and Luckin, as was required by Cayman Islands law, by demonstrating the fairness and reasonableness of the compromise achieved. The Grand Court thereby issued an order approving the settlement.

I affirm under the laws of the United States of America that the above statements are true and correct, to the best of my knowledge and belief,

Executed this _8_ day of _June_ , 2022.

LAURA HATFIELD
Partner, Bedell Cristin Cayman Partnership

8