M7MKLUCH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In re Luckin Coffee Inc.
Securities Litigation,

                                    20 Civ. 1293 (JPC)

------------------------------x

                                    New York, N.Y.
                                    July 22, 2022
                                    11:00 a.m.

Before:

                 HON. JOHN PETER CRONAN,

                                    District Judge

                      APPEARANCES

BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
     Attorneys for Lead Plaintiffs
BY:  SALVATORE J. GRAZIANO
     DAVID L. DUNCAN

KESSLER TOPAZ MELTZER AND CHECK LLP
     Attorneys for Lead Plaintiffs
BY:  SHARAN NIRMUL

DAVIS POLK & WARDWELL
     Attorneys for Defendants Luckin Coffee Inc.
BY:  LAWRENCE J. PORTNOY
     JONATHAN CHANG

CAHILL GORDON & REINDEL LLP
     Attorneys for Underwriter Defendants
BY:  DAVID JANUSZEWSKI

GIBSON DUNN & CRUTCHER LLP
     Attorneys for Defendant Meier
BY:  EDWARD PATTERSON

(Case called)

MR. NIRMUL:  Good morning, your Honor.  Sharan Nirmul, Kessler Topaz Meltzer and Check, for the plaintiffs.

MR. GRAZIANO:  Good morning, your Honor.  Salvatore Graziano, Bernstein Litowitz, for the plaintiffs.

MR. DUNCAN:  David Duncan, also from Bernstein Litowitz, for the plaintiffs.

THE COURT:  Good morning, Mr. Nirmul, Mr. Graziano, and good morning, Mr. Duncan.

MR. PORTNOY:  Good morning, your Honor.  Lawrence Portnoy, Davis Polk & Wardwell, for Defendant Luckin Coffee.

MR. CHANG:  Good morning, your Honor.  Jonathan Chang, also from Davis Polk, for Luckin.

MR. JANUSZEWSKI:  Good morning, your Honor.  David Januszewski, from Cahill Gordon & Reindel, for the underwriter defendants.

MR. PATTERSON:  Good morning, your Honor.  Edward Patterson, from Gibson Dunn & Crutcher, on behalf of Thomas Meier.

THE COURT:  Great.

Good morning Mr. Portnoy, Mr. Chang, Mr. Januszewski, and Mr. Patterson.

I don't know if it hit the docket, but, Mr. Patterson, I signed your pro hac vice application.

MR. PATTERSON:  Thank you very much, your Honor.  I

M7MKLUCH

appreciate that.

THE COURT:  I believe that is everyone that I thought we'd have at the table today.

So we are, of course, here for a hearing on the lead plaintiffs' motion for approval of a class action settlement in this case, as well as a plan of allocation.  This motion is brought by the court-appointed lead plaintiffs and class representatives.

Those are -- and I will ask maybe Mr. Nirmul to make sure I'm pronouncing it correctly -- Sjunde?

MR. NIRMUL:  Sjunde AP-Fonden, your Honor.

THE COURT:  I'll call them AP7?

MR. NIRMUL:  AP7.

THE COURT:  And in Louisiana Sheriffs Pension Fund.

I've reviewed all the filings, including materials in support of the motion and the proposed allocation, as well as the one objection that I am aware of.

My thinking was to hear first from counsel from lead plaintiffs and then from Luckin's counsel and anyone else who wishes to be heard.  Obviously, don't feel the need to repeat anything in the papers, but I want to give you the opportunity to say anything you wish to, and I think I'll have some questions for counsel after that.  I may rule on the record.

Given that could cause this to be a relatively lengthy proceeding, if anyone needs to take a break at any point,

M7MKLUCH

including the reporter, please feel free to let me know.  I would expect to take a little break after I hear from the parties to finalize my findings, assuming that I do make my findings today.

So, Mr. Nirmul, is there anything you wish to address in addition to what's in your papers?

MR. NIRMUL:  Your Honor, lead plaintiffs --

THE COURT:  I apologize for interrupting you.

Certainly no one is required to, but under our current protocols, if counsel wishes to take off their mask while talking, you're welcome to do so.

MR. NIRMUL:  Thank you, your Honor.  I actually might do that, so I don't fog up my glasses.  Thanks very much.

Your Honor, lead plaintiffs and lead counsel are very pleased to submit for final approval this 175 million cash settlement reached with all the defendants in this matter.

We have submitted extensive briefing on the settlement.  Before your Honor are two motions, one for final approval and approval of the plan of allocation, and, in addition, a motion for attorneys' fees and expenses and expenses for the lead plaintiffs.  In support of those motions, Mr. Graziano and myself have submitted a joint declaration that lays out in great detail the efforts of our teams in bringing forth the settlement to court.  It was a very complex case, as the record reflects, your Honor.

In addition to our joint declaration, we have submitted affidavits in support of the lead plaintiffs from our bankruptcy counsel, Lowenstein Sandler, additional counsel for the lead plaintiff, the Klausner Kaufman firm, as well as affidavits from our Cayman counsel and PRC counsel, who assisted us in negotiating, as well as doing our due diligence, over the multijurisdictional issues that were present in this case.

THE COURT:  Can I just ask about the Cayman counsel briefly?

MR. NIRMUL:  Yes.

THE COURT:  Because you seek reimbursement for counsel that advised on the Cayman law and proceedings down there.  I know courts have approved reimbursement for retained bankruptcy counsel.  Do you know of any cases involving retained foreign counsel?  And, if not, would the situation of bankruptcy counsel be analogous here?

MR. NIRMUL:  So, with respect to foreign counsel, that's Bedell Cristin, we've paid them as an expense counsel. They aren't able to participate in a contingency fee arrangement because of their status as lawyers, so we are seeking reimbursement for their expenses as an expense in this litigation.  They haven't submitted a fee as Lowenstein Sandler has.  That will be paid out of the percentage fee that we're requesting.

M7MKLUCH

And with respect to bankruptcy counsel, yes, we have had other matters where Lowenstein Sandler, for example, has served as bankruptcy counsel and has submitted a fee request in conjunction with lead counsel.  Off the top of my head, I recall they participated in a case involving Delphi, they participated in a case with Mr. Graziano involving Refco, where they submitted a fee request.

THE COURT:  Are you aware of any objections to the attorneys' fees?

MR. NIRMUL:  There have been no objections to the attorneys' fees, your Honor.

THE COURT:  And the request for a fee, that would be 17.5 percent of the $175 million settlement fund, which comes to about $30,000,625; is that right?

MR. NIRMUL:  That's correct, your Honor, yes.

THE COURT:  That would be plus interest earned. Interest earned, would that be interest earned on the interest-bearing account?

MR. NIRMUL:  I think that's right.  I think that's approximately $224,000 interest that's been earned on the settlement fund to date.

THE COURT:  Could you say a little bit more about the 17.5 percent?  The lodestar analysis would put this on a little bit towards the higher end of settlements over $100 million; the 17.5 percent fee would be maybe even a little bit below the

M7MKLUCH

median recovery for similar settlement amounts.  So can you address why this is an appropriate amount here?

MR. NIRMUL:  Absolutely, your Honor.  So as we pointed out in our brief, with respect to the percentage that we're seeking, it is on the lower end of fees that have been approved by scores of courts in this circuit.  The percentage of the settlement fund methodology for assessing fees is widely accepted in this circuit and, in fact, is the preferred method because it promotes efficiency in litigation.  And I think it's reflected in the record, we've litigated this case very efficiently, very effectively, to get a quick result, but an outstanding result for the class.

The other thing I want to point out is that the fee percentage was negotiated by sophisticated lead counsel.  There were actually two fee retainers in this case, one with Louisiana and one with AP7.  The 17.5 percent reflects the lower of those two retainers, and so we think that it kind of reflects an arm's-length negotiation with sophisticated lead plaintiffs, institutional lead plaintiffs, over a fair fee in this matter.

With respect to the lodestar cross-check, we think it's within the range.  The lodestar cross-check is really an assessment of is the fee outrageous relative to the work performed, but, certainly, courts in this district have approved lodestar cross-checks up to a multiplier of six, and

so we're in the range.  But I think given the complexity of this case, given that there have been no objections, we've had over 46,000 claimants in this case, of which over 22,000 have been institutional investors, and none have raised an objection to the fee, I would think that evidences that it is fair and reasonable.

THE COURT:  And, here, the lodestar cross-check would be about 4.6, I think; is that right?

MR. NIRMUL:  That's correct, that's correct.

THE COURT:  Your motion also suggests that when I looked at the question of risk under Rule 23(e), I should look at the challenges approving liability and damages against any solvent defendants in the action.

My question is whether I should be only looking at solvent defendants.  It may not matter at the end of the day for the analysis, but wouldn't looking at only solvent defendants merge or confuse two inquiries here, one in proving liability and the other in the challenges in collecting judgment?  In other words, like it may be that an insolvent defendant may not be one that could be collected from if a finding of liability is made, but that defendant could become solvent, and there may be some value in a bankruptcy proceeding.

MR. NIRMUL:  I think there are two questions.

One is, yes, is there risk relating to the collection

M7MKLUCH

of a judgment against a viable defendant?  And, two, what are the risks relating to establishing liability against solvent defendants?  So we'll take a look at the solvent defendants that we understand exist — the underwriters, number one, and, two, some of the individual defendants.

So, based on our diligence and efforts in litigation, the individual defendants were all foreign residents.  So, with respect to establishing liability against them, while we may have been able to, for instance, against some of the executive defendants who were implicated in the fraud based on findings by Luckin, getting jurisdiction over them proved problematic at the outset.  We exercised service through the Hague.  None of them appeared in this case.  And so even if we were to achieve perhaps summary judgment or default judgment against them, then prosecuting those claims in China to obtain a judgment against them, we understood to be very difficult, if not impossible, if the PRC would recognize that judgment.

With respect to the outside director defendants, based on the record in this case, we understood them that they had due diligence defenses.  The fraud that we understood, based on the disclosures and our investigation, was one that really implicated the executive defendants.  And then the question was whether the outside directors, some of whom were very sophisticated individuals associated with large institutions, did they have any basis to believe, through due diligence, that

there was a fraud underway?  So that was a defense that they had, an affirmative defense, going to whether we could prove liability, but even if we were to establish liability against them, what would be the -- there was obviously a collectibility issue, and then an insurance issue as well, how much insurance did they have.  Luckin had very limited insurance.  All of that insurance has actually been contributed to this litigation.  I think it was about 20 million at the time this case was settled.

Then there's the underwriters.  And as with the underwriters, there were a couple of liability issues, important liability issues.  One was traceability with respect to the secondary offering because the underwriters are limited to -- their liability is limited to securities that can be traced to the sale in the offering, the secondary offering, which was approximately 400 million, I believe, that was raised in the open market and was limited to people who actually could prove that they purchased their shares from an underwriter. That was difficult from a liability standpoint.

With respect to the initial offering, as the record developed, it appeared that the fraud really began after the IPO, and so there was a risk of establishing that the underwriters were liable with respect to any diligence that they did in connection with the initial IPO.  So we had a substantial liability risk with respect to the initial public

offering, which provided the damages in this case.

The other issue with the underwriters is that they had indemnification claims against Luckin, and so we needed to resolve this case as a universal settlement with the underwriters because if we didn't do that, the insolvency proceeding in the Cayman Islands couldn't proceed because of these outstanding indemnification claims.  The settlement would have fallen apart had we not reached agreement with the underwriters as well as with Luckin.

So, I hope that addresses some of the liability issues.

THE COURT:  Okay.

MR. NIRMUL:  And just to put a final point on it, in terms of the adequacy of the settlement, I think the class' reaction is, I think, very important in this respect.  We've had more than 46,000 claimants in this case.  Their recognized losses are approximately 1.8 billion.  We've had only one objection, and that objection relates to the plan of allocation as it applies to an optionsholder — that's Mr. Rach.  He has not contested the adequacy of the settlement amount or the fee request.

THE COURT:  Mr. Rach is not in court today?

MR. NIRMUL:  I don't believe so.

THE COURT:  Apparently.

Let me ask about that.  Mr. Rach, his objection,

essentially, claims that the settlement doesn't treat class members equitably relative to each other, and I understand your reasons for why that objection, in your view, fails. But isn't that an objection also to the substantive fairness of the settlement, not just to the allocation? Do I look at it, also, under Rule 23(e)(2)(D), especially since he's pro se here?

MR. NIRMUL: Well, his objection is not that class members -- well, first of all, we have to go back to the definition of who's a class member. A class member is anyone who purchased an ADS. This case is limited to American depository receipts issued by Luckin and not to optionholders or transactions and put and call options. These were never part of this litigation.

So, with respect to the class as defined to be purchases of ADSs, the plan of allocation does treat them equitably because it assigns for each class member an inflation amount at the time that they transacted in Luckin securities.

What Mr. Rach is arguing is that because he transacted in puts and was put on a price of $28 a share at the time Luckin was trading at a substantially lower price — I think about $3 a share — his damages should be measured against that put transaction. And our response is, well, that's inequitable to the other class members, number one, because it values his claim relative to anyone else who purchased on that same day at a greater value. And the reason why he's saying that he should

be valued is because he had this collateral agreement to buy the shares at a different price than it was trading.

Now, if he had brought an options claim, if this case involved options, we would have had a plan of allocation that might have addressed that particular type of harm. But this case does not involve options, and, therefore, he does get his recognized loss under the plan — I think it's approximately $2,500 as opposed to the $28,000 he would prefer — but that $2,500 is consistent with how other class members who traded at the same time he did would be allocated a portion of the settlement.

THE COURT: I'm not sure it matters in terms of your argument against it, but isn't how you just described Mr. Rach's argument here essentially him saying that the settlement doesn't treat the class equitably, and perhaps that argument fails because he really would be under a different class here?

MR. NIRMUL: That's right. He wants to be treated differently than other class members, and that's why we believe his objection fails.

THE COURT: And I will just confirm with you: You're aware of no other objections that have been filed?

MR. NIRMUL: That's right, there have been no other objections filed.

THE COURT: And I also received the parties'

M7MKLUCH

supplemental letter that no one was paid, provided any

consideration to forego, withdraw an objection.  And that's

correct?

MR. NIRMUL:  That's correct, your Honor.

THE COURT:  That includes the plaintiffs in the

related action as well?

MR. NIRMUL:  That's correct, your Honor.

THE COURT:  And the only side agreement that the

parties have agreed to is the supplemental agreement mentioned

at paragraph 41 of the stipulation.  Is that still the case?

MR. NIRMUL:  That's right.  That would be the blow

provision agreement.

THE COURT:  Thank you.

If there's nothing else, I'll hear from Mr. Portnoy,

then.

MR. NIRMUL:  Thank you, your Honor.

MR. PORTNOY:  Thank you, your Honor.

I really have nothing to add.  I'd be pleased to

answer any questions the Court may have.

THE COURT:  Let me ask you one about the notice that

was sent pursuant to the Class Action Fairness Act to the

federal and state officials.  This may be a hypertechnical

reading of the statute, but the notice said that Luckin does

not know and cannot feasibly determine the names of individual

class members who reside in each state and, therefore, cannot

feasibly estimate the number of class members residing in each state or the proportionate share of the claims of such members to the entire settlement, which, I think, is pretty reasonable, given the size of this case.

But my question is whether that complies with the Class Action Fairness Act and, in particular, Section 1715(b)(7), where it says, when it's feasible, the notice must give the name of class members who reside in each state and the estimated proportionate share of the claims of each state's class action members being entitled to the entire settlement, but when it's not feasible to list names, the defendant must provide a reasonable estimate of the class members in each state and the proportionate share of claims attributable to each state.

So, in other words, (b)(7) seems to not contemplate what you did here, basically not even including an estimate, because of an inability to estimate it.  Again, I understand why that can be the case, but did that comply with 1715(b)(7), and, if not, does that matter?

MR. PORTNOY:  I think it does comply.  Just a bit of background, your Honor:  We don't know who our shareholders are, and the reason we don't know who our shareholders are is the vast majority of shares are held in street name by broker-dealers, and those broker-dealers maintain lists of the shareholders who have accounts with them.  But that's not

M7MKLUCH

information that Luckin, as issuer, has.  So, when the question is put to us, as it purports to be in the Class Action Fairness Act, who are your shareholders, where are they, in what states do they live, the answer is we don't know.

The practice that has developed with respect to those notices is that, because the issuer can't know, because plaintiffs' counsel can't know, because it's a very substantial undertaking to attempt to find out, the notices say exactly what our notice says here.  I'm unaware of this issue ever having prevented the approval of a class settlement.  I'm unaware of any state attorney general ever objecting on that ground or asking for more information.

So, it may not be completely satisfactory, but I can tell you, your Honor, this is the way it's been done without objection for quite some time.

THE COURT:  And I certainly think that makes sense.  And, here, no state attorney general or state official has objected to the notice?

MR. PORTNOY:  That's correct.

THE COURT:  And it does seem like, from our research, while this may not have come up before the Second Circuit, the Eighth and Sixth Circuits have considered this and have not found it to be a bar to approving the settlement.  So your explanation is very helpful.  Thank you.

Can you confirm, as well, like Mr. Nirmul did, that

the only side agreement remains what's mentioned in paragraph 41 of the stipulation?

MR. PORTNOY:  That's correct.

THE COURT:  And this was also in the letter I received earlier this week, but no payment or consideration was made to anyone to forego an objection, and that includes in the related actions?

MR. PORTNOY:  Absolutely correct, your Honor.

THE COURT:  It seems like in two of the related actions, Kingstown Capital, which is 20 CV 7029, and Ye, 21 CV 2020, the named plaintiffs have requested exclusion from the class here.  Is that right?

MR. PORTNOY:  That's correct, that's correct.  And those litigations remain pending.

THE COURT:  And also, I guess, Gopu, 21 CV 484, that remains pending as well?

MR. PORTNOY:  My understanding is that that case was consolidated into this case, your Honor, so it no longer exists as a separate action.

THE COURT:  And that one, even if it was not, because it was filed after, I believe it was, Judge Liman issued the consolidation opinion — I would need to check that — but, regardless, I assume that would fall under this settlement?

MR. PORTNOY:  It would.  As far as I know, there's no request to opt out by that particular plaintiff.  So that

plaintiff, assuming the settlement is approved, he will be barred from proceeding with that litigation.

THE COURT:  Let me ask both parties one other thing that I think is a pretty straightforward question.

The Second Circuit, in *Wal-Mart Stores v. Visa*, 396 F.3d, 96, back in 2005, talked about a presumption of fairness, adequacy, and reasonableness that can attach to a settlement reached after an arm's-length negotiation between experienced capable counsel after meaningful discovery.

Some district courts have said that presumption survived the amendments to Rule 23(e).  I assume that's your view?  And do you know if the Second Circuit has chimed in on that?

MR. PORTNOY:  I don't know.  And to be brutally frank, your Honor, I don't have a view on that particular legal issue. What I can say in this case is even without a presumption, the facts are obvious that this was a hard-fought negotiation between very experienced counsel, with a lot of money at stake.

THE COURT:  Maybe I'll ask Mr. Nirmul this as well, but I guess when I'm looking at the *Grinnell* factors concerning Luckin's ability to withstand a judgment, when the plaintiffs first sued here, Luckin was in clearly dire financial shape. It seems like the company has rebounded a bit since then.  CNN reported that in the first quarter of 2022, the revenues jumped over almost 90 percent, and at least from checking a stock

price as to the close of the market yesterday, it seemed to be about at $14.89.

How did that factor into the analysis here?

MR. PORTNOY:  During the course of the negotiations, we spent a lot of time with plaintiffs with respect to Luckin's financial condition.  We provided a lot of information to them. They were able to make whatever judgment they felt they needed to make to determine that the settlement we were negotiating was satisfactory.

Since that agreement, Luckin has done well in some measures, not done well in other measures, and still faces some liability in connection with the events of early 2020 and also faces substantial issues in terms of expatriating cash from China, which is a very fundamental issue here.  So there is real complexity surrounding the ability-to-pay issue.  I think for purposes of today, the relevant inquiry is did plaintiffs secure absolutely everything they could based on our condition then and based on what we were willing to do to resolve this liability, and I would certainly offer the opinion that, in fact, they did.

THE COURT:  Let me turn back to Mr. Nirmul and ask if you have anything else you wish to add on either of those two issues, whether the presumption from *Wal-Mart* survives the amendments to Rule 23(e) and also as to Luckin's current financial situation, and how that impacts the proposed

M7MKLUCH

settlement.

MR. NIRMUL:  Yes, your Honor.

With respect to the question of whether the presumption applies, we certainly presented our view in our papers that that presumption still is a valid consideration, and there's certainly case law that supports that proposition cited in our brief.

The one thing I would note, an additional fact with respect to the negotiations in this case, they were absolutely contentious for an extended period of time.  There was assistance from the JPL, the joint provisional liquidators, who were overseeing the insolvency proceeding in the Cayman Islands, and so they had engaged with lead plaintiffs at the outset to attempt to bring the parties to the table.  And with respect to the exchange of information, they were very much involved in getting information to us.  They acted as fiduciaries with respect to their position in the insolvency proceeding in the Cayman Islands.

And so, in part, there were negotiations directly between lead counsel and Luckin's counsel, but, in addition, there was an independent body that was, through the Caymans proceeding, overseeing the entire process.

THE COURT:  Does anyone have an objection to me making findings of fact and conclusions of law on the record today, as opposed to in a written opinion?  In other words, the best I

M7MKLUCH

can tell, two statutes would require a written opinion in a class action:  Settlement 1713 would require it if the settlement would entail a class member paying sums to class counsel that would result in a net loss to class members, and 1712(e) applies to coupon settlements.  Neither of those really apply here.

So, Mr. Nirmul, is there any objection on your end to me ruling on the record?

MR. NIRMUL:  I have no objection, your Honor.

THE COURT:  Mr. Portnoy?

MR. PORTNOY:  No objection, your Honor.

THE COURT:  Let me also ask counsel at the table for Defendant Meier and for the underwriter defendants if either of you have anything you wish to add this morning?

MR. JANUSZEWSKI:  Thank you, your Honor.

David Januszewski, underwriter defendants.  We have nothing to add.

THE COURT:  Mr. Patterson?

MR. PATTERSON:  Thanks, your Honor.  The same situation for us, nothing further to add.

THE COURT:  Let's take a 15-minute break.  I just want to go back and digest what we discussed, and then I'll turn to read my ruling into the record.  Thank you.

COUNSEL:  Thank you, your Honor.

(Recess)

THE COURT:  I'll confirm once again for the record that no one who wishes to object to the proposed settlement has joined since this morning, and that still appears to be the case, and no one has spoken up.

I will now issue my findings and rule on the motion to approve the class action settlement and allocation, which, for reasons that follow, I will approve, and I will assume the parties' familiarity with the background of this litigation, as well as the terms of the proposed settlement.

I first turn to whether the class members had adequate notice of the proposed settlement.  For notice to be adequate, it must meet the requirements under Federal Rule of Civil Procedure 23, the United States Constitution, Local Rule 23.1, and the Private Securities Litigation Reform Act, or the PSLRA.

"The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness."  *Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 113 (2d Cir. 2005).  Although there are no rigid rules to determine whether notice is sufficient, a notice by mail usually suffices when it informs class members about the time and place of the fairness hearing, how to obtain more information about the settlement, the time limits and procedural requirements set by the court for objecting to the settlement, and the key terms of the settlement in sufficiently understandable language to permit

class members to decide whether to object and to frame their objections. A cite for that is *Fleisher v. Phoenix Life Insurance Company*, 2015 WL 10847814, at *11, a Southern District of New York case from Judge McMahon from September 9, 2015.

Similarly, the Second Circuit in *Wal-Mart Stores* held that notice need only tell members about the terms of the settlement and members' available options in connection with the settlement. Local Rule 23.1 also requires that the class notice include a statement of the names and addresses of the applicants for attorneys' fees and the amounts requested respectively and shall disclose any fee-sharing agreements with anyone.

The PSLRA adds another layer of requirements for settlement notices. Under this law, any notice must include: (A) statement of plaintiff recovery; (B) statement of potential outcome of case; (C) statement of attorneys' fees or costs sought; (D) identification of lawyers' representatives; (E) reasons for settlement; and (F) any other information required by the court, and it also requires a page summarizing these statements. That statute is at 15, United States Code, Sections 77z-1(a)(7) and 78u4-(a)(7). Here, the settlement notice packet includes the settlement amount, the reasons why the parties are proposing the settlement, the class definition and exclusions from it, the estimated average recovery per

M7MKLUCH

affected Luckin American Depository share, or ADS, the maximum attorneys' fees and expenses sought, the right of class members to object to the settlement, the binding effect of a judgment on class members, the dates and deadlines for certain settlement-related events, the opportunity to obtain more information about the action and the settlement by calling a toll-free number available 24 hours each day of the week contacting -- by contacting class counsel or the claims administrator, or by visiting the website.  The packet included the allocation plan and also information on how to submit a claim form to be eligible to receive a distribution from the settlement fund.  And that can be found at Docket 327, Exhibit 3, which is the Villanova declaration, and as Exhibits A and B attached to that declaration.

The class notice administrator, Epiq Class Action & Claims Solutions, Inc., mailed the settlement notice packet to all potential class members and nominees who previously received the class notice, and that was done on November 15, 2021, and also mailed the settlement notice packet to all potential class members who Epiq identified through reasonable efforts after that time of the initial mailing.  That's at Villanova declaration, paragraphs 5 through 8.

Epiq also published a summary settlement notice in the Wall Street Journal and over PR Newswire on November 30, 2021, and on November 15, 2021, Epiq also updated the website for

class notice, which is at www.luckincoffeesecuritieslitigation.com, to provide information about the settlement, including downloadable copies of the settlement notice, claim form, stipulation, preliminary approval order, and complaint.  All of that is contained in the Villanova declaration.

I find that the notice of the settlement complied with my preliminary approval order.  The notice also constituted the best notice practicable under the circumstances, amounted to a notice that was reasonably calculated to inform class members of their rights under the settlement, and complied with Federal Rule of Civil Procedure 23, Local Rule 23.1, the United States Constitution, and the PSLRA.

Defendants in a class action have another notice requirement under the Class Action Fairness Act, or "CAFA." Under that law, each defendant that is participating in the proposed settlement must serve the appropriate federal and state officials — typically the Attorney General of the United States and the person in the state who has the primary regulatory or supervisory responsibility with respect to the defendant.  That requirement is at 28, United States Code, Section 1715(a) and (b).  And the defendants must do so no later than ten days after a proposed settlement is filed in court under the statute.  The notice must include:  (1) the complaint and any amended complaint; (2) notice of any

M7MKLUCH

scheduled judicial hearing; (3) any proposed or final notice to class members of their rights to request exclusion, if such rights exist, and of the proposed settlement; (4) any proposed or final class settlement; (5) any settlement or other agreement contemporaneously made between class counsel and counsel for the defendants; (6) any final judgment or notice of dismissal; (7) either the names of the class members who reside in the state, if feasible, or if not feasible, a reasonable estimate of the number of class members residing in the state; and (8) any written judicial opinions relating to the materials described in the third through sixth requirements I just mentioned.  Again, that's at Section 1715(b).

Luckin Coffee meaningfully complied with CAFA's requirements.  Luckin filed the proposed settlement on October 25, 2021.  Ten days later, on November 4, 2021, Epiq sent CAFA notice packets on behalf of Luckin to 57 state and federal officials that included the Attorney General of the United States and each of the 50 states, the District of Columbia, and the U.S. territories.  That's contained at Docket 321, which is the Fiereck declaration.  And these packets included nearly all the materials required by Section 1715.

That said, as discussed earlier, the cover letter stated that Luckin does not know and cannot feasibly determine the names of individual class members who reside in each state, and therefore cannot feasibly estimate the number of class

M7MKLUCH

members residing in each state, or the proportionate share of the claims of such members to the entire settlement.  Under the strict terms of 28, United States Code, Section 1715(b)(7), defendants must provide notice to state officials with either the names of class members who reside in the state, if feasible, or if not feasible, a reasonable estimate of the number of class members residing in the state.  By its terms, CAFA does not contemplate a scenario where it is not feasible for a defendant to at least estimate the number of class members in a state.

With that said, even if this is not technically in strict compliance with Section 1715(b)(7), it does not bar approval of the settlement.  To begin with, "Congress enacted the CAFA notice requirement to provide a check on inequitable settlements, and it emphasized that the statute was not intended to allow settlement class members to walk away from an approved settlement based on a technical noncompliance."  And that was quoted from *In Re Uponor, Inc., F1807 Plumbing Fittings Product Liability Litigation*, 716 F.3d 1057, 1064-65 (8th Cir. 2013).

So, when, as here, no federal or state official has objected to the proposed settlement agreement, courts have found that a technical error involving this notice requirement does not warrant declining to approve the class settlement. There are a few cites for that.  For example, *Emeterio v. A & P*

*Restaurant Corporation*, 2022 WL 252065, at *2 (S.D.N.Y. Jan. 26, 2022).  And in *Emeterio*, the Court said, although the notice requirements under CAFA have not been fully met on a technical basis, the substance of the requirements have been satisfied insofar as giving federal and state officials sufficient notice and opportunity to be heard concerning the settlement.  The Eighth Circuit case from 2013 I just mentioned, *Uponor*, similarly upheld the class action settlement where the CAFA notice only said that "it is not feasible to provide the names of all class members in each state," and no state attorney objected.

And *In Re Packaged Ice Antitrust Litigation*, 2018 WL 4520931, at *7, the Sixth Circuit, in 2015, upheld that withholding approval when the CAFA notice did not provide either the names or an estimate of the number of class members in each state and an estimate of their proportionate share of the claims because no attorney general objected, and, for that reason, the Sixth Circuit found it to be a mere technical error.

This view tracks how courts have dealt with other technical errors involving CAFA's requirements.  For example, in *T.K. Through Leshore v. Bytedance Technology Company*, which is 2022 WL 888943, at *10, the Northern District of Illinois in 2022 approved a class action settlement even though the CAFA notice was sent "eleven days after the plaintiffs filed their

motion for preliminary approval of the proposed settlement," and in *Beaty v. Continental Automotive Systems U.S.*, 2012 WL 1886134, at *5, *9, the Northern District of Alabama, in 2012, granted time approval of the class action settlement even though the defendant provided notice to the relevant attorneys general 16 days after filing the proposed settlement with the court.

I, therefore, find that even assuming there was any technical error under Section 1715(b)(7), it would not matter here.  Luckin meaningfully complied with Section 1715(b) in its state and federal official notices, given the content of those notices.

Lastly, because more than 90 days have passed since Epiq served the appropriate federal and state officials, CAFA does not bar approving the class settlement today.  That is because under Section 1715(d), an order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate federal official and the appropriate state official are served with the notice and, again, more than 90 days have passed.

In a moment, I will respond to the one objection I have received, but, first, I find that the parties complied with Rule 23(e)(5)(B)(i) because they did not pay, or provide other consideration, to anyone to forego or withdraw an objection.

Under Rule 23(e), I may only approve a proposed class settlement that binds class members if, after holding a hearing, I find that the settlement is "fair, reasonable, and adequate."  That's Rule 23(e)(2).  "In reviewing a proposed settlement, I 'act as a fiduciary who must serve as a guardian of the rights of absent class members,'" and that's a quote from *McDaniel v. County of Schenectady*, 595 F.3d 411, 419 (2d Cir. 2010).

After a 2018 amendment to Rule 23, Rule 23(e)(2) now lists several factors that I must consider in making this assessment.  These factors are not exclusive, however.  The advisory committee's notes on Rule 23(e)(2) say that the amendment does not displace any factor previously adopted by any United States Court of Appeals.  Instead, the listed factors are meant to focus a court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.  Many factors in Rule 23(e)(2) have long been used as part of the nine-factor test that the Second Circuit adopted in 1974 in *City of Detroit v. Grinnell Corporation*, 495 F.2d 448, 463.  To the extent that certain *Grinnell* factors are not encompassed by the analysis under Rule 23(e)(2), I will discuss those factors separately.

In determining whether a settlement is fair, reasonable, and adequate, courts must consider both the settlement's terms and the negotiation process leading to

settlement.  The cite for that is *Wal-Mart*, 396 F.3d at 116. In other words, courts must review settlements for both procedural and substantive fairness.  *Christine Asia Company v. Yun Ma*, 2019 WL 5257534, at *9, a Southern District of New York case from Judge McMahon from 2019 is the cite for that.

I will start with the procedural fairness for the settlement.  Rule 23(e)(2)(A), which requires adequate representation, and Rule 23(e)(2)(B), which requires arm's-length negotiations, constitute the procedural analysis of the fairness inquiry.  The cite for that is *Christine Asia Company* again, 2019 WL 5257534, at *9.  These factors largely track how courts traditionally have analyzed procedural fairness.  "A proposed settlement is procedurally fair when it is reached through arm's length negotiations between experienced capable counsel and after meaningful discovery." That is a quote from *In re Bear Stearns Companies, Inc. Securities, Derivative, and ERISA Litigation*, 909 F.Supp.2d 259, 265 (S.D.N.Y. 2012).

The parties have amply satisfied the standard for procedural fairness.  As I will discuss in greater detail when discussing attorneys' fees, the parties are represented by highly experienced and capable counsel.  They engaged in substantial arm's-length negotiation and the lead plaintiffs have invested significant time overseeing this case.  And the lead plaintiffs and class counsel have engaged in meaningful

Discovery.  They have reviewed documents, located and interviewed witnesses in China, consulted experts, and navigated Luckin's complex Cayman Islands insolvency proceedings and circumstances with Chinese regulators with help from a Chinese Law Firm.  This has provided the lead plaintiffs and class counsel with sufficient information to assess the adequacy of the settlement.

I therefore find that the settlement is procedurally fair.

I will now analyze the substantive fairness of the settlement, and I find the settlement to be substantively fair. Prior to the 2018 amendments to Rule 23(e), the Second Circuit instructed that, when, as here, a settlement emerges from arm's-length negotiations between experienced, capable counsel after meaningful discovery, it is afforded a presumption of fairness, adequacy, and reasonableness.  The cite for that is *Wal-Mart* again, 396 F.3d at 116.  But even if this presumption were not to survive that rule amendment from 2018, for reasons that follow, I would still find the settlement to be substantively fair.

I will begin with Rule 23(e)(2)(C), which considers whether the relief is provided to the class is adequate.

Rule 23(e)(2)(C)(I) considers the costs, risks, and delay of a trial and appeal.  "Securities class actions are by their very nature complicated."  That's a quote from *City of*

*Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at a Southern District of New York case from May 2014, which the Second Circuit affirmed.

This case is no exception.  This is a complex case involving alleged fraud by a foreign company.  There is a foreign insolvency and a U.S. bankruptcy proceedings.  In over two years and over 9,000 hours by class counsel, the case still has not gotten past the motion-to-dismiss stage.  Lead counsel has conducted an extensive investigation, including review of Chinese documents.  If this case proceeds, the costs would continue to rise and likely skyrocket.  Foreign discovery would need to take place against Luckin, a Cayman Islands corporation with its principal offices in China, and also against foreign nationals in China.  And some of this discovery would lie outside of my subpoena power.  And I note or cite *Teachers Retirement System of Louisiana v. A.C.L.N., Ltd*., 2004 WL 1087261, a Southern District of New York case from May 2004, where a settlement was approved, in part, because a foreign corporation and witnesses were beyond the subpoena power of the court.

In considering the risks here, I have looked at establishing liability as to all defendants.  While it may be that a finding of liability against a judgment-proof defendant would have little value, an adverse judgment against such a defendant could still have some value.  For example, such a

M7MKLUCH

defendant may become solvent or the judgment may have some value in a bankruptcy or liquidation.

And I agree that there is a significant risk if this case proceeds.  At the time the parties reached an agreement in principle to settle the case, there were pending fully briefed -- there was a pending fully briefed motion to dismiss the consolidated class action complaint.  Even if the lead plaintiffs' claims survived dismissal, they would face substantial challenges in proving what defendants were liable for the alleged misstatements and omissions.  And to establish this liability may have depended on the testimony of witnesses who are employees, agents, or affiliates of Luckin, and therefore likely to be hostile.

There also may be challenges involving class certification.  I only certified the class for settlement purposes.  If I deny this settlement and the case were to proceed, defendants may oppose any motion for class certification.  A contested motion would increase the parties' expenses and further delay proceedings.  And even if I were to certify the class, multiple subclasses might emerge for different groups of investors based on, for instance, when the investor bought or sold the securities.  There are also the challenges surrounding how the Cayman Islands Grand Court would treat the class in the proceedings there.

Other challenges abound.  There are the inherent

complexities in calculating damages and establishing loss causation in securities class actions.  This would likely involve a battle of experts to resolve the issues.  And even if the class won at the summary judgment or trial stage, it is unclear that they could enforce the judgment as many foreign defendants have refused to appear, and there is the question of whether the Chinese government would recognize the U.S. judgment.  All these facts point towards approving the settlement.

I will now turn to Rule 23(e)(2)(C)(ii), which looks at the effectiveness of the proposed method of distributing relief to the class, including the method of processing class member claims.

The proposed distribution method here is effective and adequate as well.  The proposed distribution method tracks the standard method routinely approved in securities class action cases.  The claims administrator, Epiq, will review and process all claims received and provide claimants with an opportunity to cure any deficiency or request judicial review of the denial of their claims, if applicable, and will ultimately mail or wire authorized claimants their pro rata share of the net settlement fund, as calculated under the plan.  This is set forth in the stipulation at Docket 315, paragraph 26, and I cite again *Christine Asia Company*, 2019 WL 5257534, at *14, which stated that the following plan is standard in securities

and effective.  "The claims administrator will review and process all claim forms received, provide claimants with an opportunity to cure any deficiency in their claim or request review of the denial of their claim, and ultimately mail a check to or wire authorized claimants their pro rata share of the net settlement fund as calculated under the plan of allocation, upon approval of the Court."  That is what the allocation would entail here.  Plus, none of the settlement will revert to Luckin, ensuring that the class will receive the full amount of the relief.  I cite *Christine Asia Company*, as well, for that consideration.

Rule 23(e)(2)(C)(iii) considers the terms of any proposed award of attorneys' fees, including the timing of any payment.  I have considered the requested fees and find that the proposed award and timing is fair, reasonable, and adequate.

As I will detail later, the proposed 17.5 percent in attorneys' fees and $721,462.68 in litigation expenses are reasonable given the work of plaintiffs' counsel, their investment of resources in the case, their prosecution of the action for the benefit of the class, the risks that they faced in the litigation, and the overall benefit of the settlement achieved.  *Christine Asia Company* is the cite for that as well.

Importantly, the settlement agreement does not hinge on me approving the requested fees and expenses.  "In the

agreement, at paragraph 19, any disapproval or modification of an application for an award of attorneys' fees and/or litigation expenses by the Court shall not affect the agreement's enforceability."  And, again, a quote from *Christine Asia Company*, 2019 WL 5257534, at *15.  Most importantly, with respect to the Court's consideration of the settlement's fairness, the approval of attorneys' fees is entirely separate from approval of the settlement; neither plaintiffs, nor plaintiffs' counsel may terminate the settlement based on the ultimate award of attorneys' fees or expenses.  *In re Hudson's Bay Company Data Security Incident Consumer Litigation*, 2022 WL 2063864, at *9.  There, the Court similarly placed weight on the fact that the settlement agreement provided that in the event the Court rejects or modifies the motion for fees and expenses, such an order shall not serve as a basis to avoid or terminate the settlement agreement.

Rule 23(e)(2)(C)(iv) considers any agreement that must be identified under Rule 23(e)(3).  Rule 23(e)(3), in turn, requires the parties seeking judicial approval of a class settlement to file a statement identifying any agreement made in connection with the proposal.  As the rule makes clear, the statement need only describe the side agreement's terms -- I'm sorry.  As the rule makes clear, the statement need not describe the side agreement's terms, rather only identify the

agreement.  The only side agreement that the parties entered into was a confidential supplemental agreement about requests for exclusion.  That's at paragraph 41 of the stipulation.  The side agreement allowed Luckin to end the settlement if I had allowed a second opt-out opportunity and the total damages of those who validly requested exclusion exceeded certain conditions.  That's discussed at page 21 of the motion.  That agreement is now moot.  It is also standard in securities class action settlements, have no negative impact on the fairness of the settlement, and, like I said, is moot because I did not allow a second opt-out.  In any event, the parties adequately identified the side agreement under Rule 23(e)(3), and I find this requirement met as well.

Next, I find that the settlement treats class members equitably relative to each other for purposes of Rule 23(e)(2)(D).  Plans like the one here are standard in securities class actions.  And courts routinely say that they are equitable.  And that makes sense.  The plan permits all authorized claimants to receive their pro rata share of the net settlement funds based on the amount of their recognized loss calculated under the plan of allocation.  Support for this being equitable is, again, *Christine Asia Company*, 2019 WL 5257534, at *15.

Now, despite the routine allocation plan, the one objector, Mr. Robert Rach, claims that the settlement did not

M7MKLUCH

treat class members equitably, and I therefore should reject the plan of allocation.  Given that Mr. Rach is proceeding pro se, I will liberally construe his objection as one to both the substantive fairness of the settlement, as well as the plan of allocation, and I will reject that objection.

First, a little bit of background is in order. Mr. Rach had a put option to buy Luckin Coffee's ADSs for $38 per share.  That's revealed at Docket 321, which is his objection at page 2.  On February 5, 2020, he exercised the option and bought 1,000 shares at $38 per share despite the share trading on the market at $3.81 per share and closing that day at 39 cents per share.  The proposed plan of allocation assesses the loss amount as the lesser of (a) the purchase price calculated as I just discussed minus the sale price; and (b) the artificial inflation on the day of purchase minus the artificial inflation on the day of sale.  That's at paragraphs 4 and 7 of the proposed plan of allocation.  Mr. Rach contends that the plan should calculate his loss based on the price he paid for the shares, minus the amount received to undertake the options contract.

I find that objection to be unpersuasive.  To calculate Mr. Rach's losses the way he suggests would be unfair to other class members.  The additional damages that Mr. Rach suffered because he entered into a put option contract — requiring him to buy Luckin's ADSs at $38 in April 2020 rather

M7MKLUCH

than at the market price that day — were damages attributable to him trading in Luckin options rather than trading in Luckin ADSs.  Yet, the class does not include option buyers, no claims were asserted on behalf of purchasers of options, and no claims related to trading in options are released under the settlement.  It is reasonable not to include extra compensation for options trading based on trades that are not included in the class or part of the claims in this case.

I will now turn briefly to the *Grinnell* factors.  I have considered all the *Grinnell* factors and find that they point to affirming the class settlement.  In analyzing Rule 23(e)(2)'s factors moments ago, I also applied many of the *Grinnell* factors, including the complexity, expense, and likely duration of the litigation, the stage of proceedings and amount of discovery, the risks of establishing liability and damages, and the risks of maintaining the class action through trial.  I will not repeat that, as I'm sure everyone will appreciate, but I will detail the remaining *Grinnell* factors.

Among the most significant *Grinnell* factors a court weighs in considering a class settlement is how the class has reacted.  The cite for that is *In re MetLife Demutualization Litigation*, 689 F.Supp.2d 297, 333 (E.D.N.Y. 2010).  Here, the class has reacted very favorably to the proposed settlement.  After sending out over 560,000 settlement notices, only one person objected by the June 24, 2022 deadline.  As Judge

Buchwald has put it in the *In re IMAX Securities Litigation*, at 283 F.R.D. at 190, a single objector "is but a whisper amidst an otherwise thundering roar of silence."

Next, I find that the settlement is reasonable compared to the possible recovery. In considering this factor, I must judge the settlement in light of the strengths and weaknesses of plaintiffs' case, and not in comparison with the possible recovery in the best of all possible worlds. That is also citing Judge Buchwald in *In re IMAX Securities Litigation*.

In other words, I must examine whether the settlement amount lies within a range of reasonableness reflecting the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion. The cite for that is *Wal-Mart*, 396 F.3d at 119.

Here, the lead plaintiffs' damages consultant has estimated that the class' maximum aggregate damages are approximately $2.75 billion. That's at paragraph 90 of the joint declaration. That means that the $175 million settlement represents approximately 6.4 percent of the maximum damages that the class could establish. Given the inherent risks and weaknesses in plaintiffs' case, this settlement amount is within the range of reasonableness. Indeed, it is in line with other settlements in securities class actions. For securities class actions between 2012 and 2021 with estimated investor

losses of 1 to 5 billion dollars, the median settlement recovery is 1.3 percent of estimated damages. That's coming from NERA Economic Consulting, Recent Trends in Securities Class Action Litigation, and it's the 2021 full-year report at page 23. I also cite *In re Giant Interactive Group, Inc. Securities Litigation*, 279 F.R.D. 151, 162-63, a 2011 Southern District of New York case where the court commented that the average settlement in securities class actions ranges from 3 to 7 percent of the class' total estimated losses.

Lastly, I find that the ability of defendants to withstand greater judgment is neutral on whether to approve the proposed settlement. When the plaintiffs first sued, Luckin was in dire financial shape. But since that time, Luckin seems to have rebounded financially. In the first quarter of 2022, at least according to a CNN article, its revenues jumped about 90 percent. And the stock price appears to have closed last night at $14.89. But, still, when, as here, other factors weigh in favor of approval, this factor alone did not suggest that the settlement is unfair. Once again, I'm citing *Christine Asia Company*, 2019 WL 5257534, at \*14.

Finally, to warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized — namely, it must be fair, adequate, and reasonable. And that is citing *In Re WorldCom, Inc. Securities Litigation*, 388 F.Supp.2d 319, 344 (S.D.N.Y. 2005). As many

courts have held, a plan of allocation need not be perfect. Judge Leisure commented in *RMED International, Inc. v. Sloan's Supermarkets*, 2000 WL 420548, at *2, that aggregate damages in securities fraud cases are generally incapable of mathematical precision.  Rather, an allocation formula need only have a reasonable rational basis, particularly if recommended by experienced and competent class counsel.  That's from *WorldCom* as well, 388 F.Supp.2d, at 344.  Thus, in determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel.  In re EVCI Career Colleges Holding corp. Securities Litigation, 2007 WL 2230177, at *11, a 2007 case from Judge McMahon.  And, generally, a plan of allocation should reimburse class members based on the relative strength and value of their claims.  *In re Signet jewelers Ltd. Securities Litigation*, 2020 WL 4196468, at *13, a Southern District of New York case from 2020.

And, here, the proposed plan of allocation, developed by the plaintiffs' damages expert alongside plaintiffs' counsel, reflects an assessment of the damages that the plaintiffs claim could have been recovered under the theories of liability asserted in the action.  The plan has a clear rational basis, equitably treats the class members, and was devised by experienced and qualified class counsel.  I therefore find that the plan is fair, reasonable, and adequate.

I will now turn to the requested attorneys' fees.

Class counsel seeks a fee award of 17.5 percent of the settlement fund of $175 million along with reimbursement for litigation expenses.

In reviewing this fee application, I must act as a fiduciary who searches as a guardian of the rights of absent class members and must perform a searching assessment regarding attorneys' fees.  The cite for that is *McDaniel*, 595 F.3d at 419.  The fee award must reflect the actual effort made by the attorney to benefit the class.  The cite for that is from the Second Circuit in 2007 from *Central States and Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 249.

In common fund cases, courts typically use either the lodestar method or the percentage-of-fund method to compute attorneys' fees.  Under both approaches, courts consider various factors in assessing the reasonableness of a fee, including:  (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.  *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50, a Southern District of New York case from 2000, is a cite for that.

In the end, it is up to me rather than counsel to choose whether to use the lodestar or percentage methods.

*Allen v. Taylor*, 795 F. App'x 79, 80, a Second Circuit summary order from 2020. With that said, in common fund cases, the percentage-of-funds method is generally preferable because that method directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation. *Wal-Mart*, 396 F.3d at 121. The lodestar method, in contrast, creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of line-item fee audits. And that's citing to *Wal-Mart* as well.

Besides the general disincentives created by the lodestar method, there are statutory considerations in securities fraud cases as well. The PSLRA expressly contemplates that attorneys' fees should be calculated using the percentage method. The cite for that is Judge Kimba Wood's decision in *Woburn Retirement System v. Salix Pharmaceuticals, Ltd.*, 2017 WL 3579892, at *7. And, indeed, quoting the PSLRA, that statute says that the "total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." That's at 15, United States Code, Section 78u-4(a)(6).

I'll therefore follow the general trend in this circuit of using the percentage method. I will, however, use

the lodestar method to cross-check that the awarded attorneys' fees are reasonable.  And as the Second Circuit commented in *Goldberger*, at 209 F.3d at 50, the circuit encourages the practice of requiring documentation of hours as a cross-check on the reasonableness of the requested percentage.  But I will also note that when using the lodestar method as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court.  Again, citing *Goldberger*.

One point before analyzing the requested fee:  Both of the lead plaintiffs entered into retainer agreements with the class counsel firms at the outset of the litigation.  That's at paragraph 123 of the joint declaration.  The Louisiana Sheriffs' retention agreement would have authorized a fee request of up to 25 percent of the net settlement, while AP7's retention agreement limits class counsel's fee to 17.5 percent.

Because the requested fee is based on the more restrictive retainer agreement, class counsel contends that the PSLRA requires that I afford a presumption of reasonableness to the requested fee.  That is the view that the Third Circuit and other judges in this district have adopted, essentially, that before-the-fact litigation agreements with lead plaintiffs create a presumption of reasonableness.  The Third Circuit found that *In re Cendant Corporation Litigation*, 264 F.3d 201, 282, that was in 2001.  And that has been found by judges in

M7MKLUCH

this district, namely, Judge McMahon in *In re Marsh & McLennan Companies, Inc. Securities Litigation*, 2009 WL 5178546, at \*15, and by Judge Cote in *In re Credit Default Swaps Antitrust Litigation,* 2016 WL 2731524, at \*16.  But it does remain an open question in this circuit whether the PSLRA creates a presumption of reasonableness for fees agreed upon by the lead plaintiff.  That's quoting from *In re Nortel Networks Corporation Securities Litigation*, 539 F.3d 129, 132, a Second Circuit case from 2008.

So I do not reach this issue.  As I will explain in a moment, even without the presumption, I find that the requested fee is reasonable.  In analyzing the requested fee, though, I am giving serious consideration to the negotiated fee because PSLRA lead plaintiffs often have a significant financial stake in the settlement, quoting *Nortel*, 539 F.3d at 133-134.

I'll start with the first *Goldberger* factor, the time and labor extended by counsel.  Counsel expended extensive time and labor in prosecuting this case and achieving the settlement.  They extensively investigated the claims, including reviewing public sources and interviewing witnesses in China.  That's detailed in paragraphs 19 to 27 of the joint declaration.  They drafted briefs, consulted experts, participated in the Cayman Islands liquidation and U.S. bankruptcy, negotiated for the provisional certification of the class, and conducted extensive negotiations that yielded a fair

M7MKLUCH

and reasonable settlement agreement.  That's at paragraphs 28 to 60 of the joint declaration.  Class counsel, which is Kessler Topaz Meltzer and Check LLP and Bernstein Litowitz Berger & Grossman, along with help from bankruptcy counsel Lowenstein Sandler LLP and additional counsel for the Louisiana Sheriffs, Klausner Kaufman Jensen & Levinson, have submitted time records showing the significant work that went into this case.  Those are at Exhibit 6 of the joint declaration.  And, in total, counsel expended over 9,380 hours prosecuting this case.

I will now pause to conduct the lodestar cross-check. The lodestar amount allows me to evaluate the extent and time and labor expended in comparison to the percentage of the fund requested as attorneys' fees.  As of the date of the filing for approval of the proposed attorneys' fees, counsel had spent collectively over 9,380 hours of attorney and other professional support time prosecuting this action for the benefit of the class.  Taking into account the hourly rates of each attorney and paraprofessional, this equates to a total lodestar value of counsel's work, not including expenses, of $6,596,079.75.  Again, counsel is requesting 17.5 percent of the settlement fund, which equates to $30,625,000, plus interest earned.  Therefore, the requested fee yields a 4.6 lodestar multiplier.

In complex litigation, lodestar multipliers between 2

M7MKLUCH

and 5 are commonly awarded, and fee awards resulting in multipliers as high as 6 have also been approved.  That's quoting *In re signet Jewelers Limited Securities Litigation*, 2020 WL 4196468, at *16.  At the same time, courts have trended toward awarding lower percentages and lower multipliers for awards from extremely common funds.  *In re Citigroup, Inc. Securities Litigation*, 965 F.Supp.2d 369, 401 (S.D.N.Y. 2013) is a cite for that.

Still, courts in this circuit have awarded comparable lodestars for the one here -- comparable lodestars to the one here for similar settlement amounts.  I will mention a few of those.  In *In re Deutsche Telekom AG Securities Litigation*, 2005 WL 7984326, at *4, Judge Buchwald, on June 9, 2005, awarded 28 percent of $120 million settlement where there was a lodestar multiplier of 3.96; the court in *Woburn Retirement System*, 2017 WL 3579892, at *6, awarded 21.24 percent of a $210 million settlement with a lodestar multiplier of 3.14; in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Company*, 2016 WL 3369534, at *1, Judge Preska, in 2016, awarded 21 percent of a $272 million settlement where there was a lodestar multiplier of 3.9; and in *In re GSE Bonds Antitrust Litigation*, 2020 WL 3250593, at *5, Judge Rakoff, in 2020, awarded 20 percent of a $386.5 million settlement where there was a lodestar multiplier of 4.09.  And courts in other circuits have done the same.  To name just two, the District of

M7MKLUCH

New Jersey in *In re AremisSoft Corporation Securities Litigation*, 210 F.R.D. 109, 134-35, awarded 28 percent of a $194 million settlement with a lodestar multiplier of 4.3, and in *In re Xcel Energy, Inc. Securities Derivative and ERISA Litigation*, 364 F.Supp.2d 980, 999, the District of Minnesota awarded 25 percent of an $80 million settlement where there was a lodestar multiplier of 4.7. So even though the lodestar multiplier of 4.6 for a $175 million settlement is on the higher end, it is still within the range of reasonable lodestar multipliers.

And, as I mentioned earlier, the lodestar method is just a cross-check. Too careful scrutiny of the lodestar multiplier would risk discouraging quick and valuable settlements, misaligning the desires of counsel and class members. Therefore, I find that the lodestar cross-check also supports approving the requested attorneys' fees.

The magnitude and complexities of the case also supports the requested fee. Securities class action litigation is notably difficult and notoriously uncertain. Quoting *Woburn Retirement System*, 2017 WL 3579892, at *6. This case was complex and required consulting experts, navigating bankruptcy and liquidation proceedings, and determining complex foreign law issues.

Next, I find that the risk of litigation supports the requested fee. This factor is perhaps the foremost factor to

M7MKLUCH

be considered in determining whether to award an enhancement. That's under *Goldberger*, 209 F.3d at 54. As I mentioned when I was analyzing the fairness of the class settlement, the lead plaintiffs faced substantial hurdles to recovery. Despite these risks, counsel took the case on a contingency basis and used a significant outlay of cash and personal resources. Judge McMahon considered that factor in *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 2010 WL 4537550, at *22. And as Judge McMahon put it in another case, being *In re Marsh ERISA Litigation*, 265 F.R.D. 128, 148, there was significant risk of nonpayment in this case, and plaintiffs' counsel should be rewarded for having borne and successfully overcome that risk.

Next, class counsel are national leaders in this type of litigation. Kessler Topaz has served as lead or colead counsel in significant securities class actions and recovered billions in representing defrauded shareholders. Likewise, Bernstein Litowitz represents some of the country's largest pension funds and other institutional investors in securities fraud class actions. Since 1983, they have obtained over $37 billion on behalf of investors.

Besides the firms' excellent experience, the high quality of defense counsel opposing plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the settlement. Quoting *In re Marsh ERISA Litigation*,

265 F.R.D. at 148.  Davis Polk is an unquestioned leader in defending against securities fraud class actions.  So plaintiffs' counsel's ability to obtain a favorable settlement for the class in the face of such formidable legal opposition confirms the quality of their representation of the class.  Again, citing *In re Marsh ERISA Litigation*.

In considering whether the requested fee is reasonable, I have kept in mind that the percentage used in calculating any given fee award must follow a sliding scale and must bear an inverse relationship to the amount of the settlement.  Citing *Wal-Mart*, 396 F.3d at 96.  The empirical data shows that a 17.5 percent fee on a $175 million settlement is well within the range of awards made by district courts in this circuit and across the country.  Some comparator cases are *Alaska Electric Pension Fund v. Bank of America Corporation*, 2018 WL 6250657, at *1, where, in 2018, Judge Furman awarded 26 percent of a $486 million settlement; another is *In re Signet Jewelers Ltd. Securities Litigation*, 2020 WL 4196468, which awarded 25 percent of a $240 million settlement; another is *Christine Asia Company*, 2019 WL 5257534, where 25 percent of a $250 million settlement was awarded; another is *Woburn retirement System*, 2017 WL 3579892, where 21.24 percent of a $210 million settlement was awarded; and, lastly, *NECA-IBEW Health & Welfare Fund*, 2016 WL 3369534, where 21 percent of a $272 million settlement was awarded.

Indeed, between 2012 and 2021, the median fee award in settlements between $100 million to $500 million has been 24.5 percent. And that's from the NERA Economic Consulting report that I mentioned earlier.

I, therefore, find that 17.5 percent in a fee to the settlement amount is reasonable.

I also find that public policy concerns favor granting the requested fees. Public policy supports granting attorneys' fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the SEC. Citing *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 2022 WL 4537550, at *29. To carry out this goal, courts should award fees which will adequately compensate lead counsel for the value of their efforts taking into account the enormous risks they undertook. Same cite. I think this is especially true in cases like this one, where the defendant is an international company that allegedly committed extensive fraud, but it is incorporated and headquartered in foreign countries that thus make enforcing a judgment extremely difficult. Therefore, given the inherent risks in complex securities fraud cases like this one, I find that a 17.5 percent will incentivize lawyers to bear the risk to bring cases like this one to supplement the SEC's efforts.

And, lastly, many courts have noted that the lack of objection from members of the class is one of the most

important factors in determining the reasonablenesses of a requested fee. Again, *In re Flag Telecom Holdings*, 2020 WL 4537550, at *29, is a cite there where the court collected cases.

The settlement notice advised class -- the settlement notice advised class members that class counsel intended to apply for attorneys' fees not to exceed 25 percent of the settlement fund and up to $1 million in litigation expenses. Despite this notice, no one objected to the June 24, 2022 deadline. The overwhelmingly positive response to date by the class attests to the approval of the class with respect to both the settlement, as well as to the fee and expense application.

As to the expenses, I find that the requested $721,462.68 in litigation expenses are reasonable. It is well settled that attorneys may be compensated for reasonable out-of-pocket expenses incurred as long as they were incidental and necessary to the representation of their clients. Citing *In re Facebook, Inc. IPO Securities and Derivative Litigation*, 343 F.Supp.3d 394, 418, a Southern District of New York case from 2018. In the Second Circuit, expense requests are usually granted as a matter of course as long as the expenses were of the type customarily charged to clients. Citing *In re EVCI Career Colleges Holding Corp. Securities Litigation*, 2007 WL 2230177, at *18. The largest expenses went toward the lead plaintiffs' experts and online legal and factual research. And

that's discussed at paragraphs 143 and 144 of the joint declaration.  These expenses are commonly reimbursed as seen in *EVCI Career Colleges Holding Corporation*.

A significant amount also went toward retaining specialized counsel in the Cayman Island to advise on Cayman Islands law relevant to the liquidation proceeding.  Although reimbursement for retaining outside counsel is not commonly requested, courts in this district have granted reimbursement for retained bankruptcy counsel.  One example would be *Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, a case before Judge McMahon with a decision on December 18, 2019.  Additionally, the notice to the class said that the litigation expenses would not exceed $1 million, and it has not.  And, again, there have been no objections to this request.

So under these circumstances, I find that the requested expenses are reasonable and therefore approve them.  Again, this is similar to another case I mentioned earlier, *Woburn Retirement System*, 2017 WL 3579892, at *8, where the court approved reimbursement expenses when the significant bulk of expenses went toward the lead plaintiffs' experts as well as online legal research and an electronic discovery vendor, requested expenses were less than given on notice to the class, and there were no objections to the request.

And, lastly, I turn to the requested $5,430 in costs and expenses incurred by the lead plaintiffs AP7 and the

M7MKLUCH

Louisiana Sheriffs.  The PSLRA allows for reimbursement to representative plaintiffs in securities class actions. *Christine Asia Company* is a cite for that as well, at 2019 WL 5257534, at *20.  I also cite 15, United States Code, Section 77z-1(a)(4), which reads that "Nothing in this paragraph shall be construed to limit the award of reasonable expenses and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class."

In considering whether to reimburse a lead plaintiff, courts in this circuit routinely apply such costs and expenses both to reimburse the named plaintiffs for the expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place.  Again, citing *Christine Asia Company*, 2019 WL 5257534, at *20.  Here, I find the lead plaintiffs devoted substantial time and effort to prosecute this action.  They communicated and consulted extensively with counsel along with reviewing pleadings and briefs.  And that's set forth in a couple of declarations — the Grottheim declaration at paragraph 10 and the McGee declaration at paragraph 10.

So I find the requested $5,430 in costs and expenses incurred by the lead plaintiffs are reasonable under these circumstances.

So, in sum, I approve the settlement and requested attorneys' fees and costs.  I award for 17.5 percent of the settlement fund in attorneys' fees, $721,462.68 for the reasonable expenses incurred by plaintiffs' counsel, and $5,430 to reimburse the lead plaintiffs' costs and expenses.

The parties have previously submitted a proposed judgment, proposed order approving the plan of allocation, and a proposed order awarding attorneys' fees.  I think there might be two minor changes I want to run by the parties based on my ruling.

Paragraph 4:  This is the CAFA notice section of the proposed judgment approving class action settlement.  Is there any concern with, as I said in my ruling, that the CAFA notice requirement was substantially complied with?  I think we can just put in the word "substantially" before the word "satisfy."

MR. PORTNOY:  No objection, your Honor.

MR. NIRMUL:  None from plaintiffs, your Honor.

THE COURT:  Great.

And then, secondly, given that I treated Mr. Rach's objection both to the substantive reasonableness, fairness, as well as to the allocation in paragraph 5, are there any objections with updating that to say there was one objection to the settlement, the Court has considered the sole objection, and just continue as it has there, the Court finds and concludes that this objection was without merit?  Is there any

M7MKLUCH

objection to that?

MR. NIRMUL:  No objection, your Honor.

MR. PORTNOY:  No objection, your Honor.

THE COURT:  So, could you send me, then, a Word version of those documents to our chambers' email with those additions, and if there are any additional edits, I'll make them and then have the judgment entered?

MR. NIRMUL:  Your Honor, you have a Word version of the document we've submitted to you.

THE COURT:  Okay.

MR. NIRMUL:  Do you want us to make changes and resubmit a Word version?

THE COURT:  Let me double-check that.  I have it handy.

MR. NIRMUL:  It was submitted last week.

THE COURT:  Last week?

So, if we need a Word version, we'll reach out and let you know, but we should be okay.

MR. NIRMUL:  Okay.

THE COURT:  Great.

MR. NIRMUL:  Thank you.

THE COURT:  Anything further we should address this morning?  Anything that I left out that the parties think I should include in my oral ruling?

Mr. Nirmul?

M7MKLUCH

MR. NIRMUL:  I don't believe so, your Honor.  That was comprehensive.

THE COURT:  Mr. Portnoy?

MR. PORTNOY:  No, nothing further, your Honor.  Thank you.

THE COURT:  And Mr. Januszewski?

MR. JANUSZEWSKI:  No, your Honor.

THE COURT:  Mr. Patterson?

MR. PATTERSON:  No, your Honor.

THE COURT:  Well, thank you for everyone's patience this morning.  Having not read that out loud until just now before you, I appreciate everyone paying attention, and I do thank, as I alluded to in my ruling, the parties for their outstanding briefing and overall outstanding representation in this matter.  I hope everyone has a good rest of the weekend. Take care.

COUNSEL:  Thank you, your Honor.

*  *  *