**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE LUCKIN COFFEE INC.
SECURITIES LITIGATION

Case No. 1:20-cv-01293-JPC-JLC

**DECLARATION OF ALEXANDER P. VILLANOVA IN SUPPORT OF LEAD**
**PLAINTIFFS' MOTION FOR APPROVAL OF DISTRIBUTION PLAN**

I, Alexander P. Villanova, hereby declare under penalty of perjury as follows:

1.      I am a Senior Project Manager for Epiq Class Action and Claims Solutions, Inc. ("Epiq"). I am over 21 years of age and am not a party to the above-captioned action ("Action").[1] I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently thereto.

2.      Pursuant to the Court's October 26, 2021 Revised Order Preliminarily Approving Settlement and Providing for Notice of the Settlement (ECF No. 319) ("Preliminary Approval Order"), Epiq was retained by Class Counsel to serve as the Claims Administrator in connection with the Settlement of the Action. As Claims Administrator, Epiq has, among other things: (i) mailed the Notice of (I) Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses ("Settlement Notice") and the Proof of Claim and Release Form ("Claim Form" and together with the Settlement Notice, "Settlement Notice Packet") to potential Class Members, brokers, and other nominees; (ii) created and continues to maintain a toll-free helpline for inquiries during the course of the administration; (iii) created and continues

---

[1] All terms with initial capitalization not otherwise defined herein shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated as of October 20, 2021 (ECF No. 315) ("Stipulation"). The Settlement is contained in the Stipulation.

to maintain a website for the Action and the Settlement ("Website") and posted case-specific documents on it; (iv) caused the Summary Settlement Notice to be published; (v) provided, upon request, additional copies of the Settlement Notice Packet to potential Class Members, brokers, and other nominees; and (vi) received and processed each Claim Form received by the Claims Administrator (a "Claim").[2]

3.    On July 22, 2022, the Court granted final approval of the Settlement in its Judgment Approving Class Action Settlement (ECF No. 340) and also entered an Order Approving Plan of Allocation of Net Settlement Fund (ECF No. 339). Epiq has completed processing all Claims received through February 1, 2023, in accordance with the terms of the Stipulation and the Court-approved Plan of Allocation set forth in the Settlement Notice, and hereby submits its administrative determinations accepting and rejecting the Claims in preparation for a distribution of the Net Settlement Fund to Authorized Claimants. Epiq also presents this declaration in support of Lead Plaintiffs' Motion for Approval of Distribution Plan.

## DISSEMINATION OF SETTLEMENT NOTICE

4.    As more fully described in the Declaration of Alexander P. Villanova Regarding (A) Dissemination of the Settlement Notice and Claim Form; and (B) Publication of the Summary Settlement Notice (ECF No. 327-3) ("Mailing Decl.") and the Supplemental Declaration of Alexander P. Villanova Regarding (A) Continued Dissemination of the Settlement Notice and Claim Form; (B) Update on Call Center Services and Case Website; and (C) Report on Claims Received to Date (ECF No. 329-1) ("Supp. Mailing Decl."), as of July 14, 2022, Epiq had

---

[2] As reported in the Declaration of Alexander P. Villanova Regarding: (A) Mailing of the Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received, executed on October 8, 2021, and filed with the Court (ECF No. 309), Epiq also conducted a notice mailing in connection with the Court's certification of the Class for purposes of reaching a settlement of the Action, in which it mailed the Notice of Pendency of Class Action ("Class Notice") to potential Class Members and nominees beginning on July 20, 2021.

disseminated 564,474 Settlement Notice Packets to potential Class Members, brokers, and other nominees. Supp. Mailing Decl. ¶ 3. Since that date, 35 additional Settlement Notice Packets have been disseminated. In total, Epiq has disseminated 564,509 Settlement Notice Packets to potential Class Members, brokers, and other nominees.

5.  In connection with the mailing of the Class Notice, Epiq established and continues to maintain the Website (www.LuckinCoffeeSecuritiesLitigation.com) and a toll-free telephone helpline (855-535-1824) to assist potential Class Members. The Website, which provides access to important documents relevant to the Settlement, and the telephone helpline enable Class Members to obtain information about the Settlement. In connection with establishing and maintaining the Website and toll-free telephone helpline, Epiq, among other things, formulated a system to ensure that proper responses were provided to all telephone and electronic inquiries. That work included training telephone agents to respond to inquiries specific to the Settlement; developing a series of common questions and the answers thereto known as Frequently Asked Questions or "FAQs"; loading key documents onto the Website; and programming the Website to permit the viewing and downloading of those documents.

6.  In accordance with paragraph 4(c) of the Preliminary Approval Order, on November 30, 2021, Epiq caused the Summary Settlement Notice to be published in *The Wall Street Journal* and released via *PR Newswire*. Mailing Decl. ¶ 10.

## PROCEDURES FOLLOWED IN PROCESSING CLAIMS

7.  Under the terms of the Preliminary Approval Order and as set forth in the Settlement Notice, each Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to Epiq a properly executed Claim Form postmarked (if mailed) or online no later than March 15, 2022, together with adequate supporting

documentation for the transactions and holdings reported in the Claim Form. Through February 1, 2023, Epiq has received and fully processed 49,100 Claims ("Presented Claims").

8.    In preparation for receiving and processing Claims, Epiq: (i) conferred with Class Counsel to define the guidelines for processing Claims; (ii) updated the database created in connection with the Class Notice mailing in order to store Claim details, images of Claims, and supporting documentation submitted with Claims ("Settlement Database"); (iii) trained staff in the specifics of the Settlement so that Claims would be properly processed; (iv) formulated a system so that telephone and email inquiries would be properly responded to; (v) developed various computer programs and screens for entry of Class Members' identifying information and their transactional information; and (vi) developed a proprietary "calculation module" that would calculate Recognized Claims pursuant to the Court-approved Plan of Allocation for the Net Settlement Fund set forth in the Settlement Notice.

9.    Class Members seeking to share in the Net Settlement Fund were directed in the Settlement Notice to submit their Claims to a post office box address specifically designated for the Settlement or to submit their Claims online through the Website. Settlement Notice Packets returned by the United States Postal Service as undeliverable were reviewed for updated addresses and, where available, updated addresses were entered into the Settlement Database and Settlement Notice Packets were mailed to the updated addresses. Any correspondence received at the post office box was reviewed and, when necessary, appropriate responses were provided to the senders.

## PROCESSING CLAIMS

### A.    Paper Claims and Claim Forms Submitted Via the Website

10.    Of the 49,100 Presented Claims, 24,584 were submitted on paper (including 10,791 Claims submitted via the online filing component of the Website provided for individual investors). Once received, paper Claims were opened and prepared for scanning. This process

included unfolding documents, removing staples, copying nonconforming-sized documents, and sorting documents. This manual task of preparing the paper Claims is very laborious and time intensive. Once prepared, paper Claims were scanned into the Settlement Database together with all submitted documentation. Subsequently, each Claim was assigned a unique Claim number. Once scanned, the information from each Claim Form, including the Claimant's name, address, and account number/information from the supporting documentation, and the Claimant's purchase/acquisition transactions, sale transactions, and holdings listed on the Claim Form, was entered into the Settlement Database. Once entered into the Settlement Database, each Claim was reviewed to verify that all required information had been provided. The documentation provided by the Claimant in support of the Claim was reviewed for authenticity and compared to the information provided in the Claim to verify the Claimant's identity and the purchase/acquisition transactions, sale transactions, and holdings listed on the Claim Form.

11.    To process the transactions detailed in the Claims, Epiq utilized internal codes ("message codes") to identify and classify deficiency or ineligibility conditions existing within the Claims. Appropriate message codes were assigned to the Claims as they were processed. For example, where a Claim was submitted by a Claimant who did not have any eligible transactions in Luckin ADSs during the Class Period (e.g., the Claimant purchased Luckin ADSs only before or after the Class Period), that Claim would receive a message code that denoted ineligibility. Similar defect message codes were used to denote other ineligible conditions, such as duplicate Claims. These message codes would indicate to Epiq that the Claimant was not eligible to receive any payment from the Net Settlement Fund with respect to that Claim unless the deficiency was cured in its entirety. Examples of conditions of ineligibility are as follows:

- No Documentation Submitted for the Entire Claim

- Duplicate Claim Submitted

- No Eligible Purchase/Acquisition During the Class Period

- No Signature

- No Recognized Claim

12. Because a Claim may be deficient only in part, but otherwise acceptable, Epiq also utilized message codes that were applied only to specific transactions within a Claim. For example, if a Claimant submitted a Claim with supporting documentation for all but one purchase transaction, that one transaction would receive a defect message code. The message code indicated that although the transaction was deficient, the Claim was otherwise eligible for payment if other transactions in the Claim calculated to a Recognized Claim pursuant to the Court-approved Plan of Allocation. Thus, even if the deficiency was never cured, the Claim could still be partially accepted. Examples of transaction-specific message codes are as follows:

- Claim did not Balance/Trade Discrepancy

- Inadequate Documentation for Transaction

- Received Shares or Delivered Shares (i.e., shares transferred into or out of an account)

- No Proof of Unsold Holdings

### B. Electronic Claims

13. Of the 49,100 Presented Claims, 24,516 were submitted electronically ("Electronic Claims"). Electronic Claims are typically submitted by institutional investors who may have hundreds or thousands of transactions during the Class Period or by filers submitting Claims on behalf of multiple beneficial owners ("Electronic Claim Filers" or "E-Claim Filers"). Rather than provide reams of paper requiring data entry, the E-Claim Filers either mail a computer disc or

electronically submit a file to Epiq so that Epiq can upload all transactions to the Settlement Database.

14.    Epiq maintains an electronic filing operations team ("Electronic Filing Team") to coordinate and supervise the receipt and handling of all Electronic Claims. In this case, the Electronic Filing Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with Epiq's required format and to identify any potential data issues or inconsistencies within the file. If any issues or inconsistencies arose, Epiq notified the filer. If the electronic file was deemed to be in an acceptable format, it was then loaded into the Settlement Database.

15.    Once each electronic file was loaded, the Electronic Claims were coded to denote any deficient or ineligible conditions that existed within them. These message codes are similar to those applied to paper Claims. However, in lieu of manually applying message codes, the Electronic Filing Team performed programmatic reviews on Electronic Claims to identify deficient and ineligible conditions (such as, but not limited to, price out-of-range issues, out-of-balance conditions, transactions outside the Class Period, etc.). The output was thoroughly verified and confirmed as accurate.

16.    The review process also included message coding any Electronic Claims that were not accompanied by a signed Claim Form, which serves as a "Master Proof of Claim Form" for all Claims referenced on the electronic file submitted. This process was reviewed by Epiq's Electronic Filing Team and, when appropriate, Epiq contacted the E-Claim Filers whose submissions were missing information. This ensured that only fully completed Claims, submitted by properly authorized representatives of the Claimants, were considered eligible to participate in the Settlement.

7

17.    Finally, at the end of the process, Epiq performed various targeted reviews of Electronic Claims. Specifically, Epiq used criteria such as the calculated Recognized Claims and other identified criteria to apply its internal message codes and reach out to a selection of E-Claim Filers and request that various sample purchases, sales, and holdings selected by Epiq be documented by providing confirmation slips or other transaction-specific supporting documentation. These targeted reviews help to ensure that electronic data supplied by Claimants does not contain inaccurate information.

## EXCLUDED PERSONS

18.    Epiq also reviewed all Claims to ensure that they were not submitted by or on behalf of "Excluded Persons" to the extent that the identities of such persons or entities were known to Epiq through the list of Defendants and other excluded persons and entities set forth in the Stipulation and the Settlement Notice and from the Claimants' certifications on the Claim Forms. Epiq also reviewed all Claims against the list of persons who were excluded from the Class pursuant to request as listed on Appendix 1 to the Stipulation.

## THE DEFICIENCY PROCESS

### A.    Paper Claims and Online Claims

19.    Approximately 58.8% of the paper and online Claims, i.e., 14,467 of the 24,584 Claims submitted on paper or online via the Website, were incomplete or had one or more defects or conditions of ineligibility, such as the Claim not being signed, not being properly documented, or indicating no eligible transactions in Luckin ADSs during the Class Period. The "Deficiency Process," which primarily involved mailing letters to Claimants and responding to communications from Claimants by email and/or telephone, was intended to assist Claimants in properly completing their otherwise deficient submissions so that they could be eligible to participate in the Settlement.

20.     If paper and online Claims were determined to be defective, a Notice of Deficient Claim Submission ("Deficiency Letter") was sent to the Claimants describing the defect(s) in the Claims and what steps, if any, were necessary to cure the defect(s) in these Claims. The Deficiency Letter advised Claimants that submission of appropriate information and/or documentary evidence to complete the Claim had to be sent within twenty (20) days from the date of the Deficiency Letter or the Claim would be recommended for rejection to the extent that the deficiency or condition of ineligibility was not cured. The Deficiency Letter also advised Claimants of their right to contest these administrative determinations, and that Claimants wanting to contest such determinations were required to submit written statements to Epiq requesting Court review of their Claims and setting forth the basis for such requests. Epiq sent a total of 16,545 Deficiency Letters to Claimants who submitted paper or online Claims that Epiq determined to be defective.[3] Attached hereto as Exhibit A is an example of a Deficiency Letter.

21.     Claimants' responses to Deficiency Letters were scanned into the Settlement Database and associated with the corresponding Claims. The responses were then carefully reviewed and evaluated by Epiq's team of processors. If a Claimant's response corrected the defect(s) in a Claim, Epiq manually updated the Settlement Database to reflect the changes in the status of the Claim.

**B.     Electronic Claims**

22.     For Electronic Claims, Epiq used the following process to contact the banks, brokers, nominees, and other E-Claim Filers to confirm receipt of their submissions and to notify the Electronic Claim Filers of any deficiencies or Electronic Claims that were ineligible. Each E-

---

[3] The total number of Deficiency Letters sent exceeds the number of deficient paper and online Claims discussed above in paragraph 19 because some of the deficient Claims were sent more than one Deficiency Letter.

Claim Filer was sent an email to the email address included with the Claim Form(s) ("Status Email") with an attached report containing detailed information associated with the Claim(s) included in the filing and indicating which Claim(s) within the filing were deficient and/or rejected ("Transaction Report").

23.     The Status Email sent to the email address of record provided with the Claim Form:

(a)     Notified the filer that any Claims with deficiencies not corrected within twenty (20) days from the date of the Status Email may be rejected;

(b)     Advised the filer of the right to contest the rejection of the Claim(s) and request this Court's review of Epiq's administrative determination within twenty (20) days from the date of the Status Email; and

(c)     Provided the filer with instructions for how to submit corrections.

24.     The Transaction Report attached to the Status Email contained the following information:

(a)     A listing of all Electronic Claims associated with the filing and their unique identification numbers;

(b)     Identification of individual Electronic Claims that were found to be deficient or ineligible; and

(c)     Each Electronic Claim's current status in the Settlement Database.

25.     Epiq emailed a Status Email and Transaction Report(s) to 168 E-Claim Filers. Examples of a Status Email and Transaction Report are attached hereto as Exhibits B and C, respectively.

26.     The E-Claim Filers' responses to Status Emails were reviewed by Epiq's Electronic Filing Team, scanned and/or loaded into the Settlement Database, and associated with the

corresponding Electronic Claims. If a response corrected the defect(s) or affected an Electronic Claim's status, Epiq manually and/or programmatically updated the database to reflect such change in the status of the Electronic Claim.

## **DISPUTED CLAIMS**

27.     As noted above, Claimants were advised that they had the right to contest Epiq's administrative determination of deficiencies or ineligibility with respect to their Claim(s) within twenty (20) days from the date of notification and that they could request that the dispute be submitted to the Court for review. More specifically, Claimants were advised in the Deficiency Letter or Status Email that, if they disputed Epiq's determination with respect to their Claim(s), they had to provide a statement of reasons indicating the grounds for contesting the determination, along with supporting documentation, and if the dispute concerning the Claim(s) could not otherwise be resolved, Class Counsel would thereafter present the Claimant's request for review to the Court for a final determination.

28.     During the course of this administration, Epiq received one hundred thirty-four (134) requests for Court review. To resolve these disputes without necessitating the Court's intervention, Epiq reached out to each Claimant requesting Court review and attempted to answer all questions, fully explain Epiq's administrative determination of the Claim's status, and facilitate the submission of missing information or documentation where applicable. As a result of these efforts, one hundred thirteen (113) Claimants resolved their deficiencies and their Claims are being recommended for approval, and eleven (11) Claimants withdrew their request for Court review after receiving further explanation of the reasons for Epiq's determination with respect to their Claims. Accordingly, ten (10) requests for Court review remain outstanding. Attached hereto as Exhibit D are the pending requests for Court review. Exhibit D includes a copy of each Disputed

11

Claim with its supporting documentation.[4] A summary chart at the beginning of Exhibit D sets

forth the reasons for Epiq's rejection of each Disputed Claim, which are summarized here:

     (a)    Disputed Claim 1 (Claim No. 16602): No Exchange Act Loss Amount or

Securities Act Loss Amount as Claimant purchased and sold all Luckin

ADSs at a market gain; i.e., sales price is greater than purchase price. *See*

*id.* ¶¶ 7(b)(ii), (8)(a).

     (b)    Disputed Claims 2, 3, and 4 (Claim Nos. 9084, 20190, and 21094): No

Exchange Act Loss Amount as Claimants purchased and sold all of their

Luckin ADSs prior to January 31, 2020. *See* Settlement Notice App. A

¶ 7(a). Additionally, no Securities Act Loss Amount as sales price of the

Luckin ADSs exceeded $17.00. *See* Settlement Notice App. A ¶ 8(a).

     (c)    Disputed Claims 5, 6, 7, and 8 (Claim Nos. 319, 18435, 21803, 11979): No

Recognized Claim as Claimants purchased and sold all of their Luckin

ADSs between the dates of two alleged corrective disclosures, *see*

Settlement Notice App. A ¶ 7(b), and these Luckin ADS were not purchased

in or traceable to either offering.

     (d)    Disputed Claim 9 (Claim No. 7878): No eligible purchases as Claimant only

filed for options contracts on Luckin ADSs, which are not eligible securities

in this matter. *See* Settlement Notice ¶ 17.

     (e)    Disputed Claim 10 (Claim No. 17888): Questionable Claim where Epiq

requested authorization to communicate directly with Claimant's broker

---

[4] For privacy reasons, the documents included in Exhibit D have been redacted to remove personal information such as street addresses, email addresses, telephone numbers, account numbers, Taxpayer ID, Social Security or Social Insurance Numbers, and all financial and transaction information not related to the Claimants' transactions in Luckin ADSs.

(E*Trade) to independently verify the trades in the Claim Form. Claimant did not complete authorization form after multiple requests and requested Court review of the Claim.

## LATE BUT OTHERWISE ELIGIBLE CLAIMS

29.     Of the 49,100 Presented Claims, 2,603 Claims were received or postmarked after March 15, 2022, the Claim submission deadline established by the Court. Epiq processed all late Claims received after March 15, 2022, through February 1, 2023, and 1,355 late Claims have been found to be otherwise eligible in whole or in part ("Late But Otherwise Eligible Claims"). Epiq has not rejected any Claim received through February 1, 2023, solely based on its late submission, and Epiq believes no delay has resulted from the provisional acceptance of these Late But Otherwise Eligible Claims. To the extent these Claims are eligible but for the fact that they were late, they are recommended for payment.

30.     However, there must be a final cut-off date after which no more Claims will be accepted so that there may be a proportional allocation of the Net Settlement Fund and the distribution may be accomplished. Acceptance of additional Claims or responses received during the finalization of the administration and the preparation of this declaration would necessarily require a delay in the distribution. Accordingly, Epiq also respectfully requests that this Court order that no Claim received after February 1, 2023, or Claim cured or adjusted after February 1, 2023, be eligible for payment for any reason whatsoever subject only to the provision of paragraph 39(f) of the proposed distribution plan discussed below. If the Court adopts the proposed distribution plan, then, after Class Counsel have determined that further distributions are not cost-effective and before any contribution of the residual funds to charity, if sufficient funds remain to warrant the processing of Claims received after February 1, 2023, these Claims will be processed and, if any would have been eligible if timely received, these Claimants may be paid their

13

distribution amounts, to the extent permitted by the amount of remaining funds, on a *pro rata* basis that would bring them into parity with other Authorized Claimants who have cashed all their prior distribution checks. *See* ¶ 39(f) below. With respect to previously submitted Claims that are cured or adjusted after February 1, 2023, such Claims will be reevaluated upon receipt of the adjustment and, to the extent that they are found eligible for a distribution or additional distribution, they will be treated in the same manner as Claims received after February 1, 2023. However, should an adjustment result in a lower Recognized Claim amount, the Recognized Claim amount will be reduced accordingly prior to a distribution to that Claimant.

## QUALITY ASSURANCE

31.    An integral part of the claims administration process is the Quality Assurance review. Throughout the administration process, Epiq's Quality Assurance personnel worked to verify that Claims were processed properly by ensuring that information was entered correctly into the database, deficiency and/or rejection message codes were assigned accurately, and Deficiency Letters and/or Status Emails were sent appropriately. After all Claims were processed, Deficiency Letters and/or Status Emails were sent, and Claimants' responses to Deficiency Letters and/or Status Emails were reviewed and processed, Epiq's Quality Assurance personnel performed additional Quality Assurance reviews. These final Quality Assurance reviews further ensured the correctness and completeness of all Claims processed prior to preparing this declaration and all Epiq's final documents in support of distribution of the Net Settlement Fund. As part of the Quality Assurance reviews, Epiq:

(a)    Verified that all Claims had signatures of authorized individuals;

(b)    Verified that true duplicate Claims were identified, verified, and rejected;

(c)    Verified that persons and entities excluded from the Class did not file Claims or their Claims were rejected upon review;

14

(d)    Performed a final Quality Assurance audit of Claims and all supporting documentation to ensure completeness of Claims;

(e)    Determined that Claimants requiring Deficiency Letters and/or Status Emails were sent such notifications;

(f)    Performed an audit of deficient Claims;

(g)    Performed an additional review of Claims with high Recognized Claim amounts;

(h)    Audited Claims that were designated invalid;

(i)    Audited Claims with a Recognized Claim amount equal to zero;

(j)    Performed other auditing based on Claims completion requirements and the approved calculation specifications based on the Court-approved Plan of Allocation; and

(k)    Re-tested the accuracy of the Recognized Claim amount calculation program.

32.    As part of its due diligence in processing the Claims, Epiq reviewed and compared the entire Settlement Database against the "watch list" of known questionable filers that Epiq has developed throughout its years of experience as a claims administrator. Epiq performs searches based on names, aliases, addresses, and city/zip codes. In addition, Epiq's claim processors are trained to identify any potentially inauthentic documentation when processing claims, including claims submitted by claimants not previously captured in the "watch list." Processors are instructed to apply internal message codes to any claim that matches to a record on the "watch list" and escalate them to management for review. In this administration, two (2) potentially fraudulent Claims were identified as having been submitted by someone on the "watch list." These Claims

were then reviewed by management to consider the documentation submitted with each Claim in conjunction with other factors, including a review of the Claimant's website registration, address, and registration with the SEC or asset management organizations, and determined to be potentially fraudulent. Epiq sent these Claimants Deficiency Letters and/or Status Emails notifying the Claimants that additional documentation was required for the Claim to be eligible to participate in the Settlement. No additional documentation has been received supporting these potentially fraudulent Claims and both potentially fraudulent Claims are recommended for rejection for failure to cure their conditions of ineligibility.

### RECOMMENDATIONS FOR APPROVAL AND REJECTION

33.     As noted above, the number of Presented Claims in this motion is 49,100.

**A.     Timely Submitted and Valid Claims**

34.     A total of 46,497 Claims was received or postmarked on or before March 15, 2022, the Court-approved Claim submission deadline, of which 31,275 Claims were determined by Epiq to be eligible to participate in the Settlement and are recommended for approval ("Timely Eligible Claims"). The total Recognized Claim amount for these Timely Eligible Claims is $1,773,027,599.93.

**B.     Late But Otherwise Eligible Claims**

35.     A total of 2,603 Claims was received or postmarked after March 15, 2022, but received on or before February 1, 2023. Of those 2,603 late Claims, 1,355 were determined by Epiq to be otherwise eligible and are recommended for approval (i.e., Late But Otherwise Eligible

Claims). The total Recognized Claim amount for these Late But Otherwise Eligible Claims is $124,058,738.76.

### C.    Rejected Claims

36.    After the responses to Deficiency Letters and Status Emails were processed, a total of 16,470 Claims (including the Disputed Claims discussed above) remains recommended for rejection by the Court ("Rejected Claims") for the following reasons:

(a)    11,455 Claims did not result in a Recognized Claim pursuant to the Court-approved Plan of Allocation;

(b)    1,812 Claims had no Purchase(s)/Acquisition(s) of Luckin ADSs during the Class Period;

(c)    1,620 Deficient Claims were never cured;

(d)    968 Claims were duplicate Claims; and

(e)    615 Claims were withdrawn by the filer.

### D.    Lists of All Presented Claims

37.    Attached hereto as Exhibits D through G are listings of all the Presented Claims:

(a)    Exhibit D lists the ten (10) Disputed Claims recommended for rejection;

(b)    Exhibit E lists the Timely Eligible Claims and shows each Claimant's Recognized Claim;

(c)    Exhibit F lists the Late But Otherwise Eligible Claims and shows each Claimant's Recognized Claim; and

(d)    Exhibit G lists the Rejected Claims and the reasons for rejection.

**FEES AND DISBURSEMENTS**

38.    Epiq agreed to be the Claims Administrator in exchange for payment of its fees and out-of-pocket expenses. Class Counsel received reports on and invoices for the work Epiq

performed with respect to the provision of notice and administration of the Settlement. Attached hereto as Exhibit H are copies of Epiq's invoices for its work performed on behalf of the Class as well as an estimate for the work that will be performed and the costs that will be incurred in connection with the initial distribution of the Net Settlement Fund. Should the estimate of fees and expenses to conduct the initial distribution of the Net Settlement Fund exceed the actual cost, the excess will be returned to the Net Settlement Fund and will be available for subsequent distribution to Authorized Claimants. As set forth in these invoices, Epiq's total fees and expenses for this matter through December 31, 2022, are $1,674,669.73. Epiq anticipates that its fees and expenses for the work performed in conjunction with the initial distribution of the Net Settlement Fund will be $38,621.75. To date Epiq has been reimbursed in the amount of $1,587,479.03. Accordingly, there is an outstanding balance of $125,812.45 payable to Epiq from the Settlement Fund, which includes the estimate for completing the initial distribution.

## DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

39.     Should the Court concur with Epiq's determinations concerning the provisionally accepted and rejected Claims, including the Late But Otherwise Eligible Claims, Epiq recommends the following distribution plan ("Distribution Plan"):

(a)     Epiq will conduct an initial distribution ("Initial Distribution") of the Net Settlement Fund, after deducting all payments approved by the Court, and after payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, while maintaining a 10% reserve to address any tax liability and claims administration-related contingencies that may arise following the Initial Distribution, as follows:

(1)     Epiq will calculate award amounts for all Authorized Claimants as if the entire Net Settlement Fund were to be distributed now. In

18

accordance with the Court-approved Plan of Allocation, Epiq will calculate each Authorized Claimant's *pro rata* share of the Net Settlement Fund based on the amount of the Authorized Claimant's Recognized Claim in comparison to the total Recognized Claims of all Authorized Claimants. *See* Settlement Notice App. A ¶ 18.

(2) Epiq will, pursuant to the terms of the Plan of Allocation, eliminate from the Initial Distribution any Authorized Claimant whose *pro rata* share calculates to less than $10.00. *See id.* ¶¶ 11, 19. These Claimants will not receive any payment from the Net Settlement Fund and will be so notified by Epiq.

(3) After eliminating Claimants who would have received less than $10.00, Epiq will recalculate the *pro rata* share of the Net Settlement Fund for Authorized Claimants who would have received $10.00 or more. A "Distribution Amount" will be calculated for each of these Authorized Claimants, which shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants who would have received $10.00 or more, multiplied by the total amount in the Net Settlement Fund. *See id.* ¶ 18.

(4) Authorized Claimants whose Distribution Amount calculates to less than $200.00 will be paid their full Distribution Amount in the Initial Distribution ("Claims Paid in Full"). These Authorized Claimants will receive no additional funds in subsequent distributions.

(5)    After deducting the payments to the Claims Paid in Full, 90% of the remaining balance of the Net Settlement Fund will be distributed *pro rata* to Authorized Claimants whose Distribution Amount calculates to $200.00 or more. The remaining 10% of the Net Settlement Fund will be held in reserve (the "Reserve") to address any tax liability and claims administration-related contingencies that may arise following the Initial Distribution. To the extent the Reserve is not depleted, the remainder will be distributed in the "Second Distribution" described in subparagraph (d) below.

(b)    To encourage Authorized Claimants to deposit their payments promptly, all distribution checks will bear a notation: "CASH PROMPTLY. VOID AND SUBJECT TO REDISTRIBUTION IF NOT CASHED BY [DATE 90 DAYS AFTER ISSUE DATE]." For Authorized Claimants whose checks are returned as undeliverable, Epiq will endeavor to locate new addresses through reasonable methods. Where a new address is located, Epiq will update the Settlement Database accordingly and reissue a distribution check to the Authorized Claimant at the new address. In the event a distribution check is lost or damaged or otherwise requires reissuance, Epiq will issue replacements. Distribution reissues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate. For all checks, Epiq will void the initial payment prior to reissuing a payment. In order not to delay further distributions to Authorized Claimants who have timely cashed

20

their checks, Epiq's outreach program shall end thirty (30) days after the initial void date. Authorized Claimants will be informed that, if they do not cash their Initial Distribution checks within ninety (90) days of the mail date, or they do not cash check reissues within thirty (30) days of the mailing of such reissued check, their check will lapse, their entitlement to recovery will be irrevocably forfeited, and the funds will be reallocated to other Authorized Claimants. Reissue requests for lost or damaged checks will be granted after the void date on the checks as long as the request for the reissue is received no later than forty-five (45) days prior to the next planned distribution. Requests for reissued checks in connection with any subsequent distributions (should such distributions occur) will be handled in the same manner.

(c)     Authorized Claimants who do not cash their Initial Distribution checks within the time allotted or on the conditions set forth above will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available for distribution to other Authorized Claimants in the Second Distribution. Similarly, Authorized Claimants who do not cash their second or subsequent distribution checks, should such distributions occur, within the time allotted or on the conditions set forth above will irrevocably forfeit any further recovery from the Settlement.

(d)     Consistent with the Court-approved Plan of Allocation, after Epiq has made reasonable and diligent efforts to have Authorized Claimants cash their Initial Distribution checks, which efforts shall consist of the follow-up

efforts described above, but not earlier than seven (7) months after the Initial Distribution, Epiq will, after consulting with Class Counsel, conduct a second distribution of the Net Settlement Fund ("Second Distribution"). *See* Settlement Notice App. A ¶ 20. Any amounts remaining in the Net Settlement Fund after the Initial Distribution, including from the Reserve and the funds allocated for all void stale-dated checks, after deducting Epiq's unpaid fees and expenses incurred in connection with administering the Settlement, including Epiq's estimated costs of the Second Distribution, and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, any escrow fees, and appropriate reserves, will be distributed to all Authorized Claimants in the Initial Distribution (other than Claims Paid in Full) who cashed their distribution checks and who would receive at least $10.00 in the Second Distribution based on their *pro rata* share of the remaining funds. *See id.* Additional distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur thereafter in six-month intervals until Class Counsel, in consultation with Epiq, determine that further distribution is not cost-effective. *See id.*

(e) At such time as Class Counsel, in consultation with Epiq, determine that further distribution of the funds remaining in the Net Settlement Fund is not cost-effective, if sufficient funds remain to warrant the processing of Claims received after February 1, 2023, those Claims will be processed, and any otherwise valid Claims received after February 1, 2023, as well as any

earlier received Claims for which an adjustment was received after February 1, 2023, that resulted in an increased Recognized Claim, will be paid in accordance with subparagraph (f) below. If any funds remain in the Net Settlement Fund after payment of these late or late-adjusted Claims, the remaining balance of the Net Settlement Fund, after payment of any unpaid fees or expenses incurred in connection with administering the Net Settlement Fund and after the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, will be contributed to the National Consumer Law Center ("NCLC"), a non-sectarian, not-for-profit 501(c)(3) organization. *See id.*

(f)    No new Claims may be accepted after February 1, 2023, and no further adjustments to Claims received on or before February 1, 2023, that would result in an increased Recognized Claim may be made for any reason after February 1, 2023, subject to the following exception. If Claims are received or modified after February 1, 2023, that would have been eligible for payment or additional payment under the Plan of Allocation if timely received, then at the time that Class Counsel, in consultation with Epiq, determine that an additional distribution is not cost-effective as provided in subparagraph (e) above, and after payment of any unpaid fees or expenses incurred in connection with administering the Net Settlement Fund and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, such Claimants, at the discretion of Class Counsel and to the extent possible, may be paid the

23

distribution amounts or additional distribution amounts on a *pro rata* basis that would bring them into parity with other Authorized Claimants who have cashed all their prior distribution checks.

(g)    Unless otherwise ordered by the Court, Epiq may destroy the paper copies of the Claims and all supporting documentation one (1) year after the Initial Distribution, and one (1) year after all funds have been distributed may destroy the electronic copies of the same.

## CONCLUSION

40.    Epiq respectfully requests that the Court enter the Class Distribution Order approving its administrative determinations accepting and rejecting the Claims submitted herein and approving the proposed Distribution Plan. Epiq further respectfully submits that its unpaid fees and expenses and its fees and expenses expected to be incurred in connection with the Initial Distribution, as reflected on the invoices attached hereto as Exhibit H, should be approved for payment from the Settlement Fund.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on March 6, 2023                    _____

Alexander P. Villanova